No. 14-17351 consolidated cases 14-17350, 14-17352, and 14-17374

THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

QUATERRA ALASKA, INC., ARIZONA UTAH LOCAL ECONOMIC
COALITION, ON BEHALF OF MEMBER THE BOARD OF SUPERVISORS,
MOHAVE COUNTY, ARIZONA;

Appellants;
v.

S.R.M. JEWELL, SECRETARY OF THE INTERIOR; *et al.*

Respondents;

and

GRAND CANYON TRUST, *et al.*

Respondent-Intervenors.

—————————————

On Appeal from the United States District Court For the District of Arizona,
The Honorable David G. Campbell Presiding
D.C. Nos. 3:11-cv-08171-DGC;  3:12-cv-08038-DGC;
3:12-cv-08042-DGC; 3:12-cv-08075-DGC

—————————————

**APPELLANTS' OPENING BRIEF**

—————————————

**ORAL ARGUMENT REQUESTED**

Filed: April 10, 2015          C. E. BROOKS & ASSOCIATES P.C.
Constance E. Brooks connie@cebrooks.com
Danielle Hagen assoc2@cebrooks.com
Cody Doig assoc@cebrooks.com
303 East 17th Avenue, Ste. 650
Denver, CO 80203 (303) 297-9100
*Counsel for Plaintiffs-Appellants*

*Petitioners' Corporate Disclosure Statement* Fed. R. App. P. 26.1(a)

Quaterra Alaska Inc. is a wholly owned subsidiary of Quaterra Resources Inc., which is a public corporation listed on the Toronto Stock Exchange. Quaterra transferred its interests in state land leases and mining claims to Metamin Enterprises USA, Inc., which is a public corporation listed on the Toronto Exchange.

The Arizona Utah Local Economic Coalition is a group of local governments that are not publicly traded corporations under Rule 26.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

Petitioners' Corporate Disclosure Statement Fed. R. App. P. 26.1(a)

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW. . . . . . . . . 2

I.   STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . 3

   A.   Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      1.   *Northern Arizona Withdrawal Decision.* . . . . . . . . . 5

      2.   *Coordination with Local Governments.* . . . . . . . . . 11

      3.   *Effects of Uranium Mining on Water Resources.* . . 14

      4.   *Impacts to Cultural and American Indian Resources* 17

   B.   Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . 21

   C.   Opinion of the District Court. . . . . . . . . . . . . . . . . . . 25

SUMMARY OF LEGAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . 29

LEGAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

I.   NAW VIOLATED FLPMA's CRITERIA FOR A WITHDRAWAL . 32

   A.   Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . 32

B.   FLPMA Defines Criteria for a Withdrawal. . . . . . . . . .  33

C.   The ROD Fails to Determine That Existing Law Was
     Insufficient to Protect the Resources. . . . . . . . . . . . . .  36

     1.   *The FEIS Makes Determination of Sufficiency.* . . .  36

     2.   *Record Does Not Support Finding of Potentially
          Significant Harm Because DOI Must Assume
          Compliance with Laws and Rules.* . . . . . . . . . . . .  37

D.   Withdrawal Not Kept to a Minimum and Exceeded Grand
     Canyon Watershed. . . . . . . . . . . . . . . . . . . . . . . . . .  39

     1.   *Resources to be Protected Are "in the Grand Canyon
          Watershed.* . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

     2.   *More Than One-Third of the North Parcel is Outside the
          Grand Canyon Watershed.* . . . . . . . . . . . . . . . . .  39

     3.   *Identified Resources Tied At All Times to Grand Canyon
          Watershed.* . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

     4.   *Definition of Watershed Limited to Hydrology* . . . .  44

II.   FLPMA DOES NOT AUTHORIZE WITHDRAWALS BASED ON
      THE BELIEF THAT MINING WOUNDS THE EARTH. . . . . . .  47

A.   Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . .  47

B.   Closing One Million Acres to Mining Based on Belief That
     It Will Desecrate Aboriginal or Traditional Lands
     Contradicts Precedent Declining to Recognize Such a Broad
     Right of Protection. . . . . . . . . . . . . . . . . . . . . . . . . . .  47

III.   UNAVAILABLE INFORMATION REGARDING MINING IMPACTS
       ON SURFACE AND GROUNDWATER IS ESSENTIAL SINCE

PURPOSE OF WITHDRAWAL WAS TO PROTECT WATER FROM
EFFECTS OF MINING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . 53

B.    Conclusion that Effects of Mining on Water Resources Were
      Not Essential Unsupported. . . . . . . . . . . . . . . . . . . . . 54

IV.   DOI FAILED TO COORDINATE WITH THE COUNTIES AND
      DISCUSS/RESOLVE INCONSISTENCIES WITH LOCAL LAND
      USE PLANS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . 64

B.    NEPA and FLPMA Mandate Coordination. . . . . . . . . . 65

C.    Coordination Mandates in Both FLPMA and NEPA. . . 66

D.    DOI Marginalized Local Government Participation. . . 69

E.    Counties Not Allowed to Fully Participate as
      Cooperators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

STATEMENT OF RELATED CASES. . . . . . . . . . . . . . . . . . . . 78

ORAL ARGUMENT REQUESTED. . . . . . . . . . . . . . . . . . . . . . 79

Certificate of Compliance with 32(a)(7)(b). . . . . . . . . . . . . . . . 80

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . 81

# TABLE OF AUTHORITIES

**CASES**                                                        **PAGE**

*Am. Motorcyclist Ass'n v. Watt,* 534 F. Supp. 923

  (C.D. Cal. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Barnes v. U.S. Dep't of Transp.,* 655 F.3d 1124 (9th Cir. 2011). . . 53

*Conservation Cong. v. U.S. Forest Serv.,* 720 F.3d 1048. . . . . . . . . 28

*Desert Protective Council v. U.S. Dep't of the Interior,*

  927 F. Supp. 2d 949 (S.D. Cal. 2013). . . . . . . . . . . . . . . . . . . . 56

*Havasupai Tribe v. Robertson,* 943 F.2d 32 (9th Cir. 1991). . . 47, 50

*Havasupai Tribe v. United States,* 752 F. Supp. 1471

  (D. Ariz. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 51

*Hymas v. United States,* 117 Fed. Cl. 466 (2014). . . . . . . . . . . . . . 35

*Int'l Snowmobile Mfrs. Ass'n v. Norton,* 340 F. Supp. 2d 1249. . . . 73

*Klamath Siskiyou Wildlands Ctr. v. Boody,* 468 F.3d 549. . . . . . . . 32

*League of Wilderness Defenders/Blue Mountains Biodiversity Project*

  *v. Ferguson,* 163 F. Supp. 2d 1222 (D. Or. 2001),

  rev'd on other grounds, 309 F.3d 1181 (9th Cir. 2002). . . . . . . 26

-iv-

## TABLE OF AUTHORITIES (cont'd.)

*Montana Wilderness Ass'n v. McAllister,* 666 F.3d 549

    (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*N. Alaska Envtl. Ctr. v. Kempthorne,* 457 F.3d 969

    (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*NLRB v. Brown,* 380 U.S. 278 (1965). . . . . . . . . . . . . . . . . . . . 33, 78

*Nat'l Wildlife Fed'n v. Burford,* 835 F.2d 305 (D.C. Cir. 1987)

    rev'd on other grounds *Lujan v. Nat'l. Wildlife Fed'n.,*

    497 U.S. 871 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 70

*Natural Res. Def. Council v. U.S. Forest Serv.,* 421 F.3d 797

    (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Navajo Nation v. U.S. Forest Serv.,* 535 F.3d 1058

    (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 51

*Norton Const. Co. v. U.S. Army Corps of Eng'rs,* 2007 WL 1431907

    (N.D. Ohio 2007), aff'd, 280 F. App'x 490 (6th Cir. 2008). . . . . . 45

*Ocean Advocates v. U.S. Army Corps of Eng'rs,* 402 F.3d 846

    (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Oceana v. Bureau of Ocean Energy Mgmt.,* 37 F. Supp. 3d

    (D. D.C. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

**TABLE OF AUTHORITIES** (cont'd.)

*Point Hope v. Jewell,* 740 F.3d 489 (9th Cir. 2014). . . . . . . . *passim*

*Quechan Tribe of Ft. Yuma Indian Reservation v. U.S. Dep't of the Interior,* 927 F. Supp. 2d 921 (S.D. Cal. 2013). . . . . . . . . . . 26, 75

*Quechan Tribe of the Fort Yuma Indian Reservation v. U.S. Dep't of Interior,* 755 F. Supp. 2d 1104 (S. D. Cal. 2010). . . . . . . . . . . 73

*South Fork Band Council of Western Shoshone Ind. of Nev. v.*

*U.S. Dep't of the Interior,* 588 F.3d 718 (9th Cir. 2009). . . . . . . . 52

*Zeinali v. Raytheon Co.,* 636 F.3d 544 (9th Cir. 2011). . . . . . . . . . . 1

**FEDERAL STATUTES**                                  **PAGE**

5 U.S.C. §§701-706. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5 U.S.C. §706(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

16 U.S.C. §469. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

16 U.S.C. §469a-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

16 U.S.C. §470a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

16 U.S.C. §470f. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

16 U.S.C. §§470aa-470mm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

25 U.S.C. §3002(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## TABLE OF AUTHORITIES (cont'd.)

28 U.S.C. §1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. §1996. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

42 U.S.C. §4331(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

42 U.S.C. §4332(2)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 78

43 U.S.C. §1701(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

43 U.S.C. §1701(a)(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

43 U.S.C. §1702(j). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 34, 39

43 U.S.C. §1712. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

43 U.S.C. §1712(c)(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

43 U.S.C. §1712(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 69

43 U.S.C. §1712(e)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 72

43 U.S.C. §1714. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

43 U.S.C. §1714(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

43 U.S.C. §1714(c)(2)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

43 U.S.C. §1714(c)(2)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

43 U.S.C. §1714(c)(2)(2)(7). . . . . . . . . . . . . . . . . . . . . . . . . . . 68, 78

43 U.S.C. §1714(c)(2)(2)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

## <u>TABLE OF AUTHORITIES</u> (cont'd.)

43 U.S.C. §1714(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

43 U.S.C. §1739(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

**FEDERAL RULES OF APPELLATE PROCEDURE**             **PAGE**

Fed. R. App. Proc. 4(a)(1)(A). . . . . . . . . . . . . . . . . . . . . . . <u>3</u>

Fed. R. App. Proc. 4(a)(1)(B). . . . . . . . . . . . . . . . . . . . . . . <u>3</u>

Fed. R. App. P. 26.1(a). . . . . . . . . . . . . . . . . . . . . . . . 1, 7

Fed. R. App. P. 32(a)(7)(c). . . . . . . . . . . . . . . . . . . . . 7, 81

Fed. R. App. P. 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

**REGULATIONS**                                              **PAGE**

40 C.F.R. §1500.1(b), . . . . . . . . . . . . . . . . . . . . . . . . 7, 56

 40 C.F.R. §1502.16(c). . . . . . . . . . . . . . . . . . . . . 7, 68, 78

40 C.F.R. §1502.22. . . . . . . . . . . . . . . . . . . . . . . . *passim*

40 C.F.R. §1502.22(b). . . . . . . . . . . . . . . . . . . . . . *passim*

40 C.F.R. §1502.24. . . . . . . . . . . . . . . . . . . . . . . . . 7, 56

40 C.F.R. §1506.2. . . . . . . . . . . . . . . . . . . . . . . . . . . 67

40 C.F.R. §1506.2(b). . . . . . . . . . . . . . . . . . . . . . 7, 67, 68

**TABLE OF AUTHORITIES** (cont'd.)

40 C.F.R. §1506.2(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 68, 78

43 C.F.R. §1610.3-1(a)(4). . . . . . . . . . . . . . . . . . . . . . . . 7, 68, 78

43 C.F.R. §2300.0-1(a). . . . . . . . . . . . . . . . . . . . . . . . . . 7, 28, 34

43 C.F.R. §2310.3-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 28

**FEDERAL REGISTER NOTICES**                                      **PAGE**

73 Fed. Reg. 74039 (Dec. 4, 2008). . . . . . . . . . . . . . . . . . . . . . 5

74 Fed. Reg. 35,887-88 (July 21, 2009). . . . . . . . . . . . . . . . . . . 5

76 Fed. Reg. 37,826 (Public Land Order 7773) (June 28, 2011).  6, 8

76 Fed. Reg. 66,925 (Oct. 28, 2011). . . . . . . . . . . . . . . . . . . . . . 8

76 Fed. Reg. 9,594 (Feb. 18, 2011). . . . . . . . . . . . . . . . . . 6, 7, 8

77 Fed. Reg. 2564 (Public Land Order 7787) (Jan. 13, 2012). . 8, 42

**DEPARTMENT OF THE INTERIOR DIRECTION**

011 DM 1.1 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35
011 DM § 1.2(B) (2001). . . . . . . . . . . . . . . . . . . . . . . . . . .  35
603 DM 1.1(A) (Aug. 1, 2005). . . . . . . . . . . . . . . . . . . . . . .  35
603 DM 1.1(A)(3) (Aug. 1, 2005). . . . . . . . . . . . . . . . . . . . .  35
BLM H-1601-1, Land Use Planning Handbook (Mar. 11, 2005). .  45

**TABLE OF AUTHORITIES** (cont'd.)

**OTHER AUTHORITIES**

EPA, Handbook for Developing Watershed Plans to Restore and
Protect Our Waters (Mar. 2008). . . . . . . . . . . . . . . . . . . . . . . . . .  45

The Appellants Quaterra Resources and the Arizona Utah Local Economic Coalition, on behalf of member Mohave County, Arizona (hereafter Quaterra or the Coalition) file this Opening Brief in support of the appeal of the District Court for the District of Arizona's decision on September 28, 2014.

## STATEMENT OF JURISDICTION

Subject matter jurisdiction exists because the claims arise under federal law, 28 U.S.C. §1331, and the Administrative Procedure Act (APA), 5 U.S.C. §§701-706, grants a right to judicial review of a federal agency decision. This Court has jurisdiction pursuant to 28 U.S.C. §1291. The District Court denied Quaterra and the Coalition's Motion for Summary Judgment and granted the Respondents' Department of the Interior (DOI) Motion for Summary Judgment and dismissed Quaterra and the Coalition's Complaint on September 30, 2014. Excerpt of Record (ER) 27 (ECF 238). The Order is an appealable final decision. *Zeinali v. Raytheon Co.*, 636 F.3d 544, 547 (9th Cir. 2011). Quaterra and the Coalition filed a timely Notice of Appeal on November 26, 2014. Fed. R. App. Proc. 4(a)(1)(A), 4(a)(1)(B). ER27 (ECF 241).

~ 2 ~

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

(1) Whether the District Court erred as a matter of law in affirming the withdrawal when (a) there was no determination that existing law and rules were insufficient to protect all of the resources; (b) DOI failed to minimize the withdrawal by including 200,000 acres in the North Parcel which is not part of the Grand Canyon watershed and the terms of the withdrawal applied to resources in this watershed; and (c) the risk of environmental degradation to the Grand Canyon watershed was determined to be low and any finding that there was a risk of significant harm was negated by the finding that existing law and regulation protects the resources;

(2) Whether the District Court erred in finding that the withdrawal could be justified on the need to mitigate Indian resources, when existing law and rules protect historical, archeological, cultural, and sacred sites and traditional use areas and consistent precedent holds that the beliefs tied to aboriginal areas are not a valid basis to prohibit otherwise lawful uses of federal land.

~ 3 ~

(3)   Whether the District Court erred in finding that DOI complied with National Environmental Policy Act (NEPA) when it affirmed Interior's conclusion that the unavailable data showing a link between mining and water quality was not essential to justify a withdrawal to protect the Grand Canyon watershed; and

(4) Whether the District Court erred in finding that DOI complied with its legal obligations under NEPA and Federal Land Policy and Management Act (FLPMA) by granting cooperating agency status to Coalition members, even though they were excluded from most meetings and DOI selectively read the plan to find consistency.

## I.   STATEMENT OF THE CASE

### A.   Statement of Facts

Quaterra Resources located unpatented mining claims in the Arizona Strip and holds seven mineral leases for school trust lands from the State of Arizona.  ER951 (¶7).  Quaterra invested more than $12 million on the acquisition, exploration, and development work. The NAW imposes costly and lengthy validity examinations before any additional work can occur.  ER953 (¶¶12-14).

~ 4 ~

Mohave County, Arizona, encompasses about 8,626,560 acres, where most of the North Parcel of the NAW is located. ER920 (¶¶5-6). Mohave County, along with the Utah Counties of Garfield, Kane, San Juan, and Washington and the City of Fredonia created the Arizona Utah Local Economic Coalition (Coalition) to coordinate efforts to oppose or modify the proposed NAW. ER919 (¶3). The purpose of the Coalition was "to protect the counties from the serious economic, environmental, and social impacts of the [NAW]". *Id.* The counties became cooperating agencies in February 2010 due to their jurisdictional authority to protect the environmental resources and their special expertise on the resources in their region. ER922-ER923 (¶14), ER474, ER485, ER495, ER505, ER515. The Coalition members opposed the NAW due to the economic impacts. Mohave County demonstrated that the economic loss reduced planned road improvements that would improve air quality and fund desert tortoise habitat protection. *See* ER925-ER929 (¶¶27, 30, 33, 36-37); ER935-ER943 (¶¶5, 7-9, 15-17, 20-26).

~ 5 ~

### 1.    *Northern Arizona Withdrawal Decision*

In 2008, Congressman Raul Grijalva introduced a bill to permanently withdraw from location, entry, leasing, and material sales and deposits under the Mining Law about a million acres of federal lands, which correlated with the uranium mining claims filed in northern Arizona as of 2008.    ER111.    The House Resources Committee adopted a resolution directing the Interior Secretary to withdraw the public lands.  73 Fed. Reg. 74039 (Dec. 5, 2008).  The Secretary proceeded to amend the withdrawal regulations to conform to federal court decisions that the congressional committee authority in Section 204(e), 43 U.S.C. §1714(e), to direct the Interior Secretary to withdraw land was unconstitutional.  *Id.* 74040-41.

In 2009, the DOI published its notice of intent to withdraw 633,547 acres of public lands and 360,002 acres of National Forest System land in Northern Arizona.  74 Fed. Reg. 35,887-88 (July 21, 2009).  The withdrawal's purpose was "to protect the Grand Canyon watershed from adverse effects of locatable hardrock mineral exploration and mining."  *Id.* at 35,887.  The notice segregated the

~ 6 ~

lands from location and entry for two years to allow time for NEPA analysis and other studies. *Id*. DOI adopted the boundaries of Congressman Grijalva's bill for the withdrawal with minor changes to exclude state or private lands. ER111-ER113, ER128.

Public comment on the Draft Environmental Impact Statement (DEIS) opened on February 18, 2011. 76 Fed. Reg. 9,594 (Feb. 18, 2011). The DEIS stated that the purpose of the NAW was "to protect the natural, cultural, and social resources in the Grand Canyon watershed from the possible adverse effects of the reasonably foreseeable locatable mineral exploration and development that could occur in the segregated area." ER303. The resources in the Grand Canyon watershed to be protected were "[s]urface water and groundwater, including seeps, springs, wells, and runoff, that may ultimately flow into the Colorado River;" "[c]ultural resources, including prehistoric and historic sites, places of traditional religious and cultural importance (including Traditional Cultural Properties [TCPs]) and other places of significance to American Indians;" "[v]egetation, wildlife, and aquatic species and their habitat that are

~ 7 ~

unique to the Grand Canyon watershed;" and "[v]isual resources, including night skies, scenic overlooks, and other designated scenic areas." *Id.* at ER303-ER304.

The DEIS considered four alternatives, including the no action alternative, the proposed action to withdraw over one million acres of land for 20 years, and two smaller withdrawals of 652,986 acres and 300,681 acres of land for 20 years, respectively. *Id.* at ER305-ER323. The NAW consists of three parcels, the North, East, and South Parcels located around the Grand Canyon National Park. ER86. The DEIS did not identify a preferred alternative. ER324.

DOI received more than 296,461 comments on the DEIS but 99.6 percent were form letters generated by environmental organizations supporting the withdrawal. ER298. The State of Arizona and individual state agencies opposed the withdrawal, ER330, ER362, ER332, ER344, ER350, ER357, as did the state legislature, ER359, and local governments, ER366, ER368, ER373, ER525, ER597. Coconino County initially supported the NAW but by 2011 recommended excluding lands west of Kanab Creek in Mohave

~ 8 ~

County. ER377-ER378. The Arizona Resource Advisory Council, established under FLPMA to advise BLM on resource issues, also opposed the withdrawal. ER469.

Because the NEPA process would not be completed within the two-year segregation window, the Secretary issued a six-month emergency withdrawal. 76 Fed. Reg. 37,826 (June 28, 2011), Public Land Order No. 7773. Contemporaneously, the Secretary announced his decision to withdraw the full one million acres for 20 years. ER471. The FEIS published in October of 2011, 76 Fed. Reg. 66,925 (Oct. 28, 2011), did not change the original purpose to protect resources in the Grand Canyon watershed, ER113, and confirmed the previously announced preferred alternative to withdraw about one million acres of land for 20 years. ER107.

On January 9, 2012, the Secretary signed the Record of Decision (ROD) ER83, and the public land order withdrawing 1,006,545 acres from mining. 77 Fed. Reg. 2563 (Jan. 18, 2012), Public Land Order No. 7787. This included 549,995 acres in the North Parcel, 322,096 acres in the South Parcel, and 134,454 acres in the East Parcel.

~ 9 ~

ER83, ER86, ER90. The ROD stated that the NAW was "to protect the Grand Canyon Watershed from adverse effects of locatable mineral exploration and development." ER84. The ROD also set out the rationale for the withdrawal: (1) uncertain effects to surface and groundwater, and risk of significant harm; (2) potential impacts to tribal resources which could not be entirely mitigated; (3) mining would continue to benefit the communities due to potentially 11 mines proceeding under the withdrawal; and (4) the circumstances and unique resources in the area support a cautious and careful approach. ER91.

The ROD stated that the "likelihood of a serious impact [to water resources] may be low, but should such an event occur, significant." *Id.* The 20-year withdrawal would allow for the gathering of additional data and investigation of groundwater flow paths, travel times, and radionuclide contributions from uranium mining. *Id.* The ROD concluded that the unavailable information regarding the impacts of uranium mining was not essential to the decision, because data from

~ 10 ~

six former mine sites and the conservative assumptions as to the estimated impacts were sufficient.  ER92.

As an additional reason for the withdrawal, the ROD noted that the entire area is the traditional homeland and use area for seven tribes, who believe that uranium mining will result in the loss of their functional use of the land's natural resources and degrade the value of the land.  ER91, ER93.

Contradicting the finding that potentially 11 mines would proceed under the withdrawal, the ROD states that "neither the BLM nor the USFS will process a new notice or plan of operations until the surface managing agency conducts a mineral examination and determines that the mining claims on which the surface disturbance would occur were valid as of the date the lands were segregated or withdrawn."  ER88.  A valid mining claim is limited to those claims where there is a physical exposure of the mineral deposit, which demonstrates a discovery of valuable minerals of sufficient quality and quantity that a reasonable man would invest his own funds to develop the property.  ER89.

~ 11 ~

2. *Coordination with Local Governments*

Coalition members, Mohave County in Arizona and Kane, San Juan, Garfield, and Washington Counties in Utah were granted cooperating agency status. ER473, ER485, ER505, ER495, ER515. The cooperating agency MOUs granted Coalition members broad authority for natural resources, environmental, economic, and social issues, including coordination on county plans and development of alternatives. ER477, ER487, ER497, ER507, ER517. The Coalition members were excluded, however, from the alternative development meetings (ER556; ER558; ER565) and from participating in identifying a preferred alternative (ER589; ER471) (announcing the preferred alternative without communicating with cooperating agencies). The EIS alternatives were only discussed with the Coalition members after the federal agencies had defined them.

Mohave and Kane County passed resolutions in 2008 and 2009 opposing the withdrawal (ER385, ER126-ER127), and the Coalition passed a similar resolution in 2011 (ER127). The Coalition submitted comments to the DOI Secretary that focused on the importance of

~ 12 ~

uranium mining to the local governments' economies and the value of

the uranium located in the proposed withdrawal area. ER525, ER697.

*See* ER703-ER713. Mohave County submitted comments on the DEIS

stating its opposition to the NAW because of the economic impact it

would have on each of the Counties and the State of Arizona, and

because the scientific documentation clearly demonstrated that

uranium mining does not threaten the Grand Canyon watershed.

ER366. San Juan, Washington, and Kane Counties' comments on the

DEIS and FEIS also noted the economic impact the withdrawal would

have on the County, stated that there was no scientific basis for

supporting the withdrawal, and requested the DOI to consider their

Land Use Plans in the FEIS. ER368, ER373, ER694. The Coalition

member comments echoed those of Arizona and the state agencies.

*Supra* at 6. The Acting Deputy Assistant Secretary toured the Arizona

Strip in May 2011 and met with the tribes and mining companies but

did not meet with Coalition members. *E.g.* ER586-587.

Based on the Counties' comments, DOI contracted for a new

economic impact analysis and allowed the local governments to

~ 13 ~

comment on the new analysis. ER588-ER591. The Counties again identified the shortcomings of the economic analysis. ER594-ER603. The revised economic analysis considerably reduced the estimated economic impacts to the State and local governments. ER604-605, ER653-686, ER283.

The FEIS did not address inconsistencies with the Utah Counties' General Plans because the latter were outside the withdrawal area. ER127. The Coalition and its members requested that DOI discuss and attempt to resolve the inconsistencies with their local land use plans. ER943 (¶28), ER368-ER369, ER597, ER698-ER699. The FEIS recognized that the proposed withdrawal was inconsistent with the Counties' Resolutions, ER126-ER127, but found consistency with a single reference to protecting sensitive land, (*Id.*), while omitting provisions which called for economic development and improved revenues to fund transportation. ER533, ER543-ER555. The FEIS admitted that any uranium mined would be trucked to mills in Utah and, thus, the withdrawal had a direct impact on Utah communities and jobs. ER177, ER290, ER296.

~ 14 ~

3.  *Effects of Uranium Mining on Water Resources*

Redwall Muav Aquifer (R-aquifer)

The FEIS concluded that "deep drilling operations are projected to represent no impact or a negligible impact to R-aquifer water quality," and negligible impact to water quantity.  ER232-ER233, ER238, ER246-ER254.  Even if mine drainage were to occur from a breccia pipe uranium mine within the R-aquifer capture zone, "although it is unlikely, if the mine drainage were to reach the R-aquifer and not be mitigated, it would be possible for the mine drainage to eventually become part of the groundwater yielded to the Tusayan wells at a highly diluted concentration."  ER238.  The FEIS further concludes that "AAC Title 12, Chapter 15, Article 8 requires proper construction and abandonment of wells to prevent cross-contamination of different aquifers."  ER229-ER230.  This regulation protects both R-aquifers and perched aquifers.

The FEIS also concludes that the R-aquifer groundwater in the western, northwestern, and northeastern margins of the North Parcel are likely to flow north towards areas in south and central Utah.

~ 15 ~

ER140, ER221. Any contribution of flow from the North Parcel attributable to potential drainage from breccia pipe uranium mines would be zero. ER233.

> Additional factors that would likely diminish metal concentrations in any mine drainage include the large distance from the North Parcel and the long residence time of the solution in the aquifer, the geochemical characteristics of the groundwater system, which tend to remove metals from groundwater, and the ample opportunities for further dilution along the long and complex flow path that groundwater would need to traverse to reach the Virgin River. Therefore, even if there is a contribution to the Virgin River from the R-aquifer beneath the North Parcel, the potential impact on water quality attributable to drainage from North Parcel breccia pipe uranium mines would be negligible and not measurable.

ER251. The FEIS then concludes "As described in a preceding part of Section 4.4.1 on perched aquifer wells, it is assumed that the state and federal regulations for drilling exploration wells and water wells have been and are being met; therefore, deep drilling operations are projected to represent no impact or negligible impact to R-aquifer water quality." ER238.

~ 16 ~

Perched Aquifers

The ROD refers to a 13.3 percent probability of impacts to perched aquifers and states this risk is unacceptable. ER92. The FEIS does not support this finding.

The FEIS described "[p]erched aquifer zones in the proposed withdrawal area are characterized as being commonly small, thin, discontinuous and generally dependent on annual recharge to sustain yield to springs and wells." ER141, ER222. Most perched aquifers are not connected to a spring, are highly mineralized, and of poor quality. ER141, ER690-ER691. Water assessed at the six mine sites was within background limits and only one aquifer was connected to a spring. ER136-ER137. The FEIS further stated:

> For the purposes of this EIS, it is assumed that mines comply with all applicable state and federal regulations. Therefore, because the regulations are protective of groundwater, deep drilling operations that occurred after the regulations were adopted on March 5, 1984 (ADWR 2008), are considered to represent no impact or negligible impact to the quantity and quality of perched groundwater available to perched aquifer springs or wells. Duration of the negligible impact would likely range from temporary to short term (see Table 4.4-2).

~ 17 ~

ER230.  *See also* ER243.

These FEIS conclusions are consistent with Karen Wenrich's report on water movement within perched aquifers to the R-aquifer. *See* ER818 (The breccia pipes are well sealed and act like a membrane, not allowing water to flow into the surrounding rock.).

The FEIS states that there is a 13.3 percent probability of impact to the perched aquifers, which may be major since there is less dilution for a spring.  ER242-ER243.  But the FEIS conclusion that the state regulatory system will protect perched aquifers contradicts the conclusion in the ROD that impacts to the perched aquifers is unacceptable.  The ROD's conclusion can be true if federal and state law is not followed, while the FEIS assumes the law will be.  *Supra* 18.

4.   *Impacts to Cultural and American Indian Resources*

The American Indian Tribes in northern Arizona include the Southern Paiute, Havasupai, Hualapai, Navajo, Hopi, and the Zuni. ER168-ER170. The FEIS defines cultural resources as including archaeological sites, historic buildings and structures, and places of traditional religious and cultural importance.  ER159, ER267.  The

~ 18 ~

FEIS concluded that the potential impacts of mining on cultural, historical, and archaeological resources were negligible due to existing laws and regulations that require avoidance or mitigation of any impacts. ER268-ER269, ER271. Areas that are proposed for mine development would undergo intensive archaeological surveys to identify and evaluate cultural resources in the area, and efforts would be made to "identify, avoid, mitigate, or otherwise resolve any adverse effects." ER269.

The FEIS discusses American Indian resources separately as places that are important to Indian culture and tradition. ER167. The FEIS adopted a new term "cultural landscapes or "ethnographic landscapes," which is "taken from scholarly literature and is used in the EIS exclusively in this sense. These terms are not intended to imply any kind of landscape level protection." ER171, ER687 (anticipating years of litigation over use of the term). These terms include individual landforms or large geographic features, tribal homelands, places of traditional importance, trails, springs,

~ 19 ~

waterways, sacred sites, or places where people come to hunt game or gather plant resources.  ER166, ER274.

The FEIS and ROD conclude that impacts to the belief that mining wounds the earth and degrades the value of tribal lands cannot be fully mitigated.  The FEIS explains "any drilling or excavation into the earth is considered wounding the earth."  ER277. Any "disturbance of traditional cultural and sacred places over time and space can result in the loss of function and sacredness of these places."  ER279.

The ROD states that "[a]ny mining within the sacred and traditional places of tribal peoples may degrade the values of those lands to the tribes that use them."  ER91.  The ROD also states seven tribes "uniformly believe that continued uranium mining will result in the loss of their functional use of the area's natural resources."  ER93. The FEIS found that sacred and traditional use places are protected from mining under federal law.  ER166, ER275-ER276.

The State of Arizona questioned the legality of using "wounding the earth" as criteria for a withdrawal.  Arizona Geological Survey

~ 20 ~

Director, M.M. Singh, wrote: "if there was a known 'sacred site' the federal agency would not grant a permit to mine there" and "[i]f perception of adverse effects is as important as physical impact, this becomes a no-win situation." ER692. He further stated that "wounding the earth" does not "square with wells that they drill for water" or the coal mining that is occurring in the Black Mesa with many American Indians employed there. *Id.*

In regards to the North Parcel, the BLM recognized that the western and northeastern portions had "very few, if any, resource values or concerns." ER715, ER721. The Southern Paiute tribe identified cultural resources around Kanab Creek, which is wilderness or an area of critical environmental concern (ACEC). ER578 ("The sensitive areas in the north parcel are due to the importance of the area as cultural landscape for the Paiute Tribe ethnographic sensitivity archaeological sites and three ACECs that were designated due to cultural resources Kanab Creek ACEC, Johnson Springs ACEC, and Moonshine Ridge ACEC"); ER158. The 2008 Arizona Strip Resource Management Plan established or expanded the ACECs to

~ 21 ~

protect cultural and tribal use areas identified by the tribes.  ER908-ER909, ER912-ER915.

### B.    Procedural History

On April 17, 2012, Quaterra and Mohave County filed a Complaint for Declarative and Injunctive Relief against Ken Salazar in his official capacity as the Secretary of DOI, the DOI, Robert V. Abbey, Director of the BLM, and BLM.  ER29 (ECF 1). The complaint raised six claims under FLPMA and NEPA: (1) the withdrawal violates FLPMA because the stated reasons are not supported by the government's own scientific and technical reports; (2) the justification of the withdrawal based on the impacts on American Indian resources is arbitrary because mere sensibilities that mining will wound the earth are not a legally recognized basis to close federal land to mining; (3) the federal government failed to follow the mandatory procedures in preparing the FEIS including not addressing the material comments, not resolving scientific controversies, and not complying with the unavailable information procedures; and (4) violated NEPA and FLPMA by not fully coordinating with counties in resolving conflicts

~ 22 ~

between the land management decision and the county plans. Quaterra and Mohave County amended the Complaint on June 19, 2012, and substituted Plaintiff Mohave County with the Arizona Utah Local Economic Coalition (Coalition), of which Mohave County is a member. ER31 (ECF 30).

Three other lawsuits challenged the NAW on similar grounds and all were consolidated. ER6 (ECF 56). Gregory Yount (Case No. 3:11-cv-08171), National Mining Association (NMA) and Nuclear Energy Institute (NEI) (Case No. 3:12-cv-08038), and Northwest Mining Association (NWMA)[1] (Case No. 3:12-cv-08042).

The Grand Canyon Trust, Sierra Club, Center for Biological Diversity, National Parks Conservation Association, and Havasupai Tribe (collectively "GCT") were granted intervention in all cases. ER6 (ECF 56). Vane Minerals (Vane) also intervened as a Plaintiff in the NMA and NWMA matters. *Id.*

---

[1] NWMA name was changed to American Exploration & Mining Association (AEMA) on September 24, 2014, and will be referred to as AEMA throughout the remainder of the brief. ER27 (ECF 237).

~ 23 ~

DOI filed motions to dismiss all of the cases for lack of jurisdiction. ER6-ER7 (ECF 58, 62). On September 7, 2012, the DOI filed a Motion to Dismiss the First Amended Complaint of Quaterra and the Coalition for lack of subject-matter jurisdiction. *Id.* The DOI argued that Quaterra and the Coalition did not demonstrate Article III standing or APA standing and that their claims were not ripe for review.

The District Court granted the motions in part and denied them in part on January 8, 2013. ER9-ER10. The District Court denied the Motion to Dismiss as to all FLPMA claims finding that Quaterra and the Coalition had alleged a sufficient injury for Article III standing.[2] *Id.* The District Court then granted the Motion to Dismiss as to Quaterra's NEPA claims on the basis that its interests were

---

[2] The District Court also found that Yount, NMA, NEI, AEMA, and Vane asserted a sufficient injury for Article III standing under FLPMA by claiming that their members' mining claims would be subject to expensive and lengthy examination processes, the mining claims would lose value due to complications in location and development, and the withdrawal prevents their members from locating new claims. ER9-10 (ECF 87). Vane's Complaint was dismissed by the District Court due to the party filing a Notice of Party Dismissal on December 26, 2012. *Id.*

~ 24 ~

essentially economic but denied the motion as to the Coalition's NEPA claims. *Id.* The court held that the Coalition's economic injuries were specifically tied to an environmental interest of protecting air quality and the desert tortoise habitat.[3] *Id.*

DOI filed the Administrative Record on February 11, 2013 (ER11 (ECF 98)), and filed Answers to all of the Plaintiffs' Complaints on February 22, 2013. ER12-ER13 (ECF 106, 107, 108, 111). DOI continued to supplement the Administrative Record. ER15, ER18 (ECF 133, 161).

Pursuant to a case management order, the parties filed motions and cross motions for summary judgment. ER19, ER22 (ECF 167, 170, 173, 198). The District Court heard oral arguments on the pending Motions for Summary Judgment on September 9, 2014

---

[3] The District Court dismissed all claims under NEPA brought by Yount, AEMA, and Vane, but found APA standing for NEI and NMA. ER9-10 (ECF 87). NEI and NMA asserted that the NAW injured their intertwined economic and environmental interests in minimizing the environmental footprint of mining operations, where alternative operations outside the NAW would generate increased physical disturbance and costs. *Id.*

~ 25 ~

(ER27 (ECF 235)), and issued its order granting DOI's Cross-Motion

for Summary Judgment and denying Quaterra and the Coalition's

Motion for Summary Judgment on September 30, 2014.  ER27 (ECF

238).  The District Court also denied the other Plaintiffs' Motions for

Summary Judgment and granted the DOI's Cross-Motion for

Summary Judgment in their respective cases.  *Id.*

## C.  Opinion of the District Court

The District Court held that the Coalition, on behalf of member

Mohave County, had standing to pursue its NEPA claims because it

had established that the NAW would reduce the County's funds used

to pave its roads to improve air quality and protect desert tortoise

habitat pursuant to its Land Use Plan.  ER50-51.  This environmental

injury falls within NEPA's zone of interest.[4]  The District Court denied

Summary Judgment as to the Coalition's NEPA coordination claims.

The Court found that the Coalition's members had an opportunity to

participate during the NEPA process as cooperating agencies,

attended public meetings, participated in five cooperating agency

---

[4]  The Coalition reserves the standing issues for the Reply.

~ 26 ~

meetings, and were involved in three meeting or hearings where the BLM met with the Coalition specifically. ER54-ER55. DOI further considered Mohave County's resolution opposing the withdrawal but determined that the NAW was not inconsistent with the County's Land Use Plan. *Id.* at ER55-56 (*citing Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 927 F. Supp. 2d 921, 946 (S.D. Cal. 2013)).

The District Court held that the FEIS complied with the unavailable information rule, 40 C.F.R. §1502.22, and that the DOI did not make unsupported assumptions during the NEPA decision-making process. ER57-ER65. The Court relied on the ROD's statement that there was incomplete information and that such information was not essential to informed decision-making. ER57-ER59 (*citing Point Hope v. Jewell*, 740 F.3d 489, 498 (9th Cir. 2014); *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Ferguson*, 163 F. Supp. 2d 1222, 1255 (D. Or. 2001), *rev'd on other grounds*, 309 F.3d 1181 (9th Cir. 2002)).

~ 27 ~

The Court found that the DOI's uranium endowment estimate was not arbitrary and capricious, because it was based on the best information available, was peer reviewed within the agency, and the Plaintiffs had the opportunity to comment on the methodology used. ER59-ER62. The Court also found that the DOI considered the available science on uranium impacts to water sources, solicited and considered comments from the public, and openly acknowledged the uncertainty in how the water resources might be impacted. ER62-ER64. Therefore, the decision to take precautions and approve the NAW due to the potential major risk to the water resources, notwithstanding the low probability of contamination, was not arbitrary and capricious. ER64. The Court also held that Quaterra and the Coalition's argument that portions of the withdrawal area were outside the Grand Canyon watershed failed to address the other reasons supporting the NAW. ER64 (n.55).

As to the FLPMA claims, the District Court held that a withdrawal decision was reviewable under the APA because FLPMA provides legal standards for withdrawals. ER66-ER67. FLPMA allows

~ 28 ~

withdrawals only "where appropriate" and the regulations set forth specific procedural requirements. ER67 (*citing* 43 U.S.C. §§1702(j), 1714(c)(2)(2); 43 C.F.R. §§2300.0-1(a), 2310.3-1). The Court further noted that the APA clearly provides a standard of review by which to review the agency's decision-making process. ER68 (*citing Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013)).

Although finding the FLPMA claims reviewable, the District Court denied Summary Judgment as to all of Quaterra and the Coalition's FLPMA claims. The Court specifically found that FLPMA does not require known mineral deposits to be exact, only that they be identified, so the DOI's use of the USGS Report that relied on 1999 data to estimate the uranium endowment did not violate FLPMA. ER71-ER72. The District Court also concluded that the DOI satisfied FLPMA's coordination requirements because it granted the Counties cooperating agency status, held public meetings and accepted comments, and discussed in the EIS the local government plans and the economic impacts of the NAW. ER72-ER73.

~ 29 ~

Finally, the District Court concluded that basing the NAW on the need to protect tribal resources did not violate FLPMA because the Act requires public lands to be managed in a manner that protects historical and archeological resources. ER79-ER80. The Court also noted that withdrawing the lands to protect tribal resources does not give the tribes a First Amendment veto right over mining. ER80.

The judgment was entered, and Quaterra and the Coalition's Complaint was dismissed. Quaterra and the Coalition filed its Notice of Appeal on November 26, 2014. ER27 (ECF 241).

## SUMMARY OF LEGAL ARGUMENT

1. The withdrawal violates the Interior Department criteria for a withdrawal under FLPMA. The ROD failed to determine that existing laws and regulations were insufficient to protect the resources and the FEIS concludes that existing law and regulation are sufficient to protect both surface and ground water. Both NEPA and FLPMA require the assumption that existing laws and rules will be followed.

2. The ROD's conclusion that the low risk of impact was balanced by possible significant harm is unsupported in the FEIS or underlying

~ 30 ~

documents. The withdrawal's premise that uranium mining might significantly harm the watershed of the Grand Canyon can only be true if there were no laws and regulations governing protection of water quality and quantity, reclamation and wildlife. Instead the FEIS concluded there was a very low risk of environmental degradation to surface waters or the groundwater in the aquifers and that existing law was sufficient to protect these resources.

3.    The NAW was not a minimum area since about 37% of the North Parcel drains either north or west into the Virgin River watershed. The purpose of the withdrawal tied the wildlife, vegetation, visual and cultural resources to the Grand Canyon watershed, not other watersheds or some larger area in northern Arizona.

4.    The justification for the NAW that it was not possible to fully mitigate impacts on Indian resources is based solely on the stated belief that mining would desecrate the traditional or aboriginal lands. The FEIS concluded the Indian cultural resources, including sacred and traditional use areas, and other historic, archeological, religious, and cultural sites, were protected under existing law. Extending

~ 31 ~

recognition to a belief that could apply to the entire State of Arizona or the entire Colorado River system conflicts with long-standing precedent limiting claims for protection of aboriginal areas.

5.    The premise that mining will harm surface and ground water in the Grand Canyon watershed instigated the withdrawal.  The ROD's conclusion that the unavailable information regarding the impact of mining on groundwater was not essential and thus additional analysis was not necessary does not comply with NEPA regulation, 40 C.F.R. §1502.22.  When faced with unavailable information NEPA requires the Secretary to further analyze the alternatives and how the lack of information changes that analysis.  The FEIS used data from six previously mined sites as a proxy but two mines were reclaimed before the Arizona water regulations and BLM reclamation rules were in effect.  Two mines are not reclaimed since they are on standby. Conservative assumptions are not a substitute for the analysis that should have occurred.

6.    FLPMA and NEPA require BLM to coordinate with local governments and to resolve inconsistencies with local government

~ 32 ~

plans.  The withdrawal is a land management decision that is subject

to this mandate.  The failure to consider modifying the withdrawal to

reconcile the conflicts with local government interests violates both

FLPMA and NEPA procedures.

## LEGAL ARGUMENT

### I.    NAW VIOLATED FLPMA's CRITERIA FOR A WITHDRAWAL

### A.    Standard of Review

An appellate court reviews *de novo* a district court's grant of

summary judgment upholding a federal agency decision.  *N. Alaska

Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006).  Claims

that an agency violated FLPMA are viewed under the discretionary

review standard of the APA.  *Klamath Siskiyou Wildlands Ctr. v. Boody*,

468 F.3d 549, 554 (9th Cir. 2006).

Pursuant to the APA, an agency decision will be set aside if it is

"arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. §706(2)(A).  A court's review "must not

'rubber-stamp' . . . administrative decisions that [it] deem[s]

inconsistent with a statutory mandate or that frustrate the

~ 33 ~

congressional policy underlying a statute." *Ocean Advocates v. U.S.
Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2004) (*quoting NLRB
v. Brown*, 380 U.S. 278, 291-92 (1965)).  A federal agency decision,
which misinterprets or relies on inaccurate or unsupported
information, is arbitrary and capricious.  *Natural Res. Def. Council v.
U.S. Forest Serv.*, 421 F.3d 797, 806-07 (9th Cir. 2005).

## B.     FLPMA Defines Criteria for a Withdrawal

FLPMA governs public land management including withdrawal
criteria and procedures to close public lands to mineral development.
43 U.S.C. §1714(a).  Adopted in 1976, FLPMA reaffirmed federal
ownership of public lands and dedicated them to multiple use and
sustainable yield management. 43 U.S.C. §§1701(a)(1), (7); 1702(c),
1732(a). BLM must manage public lands for six major or principal
multiple uses: (1) mineral development; (2) recreation; (3) livestock
grazing; (4) rights-of-way; (5) fish and wildlife; and (6) timber. *Id.* at
§1702(l).  Closing more than 100,000 acres to any one of the above
uses is a management decision that requires a plan amendment and
report to Congress.  *Id.* §1712(e).

~ 34 ~

FLPMA also defined and limited the Interior Secretary's authority to withdraw federal land from mineral development. Withdrawals must occur in accordance with the provisions of Section 204 and "where appropriate." 43 U.S.C. §1714(a); 43 C.F.R. §2300.0-1(a). FLPMA defines the term "withdrawal" as a withholding of federal land "for the purpose of limiting activities under those laws in order to maintain other public values in the area or serving the area for a particular public purpose or program." 43 U.S.C. §1702(j).

Section 204 authorizes a withdrawal accompanied by "an inventory and evaluation of the current natural resource uses and values of the site and adjacent public and nonpublic land and how it appears they will be affected by the proposed use, including particularly aspects of use that might cause degradation of the environment." 43 U.S.C. §1714(c)(2)(2). FLPMA limits the Secretary's authority to withdraw federal land to instances when the proposed use will cause environmental degradation or where existing and potential uses are incompatible with or conflict with the proposed use. 43 U.S.C. §§1714(c)(2)(1), (2) & (3). Therefore, the Secretary does not

~ 35 ~

have unlimited discretion to withdraw federal land and must support the decision with facts documenting the specific purpose and not to exceed 20 years.  The Interior's  Departmental Manual (DM) requires that "withdrawals shall be kept to a minimum," be supported by "a justification for the lands to be withdrawn," and include "an explanation of why existing law or regulation cannot protect or preserve the resource."  603 DM 1.1(A), 1.1(A)(3) (Aug. 1, 2005).[5]

---

[5]  Departmental Manuals are binding on Interior's bureaus and offices.  *Hymas v. United States*, 117 Fed. Cl. 466, 473 (2014).

> Through the Departmental Manual, the Secretary communicates instructions and guidance to all of Interior's components.  *See* 011 DM § 1.2 (2001).  The Departmental Manual "serve[s] as the primary source of information on organization structure, authority to function, and policy and general procedures."  011 DM §1.2 (2001).  In the absence of superseding authority, "[b]ureaus and offices must comply with the provisions of the [Departmental Manual]."  011 DM § 1.2(B) (2001).

*Id.*

~ 36 ~

## C.   The ROD Fails to Determine That Existing Law Was Insufficient to Protect the Resources

### 1.   *The FEIS Makes Determination of Sufficiency*

The ROD does not find that existing law is insufficient to protect surface and groundwater from pollution, soils, vegetation, and wildlife, and the FEIS finds, in fact, that existing regulations and state regulation are sufficient. ER230, ER238, ER241-ER243, ER258.  This is also true for cultural and archeological resources as well as traditional use areas and sacred sites.  The FEIS states:

> If sites are found during this inventory, disturbance to those sites must be mitigated.  Since avoidance is the primary mitigation measure for any project, it can be assumed that the total number of cultural resources that would need to be mitigated further through data recovery or other means for these projects is minimal and would not significantly change the historic or prehistoric character of the parcels; therefore, no cumulative impacts to cultural resources are anticipated under Alternative A.

ER271.

~ 37 ~

2. *Record Does Not Support Finding of Potentially Significant Harm Because DOI Must Assume Compliance with Laws and Rules*

The District Court held that the uncertainties, despite a low potential for major adverse effects, warranted the conservative approach that justified the NAW. ER64. The District Court erred because FLPMA does not authorize a conservative approach when closing public land to a primary multiple use. The FEIS also contradicts the ROD's finding that the harm could be significant. Instead the FEIS concludes that there would be negligible impacts to the R-aquifer (ER233, ER238) and to the perched aquifers (ER230). The ROD can make such a finding, only if it determined existing laws and rules were insufficient, a determination clearly contradicted in the FEIS.

The FEIS did not conclude that the potential harm to groundwater could be significant. Instead, the FEIS states that due to distance and dilution, even if water flowed from the mine down through fissures, it would not harm the R-aquifer. ER233, ER238, ER246, ER248. Similarly, the FEIS states that these waters are not

~ 38 ~

used for drinking water and thus issue of MCLs does not apply. ER235-ER236. The FEIS analysis of impact indicates that while perched aquifers might be intersected by drilling only one aquifer is linked to a spring and potential deposit. ER141, ER222, ER229, ER231.

Further, the federal cooperators when reviewing the FEIS studies recognized the lack of a factual basis to withdraw the North Parcel to protect the R-aquifer, because the numerous opportunities for dilution meant that mining would not have any adverse impacts on surface or groundwater. ER567, ER819. *See* ER233, ER251 (The FEIS recognizes that breccia pipe uranium mining in the North Parcel would have no impact on the chemical quality of groundwater in the regional R-aquifer.). The R-aquifer is covered by a thick, unsaturated, and practically impermeable layer of Supai Group Sandstone. ER300-ER301.

~ 39 ~

### D. Withdrawal Not Kept to a Minimum and Exceeded Grand Canyon Watershed

1. *Resources to be Protected Are "in the Grand Canyon Watershed"*

The DOI's stated purpose for the NAW "is to protect the natural, cultural, and social resources in the *Grand Canyon watershed* from the possible adverse effects of the reasonably foreseeable locatable mineral exploration and development that could occur in the proposed withdrawal area." ER303 (emphasis added), ER113 (emphasis added). The ROD also recognized that the decision to withdraw the public lands was "to protect the *Grand Canyon Watershed* from adverse effects of locatable mineral exploration and development." ER84 (emphasis added).

2. *More Than One-Third of the North Parcel is Outside the Grand Canyon Watershed*

DOI must provide a particular public purpose (43 U.S.C. §1702(j)) and a reasonable, well-informed rationale (*Natural Res. Def. Council*, 421 F.3d at 806-07) for including about 200,000 acres of land outside of the Grand Canyon watershed as part of the NAW. The

~ 40 ~

record does not support inclusion of land that is within an entirely different watershed and has no impact on the Grand Canyon watershed.

The NAW boundaries were based on a legislative proposal introduced by Congressman Raul Grijalva in 2008. ER111. The boundaries were never redefined to reflect the resources, aquifers, or delineation of the Grand Canyon watershed. ER901-ER902. As a result, over 120,000 acres of land within the North Parcel, west of Kanab Creek, are included within the NAW despite not being in the Grand Canyon watershed and having aquifer flows that are northwesterly into the Virgin River watershed. ER138, ER140, ER714-ER715, ER720-ER721.[6] Another estimated 80,000 acres of land within the North Parcel, in the northeast, are 40 to 45 miles from the Grand Canyon and the water also flows away from the Grand

---

[6] BLM Planning and Environmental Coordinator, Chris Horyza, recognized that this fact could be a vulnerability in a legal challenge but could not "see a way to strengthen the rationale for withdrawal and still make these factual points in the ROD." ER718-ER719. BLM also recognized this in 2009 at the beginning of the EIS process. ER722.

~ 41 ~

Canyon into Utah. ER720. There is no basis for including these 200,000 acres of land within the withdrawal area because mining activity in this area would not impact the Grand Canyon watershed. The ROD's other stated reasons for the withdrawal (impacts to tribal resources, impacts to unique resources in the area, and potentially 11 mines proceeding even with the withdrawal) do not support the withdrawal of this 200,000 acres in the North Parcel. *See* ER91. The FEIS did not identify unique resources or that the land is 40 to 100 miles away from the park boundaries.

The Grand Canyon watershed does not cover the entire one million acre withdrawal area. There are portions of the North Parcel, totaling 200,000 acres, that are in a different watershed or drain away from the Grand Canyon, and as a consequence, activities on these lands would have no impact on the Grand Canyon watershed.

3.   *Identified Resources Tied At All Times to Grand Canyon Watershed*

The District Court erred when it found that there were other reasons for the withdrawal and Appellants failed to show these

~ 42 ~

reasons did not apply to areas outside the watershed. ER64 (n.55). The express language for the withdrawal was to "to protect **the Grand Canyon watershed** from the possible adverse effects of the reasonably foreseeable locatable mineral exploration and development." 77 Fed. Reg. at 2563 (emphasis added). The purpose stated in the FEIS stated the withdrawal was "to protect the natural, cultural, and social resources **in the Grand Canyon watershed**." ER113 (emphasis added). The identified resources were at all times linked to the Grand Canyon watershed not the Virgin River watershed or elsewhere. The record does not support the withdrawal of the estimated 200,000 acres in the North Parcel; therefore, the Secretary's decision is arbitrary and capricious. *Natural Res. Def. Council*, 421 F.3d at 806-07.

BLM recognized this vulnerability early in the NEPA process. BLM wrote in 2009:

> As the map below shows, there is approximately 120,000 acres along the west edge of the Kanab parcel of the Arizona Strip withdrawal, that is not in the Grand Canyon watershed. It is in the Fort Pierce sub-basin, HUC 1501009, from which surface runoff flows to the northwest,

~ 43 ~

into Utah, away from the Grand Canyon. Its likely that any aquifer flows also move northwesterly, if they move at all, as the geologic formations appear to slightly tilt that direction.

I have not seen any written criteria which justifies the withdrawal of this subject strip of land. If it exists, I somehow missed it, so please send me a copy so I can have it for my records.

If this anomaly does not actually fit the purpose of the withdrawal, it may not be appropriate and legal. I would then suggest that a simple validity examination be done to determine if to and how to take action to delete this non-Grand Canyon watershed land from the EIS and the withdrawal itself and stick to the pertinent watershed boundaries.

ER722.

In December 2011, when BLM commented on the draft ROD, the

FEIS lead coordinator Scott Florence wrote:

We need to point out that the north end of the north parcel is 40+ miles from the canyon. Also, there is a ground water divide on the west end of the north parcel where east of the divide water moves to the canyon but west of the divide it moves away (into the Virgin River watershed which eventually makes its way in to the Colorado River at Lake Mead but does not drain in to the canyon itself). In addition, there were very few, if any, resource values or concerns in these areas.

~ 44 ~

> As currently written, even though its much improved, the
> rationale is still very weak and not very compelling for
> withdrawal of the above areas. This is just a weakness that
> I think we need to point out to them so they are aware of it
> and know where they are most vulnerable.

ER714-ER715, ER718. *See* ER721 ("The areas on the northeast and
west portions of the north parcel that I pointed out have low resource
values, are 40-45 miles from the canyon and/or don't drain into the
canyon at all total about 200,000 acres."). Also, the "groundwater
movement in the northeast end of the north parcel is to the north . .
. away from the canyon." ER720. The withdrawal should be
remanded to consider the exclusion of these lands as entirely
unrelated to the resources in the Grand Canyon watershed.

### 4. *Definition of Watershed Limited to Hydrology*

DOI defended the withdrawal on the basis that the watershed
encompasses all resources, including wildlife, visual, and cultural
resources, and includes significant values and irreplaceable
resources. Notably, DOI cannot cite to any statutory or regulatory
definition to validate this defense and, as written, throughout a two-

~ 45 ~

year process, that the identified resources were linked to the watershed of the Grand Canyon not the Virgin River.

A watershed is a geographical term that requires a hydrological connection. The BLM land use planning handbook uses the term watershed as a planning boundary. BLM H-1601-1, Land Use Planning Handbook, at 15, 21 Glossary-5 (Mar. 11, 2005). It defines the "watershed approach" as:

> [A] framework to guide watershed management that: (1) uses watershed assessments to determine existing and reference conditions; (2) incorporates assessment results into resource management planning; and (3) fosters collaboration with all landowners in the watershed. The framework considers both *ground and surface water flow within a hydrologically defined geographical area.*

*Id.* at Glossary-8 (emphasis added). The Environmental Protection Agency (EPA) defines a watershed as "the area of land that contributes runoff to a lake, river, stream, wetland, estuary, or bay." EPA, Handbook for Developing Watershed Plans to Restore and Protect Our Waters, at 1-2 (Mar. 2008). *See Norton Const. Co. v. U.S. Army Corps of Eng'rs*, 2007 WL 1431907, *5 (N.D. Ohio 2007), *aff'd*, 280 F. App'x 490 (6th Cir. 2008) ("Informal definitions provided by the Corps and

~ 46 ~

EPA state that a 'watershed' is the area where all waters flow to a single point.  The USGS equates a watershed with a drainage basin which is [t]he land area drained by a river or a stream." (internal quotes omitted)).

Thus, the term "Grand Canyon watershed" does not include other resources outside the watershed nor does the definition encompass all values or resources that may be found in the State of Arizona.  Using DOI's definition in this case, the NAW could include Utah, Colorado and Wyoming since these states watersheds contribute to the Colorado River system. There must be a hydrological connection for an area and its resources to fall within a particular watershed.  At all relevant times, DOI defined the withdrawal in terms of the Grand Canyon watershed and it cannot make a *post hoc* argument to explain the inclusion of land and resources outside the watershed.

~ 47 ~

## II. FLPMA DOES NOT AUTHORIZE WITHDRAWALS BASED ON THE BELIEF THAT MINING WOUNDS THE EARTH

### A. Standard of Review

This Court's review is *de novo*. *N. Alaska Envtl. Ctr.,* 457 F.3d at 975. When an agency acts contrary to law, it is arbitrary and capricious. 5 U.S.C. §706(2)(A). *Supra* at 30. When an agency decision is contrary to a statutory mandate or policy, it will be set aside. *Ocean Advocates*, at 859. The Court erred inasmuch as the courts have consistently held that public land dedicated to multiple use cannot be closed to protect traditional or aboriginal use lands.[7]

### B. Closing One Million Acres to Mining Based on Belief That It Will Desecrate Aboriginal or Traditional Lands Contradicts Precedent Declining to Recognize Such a Broad Right of Protection

The District Court affirmed DOI's rationale for the withdrawal based on the possibility that impacts to tribal resources could not be fully mitigated in the FEIS and ROD, and that withdrawing the lands

---

[7] The FEIS uses the terms historical, traditional or ethnographic landscape to describe the tribes' interests in the land. This area also corresponds to aboriginal areas claimed by Havasupai in *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991).

~ 48 ~

to protect these resources was not in excess of authority or contrary to law. ER79-ER80.

The FEIS concluded that existing law and regulation were fully adequate to mitigate impacts to Indian cultural specific sites and cultural resources by prohibiting development in these locations. ER269. The term cultural resources extends to archeological, historical, traditional, religious, and sacred places. Numerous laws and regulations protect cultural resources and identifiable sites that are sacred or traditionally important to American Indians. *See e.g.* Archeological and Historic Preservation Act (AHPA), 16 U.S.C. §§469, 469a-1; Archaeological Resource Protection Act (ARPA), 16 U.S.C. §§470aa-470mm; Native American Graves Protection and Repatriation Act (NAGPRA), 25 U.S.C. §3002(a); National Historic Preservation Act (NHPA), 16 U.S.C. §470f; American Indian Religious Freedom Act, 42 U.S.C. §1996. The FEIS also concluded that there would be no cumulative impacts to cultural resources without the withdrawal because all future projects are subject to a cultural resource inventory and mitigation requirements under federal law. ER269.

~ 49 ~

BLM recognized that the western and northeastern portions of the North Parcel had "very few, if any, resource values or concerns." ER714-ER715, ER721. The 2007 Arizona Strip RMP classified and expanded ACECs to protect sacred and traditional use areas identified by the tribes, including Kanab Creek, Moonshine Ridge and Johnson Springs ACEC.[8] ER130, ER905-ER911; ER914-ER915. Part of Kanab Creek is designated wilderness and closed to mining. ER158.

However, the FEIS and ROD found that it was not possible to fully mitigate impacts to American Indian resources due to the tribes' belief that any mining would wound the earth. ER91, ER93, ER274-277, ER279. The one million acres is said to be traditional or historical use areas and has previously been claimed as aboriginal lands.

Withdrawing the land on the belief that any type of drilling wounds the earth contradicts the consistent line of cases declining to

---

[8] The 2007 RMP provides for special mitigation in mining plans of operation to protect the Siler pincushion cactus and to protect cultural resources. ER905-ER910; ER914-ER915. It also continued and expanded ACEC status for Johnson Springs and Moonshine.

~ 50 ~

close multiple use public lands based on the belief that mining desecrates public land. *See e.g. Navajo Nation v. US Forest Service*, 535 F.3d 1058, 1070-74 (9th Cir. 2008) (*en banc*) (affirming ski area snowmaking even if the equipment would desecrate the land); *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991) (affirming mine approval even though it was contrary to tribe's belief that these aboriginal lands were sacred).

Case law consistently holds that traditional use areas or aboriginal lands are not a basis to prohibit otherwise lawful uses of federal land. *See Havasupai Tribe v. United States*, 752 F. Supp. 1471, 1484-86 (D. Ariz. 1990), *aff'd sub nom. Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991); *Navajo Nation,* 535 F.3d at 1063-64, 1070-74. In *Havasupai Tribe,* the Tribe asserted that the mine plan of operations for the Canyon Uranium Mine interfered with its right to practice its religion on its former aboriginal lands and would destroy their religion. 752 F. Supp. at 1476, 1484. The Court held that the Tribe was not prevented from practicing its religion and that it "apparently [had] thousands of other religious sites within [its] former

~ 51 ~

aboriginal lands. Giving the Indians veto power over activities on federal land that would easily require de facto beneficial ownership of some rather spacious tracts of public property." *Id.* at 1485-86 (internal quotes and citations omitted). Although this case dealt with the Tribe's First Amendment right to practice its religion, it is still applicable to the current case, because the Havasupai challenged mining as desecrating its aboriginal land.

The rationale for the withdrawal as necessary to protect the tribes' belief that mining "wounds the earth" and would desecrate its traditional lands is very similar to the arguments in *Havasupai Tribe*. ER276-ER277, ER279, ER771, ER776, ER882. The withdrawal is not tied to any specific American Indian sacred or religious site, but extends to lands described as ethno-landscape or traditional lands and is the same area previously described as aboriginal lands.

Courts have consistently held that beliefs attached to these large areas, whether under a theory of aboriginal lands, *Havasupai Tribe* or interference with religion, *Navajo Nation*, are not a valid ground to prevent otherwise lawful uses of federal land. The courts have instead

~ 52 ~

required the tribe to identify sacred sites that may be impacted by a project instead of seeking to protect all of the land. *South Fork Band Council of Western Shoshone Ind. of Nev. v. U.S. Dep't of the Interior*, 588 F.3d 718, 724 (9th Cir. 2009) (BLM's approval of a mining project on Mt. Tenabo was not arbitrary and capricious because the project would not harm areas specifically identified by the tribes as sacred.); *Te-Moak Tribe of Western Shoshone Indians v. U.S. Dep't of Interior*, 565 Fed. Appx. 665, 667-68 (9th Cir. 2014) (BLM's action to reduce the scope of its mining project and avoid the most religiously and culturally significant areas of the tribes was not arbitrary and capricious considering the lack of specificity as to other religious site locations.).

The withdrawal cannot be affirmed as a lawful exercise of withdrawal authority because it is not based on particular sites or sacred areas. Using the term ethnographic landscape to describe the one million acres does not make the decision valid. DOI is withdrawing this land contrary to the multiple use and principal use direction in FLPMA without articulating a law-based reason to support

~ 53 ~

these protections and without limiting the withdrawal to specific

cultural or ethnographic sites. This is contrary to federal law and the

legal precedent and therefore is not a valid basis to affirm the

withdrawal. Further the premise the mineral development would

desecrate the land cannot be reconciled with the fact that oil and gas

leasing and other mining, such as sand and gravel, are permitted

under the withdrawal.

## III. UNAVAILABLE INFORMATION REGARDING MINING IMPACTS ON SURFACE AND GROUNDWATER IS ESSENTIAL SINCE PURPOSE OF WITHDRAWAL WAS TO PROTECT WATER FROM EFFECTS OF MINING

### A. Standard of Review

An appellate court reviews de novo a district court's grant of

summary judgment upholding a federal agency decision. *N. Alaska*

*Envtl. Ctr.*, 457 F.3d at 975. Claims that an agency violated NEPA are

viewed under the discretionary review standard of the APA. *Barnes v.*

*U.S. Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011). Pursuant

to the APA, an agency decision will be set aside if it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. §706(2)(A). A court must not "rubber-stamp" an agency

~ 54 ~

action that is inconsistent with a statutory mandate or frustrates the congressional policy underlying a statute. *Ocean Advocates*, 402 F.3d at 859.

### B. Conclusion that Effects of Mining on Water Resources Were Not Essential Unsupported

The District Court erred when it held that DOI satisfied its obligations under 40 C.F.R. §1502.22 by disclosing in the FEIS that information was missing or uncertain and by concluding in the ROD that the missing information was not essential to the decision-making process. ER58-ER59. The Court found that DOI is only required to comply with the additional requirements set out in 40 C.F.R. §1502.22(b) if the missing information is essential to a reasonable choice among alternatives. ER59. The Court erroneously accepted the ROD's conclusion, however, that the missing information was not essential to the decision-making process. The conclusion in the ROD cannot be reconciled with the stated purpose of the NAW to protect water resources from the impacts of mining or the extensive discussion of unavailable information in the FEIS. *Infra* 58. If the

~ 55 ~

missing information was not essential to the alternatives and the decision, then the FEIS would not have devoted so much space to the lack of data and uncertainties as a result.

    1.   *The Identified Missing Information Must Be Evaluated for the Impacts on the Alternatives*

DOI's conclusion that the missing information on uranium mining's impacts to water resources and other natural resources was not essential to the decision-making process is unsupported by the evidence. *Natural Res. Def. Council*, 421 F.3d at 806-07. The missing information was essential to the decision-making process and required further analysis under 40 C.F.R. §1502.22(b). *Montana Wilderness Ass'n. v. McAllister*, 666 F.3d 549, 559-60 (9th Cir. 2011). The NAW decision must be remanded to DOI so it may either take steps to secure the data or document a data-driven analysis as a substitute which would be more than erring on the side of conservation. Finally, the analysis would examine how the lack of data changes the alternatives and the decision in compliance with Section 1502.22(b).

~ 56 ~

NEPA requires that the environmental information in an EIS must be of high quality and based on accurate scientific analysis. 40 C.F.R. §§1500.1(b), 1502.24; *Desert Protective Council v. U.S. Dep't of Interior*, 927 F. Supp. 2d 949, 968 (S.D. Cal. 2013). When there is incomplete or unavailable information, an agency must identify the missing information, 40 C.F.R. §1502.22. If the missing information is relevant to adverse environmental impacts and is essential to a reasoned choice among alternatives, the agency must either secure the information, unless the cost is exorbitant or how to obtain it is not known. *Id.* at §1502.22(a). If the agency cannot secure the missing information, it must identify in the EIS the incomplete or unavailable information, the relevance to evaluating reasonably foreseeable significant adverse impacts on the environment, a summary of the existing credible scientific evidence, and the agency's assessment of impacts based on scientifically acceptable research or methodology. *Id.* at §1502.22(b); *Montana Wilderness Ass'n,* 666 F.3d at 559-60.

The FEIS admits that information is incomplete or unavailable as to how uranium mining impacts the natural resources and the

~ 57 ~

local economy. ER177, ER239-ER240, ER264-ER266, ER280, ER287-ER288. The FEIS discussed the limited information that was available regarding the data on perched aquifers and shallow springs, direction of groundwater movement in the regional aquifer, and reclamation data for historic mines. ER239-ER240, ER264-ER266. The FEIS even admits that a more thorough quantitative analysis of possible effects of uranium mining on springs and waterways, as well as the water chemistry in the Grand Canyon region, is necessary to better understand the groundwater flow paths, travel times, and contributions from mining activities. ER264-ER267. The FEIS was also missing information on the impacts of uranium mining on wildlife and humans, and the economic impacts to the local economy. ER264, ER280, ER287-ER288.

The ROD recognizes uncertainty with respect to ground water flows, the impact of uranium mining on perched aquifers, and the impact of uranium mining on deep aquifer springs, such as the R-aquifer. ER92, 94. The uncertainties of the impacts to water quantity and quality also leads to unknown impacts to animals and humans.

~ 58 ~

*Id.* Despite these uncertainties, the ROD concluded that the missing information relating to water quality and quantity impacts was not essential to a reasoned choice among the alternatives, because the DOI had data regarding dissolved uranium concentrations near six previously-mined sites and relied on conservative assumptions to estimate the impacts. ER92 (n.1).

Rather than complete the last regulatory requirement to discuss how the available scientific date is credible and relevant to evaluating reasonably foreseeable adverse impacts under the alternatives, DOI declared the information non-essential. This does not square with the FEIS's detailed discussion of missing information or its relevance to the alternatives and the decision.

2.  *Judicial Precedent Supports a Remand to Complete the Missing Information Analysis*

The District Court relied on *Point Hope v. Jewell*, 740 F.3d 489 (9th Cir. 2014), to affirm Interior's decision to not undertake a more thorough analysis under 40 C.F.R. §1502.22. The holding, however,

~ 59 ~

supports a remand for supplemental NEPA analysis to address how the missing information changes the alternatives and the decision.

In *Point Hope*, the Bureau of Ocean Energy Management (BOEM) sought to lease areas for oil and gas development in the Chukchi Sea. *Id.* at 492. The plaintiffs argued that BOEM violated NEPA by excluding essential information regarding specific animal species in the FEIS. *Id.* at 495-96. The original FEIS was first rejected by the court for failing to account for missing information (which is the relief requested here), but BOEM prepared a supplemental EIS to specifically address the missing information. *Id.* at 492. Only after the supplemental analysis was completed, the court held that BOEM had reasonably concluded that the missing information was not essential because compliance with other statutes would protect the animal species of concern. *Id.* at 498. The court also relied on the fact that further environmental analysis would be appropriate at the site-specific development stage of any oil and gas operations. *Id.* at 489-99. Thus, under *Point Hope*, the court upheld the EIS after the

~ 60 ~

supplemental analysis was completed to analyze how the missing information affected the decision.

The case of *Montana Wilderness Association* also supports this argument. In that case, the plaintiffs challenged the Forest Service's travel plan for failing to recognize the relevance of the missing historical information regarding the volume of use of motorized travel within a wilderness study area. 666 F.3d at 554-55. The court found that the historical increase in traffic was relevant to a wilderness analysis and the reasonably foreseeable adverse impacts because such use had the potential to affect the opportunities for solitude available in the area. *Id.* at 558, 560. The court, therefore, held that the Forest Service violated NEPA for determining the missing information was irrelevant for Section 1502.22 purposes. *Id.* at 560.

As in the *Point Hope* and *Montana Wilderness Association* cases, DOI should be required to complete an analysis of the unavailable information and discussion of the credibility of the scientific data that was available. Assuming that none to 50 percent of all new mines would contribute contaminated water to the R-aquifer is not

~ 61 ~

supported by credible scientific data. *See* ER234. The conservative estimates in the ROD are further not supported by the data. ER91 ("EIS indicates that the likelihood of a serious impact may be low, but should such an event occur, significant.").

Relying on data from six previously mined sites was insufficient because there was no documentation for the earlier Hack Mine. ER240. The remaining sites showed no water contamination above background levels, ER136, although there was no data on water quality in the R-aquifer other than the reclaimed wells. ER136, ER233-ER235, ER240-ER241. The FEIS documents that well monitoring does not show adverse impacts to the R-aquifer and that sealing of the well under existing regulations prevents perched water from seeping into mine works. ER135-ER137, ER240-ER242. The FEIS concluded in a number of areas that there would be no impact to negligible impact on the quantity and quality of perched aquifers, R-aquifer water quality, and overall water resources. *See e.g.* ER230, ER238, ER243-ER258.

~ 62 ~

DOI's use of past mining to make its conservative estimates including the Orphan Mine is also problematic. ER157 (legacy of mining in context of the Orphan Mine). The Orphan Mine features an exposed wall of mineralization, unlike the mines to the west outside of the Grand Canyon National Park and was never reclaimed. *See* ER137 (The "environmental issues surround the Orphan Lode Mine . . . are the result of the lack of mine reclamation."); ER234-235 ("Orphan Lode Mine is a singularly poor example of post-mining practices" and concentration of dissolved uranium "in the Hermit Mine sump were not considered representative for post-mining drainage at mines in the proposed withdrawal area.").

The missing information is also essential to a reasoned choice among alternatives, because it would show that the withdrawal area should have been, at the very least, reduced in size, or indeed no withdrawal was appropriate. *Supra* Section I.E. (Watershed Argument). *See also* ER813 (National Park Service states that the withdrawal area could be reduced by about 28 percent without having an impact on the Grand Canyon National Park resources.); ER814-

~ 63 ~

ER817 (A meaningful connection between mine sites and park waters is highly unlikely, and the potential impacts in the DEIS are grossly overestimated.). The missing information is further essential to determining the potential impacts to wildlife and the habitat, which determines whether specific areas should be withdrawn from mining. *See* ER895-ER896 (No studies have shown obvious animal health problems at historic mines.).

If the missing information is essential, the DOI must provide a summary of the existing credible scientific evidence that is relevant to evaluating the reasonable foreseeable adverse impacts on the environment and the agency's evaluation of the impacts based on theoretical approaches or research methods. *Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F. Supp. 3d 147, 155-56, 160-61 (D. D.C. 2014) (BOEM explained the methodologies and scientific studies it relied on for discussing impacts to each of the eleven resources where there was incomplete or unavailable information.). DOI must consider "impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the

~ 64 ~

impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." 40 C.F.R. §1502.22(b). The use of conservative assumptions in the FEIS and ROD are nothing but pure conjecture and data from historic mining sites that are not representative of today's mining operations is not "credible scientific evidence" and is not based on either theoretical approaches or research methods. *See Montana Wilderness Ass'n*, 666 F.3d at 560, n.6 (Analyzing the direct and indirect effects of the travel plan alternatives generally does not deal with the uncertainties from the gaps in the available volume of use data.).

## IV. DOI FAILED TO COORDINATE WITH THE COUNTIES AND DISCUSS/RESOLVE INCONSISTENCIES WITH LOCAL LAND USE PLANS

### A. Standard of Review

An appellate court reviews de novo a district court's grant of summary judgment upholding a federal agency decision. *N. Alaska Envtl. Ctr.,* 457 F.3d at 975. An agency decision will be set aside if it is "arbitrary, capricious , an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

~ 65 ~

## B.  NEPA and FLPMA Mandate Coordination

The District Court held that DOI met its obligations under NEPA and FLPMA to coordinate with the Coalition members because it gave them several opportunities to participate in the EIS process, including two public scoping meetings, five meetings with cooperating agencies, and three meetings with the Coalition specifically.  ER54-ER55, ER72-ER73.  The FEIS notes the Counties' local land use plans and resolutions opposing the withdrawal, as well as whether these were consistent with the withdrawal decision.  ER55.  The District Court also noted that DOI addressed the economic impact of the withdrawal on the affected Counties in the FEIS, basing its analysis on the comments it received.  *Id.*  A few meetings (five) and a conclusory discussion in the FEIS are not compliance with either NEPA or FLPMA, which mandate that federal actions consider and try to resolve conflicts with county plans.  43 U.S.C. §1712(c)(9); 40 C.F.R. §1506.2.  The cooperating agencies had numerous meetings, most of which excluded the local governments.  This is particularly obvious for

~ 66 ~

the development of alternatives, when the counties were presented with the alternatives but played no role in their development.

## C.   Coordination Mandates in Both FLPMA and NEPA

NEPA and FLPMA both require federal agencies to coordinate with state and local governments, to consider the comments and views of local governments, and to the extent possible, resolve any inconsistencies between federal actions and local plans and policies. NEPA requires federal agencies to consider the comments and views of local agencies that "are authorized to develop and enforce environmental standards." 42 U.S.C. §4332(2)(C).  Federal agencies are required to cooperate with state and local agencies to avoid duplication between NEPA and state and local requirements.  42 U.S.C. §4331(a); 40 C.F.R. §1506.2(b).  Such cooperation should include joint planning, environmental research, public hearings, and environmental assessments.  40 C.F.R. §1506.2(b).  NEPA further requires federal agencies to discuss conflicts between the proposed action and local land use plans and policies, and the extent to which

~ 67 ~

such inconsistencies could be reconciled. 40 C.F.R. §§1502.16(c), 1506.2(d).

FLPMA also requires that the Secretary consult with State and local government agencies regarding any withdrawal decision and provide an explanation as to the extent a withdrawal will impact State and local government interests and the economy. 43 U.S.C. §1714(c)(2)(2), (7), (8). FLPMA further requires "meaningful public involvement of State and local government officials . . . in the development of land use programs, land use regulations, and *land use decisions for public lands*." 43 U.S.C. §1712(c)(9) (emphasis added); 43 C.F.R. §1610.3-1(a)(4). The statute requires the Secretary to "coordinate land use inventory, planning, and *management activities* of or for such lands with the land use plans and management programs . . . of the State and local governments." 43 U.S.C. §1712(c)(9) (emphasis added). Section 202(e) defines a land management decision as closing public lands to any of the principal multiple uses. 43 U.S.C. §1712(e). The Secretary is also to establish procedures, such as public hearings, to give local governments and

~ 68 ~

the public "an opportunity to comment upon . . . , and to participate in, the preparation and execution of plans and programs for, and *the management of*, the public lands." 43 U.S.C. §1739(e) (emphasis added).

The District Court erred when it held that 43 U.S.C. §1712(c)(9) only applies to land use plans, not agency withdrawals. ER72. FLPMA extends the coordination requirement to land use decisions and management activities. 43 U.S.C. §1712(c)(9) ("to the extent consistent with the laws governing the administration of the public lands, coordinate the land use inventory, planning, and management activities"). Moreover, a withdrawal is a land management decision and a management activity. 43 U.S.C. §1712(e). Any interpretation that limits Section 1712 coordination requirement to only land use plans reads the "land use decisions" and "management activities" language out of the FLPMA. *See Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 322-23 (D. D.C. 1987), *rev'd on other grds sub. nom. Lujan v. Nat'l. Wildlife* Fed'n., 497 U.S. 871 (1990) (Restricting Section 1739's public participation mandate to only land use planning would

~ 69 ~

read "the management of public lands" language out of the statute.).

A withdrawal made pursuant to 43 U.S.C. §1714 is both a management decision and a management activity. BLM must therefore coordinate with state, tribal, and local governments in how the withdrawal affects county land uses and plans. *See Nat'l Wildlife Fedn*, 835 F.2d at 323 (finding that "withdrawal revocations are themselves major management decisions"). *See also* 43 U.S.C. §1712(e)(3).

### D. DOI Marginalized Local Government Participation

Local governments submitted comments stating that the DEIS had understated the economic impacts of the withdrawal and emphasized the economic importance of uranium mining on the local economies. ER366-ER376, ER695-ER696, ER698-ER699, ER705-ER712. These comments supported the conclusions by the Tetra-Tech report that uranium mining would contribute $168 million in state severance taxes alone over a 42-year period. ER608. Mohave County Supervisor Johnson testified that the withdrawal would cost the county an estimated $40 million in annual payroll and over the

~ 70 ~

20-years, an estimated $2 billion in combined tax revenues including taxes and fees. ER705. Uranium mining over 20 years would also generate a total of $2 billion in federal and state corporate income taxes, 1,078 jobs annually (directly and indirectly related to mining in the project area), and $40 million annually from payroll. ER608.

Based on their comments, the DOI contracted for a new economic impact analysis for the FEIS. The DOI recognized the Counties should be involved in this economic analysis and the Counties requested a joint meeting with DOI to discuss the analysis. ER588. *See* ER589-ER591. The Counties made comments during the cooperating agency meetings of the shortcoming in the economic analysis of the DEIS and that of the new analysis being conducted by the agency hired by DOI. ER594-ER601. *See* ER602-ER603.

Despite all the comments DOI received from the cooperating agencies and local governments on the economic impacts, the revised FEIS concluded that the economic loss to Mohave and the Utah counties would be less that what was stated in the DEIS. *See* ER283, ER604-ER605, ER653-ER686. The number of jobs created by

~ 71 ~

uranium mining increased from the DEIS to the FEIS, but it is still considerably lower than the ACERT's estimates on employment. *Compare* ER604-ER605 *with* ER608. The DOI reduced the regional economic output effects from mining and fiscal effects from mining in the FEIS and the estimates were significantly lower than ACERT's estimates. *Id.* For example, the FEIS estimates about $1.1 million in annual severance tax revenues (ER295, ER297) when Tetra Tech calculated $4 million annually (ER608 ($168 million over 42 years)).

DOI defended the changed FEIS economic analysis as reflecting comments on the DEIS. ER283, ER604-ER605. The comments that triggered the amendments appear to be tied to only one County, Coconino County, which supported the withdrawal. ER604-ER605. *See* ER299. The mines, however, are located mostly in Mohave County and the ore would have been processed in the Utah counties.

~ 72 ~

### E. Counties Not Allowed to Fully Participate as Cooperators

While BLM granted the Counties cooperating agency status and there were meetings, it does not automatically follow that they were given meaningful involvement throughout the EIS process. *Int'l Snowmobile Mfrs. Ass'n v. Norton*, 340 F. Supp. 2d 1249, 1261-64 (D. Wyo. 2004). *See Quechan Tribe of the Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1118-20 (S.D. Cal. 2010). In *International Snowmobile Manufacturers Association*, the National Park Service (NPS) revised its preferred alternative after the DEIS was issued and without involving the cooperating agency. 340 F. Supp. 2d at 1261-62. It further disregarded cooperating agency expertise on the expected economic loss to the State under the revised preferred alternative. *Id.* The court found that NPS failed in its NEPA "obligation to involve and seriously consider the comments of cooperating agencies." *Id.* at 1262.

In the current case, the DOI did not involve the Counties in developing the alternatives and disregarded the comments of the

~ 73 ~

Coalition members regarding the economic impacts the NAW would have on the state and local economies despite the clear expertise and knowledge of the local governments. *See* ER924-ER926 (¶¶21-22, 27-29).

DOI also ignored the Coalition members' comments regarding the conflicts between the NAW and the local land use plans and policies. The FEIS noted that the NAW was inconsistent with Mohave County's resolution opposing the withdrawal. ER126. However, it concluded that Mohave County plans were consistent with the NAW and that it did not need to consider the general plans of Kane, Washington, Garfield, and San Juan Counties because the withdrawal was outside of their jurisdiction. ER126-ER127.

The regulations require federal agencies to address how inconsistencies between a proposed action and local land use plans are addressed and resolved. *Am. Motorcyclist Ass'n v. Watt*, 534 F. Supp. 923, 936 (C.D. Cal. 1981). If the administrative record demonstrates that the DOI considered the inconsistencies and reasonably concluded there was no conflict, then an agency's NEPA

~ 74 ~

obligations are met. *Quechan Tribe of Ft. Yuma Indian Reservation v. U.S. Dep't of Interior*, 927 F. Supp. 2d 921, 946 (S.D. Cal. 2013). However, DOI considered only one policy statement from Mohave County's General Plan in concluding that the withdrawal was consistent with the Plan. *See* ER126. BLM further failed to even consider the land use plans of the other Coalition members despite involving them in the EIS process as cooperating agencies and analyzing the impacts the withdrawal would have on the their local economies. ER127.

The FEIS noted that the withdrawal area was outside the American Indian tribes' jurisdictions, but considered their plans and policies because of the potential impact the uranium mining would have on their ancestral homelands. ER126. The plans and policies of the other Coalition member Counties should have also be considered due to the impact the withdrawal had on their local economies and Mohave County programs.

The Coalition members submitted a number of comments notifying the DOI of its obligation to consider and resolve the

~ 75 ~

inconsistencies between the NAW and their local land use plans and policies.  Mohave County requested coordination "on land use as a way to resolve the inconsistencies and to minimize harm to its interest in managing roads and air quality, and being in a position to fund other land use and environmental projects, such as desert tortoise protection."  ER943 (¶28).  San Juan County requested that the language in its Master Plan be analyzed and reflected in the FEIS as it "demonstrates the need and support for hard rock mining and its importance in the local economy."  ER369.  The Coalition also noted in its comments and in public meetings that the DOI had failed to resolve conflicts between the NAW and local policy of retaining the lands in multiple use as Congress first ordered in 1981.  ER597, ER698-ER699.

DOI's conclusion that the withdrawal was not inconsistent with Mohave County's General Plan contradicts the comments and concerns expressed by the County during the EIS process and the language of Mohave County's General Plan.  The Plan states that the county is "rich in natural resources that contribute to the County's

~ 76 ~

environmental health, economic welfare and less tangible elements of the quality of life." ER535. The County has an abundance of publicly owned land that is managed by the DOI and used for recreation, grazing, mining, and landfills. ER540. The County supports and encourages commercial and industrial development, which promotes a diverse and stable economy. ER547. The withdrawal of over one million acres of land from mining directly conflicts with the County's goal of encouraging industrial development to stabilize the local economy. Its loss of severance revenues from future mining operations also conflicts with the County's ability to fund the improvements of roads as a way to reduce air pollution and to fund conservation and mitigation measures for the desert tortoise and its habitat. ER534-ER542.

The DOI's failure to provide the Counties with meaningful involvement during the EIS process, to seriously consider the Counties comments on the economic impacts of the withdrawal and inconsistencies with their local land use plans, and to discuss the withdrawal's inconsistencies with local land use plans and policies

~ 77 ~

violates both NEPA and FLPMA. 42 U.S.C. §4332(2)(C); 43 U.S.C. §§1712(c)(9), 1714(c)(2)(2), (7), (8); 40 C.F.R. §§1502.16(c), 1506.2(d); 43 C.F.R. §1610.3-1(a)(4). The NAW decision must be remanded to the federal agency for reconsideration consistent with the statutory mandate of NEPA to coordinate with local governments and discuss and resolve inconsistencies with local land use plans. *See Ocean Advocates*, 402 F.3d at 859 (*quoting NLRB v. Brown*, 380 U.S. 278, 291-92 (1965)) (A court's review "must not 'rubber-stamp' . . . administrative decisions that [it] deem[s] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.").

## CONCLUSION

Quaterra and the Coalition urge this Court to find that the public lands were unlawfully withdrawn and set aside the decision. The withdrawal should not have been made in light of the admitted fact that existing laws and regulations protected the resources. The boundaries exceed the Grand Canyon watershed by a huge area and DOI always referred to the resources as being in the Grand Canyon

~ 78 ~

watershed. Moreover, the justification that the withdrawal was needed to protect the belief that mining would desecrate the land is inconsistent with legal rulings over the past 30 years. Alternatively, the withdrawal decision should be remanded to BLM to supplement the EIS and address how the missing information might change the decision and to resolve conflicts with Coalition members land use plans.

## STATEMENT OF RELATED CASES

This matter arises out of the same controverted withdrawal as the following cases that have been appealed to this Court and consolidated with this matter. Gregory Yount v. Jewell, (Case No. 14-17352); National Mining Association v. Jewell, (Case No. 14-17350), and American Exploration & Mining Association v. Jewell, (Case No. 14-17374).

~ 79 ~

## <u>ORAL ARGUMENT REQUESTED</u>

Oral argument is requested due to the complex issues and the

importance of the case.

Dated April 10, 2015.
Respectfully Submitted,

/s/ Constance E. Brooks
Constance E. Brooks connie@cebrooks.com
C. E. BROOKS & ASSOCIATES, P.C.
303 East 17th Avenue, Suite 650
Denver, Colorado 80203
Tel. 303-297-9100 Fax. 303-297-9101

*Attorneys for the Plaintiff-Appellants Quaterra Alaska, Inc.; Quaterra Resources, Inc.; and the Arizona Utah Local Economic Coalition on behalf of named member, the Board of Supervisors, Mohave County, Arizona.*

~ 80 ~

## Certificate of Compliance with 32(a)(7)(b)

Pursuant to Fed. R. App. P. 32(a)(7)(c), I certify that exclusive of the corporate disclosure statement, table of contents, table of authorities, and statement with respect to oral argument, this brief is proportionally spaced, using a 14 point serif font, and contains 13,730 words. I relied on my word processor WordPerfect X6 to obtain the count.

I certify that the information on this certificate is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

s/ Constance E. Brooks
C. E. BROOKS & ASSOCIATES P.C.
303 East 17th Avenue, Suite 650
Denver, CO 80203
(303) 297-9100
connie@cebrooks.com

~ 81 ~

## CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing opening brief, addendum, and separately bound excerpts of record to be served upon counsel of record through the Court's electronic service system (ECF/CM) and by first class mail to Gregory Yount at the following address: 807 West Butterfield Road, Chino Valley, Arizona 86323. I have also served written copies of the opening brief and excerpts of record in accordance with Rule 32 of the Fed.R.App.P.

Dated: April 10, 2015.

/s/ Constance E. Brooks
Constance E. Brooks connie@cebrooks.com
C. E. Brooks & Associates, P.C.
303 East 17th Avenue, Suite 650
Denver, Colorado 80203
Tel. 303-297-9100 Fax. 303-297-9101

No. 14-17351 consolidated cases 14-17350, 14-17352, and 14-17374

## THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

QUATERRA ALASKA, INC., ARIZONA UTAH LOCAL ECONOMIC
COALITION, ON BEHALF OF MEMBER THE BOARD OF SUPERVISORS,
MOHAVE COUNTY, ARIZONA;

Appellants;
v.

S.R.M. JEWELL, SECRETARY OF THE INTERIOR; *et al.*

Respondents;

and

GRAND CANYON TRUST, *et al.*

Respondent-Intervenors.

_____

On Appeal from the United States District Court For the District of Arizona,
The Honorable David G. Campbell Presiding
D.C. Nos. 3:11-cv-08171-DGC;  3:12-cv-08038-DGC;
3:12-cv-08042-DGC; 3:12-cv-08075-DGC

_____

**APPELLANTS' ADDENDUM**

_____

Filed: April 10, 2015          C. E. BROOKS & ASSOCIATES P.C.
Constance E. Brooks connie@cebrooks.com
Danielle Hagen assoc2@cebrooks.com
Cody Doig assoc@cebrooks.com
303 East 17th Avenue, Ste. 650
Denver, CO 80203 (303) 297-9100
*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS FOR ADDENDUM
*Quaterra Resources v. S.M.R. Jewell, et al.* Civ. No. 14-17351

PAGE     DOCUMENT

STATUTES

1       Administrative Procedure Act, 5 U.S.C. §§701-706

8       16 U.S.C. §469 (repealed Pub. L. 113-287) (Dec. 2014)
        (recodification pending)

9       16 U.S.C. §469a-1 (repealed Pub. L. 113-287) (Dec. 2014)
        (recodification pending)

10      16 U.S.C.§470a (repealed Pub. L. 113-287) (Dec. 2014)
        (recodification pending)

15      16 U.S.C. §470f (repealed Pub. L. 113-287) (Dec. 2014)
        (recodification pending)

24      16 U.S.C. §§470aa-mm

40      Native American Graves Protection Act, 25 U.S.C. §3002(a)

42      28 U.S.C. §1291

45      28 U.S.C. §1331

47      American Indian Religious Freedom Protection Act, 42 U.S.C. §1996

49      National Environmental Policy Act (NEPA)

49      42 U.S.C. §4331(a)

51      42 U.S.C. §4332(2)(C)

54      Federal Land Management and Policy Act (FLPMA)

54      43 U.S.C. §1701

57      43 U.S.C. §1702

59      43 U.S.C. §1712

62      43 U.S.C. §1714

i

# TABLE OF CONTENTS FOR ADDENDUM
### *Quaterra Resources v. S.M.R. Jewell, et al.* Civ. No. 14-17351

PAGE    DOCUMENT

66      43 U.S.C. §1732(a)

69      43 U.S.C. §1739

71      Federal Rules of Appellate Procedure

71      Fed. R. App. P. 4

75      Fed. R. App. P. 26.1(a)

76      Fed. R. App. P 32

CODE OF FEDERAL REGULATIONS

82      40 C.F.R. §1500.1(b)

89      40 C.F.R. §1502.16(c)

91      40 C.F.R. §1502.22

92      40 C.F.R. §1502.24

93      40 C.F.R. §1506.2

101     43 C.F.R. §1610.3-1

104     43 C.F.R. §2300.0-1(a)

131     43 C.F.R. §2310.3-1

FEDERAL REGISTER NOTICES

141     73 Fed. Reg. 74,039 (Dec. 5, 2008)

150     74 Fed. Reg. 35,887-88 (July 21, 2009)

152     76 Fed. Reg. 9,594 (Feb. 18, 2011)

154     76 Fed. Reg. 37,826 (June 28, 2011), Public Land Order No. 7773

156     76 Fed. Reg. 66,925 (Oct. 28, 2011)

157     77 Fed. Reg. 2563 (Jan. 18, 2012), Public Land Order No. 7787

# TABLE OF CONTENTS FOR ADDENDUM
### *Quaterra Resources v. S.M.R. Jewell, et al.* Civ. No. 14-17351

PAGE    DOCUMENT

AGENCY GUIDANCE

161     Department of the Interior Manual

161     011 DM § 1.2 (2001)

164     603 DM 1.1(A)

167     EPA, Handbook for Developing Watershed Plans to Restore and Protect Our Waters (Mar. 2008) (excerpt) pp. 1-2

169     BLM H-1601-1, Land Use Planning Handbook (Mar. 11, 2005) (excerpt) pp. 15, 21, Glossary-8

174     *Norton Const. Co. v. U.S. Army Corps of Eng'rs*, 2007 WL 1431907, *5 (N.D. Ohio 2007), *aff'd*, 280 F. App'x 490 (6th Cir. 2008)

iii

**5 USC 701: Application; definitions**
Text contains those laws in effect on April 4, 2015

**From Title 5-GOVERNMENT ORGANIZATION AND EMPLOYEES**
    PART I-THE AGENCIES GENERALLY
    CHAPTER 7-JUDICIAL REVIEW
**Jump To:**
    **Source Credit**
    **References In Text**
    **Amendments**

## §701. Application; definitions

(a) This chapter applies, according to the provisions thereof, except to the extent that-
    (1) statutes preclude judicial review; or
    (2) agency action is committed to agency discretion by law.

(b) For the purpose of this chapter-
    (1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include-
        (A) the Congress;
        (B) the courts of the United States;
        (C) the governments of the territories or possessions of the United States;
        (D) the government of the District of Columbia;
        (E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;
        (F) courts martial and military commissions;
        (G) military authority exercised in the field in time of war or in occupied territory; or
        (H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix; and

    (2) "person", "rule", "order", "license", "sanction", "relief", and "agency action" have the meanings given them by section 551 of this title.

( Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392 ; Pub. L. 103–272, §5(a), July 5, 1994, 108 Stat. 1373 ; Pub. L. 111–350, §5(a)(3), Jan. 4, 2011, 124 Stat. 3841 .)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| (a) | 5 U.S.C. 1009 (introductory clause). | June 11, 1946, ch. 324, §10 (introductory clause), 60 Stat. 243. |

In subsection (a), the words "This chapter applies, according to the provisions thereof," are added to avoid the necessity of repeating the introductory clause of former section 1009 in sections 702–706.

Subsection (b) is added on authority of section 2 of the Act of June 11, 1946, ch. 324, 60 Stat. 237, as amended, which is carried into section 551 of this title.

In subsection (b)(1)(G), the words "or naval" are omitted as included in "military".

In subsection (b)(1)(H), the words "functions which by law expire on the termination of present hostilities, within any fixed period thereafter, or before July 1, 1947" are omitted as executed. Reference to the "Selective Training and Service Act of 1940" is omitted as that Act expired on Mar. 31, 1947. Reference to the "Sugar Control Extension Act of 1947" is omitted as that Act expired on Mar. 31, 1948. References to the "Housing and Rent Act of 1947, as amended" and the "Veterans' Emergency Housing Act of 1946" have been consolidated as they are related. The reference to former section 1641(b)(2) of title 50, appendix, is retained notwithstanding its repeal by §111(a)(1) of the Act of Sept. 21, 1961, Pub. L. 87–256, 75 Stat. 538 , since §111(c) of the Act provides that a reference in other Acts to a provision of law repealed by §111(a) shall be considered to be a reference to the appropriate

1

provisions of Pub. L. 87–256.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

### REFERENCES IN TEXT

Sections 1891–1902 of title 50, appendix, referred to in subsec. (b)(1)(H), were omitted from the Code as executed.

### AMENDMENTS

**2011**–Subsec. (b)(1)(H). Pub. L. 111–350 struck out "chapter 2 of title 41;" after "title 12;".

**1994**–Subsec. (b)(1)(H). Pub. L. 103–272 substituted "subchapter II of chapter 471 of title 49; or sections" for "or sections 1622,".

---

**5 USC 702: Right of review**
Text contains those laws in effect on April 4, 2015

**From Title 5-GOVERNMENT ORGANIZATION AND EMPLOYEES**
    PART I-THE AGENCIES GENERALLY
    CHAPTER 7-JUDICIAL REVIEW
**Jump To:**
    **Source Credit**
    **Amendments**

---

## §702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

( Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392 ; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721 .)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| | 5 U.S.C. 1009(a). | June 11, 1946, ch. 324, §10(a), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

### AMENDMENTS

**1976**-Pub. L. 94–574 removed the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review.

3

---

**5 USC 703: Form and venue of proceeding**
Text contains those laws in effect on April 4, 2015

**From Title 5-GOVERNMENT ORGANIZATION AND EMPLOYEES**
    PART I-THE AGENCIES GENERALLY
    CHAPTER 7-JUDICIAL REVIEW
**Jump To:**
    **Source Credit**
    **Amendments**

---

## §703. Form and venue of proceeding

    The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

( Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392 ; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721 .)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, §10(b), 60 Stat. 243. |

    Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

### AMENDMENTS

    **1976**-Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

Case: 14-17374, 04/10/2015, ID: 9491805, DktEntry: 13-1, Page 102 of 278

Current

Back to Original Document     << Previous   TITLE 5 / PART I / CHAPTER 7 / § 704   Next >>

[Print]    [Print selection]      [Close]   Help

**5 USC 704: Actions reviewable**
Text contains those laws in effect on April 4, 2015
**From Title 5-GOVERNMENT ORGANIZATION AND EMPLOYEES**
    PART I-THE AGENCIES GENERALLY
    CHAPTER 7-JUDICIAL REVIEW
**Jump To:**
    Source Credit

## §704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

( Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392 .)

<div align="center">HISTORICAL AND REVISION NOTES</div>

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

Back to Original Document     << Previous   TITLE 5 / PART I / CHAPTER 7 / § 705   Next >>

[Print]    [Print selection]      [Close]   Help

**5 USC 705: Relief pending review**
Text contains those laws in effect on April 4, 2015

**From Title 5-GOVERNMENT ORGANIZATION AND EMPLOYEES**
> PART I-THE AGENCIES GENERALLY
> CHAPTER 7-JUDICIAL REVIEW

**Jump To:**
Source Credit

## §705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

( Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393 .)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
| --- | --- | --- |
| | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

Back to Original Document

Current

&lt;&lt; Previous   TITLE 5 / PART I / CHAPTER 7 / § 706   Next &gt;&gt;

[Print]   [Print selection]       [Close]  Help

**5 USC 706: Scope of review**
Text contains those laws in effect on April 4, 2015

**From Title 5-GOVERNMENT ORGANIZATION AND EMPLOYEES**
PART I-THE AGENCIES GENERALLY
CHAPTER 7-JUDICIAL REVIEW
**Jump To:**
Source Credit
Miscellaneous

### §706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall-

  (1) compel agency action unlawfully withheld or unreasonably delayed; and

  (2) hold unlawful and set aside agency action, findings, and conclusions found to be-

    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    (B) contrary to constitutional right, power, privilege, or immunity;

    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    (D) without observance of procedure required by law;

    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

( Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393. )

(e) To accept, hold, and administer gifts and bequests of money, securities, or other personal property of whatsoever character, absolutely or on trust, for the purposes for which the National Trust is created. Unless otherwise restricted by the terms of the gift or bequest, the National Trust is authorized to sell, exchange, or otherwise dispose of and to invest or reinvest in such investments as it may determine from time to time the moneys, securities, or other property given or bequeathed to it. The principal of such corporate funds, together with the income therefrom and all other revenues received by it from any source whatsoever, shall be placed in such depositories as the National Trust shall determine and shall be subject to expenditure by the National Trust for its corporate purposes.

(f) To acquire by gift, devise, purchase, or otherwise, absolutely or on trust, and to hold and, unless otherwise restricted by the terms of the gift or devise, to encumber, convey, or otherwise dispose of, any real property, or any estate or interest therein (except property within the exterior boundaries of national parks and national monuments), as may be necessary and proper in carrying into effect the purposes of the National Trust.

(g) To contract and make cooperative agreements with Federal, State, or municipal departments or agencies, corporations, associations, or individuals, under such terms and conditions as it deems advisable, respecting the protection, preservation, maintenance, or operation of any historic site, building, object, or property used in connection therewith for public use, regardless of whether the National Trust has acquired title to such properties, or any interest therein.

(h) To enter into contracts generally and to execute all instruments necessary or appropriate to carry out its corporate purposes, which instruments shall include such concession contracts, leases, or permits for the use of lands, buildings, or other property deemed desirable either to accommodate the public or to facilitate administration.

(i) To appoint and prescribe the duties of such officers, agents, and employees as may be necessary to carry out its functions, and to fix and pay such compensation to them for their services as the National Trust may determine.

(j) And generally to do any and all lawful acts necessary or appropriate to carry out the purposes for which the National Trust is created.

(Oct. 26, 1949, ch. 755, §4, 63 Stat. 928.)

## §468d. Consultation with Advisory Board on National Parks, Historic Sites, Buildings, and Monuments

In carrying out its functions under sections 468 to 468d of this title, the National Trust is authorized to consult with the Advisory Board on National Parks, Historic Sites, Buildings, and Monuments, on matters relating to the selection of sites, buildings, and objects to be preserved and protected pursuant hereto.

(Oct. 26, 1949, ch. 755, §5, 63 Stat. 929.)

#### CHANGE OF NAME

The Advisory Board on National Parks, Historic Sites, Buildings, and Monuments was renamed the Na-

tional Park System Advisory Board by Pub. L. 91–383, §9, as added by Pub. L. 94–458, §2, Oct. 7, 1976, 90 Stat. 1940. See section 463 of this title.

## §468e. Repealed. Pub. L. 86–533, §1(19), June 29, 1960, 74 Stat. 248

Section, act Oct. 26, 1949, ch. 755, §6, 63 Stat. 929, required the National Trust to report to the Congress its proceedings and activities.

## §469. Preservation of historical and archeological data threatened by dam construction or alterations of terrain

It is the purpose of sections 469 to 469c–1 of this title to further the policy set forth in sections 461 to 467 of this title, by specifically providing for the preservation of historical and archeological data (including relics and specimens) which might otherwise be irreparably lost or destroyed as the result of (1) flooding, the building of access roads, the erection of workmen's communities, the relocation of railroads and highways, and other alterations of the terrain caused by the construction of a dam by any agency of the United States, or by any private person or corporation holding a license issued by any such agency or (2) any alteration of the terrain caused as a result of any Federal construction project or federally licensed activity or program.

(Pub. L. 86–523, §1, June 27, 1960, 74 Stat. 220; Pub. L. 93–291, §1(1), May 24, 1974, 88 Stat. 174.)

#### AMENDMENTS

1974—Pub. L. 93–291 designated existing provisions as cl. (1) and added cl. (2).

## §469a. Notice of dam construction to be given Secretary of the Interior by United States agencies

Before any agency of the United States shall undertake the construction of a dam, or issue a license to any private individual or corporation for the construction of a dam, it shall give written notice to the Secretary of the Interior (hereafter referred to as the Secretary) setting forth the site of the proposed dam and the approximate area to be flooded and otherwise changed if such construction is undertaken: *Provided,* That with respect to any flood water retarding dam which provides less than five thousand acre-feet of detention capacity and with respect to any other type of dam which creates a reservoir of less than forty surface acres the provisions of this section shall apply only when the constructing agency, in its preliminary surveys, finds, or is presented with evidence that historical or archeological materials exist or may be present in the proposed reservoir area.

(Pub. L. 86–523, §2, formerly §2(a), June 27, 1960, 74 Stat. 220, renumbered and amended Pub. L. 93–291, §1(2), (5), May 24, 1974, 88 Stat. 174, 175.)

#### AMENDMENTS

1974—Pub. L. 93–291 struck out designation "(a)" before and, in the resulting unlettered provisions, inserted "(hereafter referred to as the Secretary)" after "Secretary of the Interior". Subsecs. (b) to (e) were disposed of as follows: subsec. (b) was transferred and amended, and as so transferred and amended, is set out as sections 469a–1 and 469a–2 of this title, subsecs. (c)

and (e) were redesignated as subsecs. (a) and (b), respectively, of section 469a–3 of this title, and subsec. (d) was struck out.

TRANSFER OF FUNCTIONS

Enforcement functions of Secretary or other official in Department of the Interior related to compliance with system activities requiring coordination and approval under sections 469 to 469c of this title and such functions of Secretary or other official in Department of Agriculture, insofar as they involve lands and programs under jurisdiction of that Department, related to compliance with sections 469 to 469c of this title with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§102(e), (f), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out in the Appendix to Title 5, Government Organization and Employees. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of Title 15, Commerce and Trade. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of Title 15.

### § 469a–1. Threat of irreparable loss or destruction of significant scientific, prehistorical, historical, or archeological data by Federal construction projects; notice to Secretary of the Interior; survey; recovery, preservation, and protection of data

#### (a) Notification and request for preservation of data

Whenever any Federal agency finds, or is notified, in writing, by an appropriate historical or archeological authority, that its activities in connection with any Federal construction project or federally licensed project, activity, or program may cause irreparable loss or destruction of significant scientific, prehistorical, historical, or archeological data, such agency shall notify the Secretary, in writing, and shall provide the Secretary with appropriate information concerning the project, program, or activity. Such agency may request the Secretary to undertake the recovery, protection, and preservation of such data (including preliminary survey, or other investigation as needed, and analysis and publication of the reports resulting from such investigation), or it may, with funds appropriated for such project, program, or activity, undertake such activities. Copies of reports of any investigations made pursuant to this section shall be submitted to the Secretary, who shall make them available to the public for inspection and review.

#### (b) Survey of site; preservation of data; compensation

Whenever any Federal agency provides financial assistance by loan, grant, or otherwise to any private person, association, or public entity, the Secretary, if he determines that significant scientific, prehistorical, historical, or archeological data might be irrevocably lost or destroyed, may with funds appropriated expressly for this purpose conduct, with the consent of all persons, associations, or public entities having a legal interest in the property involved, a survey of the affected site and undertake the recovery, protection, and preservation of such data (including analysis and publication). The Secretary shall, unless otherwise mutually agreed to in writing, compensate any person, association, or public entity damaged as a result of delays in construction or as a result of the temporary loss of the use of private or any nonfederally owned lands.

(Pub. L. 86–523, §3, as added Pub. L. 93–291, §1(3), May 24, 1974, 88 Stat. 174.)

PRIOR PROVISIONS

A prior section 3 of Pub. L. 86–523 was renumbered section 6 and is classified to section 469b of this title.

TRANSFER OF FUNCTIONS

For transfer of certain enforcement functions of Secretary or other official in Department of the Interior and Secretary or other official in Department of Agriculture to Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, and subsequent transfer to Secretary of Energy, then to Federal Coordinator for Alaska Natural Gas Transportation Projects, see note set out under section 469a of this title.

### § 469a–2. Survey by Secretary of the Interior; recovery and preservation of data; compensation for delays in construction and for temporary loss of use of land

#### (a) Survey conducted; preservation of data

The Secretary, upon notification, in writing, by any Federal or State agency or appropriate historical or archeological authority that scientific, prehistorical, historical, or archeological data is being or may be irrevocably lost or destroyed by any Federal or federally assisted or licensed project, activity, or program, shall, if he determines that such data is significant and is being or may be irrevocably lost or destroyed and after reasonable notice to the agency responsible for funding or licensing such project, activity, or program, conduct or cause to be conducted a survey and other investigation of the areas which are or may be affected and recover and preserve such data (including analysis and publication) which, in his opinion, are not being, but should be, recovered and preserved in the public interest.

#### (b) Emergency projects

No survey or recovery work shall be required pursuant to this section which, in the determination of the head of the responsible agency, would impede Federal or federally assisted or licensed projects or activities undertaken in connection with any emergency, including projects or activities undertaken in anticipation of, or as a result of, a natural disaster.

#### (c) Initiation of survey

The Secretary shall initiate the survey or recovery effort within sixty days after notification to him pursuant to subsection (a) of this section or within such time as may be agreed upon with the head of the agency responsible for funding or licensing the project, activity, or program in all other cases.

request to Federal agencies regarding their properties which have been evaluated with respect to historic, architectural or archaeological significance and which as a result of such evaluations have not been found suitable for listing on the National Register of Historic Places.

(e) develop and make available to Federal agencies and State and local governments information concerning professional methods and techniques for preserving, improving, restoring and maintaining historic properties.

(f) advise Federal agencies in the evaluation, identification, preservation, improvement, restoration and maintenance of historic properties.

(g) review and evaluate the plans of transferees of surplus Federal properties transferred for historic monument purposes to assure that the historic character of such properties is preserved in rehabilitation, restoration, improvement, maintenance and repair of such properties.

(h) review and comment upon Federal agency procedures submitted pursuant to section 2(e) of this order.

RICHARD NIXON.

## § 470–1. Declaration of policy of the Federal Government

It shall be the policy of the Federal Government, in cooperation with other nations and in partnership with the States, local governments, Indian tribes, and private organizations and individuals to—

(1) use measures, including financial and technical assistance, to foster conditions under which our modern society and our prehistoric and historic resources can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations;

(2) provide leadership in the preservation of the prehistoric and historic resources of the United States and of the international community of nations and in the administration of the national preservation program in partnership with States, Indian tribes, Native Hawaiians, and local governments;

(3) administer federally owned, administered, or controlled prehistoric and historic resources in a spirit of stewardship for the inspiration and benefit of present and future generations;

(4) contribute to the preservation of nonfederally owned prehistoric and historic resources and give maximum encouragement to organizations and individuals undertaking preservation by private means;

(5) encourage the public and private preservation and utilization of all usable elements of the Nation's historic built environment; and

(6) assist State and local governments, Indian tribes and Native Hawaiian organizations and the National Trust for Historic Preservation in the United States to expand and accelerate their historic preservation programs and activities.

(Pub. L. 89–665, § 2, as added Pub. L. 96–515, title I, § 101(a), Dec. 12, 1980, 94 Stat. 2988; amended Pub. L. 102–575, title XL, § 4002, Oct. 30, 1992, 106 Stat. 4753.)

AMENDMENTS

1992—Par. (2). Pub. L. 102–575, § 4002(1), inserted "and in the administration of the national preservation program in partnership with States, Indian tribes, Native

Hawaiians, and local governments" after "community of nations".

Par. (6). Pub. L. 102–575, § 4002(2), inserted ", Indian tribes and Native Hawaiian organizations" after "local governments".

PART A—PROGRAMS

## § 470a. Historic preservation program

**(a) National Register of Historic Places; designation of properties as historic landmarks; properties deemed included; criteria; nomination of properties by States, local governments or individuals; regulations; review of threats to properties**

(1)(A) The Secretary of the Interior is authorized to expand and maintain a National Register of Historic Places composed of districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture. Notwithstanding section 1125(c) of title 15, buildings and structures on or eligible for inclusion on the National Register of Historic Places (either individually or as part of a historic district), or designated as an individual landmark or as a contributing building in a historic district by a unit of State or local government, may retain the name historically associated with the building or structure.

(B) Properties meeting the criteria for National Historic Landmarks established pursuant to paragraph (2) shall be designated as "National Historic Landmarks" and included on the National Register, subject to the requirements of paragraph (6). All historic properties included on the National Register on December 12, 1980, shall be deemed to be included on the National Register as of their initial listing for purposes of this subchapter. All historic properties listed in the Federal Register of February 6, 1979, as "National Historic Landmarks" or thereafter prior to the effective date of this Act are declared by Congress to be National Historic Landmarks of national historic significance as of their initial listing as such in the Federal Register for purposes of this subchapter and sections 461 to 467 of this title; except that in cases of National Historic Landmark districts for which no boundaries have been established, boundaries must first be published in the Federal Register.

(2) The Secretary in consultation with national historical and archaeological associations, shall establish or revise criteria for properties to be included on the National Register and criteria for National Historic Landmarks, and shall also promulgate or revise regulations as may be necessary for—

(A) nominating properties for inclusion in, and removal from, the National Register and the recommendation of properties by certified local governments;

(B) designating properties as National Historic Landmarks and removing such designation;

(C) considering appeals from such recommendations, nominations, removals, and designations (or any failure or refusal by a nominating authority to nominate or designate);

(D) nominating historic properties for inclusion in the World Heritage List in accordance with the terms of the Convention concerning

the Protection of the World Cultural and Natural Heritage;

(E) making determinations of eligibility of properties for inclusion on the National Register; and

(F) notifying the owner of a property, any appropriate local governments, and the general public, when the property is being considered for inclusion on the National Register, for designation as a National Historic Landmark or for nomination to the World Heritage List.

(3) Subject to the requirements of paragraph (6), any State which is carrying out a program approved under subsection (b) of this section, shall nominate to the Secretary properties which meet the criteria promulgated under subsection (a) of this section for inclusion on the National Register. Subject to paragraph (6), any property nominated under this paragraph or under section 470h–2(a)(2) of this title shall be included on the National Register on the date forty-five days after receipt by the Secretary of the nomination and the necessary documentation, unless the Secretary disapproves such nomination within such forty-five day period or unless an appeal is filed under paragraph (5).

(4) Subject to the requirements of paragraph (6) the Secretary may accept a nomination directly from any person or local government for inclusion of a property on the National Register only if such property is located in a State where there is no program approved under subsection (b) of this section. The Secretary may include on the National Register any property for which such a nomination is made if he determines that such property is eligible in accordance with the regulations promulgated under paragraph (2). Such determination shall be made within ninety days from the date of the nomination unless the nomination is appealed under paragraph (5).

(5) Any person or local government may appeal to the Secretary a nomination of any historic property for inclusion on the National Register and may appeal to the Secretary the failure or refusal of a nominating authority to nominate a property in accordance with this subsection.

(6) The Secretary shall promulgate regulations requiring that before any property or district may be included on the National Register or designated as a National Historic Landmark, the owner or owners of such property, or a majority of the owners of the properties within the district in the case of an historic district, shall be given the opportunity (including a reasonable period of time) to concur in, or object to, the nomination of the property or district for such inclusion or designation. If the owner or owners of any privately owned property, or a majority of the owners of such properties within the district in the case of an historic district, object to such inclusion or designation, such property shall not be included on the National Register or designated as a National Historic Landmark until such objection is withdrawn. The Secretary shall review the nomination of the property or district where any such objection has been made and shall determine whether or not the property or district is eligible for such inclusion or designation, and if the Secretary deter-

mines that such property or district is eligible for such inclusion or designation, he shall inform the Advisory Council on Historic Preservation, the appropriate State Historic Preservation Officer, the appropriate chief elected local official and the owner or owners of such property, of his determination. The regulations under this paragraph shall include provisions to carry out the purposes of this paragraph in the case of multiple ownership of a single property.

(7) The Secretary shall promulgate, or revise, regulations—

(A) ensuring that significant prehistoric and historic artifacts, and associated records, subject to section 470h–2 of this title, the Act of June 27, 1960 (16 U.S.C. 469c) [16 U.S.C. 469 et seq.], and the Archaeological Resources Protection Act of 1979 (16 U.S.C. 470aa and following) are deposited in an institution with adequate long-term curatorial capabilities;

(B) establishing a uniform process and standards for documenting historic properties by public agencies and private parties for purposes of incorporation into, or complementing, the national historical architectural and engineering records within the Library of Congress; and

(C) certifying local governments, in accordance with subsection (c)(1) of this section and for the allocation of funds pursuant to section 470c(c) of this title.

(8) The Secretary shall, at least once every 4 years, in consultation with the Council and with State Historic Preservation Officers, review significant threats to properties included in, or eligible for inclusion on, the National Register, in order to—

(A) determine the kinds of properties that may be threatened;

(B) ascertain the causes of the threats; and

(C) develop and submit to the President and Congress recommendations for appropriate action.

**(b) Regulations for State Historic Preservation Programs; periodic evaluations and fiscal audits of State programs; administration of State programs; contracts and cooperative agreements with nonprofit or educational institutions and State Historic Preservation Officers; treatment of State programs as approved programs**

(1) The Secretary, in consultation with the National Conference of State Historic Preservation Officers and the National Trust for Historic Preservation, shall promulgate or revise regulations for State Historic Preservation Programs. Such regulations shall provide that a State program submitted to the Secretary under this section shall be approved by the Secretary if he determines that the program—

(A) provides for the designation and appointment by the Governor of a "State Historic Preservation Officer" to administer such program in accordance with paragraph (3) and for the employment or appointment by such officer of such professionally qualified staff as may be necessary for such purposes;

(B) provides for an adequate and qualified State historic preservation review board designated by the State Historic Preservation Of-

ficer unless otherwise provided for by State law; and

(C) provides for adequate public participation in the State Historic Preservation Program, including the process of recommending properties for nomination to the National Register.

(2)(A) Periodically, but not less than every 4 years after the approval of any State program under this subsection, the Secretary, in consultation with the Council on the appropriate provisions of this subchapter, and in cooperation with the State Historic Preservation Officer, shall evaluate the program to determine whether it is consistent with this subchapter.

(B) If, at any time, the Secretary determines that a major aspect of a State program is not consistent with this subchapter, the Secretary shall disapprove the program and suspend in whole or in part any contracts or cooperative agreements with the State and the State Historic Preservation Officer under this subchapter, until the program is consistent with this subchapter, unless the Secretary determines that the program will be made consistent with this subchapter within a reasonable period of time.

(C) The Secretary, in consultation with State Historic Preservation Officers, shall establish oversight methods to ensure State program consistency and quality without imposing undue review burdens on State Historic Preservation Officers.

(D) At the discretion of the Secretary, a State system of fiscal audit and management may be substituted for comparable Federal systems so long as the State system—

(i) establishes and maintains substantially similar accountability standards; and

(ii) provides for independent professional peer review.

The Secretary may also conduct periodic fiscal audits of State programs approved under this section as needed and shall ensure that such programs meet applicable accountability standards.

(3) It shall be the responsibility of the State Historic Preservation Officer to administer the State Historic Preservation Program and to—

(A) in cooperation with Federal and State agencies, local governments, and private organizations and individuals, direct and conduct a comprehensive statewide survey of historic properties and maintain inventories of such properties;

(B) identify and nominate eligible properties to the National Register and otherwise administer applications for listing historic properties on the National Register;

(C) prepare and implement a comprehensive statewide historic preservation plan;

(D) administer the State program of Federal assistance for historic preservation within the State;

(E) advise and assist, as appropriate, Federal and State agencies and local governments in carrying out their historic preservation responsibilities;

(F) cooperate with the Secretary, the Advisory Council on Historic Preservation, and other Federal and State agencies, local governments, and organizations and individuals

to ensure that historic properties are taken into consideration at all levels of planning and development;

(G) provide public information, education, and training and technical assistance in historic preservation;

(H) cooperate with local governments in the development of local historic preservation programs and assist local governments in becoming certified pursuant to subsection (c) of this section;

(I) consult with appropriate Federal agencies in accordance with this subchapter on—

(i) Federal undertakings that may affect historic properties; and

(ii) the content and sufficiency of any plans developed to protect, manage, or reduce or mitigate harm to such properties; and

(J) advise and assist in the evaluation of proposals for rehabilitation projects that may qualify for Federal assistance.

(4) Any State may carry out all or any part of its responsibilities under this subsection by contract or cooperative agreement with any qualified nonprofit organization or educational institution.

(5) Any State historic preservation program in effect under prior authority of law may be treated as an approved program for purposes of this subsection until the earlier of—

(A) the date on which the Secretary approves a program submitted by the State under this subsection, or

(B) three years after October 30, 1992.

(6)(A) Subject to subparagraphs (C) and (D), the Secretary may enter into contracts or cooperative agreements with a State Historic Preservation Officer for any State authorizing such Officer to assist the Secretary in carrying out one or more of the following responsibilities within that State—

(i) Identification and preservation of historic properties.

(ii) Determination of the eligibility of properties for listing on the National Register.

(iii) Preparation of nominations for inclusion on the National Register.

(iv) Maintenance of historical and archaeological data bases.

(v) Evaluation of eligibility for Federal preservation incentives.

Nothing in this paragraph shall be construed to provide that any State Historic Preservation Officer or any other person other than the Secretary shall have the authority to maintain the National Register for properties in any State.

(B) The Secretary may enter into a contract or cooperative agreement under subparagraph (A) only if—

(i) the State Historic Preservation Officer has requested the additional responsibility;

(ii) the Secretary has approved the State historic preservation program pursuant to subsection (b)(1) and (2) of this section;

(iii) the State Historic Preservation Officer agrees to carry out the additional responsibility in a timely and efficient manner acceptable to the Secretary and the Secretary deter-

mines that such Officer is fully capable of carrying out such responsibility in such manner;

(iv) the State Historic Preservation Officer agrees to permit the Secretary to review and revise, as appropriate in the discretion of the Secretary, decisions made by the Officer pursuant to such contract or cooperative agreement; and

(v) the Secretary and the State Historic Preservation Officer agree on the terms of additional financial assistance to the State, if there is to be any, for the costs of carrying out such responsibility.

(C) For each significant program area under the Secretary's authority, the Secretary shall establish specific conditions and criteria essential for the assumption by State Historic Preservation Officers of the Secretary's duties in each such program.

(D) Nothing in this subsection shall have the effect of diminishing the preservation programs and activities of the National Park Service.

**(c) Certification of local governments by State Historic Preservation Officer; transfer of portion of grants; certification by Secretary; nomination of properties by local governments for inclusion on National Register**

(1) Any State program approved under this section shall provide a mechanism for the certification by the State Historic Preservation Officer of local governments to carry out the purposes of this subchapter and provide for the transfer, in accordance with section 470c(c) of this title, of a portion of the grants received by the States under this subchapter, to such local governments. Any local government shall be certified to participate under the provisions of this section if the applicable State Historic Preservation Officer, and the Secretary, certifies that the local government—

(A) enforces appropriate State or local legislation for the designation and protection of historic properties;

(B) has established an adequate and qualified historic preservation review commission by State or local legislation;

(C) maintains a system for the survey and inventory of historic properties that furthers the purposes of subsection (b) of this section;

(D) provides for adequate public participation in the local historic preservation program, including the process of recommending properties for nomination to the National Register; and

(E) satisfactorily performs the responsibilities delegated to it under this subchapter.

Where there is no approved State program, a local government may be certified by the Secretary if he determines that such local government meets the requirements of subparagraphs (A) through (E); and in any such case the Secretary may make grants-in-aid to the local government for purposes of this section.

(2)(A) Before a property within the jurisdiction of the certified local government may be considered by the State to be nominated to the Secretary for inclusion on the National Register, the State Historic Preservation Officer shall notify the owner, the applicable chief local elected official, and the local historic preservation commission. The commission, after reasonable opportunity for public comment, shall prepare a report as to whether or not such property, in its opinion, meets the criteria of the National Register. Within sixty days of notice from the State Historic Preservation Officer, the chief local elected official shall transmit the report of the commission and his recommendation to the State Historic Preservation Officer. Except as provided in subparagraph (B), after receipt of such report and recommendation, or if no such report and recommendation are received within sixty days, the State shall make the nomination pursuant to subsection (a) of this section. The State may expedite such process with the concurrence of the certified local government.

(B) If both the commission and the chief local elected official recommend that a property not be nominated to the National Register, the State Historic Preservation Officer shall take no further action, unless within thirty days of the receipt of such recommendation by the State Historic Preservation Officer an appeal is filed with the State. If such an appeal is filed, the State shall follow the procedures for making a nomination pursuant to subsection (a) of this section. Any report and recommendations made under this section shall be included with any nomination submitted by the State to the Secretary.

(3) Any local government certified under this section or which is making efforts to become so certified shall be eligible for funds under the provisions of section 470c(c) of this title, and shall carry out any responsibilities delegated to it in accordance with such terms and conditions as the Secretary deems necessary or advisable.

(4) For the purposes of this section the term—

(A) "designation" means the identification and registration of properties for protection that meet criteria established by the State or the locality for significant historic and prehistoric resources within the jurisdiction of a local government; and

(B) "protection" means a local review process under State or local law for proposed demolition of, changes to, or other action that may affect historic properties designated pursuant to this subsection.

**(d) Historic properties of Indian tribes**

(1)(A) The Secretary shall establish a program and promulgate regulations to assist Indian tribes in preserving their particular historic properties. The Secretary shall foster communication and cooperation between Indian tribes and State Historic Preservation Officers in the administration of the national historic preservation program to ensure that all types of historic properties and all public interests in such properties are given due consideration, and to encourage coordination among Indian tribes, State Historic Preservation Officers, and Federal agencies in historic preservation planning and in the identification, evaluation, protection, and interpretation of historic properties.

(B) The program under subparagraph (A) shall be developed in such a manner as to ensure that tribal values are taken into account to the ex-

tent feasible. The Secretary may waive or modify requirements of this section to conform to the cultural setting of tribal heritage preservation goals and objectives. The tribal programs implemented by specific tribal organizations may vary in scope, as determined by each tribe's chief governing authority.

(C) The Secretary shall consult with Indian tribes, other Federal agencies, State Historic Preservation Officers, and other interested parties and initiate the program under subparagraph (A) by not later than October 1, 1994.

(2) A tribe may assume all or any part of the functions of a State Historic Preservation Officer in accordance with subsections (b)(2) and (b)(3) of this section, with respect to tribal lands, as such responsibilities may be modified for tribal programs through regulations issued by the Secretary, if—

(A) the tribe's chief governing authority so requests;

(B) the tribe designates a tribal preservation official to administer the tribal historic preservation program, through appointment by the tribe's chief governing authority or as a tribal ordinance may otherwise provide;

(C) the tribal preservation official provides the Secretary with a plan describing how the functions the tribal preservation official proposes to assume will be carried out;

(D) the Secretary determines, after consulting with the tribe, the appropriate State Historic Preservation Officer, the Council (if the tribe proposes to assume the functions of the State Historic Preservation Officer with respect to review of undertakings under section 470f of this title), and other tribes, if any, whose tribal or aboriginal lands may be affected by conduct of the tribal preservation program—

(i) that the tribal preservation program is fully capable of carrying out the functions specified in the plan provided under subparagraph (C);

(ii) that the plan defines the remaining responsibilities of the Secretary and the State Historic Preservation Officer; and

(iii) that the plan provides, with respect to properties neither owned by a member of the tribe nor held in trust by the Secretary for the benefit of the tribe, at the request of the owner thereof, the State Historic Preservation Officer, in addition to the tribal preservation official, may exercise the historic preservation responsibilities in accordance with subsections (b)(2) and (b)(3) of this section; and

(E) based on satisfaction of the conditions stated in subparagraphs (A), (B), (C), and (D), the Secretary approves the plan.

(3) In consultation with interested Indian tribes, other Native American organizations and affected State Historic Preservation Officers, the Secretary shall establish and implement procedures for carrying out section 470c(a) of this title with respect to tribal programs that assume responsibilities under paragraph (2).

(4) At the request of a tribe whose preservation program has been approved to assume functions and responsibilities pursuant to paragraph (2), the Secretary shall enter into contracts or cooperative agreements with such tribe permitting the assumption by the tribe of any part of the responsibilities referred to in subsection (b)(6) of this section on tribal land, if—

(A) the Secretary and the tribe agree on additional financial assistance, if any, to the tribe for the costs of carrying out such authorities;

(B) the Secretary finds that the tribal historic preservation program has been demonstrated to be sufficient to carry out the contract or cooperative agreement and this subchapter; and

(C) the contract or cooperative agreement specifies the continuing responsibilities of the Secretary or of the appropriate State Historic Preservation Officers and provides for appropriate participation by—

(i) the tribe's traditional cultural authorities;

(ii) representatives of other tribes whose traditional lands are under the jurisdiction of the tribe assuming responsibilities; and

(iii) the interested public.

(5) The Council may enter into an agreement with an Indian tribe to permit undertakings on tribal land to be reviewed under tribal historic preservation regulations in place of review under regulations promulgated by the Council to govern compliance with section 470f of this title, if the Council, after consultation with the tribe and appropriate State Historic Preservation Officers, determines that the tribal preservation regulations will afford historic properties consideration equivalent to those afforded by the Council's regulations.

(6)(A) Properties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization may be determined to be eligible for inclusion on the National Register.

(B) In carrying out its responsibilities under section 470f of this title, a Federal agency shall consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to properties described in subparagraph (A).

(C) In carrying out his or her responsibilities under subsection (b)(3) of this section, the State Historic Preservation Officer for the State of Hawaii shall—

(i) consult with Native Hawaiian organizations in assessing the cultural significance of any property in determining whether to nominate such property to the National Register;

(ii) consult with Native Hawaiian organizations in developing the cultural component of a preservation program or plan for such property; and

(iii) enter into a memorandum of understanding or agreement with Native Hawaiian organizations for the assessment of the cultural significance of a property in determining whether to nominate such property to the National Register and to carry out the cultural component of such preservation program or plan.

**(e) Matching grants to States; grants to National Trust for Historic Preservation in the United States; program of direct grants for preservation of properties included on National Register; grants or loans to Indian tribes and ethnic or minority groups for preservation of cultural heritage; grants for religious properties; direct grants to Indian tribes, Native Hawaiian organizations, and Micronesian States**

(1) The Secretary shall administer a program of matching grants to the States for the purposes of carrying out this subchapter.

(2) The Secretary may administer grants to the National Trust for Historic Preservation in the United States, chartered by sections 468 to 468d of this title consistent with the purposes of its charter and this subchapter.

(3)(A) In addition to the programs under paragraphs (1) and (2), the Secretary shall administer a program of direct grants for the preservation of properties included on the National Register. Funds to support such program annually shall not exceed 10 per centum of the amount appropriated annually for the fund established under section 470h of this title. These grants may be made by the Secretary, in consultation with the appropriate State Historic Preservation Officer—

(i) for the preservation of National Historic Landmarks which are threatened with demolition or impairment and for the preservation of historic properties of World Heritage significance,

(ii) for demonstration projects which will provide information concerning professional methods and techniques having application to historic properties,

(iii) for the training and development of skilled labor in trades and crafts, and in analysis and curation, relating to historic preservation, and

(iv) to assist persons or small businesses within any historic district included in the National Register to remain within the district.

(B) The Secretary may also, in consultation with the appropriate State Historic Preservation Officer, make grants or loans or both under this section to Indian tribes and to nonprofit organizations representing ethnic or minority groups for the preservation of their cultural heritage.

(C) Grants may be made under subparagraph (A)(i) and (iv) only to the extent that the project cannot be carried out in as effective a manner through the use of an insured loan under section 470d of this title.

(4) Grants may be made under this subsection for the preservation, stabilization, restoration, or rehabilitation of religious properties listed in the National Register of Historic Places, provided that the purpose of the grant is secular, does not promote religion, and seeks to protect those qualities that are historically significant. Nothing in this paragraph shall be construed to authorize the use of any funds made available under this section for the acquisition of any property referred to in the preceding sentence.

(5) The Secretary shall administer a program of direct grants to Indian tribes and Native Ha-

waiian organizations for the purpose of carrying out this subchapter as it pertains to Indian tribes and Native Hawaiian organizations. Matching fund requirements may be modified. Federal funds available to a tribe or Native Hawaiian organization may be used as matching funds for the purposes of the tribe's or organization's conducting its responsibilities pursuant to this section.

(6)(A) As part of the program of matching grant assistance from the Historic Preservation Fund to States, the Secretary shall administer a program of direct grants to the Federated States of Micronesia, the Republic of the Marshall Islands, the Trust Territory of the Pacific Islands, and upon termination of the Trusteeship Agreement for the Trust Territory of the Pacific Islands, the Republic of Palau (referred to as the Micronesian States) in furtherance of the Compact of Free Association between the United States and the Federated States of Micronesia and the Marshall Islands, approved by the Compact of Free Association Act of 1985 [48 U.S.C. 1901 et seq., 2001 et seq.], the Trusteeship Agreement for the Trust Territory of the Pacific Islands, and the Compact of Free Association between the United States and Palau, approved by the Joint Resolution entitled ''Joint Resolution to approve the 'Compact of Free Association' between the United States and Government of Palau, and for other purposes'' [48 U.S.C. 1931 et seq.]. The goal of the program shall be to establish historic and cultural preservation programs that meet the unique needs of each Micronesian State so that at the termination of the compacts the programs shall be firmly established. The Secretary may waive or modify the requirements of this section to conform to the cultural setting of those nations.

(B) The amounts to be made available to the Micronesian States shall be allocated by the Secretary on the basis of needs as determined by the Secretary. Matching funds may be waived or modified.

**(f) Prohibition of use of funds for compensation of intervenors in preservation program**

No part of any grant made under this section may be used to compensate any person intervening in any proceeding under this subchapter.

**(g) Guidelines for Federal agency responsibility for agency-owned historic properties**

In consultation with the Advisory Council on Historic Preservation, the Secretary shall promulgate guidelines for Federal agency responsibilities under section 470h–2 of this title.

**(h) Professional standards for preservation of federally owned or controlled historic properties**

Within one year after December 12, 1980, the Secretary shall establish, in consultation with the Secretaries of Agriculture and Defense, the Smithsonian Institution, and the Administrator of the General Services Administration, professional standards for the preservation of historic properties in Federal ownership or control.

**(i) Dissemination of information concerning professional methods and techniques for preservation of historic properties**

The Secretary shall develop and make available to Federal agencies, State and local govern-

ments, private organizations and individuals, and other nations and international organizations pursuant to the World Heritage Convention, training in, and information concerning, professional methods and techniques for the preservation of historic properties and for the administration of the historic preservation program at the Federal, State, and local level. The Secretary shall also develop mechanisms to provide information concerning historic preservation to the general public including students.

**(j) Preservation education and training program**

(1) The Secretary shall, in consultation with the Council and other appropriate Federal, tribal, Native Hawaiian, and non-Federal organizations, develop and implement a comprehensive preservation education and training program.

(2) The education and training program described in paragraph (1) shall include—

(A) new standards and increased preservation training opportunities for Federal workers involved in preservation-related functions;

(B) increased preservation training opportunities for other Federal, State, tribal and local government workers, and students;

(C) technical or financial assistance, or both, to historically black colleges and universities, to tribal colleges, and to colleges with a high enrollment of Native Americans or Native Hawaiians, to establish preservation training and degree programs; and

(D) coordination of the following activities, where appropriate, with the National Center for Preservation Technology and Training—

(i) distribution of information on preservation technologies;

(ii) provision of training and skill development in trades, crafts, and disciplines related to historic preservation in Federal training and development programs; and

(iii) support for research, analysis, conservation, curation, interpretation, and display related to preservation.

(Pub. L. 89–665, title I, §101, Oct. 15, 1966, 80 Stat. 915; Pub. L. 93–54, §1(d), July 1, 1973, 87 Stat. 139; Pub. L. 91–383, §11, as added Pub. L. 94–458, §2, Oct. 7, 1976, 90 Stat. 1942; amended Pub. L. 96–205, title VI, §608(a)(1), (2), Mar. 12, 1980, 94 Stat. 92; Pub. L. 96–515, title II, §201(a), Dec. 12, 1980, 94 Stat. 2988; Pub. L. 102–575, title XL, §§4003–4006(a), 4007, 4008, Oct. 30, 1992, 106 Stat. 4753–4755, 4758; Pub. L. 103–437, §6(d)(29), Nov. 2, 1994, 108 Stat. 4584; Pub. L. 104–333, div. I, title VIII, §814(d)(2)(F), Nov. 12, 1996, 110 Stat. 4196; Pub. L. 106–113, div. B, §1000(a)(9) [title III, §3007], Nov. 29, 1999, 113 Stat. 1536, 1501A–551; Pub. L. 106–208, §5(a)(1)–(4), May 26, 2000, 114 Stat. 318.)

REFERENCES IN TEXT

The effective date of this Act, referred to in subsec. (a)(1)(B), probably means the effective date of the National Historic Preservation Act Amendments of 1980, Pub. L. 96–515, approved Dec. 12, 1980, rather than the effective date of the National Historic Preservation Act, Pub. L. 89–665, which was approved Oct. 15, 1966.

Act of June 27, 1960 (16 U.S.C. 469c), referred to in subsec. (a)(7)(A), is Pub. L. 86–523, June 27, 1960, 74 Stat. 220, which enacted sections 469 to 469c–1 of this title. For complete classification of this Act to the Code, see Tables.

The Archaeological Resources Protection Act of 1979 (16 U.S.C. 470aa and following), referred to in subsec. (a)(7)(A), is Pub. L. 96–95, Oct. 31, 1979, 93 Stat. 721, which is classified generally to chapter 1B (§470aa et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 470aa of this title and Tables.

Sections 468 to 468d of this title, referred to in subsec. (e)(2), was in the original "an Act of Congress approved October 26, 1949 (63 Stat. 947)", probably meaning Act Oct. 26, 1949, ch. 755, 63 Stat. 927, which is classified to sections 468 to 468d of this title. For complete classification of this Act to the Code, see Tables.

The Compact of Free Association Act of 1985, referred to in subsec. (e)(6)(A), is Pub. L. 99–239, Jan. 14, 1986, 99 Stat. 1770, which is classified principally to part A of subchapter I (§1901 et seq.) of chapter 18 and chapter 19 (§2001 et seq.) of Title 48, Territories and Insular Possession. For complete classification of this Act to the Code, see Short Title note set out under section 1901 of Title 48 and Tables.

The Joint Resolution entitled "Joint Resolution to approve the 'Compact of Free Association' between the United States and Government of Palau, and for other purposes", referred to in subsec. (e)(6)(A), is Pub. L. 99–658, Nov. 14, 1986, 100 Stat. 3672, which is classified generally to part A (§1931 et seq.) of subchapter II of chapter 18 of Title 48. For complete classification of this Act to the Code, see Tables.

AMENDMENTS

2000—Subsec. (d)(2)(D)(ii). Pub. L. 106–208, §5(a)(1), inserted "and" after semicolon.

Subsec. (e)(2). Pub. L. 106–208, §5(a)(2), amended par. (2) generally. Prior to amendment, par. (2) read as follows: "The Secretary shall administer a program of matching grant-in-aid to the National Trust for Historic Preservation in the United States, chartered by sections 468 to 468e of this title, for the purposes of carrying out the responsibilities of the National Trust."

Subsec. (e)(3)(A)(iii). Pub. L. 106–208, §5(a)(3), substituted comma for semicolon after "preservation".

Subsec. (j)(2)(C). Pub. L. 106–208, §5(a)(4), inserted "and" after semicolon at end.

1999—Subsec. (a)(1)(A). Pub. L. 106–113 inserted at end "Notwithstanding section 1125(c) of title 15, buildings and structures on or eligible for inclusion on the National Register of Historic Places (either individually or as part of a historic district), or designated as an individual landmark or as a contributing building in a historic district by a unit of State or local government, may retain the name historically associated with the building or structure."

1996—Subsec. (a)(1)(B). Pub. L. 104–333 inserted period after "published in the Federal Register" and struck out at end "and submitted to the Committee on Energy and Natural Resources of the United States Senate and to the Committee on Natural Resources of the United States House of Representatives."

1994—Subsec. (a)(1)(B). Pub. L. 103–437 substituted "Natural Resources" for "Interior and Insular Affairs" after "Committee on".

1992—Subsec. (a)(8). Pub. L. 102–575, §4003, added par. (8).

Subsec. (b)(2). Pub. L. 102–575, §4004(1), amended par. (2) generally. Prior to amendment, par. (2) read as follows: "Periodically, but not less than every four years after the approval of any State program under this subsection, the Secretary shall evaluate such program to make a determination as to whether or not it is in compliance with the requirements of this subchapter. If at any time, the Secretary determines that a State program does not comply with such requirements, he shall disapprove such program, and suspend in whole or in part assistance to such State under subsection (d)(1) of this section, unless there are adequate assurances that the program will comply with such requirements within a reasonable period of time. The Secretary may also conduct periodic fiscal audits of State programs approved under this section."

Subsec. (b)(3). Pub. L. 102–575, §4004(2), substituted "in historic preservation;" for "relating to the Federal and State Historic Preservation Programs; and" in subpar. (G) and added subpars. (I) and (J).

Subsec. (b)(5)(B). Pub. L. 102–575, §4004(3), substituted "October 30, 1992" for "December 12, 1980".

Subsec. (b)(6). Pub. L. 102–575, §4004(4), added par. (6).

Subsec. (c)(4). Pub. L. 102–575, §4005, added par. (4).

Subsec. (d). Pub. L. 102–575, §4006(a)(2), added subsec. (d). Former subsec. (d) redesignated (e).

Subsec. (e). Pub. L. 102–575, §4007, amended par. (1) generally and added pars. (4) to (6). Prior to amendment, par. (1) read as follows: "The Secretary shall administer a program of matching grants-in-aid to the States for historic preservation projects, and State historic preservation programs, approved by the Secretary and having as their purpose the identification of historic properties and the preservation of properties included on the National Register."

Pub. L. 102–575, §4006(a)(1), redesignated subsec. (d) as (e). Former subsec. (e) redesignated (f).

Subsecs. (f) to (i). Pub. L. 102–575, §4006(a)(1), redesignated subsecs. (e) to (h) as (f) to (i), respectively.

Subsec. (j). Pub. L. 102–575, §4008, added subsec. (j).

1980—Subsec. (a). Pub. L. 96–515 substituted provision designating certain properties as National Historical Landmarks, providing for establishment by the Secretary of the Interior of criteria for inclusion on or removal from the National Register, designation of properties as National Historical Landmarks and removal of such designation, and nomination of properties for inclusion in the World Heritage List, authorizing any State, local government, or person to nominate properties for inclusion on the National Register and to appeal a nomination or refusal to nominate, requiring that before property be included on the National Register or designated as a National Historic Landmark, the owner or owners of the property be given an opportunity to concur in, or object to, its inclusion, and authorizing the Secretary to promulgate regulations to ensure that significant prehistoric and historic artifacts and records receive proper treatment, to establish standards for documenting historic properties for incorporation in the national historical, architectural, and engineering records within the Library of Congress, and to certify local governments for allocation of funds, for provision authorizing the Secretary to grant funds to States for preparing comprehensive statewide historic surveys and plans for preservation and acquisition of historic properties, to establish programs of matching grants-in-aid to States for the purpose of historical preservation and to the National Trust for Historic Preservation in the United States for the purpose of carrying out the responsibilities of the National Trust, and to withhold from disclosure to the public, information relating to the location of sites or objects listed on the National Register whenever he determines that disclosure of specific information would create a risk of destruction or harm to such sites or objects.

Pub. L. 96–205, §608(a)(1), in par. (2) struck out "and" after "culture;", and in par. (3) substituted "Trust; and" for "Trust.".

Subsec. (b). Pub. L. 96–515 substituted provision authorizing the establishment of State Historic Preservation Programs, providing for periodic evaluation of these programs and periodic fiscal audits, prescribing the responsibilities of the State Historic Preservation Officer, and designating the period within which prior State historic preservation programs are to remain in effect for provision defining the terms "State", "project", "historic preservation", and "Secretary".

Pub. L. 96–205, §608(a)(2), inserted reference to the Commonwealth of the Northern Mariana Islands.

Subsecs. (c) to (h). Pub. L. 96–515 added subsecs. (c) to (h).

1976—Subsec. (a)(4). Pub. L. 91–383, §11, as added Pub. L. 94–458, §2, added par. (4).

1973—Subsec. (b)(1). Pub. L. 93–54 defined "State" to include the Trust Territory of the Pacific Islands.

### TERMINATION OF TRUST TERRITORY OF THE PACIFIC ISLANDS

For termination of Trust Territory of the Pacific Islands and the Trusteeship Agreement, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

### ST. AUGUSTINE 450TH COMMEMORATION COMMISSION

Pub. L. 111–11, title VII, §7404, Mar. 30, 2009, 123 Stat. 1219, provided that:

"(a) DEFINITIONS.—In this section:

"(1) COMMEMORATION.—The term 'commemoration' means the commemoration of the 450th anniversary of the founding of the settlement of St. Augustine, Florida.

"(2) COMMISSION.—The term 'Commission' means the St. Augustine 450th Commemoration Commission established by subsection (b)(1).

"(3) GOVERNOR.—The term 'Governor' means the Governor of the State.

"(4) SECRETARY.—The term 'Secretary' means the Secretary of the Interior.

"(5) STATE.—

"(A) IN GENERAL.—The term 'State' means the State of Florida.

"(B) INCLUSION.—The term 'State' includes agencies and entities of the State of Florida.

"(b) ESTABLISHMENT.—

"(1) IN GENERAL.—There is established a commission, to be known as the 'St. Augustine 450th Commemoration Commission'.

"(2) MEMBERSHIP.—

"(A) COMPOSITION.—The Commission shall be composed of 14 members, of whom—

"(i) 3 members shall be appointed by the Secretary, after considering the recommendations of the St. Augustine City Commission;

"(ii) 3 members shall be appointed by the Secretary, after considering the recommendations of the Governor;

"(iii) 1 member shall be an employee of the National Park Service having experience relevant to the historical resources relating to the city of St. Augustine and the commemoration, to be appointed by the Secretary;

"(iv) 1 member shall be appointed by the Secretary, taking into consideration the recommendations of the Mayor of the city of St. Augustine;

"(v) 1 member shall be appointed by the Secretary, after considering the recommendations of the Chancellor of the University System of Florida; and

"(vi) 5 members shall be individuals who are residents of the State who have an interest in, support for, and expertise appropriate to the commemoration, to be appointed by the Secretary, taking into consideration the recommendations of Members of Congress.

"(B) TIME OF APPOINTMENT.—Each appointment of an initial member of the Commission shall be made before the expiration of the 120-day period beginning on the date of enactment of this Act [Mar. 30, 2009].

"(C) TERM; VACANCIES.—

"(i) TERM.—A member of the Commission shall be appointed for the life of the Commission.

"(ii) VACANCIES.—

"(I) IN GENERAL.—A vacancy on the Commission shall be filled in the same manner in which the original appointment was made.

"(II) PARTIAL TERM.—A member appointed to fill a vacancy on the Commission shall serve for the remainder of the term for which the predecessor of the member was appointed.

"(iii) CONTINUATION OF MEMBERSHIP.—If a member of the Commission was appointed to the Commission as Mayor of the city of St. Augustine or as an employee of the National Park Service or

the State University System of Florida, and ceases to hold such position, that member may continue to serve on the Commission for not longer than the 30-day period beginning on the date on which that member ceases to hold the position.

''(3) DUTIES.—The Commission shall—

''(A) plan, develop, and carry out programs and activities appropriate for the commemoration;

''(B) facilitate activities relating to the commemoration throughout the United States;

''(C) encourage civic, patriotic, historical, educational, artistic, religious, economic, and other organizations throughout the United States to organize and participate in anniversary activities to expand understanding and appreciation of the significance of the founding and continuing history of St. Augustine;

''(D) provide technical assistance to States, localities, and nonprofit organizations to further the commemoration;

''(E) coordinate and facilitate for the public scholarly research on, publication about, and interpretation of, St. Augustine;

''(F) ensure that the commemoration provides a lasting legacy and long-term public benefit by assisting in the development of appropriate programs; and

''(G) help ensure that the observances of the foundation of St. Augustine are inclusive and appropriately recognize the experiences and heritage of all individuals present when St. Augustine was founded.

''(c) COMMISSION MEETINGS.—

''(1) INITIAL MEETING.—Not later than 30 days after the date on which all members of the Commission have been appointed, the Commission shall hold the initial meeting of the Commission.

''(2) MEETINGS.—The Commission shall meet—

''(A) at least 3 times each year; or

''(B) at the call of the Chairperson or the majority of the members of the Commission.

''(3) QUORUM.—A majority of the voting members shall constitute a quorum, but a lesser number may hold meetings.

''(4) CHAIRPERSON AND VICE CHAIRPERSON.—

''(A) ELECTION.—The Commission shall elect the Chairperson and the Vice Chairperson of the Commission on an annual basis.

''(B) ABSENCE OF THE CHAIRPERSON.—The Vice Chairperson shall serve as the Chairperson in the absence of the Chairperson.

''(5) VOTING.—The Commission shall act only on an affirmative vote of a majority of the members of the Commission.

''(d) COMMISSION POWERS.—

''(1) GIFTS.—The Commission may solicit, accept, use, and dispose of gifts, bequests, or devises of money or other property for aiding or facilitating the work of the Commission.

''(2) APPOINTMENT OF ADVISORY COMMITTEES.—The Commission may appoint such advisory committees as the Commission determines to be necessary to carry out this section.

''(3) AUTHORIZATION OF ACTION.—The Commission may authorize any member or employee of the Commission to take any action that the Commission is authorized to take under this section.

''(4) PROCUREMENT.—

''(A) IN GENERAL.—The Commission may procure supplies, services, and property, and make or enter into contracts, leases, or other legal agreements, to carry out this section (except that a contract, lease, or other legal agreement made or entered into by the Commission shall not extend beyond the date of termination of the Commission).

''(B) LIMITATION.—The Commission may not purchase real property.

''(5) POSTAL SERVICES.—The Commission may use the United States mails in the same manner and under the same conditions as other agencies of the Federal Government.

''(6) GRANTS AND TECHNICAL ASSISTANCE.—The Commission may—

''(A) provide grants in amounts not to exceed $20,000 per grant to communities and nonprofit organizations for use in developing programs to assist in the commemoration;

''(B) provide grants to research and scholarly organizations to research, publish, or distribute information relating to the early history of St. Augustine; and

''(C) provide technical assistance to States, localities, and nonprofit organizations to further the commemoration.

''(e) COMMISSION PERSONNEL MATTERS.—

''(1) COMPENSATION OF MEMBERS.—

''(A) IN GENERAL.—Except as provided in paragraph (2), a member of the Commission shall serve without compensation.

''(B) FEDERAL EMPLOYEES.—A member of the Commission who is an officer or employee of the Federal Government shall serve without compensation other than the compensation received for the services of the member as an officer or employee of the Federal Government.

''(2) TRAVEL EXPENSES.—A member of the Commission shall be allowed travel expenses, including per diem in lieu of subsistence, at rates authorized for an employee of an agency under subchapter I of chapter 57 of title 5, United States Code, while away from the home or regular place of business of the member in the performance of the duties of the Commission.

''(3) DIRECTOR AND STAFF.—

''(A) IN GENERAL.—The Chairperson of the Commission may, without regard to the civil service laws (including regulations), nominate an executive director to enable the Commission to perform the duties of the Commission.

''(B) CONFIRMATION OF EXECUTIVE DIRECTOR.—The employment of an executive director shall be subject to confirmation by the Commission.

''(4) COMPENSATION.—

''(A) IN GENERAL.—Except as provided in subparagraph (B), the Commission may fix the compensation of the executive director and other personnel without regard to the provisions of chapter 51 and subchapter III of chapter 53 of title 5, United States Code, relating to classification of positions and General Schedule pay rates.

''(B) MAXIMUM RATE OF PAY.—The rate of pay for the executive director and other personnel shall not exceed the rate payable for level V of the Executive Schedule under section 5316 of title 5, United States Code.

''(5) DETAIL OF GOVERNMENT EMPLOYEES.—

''(A) FEDERAL EMPLOYEES.—

''(i) DETAIL.—At the request of the Commission, the head of any Federal agency may detail, on a reimbursable or nonreimbursable basis, any of the personnel of the agency to the Commission to assist the Commission in carrying out the duties of the Commission under this section.

''(ii) CIVIL SERVICE STATUS.—The detail of an employee under clause (i) shall be without interruption or loss of civil service status or privilege.

''(B) STATE EMPLOYEES.—The Commission may—

''(i) accept the services of personnel detailed from the State; and

''(ii) reimburse the State for services of detailed personnel.

''(6) PROCUREMENT OF TEMPORARY AND INTERMITTENT SERVICES.—The Chairperson of the Commission may procure temporary and intermittent services in accordance with section 3109(b) of title 5, United States Code, at rates for individuals that do not exceed the daily equivalent of the annual rate of basic pay prescribed for level V of the Executive Schedule under section 5316 of such title.

''(7) VOLUNTEER AND UNCOMPENSATED SERVICES.—Notwithstanding section 1342 of title 31, United

States Code, the Commission may accept and use such voluntary and uncompensated services as the Commission determines to be necessary.

''(8) SUPPORT SERVICES.—

''(A) IN GENERAL.—The Secretary shall provide to the Commission, on a reimbursable basis, such administrative support services as the Commission may request.

''(B) REIMBURSEMENT.—Any reimbursement under this paragraph shall be credited to the appropriation, fund, or account used for paying the amounts reimbursed.

''(9) FACA NONAPPLICABILITY.—Section 14(b) of the Federal Advisory Committee Act (5 U.S.C. App.) shall not apply to the Commission.

''(10) NO EFFECT ON AUTHORITY.—Nothing in this subsection supersedes the authority of the State, the National Park Service, the city of St. Augustine, or any designee of those entities, with respect to the commemoration.

''(f) PLANS; REPORTS.—

''(1) STRATEGIC PLAN.—The Commission shall prepare a strategic plan for the activities of the Commission carried out under this section.

''(2) FINAL REPORT.—Not later than September 30, 2015, the Commission shall complete and submit to Congress a final report that contains—

''(A) a summary of the activities of the Commission;

''(B) a final accounting of funds received and expended by the Commission; and

''(C) the findings and recommendations of the Commission.

''(g) AUTHORIZATION OF APPROPRIATIONS.—

''(1) IN GENERAL.—There is authorized to be appropriated to the Commission to carry out this section $500,000 for each of fiscal years 2009 through 2015.

''(2) AVAILABILITY.—Amounts made available under paragraph (1) shall remain available until December 31, 2015.

''(h) TERMINATION OF COMMISSION.—

''(1) DATE OF TERMINATION.—The Commission shall terminate on December 31, 2015.

''(2) TRANSFER OF DOCUMENTS AND MATERIALS.—Before the date of termination specified in paragraph (1), the Commission shall transfer all documents and materials of the Commission to the National Archives or another appropriate Federal entity.''

RECOVERY OF FEES FOR REVIEW SERVICES FOR
HISTORIC PRESERVATION TAX CERTIFICATION

Pub. L. 106–113, div. B, §1000(a)(3) [title I], Nov. 29, 1999, 113 Stat. 1535, 1501A–142, provided in part: ''That notwithstanding any other provision of law, the National Park Service may hereafter recover all fees derived from providing necessary review services associated with historic preservation tax certification, and such funds shall be available until expended without further appropriation for the costs of such review services''.

WOMEN'S PROGRESS COMMEMORATION

Pub. L. 105–341, Oct. 31, 1998, 112 Stat. 3196, provided that:

''SECTION 1. SHORT TITLE.

''This Act may be cited as the 'Women's Progress Commemoration Act'.

''SEC. 2. DECLARATION.

''Congress declares that—

''(1) the original Seneca Falls Convention, held in upstate New York in July 1848, convened to consider the social conditions and civil rights of women at that time;

''(2) the convention marked the beginning of an admirable and courageous struggle for equal rights for women;

''(3) the 150th Anniversary of the convention provides an excellent opportunity to examine the history of the women's movement; and

''(4) a Federal Commission should be established for the important task of ensuring the historic preservation of sites that have been instrumental in American women's history, creating a living legacy for generations to come.

''SEC. 3. ESTABLISHMENT OF COMMISSION.

''(a) ESTABLISHMENT.—There is established a commission to be known as the 'Women's Progress Commemoration Commission' (referred to in this Act as the 'Commission').

''(b) MEMBERSHIP.—

''(1) IN GENERAL.—The Commission shall be composed of 15 members, of whom—

''(A) 3 shall be appointed by the President;

''(B) 3 shall be appointed by the Speaker of the House of Representatives;

''(C) 3 shall be appointed by the minority leader of the House of Representatives;

''(D) 3 shall be appointed by the majority leader of the Senate; and

''(E) 3 shall be appointed by the minority leader of the Senate.

''(2) PERSONS ELIGIBLE.—

''(A) IN GENERAL.—The members of the Commission shall be individuals who have knowledge or expertise, whether by experience or training, in matters to be studied by the Commission. The members may be from the public or private sector, and may include Federal, State, or local employees, members of academia, nonprofit organizations, or industry, or other interested individuals.

''(B) DIVERSITY.—It is the intent of Congress that persons appointed to the Commission under paragraph (1) be persons who represent diverse economic, professional, and cultural backgrounds.

''(3) CONSULTATION AND APPOINTMENT.—

''(A) IN GENERAL.—The President, Speaker of the House of Representatives, minority leader of the House of Representatives, majority leader of the Senate, and minority leader of the Senate shall consult among themselves before appointing the members of the Commission in order to achieve, to the maximum extent practicable, fair and equitable representation of various points of view with respect to the matters to be studied by the Commission.

''(B) COMPLETION OF APPOINTMENTS; VACANCIES.—The President, Speaker of the House of Representatives, minority leader of the House of Representatives, majority leader of the Senate, and minority leader of the Senate shall conduct the consultation under subparagraph (3) and make their respective appointments not later than 60 days after the date of enactment of this Act [Oct. 31, 1998].

''(4) VACANCIES.—A vacancy in the membership of the Commission shall not affect the powers of the Commission and shall be filled in the same manner as the original appointment not later than 30 days after the vacancy occurs.

''(c) MEETINGS.—

''(1) INITIAL MEETING.—Not later than 30 days after the date on which all members of the Commission have been appointed, the Commission shall hold its first meeting.

''(2) SUBSEQUENT MEETINGS.—After the initial meeting, the Commission shall meet at the call of the Chairperson.

''(d) QUORUM.—A majority of the members of the Commission shall constitute a quorum for the transaction of business, but a lesser number of members may hold hearings.

''(e) CHAIRPERSON AND VICE CHAIRPERSON.—The Commission shall select a Chairperson and Vice Chairperson from among its members.

''SEC. 4. DUTIES OF THE COMMISSION.

''Not later than 1 year after the initial meeting of the Commission, the Commission, in cooperation with the Secretary of the Interior and other appropriate Federal, State, and local public and private entities, shall

prepare and submit to the Secretary of the Interior a report that—

"(1) identifies sites of historical significance in the women's movement; and

"(2) recommends actions, under the National Historic Preservation Act (16 U.S.C. 470 et seq.) and other law, to rehabilitate and preserve the sites and provide to the public interpretive and educational materials and activities at the sites.

"SEC. 5. POWERS OF THE COMMISSION.

"(a) HEARINGS.—The Commission may hold such hearings, sit and act at such times and places, take such testimony, and receive such evidence as the Commission considers advisable to carry out its duties of this Act.

"(b) INFORMATION FROM FEDERAL AGENCIES.—The Commission may secure directly from any Federal department or agency such information as the Commission considers necessary to carry out the provisions of this Act. At the request of the Chairperson of the Commission, the head of such department or agency shall furnish such information to the Commission.

"SEC. 6. COMMISSION PERSONNEL MATTERS.

"(a) COMPENSATION OF MEMBERS.—A member of the Commission who is not otherwise an officer or employee of the Federal Government shall be compensated at a rate equal to the daily equivalent of the annual rate of basic pay prescribed for a position at level IV of the Executive Schedule under section 5315 of title 5, United States Code, for each day (including travel time) during which the member is engaged in the performance of the duties of the Commission. A member of the Commission who is otherwise an officer or employee of the United States shall serve without compensation in addition to that received for services as an officer or employee of the United States.

"(b) TRAVEL EXPENSES.—A member of the Commission shall be allowed travel expenses, including per diem in lieu of subsistence, at rates authorized for employees of agencies under subchapter I of chapter 57 of title 5, United States Code, while away from the home or regular place of business of the member in the performance of service for the Commission.

"(c) STAFF.—

"(1) IN GENERAL.—The Chairperson of the Commission may, without regard to the civil service laws (including regulations), appoint and terminate an executive director and such other additional personnel as may be necessary to enable the Commission to perform its duties. The employment and termination of an executive director shall be subject to confirmation by a majority of the members of the Commission.

"(2) COMPENSATION.—The executive director shall be compensated at a rate not to exceed the rate payable for a position at level V of the Executive Schedule under section 5316 of title 5, United States Code. The Chairperson may fix the compensation of other personnel without regard to the provisions of chapter 51 and subchapter III of chapter 53 of title 5, United States Code, relating to classification of positions and General Schedule pay rates, except that the rate of pay for such personnel may not exceed the rate payable for a position at level V of the Executive Schedule under section 5316 of that title.

"(3) DETAIL OF GOVERNMENT EMPLOYEES.—Any Federal Government employee, with the approval of the head of the appropriate Federal agency, may be detailed to the Commission without reimbursement, and the detail shall be without interruption or loss of civil service status, benefits, or privilege.

"(d) PROCUREMENT OF TEMPORARY AND INTERMITTENT SERVICES.—The Chairperson of the Commission may procure temporary and intermittent services under section 3109(b) of title 5, United States Code, at rates for individuals not to exceed the daily equivalent of the annual rate of basic pay prescribed for a position at level V of the Executive Schedule under section 5316 of that title.

"SEC. 7. FUNDING.

"(a) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to the Commission such sums as are necessary to carry out this Act.

"(b) DONATIONS.—The Commission may accept donations from non-Federal sources to defray the costs of the operations of the Commission.

"SEC. 8. TERMINATION.

"The Commission shall terminate on the date that is 30 days after the date on which the Commission submits to the Secretary of the Interior the report under section 4(b) [sic].

"SEC. 9. REPORTS TO CONGRESS.

"Not later than 2 years and not later than 5 years after the date on which the Commission submits to the Secretary of the Interior the report under section 4, the Secretary of the Interior shall submit to Congress a report describing the actions that have been taken to preserve the sites identified in the Commission report as being of historical significance.''

HISTORICALLY BLACK COLLEGES AND UNIVERSITIES HISTORIC BUILDING RESTORATION AND PRESERVATION

Pub. L. 104–333, div. I, title V, § 507, Nov. 12, 1996, 110 Stat. 4156, as amended by Pub. L. 108–7, div. F, title I, § 150, Feb. 20, 2003, 117 Stat. 245, provided that:

"(a) AUTHORITY TO MAKE GRANTS.—From the amounts made available to carry out the National Historic Preservation Act [16 U.S.C. 470 et seq.], the Secretary of the Interior shall make grants in accordance with this section to eligible historically black colleges and universities for the preservation and restoration of historic buildings and structures on the campus of these institutions.

"(b) GRANT CONDITIONS.—Grants made under subsection (a) shall be subject to the condition that the grantee covenants, for the period of time specified by the Secretary, that—

"(1) no alteration will be made in the property with respect to which the grant is made without the concurrence of the Secretary; and

"(2) reasonable public access to the property with respect to which the grant is made will be permitted by the grantee for interpretive and educational purposes.

"(c) MATCHING REQUIREMENT FOR BUILDINGS AND STRUCTURES LISTED ON THE NATIONAL REGISTER OF HISTORIC PLACES.—

"(1) IN GENERAL.—Except as provided by paragraphs (2) and (3), the Secretary may obligate funds made available under this section for a grant with respect to a building or structure listed on, or eligible for listing on, the National Register of Historic Places only if the grantee agrees to match, from funds derived from non-Federal sources, the amount of the grant with an amount that is equal or greater than the grant.

"(2) WAIVER.—The Secretary may waive paragraphs (1) and (3) with respect to a grant if the Secretary determines from circumstances that an extreme emergency exists or that such a waiver is in the public interest to assure the preservation of historically significant resources.

"(3) EXCEPTION.—The Secretary shall not obligate funds made available under subsection (d)(2) for a grant with respect to a building or structure listed on, or eligible for listing on, the National Register of Historic Places unless the grantee agrees to provide, from funds derived from non-Federal sources, an amount that is equal to 30 percent of the total cost of the project for which the grant is provided.

"(d) FUNDING PROVISION.—

"(1) IN GENERAL.—Under section 108 of the National Historic Preservation Act [16 U.S.C. 470h], $29,000,000 shall be made available to carry out the purposes of this section. Of amounts made available pursuant to this section, $5,000,000 shall be available for grants to Fisk University, $2,500,000 shall be available for

grants to Knoxville College, $2,000,000 shall be available for grants to Miles College, Alabama, $1,500,000 shall be available for grants to Talladega College, Alabama, $1,550,000 shall be available for grants to Selma University, Alabama, $250,000 shall be available for grants to Stillman College, Alabama, $200,000 shall be available for grants to Concordia College, Alabama, $2,900,000 shall be available for grants to Allen University, South Carolina, $1,000,000 shall be available for grants to Claflin College, South Carolina, $2,000,000 shall be available for grants to Voorhees College, South Carolina, $1,000,000 shall be available for grants to Rust College, Mississippi, and $3,000,000 shall be available for grants to Tougaloo College, Mississippi.

''(2) ADDITIONAL FUNDING.—In addition to amounts made available under paragraph (1), there is authorized to be appropriated from the Historic Preservation Fund to carry out this section $10,000,000 for each of fiscal years 2003 through 2008.

''(e) REGULATIONS.—The Secretary shall develop such guidelines as may be necessary to carry out this section.

''(f) DEFINITIONS.—For the purposes of this section:

''(1) HISTORICALLY BLACK COLLEGES.—The term 'historically black colleges and universities' has the same meaning given the term 'part B institution' by section 322 of the Higher Education Act of 1965 (20 U.S.C. 1061).

''(2) HISTORIC BUILDING AND STRUCTURES.—The term 'historic building and structures' means a building or structure listed on, or eligible for listing on, the National Register of Historic Places or designated a National Historic Landmark.''

RECOMMENDATIONS OF HISTORIC PROPERTIES FOR PRESERVATION

Pub. L. 102–575, title XL, § 4021, Oct. 30, 1992, 106 Stat. 4765, provided that: ''The Secretary of the Interior, in consultation with the Advisory Council, shall seek to ensure that historic properties preserved under the National Historic Preservation Act [16 U.S.C. 470 et seq.] fully reflect the historical experience of this nation.''

SECRETARIAL REPORT

Section 4025 of Pub. L. 102–575 directed Secretary of the Interior, not later than one year after Oct. 30, 1992, to prepare and submit to Congress a report on the manner in which properties are listed or determined to be eligible for listing on the National Register, including but not limited to, the appropriateness of the criteria used in determining such eligibility, and the effect, if any, of such listing or finding of eligibility.

PRESERVATION AND CONSERVATION OF INTANGIBLE ASPECTS OF AMERICAN CULTURAL HERITAGE; REPORT TO PRESIDENT AND CONGRESS

Section 502 of Pub. L. 96–515 directed Secretary, in cooperation with American Folklife Center of Library of Congress, to submit within two years after Dec. 12, 1980, a report to President and Congress on preserving and conserving the intangible elements of our cultural heritage such as arts, skills, folklife, and folkways, the report to take into account the view of other public and private organizations, as appropriate, and to include recommendations for legislative and administrative actions by Federal Government in order to preserve, conserve, and encourage the continuation of the diverse traditional prehistoric, historic, ethnic, and folk cultural traditions that underlie and are a living expression of our American heritage.

COORDINATED SYSTEM OF CULTURAL PARKS AND HISTORIC CONSERVATION DISTRICTS; COMPREHENSIVE STUDY AND FORMULATION OF RECOMMENDATIONS; REPORT TO PRESIDENT AND CONGRESS

Section 506 of Pub. L. 96–515 directed Secretary to undertake a comprehensive study and formulate recommendations for a coordinated system of cultural parks and historic conservation districts that provide for preservation, interpretation, development, and use by public and private entities of prehistoric, historic, architectural, cultural, and recreational resources found in definable urban areas throughout the Nation; the study to propose alternatives concerning management and funding of such system by public and private entities and by various levels of government; and directed Secretary to submit a report of his study and recommendations to President and Congress within two years after Dec. 12, 1980.

FIRE IN HISTORIC PROPERTIES; PROTECTIVE MEASURES; REPORT TO PRESIDENT AND CONGRESS

Section 507 of Pub. L. 96–515 directed Secretary, in cooperation with Secretary of the Treasury, Administrator of United States Fire Administration, and Administrator of Federal Insurance Administration, to submit a report to President and Congress on fire in historic properties, such report to include a review of Federal laws to determine any relationship between these laws and arson or fire by 'suspicious origin', to make recommendations respecting amendments to such laws should a correlation be found to exist, to include the feasibility and necessity of establishing or developing protective measures at the Federal, State, or local level for the prevention, detection, and control of arson or fire by 'suspicious origin' in historic properties, to include recommendations regarding the Federal role in assisting the States and local governments with protecting historic properties from damage by fire, and to be submitted within eighteen months after Dec. 12, 1980.

## § 470a–1. World Heritage Convention

### (a) United States participation

The Secretary of the Interior shall direct and coordinate United States participation in the Convention Concerning the Protection of the World Cultural and Natural Heritage, approved by the Senate on October 26, 1973, in cooperation with the Secretary of State, the Smithsonian Institution, and the Advisory Council on Historic Preservation. Whenever possible, expenditures incurred in carrying out activities in cooperation with other nations and international organizations shall be paid for in such excess currency of the country or area where the expense is incurred as may be available to the United States.

### (b) Nomination of property to World Heritage Committee

The Secretary of the Interior shall periodically nominate properties he determines are of international significance to the World Heritage Committee on behalf of the United States. No property may be so nominated unless it has previously been determined to be of national significance. Each such nomination shall include evidence of such legal protections as may be necessary to ensure preservation of the property and its environment (including restrictive covenants, easements, or other forms of protection). Before making any such nomination, the Secretary shall notify the Committee on Natural Resources of the United States House of Representatives and the Committee on Energy and Natural Resources of the United States Senate.

### (c) Nomination of non-Federal property to World Heritage Committee

No non-Federal property may be nominated by the Secretary of the Interior to the World Herit-

(2) Any funds obtained by the Secretary in connection with the conveyance of any property pursuant to paragraph (1) shall be covered into the historic preservation fund, in addition to the amounts covered into such fund pursuant to section 470h of this title and subsection (i)[2] of this section, and shall remain available in such fund until appropriated by the Congress to carry out the purposes of this subchapter.

**(h) Assessment of fees in connection with loans**

The Secretary may assess appropriate and reasonable fees in connection with insuring loans under this section. Any such fees shall be covered into the Historic Preservation Fund, in addition to the amounts covered into such fund pursuant to section 470h of this title and subsection (g) of this section, and shall remain available in such fund until appropriated by the Congress to carry out purposes of this subchapter.

**(i) Treatment of loans as non-Federal funds**

Notwithstanding any other provision of law, any loan insured under this section shall be treated as non-Federal funds for the purposes of satisfying any requirement of any other provision of law under which Federal funds to be used for any project or activity are conditioned upon the use of non-Federal funds by the recipient for payment of any portion of the costs of such project or activity.

**(j) Authorization of appropriations for payment of losses**

Effective after the fiscal year 1981 there are authorized to be appropriated, such sums as may be necessary to cover payments incurred pursuant to subsection (e) of this section.

**(k) Eligibility of debt obligation for purchase, etc., by Federal Financing Bank**

No debt obligation which is made or committed to be made, or which is insured or committed to be insured, by the Secretary under this section shall be eligible for purchase by, or commitment to purchase by, or sale or issuance to, the Federal Financing Bank.

(Pub. L. 89–665, title I, § 104, Oct. 15, 1966, 80 Stat. 917; Pub. L. 96–515, title II, § 204, Dec. 12, 1980, 94 Stat. 2994.)

CODIFICATION

In subsec. (c), "December 12, 1980" substituted for "the date of enactment of this Act". "This Act" probably meant the National Historic Preservation Act Amendments of 1980 (Pub. L. 96–515) rather than the National Historic Preservation Act of 1966 (Pub. L. 89–665).

AMENDMENTS

1980—Subsec. (a). Pub. L. 96–515 substituted provision authorizing the Secretary to establish and maintain a program by which he, upon application of a private lender, insure loans made by such lender to finance any project for the preservation of a property included on the National Register for provision prohibiting grants to surveys or projects receiving assistance from any other Federal program or activity.

Subsec. (b). Pub. L. 96–515 substituted provision prescribing loan qualifications for provision authorizing the President, in order to assure consistency in policies and actions and coordination of planning, acquisition,

and development assistance to States with other related Federal programs, to issue regulations as deemed desirable.

Subsecs. (c) to (k). Pub. L. 96–515 added subsecs. (c) to (k).

TRANSFER OF FUNCTIONS

Enforcement functions of Secretary or other official in Department of the Interior and such functions of Secretary or other official in Department of Agriculture, insofar as they involve lands and programs under jurisdiction of that Department, related to compliance with historic preservation under sections 470 to 470a, 470b, and 470c to 470w–6 of this title with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§102(e), (f), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out in the Appendix to Title 5, Government Organization and Employees. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of Title 15, Commerce and Trade. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of Title 15.

**§ 470e. Recordkeeping; recipients of assistance; audit**

The beneficiary of assistance under this subchapter shall keep such records as the Secretary shall prescribe, including records which fully disclose the disposition by the beneficiary of the proceeds of such assistance, the total cost of the project or undertaking in connection with which such assistance is given or used, and the amount and nature of that portion of the cost of the project or undertaking supplied by other sources, and such other records as will facilitate an effective audit.

(Pub. L. 89–665, title I, § 105, Oct. 15, 1966, 80 Stat. 917.)

**§ 470f. Effect of Federal undertakings upon property listed in National Register; comment by Advisory Council on Historic Preservation**

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under part B of this subchapter a reasonable opportunity to comment with regard to such undertaking.

(Pub. L. 89–665, title I, § 106, Oct. 15, 1966, 80 Stat. 917; Pub. L. 94–422, title II, § 201(3), Sept. 28, 1976, 90 Stat. 1320.)

[2] So in original. Probably should be "subsection (h)".

AMENDMENTS

1976—Pub. L. 94–422 inserted ''or eligible for inclusion in'' after ''included in''.

TRANSFER OF FUNCTIONS

Enforcement functions of Secretary or other official in Department of the Interior and such functions of Secretary or other official in Department of Agriculture, insofar as they involve lands and programs under jurisdiction of that Department, related to compliance with historic preservation under sections 470 to 470a, 470b, and 470c to 470w–6 of this title with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§102(e), (f), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out in the Appendix to Title 5, Government Organization and Employees. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of Title 15, Commerce and Trade. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of Title 15.

REPORTING REQUIREMENTS OF ADVISORY COUNCIL ON HISTORIC PRESERVATION

Pub. L. 104–333, div. I, title V, §509(b), Nov. 12, 1996, 110 Stat. 4157, provided that: ''Within 18 months after the date of enactment of this Act [Nov. 12, 1996], the Advisory Council on Historic Preservation shall submit a report to the appropriate congressional committees containing an analysis of alternatives for modifying the regulatory process for addressing impacts of Federal actions on nationally significant historic properties, as well as alternatives for future promulgation and oversight of regulations for implementation of section 106 of the National Historic Preservation Act [16 U.S.C. 470f].''

## § 470g. White House, United States Supreme Court building, and United States Capitol not included in program for preservation of historical properties

Nothing in this subchapter shall be construed to be applicable to the White House and its grounds, the Supreme Court building and its grounds, or the United States Capitol and its related buildings and grounds.

(Pub. L. 89–665, title I, §107, Oct. 15, 1966, 80 Stat. 917.)

## § 470h. Historic Preservation Fund; establishment; appropriations; source of revenue

To carry out the provisions of this subchapter, there is hereby established the Historic Preservation Fund (hereafter referred to as the ''fund'') in the Treasury of the United States.

There shall be covered into such fund $24,400,000 for fiscal year 1977, $100,000,000 for fiscal year 1978, $100,000,000 for fiscal year 1979, $150,000,000 for fiscal year 1980, and $150,000,000 for fiscal year 1981, and $150,000,000 for each of fiscal years 1982 through 2015, from revenues due and payable to the United States under the Outer Continental Shelf Lands Act (67 Stat. 462, 469), as amended (43 U.S.C. 1338), and/or under section 7433(b) of title 10, notwithstanding any provision of law that such proceeds shall be credited to miscellaneous receipts of the Treasury. Such moneys shall be used only to carry out the purposes of this subchapter and shall be available for expenditure only when appropriated by the Congress. Any moneys not appropriated shall remain available in the fund until appropriated for said purposes: *Provided*, That appropriations made pursuant to this paragraph may be made without fiscal year limitation.

(Pub. L. 89–665, title I, §108, Oct. 15, 1966, 80 Stat. 917; Pub. L. 91–243, §1(a), May 9, 1970, 84 Stat. 204; Pub. L. 93–54, §1(a), July 1, 1973, 87 Stat. 139; Pub. L. 94–422, title II, §201(4), Sept. 28, 1976, 90 Stat. 1320; Pub. L. 96–515, title II, §205, Dec. 12, 1980, 94 Stat. 2995; Pub. L. 100–127, Oct. 9, 1987, 101 Stat. 800; Pub. L. 102–575, title XL, §4011, Oct. 30, 1992, 106 Stat. 4760; Pub. L. 106–208, §§2, 5(a)(7), May 26, 2000, 114 Stat. 318, 319; Pub. L. 109–453, §1(c), Dec. 22, 2006, 120 Stat. 3367.)

REFERENCES IN TEXT

The Outer Continental Shelf Lands Act, referred to in second par., is act Aug. 7, 1953, ch. 345, 67 Stat. 462, as amended, which is classified generally to subchapter III (§1331 et seq.) of chapter 29 of Title 43, Public Lands. Section 9 of the Act (43 U.S.C. 1338) provides for the disposition of revenues. For complete classification of this Act to the Code, see Short Title note set out under section 1331 of Title 43 and Tables.

CODIFICATION

''Section 7433(b) of title 10'' substituted in text for ''the Act of June 4, 1920 (41 Stat. 813), as amended (30 U.S.C. 191)'', which was classified to section 524 of former Title 34, Navy, on authority of act Aug. 10, 1956, ch. 1041, §49(b), 70A Stat. 640, the first section of which enacted Title 10, Armed Forces.

AMENDMENTS

2006—Pub. L. 109–453 substituted ''2015'' for ''2005''.

2000—Pub. L. 106–208 substituted ''through 2005'' for ''through 1997'' and ''(43 U.S.C. 1338)'' for ''(43 U.S.C. 338)''.

1992—Pub. L. 102–575 substituted ''1997'' for ''1992''.

1987—Pub. L. 100–127 substituted ''1992'' for ''1987''.

1980—Pub. L. 96–515 inserted ''and $150,000,000 for each of fiscal years 1982 through 1981'' after ''1981''.

1976—Pub. L. 94–422 substituted provisions establishing Historic Preservation Fund which contains appropriations obtained from revenues due and payable to United States pursuant to Outer Continental Shelf Lands Act and Act June 4, 1920 to carry out provisions of sections 470 to 470t of this title for provisions authorizing appropriations to carry out provisions of sections 470a, 470b, and 470c to 470h of this title of not more than $15,600,000 in fiscal year 1974, $20,000,000 in fiscal year 1975, and $24,400,000 in fiscal year 1976 to remain available until expended.

1973—Pub. L. 93–54 substituted appropriations authorization of $15,600,000, $20,000,000 and $24,400,000 for fiscal years 1974 through 1976, respectively, for such authorization of $7,000,000, $10,000,000, and $15,000,000 for fiscal years 1971 through 1973, respectively.

1970—Pub. L. 91–243 substituted provisions authorizing appropriations of not more than $7,000,000 for fiscal year 1971, and $10,000,000 and $15,000,000 for fiscal years 1972 and 1973, respectively, to carry out the provisions of sections 470a, 470b, and 470c to 470h of this title for provisions authorizing the appropriation of not to exceed $2,000,000 for fiscal year 1967 and not more than $10,000,000 for the three succeeding fiscal years to carry

**16 USC 470aa: Congressional findings and declaration of purpose**
Text contains those laws in effect on April 4, 2015

**From Title 16-CONSERVATION**
　　　CHAPTER 1B-ARCHAEOLOGICAL RESOURCES PROTECTION
**Jump To:**
　　　**Source Credit**
　　　**Short Title**
　　　**Miscellaneous**

## §470aa. Congressional findings and declaration of purpose

(a) The Congress finds that-

(1) archaeological resources on public lands and Indian lands are an accessible and irreplaceable part of the Nation's heritage;

(2) these resources are increasingly endangered because of their commercial attractiveness;

(3) existing Federal laws do not provide adequate protection to prevent the loss and destruction of these archaeological resources and sites resulting from uncontrolled excavations and pillage; and

(4) there is a wealth of archaeological information which has been legally obtained by private individuals for noncommercial purposes and which could voluntarily be made available to professional archaeologists and institutions.

(b) The purpose of this chapter is to secure, for the present and future benefit of the American people, the protection of archaeological resources and sites which are on public lands and Indian lands, and to foster increased cooperation and exchange of information between governmental authorities, the professional archaeological community, and private individuals having collections of archaeological resources and data which were obtained before October 31, 1979.

( Pub. L. 96–95, §2, Oct. 31, 1979, 93 Stat. 721 .)

### SHORT TITLE

Pub. L. 96–95, §1, Oct. 31, 1979, 93 Stat. 721 , provided that: "This Act [enacting this chapter] may be cited as the 'Archaeological Resources Protection Act of 1979'."

### GALISTEO BASIN ARCHAEOLOGICAL SITES PROTECTION

Pub. L. 108–208, Mar. 19, 2004, 118 Stat. 558 , known as the "Galisteo Basin Archaeological Sites Protection Act", provided for the preservation, protection, and interpretation of nationally significant archaeological resources in the Galisteo Basin of New Mexico by designating Galisteo Basin Archaeological Protection Sites and their acreage and provided for addition, deletion or modification of the sites, administration, cooperative agreements, acquisition of land and interests, withdrawal of lands from mining and other public land laws, and construction of the Act.

---

**16 USC 470bb: Definitions**
Text contains those laws in effect on April 4, 2015

**From Title 16-CONSERVATION**
    CHAPTER 1B-ARCHAEOLOGICAL RESOURCES PROTECTION
**Jump To:**
    **Source Credit**
    **References In Text**
    **Amendments**

---

# §470bb. Definitions

As used in this chapter-

(1) The term "archaeological resource" means any material remains of past human life or activities which are of archaeological interest, as determined under uniform regulations promulgated pursuant to this chapter. Such regulations containing such determination shall include, but not be limited to: pottery, basketry, bottles, weapons, weapon projectiles, tools, structures or portions of structures, pit houses, rock paintings, rock carvings, intaglios, graves, human skeletal materials, or any portion or piece of any of the foregoing items. Nonfossilized and fossilized paleontological specimens, or any portion or piece thereof, shall not be considered archaeological resources, under the regulations under this paragraph, unless found in archaeological context. No item shall be treated as an archaeological resource under regulations under this paragraph unless such item is at least 100 years of age.

(2) The term "Federal land manager" means, with respect to any public lands, the Secretary of the department, or the head of any other agency or instrumentality of the United States, having primary management authority over such lands. In the case of any public lands or Indian lands with respect to which no department, agency, or instrumentality has primary management authority, such term means the Secretary of the Interior. If the Secretary of the Interior consents, the responsibilities (in whole or in part) under this chapter of the Secretary of any department (other than the Department of the Interior) or the head of any other agency or instrumentality may be delegated to the Secretary of the Interior with respect to any land managed by such other Secretary or agency head, and in any such case, the term "Federal land manager" means the Secretary of the Interior.

(3) The term "public lands" means-

(A) lands which are owned and administered by the United States as part of-
(i) the national park system,
(ii) the national wildlife refuge system, or
(iii) the national forest system; and

(B) all other lands the fee title to which is held by the United States, other than lands on the Outer Continental Shelf and lands which are under the jurisdiction of the Smithsonian Institution.

(4) The term "Indian lands" means lands of Indian tribes, or Indian individuals, which are either held in trust by the United States or subject to a restriction against alienation imposed by the United States, except for any subsurface interests in lands not owned or controlled by an Indian tribe or an Indian individual.

(5) The term "Indian tribe" means any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in, or established pursuant to, the Alaska Native Claims Settlement Act (85 Stat. 688) [43 U.S.C. 1601 et seq.].

(6) The term "person" means an individual, corporation, partnership, trust, institution, association, or any other private entity or any officer, employee, agent, department, or instrumentality of the United States, of any Indian tribe, or of any State or political subdivision thereof.

(7) The term "State" means any of the fifty States, the District of Columbia, Puerto Rico, Guam, and the Virgin Islands.

( Pub. L. 96–95, §3, Oct. 31, 1979, 93 Stat. 721 ; Pub. L. 100–588, §1(a), Nov. 3, 1988, 102 Stat. 2983 .)

## REFERENCES IN TEXT

The Alaska Native Claims Settlement Act, referred to in par. (5), is Pub. L. 92–203, Dec. 18, 1971, 85 Stat. 688 , as amended, which is classified generally to chapter 33 (§1601 et seq.) of Title 43, Public Lands. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of

Title 43 and Tables.

## AMENDMENTS

**1988**-Par. (3). Pub. L. 100–588 substituted a period for semicolon at end.

**16 USC 470cc: Excavation and removal**
Text contains those laws in effect on December 18, 2014
Pending Updates: Pub L. 113-287 (12/19/2014) **[View Details]**

**From Title 16-CONSERVATION**
    CHAPTER 1B-ARCHAEOLOGICAL RESOURCES PROTECTION
**Jump To:**
    **Source Credit**
    **References In Text**
    **Amendments**

## §470cc. Excavation and removal

**(a) Application for permit**

Any person may apply to the Federal land manager for a permit to excavate or remove any archaeological resource located on public lands or Indian lands and to carry out activities associated with such excavation or removal. The application shall be required, under uniform regulations under this chapter, to contain such information as the Federal land manager deems necessary, including information concerning the time, scope, and location and specific purpose of the proposed work.

**(b) Determinations by Federal land manager prerequisite to issuance of permit**

A permit may be issued pursuant to an application under subsection (a) of this section if the Federal land manager determines, pursuant to uniform regulations under this chapter, that-

    (1) the applicant is qualified, to carry out the permitted activity,

    (2) the activity is undertaken for the purpose of furthering archaeological knowledge in the public interest,

    (3) the archaeological resources which are excavated or removed from public lands will remain the property of the United States, and such resources and copies of associated archaeological records and data will be preserved by a suitable university, museum, or other scientific or educational institution, and

    (4) the activity pursuant to such permit is not inconsistent with any management plan applicable to the public lands concerned.

**(c) Notification to Indian tribes of possible harm to or destruction of sites having religious or cultural importance**

If a permit issued under this section may result in harm to, or destruction of, any religious or cultural site, as determined by the Federal land manager, before issuing such permit, the Federal land manager shall notify any Indian tribe which may consider the site as having religious or cultural importance. Such notice shall not be deemed a disclosure to the public for purposes of section 470hh of this title.

**(d) Terms and conditions of permit**

Any permit under this section shall contain such terms and conditions, pursuant to uniform regulations promulgated under this chapter, as the Federal land manager concerned deems necessary to carry out the purposes of this chapter.

**(e) Identification of individuals responsible for complying with permit terms and conditions and other applicable laws**

Each permit under this section shall identify the individual who shall be responsible for carrying out the terms and conditions of the permit and for otherwise complying with this chapter and other law applicable to the permitted activity.

**(f) Suspension or revocation of permits; grounds**

Any permit issued under this section may be suspended by the Federal land manager upon his determination that the permittee has violated any provision of subsection (a), (b), or (c) of section 470ee of this title. Any such permit may be revoked by such Federal land manager upon assessment of a civil penalty under section 470ff of this title against the permittee or upon the permittee's conviction under section 470ee of this title.

**(g) Excavation or removal by Indian tribes or tribe members; excavation or removal of resources located on Indian lands**

(1) No permit shall be required under this section or under the Act of June 8, 1906, for the excavation or removal by any Indian tribe or member thereof of any archaeological resource located on Indian lands of such Indian tribe,

27

except that in the absence of tribal law regulating the excavation or removal of archaeological resources on Indian lands, an individual tribal member shall be required to obtain a permit under this section.

(2) In the case of any permits for the excavation or removal of any archaeological [1] resource located on Indian lands, the permit may be granted only after obtaining the consent of the Indian or Indian tribe owning or having jurisdiction over such lands. The permit shall include such terms and conditions as may be requested by such Indian or Indian tribe.

**(h) Permits issued under chapter 3203 of title 54**

(1) No permit or other permission shall be required under chapter 3203 of title 54,[2] for any activity for which a permit is issued under this section.

(2) Any permit issued under chapter 3203 of title 54,[2] shall remain in effect according to its terms and conditions following the enactment of this chapter. No permit under this chapter shall be required to carry out any activity under a permit issued under chapter 3203 of title 54,[2] before October 31, 1979, which remains in effect as provided in this paragraph, and nothing in this chapter shall modify or affect any such permit.

**(i) Compliance with provisions relating to undertakings on property listed in the National Register not required**

Issuance of a permit in accordance with this section and applicable regulations shall not require compliance with section 306108 of title 54.

**(j) Issuance of permits to State Governors for archaeological activities on behalf of States or their educational institutions**

Upon the written request of the Governor of any State, the Federal land manager shall issue a permit, subject to the provisions of subsections (b)(3), (b)(4), (c), (e), (f), (g), (h), and (i) of this section for the purpose of conducting archaeological research, excavation, removal, and curation, on behalf of the State or its educational institutions, to such Governor or to such designee as the Governor deems qualified to carry out the intent of this chapter.

( Pub. L. 96–95, §4, Oct. 31, 1979, 93 Stat. 722 ; Pub. L. 113–287, §5(d)(6), Dec. 19, 2014, 128 Stat. 3264.)

## References in Text

The Antiquities Act of 1906, referred to in subsec. (g)(1), is act June 8, 1906, ch. 3060, 34 Stat. 225, also known as the National Monument Act, which was classified generally to sections 431, 432, and 433 of Title 16, Conservation, prior to the enactment of Title 54, National Park Service and Related Programs by Pub. L. 113–287, Dec. 19, 2014, 128 Stat. 3094. See chapter 3203 of Title 54.

Following the enactment of this chapter, referred to in subsec. (h)(2), means following the enactment of Pub. L. 96–95, approved Oct. 31, 1979.

## Amendments

**2014**-Subsec. (h)(1). Pub. L. 113–287, §5(d)(6)(A)(i), substituted "chapter 3203 of title 54" for "the Act of June 8, 1906 (16 U.S.C. 431–433)".

Subsec. (h)(2). Pub. L. 113–287, §5(d)(6)(A)(ii), substituted "chapter 3203 of title 54" for "the Act of June 8, 1906" in two places.

Subsec. (i). Pub. L. 113–287, §5(d)(6)(B), substituted "section 306108 of title 54" for "section 470f of this title".

[1] So in original. Probably should be "archaeological".

[2] So in original. The comma probably should not appear.

28

**16 USC 470dd: Custody of archaeological resources**
Text contains those laws in effect on December 18, 2014
Pending Updates: Pub L. 113-287 (12/19/2014) **[View Details]**

**From Title 16-CONSERVATION**
    CHAPTER 1B-ARCHAEOLOGICAL RESOURCES PROTECTION
**Jump To:**
    **Source Credit**
    **Amendments**

## §470dd. Custody of archaeological resources

The Secretary of the Interior may promulgate regulations providing for-
    (1) the exchange, where appropriate, between suitable universities, museums, or other scientific or educational institutions, of archaeological resources removed from public lands and Indian lands pursuant to this chapter, and
    (2) the ultimate disposition of such resources and other resources removed pursuant to chapter 3125 or chapter 3203 of title 54.

Any exchange or ultimate disposition under such regulation of archaeological resources excavated or removed from Indian lands shall be subject to the consent of the Indian or Indian tribe which owns or has jurisdiction over such lands. Following promulgation of regulations under this section, notwithstanding any other provision of law, such regulations shall govern the disposition of archaeological resources removed from public lands and Indian lands pursuant to this chapter.

( Pub. L. 96–95, §5, Oct. 31, 1979, 93 Stat. 724 ; Pub. L. 113–287, §5(d)(7), Dec. 19, 2014, 128 Stat. 3264.)

### AMENDMENTS

**2014**-Par. (2). Pub. L. 113–287 "chapter 3125 or chapter 3203 of title 54" for "the Act of June 27, 1960 (16 U.S.C. 469–469c) or the Act of June 8, 1906 (16 U.S.C. 431–433)".

**16 USC 470ee: Prohibited acts and criminal penalties**
Text contains those laws in effect on April 4, 2015

**From Title 16-CONSERVATION**
    CHAPTER 1B-ARCHAEOLOGICAL RESOURCES PROTECTION
**Jump To:**
    **Source Credit**
    **Amendments**

## §470ee. Prohibited acts and criminal penalties

**(a) Unauthorized excavation, removal, damage, alteration, or defacement of archaeological resources**

No person may excavate, remove, damage, or otherwise alter or deface, or attempt to excavate, remove, damage, or otherwise alter or deface any archaeological resource located on public lands or Indian lands unless such activity is pursuant to a permit issued under section 470cc of this title, a permit referred to in section 470cc(h)(2) of this title, or the exemption contained in section 470cc(g)(1) of this title.

**(b) Trafficking in archaeological resources the excavation or removal of which was wrongful under Federal law**

No person may sell, purchase, exchange, transport, receive, or offer to sell, purchase, or exchange any archaeological resource if such resource was excavated or removed from public lands or Indian lands in violation of-

    (1) the prohibition contained in subsection (a) of this section, or
    (2) any provision, rule, regulation, ordinance, or permit in effect under any other provision of Federal law.

**(c) Trafficking in interstate or foreign commerce in archaeological resources the excavation, removal, sale, purchase, exchange, transportation or receipt of which was wrongful under State or local law**

No person may sell, purchase, exchange, transport, receive, or offer to sell, purchase, or exchange, in interstate or foreign commerce, any archaeological resource excavated, removed, sold, purchased, exchanged, transported, or received in violation of any provision, rule, regulation, ordinance, or permit in effect under State or local law.

**(d) Penalties**

Any person who knowingly violates, or counsels, procures, solicits, or employs any other person to violate, any prohibition contained in subsection (a), (b), or (c) of this section shall, upon conviction, be fined not more than $10,000 or imprisoned not more than one year, or both: *Provided, however*, That if the commercial or archaeological value of the archaeological resources involved and the cost of restoration and repair of such resources exceeds the sum of $500, such person shall be fined not more than $20,000 or imprisoned not more than two years, or both. In the case of a second or subsequent such violation upon conviction such person shall be fined not more than $100,000, or imprisoned not more than five years, or both.

**(e) Effective date**

The prohibitions contained in this section shall take effect on October 31, 1979.

**(f) Prospective application**

Nothing in subsection (b)(1) of this section shall be deemed applicable to any person with respect to an archaeological resource which was in the lawful possession of such person prior to October 31, 1979.

**(g) Removal of arrowheads located on ground surface**

Nothing in subsection (d) of this section shall be deemed applicable to any person with respect to the removal of arrowheads located on the surface of the ground.

( Pub. L. 96–95, §6, Oct. 31, 1979, 93 Stat. 724 ; Pub. L. 100–588, §1(b), (c), Nov. 3, 1988, 102 Stat. 2983 .)

## AMENDMENTS

**1988**-Subsec. (a). Pub. L. 100–588, §1(b), inserted ", or attempt to excavate, remove, damage, or otherwise alter or deface" after "deface".

Subsec. (d). Pub. L. 100–588, §1(c), substituted "$500" for "$5,000".

**16 USC 470ff: Civil penalties**
Text contains those laws in effect on April 4, 2015

**From Title 16-CONSERVATION**
> CHAPTER 1B-ARCHAEOLOGICAL RESOURCES PROTECTION

**Jump To:**
> **Source Credit**

# §470ff. Civil penalties

**(a) Assessment by Federal land manager**

(1) Any person who violates any prohibition contained in an applicable regulation or permit issued under this chapter may be assessed a civil penalty by the Federal land manager concerned. No penalty may be assessed under this subsection unless such person is given notice and opportunity for a hearing with respect to such violation. Each violation shall be a separate offense. Any such civil penalty may be remitted or mitigated by the Federal land manager concerned.

(2) The amount of such penalty shall be determined under regulations promulgated pursuant to this chapter, taking into account, in addition to other factors-

> (A) the archaeological or commercial value of the archaeological resource involved, and

> (B) the cost of restoration and repair of the resource and the archaeological site involved.

Such regulations shall provide that, in the case of a second or subsequent violation by any person, the amount of such civil penalty may be double the amount which would have been assessed if such violation were the first violation by such person. The amount of any penalty assessed under this subsection for any violation shall not exceed an amount equal to double the cost of restoration and repair of resources and archaeological sites damaged and double the fair market value of resources destroyed or not recovered.

(3) No penalty shall be assessed under this section for the removal of arrowheads located on the surface of the ground.

**(b) Judicial review of assessed penalties; collection of unpaid assessments**

(1) Any person aggrieved by an order assessing a civil penalty under subsection (a) of this section may file a petition for judicial review of such order with the United States District Court for the District of Columbia or for any other district in which such a person resides or transacts business. Such a petition may only be filed within the 30-day period beginning on the date the order making such assessment was issued. The court shall hear such action on the record made before the Federal land manager and shall sustain his action if it is supported by substantial evidence on the record considered as a whole.

(2) If any person fails to pay an assessment of a civil penalty-

> (A) after the order making the assessment has become a final order and such person has not filed a petition for judicial review of the order in accordance with paragraph (1), or

> (B) after a court in an action brought under paragraph (1) has entered a final judgment upholding the assessment of a civil penalty,

the Federal land managers may request the Attorney General to institute a civil action in a district court of the United States for any district in which such person is found, resides, or transacts business to collect the penalty and such court shall have jurisdiction to hear and decide any such action. In such action, the validity and amount of such penalty shall not be subject to review.

**(c) Hearings**

Hearings held during proceedings for the assessment of civil penalties authorized by subsection (a) of this section shall be conducted in accordance with section 554 of title 5. The Federal land manager may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and administer oaths. Witnesses summoned shall be paid the same fees and mileage that are paid to witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person pursuant to this paragraph, the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Federal land manager or to appear and produce documents before the Federal land manager, or both, and any failure to obey

31

such order of the court may be punished by such court as a contempt thereof.

( Pub. L. 96–95, §7, Oct. 31, 1979, 93 Stat. 725 .)

**16 USC 470gg: Enforcement**
Text contains those laws in effect on April 4, 2015

**From Title 16-CONSERVATION**
    CHAPTER 1B-ARCHAEOLOGICAL RESOURCES PROTECTION
**Jump To:**
    **Source Credit**

# §470gg. Enforcement

### (a) Rewards

Upon the certification of the Federal land manager concerned, the Secretary of the Treasury is directed to pay from penalties and fines collected under sections 470ee and 470ff of this title an amount equal to one-half of such penalty or fine, but not to exceed $500, to any person who furnishes information which leads to the finding of a civil violation, or the conviction of criminal violation, with respect to which such penalty or fine was paid. If several persons provided such information, such amount shall be divided among such persons. No officer or employee of the United States or of any State or local government who furnishes information or renders service in the performance of his official duties shall be eligible for payment under this subsection.

### (b) Forfeitures

All archaeological resources with respect to which a violation of subsection (a), (b), or (c) of section 470ee of this title occurred and which are in the possession of any person, and all vehicles and equipment of any person which were used in connection with such violation, may be (in the discretion of the court or administrative law judge, as the case may be) subject to forfeiture to the United States upon-

(1) such person's conviction of such violation under section 470ee of this title,

(2) assessment of a civil penalty against such person under section 470ff of this title with respect to such violation, or

(3) a determination by any court that such archaeological resources, vehicles, or equipment were involved in such violation.

### (c) Disposition of penalties collected and items forfeited in cases involving archaeological resources excavated or removed from Indian lands

In cases in which a violation of the prohibition contained in subsection (a), (b), or (c) of section 470ee of this title involve archaeological resources excavated or removed from Indian lands, the Federal land manager or the court, as the case may be, shall provide for the payment to the Indian or Indian tribe involved of all penalties collected pursuant to section 470ff of this title and for the transfer to such Indian or Indian tribe of all items forfeited under this section.

( Pub. L. 96–95, §8, Oct. 31, 1979, 93 Stat. 726 .)

---

**16 USC 470hh: Confidentiality of information concerning nature and location of archaeological resources**
Text contains those laws in effect on December 18, 2014
Pending Updates: Pub L. 113-287 (12/19/2014) **[View Details]**

**From Title 16-CONSERVATION**
    CHAPTER 1B-ARCHAEOLOGICAL RESOURCES PROTECTION
**Jump To:**
    **Source Credit**
    **Amendments**

---

# §470hh. Confidentiality of information concerning nature and location of archaeological resources

**(a) Disclosure of information**

    Information concerning the nature and location of any archaeological resource for which the excavation or removal requires a permit or other permission under this chapter or under any other provision of Federal law may not be made available to the public under subchapter II of chapter 5 of title 5 or under any other provision of law unless the Federal land manager concerned determines that such disclosure would-

    (1) further the purposes of this chapter or chapter 3125 of title 54, and

    (2) not create a risk of harm to such resources or to the site at which such resources are located.

**(b) Request for disclosure by Governors**

    Notwithstanding the provisions of subsection (a) of this section, upon the written request of the Governor of any State, which request shall state-

    (1) the specific site or area for which information is sought,

    (2) the purpose for which such information is sought,

    (3) a commitment by the Governor to adequately protect the confidentiality of such information to protect the resource from commercial exploitation,

    the Federal land manager concerned shall provide to the Governor information concerning the nature and location of archaeological resources within the State of the requesting Governor.

( Pub. L. 96–95, §9, Oct. 31, 1979, 93 Stat. 727 ; Pub. L. 113–287, §5(d)(8), Dec. 19, 2014, 128 Stat. 3265.)

## AMENDMENTS

    **2014**-Subsec. (a)(1). Pub. L. 113–287 Sec. 5(d)(8), which directed substitution of "chapter 3125 of title 54" for "the Act of June 27, 1960 (16 U.S.C. 469–469c)" in subsec. (a)(2), was executed by making the substitution in subsec. (a)(1), to reflect the probable intent of Congress.

---

**16 USC 470ii: Rules and regulations; intergovernmental coordination**
Text contains those laws in effect on April 4, 2015

From Title 16-CONSERVATION
 CHAPTER 1B-ARCHAEOLOGICAL RESOURCES PROTECTION
Jump To:
 **Source Credit**
 **References In Text**
 **Amendments**

---

# §470ii. Rules and regulations; intergovernmental coordination

**(a) Promulgation; effective date**

 The Secretaries of the Interior, Agriculture and Defense and the Chairman of the Board of the Tennessee Valley Authority, after consultation with other Federal land managers, Indian tribes, representatives of concerned State agencies, and after public notice and hearing, shall promulgate such uniform rules and regulations as may be appropriate to carry out the purposes of this chapter. Such rules and regulations may be promulgated only after consideration of the provisions of the American Indian Religious Freedom Act (92 Stat. 469; 42 U.S.C. 1996 [, 1996a]). Each uniform rule or regulation promulgated under this chapter shall be submitted on the same calendar day to the Committee on Energy and Natural Resources of the United States Senate and to the Committee on Natural Resources of the United States House of Representatives, and no such uniform rule or regulation may take effect before the expiration of a period of ninety calendar days following the date of its submission to such Committees.

**(b) Federal land managers' rules**

 Each Federal land manager shall promulgate such rules and regulations, consistent with the uniform rules and regulations under subsection (a) of this section, as may be appropriate for the carrying out of his functions and authorities under this chapter.

**(c) Federal land managers' public awareness program of archaeological resources on public lands and Indian lands**

 Each Federal land manager shall establish a program to increase public awareness of the significance of the archaeological resources located on public lands and Indian lands and the need to protect such resources.

( Pub. L. 96–95, §10, Oct. 31, 1979, 93 Stat. 727 ; Pub. L. 100–588, §1(d), Nov. 3, 1988, 102 Stat. 2983 ; Pub. L. 103–437, §6(d)(30), Nov. 2, 1994, 108 Stat. 4584 ; Pub. L. 104–333, div. I, title VIII, §814(d)(2)(A), Nov. 12, 1996, 110 Stat. 4196 .)

## REFERENCES IN TEXT

 The American Indian Religious Freedom Act, referred to in subsec. (a), is Pub. L. 95–341, Aug. 11, 1978, 92 Stat. 469 , as amended, which is classified to sections 1996 and 1996a of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 1996 of Title 42 and Tables.

## AMENDMENTS

 **1996**-Subsec. (c). Pub. L. 104–333 struck out at end "Each such land manager shall submit an annual report to the Committee on Natural Resources of the United States House of Representatives and to the Committee on Energy and Natural Resources of the United States Senate regarding the actions taken under such program."

 **1994**-Subsecs. (a), (c). Pub. L. 103–437 substituted "Natural Resources" for "Interior and Insular Affairs" after "Committee on".

 **1988**-Subsec. (c). Pub. L. 100–588 added subsec. (c).

**16 USC 470jj: Cooperation with private individuals**
Text contains those laws in effect on April 4, 2015

**From Title 16-CONSERVATION**
> CHAPTER 1B-ARCHAEOLOGICAL RESOURCES PROTECTION
**Jump To:**
> **Source Credit**

## §470jj. Cooperation with private individuals

The Secretary of the Interior shall take such action as may be necessary, consistent with the purposes of this chapter, to foster and improve the communication, cooperation, and exchange of information between-

(1) private individuals having collections of archaeological resources and data which were obtained before the date of the enactment of this chapter, and

(2) Federal authorities responsible for the protection of archaeological resources on the public lands and Indian lands and professional archaeologists and associations of professional archaeologists.

In carrying out this section, the Secretary shall, to the extent practicable and consistent with the provisions of this chapter, make efforts to expand the archaeological data base for the archaeological resources of the United States through increased cooperation between private individuals referred to in paragraph (1) and professional archaeologists and archaeological organizations.

( Pub. L. 96–95, §11, Oct. 31, 1979, 93 Stat. 727 .)

**16 USC 470kk: Savings provisions**
Text contains those laws in effect on April 4, 2015

**From Title 16-CONSERVATION**
    CHAPTER 1B-ARCHAEOLOGICAL RESOURCES PROTECTION
**Jump To:**
    **Source Credit**

## §470kk. Savings provisions

**(a) Mining, mineral leasing, reclamation, and other multiple uses**

    Nothing in this chapter shall be construed to repeal, modify, or impose additional restrictions on the activities permitted under existing laws and authorities relating to mining, mineral leasing, reclamation, and other multiple uses of the public lands.

**(b) Private collections**

    Nothing in this chapter applies to, or requires a permit for, the collection for private purposes of any rock, coin, bullet, or mineral which is not an archaeological resource, as determined under uniform regulations promulgated under section 470bb(1) of this title.

**(c) Lands within chapter**

    Nothing in this chapter shall be construed to affect any land other than public land or Indian land or to affect the lawful recovery, collection, or sale of archaeological resources from land other than public land or Indian land.

( Pub. L. 96–95, §12, Oct. 31, 1979, 93 Stat. 728 .)

---

**16 USC 470ll: Annual report to Congress**
Text contains those laws in effect on April 4, 2015

**From Title 16-CONSERVATION**
    CHAPTER 1B-ARCHAEOLOGICAL RESOURCES PROTECTION
**Jump To:**
    **Source Credit**
    **References In Text**

---

## §470ll. Annual report to Congress

As part of the annual report required to be submitted to the specified committees of the Congress pursuant to section 469a–3(c) of this title,[1] the Secretary of the Interior shall comprehensively report as a separate component on the activities carried out under the provisions of this chapter, and he shall make such recommendations as he deems appropriate as to changes or improvements needed in the provisions of this chapter. Such report shall include a brief summary of the actions undertaken by the Secretary under section 470jj of this title, relating to cooperation with private individuals.

( Pub. L. 96–95, §13, Oct. 31, 1979, 93 Stat. 728 .)

### REFERENCES IN TEXT

Section 469a–3 of this title, referred to in text, was repealed by Pub. L. 113–287, §7, Dec. 19, 2014, 128 Stat. 3272. Prior to the repeal of section 469a–3, language in subsec. (c) that required submission of an annual report was struck out by Pub. L. 104–333.

[1] *See References in Text note below.*

**16 USC 470mm: Surveying of lands; reporting of violations**
Text contains those laws in effect on April 4, 2015

**From Title 16-CONSERVATION**
     CHAPTER 1B-ARCHAEOLOGICAL RESOURCES PROTECTION
**Jump To:**
     **Source Credit**

## §470mm. Surveying of lands; reporting of violations

    The Secretaries of the Interior, Agriculture, and Defense and the Chairman of the Board of the Tennessee Valley Authority shall-

    (a) develop plans for surveying lands under their control to determine the nature and extent of archeological resources on those lands;

    (b) prepare a schedule for surveying lands that are likely to contain the most scientifically valuable archeological resources; and

    (c) develop documents for the reporting of suspected violations of this chapter and establish when and how those documents are to be completed by officers, employees, and agents of their respective agencies.

(Pub. L. 96–95, §14, as added Pub. L. 100–555, Oct. 28, 1988, 102 Stat. 2778 .)

---

**25 USC 3002: Ownership**
Text contains those laws in effect on April 4, 2015

**From Title 25-INDIANS**
       CHAPTER 32-NATIVE AMERICAN GRAVES PROTECTION AND REPATRIATION
**Jump To:**
       **Source Credit**
       **References In Text**

---

# §3002. Ownership

## (a) Native American human remains and objects

The ownership or control of Native American cultural items which are excavated or discovered on Federal or tribal lands after November 16, 1990, shall be (with priority given in the order listed)-

(1) in the case of Native American human remains and associated funerary objects, in the lineal descendants of the Native American; or

(2) in any case in which such lineal descendants cannot be ascertained, and in the case of unassociated funerary objects, sacred objects, and objects of cultural patrimony-

(A) in the Indian tribe or Native Hawaiian organization on whose tribal land such objects or remains were discovered;

(B) in the Indian tribe or Native Hawaiian organization which has the closest cultural affiliation with such remains or objects and which, upon notice, states a claim for such remains or objects; or

(C) if the cultural affiliation of the objects cannot be reasonably ascertained and if the objects were discovered on Federal land that is recognized by a final judgment of the Indian Claims Commission or the United States Court of Claims as the aboriginal land of some Indian tribe-

(1) in the Indian tribe that is recognized as aboriginally occupying the area in which the objects were discovered, if upon notice, such tribe states a claim for such remains or objects, or

(2) if it can be shown by a preponderance of the evidence that a different tribe has a stronger cultural relationship with the remains or objects than the tribe or organization specified in paragraph (1), in the Indian tribe that has the strongest demonstrated relationship, if upon notice, such tribe states a claim for such remains or objects.

## (b) Unclaimed Native American human remains and objects

Native American cultural items not claimed under subsection (a) of this section shall be disposed of in accordance with regulations promulgated by the Secretary in consultation with the review committee established under section 3006 of this title, Native American groups, representatives of museums and the scientific community.

## (c) Intentional excavation and removal of Native American human remains and objects

The intentional removal from or excavation of Native American cultural items from Federal or tribal lands for purposes of discovery, study, or removal of such items is permitted only if-

(1) such items are excavated or removed pursuant to a permit issued under section 470cc of title 16 which shall be consistent with this chapter;

(2) such items are excavated or removed after consultation with or, in the case of tribal lands, consent of the appropriate (if any) Indian tribe or Native Hawaiian organization;

(3) the ownership and right of control of the disposition of such items shall be as provided in subsections (a) and (b) of this section; and

(4) proof of consultation or consent under paragraph (2) is shown.

## (d) Inadvertent discovery of Native American remains and objects

(1) Any person who knows, or has reason to know, that such person has discovered Native American cultural items on Federal or tribal lands after November 16, 1990, shall notify, in writing, the Secretary of the Department, or head of any other agency or instrumentality of the United States, having primary management authority with respect to Federal lands and the appropriate Indian tribe or Native Hawaiian organization with respect to tribal lands, if known or readily ascertainable, and, in the case of lands that have been selected by an Alaska Native Corporation or group organized pursuant to the Alaska Native Claims Settlement Act of 1971 [43 U.S.C. 1601 et seq.], the appropriate corporation or group. If the discovery occurred in connection with an activity, including (but not limited to) construction, mining, logging, and agriculture, the person shall cease the activity in the area of the discovery, make a reasonable effort to protect the items discovered before resuming such activity, and provide

40

notice under this subsection. Following the notification under this subsection, and upon certification by the Secretary of the department or the head of any agency or instrumentality of the United States or the appropriate Indian tribe or Native Hawaiian organization that notification has been received, the activity may resume after 30 days of such certification.

(2) The disposition of and control over any cultural items excavated or removed under this subsection shall be determined as provided for in this section.

(3) If the Secretary of the Interior consents, the responsibilities (in whole or in part) under paragraphs (1) and (2) of the Secretary of any department (other than the Department of the Interior) or the head of any other agency or instrumentality may be delegated to the Secretary with respect to any land managed by such other Secretary or agency head.

**(e) Relinquishment**

Nothing in this section shall prevent the governing body of an Indian tribe or Native Hawaiian organization from expressly relinquishing control over any Native American human remains, or title to or control over any funerary object, or sacred object.

( Pub. L. 101–601, §3, Nov. 16, 1990, 104 Stat. 3050 .)

## REFERENCES IN TEXT

The Indian Claims Commission, referred to in subsec. (a)(2)(C), terminated Sept. 30, 1978. See Codification note set out under former section 70 et seq. of this title.

The United States Court of Claims, referred to in subsec. (a)(2)(C), and the United States Court of Customs and Patent Appeals were merged effective Oct. 1, 1982, into a new United States Court of Appeals for the Federal Circuit by Pub. L. 97–164, Apr. 2, 1982, 96 Stat. 25 , which also created a United States Claims Court [now United States Court of Federal Claims] that inherited the trial jurisdiction of the Court of Claims. See sections 48, 171 et seq., 791 et seq., and 1491 et seq. of Title 28, Judiciary and Judicial Procedure.

This chapter, referred to in subsec. (c)(1), was in the original "this Act", meaning Pub. L. 101–601, Nov. 16, 1990, 104 Stat. 3048 , known as the Native American Graves Protection and Repatriation Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 3001 of this title and Tables.

The Alaska Native Claims Settlement Act of 1971, referred to in subsec. (d)(1), probably means the Alaska Native Claims Settlement Act, Pub. L. 92–203, Dec. 18, 1971, 85 Stat. 688 , as amended, and which is classified generally to chapter 33 (§1601 et seq.) of Title 43, Public Lands. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of Title 43 and Tables.

41

**28 USC 1291: Final decisions of district courts**
Text contains those laws in effect on April 5, 2015

**From Title 28-JUDICIARY AND JUDICIAL PROCEDURE**
PART IV-JURISDICTION AND VENUE
CHAPTER 83-COURTS OF APPEALS
**Jump To:**
Source Credit
Amendments
Effective Date

## §1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

(June 25, 1948, ch. 646, 62 Stat. 929; Oct. 31, 1951, ch. 655, §48, 65 Stat. 726 ; Pub. L. 85–508, §12(e), July 7, 1958, 72 Stat. 348 ; Pub. L. 97–164, title I, §124, Apr. 2, 1982, 96 Stat. 36 .)

### HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §§225(a), 933(a)(1), and section 1356 of title 48, U.S.C., 1940 ed., Territories and Insular Possessions, and sections 61 and 62 of title 7 of the Canal Zone Code (Mar. 3, 1911, ch. 231, §128, 36 Stat. 1133; Aug. 24, 1912, ch. 390, §9, 37 Stat. 566; Jan. 28, 1915, ch. 22, §2, 38 Stat. 804; Feb. 7, 1925, ch. 150, 43 Stat. 813; Sept. 21, 1922, ch. 370, §3, 42 Stat. 1006; Feb. 13, 1925, ch. 229, §1, 43 Stat. 936; Jan. 31, 1928, ch. 14, §1, 45 Stat. 54; May 17, 1932, ch. 190, 47 Stat. 158; Feb. 16, 1933, ch. 91, §3, 47 Stat. 817; May 31, 1935, ch. 160, 49 Stat. 313; June 20, 1938, ch. 526, 52 Stat. 779; Aug. 2, 1946, ch. 753, §412(a)(1), 60 Stat. 844).

This section rephrases and simplifies paragraphs "First", "Second", and "Third" of section 225(a) of title 28, U.S.C., 1940 ed., which referred to each Territory and Possession separately, and to sections 61 and 62 of the Canal Zone Code, section 933(a)(1) of said title relating to jurisdiction of appeals in tort claims cases, and the provisions of section 1356 of title 48, U.S.C., 1940 ed., relating to jurisdiction of appeals from final judgments of the district court for the Canal Zone.

The district courts for the districts of Hawaii and Puerto Rico are embraced in the term "district courts of the United States." (See definitive section 451 of this title.)

Paragraph "Fourth" of section 225(a) of title 28, U.S.C., 1940 ed., is incorporated in section 1293 of this title.

Words "Fifth. In the United States Court for China, in all cases" in said section 225(a) were omitted. (See reviser's note under section 411 of this title.)

Venue provisions of section 1356 of title 48, U.S.C., 1940 ed., are incorporated in section 1295 of this title.

Section 61 of title 7 of the Canal Zone Code is also incorporated in sections 1291 and 1295 of this title.

In addition to the jurisdiction conferred by this chapter, the courts of appeals also have appellate jurisdiction in proceedings under Title 11, Bankruptcy, and jurisdiction to review:

(1) Orders of the Secretary of the Treasury denying an application for, suspending, revoking, or annulling a basic permit under chapter 8 of title 27;

(2) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;

(3) Orders of the Secretary of the Army under sections 504, 505 and 516 of title 33, U.S.C., 1940 ed., Navigation and Navigable Waters;

(4) Orders of the Civil Aeronautics Board under chapter 9 of title 49, except orders as to foreign air carriers which are subject to the President's approval;

(5) Orders under chapter 1 of title 7, refusing to designate boards of trade as contract markets or suspending or revoking such designations, or excluding persons from trading in contract markets;

(6) Orders of the Federal Power Commission under chapter 12 of title 16;

(7) Orders of the Federal Security Administrator under section 371(e) of title 21, in a case of actual controversy as to the validity of any such order, by any person adversely affected thereby;

(8) Orders of the Federal Power Commission under chapter 15B of title 15;

(9) Final orders of the National Labor Relations Board;

(10) Cease and desist orders under section 193 of title 7;

(11) Orders of the Securities and Exchange Commission;

(12) Orders to cease and desist from violating section 1599 of title 7;

(13) Wage orders of the Administrator of the Wage and Hour Division of the Department of Labor under section 208 of title 29;

(14) Orders under sections 81r and 1641 of title 19, U.S.C., 1940 ed., Customs Duties.

The courts of appeals also have jurisdiction to enforce:

(1) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System, and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;

(2) Final orders of the National Labor Relations Board;

(3) Orders to cease and desist from violating section 1599 of title 7.

The Court of Appeals for the District of Columbia also has jurisdiction to review orders of the Post Office Department under section 576 of title 39 relating to discriminations in sending second-class publications by freight; Maritime Commission orders denying transfer to foreign registry of vessels under subsidy contract; sugar allotment orders; decisions of the Federal Communications Commission granting or refusing applications for construction permits for radio stations, or for radio station licenses, or for renewal or modification of radio station licenses, or suspending any radio operator's license.

Changes were made in phraseology.

## AMENDMENTS

**1982**-Pub. L. 97–164, §124, inserted "(other than the United States Court of Appeals for the Federal Circuit)" after "The court of appeals" and inserted provision that the jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

**1958**-Pub. L. 85–508 struck out provisions which gave courts of appeals jurisdiction of appeals from District Court for Territory of Alaska. See section 81A of this title which establishes a United States District Court for the State of Alaska.

**1951**-Act Oct. 31, 1951, inserted reference to District Court of Guam.

## EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–164 effective Oct. 1, 1982, see section 402 of Pub. L. 97–164, set out as a note under section 171 of this title.

## EFFECTIVE DATE OF 1958 AMENDMENT

Amendment by Pub. L. 85–508 effective Jan. 3, 1959, on admission of Alaska into the Union pursuant to Proc. No. 3269, Jan. 3, 1959, 24 F.R. 81, 73 Stat. c.16 as required by sections 1 and 8(c) of Pub. L. 85–508, see notes set out under section 81A of this title and preceding section 21 of Title 48, Territories and Insular Possessions.

## TERMINATION OF UNITED STATES DISTRICT COURT FOR THE DISTRICT OF THE CANAL ZONE

For termination of the United States District Court for the District of the Canal Zone at end of the "transition period", being the 30-month period beginning Oct. 1, 1979, and ending midnight Mar. 31, 1982, see Paragraph 5 of Article XI of the Panama Canal Treaty of 1977 and sections 2101 and 2201 to 2203 of Pub. L. 96–70, title II, Sept. 27, 1979, 93 Stat. 493 , formerly classified to sections

3831 and 3841 to 3843, respectively, of Title 22, Foreign Relations and Intercourse.

**28 USC 1331: Federal question**
Text contains those laws in effect on April 5, 2015

**From Title 28-JUDICIARY AND JUDICIAL PROCEDURE**
    PART IV-JURISDICTION AND VENUE
    CHAPTER 85-DISTRICT COURTS; JURISDICTION
**Jump To:**
    <u>Source Credit</u>
    <u>Amendments</u>
    <u>Effective Date</u>

## §1331. Federal question

    The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

(June 25, 1948, ch. 646, 62 Stat. 930; Pub. L. 85–554, §1, July 25, 1958, 72 Stat. 415 ; Pub. L. 94–574, §2, Oct. 21, 1976, 90 Stat. 2721 ; Pub. L. 96–486, §2(a), Dec. 1, 1980, 94 Stat. 2369 .)

### HISTORICAL AND REVISION NOTES

    Based on title 28, U.S.C., 1940 ed., §41(1) (Mar. 3, 1911, ch. 231, §24, par. 1, 36 Stat. 1091; May 14, 1934, ch. 283, §1, 48 Stat. 775; Aug. 21, 1937, ch. 726, §1, 50 Stat. 738; Apr. 20, 1940, ch. 117, 54 Stat. 143).

    Jurisdiction of federal questions arising under other sections of this chapter is not dependent upon the amount in controversy. (See annotations under former section 41 of title 28, U.S.C.A., and 35 C.J.S., p. 833 et seq., §§30–43. See, also, reviser's note under section 1332 of this title.)

    Words "wherein the matter in controversy exceeds the sum or value of $3,000, exclusive of interest and costs," were added to conform to rulings of the Supreme Court. See construction of provision relating to jurisdictional amount requirement in cases involving a Federal question in *United States v. Sayward*, 16 S.Ct. 371, 160 U.S. 493, 40 L.Ed. 508; *Fishback v. Western Union Tel. Co.*, 16 S.Ct. 506, 161 U.S. 96, 40 L.Ed. 630; and *Halt v. Indiana Manufacturing Co.*, 1900, 20 S.Ct. 272, 176 U.S. 68, 44 L.Ed. 374.

    Words "all civil actions" were substituted for "all suits of a civil nature, at common law or in equity" to conform with Rule 2 of the Federal Rules of Civil Procedure.

    Words "or treaties" were substituted for "or treaties made, or which shall be made under their authority," for purposes of brevity.

    The remaining provisions of section 41(1) of title 28, U.S.C., 1940 ed., are incorporated in sections 1332, 1341, 1342, 1345, 1354, and 1359 of this title.

    Changes were made in arrangement and phraseology.

### AMENDMENTS

    **1980**–Pub. L. 96–486 struck out "; amount in controversy; costs" in section catchline, struck out minimum amount in controversy requirement of $10,000 for original jurisdiction in federal question cases which necessitated striking the exception to such required minimum amount that authorized original jurisdiction in actions brought against the United States, any agency thereof, or any officer or employee thereof in an official capacity, struck out provision authorizing the district court except where express provision therefore was made in a federal statute to deny costs to a plaintiff and in fact impose such costs upon such plaintiff where plaintiff was adjudged to be entitled to recover less than the required amount in controversy, computed without regard to set-off or counterclaim and exclusive of interests and costs, and struck out existing subsection designations.

    **1976**–Subsec. (a). Pub. L. 94–574 struck out $10,000 jurisdictional amount where action is brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

    **1958**–Pub. L. 85–554 included costs in section catchline, designated existing provisions as subsec. (a), substituted "$10,000" for "$3,000", and added subsec. (b).

## EFFECTIVE DATE OF **1980** AMENDMENT; APPLICABILITY

Pub. L. 96–486, §4, Dec. 1, 1980, 94 Stat. 2370 , provided: "This Act [amending this section and section 2072 of Title 15, Commerce and Trade, and enacting provisions set out as a note under section 1 of this title] shall apply to any civil action pending on the date of enactment of this Act [Dec. 1, 1980]."

## EFFECTIVE DATE OF **1958** AMENDMENT

Pub. L. 85–554, §3, July 25, 1958, 72 Stat. 415 , provided that: "This Act [amending this section and sections 1332 and 1345 of this title] shall apply only in the case of actions commenced after the date of the enactment of this Act [July 25, 1958]."

**42 USC 1996: Protection and preservation of traditional religions of Native Americans**
Text contains those laws in effect on April 4, 2015

**From Title 42-THE PUBLIC HEALTH AND WELFARE**
    CHAPTER 21-CIVIL RIGHTS
    SUBCHAPTER I-GENERALLY
**Jump To:**
    **Source Credit**
    **Short Title**
    **Miscellaneous**
    **Executive Documents**

## §1996. Protection and preservation of traditional religions of Native Americans

On and after August 11, 1978, it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.

( Pub. L. 95–341, §1, Aug. 11, 1978, 92 Stat. 469 .)

### SHORT TITLE OF 1994 AMENDMENT

Pub. L. 103–344, §1, Oct. 6, 1994, 108 Stat. 3125 , provided that: "This Act [enacting section 1996a of this title] may be cited as the 'American Indian Religious Freedom Act Amendments of 1994'."

### SHORT TITLE

Pub. L. 95–341, as amended, which enacted this section, section 1996a of this title, and a provision set out as a note under this section, is popularly known as the American Indian Religious Freedom Act.

### FEDERAL IMPLEMENTATION OF PROTECTIVE AND PRESERVATION FUNCTIONS RELATING TO NATIVE AMERICAN RELIGIOUS CULTURAL RIGHTS AND PRACTICES; PRESIDENTIAL REPORT TO CONGRESS

Pub. L. 95–341, §2, Aug. 11, 1978, 92 Stat. 470 , provided that the President direct the various Federal departments, agencies, and other instrumentalities responsible for administering relevant laws to evaluate their policies and procedures in consultation with native traditional religious leaders to determine changes necessary to preserve Native American religious cultural rights and practices and report to the Congress 12 months after Aug. 11, 1978.

### EX. ORD. NO. 13007. INDIAN SACRED SITES

Ex. Ord. No. 13007, May 24, 1996, 61 F.R. 26771, provided:

By the authority vested in me as President by the Constitution and the laws of the United States, in furtherance of Federal treaties, and in order to protect and preserve Indian religious practices, it is hereby ordered:

SECTION 1. *Accommodation of Sacred Sites.* (a) In managing Federal lands, each executive branch agency with statutory or administrative responsibility for the management of Federal lands shall, to the extent practicable, permitted by law, and not clearly inconsistent with essential agency functions, (1) accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and (2) avoid adversely affecting the physical integrity of such sacred sites. Where appropriate, agencies shall maintain the confidentiality of sacred sites.

(b) For purposes of this order:

(i) "Federal lands" means any land or interests in land owned by the United States, including leasehold interests held by the United States, except Indian trust lands;

(ii) "Indian tribe" means an Indian or Alaska Native tribe, band, nation, pueblo, village, or community that the Secretary of the Interior acknowledges to exist as an Indian tribe pursuant to Public Law No. 103–454, 108 Stat. 4791 [see 25 U.S.C. 479a, 479a–1], and "Indian" refers to a member of such an Indian

47

tribe; and

(iii) "Sacred site" means any specific, discrete, narrowly delineated location on Federal land that is identified by an Indian tribe, or Indian individual determined to be an appropriately authoritative representative of an Indian religion, as sacred by virtue of its established religious significance to, or ceremonial use by, an Indian religion; provided that the tribe or appropriately authoritative representative of an Indian religion has informed the agency of the existence of such a site.

Sec. 2. *Procedures.* (a) Each executive branch agency with statutory or administrative responsibility for the management of Federal lands shall, as appropriate, promptly implement procedures for the purposes of carrying out the provisions of section 1 of this order, including, where practicable and appropriate, procedures to ensure reasonable notice is provided of proposed actions or land management policies that may restrict future access to or ceremonial use of, or adversely affect the physical integrity of, sacred sites. In all actions pursuant to this section, agencies shall comply with the Executive memorandum of April 29, 1994, "Government-to-Government Relations with Native American Tribal Governments" [25 U.S.C. 450 note].

(b) Within 1 year of the effective date of this order, the head of each executive branch agency with statutory or administrative responsibility for the management of Federal lands shall report to the President, through the Assistant to the President for Domestic Policy, on the implementation of this order. Such reports shall address, among other things, (i) any changes necessary to accommodate access to and ceremonial use of Indian sacred sites; (ii) any changes necessary to avoid adversely affecting the physical integrity of Indian sacred sites; and (iii) procedures implemented or proposed to facilitate consultation with appropriate Indian tribes and religious leaders and the expeditious resolution of disputes relating to agency action on Federal lands that may adversely affect access to, ceremonial use of, or the physical integrity of sacred sites.

Sec. 3. Nothing in this order shall be construed to require a taking of vested property interests. Nor shall this order be construed to impair enforceable rights to use of Federal lands that have been granted to third parties through final agency action. For purposes of this order, "agency action" has the same meaning as in the Administrative Procedure Act (5 U.S.C. 551(13)).

Sec. 4. This order is intended only to improve the internal management of the executive branch and is not intended to, nor does it, create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or equity by any party against the United States, its agencies, officers, or any person.

William J. Clinton.

48

**42 USC 4331: Congressional declaration of national environmental policy**
Text contains those laws in effect on April 4, 2015

**From Title 42-THE PUBLIC HEALTH AND WELFARE**
    CHAPTER 55-NATIONAL ENVIRONMENTAL POLICY
    SUBCHAPTER I-POLICIES AND GOALS
**Jump To:**
    **Source Credit**
    **Miscellaneous**
    **Executive Documents**

## §4331. Congressional declaration of national environmental policy

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may-

    (1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

    (2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

    (3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

    (4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

    (5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

    (6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

( Pub. L. 91–190, title I, §101, Jan. 1, 1970, 83 Stat. 852 .)

### COMMISSION ON POPULATION GROWTH AND THE AMERICAN FUTURE

Pub. L. 91–213, §§1–9, Mar. 16, 1970, 84 Stat. 67–69 , established the Commission on Population Growth and the American Future to conduct and sponsor such studies and research and make such recommendations as might be necessary to provide information and education to all levels of government in the United States and to our people regarding a broad range of problems associated with population growth and their implications for America's future; prescribed the composition of the Commission; provided for the appointment of its members, and the designation of a Chairman and Vice Chairman; required a majority of the members of the Commission to constitute a quorum, but allowed a lesser number to conduct hearings; prescribed the compensation of members of the Commission; required the Commission to conduct an inquiry into certain prescribed aspects of population growth in the United States and its foreseeable social consequences; provided for the appointment of an Executive Director and other personnel and prescribed their compensation; authorized the Commission to enter into contracts with public agencies, private firms, institutions, and individuals for the conduct of research and surveys, the preparation of reports, and other activities necessary to the discharge of its duties, and to request from any Federal department or agency any

49

information and assistance it deems necessary to carry out its functions; required the General Services Administration to provide administrative services for the Commission on a reimbursable basis; required the Commission to submit an interim report to the President and the Congress one year after it was established and to submit its final report two years after Mar. 16, 1970; terminated the Commission sixty days after the date of the submission of its final report; and authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, such amounts as might be necessary to carry out the provisions of Pub. L. 91–213.

## EXECUTIVE ORDER NO. 11507

Ex. Ord. No. 11507, eff. Feb. 4, 1970, 35 F.R. 2573, which related to prevention, control, and abatement of air and water pollution at federal facilities was superseded by Ex. Ord. No. 11752, eff. Dec. 17, 1973, 38 F.R. 34793, formerly set out below.

## EXECUTIVE ORDER NO. 11752

Ex. Ord. No. 11752, Dec. 17, 1973, 38 F.R. 34793, which related to the prevention, control, and abatement of environmental pollution at Federal facilities, was revoked by Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of this title.

50

**42 USC 4332: Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts**
Text contains those laws in effect on April 8, 2015

**From Title 42-THE PUBLIC HEALTH AND WELFARE**
    CHAPTER 55-NATIONAL ENVIRONMENTAL POLICY
    SUBCHAPTER I-POLICIES AND GOALS
**Jump To:**
    **<u>Source Credit</u>**
    **<u>Amendments</u>**
    **<u>Miscellaneous</u>**
    **<u>Executive Documents</u>**

## §4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall-

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on-

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.[1]

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.

( Pub. L. 91–190, title I, §102, Jan. 1, 1970, 83 Stat. 853 ; Pub. L. 94–83, Aug. 9, 1975, 89 Stat. 424 .)

## Amendments

**1975**-Subpars. (D) to (I). Pub. L. 94–83 added subpar. (D) and redesignated former subpars. (D) to (H) as (E) to (I), respectively.

## Certain Commercial Space Launch Activities

Pub. L. 104–88, title IV, §401, Dec. 29, 1995, 109 Stat. 955 , provided that: "The licensing of a launch vehicle or launch site operator (including any amendment, extension, or renewal of the license) under [former] chapter 701 of title 49, United States Code [now chapter 509 (§50901 et seq.) of Title 51, National and Commercial Space Programs], shall not be considered a major Federal action for purposes of section 102(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(C)) if-

"(1) the Department of the Army has issued a permit for the activity; and

"(2) the Army Corps of Engineers has found that the activity has no significant impact."

## Ex. Ord. No. 13352. Facilitation of Cooperative Conservation

Ex. Ord. No. 13352, Aug. 26, 2004, 69 F.R. 52989, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

Section 1. *Purpose*. The purpose of this order is to ensure that the Departments of the Interior, Agriculture, Commerce, and Defense and the Environmental Protection Agency implement laws relating to the environment and natural resources in a manner that promotes cooperative conservation, with an emphasis on appropriate inclusion of local participation in Federal decisionmaking, in accordance with their respective agency missions, policies, and regulations.

Sec. 2. *Definition*. As used in this order, the term "cooperative conservation" means actions that relate to use, enhancement, and enjoyment of natural resources, protection of the environment, or both, and that involve collaborative activity among Federal, State, local, and tribal governments, private for-profit and nonprofit institutions, other nongovernmental entities and individuals.

Sec. 3. *Federal Activities*. To carry out the purpose of this order, the Secretaries of the Interior, Agriculture, Commerce, and Defense and the Administrator of the Environmental Protection Agency shall, to the extent permitted by law and subject to the availability of appropriations and in coordination with each other as appropriate:

(a) carry out the programs, projects, and activities of the agency that they respectively head that implement laws relating to the environment and natural resources in a manner that:

(i) facilitates cooperative conservation;

(ii) takes appropriate account of and respects the interests of persons with ownership or other legally recognized interests in land and other natural resources;

(iii) properly accommodates local participation in Federal decisionmaking; and

(iv) provides that the programs, projects, and activities are consistent with protecting public health and safety;

(b) report annually to the Chairman of the Council on Environmental Quality on actions taken to

implement this order; and

(c) provide funding to the Office of Environmental Quality Management Fund (42 U.S.C. 4375) for the Conference for which section 4 of this order provides.

SEC. 4. *White House Conference on Cooperative Conservation*. The Chairman of the Council on Environmental Quality shall, to the extent permitted by law and subject to the availability of appropriations:

(a) convene not later than 1 year after the date of this order, and thereafter at such times as the Chairman deems appropriate, a White House Conference on Cooperative Conservation (Conference) to facilitate the exchange of information and advice relating to (i) cooperative conservation and (ii) means for achievement of the purpose of this order; and

(b) ensure that the Conference obtains information in a manner that seeks from Conference participants their individual advice and does not involve collective judgment or consensus advice or deliberation.

SEC. 5. *General Provision*. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities or entities, its officers, employees or agents, or any other person.

GEORGE W. BUSH.

---

*1* *So in original. The period probably should be a semicolon.*

**43 USC 1701: Congressional declaration of policy**
Text contains those laws in effect on April 4, 2015

**From Title 43-PUBLIC LANDS**
    CHAPTER 35-FEDERAL LAND POLICY AND MANAGEMENT
    SUBCHAPTER I-GENERAL PROVISIONS
**Jump To:**
    **Source Credit**
    **References In Text**
    **Short Title**
    **Savings Provision**
    **Severability**
    **Miscellaneous**

# §1701. Congressional declaration of policy

(a) The Congress declares that it is the policy of the United States that-

(1) the public lands be retained in Federal ownership, unless as a result of the land use planning procedure provided for in this Act, it is determined that disposal of a particular parcel will serve the national interest;

(2) the national interest will be best realized if the public lands and their resources are periodically and systematically inventoried and their present and future use is projected through a land use planning process coordinated with other Federal and State planning efforts;

(3) public lands not previously designated for any specific use and all existing classifications of public lands that were effected by executive action or statute before October 21, 1976, be reviewed in accordance with the provisions of this Act;

(4) the Congress exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes and that Congress delineate the extent to which the Executive may withdraw lands without legislative action;

(5) in administering public land statutes and exercising discretionary authority granted by them, the Secretary be required to establish comprehensive rules and regulations after considering the views of the general public; and to structure adjudication procedures to assure adequate third party participation, objective administrative review of initial decisions, and expeditious decisionmaking;

(6) judicial review of public land adjudication decisions be provided by law;

(7) goals and objectives be established by law as guidelines for public land use planning, and that management be on the basis of multiple use and sustained yield unless otherwise specified by law;

(8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use;

(9) the United States receive fair market value of the use of the public lands and their resources unless otherwise provided for by statute;

(10) uniform procedures for any disposal of public land, acquisition of non-Federal land for public purposes, and the exchange of such lands be established by statute, requiring each disposal, acquisition, and exchange to be consistent with the prescribed mission of the department or agency involved, and reserving to the Congress review of disposals in excess of a specified acreage;

(11) regulations and plans for the protection of public land areas of critical environmental concern be promptly developed;

(12) the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands including implementation of the Mining and Minerals Policy Act of 1970 (84 Stat. 1876, 30 U.S.C. 21a) as it pertains to the public lands; and

(13) the Federal Government should, on a basis equitable to both the Federal and local taxpayer, provide for payments to compensate States and local governments for burdens created as a result of the immunity of Federal lands from State and local taxation.

(b) The policies of this Act shall become effective only as specific statutory authority for their implementation is enacted by this Act or by subsequent legislation and shall then be construed as supplemental to and not in

derogation of the purposes for which public lands are administered under other provisions of law.

( Pub. L. 94–579, title I, §102, Oct. 21, 1976, 90 Stat. 2744 .)

## REFERENCES IN TEXT

This Act, referred to in subsecs. (a)(1), (3) and (b), is Pub. L. 94–579, Oct. 21, 1976, 90 Stat. 2743 , as amended, known as the Federal Land Policy and Management Act of 1976. For complete classification of this Act to the Code, see Tables.

The Mining and Minerals Policy Act of 1970, referred to in subsec. (a)(12), is Pub. L. 91–631, Dec. 31, 1970, 84 Stat. 1876 , which is classified to section 21a of Title 30, Mineral Lands and Mining.

## SHORT TITLE OF 2009 AMENDMENT

Pub. L. 111–88, div. A, title V, §501, Oct. 30, 2009, 123 Stat. 2968 , provided that: "This title [enacting sections 1748a and 1748b of this title] may be cited as the 'Federal Land Assistance, Management, and Enhancement Act of 2009' or 'FLAME Act of 2009'."

## SHORT TITLE OF 1988 AMENDMENT

Pub. L. 100–409, §1, Aug. 20, 1988, 102 Stat. 1086 , provided that: "This Act [enacting section 1723 of this title, amending section 1716 of this title and sections 505a, 505b, and 521b of Title 16, Conservation, and enacting provisions set out as notes under sections 751 and 1716 of this title] may be cited as the 'Federal Land Exchange Facilitation Act of 1988'."

## SHORT TITLE

Pub. L. 94–579, title I, §101, Oct. 21, 1976, 90 Stat. 2744 , provided that: "This Act [see Tables for classification] may be cited as the 'Federal Land Policy and Management Act of 1976'."

## SAVINGS PROVISION

Pub. L. 94–579, title VII, §701, Oct. 21, 1976, 90 Stat. 2786 , provided that:

"(a) Nothing in this Act, or in any amendment made by this Act [see Short Title note above], shall be construed as terminating any valid lease, permit, patent, right-of-way, or other land use right or authorization existing on the date of approval of this Act [Oct. 21, 1976].

"(b) Notwithstanding any provision of this Act, in the event of conflict with or inconsistency between this Act and the Acts of August 28, 1937 (50 Stat. 874; 43 U.S.C. 1181a–1181j [1181a et seq., see Tables for classification]) and May 24, 1939 (53 Stat. 753), insofar as they relate to management of timber resources, and disposition of revenues from lands and resources, the latter Acts shall prevail.

"(c) All withdrawals, reservations, classifications, and designations in effect as of the date of approval of this Act shall remain in full force and effect until modified under the provisions of this Act or other applicable law.

"(d) Nothing in this Act, or in any amendments made by this Act, shall be construed as permitting any person to place, or allow to be placed, spent oil shale, overburden, or byproducts from the recovery of other minerals found with oil shale, on any Federal land other than Federal land which has been leased for the recovery of shale oil under the Act of February 25, 1920 (41 Stat. 437, as amended; 30 U.S.C. 181 et seq.).

"(e) Nothing in this Act shall be construed as modifying, revoking, or changing any provision of the Alaska Native Claims Settlement Act (85 Stat. 688, as amended; 43 U.S.C. 1601 et seq.).

"(f) Nothing in this Act shall be deemed to repeal any existing law by implication.

"(g) Nothing in this Act shall be construed as limiting or restricting the power and authority of the United States or-

"(1) as affecting in any way any law governing appropriation or use of, or Federal right to, water on public lands;

"(2) as expanding or diminishing Federal or State jurisdiction, responsibility, interests, or rights in water resources development or control;

"(3) as displacing, superseding, limiting, or modifying any interstate compact or the jurisdiction or responsibility of any legally established joint or common agency of two or more States or of two or more States and the Federal Government;

"(4) as superseding, modifying, or repealing, except as specifically set forth in this Act, existing

55

laws applicable to the various Federal agencies which are authorized to develop or participate in the development of water resources or to exercise licensing or regulatory functions in relation thereto;

"(5) as modifying the terms of any interstate compact;

"(6) as a limitation upon any State criminal statute or upon the police power of the respective States, or as derogating the authority of a local police officer in the performance of his duties, or as depriving any State or political subdivision thereof of any right it may have to exercise civil and criminal jurisdiction on the national resource lands; or as amending, limiting, or infringing the existing laws providing grants of lands to the States.

"(h) All actions by the Secretary concerned under this Act shall be subject to valid existing rights.

"(i) The adequacy of reports required by this Act to be submitted to the Congress or its committees shall not be subject to judicial review.

"(j) Nothing in this Act shall be construed as affecting the distribution of livestock grazing revenues to local governments under the Granger-Thye Act (64 Stat. 85, 16 U.S.C. 580h), under the Act of May 23, 1908 (35 Stat. 260, as amended; 16 U.S.C. 500), under the Act of March 4, 1913 (37 Stat. 843, as amended; 16 U.S.C. 501), and under the Act of June 20, 1910 (36 Stat. 557)."

## SEVERABILITY

Pub. L. 94–579, title VII, §707, Oct. 21, 1976, 90 Stat. 2794 , provided that: "If any provision of this Act [see Short Title note set out above] or the application thereof is held invalid, the remainder of the Act and the application thereof shall not be affected thereby."

## EXISTING RIGHTS-OF-WAY

Pub. L. 94–579, title VII, §706(b), Oct. 21, 1976, 90 Stat. 2794 , provided that: "Nothing in section 706(a) [see Tables for classification], except as it pertains to rights-of-way, may be construed as affecting the authority of the Secretary of Agriculture under the Act of June 4, 1897 (30 Stat. 35, as amended, 16 U.S.C. 551); the Act of July 22, 1937 (50 Stat. 525, as amended, 7 U.S.C. 1010–1212); or the Act of September 3, 1954 (68 Stat. 1146, 43 U.S.C. 931c)."

**43 USC 1702: Definitions**
Text contains those laws in effect on April 4, 2015

**From Title 43-PUBLIC LANDS**
  CHAPTER 35-FEDERAL LAND POLICY AND MANAGEMENT
  SUBCHAPTER I-GENERAL PROVISIONS
**Jump To:**
  **Source Credit**
  **References In Text**

# §1702. Definitions

Without altering in any way the meaning of the following terms as used in any other statute, whether or not such statute is referred to in, or amended by, this Act, as used in this Act-

(a) The term "areas of critical environmental concern" means areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards.

(b) The term "holder" means any State or local governmental entity, individual, partnership, corporation, association, or other business entity receiving or using a right-of-way under subchapter V of this chapter.

(c) The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

(d) The term "public involvement" means the opportunity for participation by affected citizens in rulemaking, decisionmaking, and planning with respect to the public lands, including public meetings or hearings held at locations near the affected lands, or advisory mechanisms, or such other procedures as may be necessary to provide public comment in a particular instance.

(e) The term "public lands" means any land and interest in land owned by the United States within the several States and administered by the Secretary of the Interior through the Bureau of Land Management, without regard to how the United States acquired ownership, except-

  (1) lands located on the Outer Continental Shelf; and
  (2) lands held for the benefit of Indians, Aleuts, and Eskimos.

(f) The term "right-of-way" includes an easement, lease, permit, or license to occupy, use, or traverse public lands granted for the purpose listed in subchapter V of this chapter.

(g) The term "Secretary", unless specifically designated otherwise, means the Secretary of the Interior.

(h) The term "sustained yield" means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use.

(i) The term "wilderness" as used in section 1782 of this title shall have the same meaning as it does in section 1131(c) of title 16.

(j) The term "withdrawal" means withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program; or transferring jurisdiction over an area of Federal land, other than "property" governed by the Federal Property and Administrative Services Act, as amended (40 U.S.C. 472) [1] from one department, bureau or agency to another department, bureau or agency.

(k) An "allotment management plan" means a document prepared in consultation with the lessees or permittees involved, which applies to livestock operations on the public lands or on lands within National Forests in the eleven contiguous Western States and which:

57

(1) prescribes the manner in, and extent to, which livestock operations will be conducted in order to meet the multiple-use, sustained-yield, economic and other needs and objectives as determined for the lands by the Secretary concerned; and

(2) describes the type, location, ownership, and general specifications for the range improvements to be installed and maintained on the lands to meet the livestock grazing and other objectives of land management; and

(3) contains such other provisions relating to livestock grazing and other objectives found by the Secretary concerned to be consistent with the provisions of this Act and other applicable law.

(l) The term "principal or major uses" includes, and is limited to, domestic livestock grazing, fish and wildlife development and utilization, mineral exploration and production, rights-of-way, outdoor recreation, and timber production.

(m) The term "department" means a unit of the executive branch of the Federal Government which is headed by a member of the President's Cabinet and the term "agency" means a unit of the executive branch of the Federal Government which is not under the jurisdiction of a head of a department.

(n) The term "Bureau [2] means the Bureau of Land Management.

(o) The term "eleven contiguous Western States" means the States of Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming.

(p) The term "grazing permit and lease" means any document authorizing use of public lands or lands in National Forests in the eleven contiguous western States for the purpose of grazing domestic livestock.

( Pub. L. 94–579, title I, §103, Oct. 21, 1976, 90 Stat. 2745 .)

## REFERENCES IN TEXT

This Act, referred to in the opening par. and in subsec. (k), is Pub. L. 94–579, Oct. 21, 1976, 90 Stat. 2743 , as amended, known as the Federal Land Policy and Management Act of 1976. For complete classification of this Act to the Code, see Tables.

The Federal Property and Administrative Services Act of 1949, referred to in subsec. (j), is act June 30, 1949, ch. 288, 63 Stat. 377, which was substantially repealed and restated in chapters 1 to 11 of Title 40, Public Buildings, Property, and Works, and division C of subtitle I of Title 41, Public Contracts, by Pub. L. 107–217, §§1, 6(b), Aug. 21, 2002, 116 Stat. 1062 , 1304, which Act enacted Title 40, and Pub. L. 111–350, §§3, 7(b), Jan. 4, 2011, 124 Stat. 3677 , 3855, which Act enacted Title 41. For complete classification of this Act to the Code, see Short Title of 1949 Act note set out under section 101 of Title 41 and Tables. For disposition of sections of former Titles 40 and 41, see Disposition Tables preceding section 101 of Title 40 and section 101 of Title 41.

[1] See References in Text note below.

[2] So in original. Probably should be followed by closing quotation marks.

**43 USC 1712: Land use plans**
Text contains those laws in effect on December 18, 2014
Pending Updates: Pub L. 113-287 (12/19/2014) **[View Details]**

**From Title 43-PUBLIC LANDS**
    CHAPTER 35-FEDERAL LAND POLICY AND MANAGEMENT
    SUBCHAPTER II-LAND USE PLANNING AND LAND ACQUISITION AND DISPOSITION
**Jump To:**
    **Source Credit**
    **References In Text**
    **Amendments**

## §1712. Land use plans

**(a) Development, maintenance, and revision by Secretary**

The Secretary shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands. Land use plans shall be developed for the public lands regardless of whether such lands previously have been classified, withdrawn, set aside, or otherwise designated for one or more uses.

**(b) Coordination of plans for National Forest System lands with Indian land use planning and management programs for purposes of development and revision**

In the development and revision of land use plans, the Secretary of Agriculture shall coordinate land use plans for lands in the National Forest System with the land use planning and management programs of and for Indian tribes by, among other things, considering the policies of approved tribal land resource management programs.

**(c) Criteria for development and revision**

In the development and revision of land use plans, the Secretary shall-

(1) use and observe the principles of multiple use and sustained yield set forth in this and other applicable law;

(2) use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences;

(3) give priority to the designation and protection of areas of critical environmental concern;

(4) rely, to the extent it is available, on the inventory of the public lands, their resources, and other values;

(5) consider present and potential uses of the public lands;

(6) consider the relative scarcity of the values involved and the availability of alternative means (including recycling) and sites for realization of those values;

(7) weigh long-term benefits to the public against short-term benefits;

(8) provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans; and

(9) to the extent consistent with the laws governing the administration of the public lands, coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of other Federal departments and agencies and of the States and local governments within which the lands are located, including, but not limited to, the statewide outdoor recreation plans developed under chapter 2003 of title 54, and of or for Indian tribes by, among other things, considering the policies of approved State and tribal land resource management programs. In implementing this directive, the Secretary shall, to the extent he finds practical, keep apprised of State, local, and tribal land use plans; assure that consideration is given to those State, local, and tribal plans that are germane in the development of land use plans for public lands; assist in resolving, to the extent practical, inconsistencies between Federal and non-Federal Government plans, and shall provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non-Federal lands. Such officials in each State are authorized to furnish advice to the Secretary with respect to the development and revision of land use plans, land use guidelines, land use rules, and land use regulations for the public lands within such State and with respect to such other land use matters as may be referred to them by him. Land use plans of the Secretary under this section shall be consistent with State and local plans to the maximum extent he finds consistent with Federal law and the purposes of this Act.

**(d) Review and inclusion of classified public lands; review of existing land use plans; modification and**

**termination of classifications**

Any classification of public lands or any land use plan in effect on October 21, 1976, is subject to review in the land use planning process conducted under this section, and all public lands, regardless of classification, are subject to inclusion in any land use plan developed pursuant to this section. The Secretary may modify or terminate any such classification consistent with such land use plans.

**(e) Management decisions for implementation of developed or revised plans**

The Secretary may issue management decisions to implement land use plans developed or revised under this section in accordance with the following:

(1) Such decisions, including but not limited to exclusions (that is, total elimination) of one or more of the principal or major uses made by a management decision shall remain subject to reconsideration, modification, and termination through revision by the Secretary or his delegate, under the provisions of this section, of the land use plan involved.

(2) Any management decision or action pursuant to a management decision that excludes (that is, totally eliminates) one or more of the principal or major uses for two or more years with respect to a tract of land of one hundred thousand acres or more shall be reported by the Secretary to the House of Representatives and the Senate. If within ninety days from the giving of such notice (exclusive of days on which either House has adjourned for more than three consecutive days), the Congress adopts a concurrent resolution of nonapproval of the management decision or action, then the management decision or action shall be promptly terminated by the Secretary. If the committee to which a resolution has been referred during the said ninety day period, has not reported it at the end of thirty calendar days after its referral, it shall be in order to either discharge the committee from further consideration of such resolution or to discharge the committee from consideration of any other resolution with respect to the management decision or action. A motion to discharge may be made only by an individual favoring the resolution, shall be highly privileged (except that it may not be made after the committee has reported such a resolution), and debate thereon shall be limited to not more than one hour, to be divided equally between those favoring and those opposing the resolution. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to. If the motion to discharge is agreed to or disagreed to, the motion may not be made with respect to any other resolution with respect to the same management decision or action. When the committee has reprinted, or has been discharged from further consideration of a resolution, it shall at any time thereafter be in order (even though a previous motion to the same effect has been disagreed to) to move to proceed to the consideration of the resolution. The motion shall be highly privileged and shall not be debatable. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to.

(3) Withdrawals made pursuant to section 1714 of this title may be used in carrying out management decisions, but public lands shall be removed from or restored to the operation of the Mining Law of 1872, as amended (R.S. 2318–2352; 30 U.S.C. 21 et seq.) or transferred to another department, bureau, or agency only by withdrawal action pursuant to section 1714 of this title or other action pursuant to applicable law: *Provided*, That nothing in this section shall prevent a wholly owned Government corporation from acquiring and holding rights as a citizen under the Mining Law of 1872.

**(f) Procedures applicable to formulation of plans and programs for public land management**

The Secretary shall allow an opportunity for public involvement and by regulation shall establish procedures, including public hearings where appropriate, to give Federal, State, and local governments and the public, adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands.

( Pub. L. 94–579, title II, §202, Oct. 21, 1976, 90 Stat. 2747 ; Pub. L. 113–287, §5(l)(6), Dec. 19, 2014, 128 Stat. 3271.)

## REFERENCES IN TEXT

This Act, referred to in subsecs. (a) and (c)(9), is Pub. L. 94–579, Oct. 21, 1976, 90 Stat. 2743 , as amended, known as the Federal Land Policy and Management Act of 1976. For complete classification of this Act to the Code, see Tables.

Act of September 3, 1964, as amended, referred to in subsec. (c)(9), is Pub. L. 88–578, Sept. 3, 1964, 78 Stat. 897 , as amended, known as the Land and Water Conservation Fund Act of 1965, which is classified generally to part B (§460l–4 et seq.) of subchapter LXIX of chapter 1 of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 460l–4 of Title 16 and Tables.

The Mining Law of 1872, as amended, referred to in subsec. (e)(3), is act May 10, 1872, ch. 152, 17

Stat. 91, as amended, which was incorporated into the Revised Statutes of 1878 as R.S. §§2319 to 2328, 2331, 2333 to 2337, and 2344, which are classified to sections 22 to 24, 26 to 28, 29, 30, 33 to 35, 37, 39 to 42, and 47 of Title 30, Mineral Lands and Mining. For complete classification of R.S. §§2318–2352, see Tables.

## AMENDMENTS

**2014**–Subsec. (c)(9). Pub. L. 113–287 substituted "chapter 2003 of title 54" for "the Act of September 3, 1964 (78 Stat. 897), as amended."

61

**43 USC 1714: Withdrawals of lands**
Text contains those laws in effect on December 18, 2014
Pending Updates: Pub L. 113-287 (12/19/2014) **[View Details]**

**From Title 43-PUBLIC LANDS**
    CHAPTER 35-FEDERAL LAND POLICY AND MANAGEMENT
    SUBCHAPTER II-LAND USE PLANNING AND LAND ACQUISITION AND DISPOSITION
**Jump To:**
    **Source Credit**
    **References In Text**
    **Amendments**

## §1714. Withdrawals of lands

**(a) Authorization and limitation; delegation of authority**

On and after the effective date of this Act the Secretary is authorized to make, modify, extend, or revoke withdrawals but only in accordance with the provisions and limitations of this section. The Secretary may delegate this withdrawal authority only to individuals in the Office of the Secretary who have been appointed by the President, by and with the advice and consent of the Senate.

**(b) Application and procedures applicable subsequent to submission of application**

(1) Within thirty days of receipt of an application for withdrawal, and whenever he proposes a withdrawal on his own motion, the Secretary shall publish a notice in the Federal Register stating that the application has been submitted for filing or the proposal has been made and the extent to which the land is to be segregated while the application is being considered by the Secretary. Upon publication of such notice the land shall be segregated from the operation of the public land laws to the extent specified in the notice. The segregative effect of the application shall terminate upon (a) rejection of the application by the Secretary, (b) withdrawal of lands by the Secretary, or (c) the expiration of two years from the date of the notice.

(2) The publication provisions of this subsection are not applicable to withdrawals under subsection (e) hereof.

**(c) Congressional approval procedures applicable to withdrawals aggregating five thousand acres or more**

(1) On and after October 21, 1976, a withdrawal aggregating five thousand acres or more may be made (or such a withdrawal or any other withdrawal involving in the aggregate five thousand acres or more which terminates after such date of approval may be extended) only for a period of not more than twenty years by the Secretary on his own motion or upon request by a department or agency head. The Secretary shall notify both Houses of Congress of such a withdrawal no later than its effective date and the withdrawal shall terminate and become ineffective at the end of ninety days (not counting days on which the Senate or the House of Representatives has adjourned for more than three consecutive days) beginning on the day notice of such withdrawal has been submitted to the Senate and the House of Representatives, if the Congress has adopted a concurrent resolution stating that such House does not approve the withdrawal. If the committee to which a resolution has been referred during the said ninety day period, has not reported it at the end of thirty calendar days after its referral, it shall be in order to either discharge the committee from further consideration of such resolution or to discharge the committee from consideration of any other resolution with respect to the Presidential recommendation. A motion to discharge may be made only by an individual favoring the resolution, shall be highly privileged (except that it may not be made after the committee has reported such a resolution), and debate thereon shall be limited to not more than one hour, to be divided equally between those favoring and those opposing the resolution. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to. If the motion to discharge is agreed to or disagreed to, the motion may not be made with respect to any other resolution with respect to the same Presidential recommendation. When the committee has reprinted, or has been discharged from further consideration of a resolution, it shall at any time thereafter be in order (even though a previous motion to the same effect has been disagreed to) to move to proceed to the consideration of the resolution. The motion shall be highly privileged and shall not be debatable. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to.

(2) With the notices required by subsection (c)(1) of this section and within three months after filing the notice under subsection (e) of this section, the Secretary shall furnish to the committees-

    (1) a clear explanation of the proposed use of the land involved which led to the withdrawal;

(2) an inventory and evaluation of the current natural resource uses and values of the site and adjacent public and nonpublic land and how it appears they will be affected by the proposed use, including particularly aspects of use that might cause degradation of the environment, and also the economic impact of the change in use on individuals, local communities, and the Nation;

(3) an identification of present users of the land involved, and how they will be affected by the proposed use;

(4) an analysis of the manner in which existing and potential resource uses are incompatible with or in conflict with the proposed use, together with a statement of the provisions to be made for continuation or termination of existing uses, including an economic analysis of such continuation or termination;

(5) an analysis of the manner in which such lands will be used in relation to the specific requirements for the proposed use;

(6) a statement as to whether any suitable alternative sites are available (including cost estimates) for the proposed use or for uses such a withdrawal would displace;

(7) a statement of the consultation which has been or will be had with other Federal departments and agencies, with regional, State, and local government bodies, and with other appropriate individuals and groups;

(8) a statement indicating the effect of the proposed uses, if any, on State and local government interests and the regional economy;

(9) a statement of the expected length of time needed for the withdrawal;

(10) the time and place of hearings and of other public involvement concerning such withdrawal;

(11) the place where the records on the withdrawal can be examined by interested parties; and

(12) a report prepared by a qualified mining engineer, engineering geologist, or geologist which shall include but not be limited to information on: general geology, known mineral deposits, past and present mineral production, mining claims, mineral leases, evaluation of future mineral potential, present and potential market demands.

**(d) Withdrawals aggregating less than five thousand acres; procedure applicable**

A withdrawal aggregating less than five thousand acres may be made under this subsection by the Secretary on his own motion or upon request by a department or an agency head-

(1) for such period of time as he deems desirable for a resource use; or

(2) for a period of not more than twenty years for any other use, including but not limited to use for administrative sites, location of facilities, and other proprietary purposes; or

(3) for a period of not more than five years to preserve such tract for a specific use then under consideration by the Congress.

**(e) Emergency withdrawals; procedure applicable; duration**

When the Secretary determines, or when the Committee on Natural Resources of the House of Representatives or the Committee on Energy and Natural Resources of the Senate notifies the Secretary, that an emergency situation exists and that extraordinary measures must be taken to preserve values that would otherwise be lost, the Secretary notwithstanding the provisions of subsections (c)(1) and (d) of this section, shall immediately make a withdrawal and file notice of such emergency withdrawal with both of those Committees. Such emergency withdrawal shall be effective when made but shall last only for a period not to exceed three years and may not be extended except under the provisions of subsection (c)(1) or (d), whichever is applicable, and (b)(1) of this section. The information required in subsection (c)(2) of this subsection [1] shall be furnished the committees within three months after filing such notice.

**(f) Review of existing withdrawals and extensions; procedure applicable to extensions; duration**

All withdrawals and extensions thereof, whether made prior to or after October 21, 1976, having a specific period shall be reviewed by the Secretary toward the end of the withdrawal period and may be extended or further extended only upon compliance with the provisions of subsection (c)(1) or (d), whichever is applicable, and only if the Secretary determines that the purpose for which the withdrawal was first made requires the extension, and then only for a period no longer than the length of the original withdrawal period. The Secretary shall report on such review and extensions to the Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate.

**(g) Processing and adjudication of existing applications**

All applications for withdrawal pending on October 21, 1976 shall be processed and adjudicated to conclusion within fifteen years of October 21, 1976, in accordance with the provisions of this section. The segregative effect of any application not so processed shall terminate on that date.

**(h) Public hearing required for new withdrawals**

All new withdrawals made by the Secretary under this section (except an emergency withdrawal made under subsection (e) of this section) shall be promulgated after an opportunity for a public hearing.

63

**(i) Consent for withdrawal of lands under administration of department or agency other than Department of the Interior**

In the case of lands under the administration of any department or agency other than the Department of the Interior, the Secretary shall make, modify, and revoke withdrawals only with the consent of the head of the department or agency concerned, except when the provisions of subsection (e) of this section apply.

**(j) Applicability of other Federal laws withdrawing lands as limiting authority**

The Secretary shall not make, modify, or revoke any withdrawal created by Act of Congress; make a withdrawal which can be made only by Act of Congress; modify or revoke any withdrawal creating national monuments under chapter 3203 of title 54; or modify, or revoke any withdrawal which added lands to the National Wildlife Refuge System prior to October 21, 1976, or which thereafter adds lands to that System under the terms of this Act. Nothing in this Act is intended to modify or change any provision of the Act of February 27, 1976 (90 Stat. 199; 16 U.S.C. 668dd(a)).

**(k) Authorization of appropriations for processing applications**

There is hereby authorized to be appropriated the sum of $10,000,000 for the purpose of processing withdrawal applications pending on the effective date of this Act, to be available until expended.

**(l) Review of existing withdrawals in certain States; procedure applicable for determination of future status of lands; authorization of appropriations**

(1) The Secretary shall, within fifteen years of October 21, 1976, review withdrawals existing on October 21, 1976, in the States of Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming of (1) all Federal lands other than withdrawals of the public lands administered by the Bureau of Land Management and of lands which, on October 21, 1976, were part of Indian reservations and other Indian holdings, the National Forest System, the National Park System, the National Wildlife Refuge System, other lands administered by the Fish and Wildlife Service or the Secretary through the Fish and Wildlife Service, the National Wild and Scenic Rivers System, and the National System of Trails; and (2) all public lands administered by the Bureau of Land Management and of lands in the National Forest System (except those in wilderness areas, and those areas formally identified as primitive or natural areas or designated as national recreation areas) which closed the lands to appropriation under the Mining Law of 1872 (17 Stat. 91, as amended; 30 U.S.C. 22 et seq.) or to leasing under the Mineral Leasing Act of 1920 (41 Stat. 437, as amended; 30 U.S.C. 181 et seq.).

(2) In the review required by paragraph (1) of this subsection, the Secretary shall determine whether, and for how long, the continuation of the existing withdrawal of the lands would be, in his judgment, consistent with the statutory objectives of the programs for which the lands were dedicated and of the other relevant programs. The Secretary shall report his recommendations to the President, together with statements of concurrence or nonconcurrence submitted by the heads of the departments or agencies which administer the lands. The President shall transmit this report to the President of the Senate and the Speaker of the House of Representatives, together with his recommendations for action by the Secretary, or for legislation. The Secretary may act to terminate withdrawals other than those made by Act of the Congress in accordance with the recommendations of the President unless before the end of ninety days (not counting days on which the Senate and the House of Representatives has adjourned for more than three consecutive days) beginning on the day the report of the President has been submitted to the Senate and the House of Representatives the Congress has adopted a concurrent resolution indicating otherwise. If the committee to which a resolution has been referred during the said ninety day period, has not reported it at the end of thirty calendar days after its referral, it shall be in order to either discharge the committee from further consideration of such resolution or to discharge the committee from consideration of any other resolution with respect to the Presidential recommendation. A motion to discharge may be made only by an individual favoring the resolution, shall be highly privileged (except that it may not be made after the committee has reported such a resolution), and debate thereon shall be limited to not more than one hour, to be divided equally between those favoring and those opposing the resolution. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to. If the motion to discharge is agreed to or disagreed to, the motion may not be made with respect to any other resolution with respect to the same Presidential recommendation. When the committee has reprinted, or has been discharged from further consideration of a resolution, it shall at any time thereafter be in order (even though a previous motion to the same effect has been disagreed to) to move to proceed to the consideration of the resolution. The motion shall be highly privileged and shall not be debatable. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to.

(3) There are hereby authorized to be appropriated not more than $10,000,000 for the purpose of paragraph (1) of this subsection to be available until expended to the Secretary and to the heads of other departments and agencies which will be involved.

( Pub. L. 94–579, title II, §204, Oct. 21, 1976, 90 Stat. 2751 ; Pub. L. 103–437, §16(d)(1), Nov. 2, 1994, 108 Stat.

4594 ; Pub. L. 113–287, §5(l)(7), Dec. 19, 2014, 128 Stat. 3271.)

### REFERENCES IN TEXT

On and after the effective date of this Act, referred to in subsecs. (a) and (k), probably means on and after the date of enactment of Pub. L. 94–579, which was approved Oct. 21, 1976.

Act of February 27, 1976 (90 Stat. 199; 16 U.S.C. 668dd(a)), referred to in subsec. (j), is Pub. L. 94–223, Feb. 27, 1976, 90 Stat. 199 , which amended section 668dd of Title 16. For complete classification of this Act to the Code, see Tables.

This Act, referred to in subsec. (j), is Pub. L. 94–579, Oct. 21, 1976, 90 Stat. 2743 , as amended, known as the Federal Land Policy and Management Act of 1976. For complete classification of this Act to the Code, see Tables.

The Mining Law of 1872 (17 Stat. 91, as amended; 30 U.S.C. 22 et seq.), referred to in subsec. (l)(1), is act May 10, 1972, ch. 152, 17 Stat. 91, as amended. That act was incorporated into the Revised Statutes as R.S. §§2319 to 2328, 2331, 2333 to 2337, and 2344, which are classified to sections 22 to 24, 26 to 28, 29, 30, 33 to 35, 37, 39 to 42, and 47 of Title 30, Mineral Lands and Mining. For complete classification of R.S. §§2319 to 2328, 2331, 2333 to 2337, and 2344 to the Code, see Tables.

The Mineral Leasing Act of 1920 (41 Stat. 437, as amended; 30 U.S.C. 181 et seq.), referred to in subsec. (l)(1), is act Feb. 25, 1920, ch. 85, 41 Stat. 437, as amended, known as the Mineral Leasing Act, which is classified generally to chapter 3A (§181 et seq.) of Title 30. For complete classification of this Act to the Code, see Short Title note set out under section 181 of Title 30 and Tables.

### AMENDMENTS

**2014**-Subsec. (j). Pub. L. 113–287 substituted "chapter 3203 of title 54" for "the Act of June 8, 1906 (34 Stat. 225; 16 U.S.C. 431–433)".

**1994**-Subsec. (e). Pub. L. 103–437, §16(d)(1)(A), substituted "Committee on Natural Resources of the House of Representatives or the Committee on Energy and Natural Resources of the Senate" for "Committee on Interior and Insular Affairs of either the House of Representatives or the Senate" and "both of those Committees" for "the Committees on Interior and Insular Affairs of the Senate and the House of Representatives".

Subsec. (f). Pub. L. 103–437, §16(d)(1)(B), substituted "Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate" for "Committees on Interior and Insular Affairs of the House of Representatives and the Senate".

---

[1] So in original. Probably should be "section".

65

**43 USC 1732: Management of use, occupancy, and development of public lands**
Text contains those laws in effect on April 8, 2015

**From Title 43-PUBLIC LANDS**
    CHAPTER 35-FEDERAL LAND POLICY AND MANAGEMENT
    SUBCHAPTER III-ADMINISTRATION
**Jump To:**
    <u>Source Credit</u>
    <u>References In Text</u>
    <u>Amendments</u>
    <u>Miscellaneous</u>

## §1732. Management of use, occupancy, and development of public lands

**(a) Multiple use and sustained yield requirements applicable; exception**

The Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by him under section 1712 of this title when they are available, except that where a tract of such public land has been dedicated to specific uses according to any other provisions of law it shall be managed in accordance with such law.

**(b) Easements, permits, etc., for utilization through habitation, cultivation, and development of small trade or manufacturing concerns; applicable statutory requirements**

In managing the public lands, the Secretary shall, subject to this Act and other applicable law and under such terms and conditions as are consistent with such law, regulate, through easements, permits, leases, licenses, published rules, or other instruments as the Secretary deems appropriate, the use, occupancy, and development of the public lands, including, but not limited to, long-term leases to permit individuals to utilize public lands for habitation, cultivation, and the development of small trade or manufacturing concerns: *Provided*, That unless otherwise provided for by law, the Secretary may permit Federal departments and agencies to use, occupy, and develop public lands only through rights-of-way under section 1767 of this title, withdrawals under section 1714 of this title, and, where the proposed use and development are similar or closely related to the programs of the Secretary for the public lands involved, cooperative agreements under section 1737(b) of this title: *Provided further*, That nothing in this Act shall be construed as authorizing the Secretary concerned to require Federal permits to hunt and fish on public lands or on lands in the National Forest System and adjacent waters or as enlarging or diminishing the responsibility and authority of the States for management of fish and resident wildlife. However, the Secretary concerned may designate areas of public land and of lands in the National Forest System where, and establish periods when, no hunting or fishing will be permitted for reasons of public safety, administration, or compliance with provisions of applicable law. Except in emergencies, any regulations of the Secretary concerned relating to hunting and fishing pursuant to this section shall be put into effect only after consultation with the appropriate State fish and game department. Nothing in this Act shall modify or change any provision of Federal law relating to migratory birds or to endangered or threatened species. Except as provided in section 1744, section 1782, and subsection (f) of section 1781 of this title and in the last sentence of this paragraph, no provision of this section or any other section of this Act shall in any way amend the Mining Law of 1872 or impair the rights of any locators or claims under that Act, including, but not limited to, rights of ingress and egress. In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands.

**(c) Revocation or suspension provision in instrument authorizing use, occupancy or development; violation of provision; procedure applicable**

The Secretary shall insert in any instrument providing for the use, occupancy, or development of the public lands a provision authorizing revocation or suspension, after notice and hearing, of such instrument upon a final administrative finding of a violation of any term or condition of the instrument, including, but not limited to, terms and conditions requiring compliance with regulations under Acts applicable to the public lands and compliance with applicable State or Federal air or water quality standard or implementation plan: *Provided*, That such violation occurred on public lands covered by such instrument and occurred in connection with the exercise of rights and privileges granted by it: *Provided further*, That the Secretary shall terminate any such suspension no later than the date upon which he determines the cause of said violation has been rectified: *Provided further*, That the Secretary may order an immediate temporary suspension prior to a hearing or final

administrative finding if he determines that such a suspension is necessary to protect health or safety or the environment: *Provided further*, That, where other applicable law contains specific provisions for suspension, revocation, or cancellation of a permit, license, or other authorization to use, occupy, or develop the public lands, the specific provisions of such law shall prevail.

**(d) Authorization to utilize certain public lands in Alaska for military purposes**

(1) The Secretary of the Interior, after consultation with the Governor of Alaska, may issue to the Secretary of Defense or to the Secretary of a military department within the Department of Defense or to the Commandant of the Coast Guard a nonrenewable general authorization to utilize public lands in Alaska (other than within a conservation system unit or the Steese National Conservation Area or the White Mountains National Recreation Area) for purposes of military maneuvering, military training, or equipment testing not involving artillery firing, aerial or other gunnery, or other use of live ammunition or ordnance.

(2) Use of public lands pursuant to a general authorization under this subsection shall be limited to areas where such use would not be inconsistent with the plans prepared pursuant to section 1712 of this title. Each such use shall be subject to a requirement that the using department shall be responsible for any necessary cleanup and decontamination of the lands used, and to such other terms and conditions (including but not limited to restrictions on use of off-road or all-terrain vehicles) as the Secretary of the Interior may require to-

(A) minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved; and

(B) minimize the period and method of such use and the interference with or restrictions on other uses of the public lands involved.

(3)(A) A general authorization issued pursuant to this subsection shall not be for a term of more than three years and shall be revoked in whole or in part, as the Secretary of the Interior finds necessary, prior to the end of such term upon a determination by the Secretary of the Interior that there has been a failure to comply with its terms and conditions or that activities pursuant to such an authorization have had or might have a significant adverse impact on the resources or values of the affected lands.

(B) Each specific use of a particular area of public lands pursuant to a general authorization under this subsection shall be subject to specific authorization by the Secretary and to appropriate terms and conditions, including such as are described in paragraph (2) of this subsection.

(4) Issuance of a general authorization pursuant to this subsection shall be subject to the provisions of section 1712(f) of this title, section 3120 of title 16, and all other applicable provisions of law. The Secretary of a military department (or the Commandant of the Coast Guard) requesting such authorization shall reimburse the Secretary of the Interior for the costs of implementing this paragraph. An authorization pursuant to this subsection shall not authorize the construction of permanent structures or facilities on the public lands.

(5) To the extent that public safety may require closure to public use of any portion of the public lands covered by an authorization issued pursuant to this subsection, the Secretary of the military Department concerned or the Commandant of the Coast Guard shall take appropriate steps to notify the public concerning such closure and to provide appropriate warnings of risks to public safety.

(6) For purposes of this subsection, the term "conservation system unit" has the same meaning as specified in section 3102 of title 16.

( Pub. L. 94–579, title III, §302, Oct. 21, 1976, 90 Stat. 2762 ; Pub. L. 100–586, Nov. 3, 1988, 102 Stat. 2980 .)

## REFERENCES IN TEXT

This Act, referred to in subsec. (b), is Pub. L. 94–579, Oct. 21, 1976, 90 Stat. 2743 , as amended, known as the Federal Land Policy and Management Act of 1976. For complete classification of this Act to the Code, see Tables.

The Mining Law of 1872, referred to in subsec. (b), is act May 10, 1872, ch. 152, 17 Stat. 91, which was incorporated into the Revised Statutes of 1878 as R.S. §§2319 to 2328, 2331, 2333 to 2337, and 2344, which are classified to sections 22 to 24, 26 to 28, 29, 30, 33 to 35, 37, 39 to 42, and 47 of Title 30, Mineral Lands and Mining. For complete classification of such Revised Statutes sections to the Code, see Tables.

## AMENDMENTS

**1988**-Subsec. (d). Pub. L. 100–586 added subsec. (d).

## TRANSFER OF FUNCTIONS

For transfer of authorities, functions, personnel, and assets of the Coast Guard, including the

authorities and functions of the Secretary of Transportation relating thereto, to the Department of Homeland Security, and for treatment of related references, see sections 468(b), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.

Enforcement functions of Secretary or other official in Department of the Interior related to compliance with land use permits for temporary use of public lands and other associated land uses, issued under sections 1732, 1761, and 1763 to 1771 of this title, with respect to pre-construction, construction, and initial operation of transportation systems for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for the Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§102(e), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out in the Appendix to Title 5, Government Organization and Employees. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of Title 15, Commerce and Trade. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of Title 15.

### MANAGEMENT GUIDELINES TO PREVENT WASTING OF PACIFIC YEW

For Congressional findings relating to management guidelines to prevent wasting of Pacific yew in current and future timber sales on Federal lands, see section 4801(a)(8) of Title 16, Conservation.

**43 USC 1739: Advisory councils**
Text contains those laws in effect on April 4, 2015

**From Title 43-PUBLIC LANDS**
    CHAPTER 35-FEDERAL LAND POLICY AND MANAGEMENT
    SUBCHAPTER III-ADMINISTRATION
**Jump To:**
    **Source Credit**
    **References In Text**
    **Amendments**
    **Termination Date**

## §1739. Advisory councils

**(a) Establishment; membership; operation**

The Secretary shall establish advisory councils of not less than ten and not more than fifteen members appointed by him from among persons who are representative of the various major citizens' interests concerning the problems relating to land use planning or the management of the public lands located within the area for which an advisory council is established. At least one member of each council shall be an elected official of general purpose government serving the people of such area. To the extent practicable there shall be no overlap or duplication of such councils. Appointments shall be made in accordance with rules prescribed by the Secretary. The establishment and operation of an advisory council established under this section shall conform to the requirements of the Federal Advisory Committee Act (86 Stat. 770).

**(b) Meetings**

Notwithstanding the provisions of subsection (a) of this section, each advisory council established by the Secretary under this section shall meet at least once a year with such meetings being called by the Secretary.

**(c) Travel and per diem payments**

Members of advisory councils shall serve without pay, except travel and per diem will be paid each member for meetings called by the Secretary.

**(d) Functions**

An advisory council may furnish advice to the Secretary with respect to the land use planning, classification, retention, management, and disposal of the public lands within the area for which the advisory council is established and such other matters as may be referred to it by the Secretary.

**(e) Public participation; procedures applicable**

In exercising his authorities under this Act, the Secretary, by regulation, shall establish procedures, including public hearings where appropriate, to give the Federal, State, and local governments and the public adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and to participate in, the preparation and execution of plans and programs for, and the management of, the public lands.

( Pub. L. 94–579, title III, §309, Oct. 21, 1976, 90 Stat. 2767 ; Pub. L. 95–514, §13, Oct. 25, 1978, 92 Stat. 1808 .)

### REFERENCES IN TEXT

The Federal Advisory Committee Act, referred to in subsec. (a), is Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 770 , as amended, which is set out in the Appendix to Title 5, Government Organization and Employees.

This Act, referred to in subsec. (e), is Pub. L. 94–579, Oct. 21, 1976, 90 Stat. 2743 , as amended, known as the Federal Land Policy and Management Act of 1976. For complete classification of this Act to the Code, see Tables.

### AMENDMENTS

**1978**-Subsec. (a). Pub. L. 95–514 substituted in first sentence "shall establish" for "is authorized to establish".

### TERMINATION OF ADVISORY COUNCILS

Advisory councils established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a council established by the President or an officer of the Federal Government, such council is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a council established by the Congress, its duration is otherwise provided for by law. See sections 3(2) and 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 770 , 776, set out in the Appendix to Title 5, Government Organization and Employees.

70

3      FEDERAL RULES OF APPELLATE PROCEDURE      **Rule 4**

**(e) Payment of Fees.** Upon filing a notice of appeal, the appellant must pay the district clerk all required fees. The district clerk receives the appellate docket fee on behalf of the court of appeals.

(As amended Apr. 30, 1979, eff. Aug. 1, 1979; Mar. 10, 1986, eff. July 1, 1986; Apr. 25, 1989, eff. Dec. 1, 1989; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 29, 1994, eff. Dec. 1, 1994; Apr. 24, 1998, eff. Dec. 1, 1998.)

**[Rule 3.1. Appeal from a Judgment of a Magistrate Judge in a Civil Case]** (Abrogated Apr. 24, 1998, eff. Dec. 1, 1998)

**Rule 4. Appeal as of Right—When Taken**

   **(a) Appeal in a Civil Case.**

      (1) **Time for Filing a Notice of Appeal.**

         (A) In a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from.

         (B) The notice of appeal may be filed by any party within 60 days after entry of the judgment or order appealed from if one of the parties is:

           (i) the United States;

           (ii) a United States agency;

           (iii) a United States officer or employee sued in an official capacity; or

           (iv) a current or former United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf—including all instances in which the United States represents that person when the judgment or order is entered or files the appeal for that person.

         (C) An appeal from an order granting or denying an application for a writ of error *coram nobis* is an appeal in a civil case for purposes of Rule 4(a).

      (2) **Filing Before Entry of Judgment.** A notice of appeal filed after the court announces a decision or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry.

      (3) **Multiple Appeals.** If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later.

      (4) **Effect of a Motion on a Notice of Appeal.**

         (A) If a party timely files in the district court any of the following motions under the Federal Rules of Civil Procedure, the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:

           (i) for judgment under Rule 50(b);

           (ii) to amend or make additional factual findings under Rule 52(b), whether or not granting the motion would alter the judgment;

           (iii) for attorney's fees under Rule 54 if the district court extends the time to appeal under Rule 58;

**Rule 4**     FEDERAL RULES OF APPELLATE PROCEDURE     4

(iv) to alter or amend the judgment under Rule 59;

(v) for a new trial under Rule 59; or

(vi) for relief under Rule 60 if the motion is filed no later than 28 days after the judgment is entered.

(B)(i) If a party files a notice of appeal after the court announces or enters a judgment—but before it disposes of any motion listed in Rule 4(a)(4)(A)—the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

(ii) A party intending to challenge an order disposing of any motion listed in Rule 4(a)(4)(A), or a judgment's alteration or amendment upon such a motion, must file a notice of appeal, or an amended notice of appeal—in compliance with Rule 3(c)—within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion.

(iii) No additional fee is required to file an amended notice.

(5) **Motion for Extension of Time.**

(A) The district court may extend the time to file a notice of appeal if:

(i) a party so moves no later than 30 days after the time prescribed by this Rule 4(a) expires; and

(ii) regardless of whether its motion is filed before or during the 30 days after the time prescribed by this Rule 4(a) expires, that party shows excusable neglect or good cause.

(B) A motion filed before the expiration of the time prescribed in Rule 4(a)(1) or (3) may be ex parte unless the court requires otherwise. If the motion is filed after the expiration of the prescribed time, notice must be given to the other parties in accordance with local rules.

(C) No extension under this Rule 4(a)(5) may exceed 30 days after the prescribed time or 14 days after the date when the order granting the motion is entered, whichever is later.

(6) **Reopening the Time to File an Appeal.** The district court may reopen the time to file an appeal for a period of 14 days after the date when its order to reopen is entered, but only if all the following conditions are satisfied:

(A) the court finds that the moving party did not receive notice under Federal Rule of Civil Procedure 77(d) of the entry of the judgment or order sought to be appealed within 21 days after entry;

(B) the motion is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice under Federal Rule of Civil Procedure 77(d) of the entry, whichever is earlier; and

(C) the court finds that no party would be prejudiced.

(7) **Entry Defined.**

(A) A judgment or order is entered for purposes of this Rule 4(a):

(i) if Federal Rule of Civil Procedure 58(a) does not require a separate document, when the judgment or

5  FEDERAL RULES OF APPELLATE PROCEDURE  **Rule 4**

order is entered in the civil docket under Federal Rule of Civil Procedure 79(a); or

(ii) if Federal Rule of Civil Procedure 58(a) requires a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a) and when the earlier of these events occurs:

- the judgment or order is set forth on a separate document, or
- 150 days have run from entry of the judgment or order in the civil docket under Federal Rule of Civil Procedure 79(a).

(B) A failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58(a) does not affect the validity of an appeal from that judgment or order.

**(b) Appeal in a Criminal Case.**

(1) **Time for Filing a Notice of Appeal.**

(A) In a criminal case, a defendant's notice of appeal must be filed in the district court within 14 days after the later of:

(i) the entry of either the judgment or the order being appealed; or

(ii) the filing of the government's notice of appeal.

(B) When the government is entitled to appeal, its notice of appeal must be filed in the district court within 30 days after the later of:

(i) the entry of the judgment or order being appealed; or

(ii) the filing of a notice of appeal by any defendant.

(2) **Filing Before Entry of Judgment.** A notice of appeal filed after the court announces a decision, sentence, or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry.

(3) **Effect of a Motion on a Notice of Appeal.**

(A) If a defendant timely makes any of the following motions under the Federal Rules of Criminal Procedure, the notice of appeal from a judgment of conviction must be filed within 14 days after the entry of the order disposing of the last such remaining motion, or within 14 days after the entry of the judgment of conviction, whichever period ends later. This provision applies to a timely motion:

(i) for judgment of acquittal under Rule 29;

(ii) for a new trial under Rule 33, but if based on newly discovered evidence, only if the motion is made no later than 14 days after the entry of the judgment; or

(iii) for arrest of judgment under Rule 34.

(B) A notice of appeal filed after the court announces a decision, sentence, or order—but before it disposes of any of the motions referred to in Rule 4(b)(3)(A)—becomes effective upon the later of the following:

(i) the entry of the order disposing of the last such remaining motion; or

(ii) the entry of the judgment of conviction.

**Rule 4**   FEDERAL RULES OF APPELLATE PROCEDURE   **6**

(C) A valid notice of appeal is effective—without amendment—to appeal from an order disposing of any of the motions referred to in Rule 4(b)(3)(A).

(4) **Motion for Extension of Time.** Upon a finding of excusable neglect or good cause, the district court may—before or after the time has expired, with or without motion and notice—extend the time to file a notice of appeal for a period not to exceed 30 days from the expiration of the time otherwise prescribed by this Rule 4(b).

(5) **Jurisdiction.** The filing of a notice of appeal under this Rule 4(b) does not divest a district court of jurisdiction to correct a sentence under Federal Rule of Criminal Procedure 35(a), nor does the filing of a motion under 35(a) affect the validity of a notice of appeal filed before entry of the order disposing of the motion. The filing of a motion under Federal Rule of Criminal Procedure 35(a) does not suspend the time for filing a notice of appeal from a judgment of conviction.

(6) **Entry Defined.** A judgment or order is entered for purposes of this Rule 4(b) when it is entered on the criminal docket.

**(c) Appeal by an Inmate Confined in an Institution.**

(1) If an inmate confined in an institution files a notice of appeal in either a civil or a criminal case, the notice is timely if it is deposited in the institution's internal mail system on or before the last day for filing. If an institution has a system designed for legal mail, the inmate must use that system to receive the benefit of this rule. Timely filing may be shown by a declaration in compliance with 28 U.S.C. §1746 or by a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

(2) If an inmate files the first notice of appeal in a civil case under this Rule 4(c), the 14-day period provided in Rule 4(a)(3) for another party to file a notice of appeal runs from the date when the district court dockets the first notice.

(3) When a defendant in a criminal case files a notice of appeal under this Rule 4(c), the 30-day period for the government to file its notice of appeal runs from the entry of the judgment or order appealed from or from the district court's docketing of the defendant's notice of appeal, whichever is later.

**(d) Mistaken Filing in the Court of Appeals.** If a notice of appeal in either a civil or a criminal case is mistakenly filed in the court of appeals, the clerk of that court must note on the notice the date when it was received and send it to the district clerk. The notice is then considered filed in the district court on the date so noted.

(As amended Apr. 30, 1979, eff. Aug. 1, 1979; Pub. L. 100–690, title VII, §7111, Nov. 18, 1988, 102 Stat. 4419; Apr. 30, 1991, eff. Dec. 1, 1991; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 27, 1995, eff. Dec. 1, 1995; Apr. 24, 1998, eff. Dec. 1, 1998; Apr. 29, 2002, eff. Dec. 1, 2002; Apr. 25, 2005, eff. Dec. 1, 2005; Mar. 26, 2009, eff. Dec. 1, 2009; Apr. 28, 2010, eff. Dec. 1, 2010; Apr. 26, 2011, eff. Dec. 1, 2011.)

# FRAP 26.1. CORPORATE DISCLOSURE STATEMENT

**(a)**      **Who Must File.** Any nongovernmental corporate party to a proceeding in a court of appeals must file a statement that identifies any parent corporation and any publicly held corporation that owns 10% or more of its stock or states that there is no such corporation.

**(b)**      **Time for Filing; Supplemental Filing.** A party must file the Rule 26.1(a) statement with the principal brief or upon filing a motion, response, petition, or answer in the court of appeals, whichever occurs first, unless a local rule requires earlier filing. Even if the statement has already been filed, the party's principal brief must include the statement before the table of contents. A party must supplement its statement whenever the information that must be disclosed under Rule 26.1(a) changes.

**(c)**      **Number of Copies.** If the Rule 26.1(a) statement is filed before the principal brief, or if a supplemental statement is filed, the party must file an original and 3 copies unless the court requires a different number by local rule or by order in a particular case.

(As added Apr. 25, 1989, eff. Dec. 1, 1989; amended Apr. 30, 1991, eff. Dec. 1, 1991; Apr. 29, 1994, eff. Dec. 1, 1994; Apr. 24, 1998, eff. Dec. 1, 1998; Apr. 29, 2002, eff. Dec. 1, 2002.)

---

**28 USC App Fed R App P Rule 32: Form of Briefs, Appendices, and Other Papers**

**From Title 28-Appendix**
    FEDERAL RULES OF APPELLATE PROCEDURE
    TITLE VII-GENERAL PROVISIONS
**Jump To:**
    <u>Source Credit</u>
    <u>Miscellaneous</u>
    <u>Amendments</u>

---

# Rule 32. Form of Briefs, Appendices, and Other Papers

(a) FORM OF A BRIEF.

    (1) *Reproduction.*

      (A) A brief may be reproduced by any process that yields a clear black image on light paper. The paper must be opaque and unglazed. Only one side of the paper may be used.

      (B) Text must be reproduced with a clarity that equals or exceeds the output of a laser printer.

      (C) Photographs, illustrations, and tables may be reproduced by any method that results in a good copy of the original; a glossy finish is acceptable if the original is glossy.

    (2) *Cover.* Except for filings by unrepresented parties, the cover of the appellant's brief must be blue; the appellee's, red; an intervenor's or amicus curiae's, green; any reply brief, gray; and any supplemental brief, tan. The front cover of a brief must contain:

      (A) the number of the case centered at the top;

      (B) the name of the court;

      (C) the title of the case (see Rule 12(a));

      (D) the nature of the proceeding (e.g., Appeal, Petition for Review) and the name of the court, agency, or board below;

      (E) the title of the brief, identifying the party or parties for whom the brief is filed; and

      (F) the name, office address, and telephone number of counsel representing the party for whom the brief is filed.

    (3) *Binding.* The brief must be bound in any manner that is secure, does not obscure the text, and permits the brief to lie reasonably flat when open.

    (4) *Paper Size, Line Spacing, and Margins.* The brief must be on 8½ by 11 inch paper. The text must be double-spaced, but quotations more than two lines long may be indented and single-spaced. Headings and footnotes may be single-spaced. Margins must be at least one inch on all four sides. Page numbers may be placed in the margins, but no text may appear there.

    (5) *Typeface.* Either a proportionally spaced or a monospaced face may be used.

      (A) A proportionally spaced face must include serifs, but sans-serif type may be used in headings and captions. A proportionally spaced face must be 14-point or larger.

      (B) A monospaced face may not contain more than 10½ characters per inch.

    (6) *Type Styles.* A brief must be set in a plain, roman style, although italics or boldface may be used for emphasis. Case names must be italicized or underlined.

    (7) *Length.*

      (A) *Page Limitation.* A principal brief may not exceed 30 pages, or a reply brief 15 pages, unless it complies with Rule 32(a)(7)(B) and (C).

      (B) *Type-Volume Limitation.*

        (i) A principal brief is acceptable if:

          • it contains no more than 14,000 words; or

          • it uses a monospaced face and contains no more than 1,300 lines of text.

        (ii) A reply brief is acceptable if it contains no more than half of the type volume specified in Rule 32(a)(7)(B)(i).

        (iii) Headings, footnotes, and quotations count toward the word and line limitations. The corporate disclosure statement, table of contents, table of citations, statement with respect to oral argument, any

addendum containing statutes, rules or regulations, and any certificates of counsel do not count toward the limitation.

(C) *Certificate of Compliance.*
  (i) A brief submitted under Rules 28.1(e)(2) or 32(a)(7)(B) must include a certificate by the attorney, or an unrepresented party, that the brief complies with the type-volume limitation. The person preparing the certificate may rely on the word or line count of the word-processing system used to prepare the brief. The certificate must state either:
   • the number of words in the brief; or
   • the number of lines of monospaced type in the brief.

  (ii) Form 6 in the Appendix of Forms is a suggested form of a certificate of compliance. Use of Form 6 must be regarded as sufficient to meet the requirements of Rules 28.1(e)(3) and 32(a)(7)(C)(i).

(b) FORM OF AN APPENDIX. An appendix must comply with Rule 32(a)(1), (2), (3), and (4), with the following exceptions:
  (1) The cover of a separately bound appendix must be white.
  (2) An appendix may include a legible photocopy of any document found in the record or of a printed judicial or agency decision.
  (3) When necessary to facilitate inclusion of odd-sized documents such as technical drawings, an appendix may be a size other than 8½ by 11 inches, and need not lie reasonably flat when opened.

(c) FORM OF OTHER PAPERS.
  (1) *Motion.* The form of a motion is governed by Rule 27(d).
  (2) *Other Papers.* Any other paper, including a petition for panel rehearing and a petition for hearing or rehearing en banc, and any response to such a petition, must be reproduced in the manner prescribed by Rule 32(a), with the following exceptions:
    (A) A cover is not necessary if the caption and signature page of the paper together contain the information required by Rule 32(a)(2). If a cover is used, it must be white.
    (B) Rule 32(a)(7) does not apply.

(d) SIGNATURE. Every brief, motion, or other paper filed with the court must be signed by the party filing the paper or, if the party is represented, by one of the party's attorneys.

(e) LOCAL VARIATION. Every court of appeals must accept documents that comply with the form requirements of this rule. By local rule or order in a particular case a court of appeals may accept documents that do not meet all of the form requirements of this rule.

(As amended Apr. 24, 1998, eff. Dec. 1, 1998; Apr. 29, 2002, eff. Dec. 1, 2002; Apr. 25, 2005, eff. Dec. 1, 2005.)

## NOTES OF ADVISORY COMMITTEE ON RULES-1967

Only two methods of printing are now generally recognized by the circuits-standard typographic printing and the offset duplicating process (multilith). A third, mimeographing, is permitted in the Fifth Circuit. The District of Columbia, Ninth, and Tenth Circuits permit records to be reproduced by copying processes. The Committee feels that recent and impending advances in the arts of duplicating and copying warrant experimentation with less costly forms of reproduction than those now generally authorized. The proposed rule permits, in effect, the use of any process other than the carbon copy process which produces a clean, readable page. What constitutes such is left in first instance to the parties and ultimately to the court to determine. The final sentence of the first paragraph of subdivision (a) is added to allow the use of multilith, mimeograph, or other forms of copies of the reporter's original transcript whenever such are available.

## COMMITTEE NOTES ON RULES-1998 AMENDMENT

In addition to amending Rule 32 to conform to uniform drafting standards, several substantive amendments are made. The Advisory Committee had been working on substantive amendments to Rule 32 for some time prior to completion of this larger project.

*Subdivison (a).* Form of a Brief.
*Paragraph (a)(1).* Reproduction.
The rule permits the use of "light" paper, not just "white" paper. Cream and buff colored paper, including recycled paper, are acceptable. The rule permits printing on only one side of the paper.

77

Although some argue that paper could be saved by allowing double-sided printing, others argue that in order to preserve legibility a heavier weight paper would be needed, resulting in little, if any, paper saving. In addition, the blank sides of a brief are commonly used by judges and their clerks for making notes about the case.

Because photocopying is inexpensive and widely available and because use of carbon paper is now very rare, all references to the use of carbon copies have been deleted.

The rule requires that the text be reproduced with a clarity that equals or exceeds the output of a laser printer. That means that the method used must have a print resolution of 300 dots per inch (dpi) or more. This will ensure the legibility of the brief. A brief produced by a typewriter or a daisy wheel printer, as well as one produced by a laser printer, has a print resolution of 300 dpi or more. But a brief produced by a dot-matrix printer, fax machine, or portable printer that uses heat or dye transfer methods does not. Some ink jet printers are 300 dpi or more, but some are 216 dpi and would not be sufficient.

Photographs, illustrations, and tables may be reproduced by any method that results in a good copy.

*Paragraph (a)(2).* Cover.

The rule requires that the number of the case be centered at the top of the front cover of a brief. This will aid in identification of the brief. The idea was drawn from a local rule. The rule also requires that the title of the brief identify the party or parties on whose behalf the brief is filed. When there are multiple appellants or appellees, the information is necessary to the court. If, however, the brief is filed on behalf of all appellants or appellees, it may so indicate. Further, it may be possible to identify the class of parties on whose behalf the brief is filed. Otherwise, it may be necessary to name each party. The rule also requires that attorney's telephone numbers appear on the front cover of a brief or appendix.

*Paragraph (a)(3).* Binding.

The rule requires a brief to be bound in any manner that is secure, does not obscure the text, and that permits the brief to lie reasonably flat when open. Many judges and most court employees do much of their work at computer keyboards and a brief that lies flat when open is significantly more convenient. One circuit already has such a requirement and another states a preference for it. While a spiral binding would comply with this requirement, it is not intended to be the exclusive method of binding. Stapling a brief at the upper left-hand corner also satisfies this requirement as long as it is sufficiently secure.

*Paragraph (a)(4).* Paper Size, Line Spacing, and Margins.

The provisions for pamphlet-size briefs are deleted because their use is so rare. If a circuit wishes to authorize their use, it has authority to do so under subdivision (d) of this rule.

*Paragraph (a)(5).* Typeface.

This paragraph and the next one, governing type style, are new. The existing rule simply states that a brief produced by the standard typographic process must be printed in at least 11 point type, or if produced in any other manner, the lines of text must be double spaced. Today few briefs are produced by commercial printers or by typewriters; most are produced on and printed by computer. The availability of computer fonts in a variety of sizes and styles has given rise to local rules limiting type styles. The Advisory Committee believes that some standards are needed both to ensure that all litigants have an equal opportunity to present their material and to ensure that the briefs are easily legible.

With regard to typeface there are two options: proportionally-spaced typeface or monospaced typeface.

A proportionally-spaced typeface gives a different amount of horizontal space to characters depending upon the width of the character. A capital "M" is given more horizontal space than a lower case "i." The rule requires that a proportionally-spaced typeface have serifs. Serifs are small horizontal or vertical strokes at the ends of the lines that make up the letters and numbers. Studies have shown that long passages of serif type are easier to read and comprehend than long passages of sans-serif type. The rule accordingly limits the principal sections of submissions to serif type, although sans-serif type may be used in headings and captions. This is the same approach magazines, newspapers, and commercial printers take. Look at a professionally printed brief; you will find sans-serif type confined to captions, if it is used at all. The next line shows two characters enlarged for detail. The first has serifs, the second does not.

78



So that the type is easily legible, the rule requires a minimum type size of 14 points for proportionally-spaced typeface.

A monospaced typeface is one in which all characters have the same advance width. That means that each character is given the same horizontal space on the line. A wide letter such as a capital "M" and a narrow letter such as a lower case "i" are given the same space. Most typewriters produce mono-spaced type, and most computers also can do so using fonts with names such as "Courier."

This sentence is in a proportionally spaced font; as you can see, the m and i have different widths.

```
This sentence is in a monospaced font; as you can see, the m and i have the same
width.
```

The rule requires use of a monospaced typeface that produces no more than 10½ characters per inch. A standard typewriter with pica type produces a monospaced typeface with 10 characters per inch (cpi). That is the ideal monospaced typeface. The rule permits up to 10½ cpi because some computer software programs contain monospaced fonts that purport to produce 10 cpi but that in fact produce slightly more than 10 cpi. In order to avoid the need to reprint a brief produced in good faith reliance upon such a program, the rule permits a bit of leeway. A monospace typeface with no more than 10 cpi is preferred.

*Paragraph (a)(6).* Type Styles.

The rule requires use of plain roman, that is not italic or script, type. Italics and boldface may be used for emphasis. Italicizing case names is preferred but underlining may be used.

*Paragraph (a)(7).* Type-Volume Limitation.

Subparagraph (a)(7)(A) contains a safe-harbor provision. A principal brief that does not exceed 30 pages complies with the type-volume limitation without further question or certification. A reply brief that does not exceed 15 pages is similarly treated. The current limit is 50 pages but that limit was established when most briefs were produced on typewriters. The widespread use of personal computers has made a multitude of printing options available to practitioners. Use of a proportional typeface alone can greatly increase the amount of material per page as compared with use of a monospace typeface. Even though the rule requires use of 14-point proportional type, there is great variation in the x-height of different 14-point typefaces. Selection of a typeface with a small x-height increases the amount of text per page. Computers also make possible fine gradations in spacing between lines and tight tracking between letters and words. All of this, and more, have made the 50-page limit virtually meaningless. Establishing a safe-harbor of 50 pages would permit a person who makes use of the multitude of printing "tricks" available with most personal computers to file a brief far longer than the "old" 50-page brief. Therefore, as to those briefs not subject to any other volume control than a page limit, a 30-page limit is imposed.

The limits in subparagraph (B) approximate the current 50-page limit and compliance with them is easy even for a person without a personal computer. The aim of these provisions is to create a level playing field. The rule gives every party an equal opportunity to make arguments, without permitting those with the best in-house typesetting an opportunity to expand their submissions.

The length can be determined either by counting words or lines. That is, the length of a brief is determined not by the number of pages but by the number of words or lines in the brief. This gives every party the same opportunity to present an argument without regard to the typeface used and eliminates any incentive to use footnotes or typographical "tricks" to squeeze more material onto a page.

The word counting method can be used with any typeface.

A monospaced brief can meet the volume limitation by using the word or a line count. If the line counting method is used, the number of lines may not exceed 1,300-26 lines per page in a 50-page brief. The number of lines is easily counted manually. Line counting is not sufficient if a proportionally spaced typeface is used, because the amount of material per line can vary widely.

A brief using the type-volume limitations in subparagraph (B) must include a certificate by the attorney, or party proceeding pro se, that the brief complies with the limitation. The rule permits the person preparing the certification to rely upon the word or line count of the word-processing system

79

used to prepare the brief.

Currently, Rule 28(g) governs the length of a brief. Rule 28(g) begins with the words "[e]xcept by permission of the court," signaling that a party may file a motion to exceed the limits established in the rule. The absence of similar language in Rule 32 does not mean that the Advisory Committee intends to prohibit motions to deviate from the requirements of the rule. The Advisory Committee does not believe that any such language is needed to authorize such a motion.

*Subdivision (b).* Form of an Appendix.

The provisions governing the form of a brief generally apply to an appendix. The rule recognizes, however, that an appendix is usually produced by photocopying existing documents. The rule requires that the photocopies be legible.

The rule permits inclusion not only of documents from the record but also copies of a printed judicial or agency decision. If a decision that is part of the record in the case has been published, it is helpful to provide a copy of the published decision in place of a copy of the decision from the record.

*Subdivision (c).* Form of Other Papers.

The old rule required a petition for rehearing to be produced in the same manner as a brief or appendix. The new rule also requires that a petition for rehearing en banc and a response to either a petition for panel rehearing or a petition for rehearing en banc be prepared in the same manner. But the length limitations of paragraph (a)(7) do not apply to those documents and a cover is not required if all the information needed by the court to properly identify the document and the parties is included in the caption or signature page.

Existing subdivision (b) states that other papers may be produced in like manner, or "they may be typewritten upon opaque, unglazed paper 8½ by 11 inches in size." The quoted language is deleted but that method of preparing documents is not eliminated because (a)(5)(B) permits use of standard pica type. The only change is that the new rule now specifies margins for typewritten documents.

*Subdivision (d).* Local Variation.

A brief that complies with the national rule should be acceptable in every court. Local rules may move in one direction only; they may authorize noncompliance with certain of the national norms. For example, a court that wishes to do so may authorize printing of briefs on both sides of the paper, or the use of smaller type size or sans-serif proportional type. A local rule may not, however, impose requirements that are not in the national rule.

## COMMITTEE NOTES ON RULES-2002 AMENDMENT

*Subdivision (a)(2).* On occasion, a court may permit or order the parties to file supplemental briefs addressing an issue that was not addressed-or adequately addressed-in the principal briefs. Rule 32(a)(2) has been amended to require that tan covers be used on such supplemental briefs. The amendment is intended to promote uniformity in federal appellate practice. At present, the local rules of the circuit courts conflict. *See, e.g.,* D.C. Cir. R. 28(g) (requiring yellow covers on supplemental briefs); 11th Cir. R. 32, I.O.P. 1 (requiring white covers on supplemental briefs).

*Changes Made After Publication and Comments.* No changes were made to the text of the proposed amendment or to the Committee Note.

*Subdivision (a)(7)(C).* If the principal brief of a party exceeds 30 pages, or if the reply brief of a party exceeds 15 pages, Rule 32(a)(7)(C) provides that the party or the party's attorney must certify that the brief complies with the type-volume limitation of Rule 32(a)(7)(B). Rule 32(a)(7)(C) has been amended to refer to Form 6 (which has been added to the Appendix of Forms) and to provide that a party or attorney who uses Form 6 has complied with Rule 32(a)(7)(C). No court may provide to the contrary, in its local rules or otherwise.

Form 6 requests not only the information mandated by Rule 32(a)(7)(C), but also information that will assist courts in enforcing the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6). Parties and attorneys are not required to use Form 6, but they are encouraged to do so.

*Subdivision (c)(2)(A).* Under Rule 32(c)(2)(A), a cover is not required on a petition for panel rehearing, petition for hearing or rehearing en banc, answer to a petition for panel rehearing, response to a petition for hearing or rehearing en banc, or any other paper. Rule 32(d) makes it clear that no court can require that a cover be used on any of these papers. However, nothing prohibits a court from providing in its local rules that if a cover on one of these papers is "voluntarily" used, it must be a

80

particular color. Several circuits have adopted such local rules. *See, e.g.*, Fed. Cir. R. 35(c) (requiring yellow covers on petitions for hearing or rehearing en banc and brown covers on responses to such petitions); Fed. Cir. R. 40(a) (requiring yellow covers on petitions for panel rehearing and brown covers on answers to such petitions); 7th Cir. R. 28 (requiring blue covers on petitions for rehearing filed by appellants or answers to such petitions, and requiring red covers on petitions for rehearing filed by appellees or answers to such petitions); 9th Cir. R. 40–1 (requiring blue covers on petitions for panel rehearing filed by appellants and red covers on answers to such petitions, and requiring red covers on petitions for panel rehearing filed by appellees and blue covers on answers to such petitions); 11th Cir. R. 35–6 (requiring white covers on petitions for hearing or rehearing en banc).

These conflicting local rules create a hardship for counsel who practice in more than one circuit. For that reason, Rule 32(c)(2)(A) has been amended to provide that if a party chooses to use a cover on a paper that is not required to have one, that cover must be white. The amendment is intended to preempt all local rulemaking on the subject of cover colors and thereby promote uniformity in federal appellate practice.

*Changes Made After Publication and Comments.* No changes were made to the text of the proposed amendment or to the Committee Note.

*Subdivisions (d) and (e).* Former subdivision (d) has been redesignated as subdivision (e), and a new subdivision (d) has been added. The new subdivision (d) requires that every brief, motion, or other paper filed with the court be signed by the attorney or unrepresented party who files it, much as Fed. R. Civ. P. 11(a) imposes a signature requirement on papers filed in district court. Only the original copy of every paper must be signed. An appendix filed with the court does not have to be signed at all.

By requiring a signature, subdivision (d) ensures that a readily identifiable attorney or party takes responsibility for every paper. The courts of appeals already have authority to sanction attorneys and parties who file papers that contain misleading or frivolous assertions, *see, e.g.*, 28 U.S.C. §1912, Fed. R. App. P. 38 & 46(b)(1)(B), and thus subdivision (d) has not been amended to incorporate provisions similar to those found in Fed. R. Civ. P. 11(b) and 11(c).

*Changes Made After Publication and Comments.* No changes were made to the text of the proposed amendment. A line was added to the Committee Note to clarify that only the original copy of a paper needs to be signed.

## Committee Notes on Rules-2005 Amendment

*Subdivision (a)(7)(C).* Rule 32(a)(7)(C) has been amended to add cross-references to new Rule 28.1, which governs briefs filed in cases involving cross-appeals. Rule 28.1(e)(2) prescribes type-volume limitations that apply to such briefs, and Rule 28.1(e)(3) requires parties to certify compliance with those type-volume limitations under Rule 32(a)(7)(C).

# ELECTRONIC CODE OF FEDERAL REGULATIONS

## e-CFR data is current as of April 2, 2015

Title 40 → Chapter V → Part 1500 → §1500.1

Title 40: Protection of Environment
PART 1500—PURPOSE, POLICY, AND MANDATE

---

### §1500.1   Purpose.

(a) The National Environmental Policy Act (NEPA) is our basic national charter for protection of the environment. It establishes policy, sets goals (section 101), and provides means (section 102) for carrying out the policy. Section 102(2) contains "action-forcing" provisions to make sure that federal agencies act according to the letter and spirit of the Act. The regulations that follow implement section 102(2). Their purpose is to tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act. The President, the federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the substantive requirements of section 101.

(b) NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

(c) Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. These regulations provide the direction to achieve this purpose.

---

Need assistance?

# ELECTRONIC CODE OF FEDERAL REGULATIONS

## e-CFR data is current as of April 2, 2015

Title 40 → Chapter V → Part 1502

Title 40: Protection of Environment

## PART 1502—ENVIRONMENTAL IMPACT STATEMENT

**Contents**

§1502.1   Purpose.
§1502.2   Implementation.
§1502.3   Statutory requirements for statements.
§1502.4   Major Federal actions requiring the preparation of environmental impact statements.
§1502.5   Timing.
§1502.6   Interdisciplinary preparation.
§1502.7   Page limits.
§1502.8   Writing.
§1502.9   Draft, final, and supplemental statements.
§1502.10   Recommended format.
§1502.11   Cover sheet.
§1502.12   Summary.
§1502.13   Purpose and need.
§1502.14   Alternatives including the proposed action.
§1502.15   Affected environment.
§1502.16   Environmental consequences.
§1502.17   List of preparers.
§1502.18   Appendix.
§1502.19   Circulation of the environmental impact statement.
§1502.20   Tiering.
§1502.21   Incorporation by reference.
§1502.22   Incomplete or unavailable information.
§1502.23   Cost-benefit analysis.
§1502.24   Methodology and scientific accuracy.
§1502.25   Environmental review and consultation requirements.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55994, Nov. 29, 1978, unless otherwise noted.

⬆ Back to Top

## §1502.1   Purpose.

The primary purpose of an environmental impact statement is to serve as an action-forcing device

83

to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government. It shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions.

⬆ Back to Top

## §1502.2  Implementation.

To achieve the purposes set forth in §1502.1 agencies shall prepare environmental impact statements in the following manner:

(a) Environmental impact statements shall be analytic rather than encyclopedic.

(b) Impacts shall be discussed in proportion to their significance. There shall be only brief discussion of other than significant issues. As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be kept concise and shall be no longer than absolutely necessary to comply with NEPA and with these regulations. Length should vary first with potential environmental problems and then with project size.

(d) Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of the Act and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the ultimate agency decisionmaker.

(f) Agencies shall not commit resources prejudicing selection of alternatives before making a final decision (§1506.1).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

⬆ Back to Top

## §1502.3  Statutory requirements for statements.

As required by sec. 102(2)(C) of NEPA environmental impact statements (§1508.11) are to be included in every recommendation or report.

On proposals (§1508.23).

For legislation and (§1508.17).

Other major Federal actions (§1508.18).

Significantly (§1508.27).

Affecting (§§1508.3, 1508.8).

84

The quality of the human environment (§1508.14).

↰ Back to Top

### §1502.4  Major Federal actions requiring the preparation of environmental impact statements.

(a) Agencies shall make sure the proposal which is the subject of an environmental impact statement is properly defined. Agencies shall use the criteria for scope (§1508.25) to determine which proposal(s) shall be the subject of a particular statement. Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement.

(b) Environmental impact statements may be prepared, and are sometimes required, for broad Federal actions such as the adoption of new agency programs or regulations (§1508.18). Agencies shall prepare statements on broad actions so that they are relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking.

(c) When preparing statements on broad actions (including proposals by more than one agency), agencies may find it useful to evaluate the proposal(s) in one of the following ways:

(1) Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

(2) Generically, including actions which have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter.

(3) By stage of technological development including federal or federally assisted research, development or demonstration programs for new technologies which, if applied, could significantly affect the quality of the human environment. Statements shall be prepared on such programs and shall be available before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives.

(d) Agencies shall as appropriate employ scoping (§1501.7), tiering (§1502.20), and other methods listed in §§1500.4 and 1500.5 to relate broad and narrow actions and to avoid duplication and delay.

↰ Back to Top

### §1502.5  Timing.

An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal (§1508.23) so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made (§§1500.2(c), 1501.2, and 1502.2). For instance:

(a) For projects directly undertaken by Federal agencies the environmental impact statement shall be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary.

(b) For applications to the agency appropriate environmental assessments or statements shall be commenced no later than immediately after the application is received. Federal agencies are encouraged to begin preparation of such assessments or statements earlier, preferably jointly with applicable State or local agencies.

85

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the public hearing related to the impact study. In appropriate circumstances the statement may follow preliminary hearings designed to gather information for use in the statements.

(d) For informal rulemaking the draft environmental impact statement shall normally accompany the proposed rule.

⬆ Back to Top

### §1502.6 Interdisciplinary preparation.

Environmental impact statements shall be prepared using an inter-disciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of the Act). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§1501.7).

⬆ Back to Top

### §1502.7 Page limits.

The text of final environmental impact statements (e.g., paragraphs (d) through (g) of §1502.10) shall normally be less than 150 pages and for proposals of unusual scope or complexity shall normally be less than 300 pages.

⬆ Back to Top

### §1502.8 Writing.

Environmental impact statements shall be written in plain language and may use appropriate graphics so that decisionmakers and the public can readily understand them. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which will be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

⬆ Back to Top

### §1502.9 Draft, final, and supplemental statements.

Except for proposals for legislation as provided in §1506.8 environmental impact statements shall be prepared in two stages and may be supplemented.

(a) Draft environmental impact statements shall be prepared in accordance with the scope decided upon in the scoping process. The lead agency shall work with the cooperating agencies and shall obtain comments as required in part 1503 of this chapter. The draft statement must fulfill and satisfy to the fullest extent possible the requirements established for final statements in section 102(2)(C) of the Act. If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion. The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action.

(b) Final environmental impact statements shall respond to comments as required in part 1503 of this chapter. The agency shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(c) Agencies:

86

(1) Shall prepare supplements to either draft or final environmental impact statements if:

(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall adopt procedures for introducing a supplement into its formal administrative record, if such a record exists.

(4) Shall prepare, circulate, and file a supplement to a statement in the same fashion (exclusive of scoping) as a draft and final statement unless alternative procedures are approved by the Council.

⬆ Back to Top

## §1502.10  Recommended format.

Agencies shall use a format for environmental impact statements which will encourage good analysis and clear presentation of the alternatives including the proposed action. The following standard format for environmental impact statements should be followed unless the agency determines that there is a compelling reason to do otherwise:

(a) Cover sheet.

(b) Summary.

(c) Table of contents.

(d) Purpose of and need for action.

(e) Alternatives including proposed action (sections 102(2)(C)(iii) and 102(2)(E) of the Act).

(f) Affected environment.

(g) Environmental consequences (especially sections 102(2)(C)(i), (ii), (iv), and (v) of the Act).

(h) List of preparers.

(i) List of Agencies, Organizations, and persons to whom copies of the statement are sent.

(j) Index.

(k) Appendices (if any).

If a different format is used, it shall include paragraphs (a), (b), (c), (h), (i), and (j), of this section and shall include the substance of paragraphs (d), (e), (f), (g), and (k) of this section, as further described in §§1502.11 through 1502.18, in any appropriate format.

⬆ Back to Top

## §1502.11  Cover sheet.

The cover sheet shall not exceed one page. It shall include:

87

(a) A list of the responsible agencies including the lead agency and any cooperating agencies.

(b) The title of the proposed action that is the subject of the statement (and if appropriate the titles of related cooperating agency actions), together with the State(s) and county(ies) (or other jurisdiction if applicable) where the action is located.

(c) The name, address, and telephone number of the person at the agency who can supply further information.

(d) A designation of the statement as a draft, final, or draft or final supplement.

(e) A one paragraph abstract of the statement.

(f) The date by which comments must be received (computed in cooperation with EPA under §1506.10).

The information required by this section may be entered on Standard Form 424 (in items 4, 6, 7, 10, and 18).

⬆ Back to Top

### §1502.12  Summary.

Each environmental impact statement shall contain a summary which adequately and accurately summarizes the statement. The summary shall stress the major conclusions, areas of controversy (including issues raised by agencies and the public), and the issues to be resolved (including the choice among alternatives). The summary will normally not exceed 15 pages.

⬆ Back to Top

### §1502.13  Purpose and need.

The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.

⬆ Back to Top

### §1502.14  Alternatives including the proposed action.

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§1502.15) and the Environmental Consequences (§1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the

88

expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

⬆ Back to Top

### §1502.15   Affected environment.

The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration. The descriptions shall be no longer than is necessary to understand the effects of the alternatives. Data and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

⬆ Back to Top

### §1502.16   Environmental consequences.

This section forms the scientific and analytic basis for the comparisons under §1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of section 102(2)(C)(iii) as is necessary to support the comparisons. The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not duplicate discussions in §1502.14. It shall include discussions of:

(a) Direct effects and their significance (§1508.8).

(b) Indirect effects and their significance (§1508.8).

(c) Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See §1506.2(d).)

(d) The environmental effects of alternatives including the proposed action. The comparisons under §1502.14 will be based on this discussion.

(e) Energy requirements and conservation potential of various alternatives and mitigation measures.

(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under §1502.14(f)).

[43 FR 55994, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

⬆ Back to Top

### §1502.17   List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement (§§1502.6 and 1502.8). Where possible the persons who are responsible for a particular analysis, including analyses in background papers, shall be identified. Normally the list will not exceed two pages.

⬆ Back to Top

### §1502.18   Appendix.

If an agency prepares an appendix to an environmental impact statement the appendix shall:

(a) Consist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§1502.21)).

(b) Normally consist of material which substantiates any analysis fundamental to the impact statement.

(c) Normally be analytic and relevant to the decision to be made.

(d) Be circulated with the environmental impact statement or be readily available on request.

⬆ Back to Top

### §1502.19   Circulation of the environmental impact statement.

Agencies shall circulate the entire draft and final environmental impact statements except for certain appendices as provided in §1502.18(d) and unchanged statements as provided in §1503.4(c). However, if the statement is unusually long, the agency may circulate the summary instead, except that the entire statement shall be furnished to:

(a) Any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement any person, organization, or agency which submitted substantive comments on the draft.

If the agency circulates the summary and thereafter receives a timely request for the entire statement and for additional time to comment, the time for that requestor only shall be extended by at least 15 days beyond the minimum period.

⬆ Back to Top

### §1502.20   Tiering.

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of

90

environmental review (§1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Section 1508.28).

⬆ Back to Top

### §1502.21   Incorporation by reference.

Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.

⬆ Back to Top

### §1502.22   Incomplete or unavailable information.

When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

(c) The amended regulation will be applicable to all environmental impact statements for which a Notice of Intent (40 CFR 1508.22) is published in the Federal Register on or after May 27, 1986. For environmental impact statements in progress, agencies may choose to comply with the requirements of either the original or amended regulation.

[51 FR 15625, Apr. 25, 1986]

⬆ Back to Top

### §1502.23   Cost-benefit analysis.

91

If a cost-benefit analysis relevant to the choice among environmentally different alternatives is being considered for the proposed action, it shall be incorporated by reference or appended to the statement as an aid in evaluating the environmental consequences. To assess the adequacy of compliance with section 102(2)(B) of the Act the statement shall, when a cost-benefit analysis is prepared, discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are important qualitative considerations. In any event, an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, which are likely to be relevant and important to a decision.

🔼 Back to Top

### §1502.24   Methodology and scientific accuracy.

Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix.

🔼 Back to Top

### §1502.25   Environmental review and consultation requirements.

(a) To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrently with and integrated with environmental impact analyses and related surveys and studies required by the Fish and Wildlife Coordination Act (16 U.S.C. 661 *et seq.*), the National Historic Preservation Act of 1966 (16 U.S.C. 470 *et seq.*), the Endangered Species Act of 1973 (16 U.S.C. 1531 *et seq.*), and other environmental review laws and executive orders.

(b) The draft environmental impact statement shall list all Federal permits, licenses, and other entitlements which must be obtained in implementing the proposal. If it is uncertain whether a Federal permit, license, or other entitlement is necessary, the draft environmental impact statement shall so indicate.

🔼 Back to Top

Need assistance?

Case: 14-17374, 04/10/2015, ID: 9491805, DktEntry: 13-1, Page 190 of 278

# ELECTRONIC CODE OF FEDERAL REGULATIONS

## e-CFR data is current as of April 2, 2015

Title 40 → Chapter V → Part 1506

Title 40: Protection of Environment

---

**PART 1506—OTHER REQUIREMENTS OF NEPA**

---

**Contents**

§1506.1   Limitations on actions during NEPA process.
§1506.2   Elimination of duplication with State and local procedures.
§1506.3   Adoption.
§1506.4   Combining documents.
§1506.5   Agency responsibility.
§1506.6   Public involvement.
§1506.7   Further guidance.
§1506.8   Proposals for legislation.
§1506.9   Filing requirements.
§1506.10   Timing of agency action.
§1506.11   Emergencies.
§1506.12   Effective date.

---

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 56000, Nov. 29, 1978, unless otherwise noted.

↰ Back to Top

## §1506.1   Limitations on actions during NEPA process.

(a) Until an agency issues a record of decision as provided in §1505.2 (except as provided in paragraph (c) of this section), no action concerning the proposal shall be taken which would:

(1) Have an adverse environmental impact; or

(2) Limit the choice of reasonable alternatives.

(b) If any agency is considering an application from a non-Federal entity, and is aware that the applicant is about to take an action within the agency's jurisdiction that would meet either of the criteria in paragraph (a) of this section, then the agency shall promptly notify the applicant that the agency will take appropriate action to insure that the objectives and procedures of NEPA are achieved.

(c) While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human

93

environment unless such action:

(1) Is justified independently of the program;

(2) Is itself accompanied by an adequate environmental impact statement; and

(3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

(d) This section does not preclude development by applicants of plans or designs or performance of other work necessary to support an application for Federal, State or local permits or assistance. Nothing in this section shall preclude Rural Electrification Administration approval of minimal expenditures not affecting the environment (e.g. long leadtime equipment and purchase options) made by non-governmental entities seeking loan guarantees from the Administration.

⬆ Back to Top

## §1506.2   Elimination of duplication with State and local procedures.

(a) Agencies authorized by law to cooperate with State agencies of statewide jurisdiction pursuant to section 102(2)(D) of the Act may do so.

(b) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include:

(1) Joint planning processes.

(2) Joint environmental research and studies.

(3) Joint public hearings (except where otherwise provided by statute).

(4) Joint environmental assessments.

(c) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and comparable State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include joint environmental impact statements. In such cases one or more Federal agencies and one or more State or local agencies shall be joint lead agencies. Where State laws or local ordinances have environmental impact statement requirements in addition to but not in conflict with those in NEPA, Federal agencies shall cooperate in fulfilling these requirements as well as those of Federal laws so that one document will comply with all applicable laws.

(d) To better integrate environmental impact statements into State or local planning processes, statements shall discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law.

⬆ Back to Top

## §1506.3   Adoption.

(a) An agency may adopt a Federal draft or final environmental impact statement or portion thereof provided that the statement or portion thereof meets the standards for an adequate statement under these regulations.

94

(b) If the actions covered by the original environmental impact statement and the proposed action are substantially the same, the agency adopting another agency's statement is not required to recirculate it except as a final statement. Otherwise the adopting agency shall treat the statement as a draft and recirculate it (except as provided in paragraph (c) of this section).

(c) A cooperating agency may adopt without recirculating the environmental impact statement of a lead agency when, after an independent review of the statement, the cooperating agency concludes that its comments and suggestions have been satisfied.

(d) When an agency adopts a statement which is not final within the agency that prepared it, or when the action it assesses is the subject of a referral under part 1504, or when the statement's adequacy is the subject of a judicial action which is not final, the agency shall so specify.

🔺 Back to Top

## §1506.4   Combining documents.

Any environmental document in compliance with NEPA may be combined with any other agency document to reduce duplication and paperwork.

🔺 Back to Top

## §1506.5   Agency responsibility.

(a) *Information.* If an agency requires an applicant to submit environmental information for possible use by the agency in preparing an environmental impact statement, then the agency should assist the applicant by outlining the types of information required. The agency shall independently evaluate the information submitted and shall be responsible for its accuracy. If the agency chooses to use the information submitted by the applicant in the environmental impact statement, either directly or by reference, then the names of the persons responsible for the independent evaluation shall be included in the list of preparers (§1502.17). It is the intent of this paragraph that acceptable work not be redone, but that it be verified by the agency.

(b) *Environmental assessments.* If an agency permits an applicant to prepare an environmental assessment, the agency, besides fulfilling the requirements of paragraph (a) of this section, shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment.

(c) *Environmental impact statements.* Except as provided in §§1506.2 and 1506.3 any environmental impact statement prepared pursuant to the requirements of NEPA shall be prepared directly by or by a contractor selected by the lead agency or where appropriate under §1501.6(b), a cooperating agency. It is the intent of these regulations that the contractor be chosen solely by the lead agency, or by the lead agency in cooperation with cooperating agencies, or where appropriate by a cooperating agency to avoid any conflict of interest. Contractors shall execute a disclosure statement prepared by the lead agency, or where appropriate the cooperating agency, specifying that they have no financial or other interest in the outcome of the project. If the document is prepared by contract, the responsible Federal official shall furnish guidance and participate in the preparation and shall independently evaluate the statement prior to its approval and take responsibility for its scope and contents. Nothing in this section is intended to prohibit any agency from requesting any person to submit information to it or to prohibit any person from submitting information to any agency.

🔺 Back to Top

## §1506.6   Public involvement.

Agencies shall:

(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures.

(b) Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected.

(1) In all cases the agency shall mail notice to those who have requested it on an individual action.

(2) In the case of an action with effects of national concern notice shall include publication in the FEDERAL REGISTER and notice by mail to national organizations reasonably expected to be interested in the matter and may include listing in the *102 Monitor.* An agency engaged in rulemaking may provide notice by mail to national organizations who have requested that notice regularly be provided. Agencies shall maintain a list of such organizations.

(3) In the case of an action with effects primarily of local concern the notice may include:

(i) Notice to State and areawide clearinghouses pursuant to OMB Circular A-95 (Revised).

(ii) Notice to Indian tribes when effects may occur on reservations.

(iii) Following the affected State's public notice procedures for comparable actions.

(iv) Publication in local newspapers (in papers of general circulation rather than legal papers).

(v) Notice through other local media.

(vi) Notice to potentially interested community organizations including small business associations.

(vii) Publication in newsletters that may be expected to reach potentially interested persons.

(viii) Direct mailing to owners and occupants of nearby or affected property.

(ix) Posting of notice on and off site in the area where the action is to be located.

(c) Hold or sponsor public hearings or public meetings whenever appropriate or in accordance with statutory requirements applicable to the agency. Criteria shall include whether there is:

(1) Substantial environmental controversy concerning the proposed action or substantial interest in holding the hearing.

(2) A request for a hearing by another agency with jurisdiction over the action supported by reasons why a hearing will be helpful. If a draft environmental impact statement is to be considered at a public hearing, the agency should make the statement available to the public at least 15 days in advance (unless the purpose of the hearing is to provide information for the draft environmental impact statement).

(d) Solicit appropriate information from the public.

(e) Explain in its procedures where interested persons can get information or status reports on environmental impact statements and other elements of the NEPA process.

(f) Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552), without regard to the exclusion for interagency memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Materials

to be made available to the public shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including the Council.

↰ Back to Top

### §1506.7   Further guidance.

The Council may provide further guidance concerning NEPA and its procedures including:

(a) A handbook which the Council may supplement from time to time, which shall in plain language provide guidance and instructions concerning the application of NEPA and these regulations.

(b) Publication of the Council's Memoranda to Heads of Agencies.

(c) In conjunction with the Environmental Protection Agency and the publication of the 102 Monitor, notice of:

(1) Research activities;

(2) Meetings and conferences related to NEPA; and

(3) Successful and innovative procedures used by agencies to implement NEPA.

↰ Back to Top

### §1506.8   Proposals for legislation.

(a) The NEPA process for proposals for legislation (§1508.17) significantly affecting the quality of the human environment shall be integrated with the legislative process of the Congress. A legislative environmental impact statement is the detailed statement required by law to be included in a recommendation or report on a legislative proposal to Congress. A legislative environmental impact statement shall be considered part of the formal transmittal of a legislative proposal to Congress; however, it may be transmitted to Congress up to 30 days later in order to allow time for completion of an accurate statement which can serve as the basis for public and Congressional debate. The statement must be available in time for Congressional hearings and deliberations.

(b) Preparation of a legislative environmental impact statement shall conform to the requirements of these regulations except as follows:

(1) There need not be a scoping process.

(2) The legislative statement shall be prepared in the same manner as a draft statement, but shall be considered the "detailed statement" required by statute; *Provided,* That when any of the following conditions exist both the draft and final environmental impact statement on the legislative proposal shall be prepared and circulated as provided by §§1503.1 and 1506.10.

(i) A Congressional Committee with jurisdiction over the proposal has a rule requiring both draft and final environmental impact statements.

(ii) The proposal results from a study process required by statute (such as those required by the Wild and Scenic Rivers Act (16 U.S.C. 1271 *et seq.*) and the Wilderness Act (16 U.S.C. 1131 *et seq.*)).

(iii) Legislative approval is sought for Federal or federally assisted construction or other projects which the agency recommends be located at specific geographic locations. For proposals requiring an environmental impact statement for the acquisition of space by the General Services Administration, a draft statement shall accompany the Prospectus or the 11(b) Report of Building Project Surveys to the

97

Congress, and a final statement shall be completed before site acquisition.

(iv) The agency decides to prepare draft and final statements.

(c) Comments on the legislative statement shall be given to the lead agency which shall forward them along with its own responses to the Congressional committees with jurisdiction.

⬆ Back to Top

## §1506.9  Filing requirements.

(a) Environmental impact statements together with comments and responses shall be filed with the Environmental Protection Agency, attention Office of Federal Activities, EIS Filing Section, Ariel Rios Building (South Oval Lobby), Mail Code 2252-A, Room 7220, 1200 Pennsylvania Ave., NW., Washington, DC 20460. This address is for deliveries by US Postal Service (including USPS Express Mail).

(b) For deliveries in-person or by commercial express mail services, including Federal Express or UPS, the correct address is: US Environmental Protection Agency, Office of Federal Activities, EIS Filing Section, Ariel Rios Building (South Oval Lobby), Room 7220, 1200 Pennsylvania Avenue, NW., Washington, DC 20004.

(c) Statements shall be filed with the EPA no earlier than they are also transmitted to commenting agencies and made available to the public. EPA shall deliver one copy of each statement to the Council, which shall satisfy the requirement of availability to the President. EPA may issue guidelines to agencies to implement its responsibilities under this section and §1506.10.

[70 FR 41148, July 18, 2005]

⬆ Back to Top

## §1506.10  Timing of agency action.

(a) The Environmental Protection Agency shall publish a notice in the FEDERAL REGISTER each week of the environmental impact statements filed during the preceding week. The minimum time periods set forth in this section shall be calculated from the date of publication of this notice.

(b) No decision on the proposed action shall be made or recorded under §1505.2 by a Federal agency until the later of the following dates:

(1) Ninety (90) days after publication of the notice described above in paragraph (a) of this section for a draft environmental impact statement.

(2) Thirty (30) days after publication of the notice described above in paragraph (a) of this section for a final environmental impact statement.

An exception to the rules on timing may be made in the case of an agency decision which is subject to a formal internal appeal. Some agencies have a formally established appeal process which allows other agencies or the public to take appeals on a decision and make their views known, after publication of the final environmental impact statement. In such cases, where a real opportunity exists to alter the decision, the decision may be made and recorded at the same time the environmental impact statement is published. This means that the period for appeal of the decision and the 30-day period prescribed in paragraph (b)(2) of this section may run concurrently. In such cases the environmental impact statement shall explain the timing and the public's right of appeal. An agency engaged in rulemaking under the Administrative Procedure Act or other statute for the purpose of protecting the public health or safety, may waive the time period in paragraph (b)(2) of this section and

98

publish a decision on the final rule simultaneously with publication of the notice of the availability of the final environmental impact statement as described in paragraph (a) of this section.

(c) If the final environmental impact statement is filed within ninety (90) days after a draft environmental impact statement is filed with the Environmental Protection Agency, the minimum thirty (30) day period and the minimum ninety (90) day period may run concurrently. However, subject to paragraph (d) of this section agencies shall allow not less than 45 days for comments on draft statements.

(d) The lead agency may extend prescribed periods. The Environmental Protection Agency may upon a showing by the lead agency of compelling reasons of national policy reduce the prescribed periods and may upon a showing by any other Federal agency of compelling reasons of national policy also extend prescribed periods, but only after consultation with the lead agency. (Also see §1507.3(d).) Failure to file timely comments shall not be a sufficient reason for extending a period. If the lead agency does not concur with the extension of time, EPA may not extend it for more than 30 days. When the Environmental Protection Agency reduces or extends any period of time it shall notify the Council.

[43 FR 56000, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]

⬆ Back to Top

## §1506.11   Emergencies.

Where emergency circumstances make it necessary to take an action with significant environmental impact without observing the provisions of these regulations, the Federal agency taking the action should consult with the Council about alternative arrangements. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review.

⬆ Back to Top

## §1506.12   Effective date.

The effective date of these regulations is July 30, 1979, except that for agencies that administer programs that qualify under section 102(2)(D) of the Act or under section 104(h) of the Housing and Community Development Act of 1974 an additional four months shall be allowed for the State or local agencies to adopt their implementing procedures.

(a) These regulations shall apply to the fullest extent practicable to ongoing activities and environmental documents begun before the effective date. These regulations do not apply to an environmental impact statement or supplement if the draft statement was filed before the effective date of these regulations. No completed environmental documents need be redone by reasons of these regulations. Until these regulations are applicable, the Council's guidelines published in the FEDERAL REGISTER of August 1, 1973, shall continue to be applicable. In cases where these regulations are applicable the guidelines are superseded. However, nothing shall prevent an agency from proceeding under these regulations at an earlier time.

(b) NEPA shall continue to be applicable to actions begun before January 1, 1970, to the fullest extent possible.

⬆ Back to Top

Need assistance?

# ELECTRONIC CODE OF FEDERAL REGULATIONS

## e-CFR data is current as of April 2, 2015

Title 43 → Subtitle B → Chapter II → Subchapter A → Part 1600 → Subpart 1610 → §1610.3-1

Title 43: Public Lands: Interior
PART 1600—PLANNING, PROGRAMMING, BUDGETING
Subpart 1610—Resource Management Planning

---

**§1610.3-1  Coordination of planning efforts.**

(a) In addition to the public involvement prescribed by §1610.2, the following coordination is to be accomplished with other Federal agencies, state and local governments, and federally recognized Indian tribes. The objectives of the coordination are for the State Directors and Field Managers to:

(1) Keep apprised of non-Bureau of Land Management plans;

(2) Assure that BLM considers those plans that are germane in the development of resource management plans for public lands;

(3) Assist in resolving, to the extent practicable, inconsistencies between Federal and non-Federal government plans;

(4) Provide for meaningful public involvement of other Federal agencies, State and local government officials, both elected and appointed, and federally recognized Indian tribes, in the development of resource management plans, including early public notice of final decisions that may have a significant impact on non-Federal lands; and

(5) Where possible and appropriate, develop resource management plans collaboratively with cooperating agencies.

(b) When developing or revising resource management plans, BLM State Directors and Field Managers will invite eligible Federal agencies, state and local governments, and federally recognized Indian tribes to participate as cooperating agencies. The same requirement applies when BLM amends resource management plans through an environmental impact statement. State Directors and Field Managers will consider any requests of other Federal agencies, state and local governments, and federally recognized Indian tribes for cooperating agency status. Field Managers who deny such requests will inform the State Director of the denial. The State Director will determine if the denial is appropriate.

(c) State Directors and Field Managers shall provide other Federal agencies, State and local governments, and Indian tribes opportunity for review, advice, and suggestion on issues and topics which may affect or influence other agency or other government programs. To facilitate coordination with State governments, State Directors should seek the policy advice of the Governor(s) on the timing, scope and coordination of plan components; definition of planning areas; scheduling of public involvement activities; and the multiple use opportunities and constraints on public lands. State Directors may seek written agreements with Governors or their designated representatives on processes and procedural topics such as exchanging information, providing advice and participation,

101

and timeframes for receiving State government participation and review in a timely fashion. If an agreement is not reached, the State Director shall provide opportunity for Governor and State agency review, advice and suggestions on issues and topics that the State Director has reason to believe could affect or influence State government programs.

(d) In developing guidance to Field Manager, in compliance with section 1611 of this title, the State Director shall:

(1) Ensure that it is as consistent as possible with existing officially adopted and approved resource related plans, policies or programs of other Federal agencies, State agencies, Indian tribes and local governments that may be affected, as prescribed by §1610.3-2 of this title;

(2) Identify areas where the proposed guidance is inconsistent with such policies, plans or programs and provide reasons why the inconsistencies exist and cannot be remedied; and

(3) Notify the other Federal agencies, State agencies, Indian tribes or local governments with whom consistency is not achieved and indicate any appropriate methods, procedures, actions and/or programs which the State Director believes may lead to resolution of such inconsistencies.

(e) A notice of intent to prepare, amend, or revise a resource management plan shall be submitted, consistent with State procedures for coordination of Federal activities, for circulation among State agencies. This notice shall also be submitted to Federal agencies, the heads of county boards, other local government units and Tribal Chairmen or Alaska Native Leaders that have requested such notices or that the responsible line manager has reason to believe would be concerned with the plan or amendment. These notices shall be issued simultaneously with the public notices required under §1610.2(b) of this title.

(f) Federal agencies, State and local governments and Indian tribes shall have the time period prescribed under §1610.2 of this title for review and comment on resource management plan proposals. Should they notify the Field Manager, in writing, of what they believe to be specific inconsistencies between the Bureau of Land Management resource management plan and their officially approved and adopted resources related plans, the resource management plan documentation shall show how those inconsistencies were addressed and, if possible, resolved.

(g) When an advisory council has been formed under section 309 of the Federal Land Policy and Management Act of 1976 for the area addressed in a resource management plan or plan amendment, BLM will inform that council, seek its views, and consider them throughout the planning process.

[48 FR 20368, May 5, 1983, as amended at 70 FR 14566, 14567, Mar. 23, 2005; 70 FR 29208, May 20, 2005]

Need assistance?

102

# ELECTRONIC CODE OF FEDERAL REGULATIONS

## e-CFR data is current as of April 2, 2015

Title 43 → Subtitle B → Chapter II → Subchapter B → Part 2300

Title 43: Public Lands: Interior

---

**PART 2300—LAND WITHDRAWALS**

---

**Contents**

**Subpart 2300—Withdrawals, General**

§2300.0-1   Purpose.
§2300.0-3   Authority.
§2300.0-5   Definitions.

**Subpart 2310—Withdrawals, General: Procedure**

§2310.1   Procedures: General.
§2310.1-1   Preapplication consultation.
§2310.1-2   Submission of applications.
§2310.1-3   Submission of withdrawal petitions.
§2310.1-4   Cancellation of withdrawal applications or withdrawal proposals and denial of applications.
§2310.2   Segregative effect of withdrawal applications or withdrawal proposals.
§2310.2-1   Termination of the segregative effect of withdrawal applications or withdrawal proposals.
§2310.3   Action on withdrawal applications and withdrawal proposals, except for emergency withdrawals.
§2310.3-1   Publication and public meeting requirements.
§2310.3-2   Development and processing of the case file for submission to the Secretary.
§2310.3-3   Action by the Secretary: Public land orders and notices of denial.
§2310.3-4   Duration of withdrawals.
§2310.3-5   Compensation for improvements.
§2310.3-6   Transfer of jurisdiction.
§2310.4   Review and extensions of withdrawals.
§2310.5   Special action on emergency withdrawals.

**Subpart 2320—Federal Energy Regulatory Commission Withdrawals**

§2320.0-3   Authority.
§2320.1   Lands considered withdrawn or classified for power purposes.
§2320.2   General determinations under the Federal Power Act.
§2320.3   Applications for restoration.

---

AUTHORITY: 43 U.S.C. 1201; 43 U.S.C. 1740; E.O. 10355 (17 FR 4831, 4833).

SOURCE: 46 FR 5796, Jan. 19, 1981, unless otherwise noted.

103

Case: 14-17374, 04/10/2015, ID: 9491805, DktEntry: 13-1, Page 201 of 278

↰ Back to Top

## Subpart 2300—Withdrawals, General

↰ Back to Top

### §2300.0-1  Purpose.

(a) These regulations set forth procedures implementing the Secretary of the Interior's authority to process Federal land withdrawal applications and, where appropriate, to make, modify or extend Federal land withdrawals. Procedures for making emergency withdrawals are also included.

(b) The regulations do not apply to withdrawals that are made by the Secretary of the Interior pursuant to an act of Congress which directs the issuance of an order by the Secretary. Likewise, procedures applicable to withdrawals authorized under the Surface Mining Control and Reclamation Act of 1977 (30 U.S.C. 1272(b); 1281), and procedures relating to the Secretary's authority to establish Indian reservations or to add lands to the reservations pursuant to special legislation or in accordance with section 7 of the Act of June 18, 1934 (25 U.S.C. 467), as supplemented by section 1 of the Act of May 1, 1936 (25 U.S.C. 473a), are not included in these regulations.

(c) General procedures relating to the processing of revocation of withdrawals and relating to the relinquishment of reserved Federal land areas are not included in this part.

↰ Back to Top

### §2300.0-3  Authority.

(a)(1) Section 204 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1714) gives the Secretary of the Interior general authority to make, modify, extend or revoke withdrawals, but only in accordance with the provisions and limitations of that section. Among other limitations, the Federal Land Policy and Management Act of 1976 provides that the Secretary of the Interior does not have authority to:

(i) Make, modify or revoke any withdrawal created by an Act of Congress;

(ii) Make a withdrawal which can be made only by an Act of Congress;

(iii) Modify or revoke any withdrawal creating national monuments under the Act of June 8, 1906 (16 U.S.C. 431-433), sometimes referred to as the Antiquities Act;

(iv) Modify or revoke any withdrawal which added lands to the National Wildlife Refuge System prior to October 21, 1976, the date of approval of the Federal Land Policy and Management Act of 1976 or which thereafter adds lands to that System under the terms of that Act. In this connection, nothing in the Federal Land Policy and Management Act of 1976 is intended to modify or change any provision of the Act of February 27, 1976 (16 U.S.C. 668 dd(a)).

(2) Executive Order 10355 of May 26, 1952 (17 FR 4831), confers on the Secretary of the Interior all of the delegable authority of the President to make, modify and revoke withdrawals and reservations with respect to lands of the public domain and other lands owned and controlled by the United States in the continental United States or Alaska.

(3) The Act of February 28, 1958 (43 U.S.C. 155-158), sometimes referred to as the Engle Act, places on the Secretary of the Interior the responsibility to process Department of Defense applications for national defense withdrawals, reservations or restrictions aggregating 5,000 acres or more for any one project or facility. These withdrawals, reservations or restrictions may only be made by an act of Congress, except in time of war or national emergency declared by the President or the

104

Congress and except as otherwise expressly provided in the Act of February 28, 1958.

(4) Section 302(b) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1732(b)) authorizes the Secretary of the Interior to regulate the management of the public lands as defined in the Act through instruments, such as memorandum of understanding, which the Secretary deems appropriate.

(5) Section 1326(a) of the Alaska National Interest Lands Conservation Act (Pub. L. 96-487), authorizes the President and the Secretary to make withdrawals exceeding 5,000 acres, in the aggregate, in the State of Alaska subject to the provisions that such withdrawals shall not become effective until notice is provided in the FEDERAL REGISTER and to both Houses of the Congress and such withdrawals shall terminate unless Congress passes a Joint Resolution of approval within one year after the notice of withdrawal has been submitted to the Congress.

(b) The following references do not afford either withdrawal application processing or withdrawal authority but are provided as background information.

(1) Executive Order 6910 of November 26, 1934, and E.O. 6964 of February 5, 1935, as modified, withdrew sizable portions of the public lands for classification and conservation. These lands and the grazing districts estalished under the Taylor Grazing Act of 1934, as amended, are subject to the classification and opening procedures of section 7 of the Taylor Grazing Act of June 28, 1934, as amended (43 U.S.C. 315f); however, they are not closed to the operation of the mining or mineral leasing laws unless separately withdrawn or reserved, classified for retention from disposal, or precluded from mineral leasing or mining location under other authority.

(2) The Classification and Multiple Use Act of September 19, 1964 (43 U.S.C. 1411-1418), authorized the Secretary of the Interior through the Bureau of Land Management for retention or disposal under Federal ownership and management. Numerous classification decisions based upon this statutory authority were made by the Secretary of the Interior. For the effect of these classification with regard to the disposal and leasing laws of the United States, see subparts 2440 and 2461 of this title.

(3) Section 202 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1712) provides for land use planning and resultant management decisions which may operate to totally eliminate a particular land use, including one or more *principal or major uses,* as defined in the Act. Withdrawals made pursuant to section 204 of the Federal Land Policy and Management Act of 1976 may be used in appropriate cases, to carry out management decisions, except that *public lands,* as defined in the Act, can be removed from or restored to the operation of the Mining Law of 1872, as amended, or transferred to another department, agency or office, only by withdrawal action pursuant to section 204 of the Federal Land Policy and Management Act of 1976 or other action pursuant to applicable law.

(4) The first proviso of section 302(b) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1732(b)) provides, in part, that unless otherwise provided for by law, the Secretary of the Interior may permit Federal departments and agencies to use, occupy and develop public lands *only* through rights-of-way under section 507 of the Act (43 U.S.C. 1767); withdrawals under section 204 of the Act (43 U.S.C. 1714); and, where the proposed use and development are similar or closely related to the programs of the Secretary for the public lands involved, cooperative agreements under section 307(b) of the Act (43 U.S.C. 1737(b)).

(5) Section 701(c) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 note) provides that all withdrawals, reservations, classifications and designations in effect on October 21, 1976, the effective date of the Act, shall remain in full force and effect until modified under the provisions of the Act or other applicable law.

↰ Back to Top

## §2300.0-5  Definitions.

As used in this part, the term:

(a) *Secretary* means the Secretary of the Interior or a secretarial officer subordinate to the Secretary who has been appointed by the President by and with the advice and consent of the Senate and to whom has been delegated the authority of the Secretary to perform the duties described in this part to be performed by the *Secretary.*

(b) *Authorized officer* means any employee of the Bureau of Land Management to whom has been delegated the authority to perform the duties described in this part to be performed by the *authorized officer.*

(c) *Act* means the Federal Land Policy and Management Act of 1976, as amended (43 U.S.C. 1701 *et seq.*), unless otherwise specified.

(d) *Lands* includes both upland and submerged land areas and any right or interest in such areas. To the extent provided in section 1 of the Act of February 28, 1958 (43 U.S.C. 155), the term also includes offshore waters.

(e) *Cultural resources* means those fragile and nonrenewable physical remains of human activity found in districts, sites, structures, burial mounds, petroglyphs, artifacts, objects, ruins, works of art, architecture or natural settings or features which were important to prehistoric, historic or other land and resource use events.

(f) *Archeological areas/resources* means sites or areas containing important evidence or the physical remains of former but now extinct cultural groups, their skeletons, settlements, implements, artifacts, monuments and inscriptions.

(g) *Resource use* means a land use having as its primary objective the preservation, conservation, enhancement or development of:

(1) Any renewable or nonrenewable natural resource indigenous to a particular land area, including, but not limited to, mineral, timber, forage, water, fish or wildlife resources, or

(2) Any resource value associated with a particular land area, including, but not limited to, watershed, power, scenic, wilderness, clean air or recreational values. The term does not include military or other governmental activities requiring land sites only as an incidental means to achieving an end not related primarily to the preservation, conservation, enhancement or development of natural resources or resource values indigenous to or associated with a particular land area.

(h) *Withdrawal* means withholding an area of Federal land from settlement, sale, location, or entry under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program; or transferring jurisdiction over an area of Federal land, other than *property* governed by the Federal Property and Administrative Services Act (40 U.S.C. 472), from one department, bureau or agency to another department, bureau or agency.

(i) *Department* means a unit of the Executive branch of the Federal Government which is headed by a member of the President's Cabinet.

(j) *Agency* means a unit of the Executive branch of the Federal Government which is not within a Department.

106

(k) *Office* means an office or bureau of the Department of the Interior.

(l) *Applicant* means any Federal department, agency or office.

(m) *Segregation* means the removal for a limited period, subject to valid existing rights, of a specified area of the public lands from the operation of the public land laws, including the mining laws, pursuant to the exercise by the Secretary of regulatory authority to allow for the orderly administration of the public lands.

(n) *Legal description* means a written land description based upon either an approved and filed Federal land survey executed as a part of the United States Public Land Survey System or, where specifically authorized under Federal law, upon a protraction diagram. In the absence of the foregoing, the term means a written description, approved by the authorized officer, which defines the exterior boundaries of a tract of land by reference to a metes and bounds survey or natural or other monuments.

(o) *Modify* or *modification* does not include, for the purposes of section 204 of the Act (43 U.S.C. 1714), the addition of lands to an existing withdrawal or the partial revocation of a withdrawal.

(p) *Withdrawal petition* means a request, originated within the Department of the Interior and submitted to the Secretary, to file an application for withdrawal.

(q) *Withdrawal proposal* means a withdrawal petition approved by the Secretary.

🔝 Back to Top

## Subpart 2310—Withdrawals, General: Procedure

🔝 Back to Top

### §2310.1  Procedures: General.

(a) The basic steps leading up to the making, modification or extension of a withdrawal, except emergency withdrawals, are:

(1) Preapplication consultation;

(2) Obtaining Secretarial approval of a withdrawal petition in appropriate cases;

(3) Submission for filing of an application for a requested withdrawal action;

(4) Publication in the FEDERAL REGISTER of a notice stating that a withdrawal proposal has been made or that an application has been submitted for filing.

(5) Negotiations between the applicant and the authorized officer as well as the accomplishment of investigations, studies and analyses which may be required to process an application.

(6) Preparation of the case file to be considered by the Secretary, including the authorized officer's findings and recommendations;

(7) Transmittal of the case file to the Director, Bureau of Land Management, for the Director's review and decision regarding the findings and recommendations of the authorized officer;

(8) Transmittal of the case file to the Secretary.

(9) Publication of a public land order or a notice of denial signed by the Secretary. If the application seeks a national defense withdrawal that may only be made by an Act of Congress, the

107

Secretary will transmit to the Congress proposed legislation along with the Secretary's recommendations, and documentation relating thereto.

⬆ Back to Top

### §2310.1-1   Preapplication consultation.

A potential applicant should contact the appropriate State office of the Bureau of Land Management well in advance of the anticipated submission date of an application. Early consultation can familiarize the potential applicant with the responsibilities of an applicant, the authorized officer and the Secretary. Early consultation also will assist in determining the need for a withdrawal, taking possible alternatives into account, increase the likelihood that the applicant's needs will be considered in ongoing land use planning, assist in determining the extent to which any public lands that may be involved would have to be segregated if an application is submitted; and result in preliminary determinations regarding the scheduling of various investigations, studies, analyses, public meetings and negotiations that may be required for a withdrawal. Studies and analyses should be programmed to ensure their completion in sufficient time to allow the Secretary or the Congress adequate time to act on the application before the expiration of the segregation period.

⬆ Back to Top

### §2310.1-2   Submission of applications.

(a) Applications for the making, modification or extension of a withdrawal shall be submitted for filing, in duplicate, in the proper Bureau of Land Management office, as set forth in §1821.2-1 of this title, except for emergency withdrawal requests and applications that are classified for national security reasons. Requests for emergency withdrawals and applications that are classified for national security reasons shall be submitted, in duplicate, in the Office of the Secretary, Department of the Interior, Washington, D.C. 20240.

(b) Before the authorized officer can take action on a withdrawal proposal, a withdrawal application in support thereof shall be submitted. The application may be submitted simultaneously with the making of a withdrawal proposal, in which case only the notice required by §2310.3-1(a) of this title, referencing both the application and the withdrawal proposal, shall be published.

(c) No specific form is required, but, except as otherwise provided in §2310.3-6(b) of this title, the application shall contain at least the following information:

(1) The name and address of the applicant. Where the organization intending to use the lands is different from the applicant, the name and address of such using agency shall also be included.

(2) If the applicant is a department or agency other than the Department of the Interior or an office thereof, a statement of the delegation or delegations of authority of the official acting on behalf of the department or agency submitting the application, substantiating that the official is empowered to act on behalf of the head of the department or agency in connection with all matters pertaining to the application.

(3) If the lands which are subject to an application are wholly or partially under the administration of any department or agency other than the Department of the Interior, the Secretary shall make or modify a withdrawal only with the consent of the head of the department or agency concerned, except in the case of an emergency withdrawal. In such case, a copy of the written consent shall accompany the application. The requirements of section (e) of E.O. 10355 (17 FR 4831), shall be complied with in those instances where the Order applies.

(4) The type of withdrawal action that is being requested (See §2300.0-5(h) of this title) and whether the application pertains to the making, extension or modification of a withdrawal.

108

(5) A description of the lands involved in the application, which shall consist of the following:

(i) A legal description of the entire land area that falls within the exterior boundaries of the affected area and the total acreage of such lands;

(ii) A legal description of the lands, Federal or otherwise, within the exterior boundaries that are to be excepted from the requested action, and after deducting the total acreage of all the excepted lands, the net remaining acreage of all Federal lands (as well as all non-Federal lands which, if they should be returned to or should pass to Federal ownership, would become subject to the withdrawal) within the exterior boundaries of the affected land areas;

(iii) In the case of a national defense withdrawal which can only be made by an Act of Congress, sections 3(2) and 3(3) of the Act of February 28, 1958 (43 U.S.C. 157 (2), (3)) shall be complied with in lieu of paragraphs (c)(5) (i) and (ii) of this section.

(6) If the application is for a withdrawal that would overlap, or that would add lands to one or more existing withdrawals, the application shall also contain:

(i) An identification of each of the existing withdrawals, including the project name, if any, the date of the withdrawal order, the number and type of order, if known, or, in lieu of the foregoing, a copy of the order;

(ii) As to each existing withdrawal that would be overlapped by the requested withdrawal, the total area and a legal description of the area that would be overlapped; and

(iii) The total acreage, Federal or otherwise, that would be added to the existing withdrawal, if the new application is allowed.

(7) The public purpose or statutory program for which the lands would be withdrawn. If the purpose or program for which the lands would be withdrawn is classified for national security reasons, a statement to that effect shall be included; but, if at all possible, a general description of the use to which the lands would be devoted, if the requested withdrawal is allowed, should be included. In the case of applications that are not classified for national security reasons, an analysis of the manner in which the lands as well as their natural resources and resource values would be used to implement the purpose or program shall be provided.

(8) The extent to which the lands embraced in the application are requested to be withheld from settlement, sale, location or entry under the public land laws, including the mining laws, together with the extent to which, and the time during which, the lands involved in the application would be temporarily segregated in accordance with §2310.2 of this subpart.

(9) The type of temporary land use that, at the discretion of the authorized officer, may be permitted or allowed during the segregation period, in accordance with §2310.2 of this subpart.

(10) An analysis and explanation of why neither a right-of-way under section 507 of the Act (43 U.S.C. 1767), nor a cooperative agreement under sections 302(b) (43 U.S.C. 1732(b)) and 307(b) (43 U.S.C. 1737(b)) of the act would adequately provide for the proposed use.

(11) The duration of the withdrawal, with a statement in justification thereof (see §2310.3-4 of this title). Where an extension of an existing withdrawal is requested, its duration may not exceed the duration of the existing withdrawal.

(12) A statement as to whether any suitable alternative sites are available for the proposed use or for uses which the requested withdrawal action would displace. The statement shall include a study comparing the projected costs of obtaining each alternative site in suitable condition for the intended use, as well as the projected costs of obtaining and developing each alternative site for uses that the

109

requested withdrawal action would displace.

(13) A statement as to whether water will or will not be needed to fulfill the purpose of the requested withdrawal action.

(14) The place where records relating to the application can be examined by interested persons.

(d) Except in the case of an emergency withdrawal, if the preceding application requirements have not been met, or if an application seeks an action that is not within the scope of the Secretary's authority, the application may be rejected by the authorized officer as a defective application.

⬆ Back to Top

## §2310.1-3   Submission of withdrawal petitions.

(a) Withdrawal petitions shall be submitted to the Director, Bureau of Land Management, for transmittal to the Secretary.

(b) No specific form is required, but the petition shall contain at least the following information:

(1) The office originating the petition;

(2) The type and purpose of the proposed withdrawal action (See §2300.0-5(h) of this title) and whether the petition pertains to the making, extension or modification of a withdrawal;

(3) A legal description of the entire land area that falls within the exterior boundaries affected by the petition, together with the total acreage of such lands, and a map of the area;

(4) The extent to which and the time during which any public lands that may be involved in the petition would be temporarily segregated and the temporary land uses that may be permitted during the segregation period, in accordance with §2310.2 of this title; and

(5) A preliminary identification of the mineral resources in the area.

(c) Except in the case of petitions seeking emergency withdrawals, if a petition is submitted simultaneously with a withdrawal application, the information requirements pertaining to withdrawal applications (See §2310.1-2 of this title), shall supersede the requirements of this section.

(d) If a petition seeks an emergency withdrawal under the provisions of section 204(e) of the act, the petition shall be filed simultaneously with an application for withdrawal. In such instances, the petition/application shall provide as much of the information required by §§2310.1-2(c) and 2310.3-2(b) of this title as is available to the petitioner when the petition is submitted.

(e) Upon the approval by the Secretary of a petition for withdrawal, the petition shall be considered as a Secretarial proposal for withdrawal, and notice of the withdrawal proposal shall be published immediately in the FEDERAL REGISTER in accordance with §2310.3-1(a) of this title. If a petition which seeks an emergency withdrawal is approved by the Secretary, the publication and notice provisions pertaining to emergency withdrawals shall be applicable. (See §2310.5 of this title.)

⬆ Back to Top

## §2310.1-4   Cancellation of withdrawal applications or withdrawal proposals and denial of applications.

(a) Withdrawal or extension applications and proposals shall be amended promptly to cancel the application or proposal, in whole or in part, with respect to any lands which the applicant, in the case of applications, or the office, in the case of proposals, determines are no longer needed in connection

with a requested or proposed action. The filing of a cancellation notice in each such case shall result in the termination of the segregation of the public lands that are to be eliminated from the withdrawal application or withdrawal proposal. (See §2310.2-1 of this title)

(b) The Secretary may deny an application if the costs (as defined in section 304(b) of the Act (43 U.S.C. 1734(b)) estimated to be incurred by the Department of the Interior would, in the judgment of the Secretary, be excessive in relation to available funds appropriated for processing applications requesting a discretionary withdrawal, or a modification or extension of a withdrawal.

⬆ Back to Top

## §2310.2   Segregative effect of withdrawal applications or withdrawal proposals.

The following provisions apply only to applications or proposals to withdraw lands and not to applications or proposals seeking to modify or extend withdrawals.

(a) *Withdrawal applications or withdrawal proposals submitted on or after October 21, 1976.* Within 30 days of the submission for filing of a withdrawal application, or whenever a withdrawal proposal is made, a notice stating that the application has been submitted or that the proposal has been made, shall be published in the FEDERAL REGISTER by the authorized officer. Publication of the notice in the FEDERAL REGISTER shall segregate the lands described in the application or proposal from settlement, sale, location or entry under the public land laws, including the mining laws, to the extent specified in the notice, for 2 years from the date of publication of the notice unless the segregative effect is terminated sooner in accordance with the provisions of this part. The notices published pursuant to the provisions of this section shall be the same notices required by §2310.3-1 of this title. Publication of a notice of a withdrawal application that is based on a prior withdrawal proposal, notice of which was published in the FEDERAL REGISTER, shall not operate to extend the segregation period which commenced upon the publication of the prior withdrawal proposal.

(b) *Withdrawal applications submitted before October 21, 1976.* The public lands described in a withdrawal application filed before October 21, 1976, shall remain segregated through October 20, 1991, from settlement, sale, location or entry under the public land laws, including the mining laws, to the extent specified in the FEDERAL REGISTER notice or notices that pertain to the application, unless the segregative effect of the application is terminated sooner in accordance with other provisions of this part. Any amendment made on or after October 21, 1976, of a withdrawal application submitted before October 21, 1976, for the purpose of adding Federal lands to the lands described in a previous application, shall require the publication in the FEDERAL REGISTER, within 30 days of receipt of the amended application, of a notice of the amendment of the withdrawal application. All of the lands described in the amended application which includes those lands described in the original application shall be segregated for 2 years from the date of publication of the notice of the amended application in the FEDERAL REGISTER.

(c) Applications for licenses, permits, cooperative agreements or other discretionary land use authorizations of a temporary nature that are filed on or after October 21, 1976, regarding lands involved in a withdrawal application or a withdrawal proposal and that are listed in the notices required by §2310.3-2 of this title as permissible during the segregation period, may be approved by the authorized officer while the lands remain segregated.

(d) Except as provided in paragraph (c) of this section, applications for the use of lands involved in a withdrawal application or a withdrawal proposal, the allowance of which is discretionary, shall be denied.

(e) The temporary segregation of lands in connection with a withdrawal application or a withdrawal proposal shall not affect in any respect Federal agency administrative jurisdiction of the lands, and the segregation shall not have the effect of authorizing or permitting any use of the lands by the applicant

<div align="center">111</div>

or using agency.

⬆ Back to Top

## §2310.2-1   Termination of the segregative effect of withdrawal applications or withdrawal proposals.

(a) The publication in the FEDERAL REGISTER of an order allowing a withdrawal application, in whole or in part, shall terminate the segregative effect of the application as to those lands withdrawn by the order.

(b) The denial of a withdrawal application, in whole or in part, shall result in the termination of the segregative effect of the application or proposal as to those lands where the withdrawal is disallowed. Within 30 days following the decision to disallow the application or proposal, in whole or in part, the authorized officer shall publish a notice in the FEDERAL REGISTER specifying the reasons for the denial and the date that the segregative period terminated. The termination date of the segregation period shall be noted promptly on the public land status records on or before the termination date.

(c) The cancellation, in whole or in part, of a withdrawal application or a withdrawal proposal shall result in the termination of the segregative effect of the application or proposal, as to those lands deleted from the application or proposal. The authorized officer shall publish a notice in the FEDERAL REGISTER, within 30 days following the date of receipt of the cancellation, specifying the date that the segregation terminated. The termination date of the segregation shall be noted promptly on the public land status records. If the cancellation applies to only a portion of the public lands that are described in the withdrawal application or withdrawal proposal, then the lands that are not affected by the cancellation shall remain segregated.

(d) The segregative effect resulting from the publication on or after October 21, 1976, of a FEDERAL REGISTER notice of the submission of a withdrawal application or the making of a withdrawal proposal shall terminate 2 years after the publication date of the FEDERAL REGISTER notice unless the segregation is terminated sooner by other provisions of this section. A notice specifying the date and time of termination shall be published in the FEDERAL REGISTER by the authorized officer 30 days in advance of the termination date. The public land status records shall be noted as to the termination date of the segregation period on or before the termination date. Such a termination shall not affect the processing of the withdrawal application.

(e) The segregative effect resulting from the submission of a withdrawal application or withdrawal proposal before October 21, 1976, shall terminate on October 20, 1991, unless the segregation is terminated sooner by other provisions of this part. A notice specifying the date and time of termination shall be published in the FEDERAL REGISTER by the authorized officer 30 days in advance of October 20, 1991. The public land status records shall be noted as to the termination date of the segregation period on or before October 20, 1991.

⬆ Back to Top

## §2310.3   Action on withdrawal applications and withdrawal proposals, except for emergency withdrawals.

⬆ Back to Top

## §2310.3-1   Publication and public meeting requirements.

(a) When a withdrawal proposal is made, a notice to that effect shall be published immediately in the FEDERAL REGISTER. The notice shall contain the information required by §2310.1-3 of this title. In the event a withdrawal petition, which subsequently becomes a withdrawal proposal, is submitted simultaneously with a withdrawal application, the information requirements for notices pertaining to

112

withdrawal applications (See paragraph (b) of this section) shall supersede the information requirements of this paragraph. However, in such instances, the notice required by paragraph (b) of this section shall be published immediately without regard to the 30-day period allowed for the filing for publication in the FEDERAL REGISTER of withdrawal application notices.

(b)(1) Except for emergency withdrawals and except as otherwise provided in paragraph (a) of this section, within 30 days of the submission for filing of a withdrawal, extension or modification application, the authorized officer shall publish in the FEDERAL REGISTER a notice to that effect. The authorized officer also shall publish the same notice in at least one newspaper having a general circulation in the vicinity of the lands involved and, with the cooperation and assistance of the applicant, when appropriate, shall provide sufficient publicity to inform the interested public of the requested action.

(2) The notice shall contain, in summary form, the information required by §2310.1-2 of this title, except that the authorized officer may exclude the information required by §2310.1-2(c)(2) of this title, and as much of the descriptive information required by §2310.1-2(c) (5) and (6) of this title as the authorized officer considers appropriate. The notice shall:

(i) Provide a legal description of the lands affected by the application, together with the total acreage of such lands;

(ii) Specify the extent to which and the time during which any lands that may be involved may be segregated in accordance with §2310.2 of this title;

(iii) Identify the temporary land uses that may be permitted or allowed during the segregation period as provided for in §2310.2(c) of this title;

(iv) Provide for a suitable period of at least 90 days after publication of the notice, for public comment on the requested action;

(v) Solicit written comments from the public as to the requested action and provide for one or more public meetings in relation to requested actions involving 5,000 or more acres in the aggregate and, as to requested actions involving less than 5,000 acres, solicit and evaluate the written comments of the public as to the requested action and as to the need for public meetings;

(vi) State, in the case of a national defense withdrawal which can only be made by an Act of Congress, that if the withdrawal is to be made, it will be made by an Act of Congress;

(vii) Provide the address of the Bureau of Land Management office in which the application and the case file pertaining to it are available for public inspection and to which the written comments of the public should be sent;

(viii) State that the application will be processed in accordance with the regulations set forth in part 2300 of this title;

(ix) Reference, if appropriate, the FEDERAL REGISTER in which the notice of a withdrawal proposal, if any, pertaining to the application was published previously;

(x) Provide such additional information as the authorized officer deems necessary or appropriate.

(c)(1) In determining whether a public meeting will be held on applications involving less than 5,000 acres of land, the authorized officer shall consider whether or not:

(i) A large number of persons have expressed objections to or suggestions regarding the requested action;

113

(ii) The objections or suggestions expressed appear to have merit without regard to the number of persons responding;

(iii) A public meeting can effectively develop information which would otherwise be difficult or costly to accumulate;

(iv) The requested action, because of the amount of acreage involved, the location of the affected lands or other relevant factors, would have an important effect on the public, as for example, the national or regional economy;

(v) There is an appreciable public interest in the lands or their use, as indicated by the records of the Bureau of Land Management;

(vi) There is prevailing public opinion in the area that favors public meetings or shows particular concern over withdrawal actions; and

(vii) The applicant has requested a public meeting.

(2) A public meeting, whether required or determined by the authorized officer to be necessary, shall be held at a time and place convenient to the interested public, the applicant and the authorized officer. A notice stating the time and place of the meeting, shall be published in the FEDERAL REGISTER and in at least one newspaper having a general circulation in the vicinity of lands involved in the requested action, at least 30 days before the scheduled date of the meeting.

⬆ Back to Top

## §2310.3-2   Development and processing of the case file for submission to the Secretary.

(a) Except as otherwise provided in §2310.3-6(b) of this title, the information, studies, analyses and reports identified in this paragraph that are required by applicable statutes, or which the authorized officer determines to be required for the Secretary or the Congress to make a decision or recommendation on a requested withdrawal, shall be provided by the applicant. The authorized officer shall assist the applicant to the extent the authorized officer considers it necessary or appropriate to do so. The qualifications of all specialists utilized by either the authorized officer or the applicant to prepare the information, studies, analyses and reports shall be provided.

(b) The information, studies, analyses and reports which, as appropriate, shall be provided by the applicant shall include:

(1) A report identifying the present users of the lands involved, explaining how the users will be affected by the proposed use and analyzing the manner in which existing and potential resource uses are incompatible with or conflict with the proposed use of the lands and resources that would be affected by the requested action. The report shall also specify the provisions that are to be made for, and an economic analysis of, the continuation, alteration or termination of existing uses. If the provisions of §2310.3-5 of this title are applicable to the proposed withdrawal, the applicant shall also furnish a certification that the requirements of that section shall be satisfied promptly if the withdrawal is allowed or authorized.

(2) If the application states that the use of water in any State will be necessary to fulfill the purposes of the requested withdrawal, extension or modification, a report specifying that the applicant or using agency has acquired, or proposes to acquire, rights to the use of the water in conformity with applicable State laws and procedures relating to the control, appropriation, use and distribution of water, or whether the withdrawal is intended to reserve, pursuant to Federal law, sufficient unappropriated water to fulfill the purposes of the withdrawal. Water shall be reserved pursuant to Federal law for use in carrying out the purposes of the withdrawal only if specifically so stated in the relevant withdrawal order, as provided in §2310.3-3(b) of this title and only to the extent needed for the

114

purpose or purposes of the withdrawal as expressed in the withdrawal order. The applicant shall also provide proof of notification of the involved State's department of water resources when a land use needed to carry out the purposes of the requested withdrawal will involve utilization of the water resources in a State. As a condition to the allowance of an order reserving water, the applicant shall certify to the Secretary that it shall quantify the amount of water to be reserved by the order.

(3) An environmental assessment, an environmental impact statement or any other documents as are needed to meet the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(2)(C)), and the regulations applicable thereto. The authorized officer shall participate in the development of environmental assessments or impact statements. The applicant shall designate the Bureau of Land Management as a cooperating agency and shall comply with the requirements of the regulations of the Council on Environmental Quality. The Bureau of Land Management shall, at a minimum, independently evaluate and review the final product. The following items shall either be included in the assessment or impact statement, or they may be submitted separately, with appropriate cross references.

(i) A report on the identification of cultural resources prepared in accordance with the requirements of 36 CFR part 800, and other applicable regulations.

(ii) An identification of the roadless areas or roadless islands having wilderness characteristics, as described in the Wilderness Act of 1964 (16 U.S.C. 1131, *et seq.*), which exist within the area covered by the requested withdrawal action.

(iii) A mineral resource analysis prepared by a qualified mining engineer, engineering geologist or geologist which shall include, but shall not be limited to, information on: General geology, known mineral deposits, past and present mineral production, mining claims, mineral leases, evaluation of future mineral potential and present and potential market demands.

(iv) A biological assessment of any listed or proposed endangered or threatened species, and their critical habitat, which may occur on or in the vicinity of the involved lands, prepared in accordance with the provisions of section 7 of the Endangered Species Act of 1973, as amended (16 U.S.C. 1536), and regulations applicable thereto, if the Secretary determines that assessment is required by law.

(v) An analysis of the economic impact of the proposed uses and changes in use associated with the requested action on individuals, local communities, State and local government interests, the regional economy and the Nation as a whole.

(vi) A statement as to the extent and manner in which the public participated in the environmental review process.

(4) A statement with specific supporting data, as to:

(i) Whether the lands involved are floodplains or are considered wetlands; and

(ii) Whether the existing and proposed uses would affect or be affected by such floodplains or wetlands and, if so, to what degree and in what manner. The statement shall indicate whether, if the requested action is allowed, it will comply with the provisions of Executive Orders 11988 and 11990 of May 24, 1977 (42 FR 26951; 26961).

(5) A statement of the consultation which has been or will be conducted with other Federal departments or agencies; with regional, State and local Government bodies; and with individuals and nongovernmental groups regarding the requested action.

(c) Prior to final action being taken in connection with an application, the applicant shall prepare, with the guidance and participation of the authorized officer, and subject to the approval of the authorized officer, the Secretary and other affected departments, agencies or offices, a resource

<div align="center">115</div>

management plan and implementation program regarding the use and management of any public lands with their related resources uses. Consideration shall be given to the impact of the proposed reservation on access to and the use of the land areas that are located in the vicinity of the lands proposed to be withdrawn. Where appropriate, the plan and program will be implemented by means of a memorandum of understanding between the affected agencies. Any allocation of jurisdiction between the agencies shall be effected in the public land order or legislation. In those cases where the Secretary, acting through the Bureau of Land Management, would continue to exercise partial jurisdiction, resource management of withdrawn areas may be governed by the issuance of management decisions by the Bureau of Land Management to implement land use plans developed or revised under the land use planning requirements of section 202 of the Act (43 U.S.C. 1712).

(d) In regard to national defense withdrawals that can only be made by an Act of Congress, and to the extent that they are not otherwise satisfied by the information, studies, analyses and reports provided in accordance with the provisions of this section, the provisions of section 3(7) of the Act of February 28, 1958 (43 U.S.C. 157(7)), shall be complied with.

(e) The authorized officer shall develop preliminary findings and recommendations to be submitted to the Secretary, advise the applicant of the findings and recommendations, and provide the applicant an opportunity to discuss any objections thereto which the applicant may have.

(f) Following the discussion process, or in the absence thereof, the authorized officer shall prepare the findings, keyed specifically to the relevant portions of the case file, and the recommendations to the Secretary in connection with the application. The authorized officer also shall prepare, for consideration by the Secretary, a proposed order or notice of denial. In the case of a national defense withdrawal which can only be made by an Act of Congress, the authorized officer shall prepare, with the cooperation of the applicant, a draft legislative proposal to implement the applicant's withdrawal request, together with proposed recommendations for submission by the Secretary to the Congress. The findings and recommendations of the authorized officer, and the other documents previously specified in this section to be prepared by the authorized officer shall be made a part of the case file. The case file shall then be sent to the Director, Bureau of Land Management. At the same time, a copy of the findings and recommendations of the authorized officer shall be sent to the applicant.

(1) If the applicant objects to the authorized officer's findings and recommendations to the Secretary, the applicant may, within 30 days of the receipt by the applicant of notification thereof, state its objections in writing and request the Director to review the authorized officer's findings and recommendations. The applicant shall be advised of the Director's decision within 30 days of receipt of the applicant's statement of objections in the Bureau of Land Management's Washington office. The applicant's statement of objections and the Director's decision shall be made a part of the case file and thereafter the case file shall be submitted to the Secretary.

(2) If the applicant disagrees with the decision of the Director, Bureau of Land Management, the applicant may, within 30 days of receipt by the applicant of the Director's decision, submit to the Secretary a statement of reasons for disagreement. The statement shall be considered by the Secretary together with the findings and recommendations of the authorized officer, the applicant's statement of objections, the decision of the Director, the balance of the case file and such additional information as the Secretary may request.

⬆ Back to Top

## §2310.3-3  Action by the Secretary: Public land orders and notices of denial.

(a) Except for national defense withdrawals which can only be made by an Act of Congress, and except as may be otherwise provided in section 1(d) of Executive Order 10355 (17 FR 4833), for applications that are subject to that order, the allowance or denial, in whole or in part, of a withdrawal, modification or extension application, may only be made by the Secretary.

116

(b)(1) Before the allowance of an application, in whole or in part, the Secretary shall first approve all applicable memoranda of understanding and the applicant shall make all certifications required in this part. When an application has been finally allowed, in whole or in part, by the Secretary, an order to that effect shall be published promptly in the FEDERAL REGISTER. Each order shall be designated as, and shall be signed by the Secretary and issued in the form of, a *public land order.* Water shall be reserved pursuant to Federal law for use in carrying out the purposes of the withdrawal only if specifically so stated in the relevant public land order. In appropriate cases, the public land order also shall refer to the memorandum of understanding discussed in §2310.3-2(c) of this title and shall be drawn to comply with §2310.3-6 of this title.

(2) On the same day an order withdrawing 5,000 or more acres in the aggregate is signed, the Secretary shall advise, in writing, each House of the Congress, or in the case of an emergency withdrawal, the appropriate Committee of each House, of the withdrawal action taken. Pursuant to the Secretary's authority under the act, the notices that are sent to the Congress shall be accompanied by the information required by section 204(c)(2) of the Act (43 U.S.C. 1714(c)(2)), except in the case of an emergency withdrawal, transmittal of the required information may be delayed as provided in §2310.5(c) of this title.

(c) When the action sought in an application involves the exercise by the Secretary of authority delegated by Executive Order 10355 (17 FR 4831) and the Secretary denies the application in whole or in part, the applicant shall be notified of the reasons for the Secretary's decision. The decision shall be subject to further consideration only if the applicant informs the Secretary, in writing, within 15 days of the receipt by the applicant of the Secretary's decision, that the applicant has submitted the matter to the Office of Management and Budget for consideration and adjustment, as provided for in section 1(d) of the Executive Order.

(d) A withdrawal application shall be denied, if, in the opinion of the Secretary, the applicant is attempting to circumvent the Congressional review provisions of section 204(c)(1) of the Act (43 U.S.C. 1714(c)(1)) concerning withdrawals of 5,000 or more acres in the aggregate.

(e) When an application is denied in its entirety by the Secretary, a notice to that effect, signed by the Secretary, shall be published promptly in the FEDERAL REGISTER.

(f) In the case of a national defense withdrawal that may only be made by an Act of Congress, the Secretary shall transmit to the Congress proposed legislation effecting the withdrawal requested, together with the recommendations of the Secretary which may or may not support the proposed legislation in whole or in part. The proposed legislation shall contain such provisions for continued operation of the public land laws as to the public land areas included in the requested withdrawal as shall be determined by the Secretary to be compatible with the intended military use.

🔼 Back to Top

## §2310.3-4   Duration of withdrawals.

(a) An order initially withdrawing 5,000 or more acres of land in the aggregate, on the basis of the Secretary's authority under section 204 of the Act (43 U.S.C. 1714), may be made for a period not to exceed 20 years from the date the order is signed, except that withdrawals exceeding 5,000 acres in the State of Alaska shall not become effective until notice is provided in the FEDERAL REGISTER and to both Houses of Congress. All orders withdrawing 5,000 or more acres in the aggregate shall be subject to the Congressional review provision of section 204(c) of the Act (43 U.S.C. 1714(c)), except as follows:

(1) A National Wildlife Refuge System withdrawal may not be terminated as provided in section 204(c)(1) of the Act (43 U.S.C 1714(c)(1)) other than by an Act of Congress; or

(2) A withdrawal exceeding 5,000 acres in the State of Alaska shall terminate unless Congress

117

passes a Joint Resolution of approval within 1 year after the notice of such withdrawal has been submitted to the Congress.

(b) An order initially withdrawing less than 5,000 acres of land, in the aggregate, on the basis of the Secretary's authority under section 204 of the Act (43 U.S.C. 1714), may be made:

(1) For such time as the Secretary determines desirable for a resource use;

(2) For not more than 20 years for any other use, including, but not limited to, the use of lands for non-resource uses, related administrative sites and facilities or for other proprietary purposes; or

(3) For not more than 5 years to preserve the lands for a specific use then under consideration by either House of Congress.

(c) An order withdrawing lands on the basis of an emergency as provided for in section 204(e) of the Act (43 U.S.C. 1714(e)) may be made for not more than 3 years.

(d) Except for emergency withdrawals, withdrawals of specific duration may be extended, as provided for in §2310.4 of this title.

⬆ Back to Top

## §2310.3-5   Compensation for improvements.

(a) When an application is allowed, the applicant shall compensate the holder of record of each permit, license or lease lawfully terminated or revoked after the allowance of an application, for all authorized improvements placed on the lands under the terms and conditions of the permit, license or lease, before the lands were segregated or withdrawn. The amount of such compensation shall be determined by an appraisal as of the date of revocation or termination of the permit, license or lease, but shall not exceed fair market value. To the extent such improvements were constructed with Federal funds, they shall not be compensable unless the United States has been reimbursed for such funds prior to the allowance of the application and then only to the extent of the sum that the United States has received.

(b) When an application is allowed that affects public lands which are subject to permits or leases for the grazing of domestic livestock and that is required to be terminated, the applicant shall comply with the cancellation notice and compensation requirements of section 402(g) of the Act (43 U.S.C. 1752(g)), to the extent applicable.

⬆ Back to Top

## §2310.3-6   Transfer of jurisdiction.

A public land order that reserves lands for a department, agency or office, shall specify the extent to which jurisdiction over the lands and their related resource uses will be exercised by that department, agency or office. (See §2310.3-2(c) of this title).

⬆ Back to Top

## §2310.4   Review and extensions of withdrawals.

(a) Discretionary withdrawals of specific duration, whether made prior to or after October 21, 1976, shall be reviewed by the Secretary commencing at least 2 years before the expiration date of the withdrawal. When requested, the department, agency or office benefitting from the withdrawal shall promptly provide the Secretary with the information required by §2310.1-2(c) of this title, and the information required by §2310.3-2(b) of this title, in the form of a withdrawal extension application with

supplemental information. If the concerned department, agency or office is delinquent in responding to such request, the deliquency shall constitute a ground for not extending the withdrawal. Such withdrawals may be extended or further extended only upon compliance with these regulations, and only if the Secretary determines that the purpose for which the withdrawal was first made requires the extension, and then only for a period that shall not exceed the duration of the original withdrawal period. In allowing an extension, the Secretary shall comply with the provisions of section 204(c) of the Act (43 U.S.C. 1714(c)), or section 204(d) of the Act (43 U.S.C. 1714(d)), whichever is applicable; and, whether or not an extension is allowed, the Secretary shall report promptly on the decision for each pending extension to the Congressional Committees that are specified in section 204(f) of the Act (43 U.S.C. 1714(f)).

(b) Notwithstanding the provisions of this section, if the Secretary determines that a National Wildlife Refuge System withdrawal of specific duration shall not be extended, the Secretary shall nevertheless extend or reextend the withdrawal until such time as the withdrawal is terminated by an Act of Congress.

⬆ Back to Top

## §2310.5  Special action on emergency withdrawals.

(a) When the Secretary makes an emergency withdrawal under Section 204(e) of the Act (43 U.S.C. 1714(e)), the withdrawal will be made immediately and will be limited in scope and duration to the emergency. An emergency withdrawal will be effective when signed, will not exceed 3 years in duration, and may not be extended by the Secretary. If it is determined that the lands involved in an emergency withdrawal should continue to be withdrawn, a withdrawal application should be submitted to the Bureau of Land Management in keeping with the normal procedures for processing a withdrawal as provided for in this subpart. Such applications will be subject to the provisions of Section 204(c) of the Act (43 U.S.C. 1714(c)), or Section 204(d) of the Act (43 U.S.C. 1714(d)), whichever is applicable, as well as Section 204(b)(1) of the Act (43 U.S.C. 1714(b)(1)).

(b) When an emergency withdrawal is signed, the Secretary must, on the same day, send a notice of the withdrawal to the two Committees of the Congress that are specified for that purpose in Section 204(e) of the Act (43 U.S.C. 1714(e)).

(c) The Secretary must forward a report to each of the aforementioned committees within 90 days after filing with them the notice of Secretarial emergency withdrawal. Reports for all such withdrawals, regardless of the amount of acreage withdrawn, will contain the information specified in Section 204(c)(2) of the Act (43 U.S.C. 1714(c)(2)).

[73 FR 74047, Dec. 5, 2008]

⬆ Back to Top

# Subpart 2320—Federal Energy Regulatory Commission Withdrawals

⬆ Back to Top

## §2320.0-3  Authority.

(a) Section 24 of the Federal Power Act of June 10, 1920, as amended (16 U.S.C. 818), provides that any lands of the United States included in an application for power development under that Act shall, from the date of filing of an application therefor, be reserved from entry, location or other disposal under the laws of the United States until otherwise directed by the Federal Energy Regulatory Commission or by Congress. This statute also provides that whenever the Commission shall determine that the value of any lands of the United States withdrawn or classified for power purposes shall not be injured or destroyed for such purposes by location, entry or selection under the public land

119

laws, the Secretary of the Interior shall declare such lands open to location, entry or selection for such purposes under such restrictions as the Commission may determine are necessary, and subject to and with a reservation of the right of the United States or its permittees or licensees to enter upon, occupy and use any and all of the lands for power purposes. Before any lands are declared open to location, entry or selection, the Secretary shall give notice of his intention to make this declaration to the Governor of the State within which such lands are located, and the State shall have a preference for a period of 90 days from the date of this notice to file under any applicable law or regulation an application of the State, or any political subdivision thereof, for any lands required as a right-of-way for a public highway or as a source of materials for the construction and maintenance of such highways. The 90-day preference does not apply to lands which remain withdrawn for national forest or other purposes.

(b) The Mining Claims Rights Restoration Act of 1955 (30 U.S.C. 621 *et seq.*), opened public lands which were then, or thereafter, withdrawn or classified for power purposes, with specified exceptions, to mineral location and development under certain circumstances.

⬆ Back to Top

## §2320.1  Lands considered withdrawn or classified for power purposes.

The following classes of lands of the United States are considered as withdrawn or classified for the purposes of section 24 of the Federal Power Act (16 U.S.C. 818): Lands withdrawn for powersite reserves under sections 1 and 2 of the Act of June 25, 1910, as amended (43 U.S.C. 141-148); lands included in an application for power development under the Federal Power Act (16 U.S.C. 818); lands classified for powersite purposes under the Act of March 3, 1879 (43 U.S.C. 31); lands designated as valuable for power purposes under the Act of June 25, 1910, as amended (43 U.S.C. 148); the Act of June 9, 1916 (39 Stat. 218, 219), and the Act of February 26, 1919 (40 Stat. 1180); lands within final hydroelectric power permits under the Act of February 15, 1901 (43 U.S.C. 959); and lands within transmission line permits or approved rights-of-way under the aforementioned Act of February 15, 1901, or the Act of March 4, 1911 (43 U.S.C. 961).

⬆ Back to Top

## §2320.2  General determinations under the Federal Power Act.

(a) On April 22, 1922, the Federal Power Commission (as predecessor to the Federal Energy Regulatory Commission) made a general determination "that where lands of the United States have heretofore been or hereafter may be reserved or classified as powersites, such reservation or classification being made solely because such lands are either occupied by power transmission lines or their occupancy and use for such purposes have been applied for or authorized under appropriate laws of the United States, and such lands have otherwise no value for power purposes, and are not occupied in trespass, the Commission determines that the value of such lands so reserved or classified or so applied for or authorized, shall not be injured or destroyed for the purposes of power development by location, entry or selection under the public land laws, subject to the reservation of section 24 of the Federal Power Act."

(b) The regulations governing mining locations on lands withdrawn or classified for power purposes, including lands that have been restored and opened to mining locations under section 24 of the Federal Power Act, are contained in subpart 3730 and in Group 3800 of this title.

⬆ Back to Top

## §2320.3  Applications for restoration.

(a) Other than with respect to national forest lands, applications for restoration and opening of

120

lands withdrawn or classified for power purposes under the provisions of section 24 of the Federal Power Act shall be filed, in duplicate, in the proper office of the Bureau of Land Management as set forth in §2321.2-1 of this title. No particular form of application is required, but it shall be typewritten or in legible handwriting, and it shall contain the information required by 18 CFR 25.1. Each application shall be accompanied by a service charge of $10 which is not returnable.

(b) Favorable action upon an application for restoration shall not give the applicant any preference right when the lands are opened.

↰ Back to Top

---

Need assistance?

121

# ELECTRONIC CODE OF FEDERAL REGULATIONS

## e-CFR data is current as of April 2, 2015

Title 43 → Subtitle B → Chapter II → Subchapter B → Part 2300

Title 43: Public Lands: Interior

---

## PART 2300—LAND WITHDRAWALS

---

### Contents

**Subpart 2300—Withdrawals, General**

§2300.0-1  Purpose.
§2300.0-3  Authority.
§2300.0-5  Definitions.

**Subpart 2310—Withdrawals, General: Procedure**

§2310.1  Procedures: General.
§2310.1-1  Preapplication consultation.
§2310.1-2  Submission of applications.
§2310.1-3  Submission of withdrawal petitions.
§2310.1-4  Cancellation of withdrawal applications or withdrawal proposals and denial of applications.
§2310.2  Segregative effect of withdrawal applications or withdrawal proposals.
§2310.2-1  Termination of the segregative effect of withdrawal applications or withdrawal proposals.
§2310.3  Action on withdrawal applications and withdrawal proposals, except for emergency withdrawals.
§2310.3-1  Publication and public meeting requirements.
§2310.3-2  Development and processing of the case file for submission to the Secretary.
§2310.3-3  Action by the Secretary: Public land orders and notices of denial.
§2310.3-4  Duration of withdrawals.
§2310.3-5  Compensation for improvements.
§2310.3-6  Transfer of jurisdiction.
§2310.4  Review and extensions of withdrawals.
§2310.5  Special action on emergency withdrawals.

**Subpart 2320—Federal Energy Regulatory Commission Withdrawals**

§2320.0-3  Authority.
§2320.1  Lands considered withdrawn or classified for power purposes.
§2320.2  General determinations under the Federal Power Act.
§2320.3  Applications for restoration.

---

AUTHORITY: 43 U.S.C. 1201; 43 U.S.C. 1740; E.O. 10355 (17 FR 4831, 4833).

SOURCE: 46 FR 5796, Jan. 19, 1981, unless otherwise noted.

122

Case: 14-17374, 04/10/2015, ID: 9491805, DktEntry: 13-1, Page 220 of 278

↑ Back to Top

## Subpart 2300—Withdrawals, General

↑ Back to Top

### §2300.0-1  Purpose.

(a) These regulations set forth procedures implementing the Secretary of the Interior's authority to process Federal land withdrawal applications and, where appropriate, to make, modify or extend Federal land withdrawals. Procedures for making emergency withdrawals are also included.

(b) The regulations do not apply to withdrawals that are made by the Secretary of the Interior pursuant to an act of Congress which directs the issuance of an order by the Secretary. Likewise, procedures applicable to withdrawals authorized under the Surface Mining Control and Reclamation Act of 1977 (30 U.S.C. 1272(b); 1281), and procedures relating to the Secretary's authority to establish Indian reservations or to add lands to the reservations pursuant to special legislation or in accordance with section 7 of the Act of June 18, 1934 (25 U.S.C. 467), as supplemented by section 1 of the Act of May 1, 1936 (25 U.S.C. 473a), are not included in these regulations.

(c) General procedures relating to the processing of revocation of withdrawals and relating to the relinquishment of reserved Federal land areas are not included in this part.

↑ Back to Top

### §2300.0-3  Authority.

(a)(1) Section 204 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1714) gives the Secretary of the Interior general authority to make, modify, extend or revoke withdrawals, but only in accordance with the provisions and limitations of that section. Among other limitations, the Federal Land Policy and Management Act of 1976 provides that the Secretary of the Interior does not have authority to:

(i) Make, modify or revoke any withdrawal created by an Act of Congress;

(ii) Make a withdrawal which can be made only by an Act of Congress;

(iii) Modify or revoke any withdrawal creating national monuments under the Act of June 8, 1906 (16 U.S.C. 431-433), sometimes referred to as the Antiquities Act;

(iv) Modify or revoke any withdrawal which added lands to the National Wildlife Refuge System prior to October 21, 1976, the date of approval of the Federal Land Policy and Management Act of 1976 or which thereafter adds lands to that System under the terms of that Act. In this connection, nothing in the Federal Land Policy and Management Act of 1976 is intended to modify or change any provision of the Act of February 27, 1976 (16 U.S.C. 668 dd(a)).

(2) Executive Order 10355 of May 26, 1952 (17 FR 4831), confers on the Secretary of the Interior all of the delegable authority of the President to make, modify and revoke withdrawals and reservations with respect to lands of the public domain and other lands owned and controlled by the United States in the continental United States or Alaska.

(3) The Act of February 28, 1958 (43 U.S.C. 155-158), sometimes referred to as the Engle Act, places on the Secretary of the Interior the responsibility to process Department of Defense applications for national defense withdrawals, reservations or restrictions aggregating 5,000 acres or more for any one project or facility. These withdrawals, reservations or restrictions may only be made by an act of Congress, except in time of war or national emergency declared by the President or the

123

Congress and except as otherwise expressly provided in the Act of February 28, 1958.

(4) Section 302(b) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1732(b)) authorizes the Secretary of the Interior to regulate the management of the public lands as defined in the Act through instruments, such as memorandum of understanding, which the Secretary deems appropriate.

(5) Section 1326(a) of the Alaska National Interest Lands Conservation Act (Pub. L. 96-487), authorizes the President and the Secretary to make withdrawals exceeding 5,000 acres, in the aggregate, in the State of Alaska subject to the provisions that such withdrawals shall not become effective until notice is provided in the FEDERAL REGISTER and to both Houses of the Congress and such withdrawals shall terminate unless Congress passes a Joint Resolution of approval within one year after the notice of withdrawal has been submitted to the Congress.

(b) The following references do not afford either withdrawal application processing or withdrawal authority but are provided as background information.

(1) Executive Order 6910 of November 26, 1934, and E.O. 6964 of February 5, 1935, as modified, withdrew sizable portions of the public lands for classification and conservation. These lands and the grazing districts estalished under the Taylor Grazing Act of 1934, as amended, are subject to the classification and opening procedures of section 7 of the Taylor Grazing Act of June 28, 1934, as amended (43 U.S.C. 315f); however, they are not closed to the operation of the mining or mineral leasing laws unless separately withdrawn or reserved, classified for retention from disposal, or precluded from mineral leasing or mining location under other authority.

(2) The Classification and Multiple Use Act of September 19, 1964 (43 U.S.C. 1411-1418), authorized the Secretary of the Interior through the Bureau of Land Management for retention or disposal under Federal ownership and management. Numerous classification decisions based upon this statutory authority were made by the Secretary of the Interior. For the effect of these classification with regard to the disposal and leasing laws of the United States, see subparts 2440 and 2461 of this title.

(3) Section 202 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1712) provides for land use planning and resultant management decisions which may operate to totally eliminate a particular land use, including one or more *principal or major uses,* as defined in the Act. Withdrawals made pursuant to section 204 of the Federal Land Policy and Management Act of 1976 may be used in appropriate cases, to carry out management decisions, except that *public lands,* as defined in the Act, can be removed from or restored to the operation of the Mining Law of 1872, as amended, or transferred to another department, agency or office, only by withdrawal action pursuant to section 204 of the Federal Land Policy and Management Act of 1976 or other action pursuant to applicable law.

(4) The first proviso of section 302(b) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1732(b)) provides, in part, that unless otherwise provided for by law, the Secretary of the Interior may permit Federal departments and agencies to use, occupy and develop public lands *only* through rights-of-way under section 507 of the Act (43 U.S.C. 1767); withdrawals under section 204 of the Act (43 U.S.C. 1714); and, where the proposed use and development are similar or closely related to the programs of the Secretary for the public lands involved, cooperative agreements under section 307(b) of the Act (43 U.S.C. 1737(b)).

(5) Section 701(c) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 note) provides that all withdrawals, reservations, classifications and designations in effect on October 21, 1976, the effective date of the Act, shall remain in full force and effect until modified under the provisions of the Act or other applicable law.

124

↑ Back to Top

## §2300.0-5   Definitions.

As used in this part, the term:

(a) *Secretary* means the Secretary of the Interior or a secretarial officer subordinate to the Secretary who has been appointed by the President by and with the advice and consent of the Senate and to whom has been delegated the authority of the Secretary to perform the duties described in this part to be performed by the *Secretary.*

(b) *Authorized officer* means any employee of the Bureau of Land Management to whom has been delegated the authority to perform the duties described in this part to be performed by the *authorized officer.*

(c) *Act* means the Federal Land Policy and Management Act of 1976, as amended (43 U.S.C. 1701 *et seq.*), unless otherwise specified.

(d) *Lands* includes both upland and submerged land areas and any right or interest in such areas. To the extent provided in section 1 of the Act of February 28, 1958 (43 U.S.C. 155), the term also includes offshore waters.

(e) *Cultural resources* means those fragile and nonrenewable physical remains of human activity found in districts, sites, structures, burial mounds, petroglyphs, artifacts, objects, ruins, works of art, architecture or natural settings or features which were important to prehistoric, historic or other land and resource use events.

(f) *Archeological areas/resources* means sites or areas containing important evidence or the physical remains of former but now extinct cultural groups, their skeletons, settlements, implements, artifacts, monuments and inscriptions.

(g) *Resource use* means a land use having as its primary objective the preservation, conservation, enhancement or development of:

(1) Any renewable or nonrenewable natural resource indigenous to a particular land area, including, but not limited to, mineral, timber, forage, water, fish or wildlife resources, or

(2) Any resource value associated with a particular land area, including, but not limited to, watershed, power, scenic, wilderness, clean air or recreational values. The term does not include military or other governmental activities requiring land sites only as an incidental means to achieving an end not related primarily to the preservation, conservation, enhancement or development of natural resources or resource values indigenous to or associated with a particular land area.

(h) *Withdrawal* means withholding an area of Federal land from settlement, sale, location, or entry under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program; or transferring jurisdiction over an area of Federal land, other than *property* governed by the Federal Property and Administrative Services Act (40 U.S.C. 472), from one department, bureau or agency to another department, bureau or agency.

(i) *Department* means a unit of the Executive branch of the Federal Government which is headed by a member of the President's Cabinet.

(j) *Agency* means a unit of the Executive branch of the Federal Government which is not within a Department.

125

(k) *Office* means an office or bureau of the Department of the Interior.

(l) *Applicant* means any Federal department, agency or office.

(m) *Segregation* means the removal for a limited period, subject to valid existing rights, of a specified area of the public lands from the operation of the public land laws, including the mining laws, pursuant to the exercise by the Secretary of regulatory authority to allow for the orderly administration of the public lands.

(n) *Legal description* means a written land description based upon either an approved and filed Federal land survey executed as a part of the United States Public Land Survey System or, where specifically authorized under Federal law, upon a protraction diagram. In the absence of the foregoing, the term means a written description, approved by the authorized officer, which defines the exterior boundaries of a tract of land by reference to a metes and bounds survey or natural or other monuments.

(o) *Modify* or *modification* does not include, for the purposes of section 204 of the Act (43 U.S.C. 1714), the addition of lands to an existing withdrawal or the partial revocation of a withdrawal.

(p) *Withdrawal petition* means a request, originated within the Department of the Interior and submitted to the Secretary, to file an application for withdrawal.

(q) *Withdrawal proposal* means a withdrawal petition approved by the Secretary.

⬆ Back to Top

## Subpart 2310—Withdrawals, General: Procedure

⬆ Back to Top

### §2310.1   Procedures: General.

(a) The basic steps leading up to the making, modification or extension of a withdrawal, except emergency withdrawals, are:

(1) Preapplication consultation;

(2) Obtaining Secretarial approval of a withdrawal petition in appropriate cases;

(3) Submission for filing of an application for a requested withdrawal action;

(4) Publication in the FEDERAL REGISTER of a notice stating that a withdrawal proposal has been made or that an application has been submitted for filing.

(5) Negotiations between the applicant and the authorized officer as well as the accomplishment of investigations, studies and analyses which may be required to process an application.

(6) Preparation of the case file to be considered by the Secretary, including the authorized officer's findings and recommendations;

(7) Transmittal of the case file to the Director, Bureau of Land Management, for the Director's review and decision regarding the findings and recommendations of the authorized officer;

(8) Transmittal of the case file to the Secretary.

(9) Publication of a public land order or a notice of denial signed by the Secretary. If the application seeks a national defense withdrawal that may only be made by an Act of Congress, the

126

Secretary will transmit to the Congress proposed legislation along with the Secretary's recommendations, and documentation relating thereto.

↰ Back to Top

### §2310.1-1  Preapplication consultation.

A potential applicant should contact the appropriate State office of the Bureau of Land Management well in advance of the anticipated submission date of an application. Early consultation can familiarize the potential applicant with the responsibilities of an applicant, the authorized officer and the Secretary. Early consultation also will assist in determining the need for a withdrawal, taking possible alternatives into account, increase the likelihood that the applicant's needs will be considered in ongoing land use planning, assist in determining the extent to which any public lands that may be involved would have to be segregated if an application is submitted; and result in preliminary determinations regarding the scheduling of various investigations, studies, analyses, public meetings and negotiations that may be required for a withdrawal. Studies and analyses should be programmed to ensure their completion in sufficient time to allow the Secretary or the Congress adequate time to act on the application before the expiration of the segregation period.

↰ Back to Top

### §2310.1-2  Submission of applications.

(a) Applications for the making, modification or extension of a withdrawal shall be submitted for filing, in duplicate, in the proper Bureau of Land Management office, as set forth in §1821.2-1 of this title, except for emergency withdrawal requests and applications that are classified for national security reasons. Requests for emergency withdrawals and applications that are classified for national security reasons shall be submitted, in duplicate, in the Office of the Secretary, Department of the Interior, Washington, D.C. 20240.

(b) Before the authorized officer can take action on a withdrawal proposal, a withdrawal application in support thereof shall be submitted. The application may be submitted simultaneously with the making of a withdrawal proposal, in which case only the notice required by §2310.3-1(a) of this title, referencing both the application and the withdrawal proposal, shall be published.

(c) No specific form is required, but, except as otherwise provided in §2310.3-6(b) of this title, the application shall contain at least the following information:

(1) The name and address of the applicant. Where the organization intending to use the lands is different from the applicant, the name and address of such using agency shall also be included.

(2) If the applicant is a department or agency other than the Department of the Interior or an office thereof, a statement of the delegation or delegations of authority of the official acting on behalf of the department or agency submitting the application, substantiating that the official is empowered to act on behalf of the head of the department or agency in connection with all matters pertaining to the application.

(3) If the lands which are subject to an application are wholly or partially under the administration of any department or agency other than the Department of the Interior, the Secretary shall make or modify a withdrawal only with the consent of the head of the department or agency concerned, except in the case of an emergency withdrawal. In such case, a copy of the written consent shall accompany the application. The requirements of section (e) of E.O. 10355 (17 FR 4831), shall be complied with in those instances where the Order applies.

(4) The type of withdrawal action that is being requested (See §2300.0-5(h) of this title) and whether the application pertains to the making, extension or modification of a withdrawal.

127

(5) A description of the lands involved in the application, which shall consist of the following:

(i) A legal description of the entire land area that falls within the exterior boundaries of the affected area and the total acreage of such lands;

(ii) A legal description of the lands, Federal or otherwise, within the exterior boundaries that are to be excepted from the requested action, and after deducting the total acreage of all the excepted lands, the net remaining acreage of all Federal lands (as well as all non-Federal lands which, if they should be returned to or should pass to Federal ownership, would become subject to the withdrawal) within the exterior boundaries of the affected land areas;

(iii) In the case of a national defense withdrawal which can only be made by an Act of Congress, sections 3(2) and 3(3) of the Act of February 28, 1958 (43 U.S.C. 157 (2), (3)) shall be complied with in lieu of paragraphs (c)(5) (i) and (ii) of this section.

(6) If the application is for a withdrawal that would overlap, or that would add lands to one or more existing withdrawals, the application shall also contain:

(i) An identification of each of the existing withdrawals, including the project name, if any, the date of the withdrawal order, the number and type of order, if known, or, in lieu of the foregoing, a copy of the order;

(ii) As to each existing withdrawal that would be overlapped by the requested withdrawal, the total area and a legal description of the area that would be overlapped; and

(iii) The total acreage, Federal or otherwise, that would be added to the existing withdrawal, if the new application is allowed.

(7) The public purpose or statutory program for which the lands would be withdrawn. If the purpose or program for which the lands would be withdrawn is classified for national security reasons, a statement to that effect shall be included; but, if at all possible, a general description of the use to which the lands would be devoted, if the requested withdrawal is allowed, should be included. In the case of applications that are not classified for national security reasons, an analysis of the manner in which the lands as well as their natural resources and resource values would be used to implement the purpose or program shall be provided.

(8) The extent to which the lands embraced in the application are requested to be withheld from settlement, sale, location or entry under the public land laws, including the mining laws, together with the extent to which, and the time during which, the lands involved in the application would be temporarily segregated in accordance with §2310.2 of this subpart.

(9) The type of temporary land use that, at the discretion of the authorized officer, may be permitted or allowed during the segregation period, in accordance with §2310.2 of this subpart.

(10) An analysis and explanation of why neither a right-of-way under section 507 of the Act (43 U.S.C. 1767), nor a cooperative agreement under sections 302(b) (43 U.S.C. 1732(b)) and 307(b) (43 U.S.C. 1737(b)) of the act would adequately provide for the proposed use.

(11) The duration of the withdrawal, with a statement in justification thereof (see §2310.3-4 of this title). Where an extension of an existing withdrawal is requested, its duration may not exceed the duration of the existing withdrawal.

(12) A statement as to whether any suitable alternative sites are available for the proposed use or for uses which the requested withdrawal action would displace. The statement shall include a study comparing the projected costs of obtaining each alternative site in suitable condition for the intended use, as well as the projected costs of obtaining and developing each alternative site for uses that the

128

requested withdrawal action would displace.

(13) A statement as to whether water will or will not be needed to fulfill the purpose of the requested withdrawal action.

(14) The place where records relating to the application can be examined by interested persons.

(d) Except in the case of an emergency withdrawal, if the preceding application requirements have not been met, or if an application seeks an action that is not within the scope of the Secretary's authority, the application may be rejected by the authorized officer as a defective application.

↑ Back to Top

## §2310.1-3  Submission of withdrawal petitions.

(a) Withdrawal petitions shall be submitted to the Director, Bureau of Land Management, for transmittal to the Secretary.

(b) No specific form is required, but the petition shall contain at least the following information:

(1) The office originating the petition;

(2) The type and purpose of the proposed withdrawal action (See §2300.0-5(h) of this title) and whether the petition pertains to the making, extension or modification of a withdrawal;

(3) A legal description of the entire land area that falls within the exterior boundaries affected by the petition, together with the total acreage of such lands, and a map of the area;

(4) The extent to which and the time during which any public lands that may be involved in the petition would be temporarily segregated and the temporary land uses that may be permitted during the segregation period, in accordance with §2310.2 of this title; and

(5) A preliminary identification of the mineral resources in the area.

(c) Except in the case of petitions seeking emergency withdrawals, if a petition is submitted simultaneously with a withdrawal application, the information requirements pertaining to withdrawal applications (See §2310.1-2 of this title), shall supersede the requirements of this section.

(d) If a petition seeks an emergency withdrawal under the provisions of section 204(e) of the act, the petition shall be filed simultaneously with an application for withdrawal. In such instances, the petition/application shall provide as much of the information required by §§2310.1-2(c) and 2310.3-2(b) of this title as is available to the petitioner when the petition is submitted.

(e) Upon the approval by the Secretary of a petition for withdrawal, the petition shall be considered as a Secretarial proposal for withdrawal, and notice of the withdrawal proposal shall be published immediately in the FEDERAL REGISTER in accordance with §2310.3-1(a) of this title. If a petition which seeks an emergency withdrawal is approved by the Secretary, the publication and notice provisions pertaining to emergency withdrawals shall be applicable. (See §2310.5 of this title.)

↑ Back to Top

## §2310.1-4  Cancellation of withdrawal applications or withdrawal proposals and denial of applications.

(a) Withdrawal or extension applications and proposals shall be amended promptly to cancel the application or proposal, in whole or in part, with respect to any lands which the applicant, in the case of applications, or the office, in the case of proposals, determines are no longer needed in connection

129

Case: 14-17374, 04/10/2015, ID: 9491805, DktEntry: 13-1, Page 227 of 278

with a requested or proposed action. The filing of a cancellation notice in each such case shall result in the termination of the segregation of the public lands that are to be eliminated from the withdrawal application or withdrawal proposal. (See §2310.2-1 of this title)

(b) The Secretary may deny an application if the costs (as defined in section 304(b) of the Act (43 U.S.C. 1734(b)) estimated to be incurred by the Department of the Interior would, in the judgment of the Secretary, be excessive in relation to available funds appropriated for processing applications requesting a discretionary withdrawal, or a modification or extension of a withdrawal.

⬆ Back to Top

## §2310.2   Segregative effect of withdrawal applications or withdrawal proposals.

The following provisions apply only to applications or proposals to withdraw lands and not to applications or proposals seeking to modify or extend withdrawals.

(a) *Withdrawal applications or withdrawal proposals submitted on or after October 21, 1976.* Within 30 days of the submission for filing of a withdrawal application, or whenever a withdrawal proposal is made, a notice stating that the application has been submitted or that the proposal has been made, shall be published in the FEDERAL REGISTER by the authorized officer. Publication of the notice in the FEDERAL REGISTER shall segregate the lands described in the application or proposal from settlement, sale, location or entry under the public land laws, including the mining laws, to the extent specified in the notice, for 2 years from the date of publication of the notice unless the segregative effect is terminated sooner in accordance with the provisions of this part. The notices published pursuant to the provisions of this section shall be the same notices required by §2310.3-1 of this title. Publication of a notice of a withdrawal application that is based on a prior withdrawal proposal, notice of which was published in the FEDERAL REGISTER, shall not operate to extend the segregation period which commenced upon the publication of the prior withdrawal proposal.

(b) *Withdrawal applications submitted before October 21, 1976.* The public lands described in a withdrawal application filed before October 21, 1976, shall remain segregated through October 20, 1991, from settlement, sale, location or entry under the public land laws, including the mining laws, to the extent specified in the FEDERAL REGISTER notice or notices that pertain to the application, unless the segregative effect of the application is terminated sooner in accordance with other provisions of this part. Any amendment made on or after October 21, 1976, of a withdrawal application submitted before October 21, 1976, for the purpose of adding Federal lands to the lands described in a previous application, shall require the publication in the FEDERAL REGISTER, within 30 days of receipt of the amended application, of a notice of the amendment of the withdrawal application. All of the lands described in the amended application which includes those lands described in the original application shall be segregated for 2 years from the date of publication of the notice of the amended application in the FEDERAL REGISTER.

(c) Applications for licenses, permits, cooperative agreements or other discretionary land use authorizations of a temporary nature that are filed on or after October 21, 1976, regarding lands involved in a withdrawal application or a withdrawal proposal and that are listed in the notices required by §2310.3-2 of this title as permissible during the segregation period, may be approved by the authorized officer while the lands remain segregated.

(d) Except as provided in paragraph (c) of this section, applications for the use of lands involved in a withdrawal application or a withdrawal proposal, the allowance of which is discretionary, shall be denied.

(e) The temporary segregation of lands in connection with a withdrawal application or a withdrawal proposal shall not affect in any respect Federal agency administrative jurisdiction of the lands, and the segregation shall not have the effect of authorizing or permitting any use of the lands by the applicant

130

or using agency.

⬆ Back to Top

### §2310.2-1 Termination of the segregative effect of withdrawal applications or withdrawal proposals.

(a) The publication in the FEDERAL REGISTER of an order allowing a withdrawal application, in whole or in part, shall terminate the segregative effect of the application as to those lands withdrawn by the order.

(b) The denial of a withdrawal application, in whole or in part, shall result in the termination of the segregative effect of the application or proposal as to those lands where the withdrawal is disallowed. Within 30 days following the decision to disallow the application or proposal, in whole or in part, the authorized officer shall publish a notice in the FEDERAL REGISTER specifying the reasons for the denial and the date that the segregative period terminated. The termination date of the segregation period shall be noted promptly on the public land status records on or before the termination date.

(c) The cancellation, in whole or in part, of a withdrawal application or a withdrawal proposal shall result in the termination of the segregative effect of the application or proposal, as to those lands deleted from the application or proposal. The authorized officer shall publish a notice in the FEDERAL REGISTER, within 30 days following the date of receipt of the cancellation, specifying the date that the segregation terminated. The termination date of the segregation shall be noted promptly on the public land status records. If the cancellation applies to only a portion of the public lands that are described in the withdrawal application or withdrawal proposal, then the lands that are not affected by the cancellation shall remain segregated.

(d) The segregative effect resulting from the publication on or after October 21, 1976, of a FEDERAL REGISTER notice of the submission of a withdrawal application or the making of a withdrawal proposal shall terminate 2 years after the publication date of the FEDERAL REGISTER notice unless the segregation is terminated sooner by other provisions of this section. A notice specifying the date and time of termination shall be published in the FEDERAL REGISTER by the authorized officer 30 days in advance of the termination date. The public land status records shall be noted as to the termination date of the segregation period on or before the termination date. Such a termination shall not affect the processing of the withdrawal application.

(e) The segregative effect resulting from the submission of a withdrawal application or withdrawal proposal before October 21, 1976, shall terminate on October 20, 1991, unless the segregation is terminated sooner by other provisions of this part. A notice specifying the date and time of termination shall be published in the FEDERAL REGISTER by the authorized officer 30 days in advance of October 20, 1991. The public land status records shall be noted as to the termination date of the segregation period on or before October 20, 1991.

⬆ Back to Top

### §2310.3 Action on withdrawal applications and withdrawal proposals, except for emergency withdrawals.

⬆ Back to Top

### §2310.3-1 Publication and public meeting requirements.

(a) When a withdrawal proposal is made, a notice to that effect shall be published immediately in the FEDERAL REGISTER. The notice shall contain the information required by §2310.1-3 of this title. In the event a withdrawal petition, which subsequently becomes a withdrawal proposal, is submitted simultaneously with a withdrawal application, the information requirements for notices pertaining to

131

Case: 14-17374, 04/10/2015, ID: 9491805, DktEntry: 13-1, Page 229 of 278

withdrawal applications (See paragraph (b) of this section) shall supersede the information requirements of this paragraph. However, in such instances, the notice required by paragraph (b) of this section shall be published immediately without regard to the 30-day period allowed for the filing for publication in the FEDERAL REGISTER of withdrawal application notices.

(b)(1) Except for emergency withdrawals and except as otherwise provided in paragraph (a) of this section, within 30 days of the submission for filing of a withdrawal, extension or modification application, the authorized officer shall publish in the FEDERAL REGISTER a notice to that effect. The authorized officer also shall publish the same notice in at least one newspaper having a general circulation in the vicinity of the lands involved and, with the cooperation and assistance of the applicant, when appropriate, shall provide sufficient publicity to inform the interested public of the requested action.

(2) The notice shall contain, in summary form, the information required by §2310.1-2 of this title, except that the authorized officer may exclude the information required by §2310.1-2(c)(2) of this title, and as much of the descriptive information required by §2310.1-2(c) (5) and (6) of this title as the authorized officer considers appropriate. The notice shall:

(i) Provide a legal description of the lands affected by the application, together with the total acreage of such lands;

(ii) Specify the extent to which and the time during which any lands that may be involved may be segregated in accordance with §2310.2 of this title;

(iii) Identify the temporary land uses that may be permitted or allowed during the segregation period as provided for in §2310.2(c) of this title;

(iv) Provide for a suitable period of at least 90 days after publication of the notice, for public comment on the requested action;

(v) Solicit written comments from the public as to the requested action and provide for one or more public meetings in relation to requested actions involving 5,000 or more acres in the aggregate and, as to requested actions involving less than 5,000 acres, solicit and evaluate the written comments of the public as to the requested action and as to the need for public meetings;

(vi) State, in the case of a national defense withdrawal which can only be made by an Act of Congress, that if the withdrawal is to be made, it will be made by an Act of Congress;

(vii) Provide the address of the Bureau of Land Management office in which the application and the case file pertaining to it are available for public inspection and to which the written comments of the public should be sent;

(viii) State that the application will be processed in accordance with the regulations set forth in part 2300 of this title;

(ix) Reference, if appropriate, the FEDERAL REGISTER in which the notice of a withdrawal proposal, if any, pertaining to the application was published previously;

(x) Provide such additional information as the authorized officer deems necessary or appropriate.

(c)(1) In determining whether a public meeting will be held on applications involving less than 5,000 acres of land, the authorized officer shall consider whether or not:

(i) A large number of persons have expressed objections to or suggestions regarding the requested action;

(ii) The objections or suggestions expressed appear to have merit without regard to the number of persons responding;

(iii) A public meeting can effectively develop information which would otherwise be difficult or costly to accumulate;

(iv) The requested action, because of the amount of acreage involved, the location of the affected lands or other relevant factors, would have an important effect on the public, as for example, the national or regional economy;

(v) There is an appreciable public interest in the lands or their use, as indicated by the records of the Bureau of Land Management;

(vi) There is prevailing public opinion in the area that favors public meetings or shows particular concern over withdrawal actions; and

(vii) The applicant has requested a public meeting.

(2) A public meeting, whether required or determined by the authorized officer to be necessary, shall be held at a time and place convenient to the interested public, the applicant and the authorized officer. A notice stating the time and place of the meeting, shall be published in the FEDERAL REGISTER and in at least one newspaper having a general circulation in the vicinity of lands involved in the requested action, at least 30 days before the scheduled date of the meeting.

🔝 Back to Top

## §2310.3-2   Development and processing of the case file for submission to the Secretary.

(a) Except as otherwise provided in §2310.3-6(b) of this title, the information, studies, analyses and reports identified in this paragraph that are required by applicable statutes, or which the authorized officer determines to be required for the Secretary or the Congress to make a decision or recommendation on a requested withdrawal, shall be provided by the applicant. The authorized officer shall assist the applicant to the extent the authorized officer considers it necessary or appropriate to do so. The qualifications of all specialists utilized by either the authorized officer or the applicant to prepare the information, studies, analyses and reports shall be provided.

(b) The information, studies, analyses and reports which, as appropriate, shall be provided by the applicant shall include:

(1) A report identifying the present users of the lands involved, explaining how the users will be affected by the proposed use and analyzing the manner in which existing and potential resource uses are incompatible with or conflict with the proposed use of the lands and resources that would be affected by the requested action. The report shall also specify the provisions that are to be made for, and an economic analysis of, the continuation, alteration or termination of existing uses. If the provisions of §2310.3-5 of this title are applicable to the proposed withdrawal, the applicant shall also furnish a certification that the requirements of that section shall be satisfied promptly if the withdrawal is allowed or authorized.

(2) If the application states that the use of water in any State will be necessary to fulfill the purposes of the requested withdrawal, extension or modification, a report specifying that the applicant or using agency has acquired, or proposes to acquire, rights to the use of the water in conformity with applicable State laws and procedures relating to the control, appropriation, use and distribution of water, or whether the withdrawal is intended to reserve, pursuant to Federal law, sufficient unappropriated water to fulfill the purposes of the withdrawal. Water shall be reserved pursuant to Federal law for use in carrying out the purposes of the withdrawal only if specifically so stated in the relevant withdrawal order, as provided in §2310.3-3(b) of this title and only to the extent needed for the

133

purpose or purposes of the withdrawal as expressed in the withdrawal order. The applicant shall also provide proof of notification of the involved State's department of water resources when a land use needed to carry out the purposes of the requested withdrawal will involve utilization of the water resources in a State. As a condition to the allowance of an order reserving water, the applicant shall certify to the Secretary that it shall quantify the amount of water to be reserved by the order.

(3) An environmental assessment, an environmental impact statement or any other documents as are needed to meet the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(2)(C)), and the regulations applicable thereto. The authorized officer shall participate in the development of environmental assessments or impact statements. The applicant shall designate the Bureau of Land Management as a cooperating agency and shall comply with the requirements of the regulations of the Council on Environmental Quality. The Bureau of Land Management shall, at a minimum, independently evaluate and review the final product. The following items shall either be included in the assessment or impact statement, or they may be submitted separately, with appropriate cross references.

(i) A report on the identification of cultural resources prepared in accordance with the requirements of 36 CFR part 800, and other applicable regulations.

(ii) An identification of the roadless areas or roadless islands having wilderness characteristics, as described in the Wilderness Act of 1964 (16 U.S.C. 1131, *et seq.*), which exist within the area covered by the requested withdrawal action.

(iii) A mineral resource analysis prepared by a qualified mining engineer, engineering geologist or geologist which shall include, but shall not be limited to, information on: General geology, known mineral deposits, past and present mineral production, mining claims, mineral leases, evaluation of future mineral potential and present and potential market demands.

(iv) A biological assessment of any listed or proposed endangered or threatened species, and their critical habitat, which may occur on or in the vicinity of the involved lands, prepared in accordance with the provisions of section 7 of the Endangered Species Act of 1973, as amended (16 U.S.C. 1536), and regulations applicable thereto, if the Secretary determines that assessment is required by law.

(v) An analysis of the economic impact of the proposed uses and changes in use associated with the requested action on individuals, local communities, State and local government interests, the regional economy and the Nation as a whole.

(vi) A statement as to the extent and manner in which the public participated in the environmental review process.

(4) A statement with specific supporting data, as to:

(i) Whether the lands involved are floodplains or are considered wetlands; and

(ii) Whether the existing and proposed uses would affect or be affected by such floodplains or wetlands and, if so, to what degree and in what manner. The statement shall indicate whether, if the requested action is allowed, it will comply with the provisions of Executive Orders 11988 and 11990 of May 24, 1977 (42 FR 26951; 26961).

(5) A statement of the consultation which has been or will be conducted with other Federal departments or agencies; with regional, State and local Government bodies; and with individuals and nongovernmental groups regarding the requested action.

(c) Prior to final action being taken in connection with an application, the applicant shall prepare, with the guidance and participation of the authorized officer, and subject to the approval of the authorized officer, the Secretary and other affected departments, agencies or offices, a resource

134

management plan and implementation program regarding the use and management of any public lands with their related resources uses. Consideration shall be given to the impact of the proposed reservation on access to and the use of the land areas that are located in the vicinity of the lands proposed to be withdrawn. Where appropriate, the plan and program will be implemented by means of a memorandum of understanding between the affected agencies. Any allocation of jurisdiction between the agencies shall be effected in the public land order or legislation. In those cases where the Secretary, acting through the Bureau of Land Management, would continue to exercise partial jurisdiction, resource management of withdrawn areas may be governed by the issuance of management decisions by the Bureau of Land Management to implement land use plans developed or revised under the land use planning requirements of section 202 of the Act (43 U.S.C. 1712).

(d) In regard to national defense withdrawals that can only be made by an Act of Congress, and to the extent that they are not otherwise satisfied by the information, studies, analyses and reports provided in accordance with the provisions of this section, the provisions of section 3(7) of the Act of February 28, 1958 (43 U.S.C. 157(7)), shall be complied with.

(e) The authorized officer shall develop preliminary findings and recommendations to be submitted to the Secretary, advise the applicant of the findings and recommendations, and provide the applicant an opportunity to discuss any objections thereto which the applicant may have.

(f) Following the discussion process, or in the absence thereof, the authorized officer shall prepare the findings, keyed specifically to the relevant portions of the case file, and the recommendations to the Secretary in connection with the application. The authorized officer also shall prepare, for consideration by the Secretary, a proposed order or notice of denial. In the case of a national defense withdrawal which can only be made by an Act of Congress, the authorized officer shall prepare, with the cooperation of the applicant, a draft legislative proposal to implement the applicant's withdrawal request, together with proposed recommendations for submission by the Secretary to the Congress. The findings and recommendations of the authorized officer, and the other documents previously specified in this section to be prepared by the authorized officer shall be made a part of the case file. The case file shall then be sent to the Director, Bureau of Land Management. At the same time, a copy of the findings and recommendations of the authorized officer shall be sent to the applicant.

(1) If the applicant objects to the authorized officer's findings and recommendations to the Secretary, the applicant may, within 30 days of the receipt by the applicant of notification thereof, state its objections in writing and request the Director to review the authorized officer's findings and recommendations. The applicant shall be advised of the Director's decision within 30 days of receipt of the applicant's statement of objections in the Bureau of Land Management's Washington office. The applicant's statement of objections and the Director's decision shall be made a part of the case file and thereafter the case file shall be submitted to the Secretary.

(2) If the applicant disagrees with the decision of the Director, Bureau of Land Management, the applicant may, within 30 days of receipt by the applicant of the Director's decision, submit to the Secretary a statement of reasons for disagreement. The statement shall be considered by the Secretary together with the findings and recommendations of the authorized officer, the applicant's statement of objections, the decision of the Director, the balance of the case file and such additional information as the Secretary may request.

⬆ Back to Top

## §2310.3–3   Action by the Secretary: Public land orders and notices of denial.

(a) Except for national defense withdrawals which can only be made by an Act of Congress, and except as may be otherwise provided in section 1(d) of Executive Order 10355 (17 FR 4833), for applications that are subject to that order, the allowance or denial, in whole or in part, of a withdrawal, modification or extension application, may only be made by the Secretary.

(b)(1) Before the allowance of an application, in whole or in part, the Secretary shall first approve all applicable memoranda of understanding and the applicant shall make all certifications required in this part. When an application has been finally allowed, in whole or in part, by the Secretary, an order to that effect shall be published promptly in the FEDERAL REGISTER. Each order shall be designated as, and shall be signed by the Secretary and issued in the form of, a *public land order.* Water shall be reserved pursuant to Federal law for use in carrying out the purposes of the withdrawal only if specifically so stated in the relevant public land order. In appropriate cases, the public land order also shall refer to the memorandum of understanding discussed in §2310.3-2(c) of this title and shall be drawn to comply with §2310.3-6 of this title.

(2) On the same day an order withdrawing 5,000 or more acres in the aggregate is signed, the Secretary shall advise, in writing, each House of the Congress, or in the case of an emergency withdrawal, the appropriate Committee of each House, of the withdrawal action taken. Pursuant to the Secretary's authority under the act, the notices that are sent to the Congress shall be accompanied by the information required by section 204(c)(2) of the Act (43 U.S.C. 1714(c)(2)), except in the case of an emergency withdrawal, transmittal of the required information may be delayed as provided in §2310.5(c) of this title.

(c) When the action sought in an application involves the exercise by the Secretary of authority delegated by Executive Order 10355 (17 FR 4831) and the Secretary denies the application in whole or in part, the applicant shall be notified of the reasons for the Secretary's decision. The decision shall be subject to further consideration only if the applicant informs the Secretary, in writing, within 15 days of the receipt by the applicant of the Secretary's decision, that the applicant has submitted the matter to the Office of Management and Budget for consideration and adjustment, as provided for in section 1(d) of the Executive Order.

(d) A withdrawal application shall be denied, if, in the opinion of the Secretary, the applicant is attempting to circumvent the Congressional review provisions of section 204(c)(1) of the Act (43 U.S.C. 1714(c)(1)) concerning withdrawals of 5,000 or more acres in the aggregate.

(e) When an application is denied in its entirety by the Secretary, a notice to that effect, signed by the Secretary, shall be published promptly in the FEDERAL REGISTER.

(f) In the case of a national defense withdrawal that may only be made by an Act of Congress, the Secretary shall transmit to the Congress proposed legislation effecting the withdrawal requested, together with the recommendations of the Secretary which may or may not support the proposed legislation in whole or in part. The proposed legislation shall contain such provisions for continued operation of the public land laws as to the public land areas included in the requested withdrawal as shall be determined by the Secretary to be compatible with the intended military use.

⬆ Back to Top

## §2310.3-4   Duration of withdrawals.

(a) An order initially withdrawing 5,000 or more acres of land in the aggregate, on the basis of the Secretary's authority under section 204 of the Act (43 U.S.C. 1714), may be made for a period not to exceed 20 years from the date the order is signed, except that withdrawals exceeding 5,000 acres in the State of Alaska shall not become effective until notice is provided in the FEDERAL REGISTER and to both Houses of Congress. All orders withdrawing 5,000 or more acres in the aggregate shall be subject to the Congressional review provision of section 204(c) of the Act (43 U.S.C. 1714(c)), except as follows:

(1) A National Wildlife Refuge System withdrawal may not be terminated as provided in section 204(c)(1) of the Act (43 U.S.C 1714(c)(1)) other than by an Act of Congress; or

(2) A withdrawal exceeding 5,000 acres in the State of Alaska shall terminate unless Congress

136

passes a Joint Resolution of approval within 1 year after the notice of such withdrawal has been submitted to the Congress.

(b) An order initially withdrawing less than 5,000 acres of land, in the aggregate, on the basis of the Secretary's authority under section 204 of the Act (43 U.S.C. 1714), may be made:

(1) For such time as the Secretary determines desirable for a resource use;

(2) For not more than 20 years for any other use, including, but not limited to, the use of lands for non-resource uses, related administrative sites and facilities or for other proprietary purposes; or

(3) For not more than 5 years to preserve the lands for a specific use then under consideration by either House of Congress.

(c) An order withdrawing lands on the basis of an emergency as provided for in section 204(e) of the Act (43 U.S.C. 1714(e)) may be made for not more than 3 years.

(d) Except for emergency withdrawals, withdrawals of specific duration may be extended, as provided for in §2310.4 of this title.

🔺 Back to Top

## §2310.3-5   Compensation for improvements.

(a) When an application is allowed, the applicant shall compensate the holder of record of each permit, license or lease lawfully terminated or revoked after the allowance of an application, for all authorized improvements placed on the lands under the terms and conditions of the permit, license or lease, before the lands were segregated or withdrawn. The amount of such compensation shall be determined by an appraisal as of the date of revocation or termination of the permit, license or lease, but shall not exceed fair market value. To the extent such improvements were constructed with Federal funds, they shall not be compensable unless the United States has been reimbursed for such funds prior to the allowance of the application and then only to the extent of the sum that the United States has received.

(b) When an application is allowed that affects public lands which are subject to permits or leases for the grazing of domestic livestock and that is required to be terminated, the applicant shall comply with the cancellation notice and compensation requirements of section 402(g) of the Act (43 U.S.C. 1752(g)), to the extent applicable.

🔺 Back to Top

## §2310.3-6   Transfer of jurisdiction.

A public land order that reserves lands for a department, agency or office, shall specify the extent to which jurisdiction over the lands and their related resource uses will be exercised by that department, agency or office. (See §2310.3-2(c) of this title).

🔺 Back to Top

## §2310.4   Review and extensions of withdrawals.

(a) Discretionary withdrawals of specific duration, whether made prior to or after October 21, 1976, shall be reviewed by the Secretary commencing at least 2 years before the expiration date of the withdrawal. When requested, the department, agency or office benefitting from the withdrawal shall promptly provide the Secretary with the information required by §2310.1-2(c) of this title, and the information required by §2310.3-2(b) of this title, in the form of a withdrawal extension application with

137

supplemental information. If the concerned department, agency or office is delinquent in responding to such request, the deliquency shall constitute a ground for not extending the withdrawal. Such withdrawals may be extended or further extended only upon compliance with these regulations, and only if the Secretary determines that the purpose for which the withdrawal was first made requires the extension, and then only for a period that shall not exceed the duration of the original withdrawal period. In allowing an extension, the Secretary shall comply with the provisions of section 204(c) of the Act (43 U.S.C. 1714(c)), or section 204(d) of the Act (43 U.S.C. 1714(d)), whichever is applicable; and, whether or not an extension is allowed, the Secretary shall report promptly on the decision for each pending extension to the Congressional Committees that are specified in section 204(f) of the Act (43 U.S.C. 1714(f)).

(b) Notwithstanding the provisions of this section, if the Secretary determines that a National Wildlife Refuge System withdrawal of specific duration shall not be extended, the Secretary shall nevertheless extend or reextend the withdrawal until such time as the withdrawal is terminated by an Act of Congress.

↑ Back to Top

## §2310.5   Special action on emergency withdrawals.

(a) When the Secretary makes an emergency withdrawal under Section 204(e) of the Act (43 U.S.C. 1714(e)), the withdrawal will be made immediately and will be limited in scope and duration to the emergency. An emergency withdrawal will be effective when signed, will not exceed 3 years in duration, and may not be extended by the Secretary. If it is determined that the lands involved in an emergency withdrawal should continue to be withdrawn, a withdrawal application should be submitted to the Bureau of Land Management in keeping with the normal procedures for processing a withdrawal as provided for in this subpart. Such applications will be subject to the provisions of Section 204(c) of the Act (43 U.S.C. 1714(c)), or Section 204(d) of the Act (43 U.S.C. 1714(d)), whichever is applicable, as well as Section 204(b)(1) of the Act (43 U.S.C. 1714(b)(1)).

(b) When an emergency withdrawal is signed, the Secretary must, on the same day, send a notice of the withdrawal to the two Committees of the Congress that are specified for that purpose in Section 204(e) of the Act (43 U.S.C. 1714(e)).

(c) The Secretary must forward a report to each of the aforementioned committees within 90 days after filing with them the notice of Secretarial emergency withdrawal. Reports for all such withdrawals, regardless of the amount of acreage withdrawn, will contain the information specified in Section 204(c)(2) of the Act (43 U.S.C. 1714(c)(2)).

[73 FR 74047, Dec. 5, 2008]

↑ Back to Top

# Subpart 2320—Federal Energy Regulatory Commission Withdrawals

↑ Back to Top

## §2320.0-3   Authority.

(a) Section 24 of the Federal Power Act of June 10, 1920, as amended (16 U.S.C. 818), provides that any lands of the United States included in an application for power development under that Act shall, from the date of filing of an application therefor, be reserved from entry, location or other disposal under the laws of the United States until otherwise directed by the Federal Energy Regulatory Commission or by Congress. This statute also provides that whenever the Commission shall determine that the value of any lands of the United States withdrawn or classified for power purposes shall not be injured or destroyed for such purposes by location, entry or selection under the public land

138

laws, the Secretary of the Interior shall declare such lands open to location, entry or selection for such purposes under such restrictions as the Commission may determine are necessary, and subject to and with a reservation of the right of the United States or its permittees or licensees to enter upon, occupy and use any and all of the lands for power purposes. Before any lands are declared open to location, entry or selection, the Secretary shall give notice of his intention to make this declaration to the Governor of the State within which such lands are located, and the State shall have a preference for a period of 90 days from the date of this notice to file under any applicable law or regulation an application of the State, or any political subdivision thereof, for any lands required as a right-of-way for a public highway or as a source of materials for the construction and maintenance of such highways. The 90-day preference does not apply to lands which remain withdrawn for national forest or other purposes.

(b) The Mining Claims Rights Restoration Act of 1955 (30 U.S.C. 621 *et seq*.), opened public lands which were then, or thereafter, withdrawn or classified for power purposes, with specified exceptions, to mineral location and development under certain circumstances.

⬆ Back to Top

## §2320.1   Lands considered withdrawn or classified for power purposes.

The following classes of lands of the United States are considered as withdrawn or classified for the purposes of section 24 of the Federal Power Act (16 U.S.C. 818): Lands withdrawn for powersite reserves under sections 1 and 2 of the Act of June 25, 1910, as amended (43 U.S.C. 141-148); lands included in an application for power development under the Federal Power Act (16 U.S.C. 818); lands classified for powersite purposes under the Act of March 3, 1879 (43 U.S.C. 31); lands designated as valuable for power purposes under the Act of June 25, 1910, as amended (43 U.S.C. 148); the Act of June 9, 1916 (39 Stat. 218, 219), and the Act of February 26, 1919 (40 Stat. 1180); lands within final hydroelectric power permits under the Act of February 15, 1901 (43 U.S.C. 959); and lands within transmission line permits or approved rights-of-way under the aforementioned Act of February 15, 1901, or the Act of March 4, 1911 (43 U.S.C. 961).

⬆ Back to Top

## §2320.2   General determinations under the Federal Power Act.

(a) On April 22, 1922, the Federal Power Commission (as predecessor to the Federal Energy Regulatory Commission) made a general determination "that where lands of the United States have heretofore been or hereafter may be reserved or classified as powersites, such reservation or classification being made solely because such lands are either occupied by power transmission lines or their occupancy and use for such purposes have been applied for or authorized under appropriate laws of the United States, and such lands have otherwise no value for power purposes, and are not occupied in trespass, the Commission determines that the value of such lands so reserved or classified or so applied for or authorized, shall not be injured or destroyed for the purposes of power development by location, entry or selection under the public land laws, subject to the reservation of section 24 of the Federal Power Act."

(b) The regulations governing mining locations on lands withdrawn or classified for power purposes, including lands that have been restored and opened to mining locations under section 24 of the Federal Power Act, are contained in subpart 3730 and in Group 3800 of this title.

⬆ Back to Top

## §2320.3   Applications for restoration.

(a) Other than with respect to national forest lands, applications for restoration and opening of

139

lands withdrawn or classified for power purposes under the provisions of section 24 of the Federal Power Act shall be filed, in duplicate, in the proper office of the Bureau of Land Management as set forth in §2321.2-1 of this title. No particular form of application is required, but it shall be typewritten or in legible handwriting, and it shall contain the information required by 18 CFR 25.1. Each application shall be accompanied by a service charge of $10 which is not returnable.

(b) Favorable action upon an application for restoration shall not give the applicant any preference right when the lands are opened.

Back to Top

Need assistance?

140

| Provisions governing . . . | Are in the following sections of the TROA . . . |
| --- | --- |
| Recitals, Definitions ................................................................................................ | Recitals 1 through 9. Definitions (1) through (106). |
| Satisfaction of provisions of law, general operational principles, protection of water rights, imported water, remaining water of the Truckee River, and emergencies. | Sections 1.A through 1.F. |
| Administration ....................................................................................................... | Sections 2.A through 2.C. |
| Accounting, reporting, forecasting, and monitoring .................................................. | Sections 3.A through 3.E. |
| Incorporation of certain provisions of the preliminary settlement agreement ................. | Sections 4.A through 4.G. |
| Operation of Floriston Rate and Project Water ......................................................... | Sections 5.A through 5.E. |
| Truckee River and Lake Tahoe Basin Allocation and Accounting .............................. | Sections 6.A through 6.E. |
| Credit Water Establishment, Storage, and Conversion ............................................. | Sections 7.A through 7.H. |
| Priorities and Rules for Operations Following Impoundment or Accumulation of Water in Reservoirs ...... | Sections 8.A through 8.V. |
| Beneficial Uses of Water for Instream Flows and Recreation in California ...................... | Sections 9.A through 9.F. |
| Design of Water Wells in the Truckee River Basin in California ................................... | Sections 10.A through 10.H. |
| Scheduling ............................................................................................................ | Sections 11.A through 11.H. |
| Effectiveness of the TROA ..................................................................................... | Sections 12.A and 12.B. |
| Relation of TROA to Settlement Act, Adjustments to Operations and Changes to Agreement ................. | Sections 13.A through 13.E. |
| Miscellaneous areas .............................................................................................. | Sections 14.A through 14.Q. |

[FR Doc. E8–28738 Filed 12–4–08; 8:45 am]

BILLING CODE 4310–MN–P

# DEPARTMENT OF THE INTERIOR

## Bureau of Land Management

**43 CFR Part 2300**

**[LLWO35000.L14300000.PN0000.24–1A]**

**RIN 1004–AE05**

**Land Withdrawals; Amendment of Regulations Regarding Emergency Withdrawals**

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends the Bureau of Land Management's (BLM) emergency withdrawal regulation to remove language that directs the Secretary of the Interior (Secretary) to immediately make an emergency withdrawal upon notification by one of two congressional committees. Constitutional questions have arisen when this regulation and corresponding provisions in Section 204(e) of the Federal Land Policy and Management Act (FLPMA) have been used by a congressional committee to direct Secretarial action. A district court, however, found it unnecessary to rule on the constitutionality of the committee-directed provision in Section 204(e) of FLPMA because the Secretary had bound himself through regulations regarding special action on emergency withdrawal. This final rule removes from regulations only the provision that has been the subject of past constitutional questions.

**DATES:** This rule is effective January 5, 2009.

**FOR FURTHER INFORMATION CONTACT:** For information on the substance of the rule, please contact Jeff Holdren at 202–452–7779 or Vanessa Engle at 202–452–7776. For information on procedural matters, please contact Jean Sonneman at 202–785–6577. Persons who use a telecommunications device for the deaf (TDD) may call the Federal Information Relay Service (FIRS) at 1–800–877–8339 to contact the above individuals. FIRS is available 24 hours a day, 7 days a week, to leave a message or question with the above individuals. You will receive a reply during normal business hours.

**SUPPLEMENTARY INFORMATION:**

I. Background
II. Discussion of the Final Rule
III. Discussion of Public Comments
IV. Procedural Matters

## I. Background

Section 204(e) of FLPMA provides that the Secretary of the Interior shall withdraw lands immediately upon a determination, either by the Secretary or by either of two committees of the Congress, that an emergency exists and that extraordinary measures need to be taken to protect natural resources or resource values that otherwise would be lost. The congressional notification authority may be exercised by the Committee on Natural Resources of the House of Representatives or by the Committee on Energy and Natural Resources of the Senate. 43 U.S.C. 1714(e). The BLM's regulations at 43 CFR 2310.5 state that the Secretary shall immediately withdraw lands when the Secretary determines, or when the Secretary is notified by a Committee, that an emergency exists and that extraordinary measures must be taken to protect natural resources or resource values that would otherwise be lost.

Over the years the Secretary has rarely invoked his authority to make an emergency withdrawal. In addition, the committee-directed emergency withdrawal provision has been controversial; the constitutionality of Section 204(e) has been the subject of litigation.

In 1991, the BLM published a proposal to remove all regulations in 43 CFR part 2300 related to emergency withdrawals (56 FR 59914 (Nov. 26, 1991)). In addition to raising the constitutional issue, the preamble for that proposed rule included an explanation that the first sentence of Section 204(e) is redundant, since public lands can be protected rapidly through the normal exercise of the general withdrawal authority, without invoking FLPMA Section 204(e). That proposed rule was never finalized, and it was withdrawn from the Semi-Annual Regulatory Agenda in 1993.

The BLM published another proposed rule on October 10, 2008 (73 FR 60212 (2008)) that would remove all regulations that provide for emergency withdrawals. The rationale for that proposed rule was the same as that for the 1991 proposal—i.e., that the existing regulations are redundant and that the committee-directed withdrawal presents constitutional issues. The public comment period on the proposed rule closed on October 27, 2008.

We received approximately 800 comments during the comment period. All comments were carefully reviewed. More than 90 percent of the comments were form letters or duplicates, some of which opposed the proposed rule, and some of which supported it. All relevant comments are discussed below.

In response to many of these comments and after additional internal deliberation, we are now promulgating a final rule that, instead of removing the BLM's regulations regarding emergency withdrawals in their entirety, removes

only that portion of 43 CFR 2310.5 that implements the committee-directed withdrawal provision of Section 204(e) of FLPMA. As set forth more fully below, the BLM continues to believe that the Secretary-initiated emergency withdrawal regulations are redundant and unnecessary. However, in response to public comments desiring minimal changes to the Secretary's regulatory authority, the BLM has decided not to amend the regulations as they relate to the Secretary's authority to make emergency withdrawals. In addition to removing language pertaining to committee-directed withdrawals, this rule makes clarifying changes that do not affect the substance of the emergency withdrawal regulation (43 CFR 2310.5).

## II. Discussion of the Final Rule

The proposed rule would have removed the BLM's emergency withdrawal regulations in their entirety, although the statutory authority for those withdrawals would have remained in place. Part of the rationale for the proposed rule was that the emergency withdrawal process is redundant, as the BLM can protect public lands quickly via the segregative effect contained in the conventional withdrawal process found in Section 204 of FLPMA and in the BLM's regulations at 43 CFR part 2300.

More specifically, the BLM's view is that the conventional withdrawal process results in the protection of lands quickly and just as effectively as the emergency withdrawal process. Conventional procedures enable the BLM to protect public lands, without substantial delay, for as long as 2 years by requiring that the BLM publish a **Federal Register** notice of the filing of a withdrawal application or proposal. Such publication temporarily segregates the public lands from settlement, sale, location, or entry under the public land laws, including the mining laws, to the extent specified in the notice. 43 CFR 2310.2(a). The 2-year segregation period ends when an order is published withdrawing the lands, or when the Secretary denies or cancels a withdrawal application. 43 CFR 2310.2–1.

If a petition seeks an emergency withdrawal, the petition is filed simultaneously with an application for withdrawal. 43 CFR 2310.1–3(d). If the Secretary approves a petition for an emergency withdrawal, the publication and notice provisions pertaining to emergency withdrawals are applicable. 43 CFR 2310.1–3(e). Those provisions, at 43 CFR 2310.5, include the immediate issuance of a withdrawal

order signed by the Secretary which is effective when signed, does not exceed 3 years in duration, and may not be extended by the Secretary. 43 CFR 2310.5(a). The Secretary also must send a notice of the emergency withdrawal to the Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate the same day it is signed, and send a report to both committees within 90 days. 43 CFR 2310.5(b) and (c).

The 2-year segregation that occurs immediately upon notice of a conventional withdrawal proposal or application has the same effect as the first 2 years of a 3-year emergency withdrawal. However, the conventional process permits the extension of a withdrawal that is granted during the 2-year segregative period, if warranted by the purpose for which the withdrawal was first made. 43 CFR 2310.4(a). In addition, public notice and opportunities for comment under conventional withdrawal procedures (43 CFR 2310.3–1(b)(2)(iv)–(v) and (c)) do not occur for emergency withdrawals. Unlike the emergency process, the conventional process ensures that the BLM casts a wide net for information and takes appropriate account of, and considers the interests of, persons with legally recognized interests in land or other natural resources. An additional difference between segregation and an emergency withdrawal is that along with the notice to Congress, the Secretary must also undertake certain steps set forth at 43 U.S.C. 1714(c)(2) within 3 months after an emergency withdrawal is made. Those steps are not required for segregation. An emergency withdrawal may not be extended by the Secretary. 43 CFR 2310.5(a). Lands involved in an emergency withdrawal may continue to be withdrawn past the expiration of the emergency withdrawal only via the conventional withdrawal procedures. *Id.* Thus, in sum, the emergency withdrawal process is unnecessary because of the segregative effect provided by the conventional withdrawal process.

As set forth more fully in Part III below, many comments opposed the proposed rule out of a concern that the BLM was removing the authority granted to it by Congress to protect public lands on an emergency basis and that the emergency withdrawal regulations were not redundant. The BLM does have a strong desire to preserve its regulatory authority to protect public lands and continues to believe that such protection can occur quickly and just as effectively through the conventional process, with the

added benefit of providing more opportunity for the public to participate. However, the assertion of redundancy did not resonate with some of the commenters. Therefore, the BLM has decided not to remove the emergency withdrawal regulations in their entirety. After today's rule becomes effective, the Secretary's regulatory authority to make emergency withdrawals (or any withdrawals, for that matter) remains unchanged. The regulations will continue to provide a procedure whereby the Secretary can protect natural resources or other values quickly via either the conventional or emergency withdrawal process.

The rule, instead, removes the committee-directed withdrawal provision of the regulation. Constitutional questions about Section 204(e) have arisen in some instances when a congressional committee has directed the Secretary to make an emergency withdrawal. By removing the corresponding provision in the regulation, a potential impediment to a judicial resolution of the issue of the constitutionality of the statutory provision is removed. As noted above, the Secretary's ability to protect lands via the conventional and emergency withdrawal process will remain unchanged by this rule.

Two previous committee notices (both from the House Committee on Interior and Insular Affairs) led to litigation in which the constitutionality of Section 204(e) was challenged. See *Pacific Legal Foundation* v. *Watt*, 529 F. Supp. 982 (D. Montana 1981); *National Wildlife Federation* v. *Watt*, 571 F. Supp. 1145 (D.D.C. 1983) (granting preliminary injunction); *National Wildlife Federation* v. *Clark*, 577 F. Supp. 825 (D.D.C. 1984) (granting summary judgment).

In *Pacific Legal Foundation*, the Secretary and other parties argued that FLPMA Section 204(e) was unconstitutional because its application through unilateral action by the committee: (a) Violated the separation of powers doctrine; (b) delegated executive power to the committee; (c) violated the requirement of bicameralism (i.e., legislation must be approved by both Houses of Congress); and (d) deprived the President of his veto power (known as the presentment requirement). At the time of that case, the U.S. Court of Appeals for the Ninth Circuit had set aside, as unconstitutional, a statutory provision that authorized either House of Congress to execute a legislative veto over decisions made by the Attorney General. *Chadha* v. *Immigration and Naturalization Service*, 634 F.2d 408 (9th Cir. 1980). Relying in part on that

**Federal Register** / Vol. 73, No. 235 / Friday, December 5, 2008 / Rules and Regulations **74041**

decision, the U.S. District Court in Montana held that, but for one distinguishing feature of Section 204(e), the Ninth Circuit's ruling in *Chadha* would have "compelled" the district court to declare Section 204(e) unconstitutional. *Pacific Legal Foundation* v. *Watt,* 529 F. Supp. 982, 1002 (D. Montana 1981). According to the district court, the saving feature of Section 204(e) was Secretarial discretion to determine the scope and duration of an emergency withdrawal. *Id.* at 1000.

Subsequently, the Supreme Court affirmed the Ninth Circuit's decision in *Immigration and Naturalization Service* v. *Chadha,* 462 U.S. 919 (1983). The breadth of the Supreme Court's ruling casts doubt on the validity of the Montana court's decision. For example, the Court stated, "Congress' authority to delegate portions of its power to administrative agencies provides no support for the argument that Congress can constitutionally control administration of the laws by way of a congressional veto." 462 U.S. at 953 n.16.

The second case in which the constitutionality of FLPMA Section 204(e) was at issue, *National Wildlife Federation* v. *Watt,* began when plaintiffs brought suit against the Secretary seeking review of a notice to receive and accept bids for the sale of coal leases. The plaintiffs argued that the notice was in contravention of a resolution adopted by the Interior and Insular Affairs Committee of the House of Representatives, directing the Secretary to withdraw certain lands from coal leasing temporarily. The court held that a forced withdrawal, like the legislative veto that was invalidated by the Supreme Court in *Chadha,* would probably be held to be legislative in character, since it alters the legal rights and duties of the Secretary of the Interior. Accordingly, the court found that the plaintiffs' attempt to distinguish Section 204(e) from an invalid legislative-veto provision, on the grounds that the withdrawal was temporary, was unlikely to succeed. *National Wildlife Federation* v. *Watt,* 571 F. Supp. 1145, 1155 (D.D.C. 1983). However, the court found that the plaintiffs were likely to prevail on the merits of their claim that the emergency-withdrawal provision (43 CFR 2310.5) was binding on the Secretary irrespective of the validity of Section 204(e), since no action had been taken to remove the regulation through notice-and-comment procedures. 571 F. Supp. at 1158. In a subsequent decision granting the plaintiffs' motion for summary judgment, the court found that it was unnecessary to reach the

constitutional question, and instead required that the Secretary "honor his own regulation unless and until he has rescinded or amended it after an appropriate rulemaking proceeding, or until the Committee has vacated its Resolution." *National Wildlife Federation* v. *Clark,* 577 F. Supp. 825, 828–29 (D.D.C. 1984).

Thus, whenever a congressional committee directs the Secretary to withdraw lands immediately, issues with regard to the constitutionality of that action are likely to arise. Such issues do not arise when the Secretary initiates and utilizes his conventional or emergency withdrawal authority. This rulemaking is not a forum for resolving the validity of the committee-directed withdrawal provision of Section 204(e). However, in view of the district court's ruling in *National Wildlife Federation* v. *Clark,* the existing committee-directed provision of the emergency-withdrawal regulation may be an impediment to resolving that question in the future in an appropriate forum. Further, as a matter of policy, the BLM does not wish to implement a statute of such questionable constitutionality. However, the statutory language in FLPMA Section 204(e) for a committee-directed emergency withdrawal remains unchanged by this rulemaking and does remain in effect. We should note that we received a June 25, 2008 communication from the House Committee on Natural Resources, citing the committee-directed provision in FLPMA Section 204(e) and the BLM's corresponding regulation at 43 CFR 2310.5. As discussed above, this rule is prospective and only affects the regulation, not the statute. Thus, this rule has no impact on the June 25, 2008 communication.

In addition to removing language pertaining to committee-directed withdrawals, this rule makes clarifying changes that do not affect the substance of the emergency withdrawal regulation.

This final rule is a "logical outgrowth" of the proposed rule and the public has therefore had adequate notice and opportunity for comment. The proposed rule would have eliminated all of the emergency withdrawal regulations, including the portion implementing the committee-directed withdrawal provision of FLPMA Section 204(e) that is removed by today's rule. Today's rule, in response to comments and upon further deliberation, implements a portion of what was proposed. The public has therefore had adequate notice and opportunity to comment on the removal of the committee-directed withdrawal provision of the regulation.

## III. Discussion of Public Comments

*Difficulty Submitting Comments*

One comment complained of trying for 3 days to fax comments from several locations, but was never able to get a fax through, and remarked that it was convenient for the BLM to be able to say that they received little public comment on this matter.

This commenter successfully submitted comments by one of the methods provided for in the proposed rule: Hand-delivery, postal mail, or posting on the Internet at regulations.gov. We believe that the commenter received a BLM fax number from an organization that, at our invitation, had faxed a copy of a letter to us. Subsequently, the organization distributed the fax number widely to prospective comments. When we began to receive comments by fax, we advised the organization that we normally do not accept comments that are sent by fax. A representative of that organization said a message would be sent that comments should not be submitted by fax.

In any event, while we normally do not accept faxed comments and faxing was not one of the methods for submitting comments provided for in the proposed rule, in the circumstances of this rulemaking we have included paper copies of all the faxed comments in the administrative record and have considered the substance of the comments in our deliberations. We will also post representative samples of repeated faxed comments, as well as unique faxed comments, on regulations.gov.

*Length of the Comment Period*

Several comments indicated that the comment period should be longer than the 15 days provided in the proposed rule. Generally, those comments claimed that Executive Order 12866, Section 309(e) of FLPMA, or the Administrative Procedure Act (APA) require longer periods. They also claimed that the fact that the public already had a chance to comment on the 1991 proposed rule was not an adequate justification for the 15-day comment period. In addition, two organizations sent letters requesting that the comment period be extended. Our letters denying those organizations' requests are posted at regulations.gov.

For several reasons, these comments have not been adopted and the comment period was not extended. First, as discussed in the preamble to the proposed rule, Executive Order 12866 does not apply because the Office of Management and Budget ("OMB") has

determined that the rule is not ''significant'' as defined in that Order. More specifically, one comment stated that the rule is ''significant'' and the comment period should be extended because the rule may adversely affect the environment (including historical, cultural, and governmental resources) across the West. The comment specifically referenced a June 25, 2008 communication from the Chairman of the House Natural Resources Committee directing the Secretary to withdraw certain lands surrounding the Grand Canyon from mineral location and entry.

As explained in the preamble to the proposed rule, segregation of lands provided for in the conventional withdrawal process is equally as effective to protect resources as are emergency withdrawals. Moreover, contrary to the comments' suggestion, the rule does not have any on-the-ground effects. The rule does not open or close any lands to or from any public land laws; rather, this rule simply removes the procedure for a committee-directed emergency withdrawal of lands from the BLM's regulations. This rule is prospective only and will have no effect on the June 25, 2008 communication from the House Committee Chairman. Several commenters appear to believe that this rule will have environmental effects because an as-yet-unidentified tract of land may not be withdrawn in the future. But the amendment of the regulation to remove the committee-directed withdrawal portion is not tied to a particular tract of land and to link this rule with effects that may occur in the future is purely speculative. In any event, as explained above, we have chosen not to eliminate the Secretary-driven emergency withdrawal process from the regulations. Therefore, the Secretary's authority to make emergency withdrawals remains unchanged by this rule.

Second, the APA does not prescribe a minimum comment period for informal rulemaking. The BLM believes a reasonable amount of time has been provided in this instance because the proposed rule is not complex. The proposed change removes regulatory text that sets forth a process that is articulated in FLPMA. The rule does not alter the relevant FLPMA language. Finally, the BLM believes the comment period was also reasonable in light of the 1991 rulemaking. At that time, the public had the opportunity to comment on the 1991 proposed rule. Those comments have been reviewed as part of this rulemaking. The substance of the proposed rule was identical to the rule proposed in 1991, and the issues remain

the same. Furthermore, this final rule only implements a portion of that proposed rule. For these reasons, we also disagree with the comments indicating that the 1991 process is irrelevant.

*The Constitutional Issue*

Some comments not in favor of the proposed rule argued that the statute was not unconstitutional and that the constitutional issue was not a valid reason for the proposed rule. In contrast, some comments in favor of the rule stated that Section 204(e) is unconstitutional. Some of those comments noted that the Department of Justice's Office of Legal Counsel (OLC) issued an opinion in 1983 stating that the committee-directed withdrawal provision of FLPMA Section 204(e) is unconstitutional.

The BLM disagrees that the recurring constitutional questions that have been raised during the history of these regulations is not a valid reason for this rule. History has demonstrated that whenever a congressional committee directs the Secretary to withdraw lands immediately, issues with regard to the constitutionality of that action are likely to arise. The committee-directed withdrawal provision of the regulation implements a portion of FLPMA Section 204(e) that is of questionable constitutionality under *Chadha,* 462 U.S. 919, as a committee-directed withdrawal arguably alters the legal rights and duties of the Secretary of the Interior. This rulemaking is not the forum to finally resolve that issue. It is a decision for the courts. However, as noted above, under a DC District Court decision, the regulation itself is a potential impediment to judicial resolution of that issue. See *Clark,* 577 F.Supp. at 828–29. The BLM wishes to remove the regulation so as to avoid implementing a statute that is of such questionable constitutionality, and to remove a potential impediment to a future Court decision on that issue. Again, however, we note that this rule would have no effect on the relevant statutory language. The BLM believes that without the change, the uncertainty surrounding the constitutionality of the statute and the respective roles of the Legislative and Executive Branches will continue.

Some comments stated that the Executive Branch has the duty to faithfully execute the laws and should therefore not challenge the constitutionality of a statute. They also stated that the BLM should leave the committee-directed emergency withdrawal provisions in place in order

to maintain a harmonious relationship with Congress.

The BLM disagrees with these comments. First, in this rulemaking the BLM is removing a potential impediment to judicial resolution of the constitutional issue based on past litigation on the provision, and is not making a direct constitutional challenge to the statute. Second, the Executive Branch has in the past taken the position that a statute is unconstitutional. In fact, that was exactly the position of the Executive Branch in *Chadha,* in which the Supreme Court agreed with the executive that the statute in that case was unconstitutional. As for maintaining a harmonious relationship with Congress on this topic, the BLM believes that by promulgating this final rule and thus potentially facilitating future resolution of this issue, there will be an opportunity to establish clearer expectations regarding committee-directed emergency withdrawals.

*Redundancy*

The BLM's view is that the conventional withdrawal process results in the protection of lands quickly and just as effectively as the emergency withdrawal process. This is because the conventional process authorizes the BLM to quickly segregate the lands from the public land laws, including the mining laws, while the withdrawal is considered. Segregation has the same practical effect as a withdrawal. Thus, natural resource values can be protected quickly by way of the conventional withdrawal process. In addition, the conventional withdrawal process is preferred because, unlike the emergency withdrawal process, it provides for substantial public participation and input.

Several comments disagreed that the emergency withdrawal regulations were redundant, stating that the committee-directed withdrawal provision is not part of the conventional withdrawal process, and segregation under conventional withdrawal procedures does not provide the same level of protection as an emergency withdrawal. One comment argued that the two procedures do not provide the same level of protection because validity exams (i.e., examinations by the appropriate agency to determine the validity of a particular mining claim) are only required on withdrawn lands and are at the agency's discretion on segregated lands. Another comment stated that the conventional withdrawal procedures and emergency withdrawal procedures are not redundant because the Secretary must seek approval to

conventionally withdraw lands under the jurisdiction of another agency, while there is no such requirement for an emergency withdrawal. Another comment stated that the rule creates an inconsistency between the statute and the regulations and confuses Congress and the public and that the removal of the emergency regulations will seriously undermine the capacity of the Federal government to act quickly in extraordinary circumstances that threaten irreplaceable public resources. Other comments stated that the Secretary should not voluntarily remove one of the tools granted to him by Congress to protect public lands.

Although the BLM disagrees with the conclusions of those comments they do highlight an area of possible confusion. The BLM agrees that the committee-directed withdrawal provision of the regulation (43 CFR 2310.5) is not redundant in the sense that there is no analogous provision in the conventional withdrawal process. However, the same goal can be met by the Secretary; that is, he can ''preserve values that might otherwise be lost'' on an emergency basis via segregation. The remainder of the emergency withdrawal regulation (i.e., the emergency withdrawals made by the Secretary without direction from a congressional committee) is clearly redundant because of the BLM's authority to segregate the lands during the conventional withdrawal process. As pointed out above, segregation does in fact have the same effect as an emergency withdrawal whether the Secretary is reacting to a committee-directed withdrawal or on his own: it closes the specified land to application of the mining laws in the particular area at issue to the extent specified. See, e.g., Preamble to the BLM's final rule amending mining regulations, 65 FR 69998, at 70026 (2000) (''there is no difference between 'segregated' lands and 'withdrawn' lands during the period of the segregation''). In other words, if the Secretary believes that an emergency situation exists, he can protect the lands quickly and effectively through the conventional withdrawal process (because the lands will be segregated while the withdrawal is considered) as he could by invoking his authority to make an emergency withdrawal. Of course, a segregation is limited to 2 years, while an emergency withdrawal can be up to 3 years. However, the protection of the lands at the end of the segregation period can be continued if the lands are in fact withdrawn. In addition, the validity examination process is in fact applicable to both withdrawn and

segregated lands. As pointed out in the preamble to the mining regulations referenced above, the BLM will examine the purpose of the segregation to determine if a validity exam is necessary on segregated lands; and, if so, perform that validity exam. 65 FR at 70026. A determination of invalidity has the same effect on both withdrawn and segregated lands.

Finally, for similar reasons, the BLM disagrees with the comment stating that the two processes are not redundant because the Secretary must seek approval of conventional withdrawals on lands under another agency's jurisdiction. This comment compares the conventional withdrawal to an emergency withdrawal. The proper comparison is between an emergency withdrawal and segregation, which is part of the conventional withdrawal process. The Secretary need not seek the approval of another agency to segregate the lands while a conventional withdrawal is considered. Thus, just as he can through the emergency withdrawal process, the Secretary, through segregation, can remove lands from the operation of the public land laws on a temporary emergency basis without the consent of any other agency.

However, although the BLM continues to believe that it can protect natural resource values quickly and effectively via the conventional withdrawal process, in response to the concerns raised by these comments and a desire to make minimal changes to the regulations, we have decided not to remove the regulations in their entirety. Thus, today's rule has no effect on the regulations dealing with the Secretary's authority to make emergency or conventional withdrawals. Both of these regulatory tools will remain at the Secretary's disposal.

### General Environmental Concerns

Some comments opposed to the rule expressed environmental concerns about mining and specifically about opening Federal lands to mining. Some of these comments specifically referenced uranium mining near Grand Canyon National Park and a June 25, 2008 communication from the Chairman of the House Natural Resources Committee directing the Secretary to withdraw certain lands surrounding the Grand Canyon from mineral location and entry under FLPMA Section 204(e).

The BLM appreciates the concerns raised in these comments but disagrees that they are relevant to this rulemaking. First, the rule merely removes one regulatory process in order to remove a potential barrier to judicial resolution of FLPMA Section 204(e)'s

constitutionality. The rule does not open any lands to mining. Further, the rule is prospective only and therefore does not have any effect on the June 25, 2008 communication relating to lands surrounding the Grand Canyon. Finally, as discussed more fully above, the final rule leaves in place the regulations authorizing the Secretary to, on his own initiative, effect an emergency withdrawal to protect natural resource or other values that might otherwise be lost. Amending the regulation to remove the portion addressing committee-directed withdrawals does not affect the Secretary's ability to protect lands, including park lands, on an emergency basis either through an emergency withdrawal or through the conventional withdrawal process.

### National Environmental Policy Act

Some comments stated that the proposed rule violated the National Environmental Policy Act (NEPA). Several comments stated that the Categorical Exclusion invoked in the proposed rule (516 DM, Chapter 2, Appendix 1, CX 1.10) is not applicable and therefore an Environmental Assessment or Environmental Impact Statement is required in order to comply with NEPA. Specifically, comments stated that the elimination of the committee-directed withdrawal provision is not ''of an administrative, financial, legal, technical, or procedural nature'' because it would have ''on-the-ground effects.'' In this regard, several comments referred to the June 25, 2008 communication from the Chairman of the House Natural Resources Committee directing the Secretary to make a withdrawal of certain lands surrounding the Grand Canyon from mineral location and entry and claimed that those lands would be affected by the removal of this regulation. Comments also claimed that the effects are not ''too broad, speculative, or conjectural to lend themselves to meaningful analysis'' because of environmental impacts from mining exploration or development in areas that would be withdrawn or segregated under FLPMA Section 204(e) and the implementing regulations. Finally, one comment stated that numerous activities that would occur in withdrawn or segregated areas, such as mining exploration activities less than 5 acres, would not later be subject to NEPA requirements.

The categorical exclusion is applicable to this rule. First, we note that the categorical exclusion at issue has been amended effective November 14, 2008, to exclude from NEPA review:

**74044** **Federal Register** / Vol. 73, No. 235 / Friday, December 5, 2008 / Rules and Regulations

Policies, directives, regulations, and guidelines: That are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case.

73 FR 61292, 61319 (Oct. 15, 2008); 43 CFR 46.210 (emphasis added). As explained in the preamble to the rule amending the categorical exclusion, the exclusion was modified in error in 2004 to include an ''and'' after the first clause. The recent rulemaking corrects that error by inserting the word ''or.'' Thus, if this rule meets either the first or second part of the categorical exclusion, the exclusion will apply.

Second, this rule is of both a legal and procedural nature. As explained above, it does not have any on-the-ground effects. The rule does not open or close any lands to or from any public land laws; rather, this rule simply removes one procedure for the withdrawal of lands from the BLM's regulations. Moreover, this rule is prospective only and will have no effect on the June 25, 2008 communication from the House Committee Chairman. Several comments appeared to believe that the proposed rule will have environmental effects because an as-yet-unidentified tract of land may not be withdrawn in the future. But the removal of the committee-directed provision of the emergency withdrawal regulation is not tied to a particular tract of land and to link this rule with effects that may occur in the future is purely speculative.

One comment also stated that even if the categorical exclusion applies by its terms, extraordinary circumstances exist that preclude its use. More specifically, that comment stated that extraordinary circumstances exist because the lands covered by the June 25, 2008 communication contain properties eligible for listing under the National Historic Preservation Act (NHPA), including Indian Sacred Sites, and are in close proximity to the Grand Canyon. Thus, the comment claimed that two of the BLM's extraordinary circumstances apply: (1) Actions that may have significant impacts on properties listed or eligible for listing under the NHPA and (2) actions that may have significant impacts on natural resources and unique geographic characteristics.

None of the extraordinary circumstances applies to this rule. As noted above, this rule in no way affects the June 25, 2008 communication relating to lands surrounding the Grand Canyon. This rule removes the committee-directed emergency withdrawal procedure from the BLM's

regulations. While mining in a particular area may affect properties listed or eligible for listing under NHPA, or might affect the natural and cultural resources or sites present in that area, this rule does not open or close any lands to the operation of the public land laws, including mining laws. Therefore, the comment's statement that the rule will impact any particular area, including the lands covered by the June 25, 2008 communication, is incorrect.

*Endangered Species Act*

Some comments stated that the proposed rule violated the Endangered Species Act (ESA) because the BLM did not enter into consultation with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service regarding the rule. One of the comments stated that mineral operations ''implicated'' by the promulgation of the rule ''may affect'' threatened or endangered species. The comment again referred to the June 25, 2008 communication as an example.

Consultation under the ESA is not required for two reasons. Under the ESA and its implementing regulations, the consultation requirement only applies to ''actions'' of Federal agencies, which are further defined as all ''activities or programs'' authorized, funded, or carried out by an agency. 15 U.S.C. 1536; 50 CFR 402.02. Here, amendment of the regulations to remove a certain procedure (i.e., committee-directed emergency withdrawals) is not an ''activity or program'' of the BLM; it is simply removing a certain procedure. While the ESA regulations include ''promulgation of regulations'' in the definition of ''action,'' this does not mean that every rule necessitates consultation. Here, the amendment of the emergency withdrawal regulation to remove the portion dealing with committee-directed withdrawals does not authorize, fund, or carry out an activity or program. As such, the ESA does not apply. Second, even if the amendment of the regulation is an ''action'' for purposes of Section 7 of the ESA, it will have no effect on listed species or designated critical habitat because the removal of this procedure from the BLM's regulations will not cause any environmental effects whatsoever. As explained above, this rule does not open any lands to mining. Nor does the rule alter the Secretary's authority to protect lands and resources through an emergency or conventional withdrawal. As such, this rule will not cause any direct effects or any indirect effects that are reasonably certain to occur. See 50 CFR 402.02.

*National Historic Preservation Act*

Some comments stated that the BLM is required to conduct consultation under the National Historic Preservation Act (NHPA) with affected Native American Tribes because Native American sacred, cultural and historical sites and land would potentially be affected by the rule.

The consultation requirement of the NHPA applies only to ''undertakings'' of a Federal agency, which are defined as a ''project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency.'' 36 CFR 800.16(y). The amendment of the emergency withdrawal regulation to remove that portion dealing with committee-directed withdrawals is not a ''project, activity, or program'' as defined by the regulations of the Advisory Council on Historic Preservation. Accordingly, the Act does not apply.

*FLPMA*

Some comments stated that the proposed rule violates FLPMA 204(e) because FLPMA directs the Secretary to promulgate rules and regulations to implement the Act and the Act contains an emergency withdrawal provision. One of these comments also stated that the proposed rule does not comply with the FLPMA requirement to prevent ''unnecessary or undue degradation'' of the public lands.

The rule does not violate FLPMA. FLPMA does not require that the BLM issue regulations to implement each and every provision of FLPMA; instead, it requires the Secretary to issue regulations that are necessary to implement the Act. 43 U.S.C. 1733(a). As explained herein and in the proposed rule, the BLM does not believe that the emergency withdrawal regulations are necessary to implement the Act. However, although the BLM continues to believe that the conventional withdrawal process can provide effective protection to resources or resource values on an emergency basis, we have decided to leave in place the regulations dealing with the Secretary-initiated emergency withdrawal process. The comment has not explained how the rule would cause ''unnecessary or undue degradation,'' and no such causal link can be made between the rule and any on-the-ground effects.

*Keeping Lands Open to Mining*

Some commenters supported the proposed rule because they believe it will open lands to mining. For example, one comment supported the proposed

rule as a means of ensuring the reasonable entry of mining on the plateaus on the north and south side of the Grand Canyon. Similarly, some comments were in favor of the proposed rule because they have a vested interest in ensuring that lands remain open to mineral entry, and were of the view that the rule will protect access to mineral deposits on public lands open to mineral entry, and protect the right to use and occupy those lands for prospecting, mining, and processing operations and all uses reasonably incident thereto. These comments also stated that it is important for the United States to utilize and produce domestic sources of the minerals required to maintain our economy, our national security and our standard of living. Some of these comments stated that for national security and national economic security reasons, withdrawal should always be the last approach for protection of public lands.

Although the BLM appreciates the concerns raised by these comments, this rule does not open or close any lands to the operation of the public land laws, including mining laws. Nor does the rule protect access to mineral deposits or the right of claimants to prospect or mine. As explained above, this rule merely amends the emergency withdrawal regulation to remove that portion dealing with the committee-directed emergency withdrawals. Through this rule, the BLM is not taking any position on when a withdrawal—emergency or otherwise—is appropriate.

*Opportunity for Public Input*

Some comments which supported the proposed rule stated that removal of the emergency withdrawal regulations is long overdue. They stated that the emergency withdrawal process, unlike the conventional withdrawal process, does not provide public notice and opportunities for comment by people who own or have other interests in the land and its natural resources and that select congressional committees should not be allowed to bypass or restrict the valuable input of those affected, and leave them with little recourse.

The BLM agrees that the conventional withdrawal process provides more opportunities for public input than does the emergency withdrawal process and that this may be a reason to use conventional withdrawal procedures instead of the emergency withdrawal process. Although today's rule does not remove the emergency withdrawal regulations in their entirety as proposed, it does not affect the BLM's ability to choose the conventional procedure to protect lands and values quickly so as

to allow for greater public input. The Secretary and the BLM are free, as they have been in the past, to choose either procedure.

*Executive Order 13132, Federalism*

Some comments objected to the finding in the proposed rule that this rule will not have a substantial direct effect on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the levels of government. One comment stated that the rule will limit the ability of the national Legislative Branch to directly represent the desires of the states and their citizens. Another commented that states are well situated—perhaps better than distant Federal officials—to recognize that an emergency situation exists regarding resource values on Federal lands within a state.

The BLM disagrees with this comment. The committee-directed emergency withdrawal provision in FLPMA itself (Section 204(e)) is not removed by operation of this rule. Moreover, although removal of the regulation providing for a committee-directed withdrawal may potentially affect relations between branches of the Federal Government, it does not have a substantial direct effect on the relationship between the Federal Government and the states.

*Executive Order 13175, Consultation and Coordination With Indian Tribal Governments*

Some comments objected to the finding in the proposed rule that tribal governments will not be unduly affected by this rule, and claim that effects on tribal governments would have been revealed if the BLM had consulted with tribes under the National Historic Preservation Act.

The BLM disagrees with these comments. As explained above, the consultation requirement of the NHPA applies only to ''undertakings'' of a Federal agency, which are defined as a ''project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency.'' 36 CFR 800.16(y). The removal of the committee-directed emergency withdrawal provision of the regulation is not a ''project, activity, or program'' as defined by the regulations of the Advisory Council on Historic Preservation. Moreover, this rule has no bearing on trust lands, or on lands for which title is held in fee status by Indian tribes or U.S. Government-owned lands managed by the Bureau of Indian Affairs. Thus, this rule will not result in

significant changes to BLM policy, and tribal Governments will not be unduly affected by this rule.

*Executive Order 13352, Facilitation of Cooperative Conservation*

One comment objected to the finding in the proposed rule that this rule facilitates cooperative conservation by announcing a policy of using the conventional withdrawal process, which provides for public participation. The comment stated that the proposed rule eliminates a path to public involvement through the Legislative Branch.

Although the BLM disagrees with this comment, it no longer is announcing a policy to use the conventional process as opposed to the emergency withdrawal process. As discussed above, this final rule does not amend the regulations relating to the Secretary's authority to make an emergency withdrawal. The Secretary may choose either the conventional or emergency withdrawal process. Moreover, the committee-directed emergency withdrawal provision in FLPMA itself (43 U.S.C. 1714(e)) is not removed by operation of this rule. Also, this rule does not in any way affect Congress's ability to pass legislation to withdraw lands. Thus, this rule does not impede the facilitation of cooperative conservation. This rule takes appropriate account of and considers the interests of persons with ownership or other legally recognized interests in land or other natural resources; properly accommodates local participation in the Federal decisionmaking process; and provides that the programs, projects, and activities of the agency are consistent with protecting public health and safety.

**IV. Procedural Matters**

*Executive Order 12866, Regulatory Planning and Review*

The Office of Management and Budget (OMB) has determined that this rule is not a ''significant regulatory action'' within the meaning of Executive Order 12866. Some comments expressed disagreement with this determination. This comment does not affect the validity of this rule, since Executive Order 12866:

Is intended only to improve the internal management of the Federal Government and does not create any right or benefit, substantive or procedural, enforceable at law or equity by any party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

**74046** **Federal Register**/Vol. 73, No. 235/Friday, December 5, 2008/Rules and Regulations

E.O. 12866, section 10. The determination of the OMB reflects the following findings:

• This rule will not have an annual effect on the economy of $100 million or more, and will not adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities.

• This rule will not create any serious inconsistency or otherwise interfere with any action taken or planned by another agency.

• This rule will not materially alter the budgetary impact of entitlements, grants, user fees, or loan programs, or the rights and obligations of their recipients.

• This rule will not raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in Executive Order 12866.

*National Environmental Policy Act*

This rule is categorically excluded from environmental review under Section 102(2)(C) of the National Environmental Policy Act (NEPA). In accordance with the Department's NEPA regulations (43 CFR 46.205; 43 CFR 46.210) this categorical exclusion excludes from NEPA review:

Policies, directives, regulations, and guidelines: That are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by case.

This rule is of a legal and procedural nature and is covered by the categorical exclusion. Moreover, no extraordinary circumstances exist that would prevent use of the categorical exclusion. See 43 CFR 46.205; 43 CFR 46.215.

*Regulatory Flexibility Act*

Congress enacted the Regulatory Flexibility Act of 1980 (RFA), as amended, 5 U.S.C. 601–612, to ensure that Government regulations do not unnecessarily or disproportionately burden small entities. The RFA requires a regulatory flexibility analysis if a rule would have a significant economic impact, either detrimental or beneficial, on a substantial number of small entities. The BLM has determined that this rule removing the provision for committee-directed emergency withdrawals will not have a significant economic impact on a substantial number of small entities under the RFA.

*Small Business Regulatory Enforcement Fairness Act*

This rule is not a ''major rule''' as defined at 5 U.S.C. 804(2) because it will not have an annual effect on the economy greater than $100 million; it will not result in major cost or price increases for consumers, industries, government agencies, or regions; and it will not have significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of United States-based enterprises to compete with foreign-based enterprises.

*Unfunded Mandates Reform Act*

This rule does not impose an unfunded mandate on state, local, or tribal governments or the private sector, in the aggregate, of $100 million or more per year; nor does the rule have a significant or unique effect on state, local, or tribal governments. The rule would impose no requirements on these entities. The changes in this rule would not have effects approaching $100 million per year on the private sector. Therefore, the BLM is not required to prepare a statement containing the information required by the Unfunded Mandates Reform Act (2 U.S.C. 1531 *et seq.*).

*Executive Order 12630, Government Action and Interference With Constitutionally Protected Property Rights (Takings)*

This rule is not a government action capable of interfering with constitutionally protected property rights. Therefore, the BLM has determined that the rule would not cause a taking of private property or require further discussion of takings implications under this Executive Order.

*Executive Order 13132, Federalism*

The BLM has determined that this rule does not have a substantial direct effect on the relationship between the Federal Government and the states. Therefore, in accordance with Executive Order 13132, the BLM has determined that this rule does not have sufficient Federalism implications to warrant preparation of a Federalism Assessment.

*Executive Order 12988, Civil Justice Reform*

The BLM has determined that this rule does not unduly burden the judicial system and meets the requirements of sections 3(a) and 3(b)(2) of Executive Order 12988.

*Executive Order 13175, Consultation and Coordination With Indian Tribal Governments*

The removal of the committee-directed portion of the emergency-withdrawal regulation is not a ''project, activity, or program'' as defined by the regulations of the Advisory Council on Historic Preservation. Moreover, this rule has no bearing on trust lands, or on lands for which title is held in fee status by Indian tribes or U.S. Government-owned lands managed by the Bureau of Indian Affairs. Therefore, in accordance with Executive Order 13175, the BLM has determined that this rule will not result in significant changes to BLM policy and that tribal Governments will not be unduly affected by this rule.

*Information Quality Act*

In developing this rule, the BLM did not conduct or use a study, experiment, or survey requiring peer review under the Information Quality Act (Section 515 of Pub. L. 106–554.).

*Executive Order 13211, Effects on the Nation's Energy Supply*

This rule has no implications under Executive Order 13211.

*Executive Order 13352, Facilitation of Cooperative Conservation*

In accordance with Executive Order 13352, the BLM has determined that this rule is administrative in content, involving only changes affecting issuance of emergency withdrawals. Secretarial authority for making conventional and emergency withdrawals remains unchanged by this rule. Thus, this rule does not impede the facilitation of cooperative conservation; takes appropriate account of and considers the interests of persons with ownership or other legally recognized interests in land or other natural resources; properly accommodates local participation in the Federal decision-making process; and provides that the programs, projects, and activities are consistent with protecting public health and safety.

*Paperwork Reduction Act*

The BLM has determined that this rule does not contain information collection requirements that the Office of Management and Budget must approve under the Paperwork Reduction Act of 1995, 44 U.S.C. 3501 *et seq.*

*Authors*

The principal authors of this rule are Jeff Holdren and Vanessa Engle of the Division of Lands, Realty, and Cadastral Survey, BLM Washington Office (WO), with assistance from the Division of

Regulatory Affairs (WO) and the Office of the Solicitor, Department of the Interior.

**List of Subjects in 43 CFR Part 2300**

Administrative practice and procedure, Electric power, Federal Energy Regulatory Commission, Public lands—withdrawal.

**C. Stephen Allred,**

*Assistant Secretary of the Interior, Land and Minerals Management.*

■ Under the authorities cited below, part 2300, group 2300, subchapter B, chapter II of title 43 of the Code of Federal Regulations is amended as follows:

**PART 2300—LAND WITHDRAWALS**

■ 1. The authority citation for part 2300 continues to read as follows:

**Authority:** 43 U.S.C. 1201; 43 U.S.C. 1740; Executive Order No. 10355 (17 FR 4831, 4833).

**Subpart 2310—Withdrawals, General: Procedure**

■ 2. Section 2310.5 is revised to read as follows:

**§ 2310.5 Special action on emergency withdrawals.**

(a) When the Secretary makes an emergency withdrawal under Section 204(e) of the Act (43 U.S.C. 1714(e)), the withdrawal will be made immediately and will be limited in scope and duration to the emergency. An emergency withdrawal will be effective when signed, will not exceed 3 years in duration, and may not be extended by the Secretary. If it is determined that the lands involved in an emergency withdrawal should continue to be withdrawn, a withdrawal application should be submitted to the Bureau of Land Management in keeping with the normal procedures for processing a withdrawal as provided for in this subpart. Such applications will be subject to the provisions of Section 204(c) of the Act (43 U.S.C. 1714(c)), or Section 204(d) of the Act (43 U.S.C. 1714(d)), whichever is applicable, as well as Section 204(b)(1) of the Act (43 U.S.C. 1714(b)(1)).

(b) When an emergency withdrawal is signed, the Secretary must, on the same day, send a notice of the withdrawal to the two Committees of the Congress that are specified for that purpose in Section 204(e) of the Act (43 U.S.C. 1714(e)).

(c) The Secretary must forward a report to each of the aforementioned committees within 90 days after filing with them the notice of Secretarial emergency withdrawal. Reports for all

such withdrawals, regardless of the amount of acreage withdrawn, will contain the information specified in Section 204(c)(2) of the Act (43 U.S.C. 1714(c)(2)).

[FR Doc. E8–28742 Filed 12–4–08; 8:45 am]

**BILLING CODE 4310–84–P**

---

**FEDERAL COMMUNICATIONS COMMISSION**

**47 CFR Part 73**

[MB Docket No. 05–312; FCC 08–256]

**Digital Television Distributed Transmission System Technologies**

**AGENCY:** Federal Communications Commission.

**ACTION:** Final rule.

**SUMMARY:** In this document, the Commission adopts rules for the use of distributed transmission system (''DTS'') technologies in the digital television (''DTV'') service. The rules adopted in this Report and Order will allow DTV station licensees and permittees to use DTS technologies where feasible in place of a single transmitter to provide service as authorized. We find that these rules will improve some DTV stations' ability to serve more of their viewers within their service areas. For example, we expect that DTS will be especially useful in mountainous areas where single transmitters have been unable to reach viewers in valleys or those blocked by elevated terrain. Furthermore, DTS may be a useful tool for stations to prevent some loss of service to existing analog viewers resulting from changes to the station's service area in the transition to digital service. These rules will apply to post-transition operations (*i.e.*, operations after February 17, 2009). DTS proposals related to pre-transition operations will continue to be evaluated under the Commission's interim policy.

**DATES:** Effective January 5, 2009, except § 73.626(f) which contains information collection requirements that have not been approved by OMB. The Commission will publish a document in the **Federal Register** announcing when OMB approval for this information collection has been received and this rule will take effect.

**FOR FURTHER INFORMATION CONTACT:** For additional information on this proceeding, please contact Evan Baranoff, *Evan.Baranoff@fcc.gov*, of the Media Bureau, Policy Division, (202) 418–2120; or John Gabrysch, *John.Gabrysch@fcc.gov*, or Gordon Godfrey, *Gordon.Godfrey@fcc.gov*, of the

Engineering Division, Media Bureau at (202) 418–7000. For additional information concerning the Paperwork Reduction Act information collection requirements contained in this document, contact Cathy Williams on (202) 418–2918, or via the Internet at *PRA@fcc.gov*.

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's *Report and Order,* FCC 08–256, adopted on November 3, 2008, and released on November 7, 2008. The full text of this document is available for public inspection and copying during regular business hours in the FCC Reference Center, Federal Communications Commission, 445 12th Street, SW., CY–A257, Washington, DC 20554. This document will also be available via ECFS (*http://www.fcc.gov/cgb/ecfs/*). (Documents will be available electronically in ASCII, Word 97, and/or Adobe Acrobat.) The complete text may be purchased from the Commission's copy contractor, 445 12th Street, SW., Room CY–B402, Washington, DC 20554. To request this document in accessible formats (computer diskettes, large print, audio recording, and Braille), send an e-mail to *fcc504@fcc.gov* or call the Commission's Consumer and Governmental Affairs Bureau at (202) 418–0530 (voice), (202) 418–0432 (TTY).

**Final Paperwork Reduction Act (''PRA'') Analysis**

This Report and Order was analyzed with respect to the Paperwork Reduction Act of 1995 (''PRA'') and contains modified information collection requirements, including changes to FCC Forms 301 and 340 to accommodate applications for DTS systems. (The Paperwork Reduction Act of 1995 (''PRA''), Pub. L. 104–13, 109 Stat. 163 (1995) (*codified in* Chapter 35 of Title 44 U.S.C.).) The information collection requirements adopted in this Report and Order will be submitted to OMB for final review under Section 3507(d) of the PRA, and OMB and the public will be afforded an opportunity to file comments on the modified information collection requirements contained in this proceeding. (See 44 U.S.C. 3507(d).) The Commission will publish a separate **Federal Register** notice seeking the PRA comments. In addition, pursuant to the Small Business Paperwork Relief Act of 2002 (''SBPRA''), the Commission sought specific comment in the *DTS NPRM* on how it might ''further reduce the information collection burden for small business concerns with fewer than 25

Federal Register / Vol. 74, No. 138 / Tuesday, July 21, 2009 / Notices **35887**

Dated: July 13, 2009.

**Dominica Van Koten,**

*Chief Cadastral Surveyor.*

[FR Doc. E9–17292 Filed 7–20–09; 8:45 am]

**BILLING CODE 4310–GJ–P**

---

## DEPARTMENT OF THE INTERIOR

**Bureau of Land Management**

**Notice of Proposed Withdrawal and Opportunity for Public Meeting; Arizona**

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice.

**SUMMARY:** The Secretary of the Interior proposes to withdraw approximately 633,547 acres of public lands and 360,002 acres of National Forest System lands for up to 20 years from location and entry under the Mining Law of 1872, 30 U.S.C. 22 *et seq.,* on behalf of the Bureau of Land Management and the United States Forest Service. The purpose of the withdrawal, if determined to be appropriate, would be to protect the Grand Canyon watershed from adverse effects of locatable hardrock mineral exploration and mining. This notice segregates the lands from location and entry under the 1872 Mining Law for up to 2 years to allow time for various studies and analyses, including appropriate National Environmental Policy Act analysis. These actions will support a final decision on whether or not to proceed with a withdrawal. The lands will remain open to the mineral leasing, geothermal leasing, mineral materials, and public land laws.

**DATES:** Comments and requests for a public meeting must be received by October 19, 2009.

**ADDRESSES:** Comments and meeting requests should be sent to the District Manager, Bureau of Land Management, Arizona Strip District Office, 345 East Riverside Drive, St. George, Utah 84790–9000, or Forest Supervisor, Forest Service, Kaibab National Forest, 800 South Sixth St., Williams, Arizona 86046.

**FOR FURTHER INFORMATION CONTACT:** Scott Florence, District Manager, BLM Arizona Strip District, 435–688–3200, or Michael Williams, Forest Supervisor, Kaibab National Forest, 928–635–8200.

**SUPPLEMENTARY INFORMATION:** The applicant is the Bureau of Land Management at the address above and its petition/application requests the Secretary of the Interior to withdraw, subject to valid existing rights, the following public lands and National Forest System lands from location and entry under the 1872 Mining Law, but not the mineral leasing, geothermal leasing, mineral materials laws, or public land laws: All the Federal lands identified in the townships below, and all non-Federal lands within the exterior boundaries described below that are subsequently acquired by the Federal government, to the boundary of the Grand Canyon National Game Preserve, including the overlap of the withdrawal for the Kanab Creek Wilderness, as depicted on the map entitled "Petition/ Application for Withdrawal" available from the BLM Arizona Strip District office and the FS Kaibab National Forest office at the addresses listed above.

*Public Lands*

**Gila and Salt River Meridian, Arizona**

Tps. 40 and 41 N., R. 1E.,

Tps. 38 and 40 N., R. 3 E., to the boundary of the Vermilion Cliffs National Monument,

Tps. 36 to 38 N., Rs. 4 and 5 E., to the boundary of the Vermilion Cliffs National Monument,

Tps. 37 to 39 N., R. 6 E., to the boundary of the Vermilion Cliffs National Monument,

T. 39 N., R. 7 E., to the boundary of the Vermilion Cliffs National Monument,

Tps. 38 to 41 N., R. 1 W.,

Tps. 38 to 40 N., R. 2 W.,

Tps. 36 to 40 N., R. 3 W.,

Tps. 35 to 40 N., Rs. 4 and 5 W.,

Tps. 35 to 39 N., Rs. 6 and 7 W.,

The areas described contain approximately 633,547 acres of public lands in Coconino and Mohave Counties.

*National Forest System Lands*

**Kaibab National Forest**

Gila and Salt River Meridian, Arizona.

**North Kaibab Ranger District**

Tps. 37 to 40 N., R. 3 E., to the boundary of the Vermilion Cliffs National Monument,

Tps. 36 and 37 N., R. 4 E.,

T. 36 N., R. 5 E.,

T. 38 N., R. 3 W.,

Tps. 36 and 37 N., Rs. 3 and 4 W.,

**Tusayan Ranger District**

Tps. 28 to 31 N., R. 1 E.,

Tps. 28 to 30 N., R 2 E.,

Tps. 27 to 30 N., Rs. 3 to 6 E.,

Tps. 31 and 32 N., R 1 W.,

The areas described contain approximately 360,002 acres of National Forest System lands in Coconino and Mohave Counties.

The total areas described aggregate approximately 993,549 acres of both public and National Forest System lands in Coconino and Mohave Counties located adjacent to the Grand Canyon National Park in Arizona. The total non-Federal lands within the area aggregate approximately 85,673 acres in Coconino and Mohave Counties.

The Secretary of the Interior has approved the Bureau of Land Management's petition for approval to file its withdrawal application. The Secretary's approval of the petition constitutes his proposal to withdraw the subject lands. The Forest Service has consented to proposing the withdrawal of lands under its administrative jurisdiction.

The purpose of the withdrawal, if determined to be appropriate, would be to protect the Grand Canyon watershed from adverse effects of locatable hardrock mineral exploration and mining for up to a 20-year period, which is the maximum allowable for a withdrawal aggregating more than 5,000 acres.

The use of a right-of-way, interagency, or cooperative agreement, or surface management by the Bureau of Land Management under 43 CFR 3715 and 3809 regulations and by the Forest Service under 36 CFR 228 would not adequately constrain nondiscretionary uses which could result in permanent loss of significant values and irreplaceable resources at the site.

There are no suitable alternative sites for the withdrawal.

No water rights would be needed to fulfill the purpose of the requested withdrawal.

Records relating to the application may be examined by contacting the BLM District Manager at the above address or by calling 435–688–3200 or the Forest Supervisor, Kaibab National Forest, 800 South Sixth Street, Williams, AZ 86046 or by calling 928–635–8200.

For a period of 90 days from the date of publication of this notice, all persons who wish to submit comments, suggestions, or objections in connection with the proposed withdrawal may present their views in writing to the BLM District Manager at the address noted above.

Comments including names and street addresses of respondents will be available for public review at the BLM Arizona Strip District Office at the address noted above, during regular business hours 8 a.m. to 4:30 p.m., Monday through Friday, except holidays. Before including your address, phone number, e-mail address, or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so. Individual respondents may request confidentiality. If you wish to withhold your name or address from public review or from disclosure under

the Freedom of Information Act, you must state this prominently at the beginning of your comments. Such requests will be honored to the extent allowed by law. All submissions from organizations or businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, will be made available for public inspection in their entirety.

Notice is hereby given that one or more public meetings will be held in connection with the proposed withdrawal. All interested persons who desire a public meeting for the purpose of being heard on the proposed withdrawal must submit a written request to the BLM District Manager no later than October 19, 2009. A notice of the time and place of any public meetings will be published in the **Federal Register** and a local newspaper at least 30 days before the scheduled date of the meeting.

This application/proposal will be processed in accordance with the regulations set forth in 43 CFR part 2300.

For a period of 2 years from the date of publication of this notice in the **Federal Register**, the lands described in this notice will be segregated from location and entry under the 1872 Mining Law, unless the application/ proposal is denied or canceled or the withdrawal is approved prior to that date. Licenses, permits, cooperative agreements, or other discretionary land use authorizations may be allowed with the approval of an authorized officer of the Bureau of Land Management or Forest Service during the segregative period.

**Authority:** 43 CFR 2310.3–1.

Dated: July 16, 2009.

**Mike Pool,**

*Acting Director, Bureau of Land Management.*

[FR Doc. E9–17293 Filed 7–20–09; 8:45 am]

**BILLING CODE 4310–32–P**

## DEPARTMENT OF JUSTICE

## Notice of Lodging of Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA")

Notice is hereby given that on July 15, 2009, a proposed Consent Decree in *United States* v. *Landia Chemical Company et al.,* Civil Action No. 8:09– cv–01325–VMC–TBM, was lodged with the United States District Court for the Middle District of Florida.

The Consent Decree resolves claims brought by the United States, on behalf of the United States Environmental Protection Agency ("EPA"), against seven parties ("Settling Defendants") under Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. 9606 and 9607. In its Complaint, filed concurrently with the Consent Decree, the United States sought injunctive relief in order to address the release or threatened release of hazardous substances at the Landia Chemical Company Site in Lakeland, Polk County, Florida, along with the recovery of costs the United States incurred for response activities undertaken at the Site.

Under the Consent Decree, the Settling Defendants—Landia Chemical Company, Inc.; Agrico Chemical Company; BASF Sparks LLC; PCS Joint Venture, Ltd.; Sylvite Terminal & Distribution LLC; Billy G. Mitchell; and Walter G. Grahn—will implement the remedy selected by EPA for the Site, including a final action to remediate soil contamination and an interim action to address groundwater contamination. The Consent Decree also requires the Settling Defendants to pay any future response costs above $796,454.46 incurred by the United States.

The Department of Justice will receive for a period of thirty (30) days from the date of this publication comments relating to the Consent Decree. Comments should be addressed to the Assistant Attorney General, Environment and Natural Resources Division, and either e-mailed to *pubcomment-ees.enrd@usdoj.gov* or mailed to P.O. Box 7611, U.S. Department of Justice, Washington, DC 20044–7611, and should refer to *United States* v. *Landia Chemical Company, Inc. et al.,* D.J. Ref. No. 90–11–3–09147.

The Consent Decree may be examined at the Office of the United States Attorney, Middle District of Florida, 400 N. Tampa Street, Suite 3200, Tampa, FL 33602, and at U.S. EPA Region 4, 61 Forsyth Street, SW., Atlanta, Georgia, 30303. During the public comment period, the Consent Decree may also be examined on the following Department of Justice Web site: *http:// www.usdoj.gov/enrd/ Consent_Decrees.html.* A copy of the Consent Decree may also be obtained by mail from the Consent Decree Library, P.O. Box 7611, U.S. Department of Justice, Washington, DC 20044–7611 or by faxing or e-mailing a request to Tonia Fleetwood (*tonia.fleetwood@usdoj.gov*), fax no. (202) 514–0097, phone confirmation number (202) 514–1547. In requesting a copy from the Consent

Decree Library, please enclose a check in the amount of $59.75 (25 cents per page reproduction cost) payable to the U.S. Treasury or, if by email or fax, forward a check in that amount to the Consent Decree Library at the stated address.

**Maureen Katz,**

*Assistant Section Chief, Environmental Enforcement Section, Environment and Natural Resources Division.*

[FR Doc. E9–17226 Filed 7–20–09; 8:45 am]

**BILLING CODE 4410–15–P**

## NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

[Notice (09–067)]

## Notice of Information Collection Under OMB Review

**AGENCY:** National Aeronautics and Space Administration (NASA).

**ACTION:** Notice of information collection under OMB review.

**SUMMARY:** The National Aeronautics and Space Administration, as part of its continuing effort to reduce paperwork and respondent burden, invites the general public and other Federal agencies to take this opportunity to comment on proposed and/or continuing information collections, as required by the Paperwork Reduction Act of 1995 (Pub. L. 104–13, 44 U.S.C. 3506(c)(2)(A)).

**DATES:** All comments should be submitted within 30 calendar days from the date of this publication.

**ADDRESSES:** All comments should be addressed to Jasmeet Seehra, Desk Officer for NASA, Office of Information and Regulatory Affairs, Room 10236, New Executive Office Building, Washington, DC 20503.

**FOR FURTHER INFORMATION CONTACT:** Requests for additional information or copies of the information collection instrument(s) and instructions should be directed to Dr. Walter Kit, NASA Clearance Officer, NASA Headquarters, 300 E Street, SW., JF0000, Washington, DC 20546, (202) 358–1350, *Walter.Kit-1@nasa.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Abstract

NASA will collect information to determine which applicants meet required selection criteria and to what extent. Ten secondary educators from institutions nation-wide will be selected to participate in the Airborne Research Experience for Educators (AREE) project based on their experience and educational background.

Part of the Northwest One Quarter (NE ¼) of the Northeast One Quarter (NE ¼) of Section 30, Township 47 North, Range 2 West, Michigan Meridian, lying west of the centerline of the County Road known as Lakeshore Drive (25 acres).

The above-described lands contain a total of 25 acres, more or less, which are subject to all valid rights, reservations, rights-of-way, and easements of record.

This proclamation does not affect title to the land described above, nor does it affect any valid existing easements for public roads and highways, public utilities and for railroads and pipelines and any other rights-of-way or reservations of record.

Dated: January 20, 2011.

**Larry Echo Hawk,**

*Assistant Secretary—Indian Affairs.*

[FR Doc. 2011–3741 Filed 2–17–11; 8:45 am]

**BILLING CODE 4310–W7–P**

---

**DEPARTMENT OF THE INTERIOR**

**Bureau of Land Management**

**[LLAZ910000.L14300000.ET0000. LXSIURAM0000 241A; AZA 035138]**

**Notice of Availability of the Draft Northern Arizona Proposed Withdrawal Environmental Impact Statement and Revisions to the Withdrawal Application, Arizona**

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of availability.

**SUMMARY:** In accordance with the National Environmental Policy Act of 1969, as amended (NEPA), the Bureau of Land Management (BLM) has prepared a Draft Environmental Impact Statement (EIS) for the Northern Arizona Proposed Withdrawal and with this notice is announcing the opening of the comment period.

**DATES:** To ensure comments will be considered, the BLM must receive written comments on the Northern Arizona Proposed Withdrawal Draft EIS within 45 days following the date the Environmental Protection Agency publishes its Notice of Availability in the **Federal Register**. The BLM will announce future meetings or hearings and any other public involvement activities at least 15 days in advance through public notices, media releases, and/or mailings.

**ADDRESSES:** You may submit comments related to the Northern Arizona Proposed Withdrawal Draft EIS by any of the following methods:

• *E-mail:* *NAZproposedwithdrawal@azblm.org.*

• *Mail:* Northern Arizona Proposed Withdrawal Project, ATTN: Scott Florence, District Manager, Bureau of Land Management, Arizona Strip District Office, 345 East Riverside Drive, St. George, Utah 84790–6714.

**FOR FURTHER INFORMATION CONTACT:** Chris Horyza, Project Manager, telephone 602–417–9446; address Bureau of Land Management, Arizona State Office, One N Central Ave., Suite 800, Phoenix Arizona 85004; e-mail *chris_horyza@blm.gov.*

**SUPPLEMENTARY INFORMATION:** On July 21, 2009, the Department of the Interior published notice of the Secretary of the Interior's (Secretary) proposal to withdraw (proposed withdrawal) approximately 1 million acres of National Forest System lands and public lands in northern Arizona from location and entry under the Mining Law of 1872, (30 U.S.C. 22–54) (Mining Law), subject to valid existing rights. The purpose of the withdrawal, if determined to be appropriate, would be to protect the Grand Canyon watershed from adverse effects of locatable hardrock mineral exploration and mining.

Under section 204 of the Federal Land Policy and Management Act (FLPMA), publication of the **Federal Register** notice of the proposed withdrawal had the effect of segregating the lands involved for up to 2 years from the location and entry of new mining claims, subject to valid existing rights, during which time the BLM will complete an analysis of the proposed withdrawal. The notice temporarily segregated the following described lands:

**Gila and Salt River Meridian**

Tps. 28 to 31 N., R. 1 E.,
Tps. 40 and 41 N., R. 1 E.,
Tps. 28 to 30 N., R. 2 E.,
Tps. 27 to 30 N., Rs. 3 to 6 E.,
Tps. 37 to 40 N., R. 3 E.,
Tps. 36 and 37 N., Rs. 4 and 5 E.,
T. 38 N., Rs. 3 to 5 E.,
T. 37 N., R. 6 E.,
Tps. 38 and 39 N., R. 6 E.,
Tps. 39 and 40 N., R. 7 E.,
T. 31 N., R. 1 W.,
Tps. 38 to 41 N., R. 1 W.,
Tps. 38 to 40 N., R. 2 W.,
Tps. 36 to 40 N., R. 3 W.,
Tps. 35 to 40 N., Rs. 4 and 5 W.,
Tps. 35 to 39 N., Rs. 6 and 7 W.

For more detailed information, refer to the map dated September 17, 2010, posted on the Internet at *http://www.blm.gov/az/st/en/prog/mining/timeout.html.* This map is also on file at the Arizona Strip District Office at the address below and can be viewed there upon request.

The Northern Arizona Proposed Withdrawal Draft EIS, now available for public review, has been prepared in accordance with NEPA.

Copies of the Northern Arizona Proposed Withdrawal Draft EIS are available in the BLM Arizona Strip District Office, 345 East Riverside Dr., St. George, Utah 84790.

Copies can also be found at:

BLM Arizona State Office at One N. Central, Suite 800, Phoenix, Arizona 85004;

BLM Phoenix District, 21605 N. 7th Ave., Phoenix, Arizona 85027;

BLM Utah State Office, 440 W. 200 S, Suite 500, Salt Lake City, Utah 84145;

USFS Tonto National Forest, 2324 E. McDowell Rd., Phoenix, Arizona 85006;

USFS Kaibab National Forest, 800 S. 6th St., Williams, Arizona 86046;

USFS Kaibab National Forest, 430 S. Main St., Fredonia, Arizona 86022; and

USFS Coconino National Forest, 1824 S. Thompson St., Flagstaff, Arizona 86001.

In addition, the EIS can be viewed at libraries in the following locations:

Wiliams Public Library, 113 1st Street, Williams, Arizona 86046; and

Fredonia Public Library, 118 N. Main St., Fredonia, Arizona 86022.

You may also access the document on the Internet at:

*http://www.blm.gov/az/st/en/prog/mining/timeout.html*

The Proposed Action analyzed in the Draft EIS is the withdrawal of 1,010,776 acres near Grand Canyon National Park from location and entry under the Mining Law for a period of 20 years, subject to valid existing rights. The lands included in the proposed action include those managed by the BLM and managed by the U.S. Forest Service and are located within portions of the Grand Canyon watershed. These lands contain significant environmental and cultural resources, including the nearby iconic Grand Canyon National Park, as well as substantial uranium deposits. The importance of the management of these resources has generated much public and Congressional interest. Public scoping for this project began on August 26, 2009 (74 FR 43152–43153), with publication of a Notice of Intent in the **Federal Register**, and closed on October 30, 2009. During that time 83,525 comment letters were received. Important issues identified during scoping include:

• Change in geologic conditions and availability of uranium resources;

• Dewatering of perched aquifers and changes in water availability in deep

aquifers;
• Contamination of both ground and surface water;
• Effects to endangered, threatened, and special status plants and animal species;
• Visual intrusions to Grand Canyon National Park visitors;
• Noise disruptions to Grand Canyon National Park visitors;
• Effects to cultural resources and Traditional Cultural Properties;
• Potential public health effects due to exposure to uranium; and
• Effects to the local, regional, or national economy.

The Draft EIS considers these issues in its analysis of four alternatives. Alternative A is the No Action Alternative, under which no lands would be withdrawn and mineral exploration and mining would continue throughout the proposed withdrawal area in accordance with existing regulations and land use plans. Alternative B, which is the Proposed Action, is a Secretarial withdrawal for 20 years, subject to valid existing rights, of approximately 1,010,776 acres in three parcels from location and entry under the Mining Law, but not the mineral leasing, geothermal leasing, mineral materials, or public land laws. Two of the three parcels are north of the Grand Canyon National Park on BLM-managed Arizona Strip lands and the North Kaibab Ranger District of the Kaibab National Forest, and the remaining parcel is south of the Grand Canyon on the Tusayan Ranger District of the Kaibab National Forest. Alternative C is a Secretarial withdrawal of approximately 652,986 acres from the Mining Law for 20 years, subject to valid existing rights. This alternative would withdraw the largest contiguous area identified on resource location maps with concentrations of cultural, hydrologic, recreational, visual, and biological resources which could be adversely affected by additional locatable mineral exploration and mining. Alternative D is a Secretarial withdrawal of 300,681 acres from the Mining Law for 20 years, subject to valid existing rights. This alternative would withdraw the contiguous area identified on resource location maps where there is the highest concentration of overlapping cultural, hydrologic, recreational, visual, and biological resources, which could be adversely affected by additional locatable mineral exploration and mining.

The Draft EIS analyzes the potential effects of the alternatives on resources within, and in the vicinity of, the potential withdrawal areas as well as within, and in the vicinity of, the Grand Canyon National Park. Analyses have been conducted for potential effects to air quality, geology and minerals, ground and surface water resources, soil resources, vegetation resources, fish and wildlife in general, special status plant and animal species including those listed as threatened or endangered, visual resources, soundscapes, cultural resources, American Indian resources, wilderness, recreation, social, and economic conditions.

Thirteen agencies and two American Indian Tribes have entered into Cooperating Agency agreements with the BLM, including the U.S. Forest Service, Kaibab National Forest; the National Park Service, Grand Canyon National Park; the U.S. Fish and Wildlife Service; the U.S. Geological Survey; the Arizona Game and Fish Department; the Arizona Geological Survey; the Arizona Department of Mines and Mineral Resources; the Arizona State Lands Department; the Hualapai Tribe; the Kaibab Band of Paiute Indians; Coconino County, Arizona; Mohave County, Arizona; Kane County, Utah; San Juan County, Utah; and Washington County, Utah.

Please note that public comments and information submitted, including names, street addresses, and e-mail addresses of persons who submit comments, will be available for public review and disclosure at the Arizona Strip District Office address given above during regular business hours (7:30 a.m. to 4 p.m.), Monday through Friday, except holidays.

Before including your address, phone number, e-mail address, or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

**Authority:** 40 CFR 1506.6 and 1506.10.

**James G. Kenna,**

*Arizona State Director.*

[FR Doc. 2011–3714 Filed 2–17–11; 8:45 am]

**BILLING CODE 4310–32–P**

# DEPARTMENT OF THE INTERIOR

## Bureau of Land Management

**[LLNV912000 L16400000.PH0000 LXSS006F0000 261A; 11–08807; MO# 4500020045; TAS: 14X1109]**

## Notice of Public Meetings: Sierra Front Northwestern Basin Resource Advisory Council, Nevada

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of public meetings.

**SUMMARY:** In accordance with the Federal Land Policy and Management Act (FLPMA) and the Federal Advisory Committee Act of 1972 (FACA), the U.S. Department of the Interior, Bureau of Land Management (BLM) Sierra Front-Northwestern Great Basin Resource Advisory Council (RAC) will meet in Carson City, Nevada and Gerlach, Nevada. The meetings are open to the public.

**DATES AND TIMES:** March 30–31, 2011, at the BLM Carson City District Office, 5665 Morgan Mill Road, Carson City, Nevada, and June 15–17, 2011, at Bruno's Country Club Café, 445 Main Street, Gerlach, Nevada, with an overnight field trip to Soldier Meadow Ranch north of the Black Rock Desert-High Rock Canyon Emigrant Trails National Conservation Area (NCA). Approximate meeting times are 9 a.m. to 5 p.m. and will include a general public comment period, tentatively scheduled for 4 p.m. on March 30 and 11 a.m. on June 15, unless otherwise listed in the final meeting agenda that will be available two weeks prior to each meeting. Field trips will be conducted as part of each two-day meeting.

**FOR FURTHER INFORMATION CONTACT:** Mark Struble, (775) 885–6107, E-mail: *mstruble@blm.gov.*

**SUPPLEMENTARY INFORMATION:** The 15-member Council advises the Secretary of the Interior, through the BLM, on a variety of planning and management issues associated with public land management in Nevada. Topics for discussion will include, but are not limited to: District Manager's reports on current program of work, Southern Nevada Public Land Management Act Round 12 review of R12 proposals and RAC-hosted public comment, landscape approach/land health assessment processes, impacts to proposed wind energy projects in eagle habitat, BLM wildlands policy, geothermal program review, Salt Wells Energy Projects Draft Environmental Impact Statement, field tour of ENEL Geothermal Power Plant at Salt Wells (Churchill County), Nevada

mechanisms that are designed to yield quantitative results.

*Current Actions:* Request for new collection of information.

*Type of Review:* New Collection.

*Affected Public:* Individuals and Households, Businesses and Organizations, State, Local or Tribal Government.

*Estimated Number of Respondents:* 60,000.

*Frequency of Response:* Once per request.

*Estimated Time per Response:* 13 minutes.

*Estimated Total Annual Burden Hours:* 13,000 hours.

*If additional information is required contact:* Tracey Denning, U.S. Customs and Border Protection, Regulations and Rulings, Office of International Trade, 799 9th Street, NW., 5th Floor, Washington, DC 20229–1177, at 202–325–0265.

Dated: June 23, 2011.

**Tracey Denning,**

*Agency Clearance Officer, U.S. Customs and Border Protection.*

[FR Doc. 2011–16131 Filed 6–27–11; 8:45 am]

**BILLING CODE 9111–14–P**

---

# DEPARTMENT OF THE INTERIOR

## Bureau of Land Management

**[LLAZ910000 L14300000.ET0000 LXSIURAM0000]**

## Public Land Order No. 7773; Emergency Withdrawal of Public and National Forest System Lands, Coconino and Mohave Counties; AZ

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Public Land Order.

**SUMMARY:** This Order withdraws, subject to valid existing rights, approximately 1,010,776 acres of public and National Forest System lands from location and entry under the 1872 Mining Law for a period of 6 months under the Secretary's emergency withdrawal authority in section 204(e) of the Federal Land Policy and Management Act of 1976.

**DATES:** Effective date is July 21, 2011.

**FOR FURTHER INFORMATION CONTACT:** Scott Florence, District Manager, BLM Arizona Strip District, 435–688–3200.

### Order

By virtue of the authority vested in the Secretary of the Interior by section 204 of the Federal Land Policy and Management Act of 1976, 43 U.S.C. 1714, and in accordance with

subsection 204(e) of that Act, it is determined that an emergency situation exists and that extraordinary measures must be taken to preserve values that would otherwise be lost. It is therefore ordered as follows:

1. Subject to valid existing rights, the following described public lands are hereby withdrawn from location and entry under the 1872 Mining Law (30 U.S.C. 22 *et seq.*), to protect the Grand Canyon Watershed from adverse effects of locatable hardrock mineral exploration and mining:

### Gila and Salt River Meridian

Tps. 28 to 31 N., R. 1 E.,
Tps. 40 and 41 N., R. 1 E.,
Tps. 28 to 30 N., R. 2 E.,
Tps. 27 to 30 N., Rs. 3 to 6 E.,
Tps. 37 to 40 N., R. 3 E.,
Tps. 36 and 37 N., Rs. 4 and 5 E.,
T. 38 N., Rs. 3 to 5 E.,
T. 37 N., R. 6 E.,
Tps. 38 and 39 N., R. 6 E.,
Tps. 39 and 40 N., R. 7 E.,
T. 31 N., R. 1 W.,
Tps. 38 to 41 N., R. 1 W.,
Tps. 38 to 40 N., R. 2 W.,
Tps. 36 to 40 N., R. 3 W.,
Tps. 35 to 40 N., Rs. 4 and 5 W.,
Tps. 35 to 39 N., Rs. 6 and 7 W.

The areas described above aggregate approximately 1,010,776 acres public and National Forest System lands in Coconino and Mohave Counties.

2. The withdrawal made by this Order does not alter the applicability of the public land laws other than the 1872 Mining Law (30 U.S.C. 22 *et seq.*).

3. This withdrawal will expire 6 months from the effective date of this Order.

Dated: June 21 2011.

**Ken Salazar,**

*Secretary of the Interior.*

[FR Doc. 2011–16056 Filed 6–27–11; 8:45 am]

**BILLING CODE 4310–32–P**

---

# DEPARTMENT OF THE INTERIOR

## Bureau of Land Management

**[LLCO–921000–L51100000–GA0000– LVEMC10CC770; COC–74219]**

## Notice of Availability of the Environmental Assessment and Notice of Public Hearing for the Sage Creek Holdings, LLC, Federal Coal Lease Application, COC–74219

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of availability.

**SUMMARY:** In accordance with the Federal coal management regulations, the Sage Creek Holdings, LLC, Federal Coal Lease-By-Application (LBA)

Environmental Assessment (EA) is available for public review and comment. The Department of the Interior, Bureau of Land Management (BLM) Colorado State Office, will hold a public hearing to receive comments on the EA, Fair Market Value (FMV), and Maximum Economic Recovery (MER) of the coal resources for Sage Creek Holdings, LLC, COC–74219.

**DATES:** The public hearing will be held at 6 p.m., on August 17, 2011. Written comments should be received no later than September 16, 2011.

**ADDRESSES:** The public hearing will be held at the BLM Little Snake Field Office (BLM/LSFO) 455 Emerson St., Craig, Colorado 81625. Written comments should be sent to Jennifer Maiolo at the same address. You may also send Jennifer Maiolo a fax at 970–826–5002. Copies of the Draft EA, unsigned Finding of No Significant Impact (FONSI) and MER report are available at the field office address above.

**FOR FURTHER INFORMATION CONTACT:** Kurt M. Barton at 303–239–3714, *kbarton@blm.gov,* or Jennifer Maiolo at 970–826–5077, *jmaiolo@blm.gov.* Persons who use a telecommunications device for the deaf (TDD) may call the Federal Information Relay Service (FIRS) at 1–800–877–8339 to contact the above individual during normal business hours. The FIRS is available 24 hours a day, 7 days a week, to leave a message or question with the above individual. You will receive a reply during normal business hours.

**SUPPLEMENTARY INFORMATION:** An LBA was filed by Sage Creek Holdings, LLC. The coal resource to be offered is limited to coal recoverable by underground mining methods. The Federal coal is located in the lands outside established coal production regions and may supplement the reserves at the Sage Creek Mine. The Federal coal resources are located in Routt County, Colorado.

### Sixth Principal Meridian,

T. 5 N., R. 87 W.,
    Sec. 21, NE¼NE¼;
    Sec. 22, N½, NW¼SW¼.
    These lands contain 400 acres, more or less.

The EA addresses the cultural, socioeconomic, environmental, and cumulative impacts that would likely result from leasing these coal lands. Two alternatives are addressed in the EA:

*Alternative 1:* (Proposed Action) The tracts would be leased as requested in the application; and

mechanisms that are designed to yield quantitative results.

*Current Actions:* Request for new collection of information.

*Type of Review:* New Collection.

*Affected Public:* Individuals and Households, Businesses and Organizations, State, Local or Tribal Government.

*Estimated Number of Respondents:* 60,000.

*Frequency of Response:* Once per request.

*Estimated Time per Response:* 13 minutes.

*Estimated Total Annual Burden Hours:* 13,000 hours.

*If additional information is required contact:* Tracey Denning, U.S. Customs and Border Protection, Regulations and Rulings, Office of International Trade, 799 9th Street, NW., 5th Floor, Washington, DC 20229–1177, at 202– 325–0265.

Dated: June 23, 2011.

**Tracey Denning,**

*Agency Clearance Officer, U.S. Customs and Border Protection.*

[FR Doc. 2011–16131 Filed 6–27–11; 8:45 am]

**BILLING CODE 9111–14–P**

---

## DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

**[LLAZ910000 L14300000.ET0000 LXSIURAM0000]**

### Public Land Order No. 7773; Emergency Withdrawal of Public and National Forest System Lands, Coconino and Mohave Counties; AZ

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Public Land Order.

**SUMMARY:** This Order withdraws, subject to valid existing rights, approximately 1,010,776 acres of public and National Forest System lands from location and entry under the 1872 Mining Law for a period of 6 months under the Secretary's emergency withdrawal authority in section 204(e) of the Federal Land Policy and Management Act of 1976.

**DATES:** Effective date is July 21, 2011.

**FOR FURTHER INFORMATION CONTACT:** Scott Florence, District Manager, BLM Arizona Strip District, 435–688–3200.

### Order

By virtue of the authority vested in the Secretary of the Interior by section 204 of the Federal Land Policy and Management Act of 1976, 43 U.S.C. 1714, and in accordance with

subsection 204(e) of that Act, it is determined that an emergency situation exists and that extraordinary measures must be taken to preserve values that would otherwise be lost. It is therefore ordered as follows:

1. Subject to valid existing rights, the following described public lands are hereby withdrawn from location and entry under the 1872 Mining Law (30 U.S.C. 22 *et seq.*), to protect the Grand Canyon Watershed from adverse effects of locatable hardrock mineral exploration and mining:

### Gila and Salt River Meridian

Tps. 28 to 31 N., R. 1 E.,
Tps. 40 and 41 N., R. 1 E.,
Tps. 28 to 30 N., R. 2 E.,
Tps. 27 to 30 N., Rs. 3 to 6 E.,
Tps. 37 to 40 N., R. 3 E.,
Tps. 36 and 37 N., Rs. 4 and 5 E.,
T. 38 N., Rs. 3 to 5 E.,
T. 37 N., R. 6 E.,
Tps. 38 and 39 N., R. 6 E.,
Tps. 39 and 40 N., R. 7 E.,
T. 31 N., R. 1 W.,
Tps. 38 to 41 N., R. 1 W.,
Tps. 38 to 40 N., R. 2 W.,
Tps. 36 to 40 N., R. 3 W.,
Tps. 35 to 40 N., Rs. 4 and 5 W.,
Tps. 35 to 39 N., Rs. 6 and 7 W.

The areas described above aggregate approximately 1,010,776 acres public and National Forest System lands in Coconino and Mohave Counties.

2. The withdrawal made by this Order does not alter the applicability of the public land laws other than the 1872 Mining Law (30 U.S.C. 22 *et seq.*).

3. This withdrawal will expire 6 months from the effective date of this Order.

Dated: June 21 2011.

**Ken Salazar,**

*Secretary of the Interior.*

[FR Doc. 2011–16056 Filed 6–27–11; 8:45 am]

**BILLING CODE 4310–32–P**

---

## DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

**[LLCO–921000–L51100000–GA0000– LVEMC10CC770; COC–74219]**

### Notice of Availability of the Environmental Assessment and Notice of Public Hearing for the Sage Creek Holdings, LLC, Federal Coal Lease Application, COC–74219

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of availability.

**SUMMARY:** In accordance with the Federal coal management regulations, the Sage Creek Holdings, LLC, Federal Coal Lease-By-Application (LBA)

Environmental Assessment (EA) is available for public review and comment. The Department of the Interior, Bureau of Land Management (BLM) Colorado State Office, will hold a public hearing to receive comments on the EA, Fair Market Value (FMV), and Maximum Economic Recovery (MER) of the coal resources for Sage Creek Holdings, LLC, COC–74219.

**DATES:** The public hearing will be held at 6 p.m. on August 17, 2011. Written comments should be received no later than September 16, 2011.

**ADDRESSES:** The public hearing will be held at the BLM Little Snake Field Office (BLM/LSFO) 455 Emerson St., Craig, Colorado 81625. Written comments should be sent to Jennifer Maiolo at the same address. You may also send Jennifer Maiolo a fax at 970– 826–5002. Copies of the Draft EA, unsigned Finding of No Significant Impact (FONSI) and MER report are available at the field office address above.

**FOR FURTHER INFORMATION CONTACT:** Kurt M. Barton at 303–239–3714, *kbarton@blm.gov,* or Jennifer Maiolo at 970–826–5077, *jmaiolo@blm.gov.* Persons who use a telecommunications device for the deaf (TDD) may call the Federal Information Relay Service (FIRS) at 1–800–877–8339 to contact the above individual during normal business hours. The FIRS is available 24 hours a day, 7 days a week, to leave a message or question with the above individual. You will receive a reply during normal business hours.

**SUPPLEMENTARY INFORMATION:** An LBA was filed by Sage Creek Holdings, LLC. The coal resource to be offered is limited to coal recoverable by underground mining methods. The Federal coal is located in the lands outside established coal production regions and may supplement the reserves at the Sage Creek Mine. The Federal coal resources are located in Routt County, Colorado.

### Sixth Principal Meridian,

T. 5 N., R. 87 W.,
Sec. 21, NE¼NE¼;
Sec. 22, N½, NW¼SW¼.
These lands contain 400 acres, more or less.

The EA addresses the cultural, socioeconomic, environmental, and cumulative impacts that would likely result from leasing these coal lands. Two alternatives are addressed in the EA:

*Alternative 1:* (Proposed Action) The tracts would be leased as requested in the application; and

## ENVIRONMENTAL PROTECTION AGENCY

**[FRL–9484–2]**

### Children's Health Protection Advisory Committee (CHPAC); Notice of Charter Renewal

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of Charter Renewal.

Notice is hereby given that the Environmental Protection Agency (EPA) has determined that, in accordance with the provisions of the Federal Advisory Committee Act (FACA), 5 U.S.C. App.2. The Children's Health Protection Advisory Committee (CHPAC) is a necessary committee which is in the public interest. Accordingly, CHPAC will be renewed for an additional two-year period. The purpose of CHPAC is to provide advice and recommendations to the Administrator of EPA on issues associated with development of regulations, guidance and policies to address children's health risks.

Inquiries may be directed to Martha Berger, Designated Federal Officer, CHPAC, U.S. EPA, OCHP MC 1107A, 1200 Pennsylvania Avenue, NW., Washington, DC 20460. *berger.martha@epa.gov,* Telephone (202) 564–2191.

Dated: October 7, 2011.

**Peter Grevatt,**

*Director, Office of Children's Health Protection.*

[FR Doc. 2011–27965 Filed 10–27–11; 8:45 am]

**BILLING CODE 6560–50–P**

## ENVIRONMENTAL PROTECTION AGENCY

**[ER–FRL–8999–7]**

### Environmental Impacts Statements; Notice of Availability

*Responsible Agency:* Office of Federal Activities, General Information (202) 564–1399 or *http://www.epa.gov/ compliance/nepa/.*

Weekly receipt of Environmental Impact Statements

Filed 10/17/2011 Through 10/21/2011.

Pursuant to 40 CFR 1506.9.

**Notice**

Section 309(a) of the Clean Air Act requires that EPA make public its comments on EISs issued by other Federal agencies. EPA's comment letters on EIS are available at: *http:// www.epa.gov/compliance/nepa/ eisdata.h*tml.

*EIS No. 20110357, Draft EIS, BLM, NV,* Phoenix Copper Leach Project, Proposed Construction and Operation of a New Copper Benfication Facility, Lander County, NV, Comment Period Ends: 12/12/2011, Contact: Dave Davis (775) 635–4000.

*EIS No. 20110358, Draft EIS, USFS, ID,* Mill Creek—Council Mountain Landscape Restoration Project, Proposed Landscape Restoration Treatment Activities on 51,975 Acres, Council Ranger District, Payette National Forest, Adams County, ID, Comment Period Ends: 12/12/2011, Contact: Steve Penny (208) 253–0164.

EIS No. 20110359, Final EIS, BLM, AZ, Northern Arizona Proposed Withdrawal Project, Proposed 20–Year Withdrawal of Approximately 1 Million Acres of Federal Mineral Estate, Coconino and Mohave Counties, AZ, Review Period Ends: 11/28/2011, Contact: Scott Florence (435) 688–3200.

EIS No. 20110360, Draft EIS, USFS, AK, Tonka Timber Sale Project, Proposed Timber Harvesting, Petersburg Ranger District, Tongass National Forest, Petersburg, AK, Comment Period Ends: 12/12/2011, Contact: Carey Case (907) 772–3871.

EIS No. 20110361, Draft EIS, BLM, 00, Programmatic—Solar Energy Development in Six Southwestern States, To Identifying and Prioritizing Specific Location Best Suited for Utility-Scale Solar Energy Development on Public Land, AZ, CA, NV, CO, UT and NM, Comment Period Ends: 01/27/2012, Contact: Shannon Stewart (202) 912–7219.

EIS No. 20110362, Final EIS, NOAA, 00, Generic—Annual Catch Limits/ Accountability Measures Amendment for the Gulf of Mexico Fishery Management Council's Red Drum, Reef Fish, Shrimp, Coral and Coral Reefs, Fishery Management Plans, Implementing the National Standard 1 Guidelines, Review Period Ends: 11/28/2011, Contact: Roy E. Crabtree (727) 824–5305.

EIS No. 20110363, Final EIS, NOAA, 00, Amendment 2 to the Fishery Management Plan of Puerto Rico and the U.S. Virgin Islands and Amendment 5 to the Reef Fish Fishery Management Plan of Puerto Rico and the U.S. Virgin Islands, Implementation of Annual Catch Limits (ACLs) and Accountability Measures (AMs) for Reef Fish and Queen Conch in the U.S. Caribbean, Review Period Ends: 11/28/2011, Contact: Roy E. Crabtree (727) 824–5308.

EIS No. 20110364, Draft EIS, NRC, MI, Enrico Fermi Unit 3 Combined License (COL) Application, Construction and Operation of a Power Reactor, U.S. Corp of Engineer 10 and 404 Permits, NUREG–2105, Monroe County, MI, Comment Period Ends: 01/10/2012, Contact: Bruce Olson (301) 415–3731.

EIS No. 20110365, Final EIS, FHWA, UT, Provo Westside Connector Project, Improvements to Interstate 15/University Avenue/1860 South Interchange to 3110 West Street in Provo, UT, Review Period Ends: 11/28/2011, Contact: Edward Woolford (801) 955–3500.

EIS No. 20110366, Final EIS, USFS, 00, Nationwide Aerial Application of Fire Retardant Project, Proposing to Continue the Aerial Application of Fire on National Forest System Lands, Implementation, Review Period Ends: 11/28/2011, Contact: Glen Stein (202) 205–1588.

**Amended Notices**

EIS No. 20110355, Final EIS, FHWA, CA, Northwest Corridor Improvements, I–75/I–575 Construction, New Alternative, USACE Section 404 Permit, NPDES Permit, Cobb and Cherokee Counties, GA, Review Period Ends: 11/21/2011, Contact: Rodney N. Barry (404) 562–3630.

Revision to FR Notice Published 10/21/2011: Correction to the State from CA to GA.

Dated: October 25,2011.

**Cliff Rader,**

*Acting Director, NEPA Compliance Division, Office of Federal Activities.*

[FR Doc. 2011–27934 Filed 10–27–11; 8:45 am]

**BILLING CODE 6560–50–P**

## ENVIRONMENTAL PROTECTION AGENCY

**[EPA–HQ–OAR–2010–1059; FRL–9484–6]**

### Guidance for 1-Hour SO$_2$ SIP Submissions

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of Extension of Comment Period.

**SUMMARY:** The EPA is announcing an extension of the public comment period for its draft non-binding guidance titled, "Guidance for 1-Hour SO$_2$ SIP Submissions." The draft of the guidance document is currently on the EPA's Web site. The EPA is extending the comment period for an additional 30-day period and invites public comments on this guidance during this period. The EPA plans to issue an updated version of the

eliminate the need for CBP personnel to manually enter vehicles to search for contraband. As a result, LEXRIS will increase the safety of CBP personnel.

The draft PEA addresses the potential impacts from the installation and operation of LEXRIS at various CBP operational areas throughout the United States for the purpose of conducting non-intrusive inspections. Evaluations were conducted on various resources present at operational areas, including: climate, soils, water quality, air quality, vegetation, wildlife, noise, infrastructure, aesthetics, and radiological health and safety.

**Next Steps**

This process is being conducted pursuant to the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321 *et seq.*), the Council on Environmental Quality Regulations for Implementing the NEPA (40 CFR parts 1500–1508), and Department of Homeland Security Directive 023–01, *Environmental Planning Program,* (April 19, 2006).

Substantive comments concerning environmental impacts received from the public and agencies during the comment period will be evaluated to determine whether further environmental impact review is needed in order to complete the Final PEA. The Final PEA will be made available to the public through a Notice of Availability in the **Federal Register**.

Should CBP determine, after review of the comments, that the implementation of the proposed action would not have a significant impact on the environment, it will prepare a Finding of No Significant Impact (FONSI), and a Notice of Availability of the FONSI for publication in the **Federal Register**.

Should CBP determine that significant environmental impacts exist due to the action, CBP will prepare a Notice of Intent (NOI) to prepare an Environmental Impact Statement (EIS) for publication in the **Federal Register**.

Dated: January 12, 2012.

**Karl H. Calvo,**

*Executive Director, Facilities Management and Engineering, Office of Administration.*

[FR Doc. 2012–809 Filed 1–17–12; 8:45 am]

**BILLING CODE 9111–14–P**

# DEPARTMENT OF THE INTERIOR

**Bureau of Land Management**

**[LLAZ91000.L14300000.ET0000. LXSIURAM0000, AZA 35138]**

**Public Land Order No. 7787; Withdrawal of Public and National Forest System Lands in the Grand Canyon Watershed; Arizona**

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Public Land Order.

**SUMMARY:** This order withdraws approximately 1,006,545 acres of public and National Forest System lands from location and entry under the Mining Law of 1872, 30 U.S.C. 22–54, subject to valid existing rights, for a period of 20 years in order to protect the Grand Canyon Watershed from adverse effects of locatable mineral exploration and development.

**DATES:** This Order is effective on January 21, 2012.

**FOR FURTHER INFORMATION CONTACT:** Chris Horyza, Bureau of Land Management, Arizona State Office, One North Central Avenue, Suite 800, Phoenix, Arizona 85004, (602) 417–9446 or Liz M. Schuppert, U.S. Forest Service, Kaibab National Forest, 800 South 6th Street, Williams, Arizona 86046, (928) 635–8367. Persons who use a telecommunications device for the deaf (TDD) may call the Federal Information Relay Service (FIRS) at 1– (800) 877–8339 to reach the Bureau of Land Management or U.S. Forest Service contact during normal business hours. The FIRS is available 24 hours a day, 7 days a week, to leave a message or question with either of the above individuals. You will receive a reply during normal business hours.

**SUPPLEMENTARY INFORMATION:** The public and National Forest System lands described in this order are within Coconino and Mohave Counties, Arizona. The lands will remain open to the mineral leasing laws, geothermal leasing laws, mineral material sales laws, and other public land laws. Non-Federal interests within the area described are not affected by this order. If the non-Federal interests within the boundaries of the area described in this order are subsequently acquired by the United States, the non-Federal interests will become subject to the withdrawal.

**Order**

By virtue of the authority vested in the Secretary of the Interior by section 204 of the Federal Land Policy and Management Act of 1976, 43 U.S.C. 1714, it is ordered as follows:

1. Subject to valid existing rights, the following described public and National Forest System lands are hereby withdrawn from location and entry under the Mining Law of 1872 (30 U.S.C. 22–54), but not from the mineral leasing, geothermal leasing, mineral materials or other public land laws, in order to protect the Grand Canyon Watershed from adverse effects of locatable mineral exploration and development:

**Gila and Salt River Meridian**

*South Parcel*

T. 28 N., R. 1 E.,
Sec. 1;
Sec. 2, lots 1 and 2, S½NE¼, and SE¼;
Sec. 11, E½;
Sec. 12.
T. 29 N., R. 1 E.,
Secs. 1, 2, and, secs. 11 to 14, inclusive;
Sec. 23, E½;
Secs. 24 and 25;
Sec. 26, E½;
Sec. 35, NW¼NE¼NE¼, N½NW¼NE¼,
   SW¼NW¼NE¼, NW¼SE¼NW¼NE¼,
   NW¼NW¼SW¼NE¼,
   SE¼SE¼SW¼NE¼, E½SE¼NE¼,
   E½NW¼SE¼NE¼, SW¼SE¼NE¼,
   and SE¼;
Sec. 36.
T. 30 N., R. 1 E.,
Secs. 1 and 2;
Secs. 11 to 14, inclusive;
Secs. 23 to 26, inclusive;
Secs. 35 and 36.
T. 31 N., R. 1 E.,
Sec. 17, lots 2, 3, S½NE¼, W½, and SE¼;
Secs. 18, 19, and 20;
Sec. 21, lot 2, W½NE¼, SE¼NE¼, W½,
   and SE¼;
Secs. 27 to 35, inclusive.
T. 28 N., R. 2 E.,
Secs. 1 to 6, inclusive;
Sec. 7, excluding MS 1419;
Secs. 8 to 13, inclusive.
T. 29 N., Rs. 2, 3, and 4 E.
T. 30 N., R. 2 E.,
Secs. 2 to 11, inclusive;
Secs. 13 to 36, inclusive.
T. 27 N., R. 3 E.,
Sec. 1.
T. 28 N., R. 3 E.,
Secs. 1 to 18, inclusive;
Secs. 23 to 25, inclusive;
Sec. 36.
T. 30 N., R. 3 E.,
Secs. 15 to 36, inclusive.
T. 27 N., R. 4 E.,
Secs. 1 to 6, inclusive.
T. 28 N., Rs. 4 and 5 E.
T. 30 N., R. 4 E.,
Sec. 13, 24, 25, and 26;
Sec. 27, S½;
Sec. 28, S½;
Sec. 29, S½;
Sec. 30, lots 3 to 7, inclusive, NE¼SW¼
   and N½SE¼;
Secs. 31 to 36, inclusive.
T. 27 N., R. 5 E.,
Secs. 1 to 6, inclusive.
T. 29 N., R. 5 E., partly unsurveyed.
T. 30 N., R. 5 E.,

Secs. 7 to 36, inclusive, unsurveyed.
T. 27 N., R. 6 E.,
  Secs. 1 to 6, inclusive.
T. 28 N., R. 6 E.,
  Secs. 2 to 11, inclusive;
  Sec. 12, S½;
  Secs. 13 to 36, inclusive.
T. 29 N., R. 6 E.,
  Secs. 3 to 9, inclusive;
  Secs. 15 and 16, unsurveyed;
  Secs. 17 to 21, inclusive;
  Sec. 22, unsurveyed;
  Secs. 27 to 34, inclusive.
T. 30 N., R. 6 E.,
  Secs. 7 to 9, inclusive;
  Secs. 15 to 22, inclusive, unsurveyed;
  Sec. 23, W½;
  Sec. 26, W½;
  Secs. 27 to 34, inclusive, unsurveyed.
T. 31 N., R. 1 W.,
  Sec. 2, lots 3 and 4, S½NW¼ and SW¼;
  Secs. 3, 4, 9, 10, and 11, Secs. 13 to 16, inclusive;
  Secs. 21 to 28, inclusive;
  Secs. 33 to 36, inclusive.

*North Parcel*
T. 40 N., R. 1 E.,
  Secs. 4 to 9, inclusive;
  Secs. 16 to 21, inclusive;
  Secs. 28 to 33, inclusive.
T. 41 N., R. 1 E.
T. 38 N., R. 1 W.,
  Secs. 2 to 4, inclusive, excluding that part within the Grand Canyon National Game Preserve and Kanab Creek Wilderness;
  Sec. 5;
  Secs. 6 to 11, inclusive, excluding that part within the Grand Canyon National Game Preserve and Kanab Creek Wilderness.
T. 39 N., R. 1 W.,
  Secs. 2 to 11, inclusive;
  Secs. 14 to 23, inclusive;
  Secs. 26 to 35, inclusive.
Tps. 40 and 41 N., R. 1 W.
T. 38 N., R. 2 W.,
  Secs. 1 to 8, inclusive, unsurveyed, excluding that part within the Grand Canyon National Game Preserve and Kanab Creek Wilderness;
  Secs. 10 to 12, inclusive, unsurveyed, excluding that part within the Grand Canyon National Game Preserve and Kanab Creek Wilderness.
T. 39 N., Rs. 2 and 3 W.
T. 40 N., R. 2 W.,
  Secs. 1, 2, and 3;
  Secs. 10 to 15, inclusive;
  Secs. 22 to 27, inclusive;
  Secs. 31 to 36, inclusive.
T. 37 N., R. 3 W.,
  Secs. 4 and 5, unsurveyed, excluding that part within the Grand Canyon National Game Preserve and Kanab Creek Wilderness;
  Secs. 6 and 7, unsurveyed;
  Secs. 8, 9, 16, and 17, unsurveyed, excluding that part within the Grand Canyon National Game Preserve and Kanab Creek Wilderness;
  Secs. 18 and 19, unsurveyed;
  Secs. 20 and 21, unsurveyed, excluding that part within the Grand Canyon National Game Preserve and Kanab Creek Wilderness;
  Secs. 29, 30, and 31, unsurveyed, excluding that part within the Grand

Canyon National Game Preserve and Kanab Creek Wilderness.
T. 38 N., R. 3 W.,
  Secs. 1 to 10, inclusive;
  Secs. 11 to 14, inclusive, excluding that part within the Grand Canyon National Game Preserve and Kanab Creek Wilderness;
  Secs. 15 to 22, inclusive;
  Secs. 23, 26, and 27, excluding that part within the Grand Canyon National Game Preserve and Kanab Creek Wilderness;
  Secs. 28 to 32, inclusive;
  Secs. 33 and 34, excluding that part within the Grand Canyon National Game Preserve and Kanab Creek Wilderness.
T. 40 N., R. 3 W.,
  Secs. 31 to 36, inclusive.
T. 35 N., R. 4 W.,
  Sec. 5, unsurveyed, excluding that part within the Grand Canyon National Game Preserve;
  Secs. 6 and 7, unsurveyed;
  Sec. 8, unsurveyed, excluding that part within the Grand Canyon National Game Preserve;
  Sec. 17, unsurveyed, excluding that part within the Grand Canyon National Game Preserve;
  Secs. 18 and 19, unsurveyed;
  Sec. 20, unsurveyed, excluding the part within the Grand Canyon National Game Preserve.
T. 36 N., R. 4 W.,
  Sec. 1, unsurveyed, excluding that part within the Grand Canyon National Game Preserve and Kanab Creek Wilderness;
  Sec. 2, excluding that part within the Kanab Creek Wilderness;
  Secs. 3 to 10, inclusive, unsurveyed;
  Sec. 11, unsurveyed, excluding that part within the Kanab Creek Wilderness;
  Secs. 12 and 13, unsurveyed, excluding that part within Grand Canyon National Game Preserve and Kanab Creek Wilderness;
  Sec. 14, unsurveyed, excluding that part within the Kanab Creek Wilderness;
  Secs. 15 to 22, inclusive, unsurveyed;
  Sec. 23, unsurveyed, excluding that part within the Kanab Creek Wilderness;
  Sec. 29, unsurveyed, excluding that part within the Grand Canyon National Game Preserve;
  Sec. 30, unsurveyed;
  Sec. 31;
  Sec. 32, unsurveyed, excluding that part within the Grand Canyon National Game Preserve.
T. 37 N., R. 4 W.,
  Secs. 1, 2, and 3, unsurveyed;
  Sec. 4;
  Secs. 5 to 8, inclusive, unsurveyed;
  Sec. 9;
  Secs. 10 to 15, inclusive, unsurveyed;
  Secs. 16 to 18;
  Secs. 19 to 22, inclusive, unsurveyed;
  Secs. 23 and 24;
  Secs. 25, unsurveyed;
  Secs. 26, 27, and 28, unsurveyed, excluding that part within the Kanab Creek Wilderness;
  Secs. 29, 30, and 31, unsurveyed;
  Secs. 32 to 35, unsurveyed, excluding that part within the Kanab Creek Wilderness;

Sec. 36, unsurveyed, excluding that part within the Grand Canyon National Game Preserve and Kanab Creek Wilderness.
Tps. 38 and 39 N., R. 4 W.,
T. 40 N., R. 4 W.,
  Secs. 31 to 36, inclusive.
T. 35 N., R. 5 W.,
  Secs. 1 to 24, inclusive.
T. 36 N., Rs. 5 and 6 W.
Tps. 37 to 39 N., Rs. 5 to 7 W.
T. 40 N., R. 5 W.,
  Secs. 31 to 36, inclusive.
T. 35 N., R. 6 W.,
  Secs. 1 to 24, inclusive.
T. 35 N. R. 7 W.,
  Secs. 1 and 2;
  Secs. 3 to 6, inclusive, excluding that part within the Grand Canyon-Parashant National Monument;
  Secs. 9 and 10, excluding that part within the Grand Canyon-Parashant National Monument;
  Secs. 11 to 15, inclusive;
  Secs. 16, 21, 22, and 23, excluding that part within the Grand Canyon-Parashant National Monument;
  Sec. 24;
  Secs. 27 and 28, excluding that part within the Grand Canyon-Parashant National Monument.
T. 36 N., R. 7 W.,
  Secs. 1 to 32, inclusive;
  Secs. 33 and 34, excluding that part within the Grand Canyon-Parashant National Monument;
  Secs. 35 and 36.

*East Parcel*
T. 37 N., R. 3 E.,
  Sec. 1, unsurveyed;
  Secs. 2 and 11 unsurveyed, excluding that part within the Grand Canyon National Game Preserve;
  Secs. 12 and 13, unsurveyed;
  Sec. 14, unsurveyed, excluding that part within the Grand Canyon National Game Preserve.
T. 38 N., R. 3 E.,
  Secs. 1 and 2, excluding that part within the Vermilion Cliffs National Monument;
  Sec. 3, unsurveyed;
  Secs. 4 and 9, unsurveyed, excluding that part within the Grand Canyon National Game Preserve;
  Secs. 10 and 11, unsurveyed;
  Sec. 12;
  Secs. 13 to 15, inclusive, unsurveyed;
  Secs. 16 and 21, unsurveyed, excluding that part within the Grand Canyon National Game Preserve;
  Secs. 22 to 27, inclusive, unsurveyed;
  Secs. 28 and 35, unsurveyed, excluding that part within the Grand Canyon National Game Preserve;
  Sec. 36, unsurveyed.
T. 39 N., R. 3 E.,
  Sec. 4, excluding that part within the Grand Canyon National Game Preserve and the Vermilion Cliffs National Monument;
  Secs. 5 and 8, inclusive, excluding that part within the Grand Canyon National Game Preserve;
  Secs. 9 and 15, inclusive, excluding that part within the Vermilion Cliffs National Monument;

Sec. 16;
Secs. 17 and 20, excluding that part within the Grand Canyon National Game Preserve;
Sec. 21;
Secs. 22 and 27, excluding that part within the Vermilion Cliffs National Monument;
Sec. 28;
Secs. 29 and 32, excluding that part within the Grand Canyon National Game Preserve;
Secs. 33 and 34;
Sec. 35, excluding that part within the Vermilion Cliffs National Monument.

T. 40 N., R. 3 E.,
Secs. 3, 10, and 15, excluding that part within the Vermilion Cliffs National Monument;
Sec. 21, unsurveyed, excluding that part within the Grand Canyon National Game Preserve;
Secs. 22 and 27, excluding that part within the Vermilion Cliffs National Monument;
Secs. 28 and 33, unsurveyed, excluding that part within the Grand Canyon National Game Preserve.

T. 36 N., R. 4 E.,
Secs. 1 to 5, inclusive;
Secs. 6 and 7, excluding that part within the Grand Canyon National Game Preserve;
Secs. 8 to 17, inclusive;
Secs. 18 to 24, inclusive, excluding that part within the Grand Canyon National Game Preserve.

T. 37 N., R. 4 E.,
Secs. 1 to 18, inclusive;
Sec. 19, excluding that part within the Grand Canyon National Game Preserve;
Secs. 20 to 29, inclusive;
Secs. 30 and 31, excluding that part within the Grand Canyon National Game Preserve;
Secs. 32 to 36, inclusive.

T. 38 N., R. 4 E.,
Secs. 5 and 6, excluding that part within the Vermilion Cliffs National Monument;
Sec. 7;
Secs. 8 to 13, inclusive, excluding that part within the Vermilion Cliffs National Monument;
Secs. 14 to 36, inclusive.

T. 36 N., R. 5 E.,
Sec. 2, unsurveyed, excluding that part within the Grand Canyon National Park;
Secs. 3 to 9, inclusive;
Sec. 10, partly surveyed, excluding that part within the Grand Canyon National Park;
Secs. 11 and 15, unsurveyed, excluding that part within the Grand Canyon National Park;
Sec. 16, excluding that part within the Grand Canyon National Park;
Sec. 17;
Sec. 18, excluding that part within the Grand Canyon National Park;
Sec. 19, partly unsurveyed, excluding that part within the Grand Canyon National Park and the Grand Canyon National Game Preserve;
Sec. 20, unsurveyed, excluding that part within the Grand Canyon National Game Preserve and the Grand Canyon National Park;
Secs. 21, unsurveyed, excluding that part within the Grand Canyon National Park.

T. 37 N., R. 5 E.,
Secs. 1 to 12, inclusive;
Sec. 13, excluding that part within the Grand Canyon National Park;
Secs. 14 to 24, inclusive;
Sec. 25, unsurveyed, excluding that part within the Grand Canyon National Park;
Secs. 26 to 34, inclusive;
Sec. 35, partly unsurveyed, excluding that part within the Grand Canyon National Park;
Sec. 36, unsurveyed, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation.

T. 38 N., R. 5 E.,
Secs. 13 and 14, 16 to 18, inclusive, excluding that part within the Vermilion Cliffs National Monument;
Secs. 19 and 20;
Secs. 21, 22, and 23, excluding that part within the Vermilion Cliffs National Monument;
Secs. 24 to 36, inclusive.

T. 37 N., R. 6 E.,
Sec. 4, unsurveyed, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation;
Sec. 5, partly unsurveyed, excluding that part within the Grand Canyon National Park;
Sec. 6;
Sec. 7, excluding that part within the Grand Canyon National Park;
Sec. 8, partly unsurveyed, excluding that part within the Grand Canyon National Park;
Sec. 9, unsurveyed, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation;
Sec. 17, partly unsurveyed, excluding that part within the Grand Canyon National Park;
Sec. 18, excluding that part within the Grand Canyon National Park;
Sec. 19, partly unsurveyed, excluding that part within the Grand Canyon National Park;
Secs. 20 and 30, unsurveyed, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation.

T. 38 N., R. 6 E.,
Sec. 1, unsurveyed, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation;
Secs. 2 and 3, excluding that part within the Grand Canyon National Park;
Secs. 4, 5, 7, and 8, excluding that part within the Vermilion Cliffs National Monument;
Secs. 9 and 10;
Sec. 11, partly unsurveyed, excluding that part within the Grand Canyon National Park;
Secs. 12 and 14, unsurveyed, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation;
Sec. 15, partly unsurveyed, excluding that part within the Grand Canyon National Park;
Secs. 16 and 17;
Sec. 18, excluding that part within the Vermilion Cliffs National Monument;
Sec. 19;
Secs. 20 and 21, partly unsurveyed, excluding that part within the Grand Canyon National Park;
Secs. 22 and 27, unsurveyed, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation;
Secs. 28 and 29, partly unsurveyed, excluding that part within the Grand Canyon National Park;
Secs. 30 to 32, inclusive, excluding that part within the Grand Canyon National Park;
Secs. 33, unsurveyed, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation.

T. 39 N., R. 6 E.,
Secs. 13, 23, and 24, excluding that part within the Vermilion Cliffs National Monument;
Sec. 25;
Sec. 26, excluding that part within the Vermilion Cliffs National Monument;
Sec. 27, excluding that part within the Vermilion Cliffs National Monument and the Grand Canyon National Park;
Sec. 33, S½NE¼, SE¼SW¼, and SE¼, excluding that part within the Vermilion Cliffs National Monument;
Secs. 34 and 35, excluding that part within the Grand Canyon National Park;
Sec. 36, partly unsurveyed, excluding that part within the Grand Canyon National Park.

T. 39 N., R. 7 E.,
Sec. 3, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation;
Sec. 4, partly unsurveyed, excluding that part within the Grand Canyon National Park, Vermilion Cliffs National Monument, and Navajo Indian Reservation;
Secs. 5, 7, and 8, excluding that part within the Vermilion Cliffs National Monument;
Secs. 9 and 16, partly unsurveyed, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation;
Sec. 17, excluding that part within the Grand Canyon National Park;
Sec. 18, excluding that part within the Vermilion Cliffs National Monument;
Sec. 19;
Sec. 20, and Secs. 29 to 31, inclusive, partly unsurveyed, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation.

T. 40 N., R. 7 E.,
Sec. 33, excluding that part within the Grand Canyon National Park and Vermilion Cliffs National Monument;
Sec. 34, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation.

The areas described aggregate approximately 1,006,545 acres of public and National Forest System lands in Coconino and Mohave Counties.

2. The withdrawal made by this order does not alter the applicability of the public land laws other than the Mining Law.

3. This withdrawal will expire 20 years from the effective date of this

order unless, as a result of a review conducted before the expiration date pursuant to Section 204(f) of the Federal Land Policy and Management Act of 1976, 43 U.S.C. 1714(f), the Secretary determines that the withdrawal shall be extended.

**Authority:** 43 CFR 2310.3–3(b)(1).

Dated: January 9, 2012.

**Ken Salazar,**

*Secretary of the Interior.*

[FR Doc. 2012–849 Filed 1–17–12; 8:45 am]

**BILLING CODE 4310–32–P**

---

**INTERNATIONAL TRADE COMMISSION**

**[USITC SE–12–001]**

**Government in the Sunshine Act Meeting Notice**

**AGENCY HOLDING THE MEETING:** United States International Trade Commission.

**TIME AND DATE:** January 20, 2012 at 11 a.m.

**PLACE:** Room 101, 500 E Street SW., Washington, DC 20436, Telephone: (202) 205–2000.

**STATUS:** Open to the public.

**MATTERS TO BE CONSIDERED:**

1. Agendas for future meetings: none.

2. Minutes.

3. Ratification List.

4. Vote in Inv. No. 731–TA–703 (Third Review) (Furfuryl Alcohol from China). The Commission is currently scheduled to transmit its determination and Commissioners' opinions to the Secretary of Commerce on or before January 30, 2012.

5. Outstanding action jackets: none.

In accordance with Commission policy, subject matter listed above, not disposed of at the scheduled meeting, may be carried over to the agenda of the following meeting.

By order of the Commission.

Issued: January 13, 2012.

**William R. Bishop,**

*Hearings and Meetings Coordinator.*

[FR Doc. 2012–949 Filed 1–13–12; 4:15 pm]

**BILLING CODE 7020–02–P**

---

**DEPARTMENT OF LABOR**

**Employment and Training Administration**

**Comment Request for Information Collection for a Three-Year Extension of the Labor Exchange Reporting System (LERS), Extension With Revisions**

**AGENCY:** Employment and Training Administration, Labor.

**ACTION:** Notice.

**SUMMARY:** The Department of Labor (Department), as part of its continuing effort to reduce paperwork and respondent burden conducts a preclearance consultation program to provide the general public and Federal agencies with an opportunity to comment on proposed and/or continuing collections of information in accordance with the Paperwork Reduction Act of 1995 (PRA95) [44 U.S.C. 3506(c)(2)(A)]. This program helps to ensure that requested data can be provided in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the impact of collection requirements on respondents can be properly assessed.

Currently, the Employment and Training Administration (ETA) is soliciting comments concerning LERS, Office of Management and Budget (OMB) Control No. 1205–0240), which facilitates performance reporting for the Wagner-Peyser Act funded public employment service activities through the ETA 9002 reports and for the Jobs for Veterans' State grants' activities through the Veterans' Employment and Training Services (VETS) 200 reports. The current expiration date is March 31, 2012. A copy of the proposed information collection request can be obtained by contacting the office listed below in the addresses section of this notice.

**DATES:** Written comments must be submitted to the office listed in the addresses section below on or before March 19, 2012.

**ADDRESSES:** Submit written comments to Karen Staha, Office of Policy Development and Research, Employment and Training Administration, U.S. Department of Labor, 200 Constitution Avenue NW., Room N–5641, Washington, DC 20210. Telephone number: (202) 693–2917 (this is not a toll-free number). Fax: (202) 693–3490. Email: *Staha.Karen@dol.gov*.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

Each quarter, states and territories submit data on individuals and employers who receive core employment and workforce information services through the public labor exchange and employment services and the Jobs for Veterans' state grants in the states' One-Stop delivery systems. These data—submitted to the Department via the ETA 9002 and VETS 200 reports—are used by ETA and VETS to evaluate performance and delivery of labor exchange and employment services within the One-Stop delivery system.

ETA and VETS use the data to track total participants, aggregate information about characteristics, services and outcomes of job seeker customers. Additionally, ETA and VETS analyze the data to determine the delivery of core labor exchange services; to study performance outcomes vis-à-vis performance measures, and state policies and procedures; and to help drive the workforce investment system toward continuous improvement of outcomes and integrated service delivery. Within ETA, the data are used by the Office of Workforce Investment, the Office of Unemployment Insurance, the Office of Financial and Administrative Management, the Office of Policy Development and Research, and the Office of Regional Management (including the regional offices). Other Departmental users include the Office of the Assistant Secretary for Employment and Training and the Office of the Assistant Secretary for Policy.

The reports and other analyses of the data are made available to the states, members of Congress, veterans' organizations, research firms and others needing information on public employment and workforce information services. Information about labor exchange and employment services for veterans are provided to Congress to meet VETS reporting requirements codified in Title 38 of the United States Code (U.S.C.).

Currently, LERS is the only mechanism for collecting performance information on Wagner-Peyser Act funded and Jobs for Veterans' state grants. As such, this set of reports is necessary for tracking and reporting to stakeholders data on the usage and performance of these programs. More specifically, these reports are used to monitor the core purpose of the program—mainly, tracking how many people found jobs; did people stay employed; and what were their earnings.

# Department of the Interior
# Departmental Manual

---

**Effective Date:** 12/11/01
**Series:**   Departmental Directives
**Part 011:**   The Departmental Manual
**Chapter 1:**   Purpose and Structure

**Originating Office:**  Office of Planning and Performance Management

---

## 011 DM 1

1.1   **Purpose**.  This chapter describes the purpose and structure of the Departmental Manual (DM).  The DM is the authorized means of documenting and issuing instructions, policies, and procedures that have general and continuing applicability to Departmental activities, or that are important to the management of the Department.

1.2   **Scope**.  The DM describes the organizations and functions of the Department's bureaus and offices, documents delegations of the Secretary's authority, and prescribes the policies and general procedures for administrative activities and specific program operations.

   A.   It is used to communicate the instructions of the Office of the Secretary throughout the Department, to provide guidance to the bureaus and offices in their administrative and program operations, and to serve as the primary source of information on organization structure, authority to function, and policy and general procedures.

   B.   Bureaus and offices must comply with the provisions of the DM, except to the extent that the provisions are superseded by appropriate authority:  e.g., a change in statute, regulation, or Executive order; a Secretary's Order or a court decision; etc.

1.3   **Issuing Authority**.  Chapters in the DM, including revisions, additions, or amendments to DM chapters are issued under the signatures of authorized officials or officials acting for authorized officials as follows:

   A.   The Assistant Secretary - Policy, Management and Budget or a properly authorized subordinate official is authorized to sign DM chapters, except as follows:

      (1)   The Secretary or the Deputy Secretary are the officials authorized to sign chapters covering Secretarial officers, offices reporting to the Secretary, and delegations of the Secretary's authority.  This authority may not be redelegated.

      (2)   Assistant Secretaries are authorized to sign chapters further redelegating the authorities delegated to them.  This authority may be redelegated to Deputy Assistant Secretaries.

No further redelegation is authorized.

B.    The Assistant Secretary - Policy, Management and Budget, or a properly authorized subordinate official, may sign a DM chapter in the 200-299 DM Series (Delegations), if the chapter is transferring a delegation from a Secretary's Order, without substantive change.

1.4    **Responsibilities.**

A.    <u>Management and Coordination</u>.  The Office of Planning and Performance Management under the Deputy Assistant Secretary - Performance and Management is responsible for managing the DM System, for assigning Series, Part and Chapter numbers, coordinating the review and issuance of  instructions in the DM, and for maintaining the currency and completeness of the DM.

B.    <u>Chapter Currency</u>.  The responsibilities for maintaining current policy statements in the DM, including issuing new chapters, revising existing chapters, or removing outdated chapters under the various Parts, are as follows:

(1)    Organization (Parts 100 - 199) - Secretarial Officers and heads of bureaus and offices responsible for the respective organizations.

(2)    Delegations of Authority (Parts 200 - 299) - Secretarial Officers and heads of bureaus and offices seeking specific authority.

(3)    Administrative and Program (Parts 300 - 999) - Officials in bureaus and offices responsible for the subject matter of the directive.

1.5    **Contents of the DM**. The DM includes the following:

A.    The Basic Manual

B.    DM Additions which supplement other Federal issuances that establish government-wide policies.  These include the DM Additions to the Federal Acquisition Regulations (FAR), the Federal Property Management Regulations (FPMR) and the DM Additions to the Treasury Financial Manual (TFM).  The DM Additions to the FAR, FPMR, and TFM are structured similar to the basic issuances they supplement.  Descriptions of the structure and procedures for issuing and revising additions are contained in the following DM chapters:

(1)    DM Additions to the FAR - 401 DM 1

(2)    DM Additions to the FPMR - 400 DM 1

(3)    DM Additions to the TFM - 330 DM 1

The DM also contains DOI Human Resources policies that supplement federal statutes and

authorities.

1.6    **Structure of the Basic Manual.**  The policy and guidance in the DM is organized into related subject matter categories.  There are six broad categories which are further subdivided into categories called "Series."  Each series is divided into numbered subclassifications called "Parts."  The Part numbers range from 010 to 999.  Each Part contains specific subject areas consisting of chapters.  Each chapter includes policy, procedures, instructions, etc., on a specific topic.  The chapter is the basic unit of text in the DM.  The six broad categories are described below.

     A.    Departmental Directives.  This category includes Parts 001 - 004 DM.  It includes the introductory chapters and contains the requirements and instructions for writing, reviewing, and approving policies, procedures, and guidance issued in the DM.

     B.    Organization.  This category includes Parts 100 - 199 DM.  It contains descriptions of bureau and office organizational structures and functions.

     C.    Delegation.  This category includes Parts 200 - 299 DM.  It contains statements of the authorities for Secretarial Officers and heads of bureaus and offices, including authorities delegated to these officials to perform administrative and program responsibilities.

     D.    Administration.  This category includes Parts 300 - 399 DM.  It contains policies, standards, and procedures governing the Department's administrative, legal, legislative, and informational activities.

     E.    Programs.  This category includes Parts 500 - 899 DM.  It contains policies, standards, and procedures governing specific program activities of the Department (e.g., Federal Assistance Programs, Environmental Quality Programs, Public Lands,  Water and Land Resources, etc.).

     F.    Emergency Programs.  This category includes Parts 900 - 999 DM.  It contains policies, standards, and procedures for planning and operations in emergency situations.

12/11/01 #3384
Replaces 9/14/88 #2810

# Department of the Interior
# Departmental Manual

---

**Effective Date:** 8/1/05
**Series:** Public Lands
**Part 603:** Land Withdrawal Program
**Chapter 1:** Policy and Responsibility

**Originating Office**: Bureau of Land Management

---

**603 DM 1**

1.1 **Policy**. In general, the Secretary of the Interior is vested by statute and under limited circumstances by Executive order, with the administrative responsibility for the withdrawal of lands owned or controlled by the United States for public purposes and for the modification, extension or revocation of withdrawals. The term withdrawal, as employed in this Chapter, includes not only withdrawals of public lands from the general land laws but, also, reservations, power site classifications and transfers of administrative jurisdiction. The term, however, does not include the classification of public lands for their mineral potential. The term "applicant" as used in this Chapter refers to Interior bureaus or offices filing a withdrawal application. In processing a withdrawal application, the following policy shall be observed.

    A.    All withdrawals shall be kept to a minimum consistent with the demonstrated needs of the applicants. This "demonstrated need" must accompany all applications for withdrawal. "Demonstrated need" means submitting the following:

        (1)    A 1: 24,000 topographic map(s), if available, identifying the boundaries of the proposed withdrawal and, if resources or improvements are to be protected or preserved, the location of the resource and/or improvements to be protected or preserved;

        (2)    The approximate value in dollars of any improvements that are to be placed on the withdrawn lands;

        (3)    A justification for the lands to be withdrawn--that is: how is the integrity of the resources, to be protected or preserved by a withdrawal, at risk with the active management of the lands for other public purposes? If a withdrawal is intended to protect a particular resource, a narrative describing how the resource is in terms of its rarity, significance, fragility, or irreplaceability, as well as an explanation of why existing law or regulation cannot protect or preserve the resource. If authorized, acreage will be kept to the minimum needed to protect or preserve the withdrawn resource(s).

B.     Withdrawals as to which the applications are classified for national security reasons or are subject to the Military Lands Withdrawal Act of 1958 (the Engle Act) are exempt from "A" above.

C.     Withdrawals expressly directed by federal legislation or by the Secretary of the Interior are exempt from the requirements of "A" above.

D.     Withdrawals made to transfer custody and control of federal land, i.e., to transfer administrative jurisdiction from one department, bureau or agency to another department, bureau or agency, are exempt from "A" above.

E.     In order to ensure that these policies are observed within Interior, no official or employee of any Interior bureau or office shall file a withdrawal application with the Bureau of Land Management unless and until the appropriate program Assistant Secretary for the bureau or office concerned has approved a withdrawal petition.  Where such program Assistant Secretary is other than the Assistant Secretary - Land and Minerals Management, the withdrawal petition, either with or without an accompanying application, shall be referred to the Assistant Secretary - Land and Minerals Management, for his or her comment before it is considered for approval.

F.     Unless exclusive use of the lands is required, lands shall be available for other public purposes to the fullest extent possible consistent with the purpose of the withdrawal.  The applicant for which the lands are to be withdrawn should recognize such alternative uses and, if a withdrawal is granted, be willing to undertake the management thereof while the withdrawal remains in effect.

## 1.2    **Responsibilities.**

A.     The Assistant Secretary - Land and Minerals Management is responsible for policy matters affecting land withdrawal related actions; for approving basic procedures affecting withdrawal related actions; and for establishing and maintaining relationships with other agencies necessary to the successful conduct of Interior's land withdrawal program with respect to such agencies.  All Interior directives or initiatives relating to land withdrawals shall be submitted to the Assistant Secretary - Land and Minerals Management for approval.

B.     The Bureau of Land Management is responsible for processing all withdrawal related applications or proposals; for making recommendations concerning them to the Assistant Secretary - Land and Minerals Management; for developing and conducting a withdrawal review program; for assisting applicants with their withdrawal related inquiries and needs; for devising effective, uniform operating procedures; for keeping the Assistant Secretary - Land and Minerals Management informed; and recommending to that official necessary improvements with respect to Interior's land withdrawal program.

C.     The Bureaus and Offices are responsible for careful review of all withdrawals to be proposed by them to ensure that a withdrawal is the only viable mechanism available to meet the needs of the agency.  They must ensure that the lands they ask to be withdrawn do not exceed

demonstrated minimum needs.  They are responsible for maintaining accurate and current records of all lands withdrawn for their benefit; for periodic review of such withdrawals; and for cooperating by all possible means with the Bureau of Land Management in the general administration of Interior's land withdrawal program.

1.3    **Review and Revocation of Withdrawals.**  The Bureau of Land Management, in cooperation with Interior bureaus or offices and other federal departments and agencies, is responsible for the systematic periodic review of withdrawals.  When it appears that a withdrawal no longer serves its original purpose, these entities, in cooperation with the Bureau of Land Management, shall consider the need for an appropriate revocation order.  If agreement cannot be reached on the proposed order, the matter shall be presented to the appropriate supervisory officials for settlement.  If two or more jurisdictional areas are involved, and agreement cannot be reached, the matter shall be referred to higher authority for further consideration.  This may include discussions with the head of the federal department or agency for which the withdrawal was made.

1.4    **Reports to the Assistant Secretary - Land and Minerals Management.**  At the end of every two fiscal years, the Bureau of Land Management shall report to the Assistant Secretary - Land and Minerals Management concerning developments or trends in land withdrawals related matters.  Such reports shall include acreages, purposes, and agencies for which withdrawals and restorations are made, and shall include also, when appropriate, recommendations for action by the Office of the Secretary for needed improvements to the federal land withdrawal program.

8/1/05 #3678
Replaces 4/13/76 #1876






# Handbook for Developing Watershed Plans to Restore and Protect Our Waters











*Handbook for Developing Watershed Plans to Restore and Protect Our Waters*

## 1.1   What Is the Purpose of This Handbook?

This handbook provides information on developing and implementing watershed management plans that help to restore and protect water quality. A watershed is the area of land that contributes runoff to a lake, river, stream, wetland, estuary, or bay. A watershed management plan defines and addresses existing or future water quality problems from both point sources and nonpoint sources of pollutants. Experience over the past decade has shown that effective watershed management includes active participation from stakeholders, analysis and quantification of the specific causes and sources of water quality problems, identification of measurable water quality goals, and implementation of specific actions needed to solve those problems.

> **What is a watershed?**
> A **watershed** is the area of land that contributes runoff to a lake, river, stream, wetland, estuary, or bay.

Don't be daunted by the size of this handbook! Although it is comprehensive in terms of providing resources and tools for each step of the watershed planning process, it is laid out in an easy-to-read format with shortcuts and road maps along the way so you can flip to specific sections for more in-depth information. You might not need to read all the sections if you have already completed some stages of the watershed planning process. Read the highlights at the beginning of each chapter to determine whether you can skip to the next section.

> **Watershed plans** are a means to resolve and prevent water quality problems that result from both point source and nonpoint source problems. Although the primary focus of this handbook is on waters listed as impaired under section 303(d) of the Clean Water Act, watershed plans are intended both to provide an analytic framework to restore water quality in impaired waters and to protect water quality in other waters adversely affected or threatened by point source and nonpoint source pollution.

This handbook is intended to serve as the basis for developing and implementing watershed plans to meet water quality standards and protect water resources. Although watershed plans are useful for all watersheds to protect and restore water resources, as well as to meet other community resource goals, they are critical for impaired or threatened waterbodies. The most recent national water quality assessment reported that 40 to 50 percent of the nation's assessed waterbodies are impaired or threatened. This handbook is designed to provide a framework to help you develop a scientifically defensible plan that will lead to measurable results and an overall improvement in the water quality and watershed conditions that are important to your community.

Developing watershed plans does not have to be an exhaustive, expensive endeavor. This handbook shows you how to effectively and efficiently collect the information you need to answer the right questions. The level of effort you expend preparing a watershed plan will depend on several factors, such as the available information, the size of the watershed, and the pollutants of concern.

Federal, state, and local organizations have developed many watershed guides. EPA intends for this handbook to *supplement*, rather than *replace*, those guides. ⮫ Appendix A includes a list of some watershed planning guides for your reference.





### United States
### Department of the Interior
### Bureau of Land Management



# Land Use Planning Handbook



## BLM Handbook H-1601-1

When establishing goals and objectives and making management decisions, it is also important to consider temporal scales. Some natural processes affected by decisions may occur over very long timeframes. For example, complete restoration of a degraded habitat may take much longer than the typical time span of a land use plan.

## E. Multijurisdictional Planning

Within a planning area, the BLM surface lands and subsurface mineral estate interests are often intermingled with non-Federal mineral estate, or with lands that are managed by or under the jurisdiction of Tribal, state, or local governments or other Federal agencies. As an outgrowth of these landownership patterns and responsibilities, other governmental entities and BLM have increasingly sought to coordinate their decisions and plans.

Multijurisdictional planning assists land use planning efforts where there is a mix of landownership and government authorities and there are opportunities to develop complementary decisions across jurisdictional boundaries. Planning can be accomplished for subbasins, entire watersheds, or other landscape units. A multijurisdictional plan may include both land use and implementation decisions that are germane to each jurisdiction involved in the planning effort. However, the BLM still retains authority for decisions affecting the public lands it administers. The BLM office leading or participating in a multijurisdictional plan must assure conformance with the BLM's planning regulations, as well as all other applicable laws and regulations for the BLM-administered lands. This can be accomplished by completing the notification, public review, and procedural requirements of 43 CFR 1600 and 40 CFR 1500-1508 as part of the multijurisdictional planning effort. Where BLM becomes a cooperating agency for implementation actions in conformance with the existing land use plan, the lead agency's planning process may be followed provided that NEPA requirements are met.

In cases where the BLM-administered lands make up a small part of the planning area for a multijurisdictional planning effort, it may be desirable for other jurisdictional interests to lead the planning effort. The BLM may act as a cooperating agency's facilitator, convener, leader, or participant, as appropriate, to encourage positive relationships and to develop a mutual understanding of resource conditions and multiple-use management options. In some cases, law may define the lead role. In most cases, planning procedures of Tribal, state, or local governments and other Federal agencies will differ from those of the BLM. Therefore, successful multijurisdictional planning efforts are normally guided by MOUs, which clearly delineate lines of authority and roles and responsibilities for all participants, including the BLM.

## F. Establishing Management Direction for Lands That May Come Under the BLM Jurisdiction in the Future

If it is foreseeable that the BLM will acquire management responsibility for certain parcels of land through purchase, exchange, withdrawal revocation, administrative transfers, or some other means, then the BLM can establish management direction for these lands, contingent on their acquisition, in conjunction with planning efforts on adjacent or similar BLM-administered lands.

and environmental factors.  An alternative may be considered reasonable even if it is outside the legal jurisdiction of the BLM because it may serve as the basis for modifying congressional approval in light of the analysis (40 CFR 1502.14(c); Forty Questions No. 2(b)).

c.  Each fully-developed alternative represents a different land use plan that addresses and/or resolves the identified planning issues in different ways.

d.  Each alternative will include a different suite of potential planning decisions to address the issues.  Some potential planning decisions may be common to multiple, or all alternatives.

e.  Goals typically pertain to all alternatives (will not vary by alternative).  Objectives, allowable uses, and management actions may (1) be consistent across alternatives, and/or (2) vary by alternative.  A plan could include some objectives that vary by alternative, and other objectives that are consistent across alternatives.

f.  Goals typically apply to the entire planning area.  Objectives, allowable uses, and management actions may (1) apply to the planning area as a whole, and/or (2) be specific to certain geographic areas, such as those listed below:

    1.  Landscape-level systems (such as ecosystems and watersheds);

    2.  specific resources (such as threatened and endangered species and cultural sites);

    3.  areas (such as allotments and special management units); and

    4.  areas needing restoration or maintenance in order to meet land health standards.

g.  All components of an individual alternative must be complementary.  Desired outcomes, allowable uses, and management actions can (and probably will) conflict from one alternative to the next.  However, they must not conflict within any one alternative.  For example, an alternative should not allow all lands open to oil and gas leasing while having all lands designated as Visual Resource Management Class I or II.

h.  When identifying allowable uses in alternatives, consider resource development potential, levels of use, and restrictions to best achieve the identified goals and objectives (see Analysis of the Management Situation above).  These uses and restrictions are based on resource protection needs and social and economic factors, and represent the most appropriate mix of uses and protections for the resources in the planning area.  Different protection and restoration measures and the availability of areas for certain uses, levels of uses, and restrictions are presented in alternatives.

H-1601-1 — LAND USE PLANNING HANDBOOK

**Management decision** ~ a decision made by the BLM to manage public lands. Management decisions include both land use plan decisions and implementation decisions.

**Midscale data** ~ midscale data sets support information needs at scales between the local and state/regional. Such a level is usually represented at the 1:100,000 scale. Typical usage includes land use planning, rangeland monitoring, and assessment.

**Monitoring (plan monitoring)** ~ the process of tracking the implementation of land use plan decisions and collecting and assessing data/information necessary to evaluate the effectiveness of land use planning decisions.

**Multijurisdictional planning** ~ collaborative planning in which the purpose is to address land use planning issues for an area, such as an entire watershed or other landscape unit, in which there is a mix of public and/or private land ownerships and adjoining or overlapping Tribal, state, local government, or other Federal agency authorities.

**Objective** ~ a description of a desired outcome for a resource. Objectives can be quantified and measured and, where possible, have established timeframes for achievement.

**Off-highway vehicle (off-road vehicle)** ~ any motorized vehicle capable of, or designed for, travel on or immediately over land, water, or other natural terrain, excluding: (1) any nonamphibious registered motorboat; (2) any military, fire, emergency, or law enforcement vehicle while being used for emergency purposes; (3) any vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved; (4) vehicles in official use; and (5) any combat or combat support vehicle when used for national defense.

**Open** ~ generally denotes that an area is available for a particular use or uses. Refer to specific program definitions found in law, regulations, or policy guidance for application to individual programs. For example, 43 CFR 8340.0-5 defines the specific meaning of "open" as it relates to off-highway vehicle use.

**Planning analysis** ~ a process using appropriate resource data and NEPA analysis to provide a basis for decisions in areas not yet covered by an RMP.

**Planning criteria** ~ the standards, rules, and other factors developed by managers and interdisciplinary teams for their use in forming judgments about decision making, analysis, and data collection during planning. Planning criteria streamline and simplify the resource management planning actions.

**Project plan** ~ a type of implementation plan (see *Implementation plan*). A project plan typically addresses individual projects or several related projects. Examples of project plans include prescribed burn plans, trail plans, and recreation site plans.

**Public land** ~ land or interest in land owned by the United States and administered by the Secretary of the Interior through the BLM without regard to how the United States acquired

how requirements of the Clean Air Act will be implemented (including standards to be achieved, control measures to be applied, enforcement actions in case of violation, etc.).

**Strategic plan (DOI strategic plan)** ~ a plan that establishes the overall direction for all DOI Bureaus, including the BLM.  This plan is guided by the requirements of the Government Performance and Results Act of 1993, covers a 5-year period, and is updated every 3 years.  It is consistent with FLPMA and other laws affecting the public lands.

**Total maximum daily load (TMDL)** ~ an estimate of the total quantity of pollutants (from all sources:  point, nonpoint, and natural) that may be allowed into waters without exceeding applicable water quality criteria.

**Travel management areas** ~ polygons or delineated areas where a rational approach has been taken to classify areas open, closed, or limited, and have identified and/or designated network of roads, trails, ways, and other routes that provide for public access and travel across the planning area.  All designated travel routes within travel management areas should have a clearly identified need and purpose as well as clearly defined activity types, modes of travel, and seasons or timeframes for allowable access or other limitations.

**Tribe** ~ see Indian Tribe.

**Undeveloped recreation-tourism market** ~ national, regional, and/or local recreation-tourism visitors, communities, or other constituents who value public lands for the distinctive kinds of dispersed recreation produced by the vast size and largely open, undeveloped character of their recreation settings.  Major investments in facilities are excluded within SRMAs where BLM's strategy is to target demonstrated undeveloped recreation-tourism market demand.  Here, recreation management actions are geared toward meeting primary recreation-tourism market demand to sustain distinctive recreation setting characteristics; however, major investments in visitor services are authorized both to sustain those distinctive setting characteristics and to maintain visitor freedom to choose where to go and what to do—all in response to demonstrated demand for undeveloped recreation.

**Visual resource management classes** ~ categories assigned to public lands based on scenic quality, sensitivity level, and distance zones.  There are four classes.  Each class has an objective which prescribes the amount of change allowed in the characteristic landscape.

**Watershed approach** – a framework to guide watershed management that: (1) uses watershed assessments to determine existing and reference conditions; (2) incorporates assessment results into resource management planning; and (3) fosters collaboration with all landowners in the watershed.  The framework considers both ground and surface water flow within a hydrologically defined geographical area.

2007 WL 1431907

United States District Court,

N.D. Ohio,

Eastern Division.

NORTON CONSTRUCTION CO., d/b/a Norton Environmental, Plaintiff,

v.

U.S. ARMY CORPS OF ENGINEERS, and Colonel William E. Bulen, Defendants.

No. 1:03−CV−02257.    |    May 14, 2007.

**Attorneys and Law Firms**

Orla E. Collier, Benesch, Friedlander, Coplan & Aronoff, Columbus, OH, for Plaintiff.

David S. Gualtieri, U.S. Department of Justice, Environmental Defense Section, Washington, DC, Deborah Tabor, Departmnet of the Army Corps of Engineers Huntington District, Huntington, WV, James L. Bickett, Office of the U.S. Attorney, Akron, OH, for Defendants.

*Memorandum Opinion and Order*

PATRICIA A. GAUGHAN, United States District Judge.

### INTRODUCTION

**\*1** Currently before the Court are the merits briefs of Plaintiff Norton Construction Company ("Norton") and Defendants U.S. Army Corps of Engineers and Colonel William E. Bullen (collectively "the Corps"). The parties seek a decision as to whether the Corps has properly refused to process Norton's application for a permit under the Clean Water Act ("CWA"). For the following reasons, the Court finds that the Corps is entitled to judgment on Norton's claims.

### BACKGROUND

The Court will assume familiarity with the Court's previous Orders *(See* Doc. 27, 56, 80) and the parties' Supplemental Stipulations (Doc. 83). Norton is an Ohio corporation that seeks to construct the Ridge Sanitary Landfill ("Ridge Landfill" or "the Landfill") in Tuscarawas County, Ohio, approximately three miles south of Wilmot, Ohio. In connection with its efforts to procure approval of the Landfill, Norton submitted to the Corps an application for a permit to dredge and fill certain areas of the property under Section 404(a) of the CWA, 33 U.S.C. 1344(a). Specifically, the proposed location for the Ridge Landfill includes an unnamed tributary of the South Fork of Sugar Creek. Sugar Creek eventually empties into the Tuscarawas River, which joins with the Walhonding River in Coshocton, Ohio to form the Muskingum River, which eventually empties into the Ohio River near Marietta, Ohio.

The Corps initially refused to process Norton's permit application as a result of certain federal Appropriations Riders which stated that "[n]one of the funds appropriated in this or any Act may be used by the United States Army Corps of Engineers to support activities related to the proposed Ridge Landfill in Tuscarawas County, Ohio."Norton filed a Complaint against the Corps and the Court eventually held that the Appropriations Riders violated the Equal Protection guarantee of the Fifth Amendment to the Constitution. The Corps appealed the Court's decision. While the appeal was pending, the latest Appropriations Rider expired. Congress instead passed Section 103 of Public Law No. 109–103 of the Energy and Water Development Appropriations Act, 2006, 119 Stat. 2247–2284 (Nov. 19, 2005) ("Section 103"). Section 103 states the following:

Norton Const. Co. v. U.S. Army Corps of Engineers, Not Reported in F.Supp.2d (2007)

Case: 14-17374 04/10/2015 ID: 9491805 DktEntry: 13-1 Page 272 of 278

2007 WL 1431907, 65 ERC 1920

In order to protect and preserve the integrity of the water supply against further degradation, none of the funds made available under this Act and any other Act hereafter may be used by the Army Corps of Engineers to support activities related to any proposed new landfill in the Muskingum Watershed if such landfill—

(1) has not received a permit to construct from the State agency with responsibility for solid waste management in the watershed;

(2) has not received waste for disposal during 2005; and

(3) is not contiguous or adjacent to a portion of a landfill that has received waste for disposal in 2005 and each landfill is owned by the same person or entity.

The Corps then filed a Suggestion of Mootness and Request for Vacatur with the Sixth Circuit. The Sixth Circuit agreed that the original case was moot and ordered that the judgment be vacated. Norton then requested that the Corps proceed with adjudication and processing of its Section 404 permit application. According to Norton, the Appropriations Riders had expired and Section 103 does not apply to the Ridge Landfill because it is not within the "Muskingum Watershed." The Corps disagreed that the Ridge Landfill is not within the Muskingum Watershed and refused to process the application. Norton responded by filing its Third Amended Complaint, which claims that the Corps has improperly interpreted Section 103 to cover the Ridge Landfill and that Section 103 violates the constitutional guarantees of separation of powers, equal protection, substantive due process and procedural due process. The parties have provided the Court with merits briefs as well as an extensive factual record to resolve these disputes.

## DISCUSSION

**\*2** Plaintiff first challenges the Corps' interpretation of the Muskingum Watershed of Section 103 as reaching the waters of the Ridge Landfill. If Norton's interpretation is correct, that settles the matter as Section 103 does not prohibit the Corps from processing Norton's application. However, if the Court accepts the Corps' interpretation it must then consider whether Section 103 is unconstitutional. Plaintiff claims that Section 103 violates separation of powers as well as its rights to equal protection, substantive due process and procedural due process under the Fifth Amendment to the Constitution. The Court will address each of these arguments in turn.

### The Muskingum Watershed

Norton challenges the Corps' conclusion that the Ridge Landfill falls within the Muskingum Watershed for purposes of Section 103 under the Administrative Procedures Act, 5 U.S.C. §§ 702, 706. The Corps reads the term to encompass all waters that eventually empty into the Muskingum River, including the Tuscarawas River and its respective tributaries. This definition corresponds to the traditional boundaries of the "Muskingum Watershed Conservancy District," a New Deal era flood control project. The parties agree that the Corps' interpretation covers a vast swath of the state of Ohio, including approximately 8,000 square miles (or 1/5 of Ohio's total land area) in 18 counties. Norton responds that the Muskingum Watershed is limited to the waters immediately adjacent to the Muskingum River. The United States Geological Survey ("USGS") identifies this area as the Muskingum hydrologic unit 05040004, which the USGS also refers to as the "Muskingum Watershed." Norton notes that the Ridge Landfill is located in the Tuscarawas hydrologic unit 05040001, which the USGS also refers to as the "Tuscarawas Watershed."

The final action of an administrative agency will be accepted unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). When the issue is an agency's interpretation of a statute, courts employ a two-step inquiry. Wall v. U.S. Envtl. Prot. Agency, 265 F.3d 426, 435 (6th Cir.2001). The first question the Court must always ask is whether Congress has spoken on the issue. Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842 (1984); Wall, 265 F.3d at 435. If so, there is no need to bother with questions of deference or review of administrative agencies. Chevron, 467 U.S. at 842. However, where the statute is silent or ambiguous with respect to a particular issue, the

Norton Const. Co. v. U.S. Army Corps of Engineers, Not Reported in F.Supp.2d (2007)

Case: 14-17374  04/10/2015  ID: 9491805  DktEntry: 13-1  Page 273 of 278

2007 WL 1431907, 65 ERC 1920

agency interpretation is typically subject to *Chevron* deference. The issue becomes whether the agency's conclusion is based on a permissible construction of the statute. *Chevron,* 467 U.S. at 842; *Wall,* 265 F.3d at 435. The Court need not conclude that the agency's interpretation was the only permissible one or that the Court would have rendered the same interpretation.*Chevron,* 467 U.S. at 842, n. 11.

**\*3** In making the initial determination of congressional intent, the Court may consider the language of the statute as well as its legislative history. *See Chem. Mfrs. Ass'n v. Natural Res. Def. Council, Inc.,* 470 U.S. 116, 129, 134 (examining "wording and legislative history of the statute" to determine "unambiguous congressional intent"). On its face, the term Muskingum Watershed reasonably accommodates either party's definition. Dictionary definitions such as "[t]he region draining into a river, river system, or other body of water" [1] or "the whole gathering ground of a river system" [2] are not conclusive either.

The legislative history is more revealing. In the only substantive discussion of the bill that the Court's research has uncovered, Congressman Regula of Ohio stated the following regarding "a provision in the Energy and Water Development Appropriations Act of 2006 regarding the Muskingum Watershed in Ohio":

> The Muskingum Watershed encompasses 18 counties in Ohio and includes all of the area which drains into the Muskingum River and its tributaries where it joins with the Ohio River. * * * The threat that landfills pose to the aquifer and the watershed are too great to ignore. * * * All these factors contribute to the need to protect the Muskingum Watershed and the aquifer below it. * * * Having heard from my constituents concerning the potential dangers posed by the stress of additional landfills in the Muskingum Watershed, I have made this provision one of my top priorities in Congress. I feel that the criteria set forth by the provision are fair, nondiscriminatory and of the utmost importance in preserving the quality of the aquifer for years to come.

151 Cong. Rec. H10360–01.

Congressman Regula's description of the Muskingum Watershed conforms to the Corps' interpretation and is persuasive. [3] *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 585 (1988) ("It is the sponsors [of the statute] that we look to when the meaning of the statutory words is in doubt."(quoting *NLRB v. Fruit Packers,* 377 U.S. 58, 66 (1964)). Moreover, as the Corps notes, Congress and the Corps have referred to the same area as the Muskingum Watershed Conservancy District since the New Deal era. [4]

Accordingly, the Court finds that Congressional intent is clear—Section 103 was intended to apply to the Muskingum Watershed, as defined by the Muskingum River and all waters that eventually flow into the Muskingum River. This includes the full 18–county area contemplated by the Corps, including the unnamed tributary of the South Fork of Sugar Creek found on Norton's proposed location for the Ridge Landfill. [5]

Even if the Court were to find the statute to be ambiguous, it finds that the Corps' interpretation is permissible. Before reaching the Corps' specific interpretation, the Court must first decide whether the Corps is entitled to *Chevron* deference. Norton claims that the Corps' interpretation of Section 103 is not entitled to *Chevron* deference for two reasons. The first reason is technical —namely, that Section 103 was passed as part of an appropriations bill rather than a statute which it administers. The second reason is Norton's assertion that the Corps' interpretation challenges the boundaries of congressional power.

**\*4** This is the Corps' own appropriations bill. [6] Accordingly, the Court believes that this interpretation was promulgated in the exercise of authority delegated generally to the agency. *U.S. v. Mead Corp.,* 533 U.S. 218, 226–27 (2001). Because this was an appropriations bill related to matters already delegated to the Corps, it is reasonable to assume that to the extent the Congress was not clear it implicitly delegated interpretation of Section 103 to the Corps. *See id.* at 229 (recognizing that delegation can be implicit); *Nat'l Leased Housing Ass'n v. U.S. Dept. of Hous. & Urban Dev.,* 2007 U.S. Dist. LEXIS 2859, *30–31 (D.D.C. Jan. 16, 2007) (analyzing a HUD appropriations bill under the *Chevron* standard); *Moore v. Navy Public Works Center,* 139

F.Supp.2d 1349, 1357 (N.D.Fl.2001) (applying *Chevron* deference to the Navy's interpretation of the Department of Defense Appropriations Act); *Am. Med. Ass'n v. Reno,* 857 F.Supp. 80, 84 n. 7 (D.D.C.1994) (applying *Chevron* deference to agency's interpretation of an appropriations act); *Gay Men's Health Crisis v. Sullivan,* 733 F.Supp. 619, 634 (S.D.N.Y.1989) (explaining that "this Court must defer to an agency's reasonable construction of its own enabling legislation and of the appropriations bills that fund it"). [7]

Norton is correct that courts will not extend *Chevron* deference "[w]here an administrative interpretation of a statute invokes the outer limits of Congress' power...."*Solid Waste Agency of N. Cook County ("SWANCC") v. U.S. Army Corps of Eng'rs,* 531 U.S. 159, 172 (2001). However, the Court does not agree that the Corps' interpretation of the "Muskingum Watershed" poses such a problem. Norton makes broad allusions to federalism concerns and the fact that the Corps' interpretation essentially precludes a particular land use (i.e., for landfills) throughout a large portion of the state Ohio. Norton has not, however, attempted to develop any argument that Section 103 reaches the "nonnavigable, isolated, intrastate waters" at issue in *SWANCC,* 531 U.S. at 171, or the "wetlands, which lie near ditches or man-made drains that eventually empty into traditional navigable waters" that the Supreme Court found beyond federal reach in *Rapanos v. U.S.,* 126 S.Ct. 2208, 2219 (2006). Although one might have once raised legitimate arguments that the federal government should not be allowed to regulate unnamed tributaries of small creeks, that ship set sail long ago. [8] *See Rapanos,* 126 S.Ct. at 2249 (Kennedy, J., concurring) (explaining that federal regulation of wetlands that are adjacent to tributaries and possess a significant nexus with navigable waters "will raise no serious constitutional or federalism concerns"); *see generally U.S. v. Riverside Bayview Homes, Inc.,* 474 U.S. 121 (1985); *Kaiser Aetna v. U.S.,* 444 U.S. 164, 173 (1979) (explaining that "[i]t has long been settled that Congress has extensive authority over this Nation's waters under the Commerce Clause" and that "congressional authority over the waters of this Nation does not depend on a stream's 'navigability' "). Simply put, landfills can be constructed without regard to Section 404 anywhere within the Muskingum Watershed so long as the landfill site does not have waters subject to the Corps' jurisdiction. Because the Corps' interpretation does not implicate the boundaries of federal power implicated by *SWANCC* or *Rapano*s, the *SWANCC* Court's refusal to apply *Chevron* deference is not an issue here. [9]

**\*5** Accordingly, assuming *arguendo* that the Court looks beyond congressional intent, the Court will afford the Corps the appropriate *Chevron* deference. As the Court noted above, the Muskingum Watershed Conservancy was created in cooperation with the federal government and Corps during the New Deal era to provide flood control and water conservation for the entire Muskingum River Watershed Basin, an area roughly corresponding to the Corps' definition. The Muskingum Watershed Conservancy District is still in operation to this day and released an Amendment to the Official Plan as recently as 2005. Informal definitions provided by the Corps and EPA state that a "watershed" is the area where all waters flow to a single point. The USGS equates a watershed with a "drainage basin" which is "[t]he land area drained by a river or a stream."The Corps also submits a number of newspaper articles regarding Congressman Regula's support of Section 103 which explain that the Muskingum Watershed covers the entire 18–county area contemplated by the Corps' interpretation.

Norton's best argument rests on the USGS classification of the hydrologic unit 05040004 as the Muskingum Watershed. That hydrologic unit corresponds to the area surrounding the Muskingum River, while the Ridge Landfill is located in the Tuscarawas Watershed, hydrologic unit 05040001. However, the USGS also recognizes that a watershed is akin to a drainage basin. The USGS Tuscarawas unit, Muskingum unit, Mohican unit (05040002), Walhonding unit (05040003), Wills unit (05040005) and Licking unit (05040006) all fall within the "Muskingum River Drainage Basin," which is subregion 0504 and roughly aligns with the Corps' interpretation of the Muskingum Watershed. In light of the varying scope that can be afforded the word "watershed," USGS' own understanding that a watershed can equate to a drainage basin, and the fact that the Muskingum River Drainage Basin is equivalent to Corps' understanding of the Muskingum Watershed, the USGS use of that term to also refer to a smaller hydrologic unit cannot overcome the deference due the Corps or the contrary evidence submitted by the Corps.

### *Equal Protection*

Under the Fourteenth Amendment no state shall "deny any person within its jurisdiction the equal protection of the laws."The same equal protection concepts applicable to the states under the Fourteenth Amendment are applicable to the federal

2007 WL 1431907, 65 ERC 1920

government as a component of the Due Process Clause of the Fifth Amendment. *United States v. Baker,* 197 F.3d 211, 215 & n. 1 (6th Cir.1999). With respect to equal protection, the Supreme Court has noted that nearly every statue "classifies for one reason or another, with resulting disadvantage to various groups or persons." *Romer v. Evans,* 517 U.S. 620, 631 (1996). Accordingly, where a statute does not burden a fundamental right or target a suspect class, the legislative classification must merely bear some rational relation to a legitimate end. *Id.* The parties do not dispute that Section 103 is subject to this "rational basis" review.

**\*6** The requirement that there be a relationship between the classification adopted and some legitimate end gives substance to the Equal Protection clause. *Romer,* 517 U.S. at 632. However, a law does not run afoul of the rational basis test simply because the Court finds that it is "unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous."*Id.* Courts are "very reluctant ... to closely scrutinize legislative choices as to whether, how, and to what extent [government] interests should be pursued."*City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 441–42 (1985). Accordingly, "[t]hose seeking to invalidate a statute using rational basis review must 'negative every conceivable basis that might support it.' " *Craigmiles v. Giles,* 312 F.3d 220, 224 (6th Cir.2002) (quoting *Lehnkausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364 (1973)). The legislature's actual reasoning is irrelevant to rational basis review and the government's burden is satisfied by "rational speculation ... unsupported by evidence or empirical data." *Craigmiles,* 312 F.3d at 224 (quoting *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313 (1993)). Courts are "not bound by the explanations of the statute's rationality that may be offered by litigants or other courts." *Kadramas v. Dickinson Public Schools,* 487 U.S. 450, 463 (1988).

The parties do not dispute that the stated goal of protecting and preserving the integrity of the water quality of the Muskingum Watershed against further degradation is legitimate. Norton simply challenges whether Section 103 is rationally related to this purpose.

Norton first argues that Section 103 improperly enacts a "barrier to a Section 404 permit based *solely* on a particular land *use* rather than any particular *impact* that *use* may have on waters subject to the Corps' jurisdiction."(Doc. 84 p. 19) (emphasis in original). Norton then cites the CWA, *SWANCC,* and *Rapanos* for the proposition that the states retain the power to regulate land use. From this Norton posits that a distinction based on a land's use is wholly irrelevant to the achievement of the purported purpose of protecting the water quality in the Muskingum Watershed. The Court disagrees. A Section 404 permit, by definition, only relates to waters that the Corps is permitted to regulate. Any land use that requires a Section 404 permit potentially impacts those waters. Of course, the Court must still decide whether the particular "use" set out in Section 103 is rationally related to a legitimate end. However, there is nothing wrong with basing Section 103 on a land use *per se.*

Norton's other arguments address the issue of whether it was proper to single out proposed new landfills in the Muskingum Watershed. Norton first notes that the Muskingum Watershed, as interpreted by the Corps, encompasses a very large area with a variety of land and water uses, numerous water bodies of varying water quality, and varying social, economic and environmental conditions. Norton contends that Section 103 is improper because it "cannot rationally be argued that the purpose of the prohibition is to protect some identifiable waters subject to the Corps' jurisdiction" and "[t]here is obviously significant land within the 'Muskingum Watershed' that is well suited to the siting of a 'proposed new landfill.' " (Doc. 84 p. 20). As for the former point, the Court finds it reasonable to assume that any new landfill that requires a Section 404 permit, placed anywhere within the Muskingum Watershed, would implicate water quality concerns in that area and beyond. Again, a Section 404 permit is only required where the Corps has the power to regulate. The Court also finds it self-evident that a landfill in particular has a potential to impact water quality. Although not necessary to save the legislation, this is supported by evidence submitted by the Corps. As for the latter point, Norton seems to be questioning the wisdom of Section 404. However, "[e]ven foolish and misdirected provisions are generally valid if subject to rational basis review." *Craigmiles,* 312 F.3d at 223–24.

**\*7** Norton's next argument challenges the fact that there is no prohibition on Section 404 permits for the expansion of existing landfills to areas which are contiguous or adjacent to these landfills. It notes that there are already 26 solid and hazardous waste facilities in the Muskingum Watershed used for a variety of waste disposal purposes. The Court disagrees that this implicates equal protection concerns. The only issue is whether the restriction of Section 103 is reasonably related to a legitimate end. Congress is not required to take an "all or nothing" approach when legislating. *See 37712, Inc. v. Ohio Dept. of Liquor Control,*

Norton Const. Co. v. U.S. Army Corps of Engineers, Not Reported in F.Supp.2d (2007)

2007 WL 1431907, 65 ERC 1920

Case: 14-17374  04/10/2015  ID: 9491805  DktEntry: 13-1  Page 276 of 278

113 F.3d 614, 622 (6th Cir.1997) (holding that a distinction based on establishments' liquor licenses is proper and that it is not necessary to adopt an "all or nothing" approach). Moreover, it is not difficult to find legitimate reasons for distinguishing between existing and new facilities, such as to limit the number of potential pollution sources.

Norton's final argument is that Section 103 fails to address any other use, proposed or existing, either within the Muskingum Watershed or elsewhere in the United States. However, "the legislature must necessarily engage in a process of line drawing," *Beach,* 508 U.S. at 315, and here those lines—proposed new landfills in the Muskingum Watershed—have been drawn in a reasonable manner. As Norton notes in other contexts, Section 103 is not particularly narrow. Even if it was, the "legislature must be allowed leeway to approach a perceived problem incrementally." *Beach,* 508 U.S. at 316; *see also Nixon v. Administrator of Gen'l Servs.,* 433 U.S. 425, 471 n. 33 (1977) ("[M]ere underinclusiveness is not fatal to the validity of a law under the equal protection component of the Fifth Amendment, ... even if the law disadvantages an individual or identifiable members of a group.").

The simple fact is that it is reasonable to conclude that Section 103 serves the stated purpose of protecting and preserving the integrity of the water quality of the Muskingum Watershed against further degradation. [10] Although rational basis review "is not toothless," *Peoples Rights Org., Inc. v. City of Columbus,* 152 F.3d 522, 532 (6th Cir.1998), the "very fact that [the impacts of new landfills] are 'arguable' is sufficient, on rational-basis review, to 'immunize' the legislative choice from constitutional challenge." *Heller v. Doe,* 509 U.S. 312, 333 (1993) (citations omitted).

### Due Process

Norton's substantive and procedural due process claims fail for at least two reasons. First, Norton concedes that "[i]n deciding whether legislation violates substantive and procedural due process, the Sixth Circuit has applied the same 'rational basis' standard that has been applied to equal protection claims."(Doc. 84, p. 23; Doc. 88, p. 19). Because the Court finds that the rational basis standard is met, Norton's due process claims fail. Second, Norton has failed to identify a protected property interest for substantive or procedural due process analysis.

**\*8** A due process violation requires "the existence of a constitutionally-protected property or liberty interest." *Silver v. Franklin Township,* 966 F.2d 1031, 1036 (6th Cir.1992). In the context of property-related permits, a plaintiff must demonstrate a "legitimate claim of entitlement" or "a justifiable expectation" that the plan will be approved. *Gen'l Motors Eng'rs & Assoc., Inc. v. West Bloomfield Township,* 922 F.2d 328, 331 (6th Cir.1990). A plaintiff cannot do so where the reviewing body has discretion—i.e, where approval of the particular use is not mandatory even though certain minimal requirements are met. *Silver,* 966 F.2d at 1036. In this case, while the Court has found that without Section 103 the Corps would be obligated to *process* the application, under the governing law and regulations the Corps' has sufficient discretion as to whether the application is *granted* such that a Section 404 permit cannot be considered a property right.

Norton relies on *Logan v. Zimmerman Brush Co.* as supporting its due process claims. 455 U.S. 422 (1982). However, *Logan* applied the same standard. *See id.* at 430 (explaining that "property ... is an individual entitlement grounded in state law, which cannot be removed except 'for cause' "). The right the *Logan* plaintiff asserted was compared to numerous preexisting rights found to create a property interest, such as disability benefits or a high school education. *Id.* at 431. Based on these comparisons, the Supreme Court found that the state-created right to redress discrimination was similar to those property rights in that it could "be surrendered for value." *Id.* Here, by contrast, Norton claims a bare right to the Section 404 procedure, and does not contend that this right is akin to a cause of action with a present value as in *Logan.* [11]

### Separation of Powers

Norton challenges Section 103 as a violation of separation of powers. In short, Norton claims that under the Corps' interpretation of Section 103 Congress has usurped the role of the executive branch in implementing and executing laws. The Constitution

Norton Const. Co. v. U.S. Army Corps of Engineers, Not Reported in F.Supp.2d (2007)

Case: 14-17374, 04/10/2015, ID: 9491805, DktEntry: 13-1 Page 277 of 278

2007 WL 1431907, 65 ERC 1920

requires that "Congress play no direct role in the execution of the laws." *Bowsher v. Synar,* 478 U.S. 714, 736 (1986). As the Supreme Court has explained:

> [I]n determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions. *United States v. Nixon,* 418 U.S. [683,] 711–712 [ ( 1974) ]. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress. *Ibid.*

*Nixon v. Adm'r of Gen. Servs.,* 433 U.S. 425, 443 (1977).

The passage of a broad prohibition in an appropriations bill does not implicate the type of separation of powers concerns prohibited in earlier cases. The legislation was properly passed by both houses of Congress and signed by the President. It is undisputed that Congress has plenary power over appropriations and Congress regularly exercises this power to prevent the expenditure of federal funds for certain activities. *See, e.g., Amron, Inc. v. U.S. Army Corps of Eng'rs,* 809 F.2d 979, 991 & n. 8 (3d Cir.1986) (describing the "enormous authority" of Congress to dictate actions through "the power of the purse"); *Walker v. United States HUD,* 912 F.2d 819, 829 (5th Cir.1990) (noting that "any exercise of a power granted by the Constitution to one of the other Branches of Government is limited by a valid reservation of congressional control over funds in the Treasury" (quoting *Office of Personnel Mgmt. v. Richmond,* 496 U.S. 414, 425 (1990))). Separation of powers does not prohibit Congress from controlling the execution of laws by passing new legislation. *Bowsher,* 478 U.S. at 734 (citing *Immigration & Naturalization Serv. v. Chadha,* 462 U.S. 919, 958 (1983)). What Congress cannot do is *retain* control over the execution of laws through its own offices or in the form of a legislative veto. *See Chadha,* 462 U.S. at 952 (holding that an effective one-house veto over deportation decisions was improper); *Bowsher,* 478 U.S. at 726 (holding that it is improper for "the execution of the laws to be vested in an officer answerable only to Congress"). Finally, Norton challenges Section 103 as an attempt to dictate the outcome of a pending proceeding. However, Norton has cited no cases that are applicable to a broad appropriations bill as opposed to a specific attempt to dictate a result in a particular proceeding. Accordingly, the Court declines to find that Section 103 violates separation of powers.

## *CONCLUSION*

**\*9** For the foregoing reasons, the Court finds that the Corps is entitled to judgment on all of Norton's claims.

IT IS SO ORDERED.

## **Parallel Citations**

65 ERC 1920

## Footnotes

1    American Heritage Dictionary of the English Language (4th Ed.2000).
2    The Compact Oxford English Dictionary at 2277 (2d ed.1998).
3    The Court notes that courts do not afford great deference to congressional statements, even of a bill's sponsor, in all instances. This is typically when a bill was subject to significant debate or the statements of the legislator are contrary to the unambiguous text. Here, Congressman Regula's statements conform to an acceptable meaning of Muskingum Watershed, were not debated, and were within the Congressman's understanding as the representative for the impacted area.
4    Relatively recent legislation utilizes this term. *See* 150 Cong. Rec. H10235–01 (providing $300,000 for the "Muskingum Watershed Conservancy District"); 149 Cong. Rec. H3701–01.
5    The Court is not unaware that the USGS has a water classification unit of the Muskingum Watershed corresponding to the narrow interpretation submitted by Norton. However, in light of the clear evidence of Congressional intent and the lack of any evidence to

**Norton Const. Co. v. U.S. Army Corps of Engineers, Not Reported in F.Supp.2d (2007)**

Case: 14-17374, 04/10/2015, ID: 9491805, DktEntry: 13-1 Page 278 of 278

2007 WL 1431907, 65 ERC 1920

tie the USGS definition to Section 103, the Court does not find the USGS definition to be particularly relevant. Moreover, as the Court will explain *infra,* the USGS definition does not carry great persuasive weight in any event.

6 Norton also argues that Section 103 should not be given deference because it "repeals" Section 404 of the CWA. However, as the Corps notes, the appropriations rider does not actually repeal Section 404 and the Corps' regulations account for situations where action on a permit is prohibited by law.

7 *But see Ass'n of Civilian Technicians v. Federal Labor Relations Authority,* 370 F.3d 1214, 1222 (D.C.Cir.2004) (explaining that "the court owes no deference to FLRA's interpretation of the appropriations act"). The *Civilian Technicians Court cites Kempenich v. Federal Labor Relations Authority,* 269 F.3d 1119 (D.C.Cir.2001). However, the *Kempenich* court refused to employ *Chevron* deference because the specific appropriations rider being interpreted—the Department of Defense Appropriations Act—was "a statute not committed to the [Fair Labor Relations] Authority's administration." *Id.* at 1121.

8 It might be said that the Norton's federalism argument misses the boat entirely. Indeed, a federal moratorium on Section 404 permits throughout Ohio for all Ohio land uses would have little impact on Ohio's ability to regulate land use absent the expansive jurisdiction granted by Congress to regulate the "waters of the United States," the Corps' expansive reading of that grant, and until recently, the judiciary's acquiescence that such a broad grant of federal power is constitutional. *See Rapanos,* 126 S.Ct. at 2223–24 (plurality opinion). The inevitable consequence of Congressional exercise of such broad federal power is a reduction in state autonomy. *Cf. Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 290 (1981) (explaining that under the Commerce Clause "Congress could have enacted a statute prohibiting any state regulation of surface coal mining").

9 To the extent that Norton argues that the Corps' interpretation invokes the outer limits of congressional power for reasons related to equal protection, procedural or substantive due process, or separation of powers, the Court notes that Norton has not demonstrated that its alternative interpretation remedies these alleged constitutional infirmities except as applied to Norton. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 577 (seeking "another interpretation, *not raising these serious constitutional concerns,* that may fairly be ascribed to" the statute (emphasis added)). Even under Norton's interpretation of Muskingum Watershed Congress has prohibited the Corps' from processing applications for any new landfills over a significant area.

10 This is not only reasonable, but likely. This case is quite different from instances where there was another alternative reason which was both clear and improper. *See Romer,* 517 U.S. at 634–35 (holding that a Colorado law "classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else"); *City of Cleburne,* 473 U.S. at 450 (holding that "requiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded" rather than the stated reason of avoiding concentration of population and lessening congestion); *Craigmiles,* 312 F.3d at 229 (explaining that the "proffered explanations for the" law were "pretextual" and the purpose was "to raise a fortress protecting the monopoly rents that funeral directors extract from consumers").

11 In another case cited by Norton an actual federal cause of action was at issue. *Societe Internationale v. Rogers,* 357 U.S. 197, 209 (1958). Norton also cites *Taylor v. U.S. Army Corps of Eng'rs,* 567 F.2d 1332 (5th Cir.1978), for the proposition that "Federal courts have long held that the adjudication of permit applications under Section 404 of the Clean Water Act is subject to procedural due process scrutiny."However, that case briefly considered and rejected an argument that the Corps' procedures run afoul of due process.

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.