**No. 14-17350**

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

NATIONAL MINING ASSOCIATION,
*Plaintiff-Appellant,*

v.

S.M.R. JEWELL, Secretary of Interior, et al.,
*Defendants-Appellees,*

and

GRAND CANYON TRUST, et. al.,
*Intervenors-Defendants-Appellees.*

*On Appeal from the United States District Court for the District of Arizona*

## OPENING BRIEF OF APPELLANT NATIONAL MINING ASSOCIATION

R. Timothy McCrum
Thomas R. Lundquist
Dawn K. Miller
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: 202-624-2500
Facsimile: 202-628-5116
rmccrum@crowell.com
tlundquist@crowell.com

Counsel for Plaintiff-Appellant
April 10, 2015                    National Mining Association

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, the National Mining Association states that it has no parent corporation, and there is no corporation that owns 10% or more of its stock.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF CONTENTS ..................................................................................... iii

TABLE OF AUTHORITIES ............................................................................... vi

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF JURISDICTION .......................................................................2

STATEMENT OF THE ISSUES ............................................................................2

CONSTITUTIONAL AND STATUTORY PROVISIONS .....................................3

STATEMENT OF FACTS AND STATEMENT OF THE CASE ...........................3

      I.     Legal Background ...................................................................................3

           A.    Historical Conditions Driving FLPMA's Enactment .................3

           B.    Enactment of FLPMA Withdrawal Authority ...........................5

      II.    Factual Background ...............................................................................8

      III.   District Court Proceedings ..................................................................10

SUMMARY OF ARGUMENT ............................................................................12

STANDARD OF REVIEW .................................................................................16

ARGUMENT ......................................................................................................17

      I.     The Legislative Veto In FLPMA Section 204(c) Is Unconstitutional. ...................................................................................17

      II.    All Of The Integrated Section 204(c)(1) Provision Should Be Severed. ................................................................................................17

           A.    The FLPMA Statutory Text Strongly Supports Severing Both the Section 204(c)(1) Veto And the Discretionary

Large-Tract Withdrawal Authority That the Veto Was Meant To Constrain. ..........................................20

1. Section 707's Requirement That the Entirety of the Relevant "Provision" Be Severed...................20

2. FLPMA's Policy Statements ..........................................23

3. FLPMA's Repudiation of *Midwest Oil* ..........................24

4. Section 204's Delegation of Limited, Conditional Withdrawal Authority...................................25

5. Section 202(e)'s Supplemental Requirement That Withdrawals Comport With Section 204 ......................32

6. Summary.......................................................33

B. FLPMA's Structure Further Demonstrates That the Legislative Veto Is Not Severable from Section 204(c)(1). .....33

C. FLPMA's Legislative History Strongly Supports Striking All of Section 204(c)(1). ...........................................37

1. Legislative History Confirms That Congress Would Not Have Intended Section 204(c)(1) to Survive the Veto's Unconstitutionality.............................37

2. Pre-FLPMA History Further Reflects Congress's Foremost Interest in Restricting Executive Withdrawals and Exercising Ultimate Control. .............44

D. The Separation of Powers and Property Clause Issues Implicated in This Case Further Reinforce That This Court Should Sever All of Section 204(c)(1). ....................................46

E. Neither the Remaining Procedural and Non-Substantive Constraints in Section 204(c) Nor Prior Practice Supports Severing Anything Less Than the Entirety of Section 204(c)(1)......................................................48

1. The Section 204(c)(2) Procedural Notices Provide No Meaningful Constraint...................................48

iv

2.  A New Formal Statute Is Not a Realistic "Check" On Executive Withdrawal Authority.....................................52

3.  Prior Practice Under Section 204(c) Does Not Warrant Only Severing the Legislative Veto. ................53

F.  Summary ...................................................................................54

CONCLUSION ........................................................................................56

CERTIFICATE OF COMPLIANCE ......................................................57

STATEMENT OF RELATED CASES .................................................57

CERTIFICATE OF SERVICE .............................................................58

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ala. Power Co. v. U.S. Dep't of Energy*,
  307 F.3d 1300 (11th Cir. 2002) .........................................................34

*Alaska Airlines, Inc. v. Brock*,
  480 U.S. 678 (1987) ..............................................................*passim*

*Am. Fed'n of Gov't Employees v. Pierce*,
  697 F.2d 303 (D.C. Cir. 1982) ......................................................49, 52

*City of New Haven v. United States*,
  809 F.2d 900 (D.C. Cir. 1987) ........................................................*passim*

*Ctr. for Biological Diversity v. Salazar*,
  706 F.3d 1085 (9th Cir. 2013) ...........................................................7

*Dorchy v. Kansas*,
  264 U.S. 286 (1924) ...............................................................29, 34

*EEOC v. CBS, Inc.*,
  743 F.2d 969 (2d Cir. 1984) ............................................................52

*Farrell v. CIR*,
  136 F.3d 889 (2d Cir. 1998) ............................................................29

*INS v. Chadha*,
  462 U.S. 919 (1983) ..............................................................*passim*

*Kidd v. U.S. Dep't of Interior*,
  756 F.2d 1410 (9th Cir. 1985) ..........................................................47

*Marks v. United States*,
  430 U.S. 188 (1977) ....................................................................31

*McComish v. Bennett*,
  611 F.3d 510 (9th Cir. 2010) ...........................................................17

vi

*McCorkle v. United States*,
   559 F.2d 1258 (4th Cir. 1977) ...........................................................52

*Miller v. Albright*,
   523 U.S. 420 (1998).................................................................*passim*

*Nat'l Wildlife Fed'n v. Watt*,
   571 F. Supp. 1145 (D.D.C. 1983)......................................................50

*Nguyen v. INS*,
   533 U.S. 53 (2001)...................................................................*passim*

*Nicklos Drilling Co. v. Cowart*,
   907 F.2d 1552 (5th Cir. 1990) ..........................................................25

*NLRB v. Noel Canning*,
   134 S. Ct. 2550 (2014)....................................................................54

*Planned Parenthood of Ctr. Mo. v. Danforth*,
   428 U.S. 52 (1976)................................................................14, 22, 34, 49

*PlayMedia Systems, Inc. v. Am. Online, Inc.*,
   171 F. Supp. 2d 1094 (C.D. Cal. 2001) ............................................29

*RadLAX Gateway Hotel v. Amalgamated Bank*,
   132 S. Ct. 2065 (2012)....................................................................30

*Regan v. Time, Inc.*,
   468 U.S. 641 (1984).................................................................35, 49

*Shell Oil Co. v. Manley Oil Corp.*,
   124 F.2d 714 (7th Cir. 1941) ............................................................29

*Spokane Arcades, Inc. v. Brockett*,
   631 F.2d 135 (9th Cir. 1980), *aff'd*, 454 U.S. 1022 (1981)................29

*State of New Mexico v. Watkins*,
   969 F.2d 1122 (D.C. Cir. 1992)........................................................49

*Texas Monthly, Inc. v. Bullock*,
   489 U.S. 1 (1989)............................................................................54

*Thomas v. Union Carbide Agric. Products Co.*,
473 U.S. 568 (1985)..............................................................21

*United States v. California*,
332 U.S. 19 (1947)...............................................................47

*United States v. Diaz-Gomez*,
680 F.3d 477 (5th Cir. 2012) ..............................................25

*United States v. Jackson*,
390 U.S. 570 (1968)..............................................................29

*United States v. Midwest Oil Co.*,
236 U.S. 459 (1915)...................................................*passim*

*United States v. Spokane Tribe of Indians*,
139 F.3d 1297 (9th Cir. 1998) ............................................29

*United Station Assocs., LLC v. Puget Sound Energy, Inc.*,
238 F. Supp. 2d 1218 (W.D. Wash. 2002) ........................25

*W. States Med. Ctr. v. Shalala*,
238 F.3d 1090 (9th Cir. 2001) ....................................16, 44

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952).............................................................54

**Statutes**

5 U.S.C. § 702 ...........................................................................2

8 U.S.C. § 1421(d) .............................................................26, 28

28 U.S.C. § 1291 .......................................................................2

28 U.S.C. § 1331 .......................................................................2

30 U.S.C. § 22 .......................................................................6, 32

30 U.S.C. § 28f ..........................................................................7

42 U.S.C. § 10222 ...................................................................34

43 U.S.C. § 1701(a) ................................................................23

43 U.S.C. § 1701(a)(4)..................................................................5, 13, 23

43 U.S.C. § 1701 Note .....................................................................18, 20

43 U.S.C. § 1712(e)(3).............................................................................32

43 U.S.C. § 1714(a) ...............................................................5, 13, 25, 28

43 U.S.C. § 1714(c)(1)....................................................................*passim*

43 U.S.C. § 1714(c)(2)...............................................................6, 49, 51

43 U.S.C. § 1714(d) ....................................................................6, 31, 33

43 U.S.C. § 1714(e) ......................................................6, 32, 33, 36, 55

43 U.S.C. § 1714(f).................................................................................51

43 U.S.C. § 1732(b) .................................................................................7

Act of February 26, 1919, 40 Stat. 1175 (1919)....................................8

Arizona Wilderness Act of 1984, Pub. L. No. 98-406, 98 Stat. 1485,
    1488, 1490, 1494 (1984)....................................................................9

Arizona Wilderness Act of 1990, Pub. L. No. 101-628, 104 Stat. 4469
    (1990)....................................................................................................9

Clean Air Act, 42 U.S.C. § 7401 *et seq.* ...............................................7

Clean Water Act, 33 U.S.C. § 1251 *et seq.*............................................7

Endangered Species Act, 16 U.S.C. § 1531, *et seq.* ...............................7

FLPMA, Pub. L. No. 94-579, § 704(a), 90 Stat. 2743, 2792 (1976)..................5, 24

Grand Canyon National Park Enlargement Act, Pub. L. No. 93-620,
    88 Stat. 2089 (1975)...........................................................................8

National Environmental Policy Act, 42 U.S.C. § 4332 ........................7, 9

National Historic Preservation Act, 16 U.S.C. § 470 *et seq.* ..................7

Pub. L. No. 88-606, § 2, 78 Stat. 982 (1964)............................................4

ix

Pub. L. No. 414, § 406, 66 Stat. 163, 281 (1952) ...................................26

Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.* ..................................7

Surface Resources Act of 1955, 30 U.S.C. § 612 ....................................7

**Rules & Regulations**

36 C.F.R. Part 228, Subpart A. .............................................................7

43 C.F.R. Subpart 3809..........................................................................7

Fed. R. App. P. 4(a)(1)(B) .....................................................................2

**Constitutional Provisions**

U.S. Const. art. IV, § 3, cl. 2..............................................................3, 46

**Legislative Materials**

122 Cong. Rec. 23,436 (1976) ..............................................................41

122 Cong. Rec. 23,436-37 (1976)..........................................................15

122 Cong. Rec. 23,440 (1976).........................................39, 40, 41, 42

122 Cong. Rec. 23,452 (1976)...............................................................40

74 Fed. Reg. 35,887 (July 21, 2009)......................................................9

77 Fed. Reg. 2,563 (Jan. 18, 2012) ........................................................9

H.R. 13777, 94th Cong. (2d Sess. 1976) ..............................................39

H.R. Rep. No. 94-1163 (1976)........................................................23, 39

H.R. Rep. No. 94-1724 ..................................................................38, 39

**Other Authorities**

Charles F. Wheatley, Jr., *Withdrawals under the Federal Land Policy Management Act of 1976*, 21 ARIZ. L. REV. 311, 319 (1979) ...................45, 46

George Coggins & Robert Glicksman, PUBLIC NATURAL RESOURCES LAW § 4:3 (2d. ed. 2011) ..............................................................20, 29

National Research Council, *Hardrock Mining on Federal Lands* at 5 (Nat'l Acad. Press 1999)...........................................................................7

Prof. David H. Getches, *Managing the Public Lands: The Authority of the Executive to Withdraw Lands*, 22 NAT. RESOURCES J. 279, 329 (1982)..................................................................................................19

Prof. Robert L. Glicksman, *Severability and the Realignment of the Balance of Power over the Public Lands: The Federal Land Policy and Land Management Act*, 36 HASTINGS L. J. 1 (1984) ...........................*passim*

*Secretarial Powers Under the Federal Land Policy and Management Act of 1976: Excessive Use of Section 204 Withdrawal Authority by the Clinton Administration; Joint Oversight Hearing Before the Subcomm. on National Parks and Public Lands and Subcomm. on Energy and Mineral Resources of the H. Comm. on Resources*, 106th Cong. 44 (1999) .......................................................................53

## PRELIMINARY STATEMENT

The National Mining Association ("NMA") challenges the withdrawal by the Secretary of the Interior ("Secretary") of over one million acres of public lands under Federal Land Policy and Management Act of 1976 ("FLPMA") section 204(c). This withdrawal closed much of the nation's highest-grade uranium deposits to new mineral exploration and development. The district court found – and <u>all</u> parties agreed – that section 204(c)(1)'s reservation of unilateral Congressional authority to terminate a withdrawal constitutes a "legislative veto" in violation of the Presentment Clause of the U.S. Constitution. *See* Excerpts of Record ("ER") 19; *INS v. Chadha,* 462 U.S. 919 (1983). The primary issue before this Court and the court below is whether the entire unconstitutional 204(c)(1) provision, including the integrated withdrawal authority, should be severed, such that the challenged withdrawal should be set aside.

The court below concluded that the unconstitutional legislative veto, standing alone, could be excised from section 204(c)'s delegation of withdrawal authority. NMA urges reversal. FLPMA's language, structure, and legislative history demonstrate that Congress would <u>not</u> have authorized the Secretary to make long-term, infinitely renewable, unlimited-acreage withdrawals without Congressional oversight in the form of a legislative veto. Section 204(c)(1) would

"function in a *manner* consistent with the intent of Congress," *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987) (emphasis in original), only by striking section 204(c)(1) in its entirety. This would mean that only Congress could withdraw greater than 5,000 acres through legislation, but would leave intact the Secretary's authority to withdraw "small" acreages and to issue short-term emergency withdrawals to preserve legislative policy options for Congress.

## STATEMENT OF JURISDICTION

NMA brought suit in the district court under 28 U.S.C. § 1331 and the Administrative Procedure Act, 5 U.S.C. § 702. The district court entered final judgment for the defendants. ER1-2. This Court has jurisdiction under 28 U.S.C. § 1291. NMA filed a timely notice of appeal from the September 30, 2014 judgment on November 25, 2014. ER88-89; Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF THE ISSUES

This case concerns the effect of the unconstitutional legislative veto embedded in FLPMA's large-tract withdrawal provision on the scope of the Secretary's withdrawal authority. FLPMA section 204(c)(1) permits the Secretary to withdraw 5,000 or more acres of public lands from the operation of the federal mining laws, but only under the specific condition that such withdrawals be subject to a "veto" by Congress. Since FLPMA's enactment in 1976, legislative vetoes like that in section 204(c)(1) have been held unconstitutional for failure to adhere

2

to Article I procedures, including presentment to the President. *See Chadha*, 462 U.S. 919. This appeal presents the following issue:

- Does the integration of the Secretary's section 204(c)(1) large-tract withdrawal authority with an unconstitutional legislative veto mean that all of section 204(c)(1), including Congress's delegation of withdrawal authority, must be struck down?

## CONSTITUTIONAL AND STATUTORY PROVISIONS

The pertinent Constitutional and statutory provisions are set forth in NMA's Addendum to this brief.

## STATEMENT OF FACTS AND STATEMENT OF THE CASE

## I.   Legal Background

### A.   Historical Conditions Driving FLPMA's Enactment

The Constitution's Property Clause vests Congress with plenary authority over management and regulation of the federal public lands. U.S. Const. art. IV, § 3, cl. 2. Although the Constitution delegated this authority to Congress alone, the Executive Branch throughout history carried out "hundreds" of withdrawals under what the Supreme Court determined was implied authority conferred through "the acquiescence of Congress." *United States v. Midwest Oil Co.*, 236 U.S. 459, 483 (1915).

3

In view of such past withdrawals, Congress directed the bipartisan Public Land Law Review Commission ("PLLRC") to conduct a "comprehensive review" of the public land laws and the practices of federal land managing agencies and to "determine whether and to what extent revisions thereof are necessary." Pub. L. No. 88-606, § 2, 78 Stat. 982 (1964). The PLLRC's report to the Congress discussed the "Withdrawals Problem" at length, observing that withdrawals "have been used by the Executive in an uncontrolled and haphazard manner." *See* ER94 (Excerpts from *One Third of the Nation's Land—A Report to the President and to Congress* ("PLLRC Report") at 43 (1970)). The PLLRC took note of the *Midwest Oil* precedent and the resultant lack of limitations on land withdrawals. ER94-95 (PLLRC Report at 43-44). As to any Congressional authorization for future executive withdrawals, the PLLRC emphasized:

> [T]his authority should be limited and exercised only within prescribed statutory guidelines. In the exercise of its land management functions, the executive branch is an agent of Congress and, as with any other agent, the extent of its power and authority should be clearly defined.

ER98-99 (PLLRC Report at 54-55) (emphases added).

The PLLRC's overriding message was as follows:

> We find that when proposed land uses are passed on by the Congress, they receive more careful scrutiny in the executive branch before being recommended[.] …. We conclude that Congress should not delegate broad authority for these types of actions.
>
> We, therefore, recommend that:

4

Congress assert its constitutional authority by enacting legislation reserving unto itself exclusive authority to withdraw or otherwise set aside public lands for specified limited-purpose uses and <u>delineating specific delegation of authority to the Executive as to the types of withdrawals and set asides that may be effected without legislative action</u>.

ER93 (PLLRC Report at 2) (emphases added).

## B.    <u>Enactment of FLPMA Withdrawal Authority</u>

Consistent with the PLLRC Report, FLPMA contains numerous provisions exerting legislative control over executive withdrawal authority.  For example, FLPMA asserts "the policy of the United States that … the Congress exercise its constitutional authority to withdraw … Federal lands for specified purposes and that Congress <u>delineate the extent to which the Executive may withdraw lands without legislative action</u>."  43 U.S.C. § 1701(a)(4) (emphasis added).

To carry out this policy, FLPMA section 704(a) first "repeal[s]" 29 statutes and expressly revokes the "implied authority of the President to make withdrawals and reservations resulting from acquiescence of the Congress (*U.S. v. Midwest Oil Co.*, 236 U.S. 459)."  Pub. L. No. 94-579, 90 Stat. 2743, 2792 (1976).

FLPMA section 204 next delimits the scope of executive withdrawal authority to be permitted under the statute.  Section 204(a) provides that the "Secretary is authorized to make … withdrawals <u>but **only** in accordance with the provisions and limitations of this section</u>."  43 U.S.C. § 1714(a) (emphases added).

5

Section 204(e) provides the Secretary with authority to make "emergency" withdrawals under certain circumstances, effective for no more than three years. 43 U.S.C. § 1714(e). Section 204(d) provides general authority for "withdrawal aggregating less than five thousand acres … by the Secretary on his own motion" and without legislative oversight. 43 U.S.C. § 1714(d).

In contrast to these small-tract and emergency withdrawal authorities, FLPMA section 204(c) subjects withdrawal of 5,000 acres or more to legislative control. The Secretary, upon withdrawing more than 5,000 acres, "shall notify both Houses of Congress of such a withdrawal." 43 U.S.C. § 1714(c)(1). The "withdrawal shall terminate and become ineffective at the end of ninety days …, if the Congress has adopted a concurrent resolution stating that such House does not approve the withdrawal." *Id.* Additionally, if the Secretary withdraws 5,000 acres or more, FLPMA section 204(c)(2) requires the Secretary contemporaneously to provide Congress with notice and detailed information on the withdrawal. 43 U.S.C. § 1714(c)(2).

FLPMA withdrawals remove the subject federal lands from the operation of the Mining Law of 1872, as amended. The Mining Law declares that "all valuable mineral deposits in [federal lands] … shall be free and open to exploration and purchase." 30 U.S.C. § 22. In subsequent legislative actions, Congress has retained this concept that mineral deposits on public lands be "free and open" to

6

mineral development: (1) except where the legislature has expressly provided
otherwise, such as in National Parks and Congressionally designated Wilderness
Areas; and (2) subject to environmental protections and maintenance fees.[1]  In
1976 through FLPMA, Congress again ratified the general applicability of the
Mining Law, but amended it to allow the Secretary to regulate mining to "prevent
unnecessary or undue degradation" of the public lands.  43 U.S.C. § 1732(b).[2]
Accordingly, development of mining claims on federal lands is subject to intensive
environmental review, rigorous mitigation conditions, and approval requirements.
*See*, *e.g.*, *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085 (9th Cir. 2013)
(affirming ability of operator to resume uranium mining operations in Northern

---

[1] *See*, *e.g.*, Surface Resources Act of 1955, 30 U.S.C. § 612 (ensuring that surface
uses can occur concurrently with mining rights on federal lands). Since 1994,
Congress has imposed annual maintenance fees on mining claims, generating tens
of millions of dollars annually for the Federal Treasury.  *See* 30 U.S.C. § 28f.
Modern mining operations on federal lands are subject to the full range of federal
and state environmental laws including the National Environmental Policy Act, 42
U.S.C. § 4332; the Endangered Species Act, 16 U.S.C. § 1531, *et seq.*; the Clean
Water Act, 33 U.S.C. § 1251 *et seq.*; the Clean Air Act, 42 U.S.C. § 7401 *et seq.*;
the Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*; the National Historic
Preservation Act, 16 U.S.C. § 470 *et seq.*, among many others.  *See generally*
National Research Council, *Hardrock Mining on Federal Lands* at 5 (Nat'l Acad.
Press 1999) (finding current federal and state environmental laws and regulations
to be "generally effective" to provide environmental protection).

[2] Pursuant to this FLPMA statutory authority, the Bureau of Land Management
("BLM") promulgated detailed environmental regulations governing hardrock
mining requiring BLM-approved plans of operations, reclamation, and financial
assurances.  *See* 43 C.F.R. Subpart 3809.  The U.S. Forest Service has promulgated
similar regulations for National Forest lands.  *See* 36 C.F.R. Part 228, Subpart A.

Arizona pursuant to plan of operations previously approved by the Interior

Department).

## II.    **Factual Background**

This case concerns the Secretary's withdrawal of over one million acres of

mineral lands under claimed authority in FLPMA section 204(c).  These lands are

the source of breccia pipe deposits containing some of the country's highest grade

and concentration of uranium.  Those features allow these uranium deposits to be

developed with a far smaller environmental footprint than alternative mining sites.[3]

While Congress has elsewhere designated and expanded the boundaries of

the over 1.2 million acre Grand Canyon National Park, the lands at issue here have

been repeatedly left open to mining development by the Congress through enacted

statutes.  *See* Act of February 26, 1919, 40 Stat. 1175 (1919) (designating Grand

Canyon National Park); Grand Canyon National Park Enlargement Act, Pub. L.

No. 93-620, 88 Stat. 2089 (1975) (expanding boundaries of the Grand Canyon

National Park, not including the lands withdrawn in this case).  In 1984, Congress

further identified certain federal lands in the Northern Arizona area for protected

---

[3] *See*, *e.g.*, Statement of Facts in Support of Pls' Mot. for Summ. J. ¶¶ 8, 10-11 and
Exhibits A, 16, and 28 (Dec. 6, 2013) [ECF Nos. 171, 171-1, 171-6, 171-8];
Exhibits A-C to Pls' Opp. to Defs' Mot. to Dismiss and Renewed Mot. to Dismiss
(Sept. 12, 2012) (Decls. of Katie Sweeney, Ellen Ginsburg, and Norman M.
Schwab) [ECF 64-1].  Unless otherwise indicated, all ECF document numbers
referenced in NMA's Opening Brief refer to documents filed in lead case No. 11-
8171 in the district court.

"Wilderness" designation, but specifically <u>released</u> for multiple-use management the federal lands withdrawn by the Secretary here.  *See* Arizona Wilderness Act of 1984, Pub. L. No. 98-406, 98 Stat. 1485, 1488, 1490, 1494 (1984); *see also* Arizona Wilderness Act of 1990, Pub. L. No. 101-628, 104 Stat. 4469 (1990) (designating additional wilderness areas not including the lands at issue here).

On July 21, 2009, then-Interior Secretary Salazar published a notice of intent to withdraw from location and entry under the Mining Laws nearly one million acres of federal land located in Northern Arizona.  74 Fed. Reg. 35,887 (July 21, 2009).  This segregated those lands from location and entry for a two-year period. *Id*.  During that time, Interior conducted National Environmental Policy Act ("NEPA") analysis.  ER17-18.

On January 9, 2012, the Secretary issued Public Land Order ("PLO") 7787, which withdrew under FLPMA section 204(c) "approximately 1,006,545 acres of public and National Forest System lands from location and entry … for a period of 20 years…."  ER69-87 (PLO 7787); *see also* 77 Fed. Reg. 2,563 (Jan. 18, 2012). The BLM Advisory Committee established under FLPMA had voted against the withdrawal.  ER161 (Amended Compl. ¶ 53).

Contemporaneously, the Secretary submitted to Congress notices and information intended to comply with sections 204(c)(1) and (2) of FLPMA.  *See* Attachment 1 to Statement of Facts (Aug. 10, 2012) [ECF 73-2 in No. 12-8038].

9

This initiated the ninety-day period for Congress to terminate the withdrawal by concurrent resolution. *See* ER19. The Chair of the U.S. House of Representatives Natural Resources Committee expressed strong opposition to the withdrawal on May 23, 2012.[4] The withdrawal remains in effect.

## III.    District Court Proceedings

Appellant NMA is a trade association whose membership includes more than 325 corporations involved in all aspects of the mining industry, including coal, uranium, metal and industrial mineral producers, mineral processors, equipment manufacturers, state associations, bulk transporters, engineering firms, consultants, financial institutions, and other companies that supply goods and services to the mining industry. Decl. of Katie Sweeney ¶ 2 [ECF 64-1]. NMA (joined by the Nuclear Energy Institute ("NEI") in the district court proceedings) filed a Complaint in the U.S. District Court for the District of Arizona, challenging the withdrawal on multiple grounds. ER146-85 (Amended Compl.). Three other sets of plaintiffs also filed Complaints challenging the Secretary's withdrawal. The four cases were consolidated before District Judge Campbell on August 20, 2012. Consolidation Order [ECF 56].

---

[4] *See* Exhibit A, Ex. 2 to Pls' Opp. to Defs' Mot. to Dismiss and Renewed Mot. to Dismiss (Sept. 12, 2012) ("Decl. of Katie Sweeney") [ECF 64-1].

The district court's March 20, 2013 ruling on cross-motions for partial summary judgment first confirmed that the section 204(c) veto "permitting Congress to terminate a withdrawal by concurrent resolution is unconstitutional" under *Chadha*. ER19. Yet, the court held that the legislative veto in isolation was severable from the remainder of the provision, leaving the Secretary with unconstrained large-tract withdrawal authority. ER43-44.

In reaching its decision, the district court agreed that "the key question … [was] whether Congress would have conferred § 204(c) withdrawal authority on the Secretary in the absence of a legislative veto." ER20. However, the district court applied a presumption of severability within a single provision (FLPMA section 204(c)(1)) because FLPMA includes a general severability clause. ER21.[5] According to the district court, this presumption could be overcome only by "strong evidence" that Congress would not have delegated section 204(c) large-tract withdrawal authority without the legislative veto. *Id.*

The district court rejected NMA's arguments that "strong evidence" supported severance of all of section 204(c)(1), including the Secretary's large-tract withdrawal authority. While agreeing that "FLPMA sought to reign [*sic*] in executive authority over public lands and to place limits and statutory protections

---

[5] As discussed below in Section II(A)(1), the district court also held that a presumption of severability applied "if what remains after severance 'is fully operative as a law.'" ER20.

around executive withdrawal authority," ER24, the district court found the veto severable from the remainder of the provision. ER43-44. NMA moved for reconsideration. Mot. for Reconsideration (Apr. 3, 2013) [ECF 135]. The district court denied the motion. ER3-15.

The parties then briefed cross-motions for summary judgment on the remaining claims. On September 30, 2014, District Judge Campbell granted summary judgment to Federal Defendants and entered final judgment. Order [ECF 238]; ER1-2. NMA timely appealed on November 25, 2014. ER88-89.

## SUMMARY OF ARGUMENT

As the district court held, the legislative veto for large-tract withdrawals in FLPMA section 204(c)(1) is unconstitutional. ER19. The issue in this case is the appropriate remedy: should the Court strike the complete integrated text of section 204(c)(1) – which ties the authorization of large-tract withdrawals to the unconstitutional option for Congressional override – rather than segmenting that provision to fashion a new provision granting the Secretary unfettered discretion over large-tract withdrawals? The answer is "yes," the entirety of FLPMA section 204(c)(1) should be removed as unconstitutional. There is strong evidence: (1) that Congress would never have granted section 204(c)(1) large-tract withdrawal authority without the ability to override withdrawals through legislative veto; and

12

(2) that FLPMA is not "fully operative as a law" if the legislative veto alone is severed.

*First*, the FLPMA text provides "strong evidence" that the section 204(c)(1) legislative veto was an indispensable element of Congress's scheme to control large-tract withdrawal authority of the Executive Branch.  Prior to FLPMA's enactment, the Executive Branch had enjoyed unbounded withdrawal authority pursuant to the Supreme Court's decision in *Midwest Oil*, 236 U.S. at 483. FLPMA expressly repealed this prior unconstrained withdrawal authority, with the intent of instead specifically "delineat[ing] the extent to which the Executive may withdraw lands without legislative action."  FLPMA § 102(a)(4), 43 U.S.C. § 1701(a)(4).  For large-tract withdrawals (5,000 acres or more), Congress limited executive authority and exerted its own control by reserving to itself veto power. 43 U.S.C. § 1714(c)(1).  Congress moreover prohibited <u>any</u> withdrawal not "in accordance with the provisions and limitations" of section 204.  43 U.S.C. § 1714(a).  Severing <u>only</u> the unconstitutional legislative veto is contrary to the manifest Congressional intent expressed through these provisions:  it would reinstate the unbounded executive authority Congress meant to eliminate, and it would run afoul of Congress's express prohibition against withdrawals not in accordance with the specific limitations contained in section 204(c).

13

Additionally, the severability clause in FLPMA section 707 provides for striking the unconstitutional "provision" from the remainder of FLPMA. This supports severing the integrated FLPMA section 204(c)(1) "provision" (including the large-tract withdrawal authority subject to legislative veto) in its entirety.

*Second*, FLPMA's structure demonstrates that Congress would not have delegated large-tract withdrawal authority to the Secretary without the integrated legislative veto. Location matters – in FLPMA, Congress merged the legislative veto language into the very same subsection and subparagraph as the withdrawal authority it was meant to constrain. *See* 43 U.S.C. § 1714(c)(1). This identity of location strongly indicates that the legislative veto and large-tract withdrawal authority must "stand or fall as a unit." *Planned Parenthood of Ctr. Mo. v. Danforth*, 428 U.S. 52, 83 (1976).

Comparison of the three withdrawal authorities delegated under FLPMA further supports severance of <u>all</u> of section 204(c)(1). While FLPMA section 204(c) subjects a large-tract withdrawal to a legislative veto, there is no legislative veto in section 204(d) (small-tract withdrawal authority) or in section 204(e) (emergency withdrawal authority). If only the legislative veto power in FLPMA section 204(c) is severed (without the adjoined withdrawal authority), the Secretary would have such broad withdrawal authority under section 204(c) that section 204(d) and (e) become largely meaningless. Thus, the structure of FLPMA section

14

204 compels striking the large-tract withdrawal authority along with the legislative veto. The structural anomalies that are created if only the legislative veto is severed, and the evisceration of FLPMA's repeal of *Midwest Oil* and section 204(a) prohibition, together demonstrate that Congress would not have enacted section 204(c) authority without the legislative veto, and that FLPMA is not "fully operative as a law" if only the veto is severed. *Alaska Airlines*, 480 U.S. at 684.

*Third*, the legislative history demonstrates Congress's foremost intent to control and sharply limit executive withdrawal authority. Members of the House spoke of the legislative veto as "[o]ne of the most important" and "essential" parts of the bill. 122 Cong. Rec. 23,436-37 (1976). Congress's ultimate delegation of FLPMA large-tract withdrawal authority reflects a compromise that turned on the precise limitations and oversight mechanisms embedded in the statute. Congress would not have enacted the broader large-tract withdrawal authority that would exist under section 204(c)(1) without the legislative veto, the heart of the delicate compromise reached.

*Fourth*, FLPMA section 204(c)(1) represents a careful balancing of executive authority against Congress's plenary power under the Property Clause. The Supreme Court has before recognized that "[s]ome delegations of power to the Executive … may have been so controversial or so broad that Congress would have been unwilling to make the delegation without a strong oversight

15

mechanism." *Alaska Airlines*, 480 U.S. at 685. Here, FLPMA demonstrates that Congress was unwilling to delegate its Property Clause authority over large-tract withdrawals without the strong oversight mechanism embodied in the legislative veto. Recrafting section 204(c) by simply excising the legislative veto would be "incompatible with the plenary power of Congress" to control public-lands legislation under the Property Clause. *Miller v. Albright*, 523 U.S. 420, 456-57 (1998) (Scalia, J., concurring in judgment). Congress's constitutional control over public lands: (1) is not respected if the judiciary severs only the legislative veto and re-writes FLPMA to create broader executive authority to withdraw large expanses of public lands than that delegated; and (2) is only honored if the large-tract withdrawal authority falls with the unconstitutional legislative veto, leaving future legislation on large-tract withdrawals to Congress.

In short, *all* of the integrated section 204(c)(1) provision must be severed.

## STANDARD OF REVIEW

This Court conducts *de novo* review of a district court's legal rulings, including those on the constitutionality of a statutory provision. *See, e.g., W. States Med. Ctr. v. Shalala*, 238 F.3d 1090, 1093, 1096-98 (9th Cir. 2001). Accordingly, this Court "will look at the case anew, the same as if it had not been heard before, and as if no decision previously had been rendered, and giving no

16

deference to the district judge's determinations."  *McComish v. Bennett*, 611 F.3d

510, 519 (9th Cir. 2010) (internal quotation marks and citations omitted).

## ARGUMENT

### I.     The Legislative Veto In FLPMA Section 204(c) Is Unconstitutional.

FLPMA section 204(c)(1) governs the Secretary's authority to make large-

acreage withdrawals and was the basis for PLO 7787.  It contains the following

restriction on the Secretary's withdrawal authority: "[t]he Secretary shall notify

both Houses of Congress of such a withdrawal no later than its effective date and

the withdrawal shall terminate and become ineffective at the end of ninety days …

if the Congress has adopted a concurrent resolution stating that such House does

not approve the withdrawal."  43 U.S.C. § 1714(c)(1).  Because this procedure

omits presentment to the President, it is unconstitutional under *INS v. Chadha,* 462

U.S. 919 (1983); *see also id*. at 967-68, 1002, 1013 (White, J., dissenting)

(referring to FLPMA section 204(c)(1) as one of "nearly 200 statutes" that *Chadha*

effectively struck down).  As all parties agree the veto is unconstitutional, that is

not the subject of this appeal.  *See* ER19.

### II.    All Of The Integrated Section 204(c)(1) Provision Should Be Severed.

The key question in determining how much of an unconstitutional statute to

sever from the remainder is whether, with a particular portion of the statute

severed, "the statute will function in a *manner* consistent with the intent of

Congress." *Alaska Airlines*, 480 U.S. at 685 (emphasis in original). Statutory language may not be severed if "it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not" or if the remaining language is not "fully operative as a law." *Id*. at 684 (internal quotation marks and citations omitted).[6]

As shown below, Congress would not have delegated FLPMA section 204(c)(1) authority (large-tract withdrawal authority) absent the unconstitutional legislative veto. This Court should honor that Congressional intent by eliminating the Secretary's authority to withdraw broad swathes of public lands under that provision, along with the million-acre withdrawal at issue here.

Public land law scholars agree that the FLPMA section 204(c) legislative veto is integral to Congress's desire to exercise control under the Property Clause.

> One of the principal legislative goals in enacting FLPMA was to limit the executive discretionary authority over the public lands. At the same time, Congress felt a need to delegate some of its own authority over the public lands, to avoid being overly burdened with making routine administrative decisions. Congress reconciled these

---

[6] Courts ordinarily apply a presumption of severability in carrying out this analysis when a severability clause (providing for excision of any provision held invalid) is triggered. *Alaska Airlines*, 480 U.S. at 686. This presumption of severability is rebuttable by "strong evidence" that Congress would not have enacted other language in the statute in the absence of the offending provision. *Id*. FLPMA contains a severability clause. *See* FLPMA § 707 (codified at 43 U.S.C. § 1701 Note). However, as discussed below in Sections II(A)(1) and (4)(a), FLPMA's severability clause does not save the large-tract withdrawal authority from severance. In fact, it supports severance of all of the section 204(c)(1) provision.

> potentially conflicting objectives by delegating to the executive
> authority subject to various substantive and procedural constraints.
> <u>The legislative veto provisions of the Act are the most significant of
> those constraints.</u>

Prof. Robert L. Glicksman, *Severability and the Realignment of the Balance of*

*Power over the Public Lands: The Federal Land Policy and Land Management*

*Act*, 36 HASTINGS L. J. 1, 66 (1984) (emphasis added); *see also* Prof. David H.

Getches, *Managing the Public Lands: The Authority of the Executive to Withdraw*

*Lands*, 22 NAT. RESOURCES J. 279, 329 (1982) ("[W]hen [withdrawals] are used

the FLPMA surrounds the process with new procedures and ultimate congressional

checks that can undo executive actions swiftly in egregious cases.")

Recognizing the importance of the legislative veto's constraint on executive

withdrawal authority, the leading treatise on public land law agrees that the

legislative intent in FLPMA is carried out only if the entirety of FLPMA section

204(c)(1) is stricken:

> <u>It will be difficult to argue that the basic congressional intent
> underlying FLPMA can be carried out simply by excising the
> legislative vetoes,</u> because Congress preeminently intended to reassert
> control over federal land use and classification. <u>Invalidation of the
> vetoes only would return unfettered and unsupervised discretion to the
> executive branch, the very result that FLPMA was enacted to prevent.</u>

George Coggins & Robert Glicksman, PUB. NAT. RESOURCES L. § 4:3 (2d. ed. 2011) (emphasis added).[7]  As shown below, FLPMA's text, structure, and legislative history support severing all of section 204(c)(1) from the remainder of FLPMA.

**A.    The FLPMA Statutory Text Strongly Supports Severing <u>Both</u> the Section 204(c)(1) Veto And the Discretionary Large-Tract Withdrawal Authority That the Veto Was Meant To Constrain.**

FLPMA's text is replete with "strong evidence" that Congress would not have granted the Secretary section 204(c)(1) large-tract withdrawal authority without the legislative veto.

**1.    <u>Section 707's Requirement That the Entirety of the Relevant "Provision" Be Severed</u>**

FLPMA contains a severability clause, which states that "[i]f <u>any provision</u> of this Act … is held invalid, the remainder of the Act … shall not be affected thereby."  FLPMA § 707, 43 U.S.C. § 1701 Note (emphasis added).  The legislative veto language enmeshed within section 204(c) is not a separate

---

[7] George Coggins is the distinguished Frank Edwards Tyler Professor Emeritus with the University of Kansas Law School.  Robert Glicksman is the J.B. & Maurice C. Shapiro Professor of Environmental Law at the George Washington University Law School.  Prof. Glicksman has concluded that all of section 204(c) must be severed with the legislative veto contained therein.  Glicksman, 36 HASTINGS L.J. at 78-90.  Given the number of unconstitutional legislative vetoes in the statute, Prof. Coggins "prefers wholesale invalidations" across much or all of FLPMA Title II, "forcing Congress to confront the problem it created."  PUB. NAT. RESOURCES L. § 4:3.

"provision" or subsection.  However, subsection 204(c)(1) of FLPMA is undoubtedly a "provision" within the purview of section 707.  Indeed, in the proceedings below, Federal Defendants acknowledged that the "<u>provision</u> at issue in this case" is "43 U.S.C. § 1714(c)(1)."  Fed. Defs' Cross-Motion for Partial Summ. J. at 1 n.2 (Feb. 12, 2013) ("Defs' Cross-Motion") [ECF 101] (emphasis added).  Thus, section 707 indicates that the Court should sever <u>all</u> of the section 204(c)(1) "provision" containing unconstitutional features from the remainder of FLPMA.  This means that the Secretary's large-tract withdrawal authority must fall.

The district court erred in failing to give effect to the plain language of section 707.  Specifically, the district court assumed that the severability clause created a presumption, rebuttable by "strong evidence," that the <u>legislative veto language alone</u> could be severed from the remainder of the section 204(c)(1) provision, rather than severing section 204(c)(1) from the remainder of the statute.  *See* ER20-21.  However, Congress acted with purpose when it chose to draft the statute as it did, opting to combine the large-tract withdrawal authority and legislative veto in a single subsection.  *Cf. Thomas v. Union Carbide Agric. Products Co.*, 473 U.S. 568, 582 (1985) (where scheme for pesticide use, registration, and compensation "is integrated in a single subsection that explicitly ties the follow-on registration to the arbitration," a finding that the arbitration

requirement was unconstitutional would support the remedy of enjoining follow-on
registration entirely); *see also Planned Parenthood*, 428 U.S. at 83) (sentences
intertwined in the same section of a statute "must stand or fall as a unit").  In
FLPMA, Congress easily could have separated out the legislative veto into a new
subsection (for example, the veto language could have been designated as section
204(c)(2), with the notice provisions following as section 204(c)(3)), but Congress
instead purposefully embedded it in the same provision as the withdrawal authority
itself, making it part and parcel of that authority.  Under the plain language of
FLPMA's severability clause, it is the entirety of the section 204(c)(1) "provision"
that must be severed.[8]

---

[8] In addition to erroneously presuming that the legislative veto language was
severable on the basis of FLPMA's severability clause, the district court also stated
that the legislative veto language is presumed severable if what remains after its
severance is operative as law.  ER20.  However, in *Alaska Airlines*, the Supreme
Court expressly rejected a presumption of severability based on the operability of a
statute containing an unconstitutional legislative veto.  480 U.S. at 684-85.  Rather,
because legislative vetoes are "by [their] nature … separate from the operation of
the substantive provisions of a statute[,] … [t]he independent operation of a statute
in the absence of a legislative-veto provision … could be said to indicate little
about the intent of Congress regarding severability of the veto."  *Id.*

In any event, as discussed throughout, the remainder of FLPMA is not "fully
operative as a law" if only the legislative veto is excised (at most, it is operative in
a "purely technical sense," *City of New Haven v. United States*, 809 F.2d 900, 906
(D.C. Cir. 1987)).  Moreover, there is "strong evidence" to defeat any presumption
that the legislative veto is severable in this case.

2. <u>FLPMA's Policy Statements</u>

FLPMA's opening declarations of policy express Congress's intent to exercise forceful oversight upon executive land management decisions and to precisely delineate the scope of – and limits on – executive withdrawal authority. *See* 43 U.S.C. § 1701(a). In particular, FLPMA directs that:

> <u>the Congress</u> exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes and that Congress <u>delineate the extent to which the Executive may withdraw lands without legislative action</u>.

FLPMA § 102(a)(4), 43 U.S.C. § 1701(a)(4) (emphases added).

This is a policy for "Congressional oversight of withdrawals," H.R. Rep. No. 94-1163 at 4 (1976), meant to <u>restrict</u> and <u>control</u> executive withdrawal authority. This supports that Congress would not have granted unrestricted 20-year large-tract withdrawal authority to the Secretary absent the now-unconstitutional legislative veto power.

In his decision below, Judge Campbell overlooked the strong oversight objective manifest in section 102(a)(4) and instead frames FLPMA as contemplating a "controlled delegation" of withdrawal authority. ER5, ER24. However, Congress's intent in FLPMA was to rein in the executive, not provide more authority. *See* 43 U.S.C. § 1701(a); *see also* Section II(C) below. That Congress desired a "<u>controlled</u> delegation" means just that: Congress intended that it retain control over withdrawals implemented by the Executive, and Congress did

23

so through enacting a legislative veto over large-tract withdrawals.  *Compare City of New Haven*, 809 F.2d at 908 (in granting executive authority subject to veto, Congress's intent was "to *control* rather than *authorize*" executive action) (emphases in original).  Severing the legislative veto apart from the authority which it was meant to constrain fails to give effect to this Congressional intent.

3.     FLPMA's Repudiation of *Midwest Oil*

In FLPMA section 704(a), Congress repealed nearly all of the Executive's prior withdrawal authority.  Specifically, section 704(a) "repealed" 29 statutes on withdrawals and "the implied authority of the President to make withdrawals and reservations resulting from the acquiescence of the Congress (U.S. v. Midwest Oil Co., 236 U.S. 459)."  90 Stat. at 2792.  Thus, the Legislative Branch wiped clean the slate such that Congress could expressly "delineate," and set specific conditions on, any new executive withdrawal authority granted – as stated in FLPMA section 102(a)(4).

If only the legislative veto in FLPMA section 204(c) is severed, this would recreate, for twenty years at a time (renewable indefinitely), the unfettered large-tract executive withdrawal authority that FLPMA section 704(a) expressly revoked.  This would violate Congress's manifest intent and would render the statute – and section 704(a) in particular – less than "fully operative as a law." *Alaska Airlines*, 480 U.S. at 684.

24

4.  Section 204's Delegation of Limited, Conditional Withdrawal Authority

Most importantly, the complementary subsections in FLPMA section 204 demonstrate Congress's clear intent that the Secretary's large-tract withdrawal authority in section 204(c)(1) not exist without the integrated legislative veto.

a.  *FLPMA section 204(a)*

Congress could not have spoken more clearly than it did in section 204(a). This provision specifies that the Secretary may withdraw lands "**only** in accordance with the provisions and limitations of this section." 43 U.S.C. § 1714(a) (emphasis added). "Only means only." *United Station Assocs., LLC v. Puget Sound Energy, Inc.*, 238 F. Supp. 2d 1218, 1225 (W.D. Wash. 2002).[9] Thus, the Secretary has authority to adopt a large-tract withdrawal under FLPMA section 204(c)(1), but "only" in accordance with each of the "limitations" Congress specifically set forth in section 204(c), including its most significant substantive limitation – the legislative veto. Now that the legislative veto has been found unconstitutional, Congress's express intent under section 204(a) is only satisfied by striking section 204(c)(1) large-tract authority along with the veto. By contrast,

---

[9] *See also United States v. Diaz-Gomez*, 680 F.3d 477, 480 (5th Cir. 2012) ("We see no reason to interpret the plain meaning of the term 'only' to mean anything other than 'only.'"); *Nicklos Drilling Co. v. Cowart*, 907 F.2d 1552, 1554 (5th Cir. 1990) ("'[O]nly' means 'only' and, absent any room for interpretation or construction, we give it its intended meaning.").

25

judicially rewriting FLPMA section 204(c) by excising the legislative veto alone

would strip section 204(a) of effect, rendering FLPMA not "fully operative as a

law." *Alaska Airlines*, 480 U.S. at 684.

The Supreme Court's precedents in *Miller v. Albright*, 523 U.S. 420 (1998),

and *Nguyen v. INS*, 533 U.S. 53 (2001), confirm that severing all of section

204(c)(1) from the statute is the only remedy in keeping with Congress's intent

under section 204(a). In *Miller*, a resident of the Philippines challenged the denial

of her application for U.S. citizenship on the grounds that one of the Immigration

and Nationality Act's ("INA's") naturalization requirements (which she had failed

to meet) was unconstitutional. 523 U.S. at 426. Like FLPMA section 707, the

INA contains a general severability clause providing for severance of any

provision deemed unconstitutional. Pub. L. No. 414, § 406, 66 Stat. 163, 281

(1952). And in language equivalent to that in FLPMA section 204(a), the INA

limits naturalization to "the manner and … the conditions prescribed in this

subchapter and not otherwise." 8 U.S.C. § 1421(d).

No majority or plurality decision was issued in the case, but Justices Scalia

and Thomas concurred in denying the plaintiff's claim to citizenship on

severability grounds, finding FLPMA section 204(a)'s analogue in the INA to be

dispositive:

> [I]f the mere character of the naturalization power were not
> enough to render the severing of a limitation upon citizenship

26

> improper, the INA itself contains a clear statement of congressional intent: "A person may only be naturalized as a citizen of the United States in the manner and under the conditions prescribed in this subchapter *and not otherwise*." … [R]eliance upon the INA's general severability clause is misplaced because the specific governs the general. The question of severance ultimately turns on "whether the provisions are inseparable by virtue of inherent character," which must be gleaned from the structure and nature of the Act.
>
> …. Given the nature of the law at issue here, and given the clear command of 8 U.S.C. § 1421(d) ("under the conditions prescribed in this subchapter and not otherwise"), there is no doubt [as to the remedy] the Court must employ. It cannot confer citizenship where Congress has not done so.

*Miller,* 523 U.S. at 457-58 (Scalia, J., concurring in judgment) (internal citations omitted; emphasis in original); *see also id.* at 451 (O'Connor, J., concurring in judgment) (noting "the potential problems with fashioning a remedy …, see *post*, at 452-458 (Scalia J., concurring in judgment)").

Given the absence of a plurality, the Supreme Court revisited the issues from *Miller* in *Nguyen*, where a majority of the Court expressly endorsed the view of Justices Scalia and Thomas:

> Petitioners ask [the Court] to invalidate and sever [the allegedly unconstitutional conditions on citizenship], but it must be remembered that severance is based on the assumption that Congress would have intended the result. In this regard, it is significant that, although the [INA] contains a general severability provision, Congress expressly provided … that "[a] person may only be naturalized as a citizen of the United States and in the manner and under the conditions prescribed in this subchapter and not otherwise." …. [Citizenship under s]ection 1409(a), then, is subject to the limitation imposed by § 1421(d).

27

*Nguyen*, 533 U.S. at 72 (internal citations omitted) (emphasis added).

FLPMA section 204(a)'s limitation provides a parallel restriction to that in 8 U.S.C. § 1421(d) of the INA, which was considered in *Miller* and *Nguyen*. Section 204(a)'s delegation of withdrawal authority "<u>only</u> in accordance with the provisions and limitations of … section [204]" constitutes precisely the sort of restriction that the Supreme Court found required broad severance of the authority tethered to an unconstitutional limit on that authority. 43 U.S.C. § 1714(a) (emphasis added). Thus, *Miller* and *Nguyen* confirm that this Court must strike not only the legislative veto, but the large-tract withdrawal authorization that it purported to limit.

The district court erred in dismissing the principles espoused in *Miller* and *Nguyen*, and their application in this case. *See* ER7-9, ER26-27. First, the court merely assumed, without explanation, that the term "only," as used in FLPMA section 204(a), means something different than "and not otherwise," as used in the INA. ER8, ER27. Then, relying on this tenuous distinction, the court concluded that section 204(a) did not overcome FLPMA's severability clause, which – in the court's misguided view – created a presumption that the veto language alone was severable. ER8, ER26-27.

However, there is no difference between FLPMA's use of "only" and the analogous language appearing in the INA. In fact, numerous courts have

confirmed that "only" means precisely "and not otherwise."[10] Thus, even if

FLPMA's general severability clause created any presumption of severability with

respect to section 204(c)(1)'s legislative veto language alone – a proposition

contrary to section 707's plain language[11] – that presumption would be overcome

by section 204(a)'s more specific prohibition against any withdrawal not in

---

[10] *See*, *e.g.*, *Farrell v. CIR*, 136 F.3d 889, 895 (2d Cir. 1998) ("The plain meaning of 'only' has the purpose and effect of excluding the remaining universe."); *Shell Oil Co. v. Manley Oil Corp.*, 124 F.2d 714, 715 (7th Cir. 1941) ("[t]he word 'only' is a limiting and restrictive term … and in that sense means 'solely' or the equivalent of the phrase 'and nothing else.'") (citation omitted); *PlayMedia Systems, Inc. v. Am. Online, Inc.*, 171 F. Supp. 2d 1094, 1115 (C.D. Cal. 2001) (citing above cases, and concluding that use of the term "only" meant that product could be sublicensed for use in conjunction with specified product "*and no other product*") (emphasis in original).

[11] *See* Section II(A)(1) above. Moreover, severability clauses serve as "an aid merely; not an inexorable command." *Dorchy v. Kansas*, 264 U.S. 286, 290 (1924). "[T]he ultimate determination of severability will rarely turn on the presence or absence of … a [severability] clause." *United States v. Jackson*, 390 U.S. 570, 585 n.27 (1968); *see also*, *e.g.*, *Spokane Arcades, Inc. v. Brockett*, 631 F.2d 135, 139 (9th Cir. 1980), *aff'd*, 454 U.S. 1022 (1981) (denying severability of unconstitutional provision of state law despite a severability clause); *United States v. Spokane Tribe of Indians*, 139 F.3d 1297, 1300 (9th Cir. 1998) (notwithstanding a severability clause, additional portions of Indian Gaming Regulatory Act would not have been enacted absent unconstitutional provision deemed "a key part of a carefully-crafted scheme balancing" competing interests). With respect to FLPMA in particular, Professors Coggins and Glicksman found that the "grounds [for severing the legislative veto] are considerably weaker in the FLPMA context" than in *Chadha*, adding that "the inclusion of … a [severability] clause is not dispositive either of the general severability question or of the determination of exactly what language should remain." PUB. NAT. RESOURCES L. § 4:3.

accordance with the limitations set forth in section 204.[12]  Here, the section

204(c)(1) legislative veto is one of the specific "limitations" Congress prescribed

in section 204, and, as such, any large-tract withdrawal authority <u>not</u> subject to the

legislative veto option would be in direct contravention of section 204(a).  This

alone is "strong evidence" that the legislative veto may not alone be severed, and

that the entirety of section 204(c)(1) must fall.[13]

---

[12] *Miller*, 523 U.S. at 457-58 (Scalia, J., concurring in judgment); *Nguyen*, 533 U.S. at 72; *see also*, *e.g.*, *RadLAX Gateway Hotel v. Amalgamated Bank*, 132 S. Ct. 2065, 2070-71 (2012) (discussing "well established canon of statutory interpretation" that the specific governs the general, particularly where – as in FLPMA – "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions" (internal quotation marks and citations omitted)).

[13] The district court's original opinion (though not the reconsideration order) also asserted that Justice Scalia's reasoning lacks weight because it is "in a concurrence, [and] they are dicta."  ER26.  This is unpersuasive for several reasons.  First, Justice Scalia's reasoning was endorsed by the majority in *Nguyen* as a supplemental basis for denying the claim to citizenship.  533 U.S. at 72.

Second, there was no majority (or even plurality) opinion in *Miller*.  Rather, six justices, split among three different opinions resting on different grounds, agreed that the petitioner's claim for relief failed.  Justice Stevens, joined by Chief Justice Rehnquist, issued an opinion concluding that the core constitutional claim in the case failed on the merits.  523 U.S. at 423.  Justice O'Connor, joined by Justice Kennedy, issued an opinion finding that the claim failed on account of third-party standing issues, and on the merits (while noting the severability issues identified by Justices Scalia and Thomas).  *Id*. at 445.  Justice Scalia, joined by Justice Thomas, did not reach the merits, but held that the petitioner's claim must fail because the relief requested was unavailable, in part due to the inseverability of the claimed unconstitutional language.  *Id*. at 452, 457-58.  Because Justice Scalia's opinion concurred on the narrowest grounds, it is the controlling opinion and therefore is not dicta but precedential authority.  *See Marks v. United States*, 430 U.S. 188, 193 (Continued...)

b.    *Delineation of Withdrawal Authorities in Sections 204(c) Through (e)*

A comparison of the respective "provisions and limitations" under each of the section 204 withdrawal authorities is also telling as to Congress's intent on the scope of severability. First, section 204(c)(1) allows the Secretary to make withdrawals or 5,000 acres or more, subject to legislative veto. *See* 43 U.S.C. § 1714(c)(1). This limitation, and the structure of FLPMA section 204(c) as an integrated whole, is respected only if the entire section 204(c)(1) provision falls due to the unconstitutionality of the embedded legislative veto.

Congress's manifest intent to exert direct oversight and control over large acreage withdrawals stands in stark contrast Congress's delegation of less restricted withdrawal authority under sections 204(d) and 204(e). Under section 204(d), the Secretary is granted complete discretion to withdraw less than 5,000 acres of federal lands for varying amounts of time, depending on the purpose of the withdrawal. 43 U.S.C. § 1714(d). Under section 204(e), the Secretary similarly enjoys broad authority to withdraw any amount of land in an "emergency

_____

(1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds ….'" (citation omitted)).

Finally, even if this Court does not believe the opinions of Justices Scalia and Thomas and the majority in *Nguyen* to be controlling, they remain closely analogous persuasive authority on the issues in this case.

situation" for up to three years. *Id*. § 1714(e). The contrast between section 204(c)(1)'s legislative-veto limitation on long-term, large-tract withdrawals and the imposition of less severe restrictions on less far-reaching withdrawals strongly compels the conclusion that Congress was unwilling to grant the Secretary unlimited long-term large-tract withdrawal authority. Limiting small-tract withdrawals, while granting unfettered discretion on large-tract withdrawals, clearly flies in the face of Congressional intent. That unintended result would occur if the legislative veto alone is severed, but can be avoided if the complete section 204(c)(1) provision is stricken.

     5.    <u>Section 202(e)'s Supplemental Requirement That Withdrawals Comport With Section 204</u>

FLPMA section 202(e) further supports declaring invalid all of the Secretary's large-tract withdrawal authority. It provides that "public lands shall be removed from or restored to the operation of the Mining Law of 1872 … <u>only by withdrawal action pursuant to [section 204]</u> or other action pursuant to applicable law." 43 U.S.C. § 1712(e)(3) (emphasis added). This language illustrates that Congress allowed public lands to be removed from being "free and open" (30 U.S.C. § 22) to mineral exploration only if compliance with all the withdrawal limitations in FLPMA section 204 (*e.g.*, legislative control over large-tract withdrawals) is assured.

32

6.    Summary

In sum, while Congress delegated less-constrained withdrawal authority with respect to smaller withdrawals (less than 5,000 acres) and emergency withdrawals, *see* 43 U.S.C. §§ 1714(d)-(e), Congress embedded a legislative veto within section 204(c) as a direct check against the Executive's authority to withdraw large acreages from mineral exploration.  This check is now recognized as unconstitutional.  The remedy that best fulfills the statutory text and legislative intent in sections 102(a)(4), 202(e), 204, 704(a), and 707 is to restrict Executive withdrawals to the limits underlined by Congress in the statute.  The Court should strike the entirety of FLPMA section 204(c)(1).  This remedy would remove the Secretary's large-tract withdrawal authority and reserve such withdrawals to Congress, in accordance with the Property Clause.  This would leave the Secretary free to make small-tract (up to 5,000 acres) withdrawals, and to make large-tract emergency withdrawals for up to three years while Congress decides longer-term status pursuant to its Property Clause power over public lands.

**B.    FLPMA's Structure Further Demonstrates That the Legislative Veto Is Not Severable from Section 204(c)(1).**

The structural choices that Congress made in drafting FLPMA reinforce that section 204(c)(1) large-tract withdrawal authority should not survive without the legislative veto.

33

The first key structural choice is Congress's decision to integrate the Secretary's large-tract withdrawal authority and the legislative veto within <u>the very same provision, subsection, and subparagraph</u>. *See* 43 U.S.C. § 1714(c)(1). Coupled with section 707's instruction for severance of the entire unconstitutional "provision," *see* Section II(A)(1) above, this structural choice is a powerful indication that Congress saw the withdrawal authority as "so interwoven with [the veto] that the section cannot stand alone." *Dorchy*, 264 U.S. at 290. Moreover, this choice readily distinguishes the section 204(c)(1) veto from legislative vetoes held severable in other cases. *See Chadha*, 462 U.S. at 959 (severing stand-alone veto provision in section 244(c)(2) of the INA); *Alaska Airlines*, 480 U.S. at 682, 689-90 (unconstitutional veto at subparagraph 43(f)(3) of Airline Deregulation Act held severable from authority subject to veto, separately located at subparagraph 43(f)(1)); *Ala. Power Co. v. U.S. Dep't of Energy*, 307 F.3d 1300 (11th Cir. 2002) (severing veto language in 42 U.S.C. § 10222(a)(4), concerning the Secretary's adjustment of fees, where the Secretary's ultimate authority to collect fees <u>was contained in separate subparagraphs</u> (section 10222(a)(1)-(3)).

Contrary to the district court's rationale (ER28), the <u>identity</u> of location in a single paragraph matters. This is one of the best indicators that the Congressional delegation of large-tract withdrawal authority and conjoined legislative veto are inextricably intertwined – that they must "stand or fall as a unit." *Planned*

34

*Parenthood*, 428 U.S. at 83; *see also*, *e.g.*, *Regan v. Time, Inc.*, 468 U.S. 641, 667 nn.4-5, 677 (1984) (Brennan, J., concurring and dissenting in part) (citing *Planned Parenthood*, 428 U.S. at 83) ("[T]wo sentences in one section of statute 'must stand or fall as a unit'").

Other structural choices further support that section 204(c) cannot function "in a manner consistent with the intent of Congress" and is not "fully operative as a law" if only the legislative veto is stricken. *Alaska Airlines*, 480 U.S. at 684-85. The division of withdrawal authorities in section 204 of FLPMA shows that its drafters intended that the legislative veto in section 204(c)(1) would be an essential limitation on <u>large-scale 20-year</u> withdrawals (such as the one in this case), as distinguished from mere <u>3-year</u> unrenewable emergency withdrawals or withdrawals <u>less than 5,000 acres</u>. If only the veto language is excised, FLPMA's separate treatment of large-tract (section 204(c)) and small-tract (section 204(d)) and emergency (section 204(e)) withdrawals would become nonsensical. Except for the mere procedural requirement for notice to Congress (which is no real constraint, *see* Section II(E)(1) below), the Secretary's discretionary large-tract withdrawal authority would be no less than that for small-tract and emergency withdrawals. That would be irrational, and would not honor the legislative intent to exercise control over large-scale withdrawals by the Executive Branch.

The district court rationalized the opposite conclusion, in part, by inferring that Congress would have consented to severing only the legislative veto from section 204(c)(1) based on its willingness to delegate authority for "20-year and other unlimited withdrawals under § 204(d) …." ER34. However, section 204(d)'s 5,000 acre limit on withdrawals actually supports a legislative intent that the Executive not have unfettered large-tract withdrawal authority under section 204(c). If only the legislative veto is severed, the Secretary has little or no reason to use section 204(d) at all, when he or she can just as easily withdraw a million acres as 5,000 acres.

With respect to section 204(e), the district court rationalized that the Executive's ability to issue emergency withdrawals <u>prior to</u> submitting required notices and information (rather than having to submit this information by the withdrawal's effective date) will continue to give section 204(e) separate meaning and import as compared to section 204(c) without the veto. ER33. But this extra time for submitting the required notices (three months at most, *see* 43 U.S.C. § 1714(e)) is trivial when compared to the ability to withdraw the same acreage for twenty years as opposed to three.

Thus, if only the legislative veto is severed from section 204(c), sections 204(d) and (e) are left with little continuing import. FLPMA section 204 is not "<u>fully</u> operative" if only the legislative veto is severed. *Alaska Airlines*, 480 U.S.

36

at 684 (emphasis added).  In FLPMA, Congress unequivocally sought to restrict the Executive's withdrawal authority.  The Congressional veto was the chief mechanism to accomplish that critical goal, but it is no longer "operative."  At most, FLPMA section 204 delegation of withdrawal authority might be said to be <u>partially</u> operative in a "purely technical sense," but that is not enough to save section 204(c)(1) from being severed.  *City of New Haven*, 809 F.2d at 906.

Because "the statute created in [the] absence [of the legislative veto] is legislation that Congress would not have enacted," the legislative veto may not be severed alone.  *Alaska Airlines*, 480 U.S. at 685.  Severance of all of section 204(c)(1), leaving intact the Secretary's authority under sections 204(d) and (e), best allows FLPMA to "function in a *manner* consistent with the intent of Congress."  *Id*.

### C. FLPMA's Legislative History Strongly Supports Striking All of Section 204(c)(1).

#### 1. Legislative History Confirms That Congress Would Not Have Intended Section 204(c)(1) to Survive the Veto's Unconstitutionality.

The House bill and amendments ultimately adopted by the Conference Committee[14] contained each of the above-discussed provisions for reining in the

---

[14] As recounted in the district court opinion, FLPMA itself is the result of the Conference Committee's reconciliation of two bills:  H.R. 13777 and S. 507.  ER36.  The district court gave undue weight to the fact that the Senate bill "contained no provisions relating to authority for withdrawals," H.R. Rep. No. 94-
(Continued...)

Executive and restricting withdrawal authority. They contained the express policy to delineate the extent of Executive withdrawals; the repeal of preexisting executive withdrawal authorities; separate small-tract, large-tract, and emergency withdrawal authority; and, of course, the legislative veto.[15]

The Conference Report confirmed that FLPMA was intended to replace "practically all existing executive withdrawal authority" with a scheme that imposed specific limits and conditions on the Secretary's withdrawal authority – including the legislative veto. Conf. Rep. at 66; *See also* 122 Cong. Rec. at 23,440 (1976) (Rep. Forsythe) ("[The House bill] repeals [preexisting] withdrawal authority and in its place substitutes a congressional review procedure.") (emphasis added). Thus, Congress viewed the legislative veto as a specific replacement for, and safeguard against, the Executive's prior exercise of unlimited withdrawal

---

1724 ("Conf. Rep.") at 58 (1976), positing that the Senate's initial lack of emphasis on withdrawal authority indicates that it would have been content with passing FLPMA without the legislative veto. ER13. This is unpersuasive because the House did adopt withdrawal provisions including limitations on large-tract withdrawals, and the Senate concurred in adopting the Conference Report.

[15] Originally, the House bill had included a one-House legislative veto. *See* H.R. 13777, 94th Cong. (2d Sess. 1976). The Conference Committee ultimately amended the bill to provide for a concurrent two-house veto out of concern about the constitutionality of a one-House veto. *See* H.R. Rep. No. 94-1163, at 47 (1976) ("The Department of Justice has advised this Department that the granting of this … one House-Committee power is of questionable constitutionality."). Thus, when faced with the veto's possible unconstitutionality, Congress did not simply dispense with the veto, but sought a way to ensure that it stayed put.

authority.  If only the unconstitutional legislative veto is severed, this would return to the Secretary the sort of unfettered withdrawal authority that the legislative veto was meant to replace.  Such a strange result should not be imputed to Congress.

The legislative history emphasizes Congress's need for strong oversight mechanisms, and places special weight on the veto power.  At the beginning of the House Report, Congress expresses concern that "[t]he Executive Branch of the Government has tended to fill in missing gaps in the law, not always in a manner consistent with a system balanced in the best interests of all the people."  H.R. Rep. No. 94-1163 at 1.  The report then sets out "major objectives" of the bill in response to this problem, including the need to "[e]stablish procedures to facilitate Congressional oversight of public land operations entrusted to the Secretary of the Interior."  *Id*. at 2.  Accordingly, the bill included "referral to Congress of withdrawals and extensions of withdrawals of 5,000 acres or more" in the form of a legislative veto.  *Id*. at 4.

The legislative veto's importance as the "principal means of limiting executive discretion," Glicksman, 36 HASTINGS L.J. at 5, is not lost on leading scholars who have considered section 204(c) in view of *Chadha* and FLPMA's own legislative history.  As Professor Glicksman has explained:

> In enacting FLPMA, Congress sought to assume the dominant role in public lands policy-making and to confine the executive role to the implementation of congressionally declared policy.  Congress relied, at least in part, on the legislative veto provisions of the statute to

accomplish these objectives.   If [only the legislative veto is invalidated], <u>the allocation of power between the two branches of government could differ dramatically from what Congress intended when the statute was enacted.</u>

*Id.* (emphasis added).

Congressman Melcher, lead sponsor of the House bill, highlighted how crucial the legislative veto was to Congress's limited delegation to the Secretary to make large-tract withdrawals.  For example, he explained that the provision for Congress to terminate any withdrawal it disapproved of "is congressional oversight responsibility."  122 Cong. Rec. 23,452 (1976).  "Since there is now no system of congressional review and congressional oversight of withdrawals, this is the first positive step that Congress has taken to make that responsibility felt <u>and to exercise that responsibility</u>."  *Id.* (emphasis added).  Rep. Skubitz likewise urged that

> [o]ne of the most important reasons for adopting this bill is that it <u>provides for Congressional oversight and control</u> over an executive agency which, at present, is free to act mostly of its own accord ….
> We must end what often has been a historic pattern of casual or even reckless withdrawal of public lands.  It is <u>essential</u> that Congress be informed of, <u>and able to oppose if necessary</u>, withdrawals which it determines not to be in the best interest of all the people.

*Id.* at 23,436-37 (emphasis added).

The House did consider whether the threshold for a legislative veto should be raised from 5,000 to 25,000 acres or some other level.  *Id.* at 23,451.  A proposed amendment to this effect failed.  *Id.* at 23,456.  Since Congress did not

agree to raise the acreage threshold for legislative veto of a withdrawal, it follows that Congress would never have agreed to eliminate the veto altogether, or to allow the million-acre withdrawal here.[16]

To be sure, there were those who disagreed with the bill's provisions for legislative vetoes over certain withdrawals. ER14, ER37-38. Reps. Udall and Sieberling respectively authored separate and dissenting opinions on the bill, collectively writing on behalf of a total of nine representatives. *Id*. But these nine representatives could not persuade Congress even to raise the acreage threshold for veto review, *see* 122 Cong. Reg. 23,436, 23,451, much less to permit withdrawal authority in the absence of the veto. The district court's approach improperly resurrects the congressional dissenters' minority view of how FLPMA withdrawals should operate.

This history makes clear that FLPMA represents a delicate compromise. As stated by Congressman Steiger of Arizona, some members of Congress "would

---

[16] Importantly, those members of Congress urging the increased acreage threshold took care to reassure Congress that the veto would remain in place. *See* 122 Cong. Rec. 23,436 (1976) (remarks of Rep. Sieberling) (discussing proposed amendment which would "retain[] close congressional oversight. Withdrawals would still be subject to disapproval by a resolution of either House."); *id*. at 23,451 (Rep. Mink) ("I would hope that this committee would approve the amendment raising the acreage to 25,000 before imposing upon this House the affirmative duty to approve or disapprove…."). Evidently, all understood that the veto was an irrevocable component of any large-tract withdrawal authority a majority of Congress would be willing to delegate.

have said that every withdrawal is the responsibility of Congress, because clearly

the previous Secretaries of the Interior have abused the withdrawal privilege"—

"the 5,000 acres already represent a very strong compromise." *Id.* at 23,451; *see*

*also id*. at 23,453 (Rep. Santini) ("I think it is a fair and rational compromise to set

a 5,000-acre ceiling [on withdrawals not subject to veto].… [I]t is imperative that

the position of the committee be maintained.").[17]  "Congress enacted the

withdrawal provisions of FLPMA in large part to reclaim its exclusive right to

dictate federal public land withdrawal policy."  Glicksman, 36 HASTINGS L. J. at

10.  Congress's clear legislative intent – that we-will-compromise-this-far-and-no-

further – is only fulfilled if, absent the unconstitutional legislative veto, the

Secretary has no authority to withdraw over 5,000 acres of public lands.

     FLPMA's legislative history is most aptly compared to that in *City of New*

*Haven*.  There, the court considered an unconstitutional legislative veto on

---

[17] Had Rep. Mink's amendment to alter the acreage threshold passed, FLPMA's history might have been a different story.  In fact, Rep. Skubitz warned that "many Members and private organizations have agreed to support [the bill] precisely because of the compromises it contains, and … if these compromises are 'undone' by floor amendments it is very possible that many supporters of this bill, including myself, could no longer support it." 122 Cong Reg. 23,436; *see also id* at 23,451 (like views of Rep. Steiger).  In other words, changes meant to narrow Congressional review of withdrawals could have been deal-breakers for FLPMA on the whole; they must therefore have been fatal to the large-tract withdrawal authority alone.

42

proposed deferrals of budgetary appropriations. The court found the legislative

history "incontrovertible" as to inseverability:

> When the numerous statements of individual legislators urging the
> passage of legislation to control presidential impoundments are ...
> considered, the evidence is incontrovertible that the 'basic purpose' of
> [the provision] was to provide each House of Congress with a veto
> power over deferrals.... As difficult (and precarious) as it may be at
> times to reconstruct what a particular Congress might have done had it
> been apprised of a particular set of facts, we refuse to entertain th[e]
> remarkable proposition [that Congress would have enacted the
> provision without the legislative veto].... [T]he "*raison d'etre*" of the
> entire legislative effort was to assert *control* over presidential
> impoundments.

*City of New Haven*, 809 F.2d at 907 (emphasis in original).[18] "Nowhere in the

legislative history is there the slightest suggestion that the [Executive] be given

statutory authority to defer funds" – or, in this case, issue a withdrawal of federal

lands of limitless size – "without the possible check of at least a one-House veto."

*Id*. at 908. Because Congress would not have granted the Secretary the authority to

make large-tract withdrawals without legislative oversight, the unconstitutionality

of the congressional veto means that section 204(c)(1)'s withdrawal authority

should be severed in its entirety.

Similarly, in *Western States Medical Center v. Shalala*, this Court was faced

with legislative history "demonstrat[ing] that Congress intended to provide access

---

[18] The court in *City of New Haven* further noted the contrast between such a clear
legislative purpose and that reflected in *Alaska Airlines*, where "the legislative veto
provision [was added] as somewhat of an afterthought." 809 F.2d at 907.

to compounded drugs while preventing pharmacies from making an end run around the FDA's drug manufacturing requirements." 238 F.3d 1090, 1096 (9th Cir. 2001). When advertising constraints meant to prevent the latter outcome were found unconstitutional, the allowance to which those constraints were attached (an exemption from more stringent drug manufacturing requirements) could not stand. *Id*. at 1096-98; *see also id*. at 1096 (unconstitutional provisions not severable from the remainder of a statute where the "statute [wa]s designed to strike a balance between competing interests"). Here, as well, the allowance of large-tract withdrawal authority should fall when the legislative constraints on that authority are found unconstitutional.

### 2. Pre-FLPMA History Further Reflects Congress's Foremost Interest in Restricting Executive Withdrawals and Exercising Ultimate Control.

FLPMA was enacted in response to the chaotic state of affairs that had arisen from Congress's own prior acquiescence under *Midwest Oil* to the Executive's "uncontrolled and haphazard" withdrawals of public lands. ER94-95 (PLLRC Report at 43-44). In enacting FLPMA and section 204(c) specifically, Congress responded to the PLLRC's recommendation that Congress "assert its constitutional authority by enacting legislation reserving unto itself exclusive authority to withdraw or otherwise set aside public lands … and delineating specific delegation of authority to the Executive as to the types of withdrawals and

44

set asides that may be effected without legislative action." ER93 (PLLRC Report at 2); *see also* Charles F. Wheatley, Jr., *Withdrawals under the Federal Land Policy Management Act of 1976*, 21 ARIZ. L. REV. 311, 319 (1979) ("The delineation by the Act of the specific terms and conditions upon which the Secretary of the Interior can exercise withdrawal power and the persons to whom it may be delegated, make clear that <u>Congress intended to occupy the entire field permitted under its constitutional authority over the public lands and to control and direct the executive use of withdrawal power.</u>") (emphasis added).[19]

Section 204(c)'s legislative veto further reflects Congress's agreement with the PLLRC's suggestion that Congress should "pass[] on" proposed withdrawals. ER93 (PLLRC Report at 2).[20] The thrust of the PLLRC's recommendations – including their emphasis on reining in executive withdrawal authority, prescribing specific limits on executive withdrawal authority, and exercising control over executive withdrawal authority – is negated if only the veto is severed from section 204(c).

---

[19] Mr. Wheatley authored the *Study of Withdrawals and Reservations of Public Domain Lands, 1969*, prepared under contract with the PLLRC to guide the PLLRC's recommendations. Wheatley, 21 ARIZ. L. REV. at 311.

[20] Judge Campbell placed weight on the fact that the PLLRC did not recommend a "legislative veto" *per se*. ER24. This was in error. The PLLRC clearly stated its view that withdrawals should be passed on, ER93 (PLLRC Report at 2), and Congress clearly acted on the PLLRC's suggestion by subjecting large-tract withdrawal authority to legislative veto.

**D.    The Separation of Powers and Property Clause Issues Implicated in This Case Further Reinforce That This Court Should Sever All of Section 204(c)(1).**

As the Supreme Court instructed in *Alaska Airlines*:

[I]t is necessary to recognize that the absence of the veto necessarily alters the balance of powers between the Legislative and Executive Branches of the Federal Government.  Thus, it is not only appropriate to evaluate the importance of the veto in the original legislative bargain, but also to consider the nature of the delegated authority that Congress made subject to a veto.  Some delegations of power to the Executive … may have been so controversial or so broad that Congress would have been unwilling to make the delegation without a strong oversight mechanism.

*Alaska Airlines*, 480 U.S. at 685 (emphasis added).

Here, it is significant that the large-tract withdrawal authority subject to

legislative veto under section 204(c)(1) was delegated pursuant to Congress's

plenary power under the Property Clause.  *See*, *e.g.*, Wheatley, 21 ARIZ. L. REV. at

319.  The Property Clause of the Constitution textually commits control over

federal lands to Congress, not to the Executive or Judicial Branches.  U.S. Const.

art. IV, § 3, cl. 2.

Courts do not have authority to cure FLPMA's unconstitutionality by

excising the legislative veto, and judicially rewriting the statute so that the

Executive Branch has greater withdrawal authority than what Congress was willing

to delegate in exercising its exclusive Property Clause authority over public lands.

Indeed, it is "incompatible with the plenary power of Congress," here, under the

Property Clause, "for judges to speculate as to what Congress would have enacted if it had not enacted what it did." *Miller*, 523 U.S. at 457 (Scalia, J., concurring in judgment); *see also United States v. California*, 332 U.S. 19, 27 (1947) (regarding the Property Clause, "neither the courts nor the executive agencies could proceed contrary to an Act of Congress in this congressional area of national power."); *Kidd v. U.S. Dep't of Interior*, 756 F.2d 1410, 1412 (9th Cir. 1985) ("Once Congress has acted in … regard [to the public lands], both the courts and the executive agencies have no choice but to follow strictly the dictates of such statutes.").[21]   The only option that honors the Constitution's textual commitment to Congress of all authority to alter management of public lands is to sever the large-tract withdrawal authority integrated with and conditioned on the legislative veto.

Thus, to respect Congress's superior public lands authority under the Property Clause, all large-tract withdrawal authority should be severed from FLPMA section 204(c).  In turn, the Secretary's million-acre withdrawal under PLO 7787, issued pursuant to that authority, must be vacated.

---

[21] The fact that Congress limited large-tract withdrawal authority pursuant to its plenary Property Clause powers is yet another reason that this Court may not give effect to FLPMA's severability clause (section 707) in any fashion other than by severing <u>all</u> of section 204(c)(1) from the statute.  *See Miller*, 523 U.S. at 457 (Scalia, J., concurring).

**E.** **Neither the Remaining Procedural and Non-Substantive Constraints in Section 204(c) Nor Prior Practice Supports Severing Anything Less Than the Entirety of Section 204(c)(1).**

The court below rationalized that the FLPMA section 204 language which would remain if the legislative veto language alone were severed (*i.e.*, the 20-year limit on withdrawals and the notice provisions) would sufficiently constrain executive withdrawal authority such that Congress would have been content with severing the veto only. ER10-11, ER29-32, 35-36. The district court further conflated prior executive withdrawal practice with evidence that FLPMA would remain "fully operative as a law" after severing the veto alone. ER43. However, the survival of <u>some procedural</u> constraints and the mere fact that prior large-tract withdrawals have occurred are beside the point. Both the original grant of large-tract withdrawal authority and its continued effective operation rest on the presence of <u>all</u> the constraints – most importantly, the express <u>substantive</u> power for Congress to veto the withdrawal.

1. The Section 204(c)(2) Procedural Notices Provide No Meaningful Constraint.

According to the district court, if the FLPMA section 204(c)(2) legislative-notice process remains after severance of the legislative veto, this process would meaningfully limit Executive authority by "forc[ing] the Secretary to incorporate [the listed 204(c)(2)] considerations into his decision-making process prior to

48

making a large-tract withdrawal." ER30 (quoting Defs' Cross-Motion at 16).[22] This supposition is unconvincing, for several reasons.

First, none of FLPMA's procedural notice provisions affirmatively forces the Secretary to incorporate the required information into her decision-making. In fact, the notices need not be compiled and submitted until the proposed withdrawal actually enters effect. 43 U.S.C. § 1714(c)(1)-(2).

Second, whatever incidental effects section 204(c)(2) notice may have on the Secretary's decision process, the 204(c)(2) procedural notices and reporting do not on their own substantively <u>constrain</u> the Secretary's withdrawal authority. Rather, the notices' significance derives from the legislative veto to which they are attached. As the district court conceded, the fact that the section 204(c)(2) notices are submitted to the Congressional committees charged with veto consideration "shows that Congress envisioned the reports <u>as aiding the committees in deciding</u> <u>whether to recommend a veto</u>." ER29 (emphasis added); *see also State of New*

---

[22] The district court's rationale assumes that a court has the option to sever the legislative veto in a way that would leave the large-tract withdrawal notice requirement intact. However, courts have held that two sentences in the very same subparagraph must "stand or fall as a unit." *Planned Parenthood*, 428 U.S. at 83; *Time, Inc.*, 468 U.S. at 667 nn.4-5, 677 (Brennan, J., concurring and dissenting in part). Courts have been even less inclined to sever a provision mid-sentence, as would have to occur if the requirement for Congressional notice were to survive. *See Am. Fed'n of Gov't Employees v. Pierce*, 697 F.2d 303, 308 (D.C. Cir. 1982) (considering effect of unconstitutional legislative veto and holding that "both parts of the single sentence Congress adopted are invalid").

*Mexico v. Watkins*, 969 F.2d 1122, 1136 (D.C. Cir. 1992) (section 204(c)(2)

notices are "a fundamental part of the scheme <u>by which Congress has reserved the</u>

<u>right to disapprove administrative withdrawals</u>" (emphasis added)).  Upon severing

the legislative veto alone, there would no longer be any veto process for the section

204(c)(2) notices to support.  Thus, the 204(c)(2) notices are little more than

administrative red tape without the legislative veto option.[23]

    *City of New Haven* again provides an apt analogy.  Like FLPMA, the statute

at issue imposed various informational requirements on the Executive.  *See*

*generally* 809 F.2d 900.  The D.C. Circuit held that the presence of such

informational requirements did not save the delegation of authority once the

legislative veto had been found unconstitutional:  "Congress was not 'very much

concerned with, let alone determined to achieve, further detail about future

Presidential impoundments *absent a mechanism for exercising control over*

*them*.'" *Id*. at 907 n.19 (emphasis in original).

    Likewise in FLPMA, there is no evidence that Congress was much

concerned with being informed about Executive withdrawals, absent the ability to

---

[23] The section 204(c)(1) notice provisions that would remain if only the veto language is severed are also distinguishable from other so-called "report-and-wait" requirements contained in other statutes, which at least provide a "grace period … allow[ing] Congress time to amend or reject the rule if it desires." *Nat'l Wildlife Fed'n v. Watt*, 571 F. Supp. 1145, 1155 (D.D.C. 1983).  In FLPMA, by contrast, the Secretary need not notify Congress until a withdrawal enters effect.

invalidate them easily.[24]  The FLPMA procedural notices and reports do not

substitute for a Congressional veto and do not constrain the Secretary's withdrawal

authority in any substantive way that would support severability of the veto.

In short, the various constraints on withdrawal authority within section

204(c) do not have equal prominence.  Notice provisions might create additional

paperwork; and the twenty-year limit provides <u>some</u> (albeit, infinitely renewable)

temporal restriction.[25]  43 U.S.C. §§ 1714(c)(1)-(2), (f).  But these constraints do

not compensate for the absence of the veto.  The veto authority is the only

constraint that directly served Congress's oversight and control purposes, and the

only constraint that conferred on Congress the power to unilaterally stop a

withdrawal in its tracks.

---

[24] In fact, prior to FLPMA's enactment, Congress already received notice of
Executive withdrawals over 5,000 acres.  ER95 (PLLRC Report at 44); *see also*
Glicksman, 36 HASTINGS L.J. at 82 ("Congress enacted FLPMA because it felt that
th[e] 'oversight' mechanism [of having executive withdrawals reported to
Congress], <u>which it always had</u>, was insufficient and left the executive with too
much discretion to make withdrawals." (emphasis added)).  Requiring notice apart
from the opportunity to actually override a withdrawal only returns to the
Executive the very authority Congress meant to repeal.

[25] Even putting aside the fact that a 20-year withdrawal may be renewed into
perpetuity, even a single 20-year withdrawal like that at issue in this case might as
well be a lifetime.  Once such a withdrawal has been issued, prior mineral
exploration investments in mineral resources are "wasted" and cannot be
recovered.  Exhibits C-D to Pls' Opp. to Defs' Mot. to Dismiss and Renewed Mot.
to Dismiss (Sept. 12, 2012) (Decls. of Norman M. Schwab and James D.
Rasmussen) [ECF 64-1].

      2.      <u>A New Formal Statute Is Not a Realistic "Check" On Executive Withdrawal Authority.</u>

Congress's ability to override a withdrawal by enactment of a new statute, presented to and signed by the President, does not argue for allowing unfettered large-tract withdrawals in the absence of a legislative veto. If that rationale is accepted, then every legislative veto that has been enacted must be automatically deemed severable. As confirmed in the case law, this is not so. *See*, *e.g.*, *City of New Haven*, 89 F.2d 909; *Am. Fed'n of Gov't Employees*, 697 F.2d at 307-08; *EEOC v. CBS, Inc.*, 743 F.2d 969, 973 (2d Cir. 1984); *McCorkle v. United States*, 559 F.2d 1258, 1262 (4th Cir. 1977).

The full legislative process is no real constraint on the Executive's FLPMA withdrawal authority. As recognized in *Chadha*, legislative vetoes are "doubtless … in many respects a convenient shortcut." 462 U.S. at 958. They allow Congress to leapfrog past time-consuming legislative procedures and avoid the uncertainties posed by presentment to the President.

The "solution" of requiring an Act of Congress to undo a large-tract Executive withdrawal is not a practical solution. It would require Presidential action to reverse a high-level decision <u>within his or her own Executive Branch</u> to withdraw lands. This is an unlikely and absurd result not in keeping with Congress's intent to exercise real control over Interior withdrawals of public lands. Only by severing all of the large-tract withdrawal authority in section 204(c)(1)

52

can Congress retain the level of control considered essential at the time of FLPMA's passage.

      3.    <u>Prior Practice Under Section 204(c) Does Not Warrant Only Severing the Legislative Veto.</u>

The district court suggested that a history of past section 204(c) withdrawals, without overrides by Congress, indicates that the statute remains "fully operative as a law" without the legislative veto. ER43. But the fact that Congress has not historically vetoed section 204(c) withdrawals merely reflects Congress's realization that the legislative veto was unconstitutional, since the 1983 *Chadha* decision expressly listed FLPMA as a statute with the offending provisions. *See Chadha,* 462 U.S. at 1013 (White, J., dissenting). Former Secretary of the Interior Bruce Babbitt testified to the U.S. Senate in 1999 that the FLPMA section 204(c) veto was almost certainly unconstitutional.[26] Congress was not going to waste time and resources on FLPMA's veto process in light of its recognized unconstitutional footing. The resulting absence of the threat of Congressional override only underscores the expansion of the Secretary's delegated withdrawal authority in the absence of the veto, and, in turn, the loss of <u>full</u> operability under

---

[26] *Secretarial Powers Under the Federal Land Policy and Management Act of 1976: Excessive Use of Section 204 Withdrawal Authority by the Clinton Administration; Joint Oversight Hearing Before the Subcomm. on National Parks and Public Lands and Subcomm. on Energy and Mineral Resources of the H. Comm. on Resources*, 106th Cong. 44 (1999).

section 102(a)(4), section 204(a), section 704(a), and the remaining withdrawal authorities.

The past exercise of FLPMA section 204(c) authority further does not convert unconstitutional authority into that which is lawful. "[N]o one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it." *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 18 n.8 (1989) (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 678 (1970)); *accord Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588-89 (1952) (even if prior Presidents had acted without Congressional authorization, "Congress ha[d] not thereby lost its exclusive constitutional authority").[27]

### F.  <u>Summary</u>

Severing the legislative veto in isolation from the remainder of the section 204(c)(1) provision is both contrary to Congress's manifest intent in enacting FLPMA, and would render FLPMA's provisions not "fully operative as a law." *Alaska Airlines*, 480 U.S. at 684. Congress expressly intended to repeal the unrestricted implied withdrawal authority of the Executive and did so in Section

---

[27] Congress's acquiescence to or agreement with the executive's prior withdrawal actions further does nothing to cure the underlying unconstitutionality created by the veto. As Justice Scalia recently recognized, "the political branches cannot by agreement alter the constitutional structure." *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2594 (2014) (Scalia, J., concurring in judgment).

704(a) of FLPMA.  In place of that repealed broad implied authority, Congress

enacted limited section 204(c) delegations.  In section 204(c)(1), Congress

carefully delineated the extent of large-tract withdrawal authority, embedding in

the provision a legislative veto as the foremost means of ensuring oversight and

control over Executive withdrawals.  Absent the legislative veto, this integrated

provision is no longer fully operative, and is no longer a provision that Congress

would ever have adopted.  As Professor Glicksman concluded:

> [R]emoval of all of section 204(c) [authority] from the statute – seems
> closest to the scheme Congress itself would have chosen had it known
> that the legislative veto was invalid.  The Secretary of the Interior's
> authority to make withdrawals under FLPMA would be limited to
> tracts less than five thousand acres….[28]  Only the larger, more
> significant withdrawals would have to emanate from the legislature.

Glicksman, 36 HASTINGS L.J. at 82-83 (emphasis added).

In short, the text, structure, and legislative history of FLPMA provide

"strong evidence" that Congress would not have enacted section 204(c)(1) as it did

without the legislative veto's essential check on the Secretary's authority.

Consequently, all of section 204(c)(1) must be severed, requiring vacation of the

Secretary's million-acre Northern Arizona withdrawal.

---

[28] In addition, the Secretary would retain emergency withdrawal authority pursuant
to FLPMA section 204(e).  43 U.S.C. § 1714(e).

## **CONCLUSION**

Because the unconstitutional legislative veto in FLPMA section 204(c)(1) is

not severable from the remainder of the provision, all of section 204(c)(1) is

unlawful. NMA seeks no blanket declaratory or injunctive relief as to any prior

withdrawals under section 204(c). NMA seeks relief with respect only to the

instant withdrawal of over one million acres of federal public lands under PLO

7787. This Court should declare invalid 43 U.S.C. § 1714(c)(1) and vacate the

withdrawal of over one million acres of public lands under PLO 7787.

                              Respectfully submitted,

                              /s/ R. Timothy McCrum
                              R. Timothy McCrum
                              Thomas R. Lundquist
                              Dawn K. Miller
                              CROWELL & MORING LLP
                              1001 Pennsylvania Avenue, N.W.
                              Washington, D.C. 20004
                              Telephone: 202-624-2500
                              Facsimile: 202-628-5116
                              rmccrum@crowell.com
                              tlundquist@crowell.com
                              damiller@crowell.com

                              Counsel for Plaintiff-Appellant
April 10, 2015                National Mining Association

56

## CERTIFICATE OF COMPLIANCE

I certify pursuant to Fed. R. App. P. 32(a)(7)(C) that this brief contains 13,367 words and has been prepared in 14-point Times New Roman proportionally spaced typeface.

/s/ R. Timothy McCrum
R. Timothy McCrum

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, NMA identifies each of the following cases consolidated with NMA's case as related cases. Both NMA's case and the actions below challenge the Secretary of Interior's withdrawal under PLO 7787.

- *Quaterra Alaska, Inc. v. Jewell* (No. 14-17351)

- *Am. Exploration & Mining Ass'n v. Jewell* (No. 14-17352)

- *Yount v. Jewell* (No. 14-17374)

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 10, 2015, I electronically filed a copy of Appellant

NMA's Opening Brief with the Clerk of Court for the U.S. Court of Appeals for

the Ninth Circuit by using the appellate CM/ECF system, which will send

electronic notification of such filings to the attorneys of record in this case.

Additionally the following parties were served via U.S. Mail:

Gregory Yount
807 W Butterfield Rd.
Chino Valley, AZ 86323

Dominika Natalia Tarczynska
DOJ - U.S. DEPARTMENT OF JUSTICE
Environmental Enforcement Section
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611

John S. Most
DOJ - U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
P.O. Box 7415
Washington, DC 20044

/s/ R. Timothy McCrum
R. Timothy McCrum

**No. 14-17350**

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

––––––––––––––––––

NATIONAL MINING ASSOCIATION,
*Plaintiff-Appellant,*

v.

S.M.R. JEWELL, Secretary of Interior, et al.,
*Defendants-Appellees,*

and

GRAND CANYON TRUST, et. al.,
*Intervenors-Defendants-Appellees.*

––––––––––––––––––

*On Appeal from the United States District Court for the District of Arizona*

## APPELLANT'S ADDENDUM

R. Timothy McCrum
Thomas R. Lundquist
Dawn K. Miller
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: 202-624-2500
Facsimile: 202-628-5116
rmccrum@crowell.com
tlundquist@crowell.com

Counsel for Plaintiff-Appellant
National Mining Association

## TABLE OF CONTENTS

| Description | ADD Page Nos. |
|---|---|
| Presentment Clause of the U.S. Constitution, Art. I, § 7, Cl. 2 | 1 |
| Property Clause of the U.S. Constitution, Art. IV, § 3, Cl. 2 | 2 |
| FLPMA § 102, 43 U.S.C. § 1701 | 3-4 |
| FLPMA § 202(e), 43 U.S.C. § 1712(e) | 5-7 |
| FLPMA § 204, 43 U.S.C. § 1714 | 8-11 |
| FLPMA § 704(a), Pub. L. No. 94-579, 90 Stat. 2743, 2792 (1976) | 12 |
| FLPMA § 707, Pub. L. No. 94-579, 90 Stat. 2743, 2794 (1976) (codified at 43 U.S.C. 1701 Note) | 13 |

Section 7, Clause 2. Approval or Veto of Bills; Repassage..., USCA CONST Art. I §...

Case: 14-17374, 04/10/2015, ID: 9491851, DktEntry: 14-1, Page 72 of 84

U.S.C.A. Const. Art. I § 7, cl. 2

Section 7, Clause 2. Approval or Veto of Bills; Repassage Over Veto

Currentness

Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.

Notes of Decisions (59)

U.S.C.A. Const. Art. I § 7, cl. 2, USCA CONST Art. I § 7, cl. 2
Current through P.L. 113-296 (excluding P.L. 113-235, 113-287, and 113-291) approved 12-19-2014

**End of Document**          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

U.S.C.A. Const. Art. IV § 3, cl. 2

Section 3, Clause 2. Public Lands

Currentness

The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

Notes of Decisions (256)

U.S.C.A. Const. Art. IV § 3, cl. 2, USCA CONST Art. IV § 3, cl. 2
Current through P.L. 113-296 (excluding P.L. 113-235, 113-287, and 113-291) approved 12-19-2014

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**ADD 000002**



Sec.
1768.  Conveyance of lands covered by right-of-way; terms and conditions.
1769.  Existing right-of-way or right-of-use unaffected; exceptions; rights-of-way for railroad and appurtenant communication facilities; applicability of existing terms and conditions.
1770.  Applicability of provisions to other Federal laws.
1771.  Coordination of applications.

SUBCHAPTER VI—DESIGNATED MANAGEMENT AREAS

1781.  California Desert Conservation Area.
1781a.  Acceptance of donation of certain existing permits or leases.
1782.  Bureau of Land Management Wilderness Study.
1783.  Yaquina Head Outstanding Natural Area.
1784.  Lands in Alaska; designation as wilderness; management by Bureau of Land Management pending Congressional action.
1785.  Fossil Forest Research Natural Area.
1786.  Piedras Blancas Historic Light Station.
1787.  Jupiter Inlet Lighthouse Outstanding Natural Area.

## SUBCHAPTER I—GENERAL PROVISIONS

### § 1701. Congressional declaration of policy

(a) The Congress declares that it is the policy of the United States that—

(1) the public lands be retained in Federal ownership, unless as a result of the land use planning procedure provided for in this Act, it is determined that disposal of a particular parcel will serve the national interest;

(2) the national interest will be best realized if the public lands and their resources are periodically and systematically inventoried and their present and future use is projected through a land use planning process coordinated with other Federal and State planning efforts;

(3) public lands not previously designated for any specific use and all existing classifications of public lands that were effected by executive action or statute before October 21, 1976, be reviewed in accordance with the provisions of this Act;

(4) the Congress exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes and that Congress delineate the extent to which the Executive may withdraw lands without legislative action;

(5) in administering public land statutes and exercising discretionary authority granted by them, the Secretary be required to establish comprehensive rules and regulations after considering the views of the general public; and to structure adjudication procedures to assure adequate third party participation, objective administrative review of initial decisions, and expeditious decisionmaking;

(6) judicial review of public land adjudication decisions be provided by law;

(7) goals and objectives be established by law as guidelines for public land use planning, and that management be on the basis of multiple use and sustained yield unless otherwise specified by law;

(8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use;

(9) the United States receive fair market value of the use of the public lands and their resources unless otherwise provided for by statute;

(10) uniform procedures for any disposal of public land, acquisition of non-Federal land for public purposes, and the exchange of such lands be established by statute, requiring each disposal, acquisition, and exchange to be consistent with the prescribed mission of the department or agency involved, and reserving to the Congress review of disposals in excess of a specified acreage;

(11) regulations and plans for the protection of public land areas of critical environmental concern be promptly developed;

(12) the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands including implementation of the Mining and Minerals Policy Act of 1970 (84 Stat. 1876, 30 U.S.C. 21a) as it pertains to the public lands; and

(13) the Federal Government should, on a basis equitable to both the Federal and local taxpayer, provide for payments to compensate States and local governments for burdens created as a result of the immunity of Federal lands from State and local taxation.

(b) The policies of this Act shall become effective only as specific statutory authority for their implementation is enacted by this Act or by subsequent legislation and shall then be construed as supplemental to and not in derogation of the purposes for which public lands are administered under other provisions of law.

(Pub. L. 94–579, title I, § 102, Oct. 21, 1976, 90 Stat. 2744.)

#### REFERENCES IN TEXT

This Act, referred to in subsecs. (a)(1), (3) and (b), is Pub. L. 94–579, Oct. 21, 1976, 90 Stat. 2743, as amended, known as the Federal Land Policy and Management Act of 1976. For complete classification of this Act to the Code, see Tables.

The Mining and Minerals Policy Act of 1970, referred to in subsec. (a)(12), is Pub. L. 91–631, Dec. 31, 1970, 84 Stat. 1876, which is classified to section 21a of Title 30, Mineral Lands and Mining.

#### SHORT TITLE OF 2009 AMENDMENT

Pub. L. 111–88, div. A, title V, § 501, Oct. 30, 2009, 123 Stat. 2968, provided that: "This title [enacting sections 1748a and 1748b of this title] may be cited as the 'Federal Land Assistance, Management, and Enhancement Act of 2009' or 'FLAME Act of 2009'."

#### SHORT TITLE OF 1988 AMENDMENT

Pub. L. 100–409, § 1, Aug. 20, 1988, 102 Stat. 1086, provided that: "This Act [enacting section 1723 of this title, amending section 1716 of this title and sections 505a, 505b, and 521b of Title 16, Conservation, and enacting provisions set out as notes under sections 751 and 1716 of this title] may be cited as the 'Federal Land Exchange Facilitation Act of 1988'."

### SHORT TITLE

Pub. L. 94–579, title I, § 101, Oct. 21, 1976, 90 Stat. 2744, provided that: "This Act [see Tables for classification] may be cited as the 'Federal Land Policy and Management Act of 1976'."

### SAVINGS PROVISION

Pub. L. 94–579, title VII, § 701, Oct. 21, 1976, 90 Stat. 2786, provided that:

"(a) Nothing in this Act, or in any amendment made by this Act [see Short Title note above], shall be construed as terminating any valid lease, permit, patent, right-of-way, or other land use right or authorization existing on the date of approval of this Act [Oct. 21, 1976].

"(b) Notwithstanding any provision of this Act, in the event of conflict with or inconsistency between this Act and the Acts of August 28, 1937 (50 Stat. 874; 43 U.S.C. 1181a–1181j [1181a et seq., see Tables for classification]) and May 24, 1939 (53 Stat. 753), insofar as they relate to management of timber resources, and disposition of revenues from lands and resources, the latter Acts shall prevail.

"(c) All withdrawals, reservations, classifications, and designations in effect as of the date of approval of this Act shall remain in full force and effect until modified under the provisions of this Act or other applicable law.

"(d) Nothing in this Act, or in any amendments made by this Act, shall be construed as permitting any person to place, or allow to be placed, spent oil shale, overburden, or byproducts from the recovery of other minerals found with oil shale, on any Federal land other than Federal land which has been leased for the recovery of shale oil under the Act of February 25, 1920 (41 Stat. 437, as amended; 30 U.S.C. 181 et seq.).

"(e) Nothing in this Act shall be construed as modifying, revoking, or changing any provision of the Alaska Native Claims Settlement Act (85 Stat. 688, as amended; 43 U.S.C. 1601 et seq.).

"(f) Nothing in this Act shall be deemed to repeal any existing law by implication.

"(g) Nothing in this Act shall be construed as limiting or restricting the power and authority of the United States or—

"(1) as affecting in any way any law governing appropriation or use of, or Federal right to, water on public lands;

"(2) as expanding or diminishing Federal or State jurisdiction, responsibility, interests, or rights in water resources development or control;

"(3) as displacing, superseding, limiting, or modifying any interstate compact or the jurisdiction or responsibility of any legally established joint or common agency of two or more States or of two or more States and the Federal Government;

"(4) as superseding, modifying, or repealing, except as specifically set forth in this Act, existing laws applicable to the various Federal agencies which are authorized to develop or participate in the development of water resources or to exercise licensing or regulatory functions in relation thereto;

"(5) as modifying the terms of any interstate compact;

"(6) as a limitation upon any State criminal statute or upon the police power of the respective States, or as derogating the authority of a local police officer in the performance of his duties, or as depriving any State or political subdivision thereof of any right it may have to exercise civil and criminal jurisdiction on the national resource lands; or as amending, limiting, or infringing the existing laws providing grants of lands to the States.

"(h) All actions by the Secretary concerned under this Act shall be subject to valid existing rights.

"(i) The adequacy of reports required by this Act to be submitted to the Congress or its committees shall not be subject to judicial review.

"(j) Nothing in this Act shall be construed as affecting the distribution of livestock grazing revenues to local governments under the Granger-Thye Act (64 Stat. 85, 16 U.S.C. 580h), under the Act of May 23, 1908 (35 Stat. 260, as amended; 16 U.S.C. 500), under the Act of March 4, 1913 (37 Stat. 843, as amended; 16 U.S.C. 501), and under the Act of June 20, 1910 (36 Stat. 557)."

### SEVERABILITY

Pub. L. 94–579, title VII, § 707, Oct. 21, 1976, 90 Stat. 2794, provided that: "If any provision of this Act [see Short Title note set out above] or the application thereof is held invalid, the remainder of the Act and the application thereof shall not be affected thereby."

### EXISTING RIGHTS-OF-WAY

Pub. L. 94–579, title VII, § 706(b), Oct. 21, 1976, 90 Stat. 2794, provided that: "Nothing in section 706(a) [see Tables for classification], except as it pertains to rights-of-way, may be construed as affecting the authority of the Secretary of Agriculture under the Act of June 4, 1897 (30 Stat. 35, as amended, 16 U.S.C. 551); the Act of July 22, 1937 (50 Stat. 525, as amended, 7 U.S.C. 1010–1212); or the Act of September 3, 1954 (68 Stat. 1146, 43 U.S.C. 931c)."

## § 1702. Definitions

Without altering in any way the meaning of the following terms as used in any other statute, whether or not such statute is referred to in, or amended by, this Act, as used in this Act—

(a) The term "areas of critical environmental concern" means areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards.

(b) The term "holder" means any State or local governmental entity, individual, partnership, corporation, association, or other business entity receiving or using a right-of-way under subchapter V of this chapter.

(c) The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

(d) The term "public involvement" means the opportunity for participation by affected citizens in rulemaking, decisionmaking, and planning with respect to the public lands, including

lation to lands administered by the Bureau of Land Management, National Park Service, Fish and Wildlife Service, or the Forest Service. To facilitate the sharing of resources under the Service First initiative, the Secretaries of the Interior and Agriculture may make transfers of funds and reimbursement of funds on an annual basis, including transfers and reimbursements for multi-year projects, except that this authority may not be used to circumvent requirements and limitations imposed on the use of funds.

(Pub. L. 106–291, title III, § 330, Oct. 11, 2000, 114 Stat. 996; Pub. L. 109–54, title IV, § 428, Aug. 2, 2005, 119 Stat. 555; Pub. L. 111–8, div. E, title IV, § 418, Mar. 11, 2009, 123 Stat. 747; Pub. L. 112–74, div. E, title IV, § 422, Dec. 23, 2011, 125 Stat. 1045.)

### CODIFICATION

Section was enacted as part of the Department of the Interior and Related Agencies Appropriations Act, 2001, and not as part of the Federal Land Policy and Management Act of 1976 which comprises this chapter.

Section was formerly set out as a note under section 1701 of this title.

### AMENDMENTS

2011—Pub. L. 112–74 substituted ''In fiscal year 2012 and each fiscal year thereafter'' for ''In fiscal years 2001 through 2011'' and ''programs.'' for ''pilot programs''.

2009—Pub. L. 111–8 substituted ''2011'' for ''2008''.

2005—Pub. L. 109–54 substituted ''2008'' for ''2005'', struck out ''may pilot test agency-wide joint permitting and leasing programs'' before '', subject to annual review'', inserted ''may establish pilot programs involving the land management agencies referred to in this section to conduct projects, planning, permitting, leasing, contracting and other activities, either jointly or on behalf of one another; may co-locate in Federal offices and facilities leased by an agency of either Department;'' after ''Congress,'' inserted '', National Park Service, Fish and Wildlife Service,'' after ''Bureau of Land Management'', and inserted at end ''To facilitate the sharing of resources under the Service First initiative, the Secretaries of the Interior and Agriculture may make transfers of funds and reimbursement of funds on an annual basis, including transfers and reimbursements for multi-year projects, except that this authority may not be used to circumvent requirements and limitations imposed on the use of funds.''

### SUBCHAPTER II—LAND USE PLANNING AND LAND ACQUISITION AND DISPOSITION

### § 1711. Continuing inventory and identification of public lands; preparation and maintenance

(a) The Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern. This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values. The preparation and maintenance of such inventory or the identification of such areas shall not, of itself, change or prevent change of the management or use of public lands.

(b) As funds and manpower are made available, the Secretary shall ascertain the boundaries of the public lands; provide means of public identification thereof including, where appropriate,

signs and maps; and provide State and local governments with data from the inventory for the purpose of planning and regulating the uses of non-Federal lands in proximity of such public lands.

(Pub. L. 94–579, title II, § 201, Oct. 21, 1976, 90 Stat. 2747.)

### § 1712. Land use plans

#### (a) Development, maintenance, and revision by Secretary

The Secretary shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands. Land use plans shall be developed for the public lands regardless of whether such lands previously have been classified, withdrawn, set aside, or otherwise designated for one or more uses.

#### (b) Coordination of plans for National Forest System lands with Indian land use planning and management programs for purposes of development and revision

In the development and revision of land use plans, the Secretary of Agriculture shall coordinate land use plans for lands in the National Forest System with the land use planning and management programs of and for Indian tribes by, among other things, considering the policies of approved tribal land resource management programs.

#### (c) Criteria for development and revision

In the development and revision of land use plans, the Secretary shall—

(1) use and observe the principles of multiple use and sustained yield set forth in this and other applicable law;

(2) use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences;

(3) give priority to the designation and protection of areas of critical environmental concern;

(4) rely, to the extent it is available, on the inventory of the public lands, their resources, and other values;

(5) consider present and potential uses of the public lands;

(6) consider the relative scarcity of the values involved and the availability of alternative means (including recycling) and sites for realization of those values;

(7) weigh long-term benefits to the public against short-term benefits;

(8) provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans; and

(9) to the extent consistent with the laws governing the administration of the public lands, coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of other Federal departments and agencies and of the States and local governments within which the lands are located,

including, but not limited to, the statewide outdoor recreation plans developed under the Act of September 3, 1964 (78 Stat. 897), as amended [16 U.S.C. 460l–4 et seq.], and of or for Indian tribes by, among other things, considering the policies of approved State and tribal land resource management programs. In implementing this directive, the Secretary shall, to the extent he finds practical, keep apprised of State, local, and tribal land use plans; assure that consideration is given to those State, local, and tribal plans that are germane in the development of land use plans for public lands; assist in resolving, to the extent practical, inconsistencies between Federal and non-Federal Government plans, and shall provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non-Federal lands. Such officials in each State are authorized to furnish advice to the Secretary with respect to the development and revision of land use plans, land use guidelines, land use rules, and land use regulations for the public lands within such State and with respect to such other land use matters as may be referred to them by him. Land use plans of the Secretary under this section shall be consistent with State and local plans to the maximum extent he finds consistent with Federal law and the purposes of this Act.

**(d) Review and inclusion of classified public lands; review of existing land use plans; modification and termination of classifications**

Any classification of public lands or any land use plan in effect on October 21, 1976, is subject to review in the land use planning process conducted under this section, and all public lands, regardless of classification, are subject to inclusion in any land use plan developed pursuant to this section. The Secretary may modify or terminate any such classification consistent with such land use plans.

**(e) Management decisions for implementation of developed or revised plans**

The Secretary may issue management decisions to implement land use plans developed or revised under this section in accordance with the following:

(1) Such decisions, including but not limited to exclusions (that is, total elimination) of one or more of the principal or major uses made by a management decision shall remain subject to reconsideration, modification, and termination through revision by the Secretary or his delegate, under the provisions of this section, of the land use plan involved.

(2) Any management decision or action pursuant to a management decision that excludes (that is, totally eliminates) one or more of the principal or major uses for two or more years with respect to a tract of land of one hundred thousand acres or more shall be reported by the Secretary to the House of Representatives and the Senate. If within ninety days from the giving of such notice (exclusive of days on which either House has adjourned for more than three consecutive days), the Congress adopts a concurrent resolution of nonapproval of the management decision or action, then the management decision or action shall be promptly terminated by the Secretary. If the committee to which a resolution has been referred during the said ninety day period, has not reported it at the end of thirty calendar days after its referral, it shall be in order to either discharge the committee from further consideration of such resolution or to discharge the committee from consideration of any other resolution with respect to the management decision or action. A motion to discharge may be made only by an individual favoring the resolution, shall be highly privileged (except that it may not be made after the committee has reported such a resolution), and debate thereon shall be limited to not more than one hour, to be divided equally between those favoring and those opposing the resolution. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to. If the motion to discharge is agreed to or disagreed to, the motion may not be made with respect to any other resolution with respect to the same management decision or action. When the committee has reprinted, or has been discharged from further consideration of a resolution, it shall at any time thereafter be in order (even though a previous motion to the same effect has been disagreed to) to move to proceed to the consideration of the resolution. The motion shall be highly privileged and shall not be debatable. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to.

(3) Withdrawals made pursuant to section 1714 of this title may be used in carrying out management decisions, but public lands shall be removed from or restored to the operation of the Mining Law of 1872, as amended (R.S. 2318–2352; 30 U.S.C. 21 et seq.) or transferred to another department, bureau, or agency only by withdrawal action pursuant to section 1714 of this title or other action pursuant to applicable law: *Provided,* That nothing in this section shall prevent a wholly owned Government corporation from acquiring and holding rights as a citizen under the Mining Law of 1872.

**(f) Procedures applicable to formulation of plans and programs for public land management**

The Secretary shall allow an opportunity for public involvement and by regulation shall establish procedures, including public hearings where appropriate, to give Federal, State, and local governments and the public, adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands.

(Pub. L. 94–579, title II, § 202, Oct. 21, 1976, 90 Stat. 2747.)

REFERENCES IN TEXT

This Act, referred to in subsecs. (a) and (c)(9), is Pub. L. 94–579, Oct. 21, 1976, 90 Stat. 2743, as amended, known as the Federal Land Policy and Management Act of 1976. For complete classification of this Act to the Code, see Tables.

Act of September 3, 1964, as amended, referred to in subsec. (c)(9), is Pub. L. 88–578, Sept. 3, 1964, 78 Stat. 897, as amended, known as the Land and Water Conservation Fund Act of 1965, which is classified generally to part B (§ 460l–4 et seq.) of subchapter LXIX of chapter 1 of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 460l–4 of Title 16 and Tables.

The Mining Law of 1872, as amended, referred to in subsec. (e)(3), is act May 10, 1872, ch. 152, 17 Stat. 91, as amended, which was incorporated into the Revised Statutes of 1878 as R.S. §§ 2319 to 2328, 2331, 2333 to 2337, and 2344, which are classified to sections 22 to 24, 26 to 28, 29, 30, 33 to 35, 37, 39 to 42, and 47 of Title 30, Mineral Lands and Mining. For complete classification of R.S. §§ 2318–2352, see Tables.

## § 1713. Sales of public land tracts

### (a) Criteria for disposal; excepted lands

A tract of the public lands (except land in units of the National Wilderness Preservation System, National Wild and Scenic Rivers Systems, and National System of Trails) may be sold under this Act where, as a result of land use planning required under section 1712 of this title, the Secretary determines that the sale of such tract meets the following disposal criteria:

(1) such tract because of its location or other characteristics is difficult and uneconomic to manage as part of the public lands, and is not suitable for management by another Federal department or agency; or

(2) such tract was acquired for a specific purpose and the tract is no longer required for that or any other Federal purpose; or

(3) disposal of such tract will serve important public objectives, including but not limited to, expansion of communities and economic development, which cannot be achieved prudently or feasibly on land other than public land and which outweigh other public objectives and values, including, but not limited to, recreation and scenic values, which would be served by maintaining such tract in Federal ownership.

### (b) Conveyance of land of agricultural value and desert in character

Where the Secretary determines that land to be conveyed under clause (3) of subsection (a) of this section is of agricultural value and is desert in character, such land shall be conveyed either under the sale authority of this section or in accordance with other existing law.

### (c) Congressional approval procedures applicable to tracts in excess of two thousand five hundred acres

Where a tract of the public lands in excess of two thousand five hundred acres has been designated for sale, such sale may be made only after the end of the ninety days (not counting days on which the House of Representatives or the Senate has adjourned for more than three consecutive days) beginning on the day the Secretary has submitted notice of such designation to the Senate and the House of Representatives, and then only if the Congress has not adopted a concurrent resolution stating that such House does not approve of such designation. If the committee to which a resolution has been referred during the said ninety day period, has not reported it at the end of thirty calendar days after its referral, it shall be in order to either discharge the committee from further consideration of such resolution or to discharge the committee from consideration of any other resolution with respect to the designation. A motion to discharge may be made only by an individual favoring the resolution, shall be highly privileged (except that it may not be made after the committee has reported such a resolution), and debate thereon shall be limited to not more than one hour, to be divided equally between those favoring and those opposing the resolution. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to. If the motion to discharge is agreed to or disagreed to, the motion may not be made with respect to any other resolution with respect to the same designation. When the committee has reprinted, or has been discharged from further consideration of a resolution, it shall at any time thereafter be in order (even though a previous motion to the same effect has been disagreed to) to move to proceed to the consideration of the resolution. The motion shall be highly privileged and shall not be debatable. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to.

### (d) Sale price

Sales of public lands shall be made at a price not less than their fair market value as determined by the Secretary.

### (e) Maximum size of tracts

The Secretary shall determine and establish the size of tracts of public lands to be sold on the basis of the land use capabilities and development requirements of the lands; and, where any such tract which is judged by the Secretary to be chiefly valuable for agriculture is sold, its size shall be no larger than necessary to support a family-sized farm.

### (f) Competitive bidding requirements

Sales of public lands under this section shall be conducted under competitive bidding procedures to be established by the Secretary. However, where the Secretary determines it necessary and proper in order (1) to assure equitable distribution among purchasers of lands, or (2) to recognize equitable considerations or public policies, including but not limited to, a preference to users, he may sell those lands with modified competitive bidding or without competitive bidding. In recognizing public policies, the Secretary shall give consideration to the following potential purchasers:

(1) the State in which the land is located;
(2) the local government entities in such State which are in the vicinity of the land;
(3) adjoining landowners;
(4) individuals; and
(5) any other person.



**(g) Acceptance or rejection of offers to purchase**

The Secretary shall accept or reject, in writing, any offer to purchase made through competitive bidding at his invitation no later than thirty days after the receipt of such offer or, in the case of a tract in excess of two thousand five hundred acres, at the end of thirty days after the end of the ninety-day period provided in subsection (c) of this section, whichever is later, unless the offeror waives his right to a decision within such thirty-day period. Prior to the expiration of such periods the Secretary may refuse to accept any offer or may withdraw any land or interest in land from sale under this section when he determines that consummation of the sale would not be consistent with this Act or other applicable law.

(Pub. L. 94–579, title II, §203, Oct. 21, 1976, 90 Stat. 2750.)

REFERENCES IN TEXT

This Act, referred to in subsecs. (a) and (g), is Pub. L. 94–579, Oct. 21, 1976, 90 Stat. 2743, as amended, known as the Federal Land Policy and Management Act of 1976. For complete classification of this Act to the Code, see Tables.

## § 1714. Withdrawals of lands

**(a) Authorization and limitation; delegation of authority**

On and after the effective date of this Act the Secretary is authorized to make, modify, extend, or revoke withdrawals but only in accordance with the provisions and limitations of this section. The Secretary may delegate this withdrawal authority only to individuals in the Office of the Secretary who have been appointed by the President, by and with the advice and consent of the Senate.

**(b) Application and procedures applicable subsequent to submission of application**

(1) Within thirty days of receipt of an application for withdrawal, and whenever he proposes a withdrawal on his own motion, the Secretary shall publish a notice in the Federal Register stating that the application has been submitted for filing or the proposal has been made and the extent to which the land is to be segregated while the application is being considered by the Secretary. Upon publication of such notice the land shall be segregated from the operation of the public land laws to the extent specified in the notice. The segregative effect of the application shall terminate upon (a) rejection of the application by the Secretary, (b) withdrawal of lands by the Secretary, or (c) the expiration of two years from the date of the notice.

(2) The publication provisions of this subsection are not applicable to withdrawals under subsection (e) hereof.

**(c) Congressional approval procedures applicable to withdrawals aggregating five thousand acres or more**

(1) On and after October 21, 1976, a withdrawal aggregating five thousand acres or more may be made (or such a withdrawal or any other withdrawal involving in the aggregate five thousand acres or more which terminates after such date of approval may be extended) only for a period of not more than twenty years by the Secretary on his own motion or upon request by a department or agency head. The Secretary shall notify both Houses of Congress of such a withdrawal no later than its effective date and the withdrawal shall terminate and become ineffective at the end of ninety days (not counting days on which the Senate or the House of Representatives has adjourned for more than three consecutive days) beginning on the day notice of such withdrawal has been submitted to the Senate and the House of Representatives, if the Congress has adopted a concurrent resolution stating that such House does not approve the withdrawal. If the committee to which a resolution has been referred during the said ninety day period, has not reported it at the end of thirty calendar days after its referral, it shall be in order to either discharge the committee from further consideration of such resolution or to discharge the committee from consideration of any other resolution with respect to the Presidential recommendation. A motion to discharge may be made only by an individual favoring the resolution, shall be highly privileged (except that it may not be made after the committee has reported such a resolution), and debate thereon shall be limited to not more than one hour, to be divided equally between those favoring and those opposing the resolution. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to. If the motion to discharge is agreed to or disagreed to, the motion may not be made with respect to any other resolution with respect to the same Presidential recommendation. When the committee has reprinted, or has been discharged from further consideration of a resolution, it shall at any time thereafter be in order (even though a previous motion to the same effect has been disagreed to) to move to proceed to the consideration of the resolution. The motion shall be highly privileged and shall not be debatable. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to.

(2) With the notices required by subsection (c)(1) of this section and within three months after filing the notice under subsection (e) of this section, the Secretary shall furnish to the committees—

(1) a clear explanation of the proposed use of the land involved which led to the withdrawal;

(2) an inventory and evaluation of the current natural resource uses and values of the site and adjacent public and nonpublic land and how it appears they will be affected by the proposed use, including particularly aspects of use that might cause degradation of the environment, and also the economic impact of the change in use on individuals, local communities, and the Nation;

(3) an identification of present users of the land involved, and how they will be affected by the proposed use;

(4) an analysis of the manner in which existing and potential resource uses are incompatible with or in conflict with the proposed use, together with a statement of the provisions to

be made for continuation or termination of existing uses, including an economic analysis of such continuation or termination;

(5) an analysis of the manner in which such lands will be used in relation to the specific requirements for the proposed use;

(6) a statement as to whether any suitable alternative sites are available (including cost estimates) for the proposed use or for uses such a withdrawal would displace;

(7) a statement of the consultation which has been or will be had with other Federal departments and agencies, with regional, State, and local government bodies, and with other appropriate individuals and groups;

(8) a statement indicating the effect of the proposed uses, if any, on State and local government interests and the regional economy;

(9) a statement of the expected length of time needed for the withdrawal;

(10) the time and place of hearings and of other public involvement concerning such withdrawal;

(11) the place where the records on the withdrawal can be examined by interested parties; and

(12) a report prepared by a qualified mining engineer, engineering geologist, or geologist which shall include but not be limited to information on: general geology, known mineral deposits, past and present mineral production, mining claims, mineral leases, evaluation of future mineral potential, present and potential market demands.

**(d) Withdrawals aggregating less than five thousand acres; procedure applicable**

A withdrawal aggregating less than five thousand acres may be made under this subsection by the Secretary on his own motion or upon request by a department or an agency head—

(1) for such period of time as he deems desirable for a resource use; or

(2) for a period of not more than twenty years for any other use, including but not limited to use for administrative sites, location of facilities, and other proprietary purposes; or

(3) for a period of not more than five years to preserve such tract for a specific use then under consideration by the Congress.

**(e) Emergency withdrawals; procedure applicable; duration**

When the Secretary determines, or when the Committee on Natural Resources of the House of Representatives or the Committee on Energy and Natural Resources of the Senate notifies the Secretary, that an emergency situation exists and that extraordinary measures must be taken to preserve values that would otherwise be lost, the Secretary notwithstanding the provisions of subsections (c)(1) and (d) of this section, shall immediately make a withdrawal and file notice of such emergency withdrawal with both of those Committees. Such emergency withdrawal shall be effective when made but shall last only for a period not to exceed three years and may not be extended except under the provisions of subsection (c)(1) or (d), whichever is applicable, and (b)(1) of this section. The information required in subsection (c)(2) of this subsection shall be furnished the committees within three months after filing such notice.

**(f) Review of existing withdrawals and extensions; procedure applicable to extensions; duration**

All withdrawals and extensions thereof, whether made prior to or after October 21, 1976, having a specific period shall be reviewed by the Secretary toward the end of the withdrawal period and may be extended or further extended only upon compliance with the provisions of subsection (c)(1) or (d) of this section, whichever is applicable, and only if the Secretary determines that the purpose for which the withdrawal was first made requires the extension, and then only for a period no longer than the length of the original withdrawal period. The Secretary shall report on such review and extensions to the Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate.

**(g) Processing and adjudication of existing applications**

All applications for withdrawal pending on October 21, 1976 shall be processed and adjudicated to conclusion within fifteen years of October 21, 1976, in accordance with the provisions of this section. The segregative effect of any application not so processed shall terminate on that date.

**(h) Public hearing required for new withdrawals**

All new withdrawals made by the Secretary under this section (except an emergency withdrawal made under subsection (e) of this section) shall be promulgated after an opportunity for a public hearing.

**(i) Consent for withdrawal of lands under administration of department or agency other than Department of the Interior**

In the case of lands under the administration of any department or agency other than the Department of the Interior, the Secretary shall make, modify, and revoke withdrawals only with the consent of the head of the department or agency concerned, except when the provisions of subsection (e) of this section apply.

**(j) Applicability of other Federal laws withdrawing lands as limiting application**

The Secretary shall not make, modify, or revoke any withdrawal created by Act of Congress; make a withdrawal which can be made only by Act of Congress; modify or revoke any withdrawal creating national monuments under the Act of June 8, 1906 (34 Stat. 225; 16 U.S.C. 431–433); or modify, or revoke any withdrawal which added lands to the National Wildlife Refuge System prior to October 21, 1976, or which thereafter adds lands to that System under the terms of this Act. Nothing in this Act is intended to modify or change any provision of the Act of February 27, 1976 (90 Stat. 199; 16 U.S.C. 668dd(a)).

**(k) Authorization of appropriations for processing applications**

There is hereby authorized to be appropriated the sum of $10,000,000 for the purpose of processing withdrawal applications pending on the effective date of this Act, to be available until expended.

**(*l*) Review of existing withdrawals in certain States; procedure applicable for determination of future status of lands; authorization of appropriations**

(1) The Secretary shall, within fifteen years of October 21, 1976, review withdrawals existing on October 21, 1976, in the States of Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming of (1) all Federal lands other than withdrawals of the public lands administered by the Bureau of Land Management and of lands which, on October 21, 1976, were part of Indian reservations and other Indian holdings, the National Forest System, the National Park System, the National Wildlife Refuge System, other lands administered by the Fish and Wildlife Service or the Secretary through the Fish and Wildlife Service, the National Wild and Scenic Rivers System, and the National System of Trails; and (2) all public lands administered by the Bureau of Land Management and of lands in the National Forest System (except those in wilderness areas, and those areas formally identified as primitive or natural areas or designated as national recreation areas) which closed the lands to appropriation under the Mining Law of 1872 (17 Stat. 91, as amended; 30 U.S.C. 22 et seq.) or to leasing under the Mineral Leasing Act of 1920 (41 Stat. 437, as amended; 30 U.S.C. 181 et seq.).

(2) In the review required by paragraph (1) of this subsection, the Secretary shall determine whether, and for how long, the continuation of the existing withdrawal of the lands would be, in his judgment, consistent with the statutory objectives of the programs for which the lands were dedicated and of the other relevant programs. The Secretary shall report his recommendations to the President, together with statements of concurrence or nonconcurrence submitted by the heads of the departments or agencies which administer the lands. The President shall transmit this report to the President of the Senate and the Speaker of the House of Representatives, together with his recommendations for action by the Secretary, or for legislation. The Secretary may act to terminate withdrawals other than those made by Act of the Congress in accordance with the recommendations of the President unless before the end of ninety days (not counting days on which the Senate and the House of Representatives has adjourned for more than three consecutive days) beginning on the day the report of the President has been submitted to the Senate and the House of Representatives the Congress has adopted a concurrent resolution indicating otherwise. If the committee to which a resolution has been referred during the said ninety day period, has not reported it at the end of thirty calendar days after its referral, it shall be in order to either discharge the committee from further consideration of such resolution or to discharge the committee from consideration of any other resolution with respect to the Presidential recommendation. A motion to discharge may be made only by an individual favoring the resolution, shall be highly privileged (except that it may not be made after the committee has reported such a resolution), and debate thereon shall be limited to not more than one hour, to be divided equally between those favoring and those opposing the resolution. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to. If the motion to discharge is agreed to or disagreed to, the motion may not be made with respect to any other resolution with respect to the same Presidential recommendation. When the committee has reprinted, or has been discharged from further consideration of a resolution, it shall at any time thereafter be in order (even though a previous motion to the same effect has been disagreed to) to move to proceed to the consideration of the resolution. The motion shall be highly privileged and shall be not debatable. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to.

(3) There are hereby authorized to be appropriated not more than $10,000,000 for the purpose of paragraph (1) of this subsection to be available until expended to the Secretary and to the heads of other departments and agencies which will be involved.

(Pub. L. 94–579, title II, § 204, Oct. 21, 1976, 90 Stat. 2751; Pub. L. 103–437, § 16(d)(1), Nov. 2, 1994, 108 Stat. 4594.)

REFERENCES IN TEXT

On and after the effective date of this Act, referred to in subsecs. (a) and (k), probably means on and after the date of enactment of Pub. L. 94–579, which was approved Oct. 21, 1976.

Act of June 8, 1906, referred to in subsec. (j), is act June 8, 1906, ch. 3060, 34 Stat. 225, popularly known as the Antiquities Act of 1906, which is classified generally to sections 431, 432, and 433 of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 431 of Title 16 and Tables.

Act of February 27, 1976 (90 Stat. 199; 16 U.S.C. 668dd(a)), referred to in subsec. (j), is Pub. L. 94–223, Feb. 27, 1976, 90 Stat. 199, which amended section 668dd of Title 16. For complete classification of this Act to the Code, see Tables.

This Act, referred to in subsec. (j), is Pub. L. 94–579, Oct. 21, 1976, 90 Stat. 2743, as amended, known as the Federal Land Policy and Management Act of 1976. For complete classification of this Act to the Code, see Tables.

The Mining Law of 1872 (17 Stat. 91, as amended; 30 U.S.C. 22 et seq.), referred to in subsec. (*l*)(1), is act May 10, 1972, ch. 152, 17 Stat. 91, as amended. That act was incorporated into the Revised Statutes as R.S. §§ 2319 to 2328, 2331, 2333 to 2337, and 2344, which are classified to sections 22 to 24, 26 to 28, 29, 30, 33 to 35, 37, 39 to 42, and 47 of Title 30, Mineral Lands and Mining. For complete classification of R.S. §§ 2319 to 2328, 2331, 2333 to 2337, and 2344 to the Code, see Tables.

The Mineral Leasing Act of 1920 (41 Stat. 437, as amended; 30 U.S.C. 181 et seq.), referred to in subsec. (*l*)(1), is act Feb. 25, 1920, ch. 85, 41 Stat. 437, as amended, known as the Mineral Leasing Act, which is classified generally to chapter 3A (§ 181 et seq.) of Title 30. For complete classification of this Act to the Code, see Short Title note set out under section 181 of Title 30 and Tables.

AMENDMENTS

1994—Subsec. (e). Pub. L. 103–437, § 16(d)(1)(A), substituted "Committee on Natural Resources of the House of Representatives or the Committee on Energy and Natural Resources of the Senate" for "Committee

on Interior and Insular Affairs of either the House of Representatives or the Senate'' and ''both of those Committees'' for ''the Committees on Interior and Insular Affairs of the Senate and the House of Representatives''.

Subsec. (f). Pub. L. 103–437, §16(d)(1)(B), substituted ''Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate'' for ''Committees on Interior and Insular Affairs of the House of Representatives and the Senate''.

### § 1715. Acquisitions of public lands and access over non-Federal lands to National Forest System units

**(a) Authorization and limitations on authority of Secretary of the Interior and Secretary of Agriculture**

Notwithstanding any other provisions of law, the Secretary, with respect to the public lands and the Secretary of Agriculture, with respect to the acquisition of access over non-Federal lands to units of the National Forest System, are authorized to acquire pursuant to this Act by purchase, exchange, donation, or eminent domain, lands or interests therein: *Provided,* That with respect to the public lands, the Secretary may exercise the power of eminent domain only if necessary to secure access to public lands, and then only if the lands so acquired are confined to as narrow a corridor as is necessary to serve such purpose. Nothing in this subsection shall be construed as expanding or limiting the authority of the Secretary of Agriculture to acquire land by eminent domain within the boundaries of units of the National Forest System.

**(b) Conformity to departmental policies and land-use plan of acquisitions**

Acquisitions pursuant to this section shall be consistent with the mission of the department involved and with applicable departmental land-use plans.

**(c) Status of lands and interests in lands upon acquisition by Secretary of the Interior; transfers to Secretary of Agriculture of lands and interests in lands acquired within National Forest System boundaries**

Except as provided in subsection (e) of this section, lands and interests in lands acquired by the Secretary pursuant to this section or section 1716 of this title shall, upon acceptance of title, become public lands, and, for the administration of public land laws not repealed by this Act, shall remain public lands. If such acquired lands or interests in lands are located within the exterior boundaries of a grazing district established pursuant to section 315 of this title, they shall become a part of that district. Lands and interests in lands acquired pursuant to this section which are within boundaries of the National Forest System may be transferred to the Secretary of Agriculture and shall then become National Forest System lands and subject to all the laws, rules, and regulations applicable thereto.

**(d) Status of lands and interests in lands upon acquisition by Secretary of Agriculture**

Lands and interests in lands acquired by the Secretary of Agriculture pursuant to this section shall, upon acceptance of title, become National Forest System lands subject to all the laws, rules, and regulations applicable thereto.

**(e) Status and administration of lands acquired in exchange for lands revested in or reconveyed to United States**

Lands acquired by the Secretary pursuant to this section or section 1716 of this title in exchange for lands which were revested in the United States pursuant to the provisions of the Act of June 9, 1916 (39 Stat. 218) or reconveyed to the United States pursuant to the provisions of the Act of February 26, 1919 (40 Stat. 1179), shall be considered for all purposes to have the same status as, and shall be administered in accordance with the same provisions of law applicable to, the revested or reconveyed lands exchanged for the lands acquired by the Secretary.

(Pub. L. 94–579, title II, §205, Oct. 21, 1976, 90 Stat. 2755; Pub. L. 99–632, §5, Nov. 7, 1986, 100 Stat. 3521.)

REFERENCES IN TEXT

This Act, referred to in subsecs. (a) and (c), is Pub. L. 94–579, Oct. 21, 1976, 90 Stat. 2743, as amended, known as the Federal Land Policy and Management Act of 1976. For complete classification of this Act to the Code, see Tables.

Act of June 9, 1916, referred to in subsec. (e), is not classified to the Code.

Act of February 26, 1919, referred to in subsec. (e), is act Feb. 26, 1919, ch. 47, 40 Stat. 1179, which is not classified to the Code.

AMENDMENTS

1986—Subsec. (c). Pub. L. 99–632, §5(1), inserted exception relating to subsec. (e).

Subsec. (e). Pub. L. 99–632, §5(2), added subsec. (e).

### § 1716. Exchanges of public lands or interests therein within the National Forest System

**(a) Authorization and limitations on authority of Secretary of the Interior and Secretary of Agriculture**

A tract of public land or interests therein may be disposed of by exchange by the Secretary under this Act and a tract of land or interests therein within the National Forest System may be disposed of by exchange by the Secretary of Agriculture under applicable law where the Secretary concerned determines that the public interest will be well served by making that exchange: *Provided,* That when considering public interest the Secretary concerned shall give full consideration to better Federal land management and the needs of State and local people, including needs for lands for the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife and the Secretary concerned finds that the values and the objectives which Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the values of the non-Federal lands or interests and the public objectives they could serve if acquired.

**(b) Implementation requirements; cash equalization waiver**

In exercising the exchange authority granted by subsection (a) of this section or by section 1715(a) of this title, the Secretary concerned may accept title to any non-Federal land or in-

90 STAT. 2792      PUBLIC LAW 94–579—OCT. 21, 1976

### REPEAL OF WITHDRAWAL LAWS

*Effective date.*

Sec. 704. (a) Effective on and after the date of approval of this Act, the implied authority of the President to make withdrawals and reservations resulting from acquiescence of the Congress (U.S. v. Midwest Oil Co., 236 U.S. 459) and the following statutes and parts of statutes are repealed:

| Act of | Chapter | Section | Statute at Large | 43 U.S. Code |
|---|---|---|---|---|
| Oct. 2, 1888 | 1069 | | 25:527 | 662. |
| Only the following portion under the section headed "U.S. Geological Survey: The last sentence of the paragraph relating to investigation of irrigable lands in the arid region, including the proviso at the end thereof. | | | | |
| Mar. 3, 1891 | 561 | 24 | 26:1103 | 16 U.S.C. 471. |
| Mar. 1, 1893 | 183 | 21 | 27:510 | 33 U.S.C. 681. |
| Aug. 18, 1894 | 301 | 4 | 28:422 | 641. |
| Only that portion of the first sentence of the second paragraph beginning with "and the Secretary of the Interior" and ending with "shall not be approved." | | | | |
| May 14, 1898 | 299 | 10 | 30:413 | 687a–4. |
| Only the fifth proviso of the first paragraph. | | | | |
| June 17, 1902 | 1093 | 3 | 32:388 | 416. |
| Only that portion of section three preceding the first proviso. | | | | |
| Apr. 16, 1906 | 1631 | | 34:116 | 561. |
| Only the words "withdraw from public entry any lands needed for townsite purposes", and also after the word "case", the word "and". | | | | |
| June 27, 1906 | 3559 | 4 | 34:520 | 561. |
| Only the words "withdraw and". | | | | |
| Mar. 15, 1910 | 96 | | 36:237 | 643. |
| June 25, 1910 | 421 | 1,2 | 36:847 | 141, 142, 16 U.S.C. 471(a). |
| All except the second and third provisos. | | | | |
| June 25, 1910 | 431 | 13 | 36:858 | 148. |
| Mar. 12, 1914 | 37 | 1 | 38:305 | 975b. |
| Only that portion which authorizes the President to withdraw, locate, and dispose of lands for townsites. | | | | |
| Oct. 5, 1914 | 316 | 1 | 38:727 | 569(a). |
| June 9, 1916 | 137 | 2 | 39:219. | |
| Under "Class One," only the words "withdrawal and." | | | | |
| Dec. 29, 1916 | 9 | 10 | 39:865 | 300. |
| June 7, 1924 | 248 | 2 | 43:655 | 16 U.S.C. 471. |
| Aug. 19, 1935 | 561 | "Sec. 4" | 49:661 | 22 U.S.C. 277c. |
| In "Sec. 4", only paragraph "c" except the proviso thereof. | | | | |
| Mar. 3, 1927 | 299 | 4 | 44:1347 | 25 U.S.C. 398d. |
| Only the proviso thereof. | | | | |
| May 24, 1928 | 729 | 4 | 45:729 | 49 U.S.C. 214. |
| Dec. 21, 1928 | 42 | 9 | 45:1063 | 617h. |
| Mar. 6, 1946 | 58 | | 60:36 | 617h. |
| First sentence only. | | | | |
| June 16, 1934 | 557 | "Sec. 40(a)" | 48:977 | 30 U.S.C. 229a. |
| The proviso only. | | | | |
| May 1, 1936 | 254 | 2 | 49:1250. | |
| May 31, 1938 | 304 | | 52:593 | 25 U.S.C. 497. |
| July 20, 1939 | 334 | | 53:1071 | 16 U.S.C. 471b. |
| May 28, 1940 | 220 | 1 | 54:224 | 16 U.S.C. 552a. |
| All except the second proviso. | | | | |
| Apr. 11, 1956 | 203 | 8 | 70:110 | 620g. |
| Only the words "and to withdraw public lands from entry or other disposition under the public land laws." | | | | |
| Aug. 10, 1956 | Chapter 949 | 9772 | 70A:588 | 10 U.S.C. 4472, 9772. |
| Aug. 16, 1952 | P.L. 87–590 | 4 | 76:389 | 616c. |
| Only the words "and to withdraw public lands from entry or other disposition under the public land laws." | | | | |

*43 USC 617h.*

(b) The second sentence of the Act of March 6, 1946 (60 Stat. 36; 43 U.S.C. 617(h)), is amended by deleting "Thereafter, at the direction of the Secretary of the Interior, such lands" and by substituting therefor the following: "Lands found to be practicable of irrigation and reclamation by irrigation works and withdrawn under the Act of March 6, 1946 (43 U.S.C. 617(h))".

### REPEAL OF LAW RELATING TO ADMINISTRATION OF PUBLIC LANDS

*Effective date.*

Sec. 705. (a) Effective on and after the date of approval of this Act, the following statutes or parts of statutes are repealed:

90 STAT. 2794                    PUBLIC LAW 94–579—OCT. 21, 1976

43 USC 1701
note.

(b) Nothing in section 706(a), except as it pertains to rights-of-way, may be construed as affecting the authority of the Secretary of Agriculture under the Act of June 4, 1897 (30 Stat. 35, as amended, 16 U.S.C. 551); the Act of July 22, 1937 (50 Stat. 525, as amended, 7 U.S.C. 1010–1212); or the Act of September 3, 1954 (68 Stat. 1146, 43 U.S.C. 931c).

SEVERABILITY

43 USC 1701
note.

SEC. 707. If any provision of this Act or the application thereof is held invalid, the remainder of the Act and the application thereof shall not be affected thereby.

Approved October 21, 1976.

---

LEGISLATIVE HISTORY:

HOUSE REPORTS: No. 94–1163 accompanying H.R. 13777 (Comm. on Interior and Insular Affairs) and No. 94–1724 (Comm. of Conference).
SENATE REPORT No. 94–583 (Comm. on Interior and Insular Affairs).
CONGRESSIONAL RECORD, Vol. 122 (1976):
    Feb. 23, 25, considered and passed Senate.
    July 22, considered and passed House, amended, in lieu of H.R. 13777.
    Sept. 30, House agreed to conference report.
    Oct. 1, Senate agreed to conference report.

Note.—A change has been made in the slip law format to provide for one-time preparation of copy to be used for publication of both slip laws and the United States Statutes at Large volumes. Comments from users are invited by the Office of the Federal Register, National Archives and Records Service, Washington, D.C. 20408.

○