**Nos. 14-17350, 14-17351, 14-17352, and 14-17374
(Consolidated)**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

American Exploration & Mining Association,

*Plaintiff-Appellant*,

v.

S.M.R. Jewell, Secretary of the Interior, *et al.*,

*Defendants-Appellees*,

and

Grand Canyon Trust, *et al.*

*Intervenors-Defendants-Appellees*.

---

On Appeal from the U.S. District Court for the District of Arizona,
Civil Case Nos. 3:11-cv-08171-DGC, 3:12-cv-08038-DGC, 3:12-cv-08042-DGC, and
3:12-cv-08075-DGC
The Honorable David G. Campbell, District Judge

---

**APPELLANT'S OPENING BRIEF**

---

Jeffrey W. McCoy, Esq.
Steven J. Lechner, Esq.
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, CO 80227
(303) 292-2021
jmccoy@mountainstateslegal.com
lechner@mountainstateslegal.com

Attorneys for Appellant AEMA

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 28 and Fed. R. App. P. 26.1, the undersigned

attorney for American Exploration & Mining Association ("AEMA") certifies that

AEMA has no parent corporation and, because it has never issued any stock, there

is no publicly held corporation that owns any stock of AEMA.

/s/ Jeffrey W. McCoy
Jeffrey W. McCoy, Esq.
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
jmccoy@mountainstateslegal.com

Attorney for Appellant AEMA

i

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ..................................... i

TABLE OF AUTHORITIES ................................................. v

STATEMENT OF JURISDICTION ......................................... 1

STATEMENT OF ISSUES ................................................... 1

STATUTORY, AND REGULATORY PROVISIONS ........................ 2

STATEMENT OF FACTS AND STATEMENT OF THE CASE ........ 2

I.    LEGAL BACKGROUND ............................................. 2

    A.    The Mining Law ..................................................... 2

    B.    The Federal Land Policy And Management Act ............... 3

    C.    The National Forest Management Act .............................. 9

II.   FACTUAL BACKGROUND ......................................... 10

III.  HISTORY OF THE CASE ........................................... 15

SUMMARY OF ARGUMENT ............................................. 17

ARGUMENT ................................................................ 19

I.    STANDARD OF REVIEW .......................................... 19

II.   THE UNCONSTITUTIONAL LEGISLATIVE VETO IN
    SECTION 204(c)(1) OF FLPMA WAS ESSENTIAL TO,
    AND CANNOT BE SEVERED FROM, THE
    DELEGATION OF AUTHORITY TO MAKE LARGE-
    TRACT WITHDRWALS .............................................. 20

A.    The Delegation Of Authority To Make Large-Tract Withdrawals Without A Legislative Veto Is Inconsistent With The Intent Of Congress When It Passed FLPMA ................................................................ 22

B.    The Evidence Demonstrates That Congress Would Not Have Delegated The Authority To Make Large-Tract Withdrawals Without The Control Provided By The Veto ............................................................................ 28

III.  THE PURPORTED JUSTIFICATIONS FOR THE WITHDRAWAL ARE NOT SUPPORTED BY THE EVIDENCE ................................................................ 31

A.    The Rationales For The Withdrawal Stated In The Record Of Decision Are Inconsistent With The Applicant's Stated Purpose For The Withdrawal. ............. 32

B.    The Secretary's Rationales Are Not Supported By The Evidence ............................................................ 35

1.    A One Million Acre Withdrawal is Not Necessary to Protect Water Resources in Northern Arizona ........................................ 35

2.    A One Million Acre Withdrawal is Not Necessary to Protect Cultural Resources in Northern Arizona ........................................ 39

3.    A One Million Acre Withdrawal is Not Necessary to Protect Other Resources in Northern Arizona ........................................ 40

4.    A One Million Acre Withdrawal Has a Major Effect on the Economic Benefits of Mining ............ 44

IV.  THE FOREST SERVICE'S PURPORTED CONSENT TO THE WITHDRAWAL WAS UNLAWFUL ................................ 47

A.    The Forest Service's Decision To Consent To The Withdrawal Violated The Governing Forest Plan............... 48

    1.    Mining is a Necessary Component of the Forest Planning Process ....................................................... 48

    2.    The Governing Forest Plan Did Not Contemplate a Withdrawal of over 355,000 Acres of Land.............................................................. 54

    3.    The Forest Service Cannot Retroactively Amend the Forest Plan to Justify a Previous Decision .................................................................. 55

B.    The Forest Service Failed To Adequately Justify Its Decision To Consent To The Withdrawal ......................... 60

CONCLUSION ......................................................................... 61

STATEMENT OF RELATED CASES ................................................. 62

CERTIFICATE OF COMPLIANCE ...................................................... 63

CERTIFICATE OF SERVICE ............................................................ 64

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alaska Airlines, Inc. v. Brock,*
480 U.S. 678 (1987)................................................................. 21, 22

*Bowen v. Georgetown University Hospital,*
488 U.S. 204 (1988)................................................................. 56

*California Coastal Comm'n v. Granite Rock Co.,*
480 U.S. 572 (1987)................................................................. 49

*Carter v. Carter Coal Co.,*
298 U.S. 238 (1936)................................................................. 25

*Deffeback v. Hawke,*
115 U.S. 392 (1885)................................................................. 45

*Ecology Ctr. v. Castaneda,*
574 F.3d 652 (9th Cir. 2009) ............................................... 10, 54

*Exxon Mobil Corp. v. Allapattah Services, Inc.,*
545 U.S. 546 (2005)................................................................. 28

*Friends of Southeast's Future v. Morrison,*
153 F.3d 1059 (9th Cir. 1998) .............................. 56, 57–58, 59

*Garcia v. United States,*
469 U.S. 70 (1984)................................................................... 28

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.,*
378 F.3d 1059 (9th Cir. 2004) ............................................... 19

*Greenpeace Action v. Franklin,*
14 F.3d 1324 (9th Cir.1992) ................................................. 39

*Gustafson v. Alloyd Co.,*
513 U.S. 561 (1995)................................................................. 59

v

*High Country Citizens Alliance v. Clarke,*
    454 F.3d 1177 (10th Cir. 2006) ........................................................ 3

*Hill v. Wallace,*
    259 U.S. 44 (1922)........................................................................ 24, 25

*Idaho Sporting Cong., Inc. v. Rittenhouse,*
    305 F.3d 957 (9th Cir. 2002) ........................................................ 10, 54

*I.N.S. v. Chadha,*
    462 U.S. 919 (1983)............................................................................ 25

*Louisiana Public Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986).............................................................................. 4

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990).............................................................................. 6

*McComish v. Bennett,*
    611 F.3d 510 (9th Cir. 2010) ............................................................ 19

*Miller v. Albright,*
    523 U.S. 420 (1998)............................................................................ 23

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
    526 U.S. 172 (1999)............................................................................ 21

*Mistretta v. United States,*
    488 U.S. 361 (1989)............................................................................ 30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*
*Ins. Co.,*
    463 U.S. 29 (1983)........................................................ 20, 31, 34, 60

*Mount Royal Joint Venture v. Kempthorne,*
    477 F.3d 745 (D.C. Cir. 2007)............................................................ 59

*Mountain States Legal Foundation v. Andrus,*
    499 F. Supp. 383 (D. Wyo. 1980)................................................... 8, 23

*Mountain States Legal Foundation v. Hodel*,
    668 F. Supp. 1466 (D. Wyo. 1987)...................................................... 53

*Native Ecosystems Council v. U.S. Forest Service*,
    418 F.3d 953 (9th Cir. 2005) ........................................... 10, 19, 34, 60

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    132 S. Ct. 2566 (2012)................................................................ 20–21

*Natural Res. Def. Council v. Nat'l Marine Fisheries Serv.*,
    421 F.3d 872 (9th Cir. 2005) ............................................................. 19

*Pac. Rivers Council v. Thomas*,
    873 F. Supp. 365 (D. Idaho 1995) ................................................ 52, 53

*Planned Parenthood of Missouri v. Danforth*,
    428 U.S. 52 (1976)............................................................................ 24

*Regan v. Time, Inc.*,
    468 U.S. 641 (1984)........................................................................... 24

*Sierra Club v. Bosworth*,
    510 F.3d 1016 (9th Cir. 2007) ..................................................... 19-20

*Sierra Forest Legacy v. Sherman*,
    646 F.3d 1161 (9th Cir. 2011) ..................................................... 57, 59

*State of Cal. ex rel. State Water Res. Control Bd. v. F.E.R.C.*,
    966 F.2d 1541 (9th Cir. 1992) ............................................................. 7

*Thomas v. Union Carbide Agric. Products Co.*,
    473 U.S. 568 (1985)........................................................................... 24

*Tuan Anh Nguyen v. INS*,
    533 U.S. 53 (2001)............................................................................ 23

*Union Oil Co. of California v. Smith*,
    249 U.S. 337 (1919)............................................................................ 3

*United States v. Midwest Oil Co.*,
236 U.S. 459 (1915)................................................................ 4, 5, 7

*United States v. Shumway,*
199 F.3d 1093 (9th Cir. 1999) ............................................... 3

*United States v. Weiss*,
642 F.2d 296 (9th Cir.1981) ................................................. 51

*United States v. Williams,*
553 U.S. 285 (2008)............................................................... 59

*Wilbur v. United States ex rel. Krushnic*,
280 U.S. 306 (1930)............................................................... 3

*Yates v. United States*,
135 S. Ct. 1074 (2015)........................................................... 59

## ADMINISTRATIVE DECISIONS

*Casey E. Folks*, *Jr.*,
183 IBLA 24 (2012) .............................................................. 8, 23

## CONSTITUTIONAL PROVISIONS

U.S. Const. Art. IV, § 3, cl. 2................................................... 3

## STATUTES

Pickett Act, 36 Stat. 847 § 1 (1910)......................................... 4, 5

Act of February 26, 1919, 40 Stat. 1175 (1919) ...................... 11

Grand Canyon National Park Enlargement Act, Pub. L. No. 93-
620, 88 Stat. 2089 (1975)......................................................... 11

Arizona Wilderness Act, Pub. L. 98–406, Title III, 98 Stat 1485
(Aug. 28, 1984) ......................................................................... 11, 45

Pub. L. 94–579, § 704 (Oct. 21, 1976), 90 Stat 2743, 2792 ................... 7, 24

Administrative Procedure Act, 5 U.S.C. § 702......................................... 1, 15, 19

    5 U.S.C. § 706(2)(A) .......................................................... 19

National Historic Preservation Act, 16 U.S.C. § 470 *et seq.*.................. 40

    16 U.S.C. § 478................................................................... 53, 54

National Forest Management Act, 16 U.S.C. § 1600 *et seq.*.................. passim

    16 U.S.C. § 1601(d) .......................................................... 9

    16 U.S.C. § 1604(a) .......................................................... 9

    16 U.S.C. § 1604(e) .......................................................... 10

    16 U.S.C. § 1604(e)(1)...................................................... 52

    16 U.S.C. § 1604(f)(4) ...................................................... 57, 58

    16 U.S.C. § 1604(i) ..........................................................10, 54, 55, 56

28 U.S.C. § 1291 .................................................................... 1

28 U.S.C. § 1331 .................................................................... 1

Mining and Minerals Policy Act, 30 U.S.C. § 21a ................................ 3, 7, 45

The Mining Law, 30 U.S.C. § 22 *et seq.* ................................................ 2, 3

    30 U.S.C. § 23..................................................................... 3

    30 U.S.C. § 26..................................................................... 3

30 U.S.C. § 611 ...................................................................... 46

National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*............... 13, 16

43 U.S.C. § 142 ...................................................................... 5

43 U.S.C. §§ 155–158 ................................................................ 5

Federal Land Policy and Management Act, Pub. L. 94–579,
Section 707, 90 Stat at 2794; 43 U.S.C. § 1701 (1976) ......................... passim

43 U.S.C. § 1701(a)(4) ........................................................ 7, 22, 23

43 U.S.C. § 1701(a)(12) ............................................................ 7

43 U.S.C. § 1702(c) .............................................................. 7, 31

43 U.S.C. § 1702(j) ................................................................. 7

43 U.S.C. § 1702(l) ................................................................ 45

43 U.S.C. § 1714(a) .............................................................. 8, 23

43 U.S.C. § 1714(b)(1) ......................................................... 32, 24

43 U.S.C. § 1714(c) ............................................................. 1, 26

43 U.S.C. § 1714(c)(1) ...................................................... 8, 23, 27

43 U.S.C. § 1714(c)(2) ........................................................... 8, 9

43 U.S.C. § 1714(d) ............................................................. 8, 26

43 U.S.C. § 1714(e) ............................................................... 30

43 U.S.C. § 1714(i) .............................................................. 9, 48

43 U.S.C. § 1732(a) ................................................................. 7

## **RULES**

Fed. R. App. P. 26.1 ................................................................. i

Fed. R. App. P. 28 .................................................................. i

Fed. R. App. P. 28(i) ................................................................20, 34, 40, 45

Fed. R. App. P 32(a)(7)(C) ..................................................... 63

Ninth Circuit Rule 28-2.6 ....................................................... 62

Ninth Circuit Rule 32-1 .......................................................... 63

## **REGULATIONS**

36 C.F.R. § 219.10(a) (2012)................................................... 49

36 C.F.R. § 219.10(a)(2) (2012) ............................................. 49

36 C.F.R. § 228 (2013) ............................................................ 51

36 C.F.R. § 228.1 (2013) ......................................................... 51

36 C.F.R. § 228.4(a) (1994)..................................................... 51, 53

36 C.F.R. § 228.8 (2013) ......................................................... 37, 41, 53

36 C.F.R. § 228.8(e)................................................................ 43

40 C.F.R. § 1506.3(c)............................................................. 60

43 C.F.R. § 2310.1-2(c)(7)...................................................... 32

43 C.F.R. § 2310.3–3 .............................................................. 32, 33

43 C.F.R. § 3809.420(a)(4)...................................................... 41

43 C.F.R. § 3809.420(b)(5)...................................................... 37

43 C.F.R. § 3809.420(b)(7)...................................................... 43

43 C.F.R. § 3809.420(b)(8)...................................................... 40

## LEGISLATIVE HISTORY

Executive Order No. 8911 (Sept. 27, 1941) ........................................... 5

122 Cong. Rec. 23,434–57 (July 22, 1976) ........................................... 28

    122 Cong Rec. 23,436–37 (Rep. Skubitz) ........................................ 28

    122 Cong. Rec. 23,454 (Rep. Johnson) ............................................ 29

S. Rep. No. 94-583, at 35 (1975) ............................................................ 6

H. Rep. No. 94-1163 (1976) .................................................................... 28

## OTHER AUTHORITIES

*Black's Law Dictionary* 1240 (7th ed. 1999) ......................................... 25

C. Wheatley, Jr., *Study of Withdrawals and Reservations of Public Domain Lands* Volume I (1969) ................................................. 4, 5

David Getches, *Managing The Public Lands: The Authority of the Executive to Withdraw Lands*, 22 Nat. Resources J. 280 (1982) ................................................................................................. 26, 27

Department of the Interior Departmental Manual 603 DM 1.1(A), *available at* http://elips.doi.gov/ELIPS/0/doc/1806/Page1.aspx ............ 32, 34, 35

Public Land Law Review Commission, Pub. L. 88-606 (Sep. 19, 1964) ...................................................................................................... 5

Public Land Law Review Commission, *One Third of the Nation's Land* 43 (1970) ........................................................................................ 6, 26, 28, 31

Robert L. Glicksman, *Severability and the Realignment of the Balance of Power over the Public Lands: The Federal Land Policy and Management Act of 1976 After the Legislative Veto Decisions,* 36 HASTINGS L.J. 1 (1984) ................................................ 22, 27, 29, 30

*The Northern Arizona Mining Continuity Act of 2011: Hearing on H.R. 3155 Before the H. Subcomm. on National Parks, Forests and Public Lands* (Nov. 3, 2011) (Statement of Sen. John McCain), *available at* http://natural resources. house.gov/ UploadedFiles/McCainOpening11.03.11.pdf .......................................... 11

U.S. Attorney General, *Withdrawal of Public Lands*, 40 U.S. Op. Atty. Gen. 73 (1941) ................................................................ 5

United States Department of Agriculture, *Final Environmental Impact Statement for the Kaibab National Forest Land and Resource Management Plan* 9, 256 (February 2014), *available at* http://www.fs.usda.gov/Internet/ FSE_ DOCUMENTS/stelprd3791591.pdf. ..................................................... 51

United States Department of Agriculture, *Land and Resource Management Plan for the Kaibab National Forest* 82 (February 2014), *available at* http://www.fs.usda.gov/Internet/FSE_ DOCUMENTS/stelprd3791580.pdf ....................................................... 51

## STATEMENT OF JURISDICTION

American Exploration & Mining Association ("AEMA"), formally

Northwest Mining Association, brought suit in the district court under 28 U.S.C.

§ 1331 and the Administrative Procedure Act, 5 U.S.C. § 702.  On September 30,

2014, the district court entered final judgment for Appellees.  AEMA's Excerpts of

Record ("ER") 1.  On November 25, 2014, AEMA filed a timely notice of appeal.

ER135.  This Court has jurisdiction over the district court's final judgment

pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.     Whether the Secretary of Interior's ("Secretary") decision to withdraw, for

       twenty years, over one million acres of federal land in northern Arizona

       from location and entry under the Mining Law was arbitrary, capricious, an

       abuse of discretion, not in accordance with law and/or an excess of statutory

       authority.

2.     Whether the unconstitutional legislative veto in Section 204(c)(1) of the

       Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §

       1714(c), is indispensable from the grant of authority to make large-tract

       withdrawals and, thus, whether the entirety of Section 204(c)(1) must be

       severed from the rest of FLPMA.

3.      Whether the Secretary's purported justifications for the decision to withdraw one million acres of federal land were inconsistent with the administrative record and not in accordance with the law.

4.      Whether the United States Forest Service's ("Forest Service") purported consent to the massive withdrawal was arbitrary capricious, an abuse of discretion, or otherwise not in accordance with law.

5.      Whether the Forest Service violated the National Forest Management Act by issuing a decision inconsistent with the governing Kaibab National Forest Land Management Plan ("Forest Plan").

## STATUTORY AND REGULATORY PROVISIONS

Pertinent legal provisions are set forth in AEMA's addendum to this brief.

## STATEMENT OF FACTS AND STATEMENT OF THE CASE

**I.    LEGAL BACKGROUND.**

    **A.    The Mining Law.**

The Mining Law, 30 U.S.C. § 22 *et seq*., provides "all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States ...."  30 U.S.C. § 22.  Thus, the Mining Law is a unilateral offer that grants all persons a statutory right to enter upon federal lands for the purpose of exploring for and developing

2

valuable mineral deposits. *Union Oil Co. of California v. Smith*, 249 U.S. 337, 346 (1919). In addition, a person who makes a "discovery" of a "valuable mineral deposit" and satisfies the procedures required for establishing the location of the claim becomes the owner of a constitutionally protected property interest. 30 U.S.C. §§ 22, 23, 26; *Wilbur v. United States ex rel. Krushnic*, 280 U.S. 306, 317–18 (1930) (a mining claim "is property in the fullest sense of that term"); *United States v. Shumway,* 199 F.3d 1093, 1108 (9th Cir. 1999).

The purpose of the Mining Law, as reflected in its title: "An Act to promote the Development of the mining Resources of the United States" (17 Stat. 91), is to increase the Nation's wealth by facilitating development of the Nation's minerals. *See High Country Citizens Alliance v. Clarke*, 454 F.3d 1177, 1183–85 (10th Cir. 2006). Congress reaffirmed this purpose when it passed the Mining and Minerals Policy Act of 1970 ("MMPA"), which provides that "it is the continuing policy of the Federal Government" to encourage private enterprise in mineral development." 30 U.S.C. § 21a.

## B.    The Federal Land Policy And Management Act.

The Property Clause of the Constitution vests solely in Congress the power to manage federal lands and provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. Art. IV, § 3, cl. 2. Thus, for

the Executive Branch to exercise any power over federal lands, Congress must

delegate a portion of its power. *See Louisiana Public Serv. Comm'n v. FCC*, 476

U.S. 355, 374 (1986) ("[A]n agency literally has no power to act ... unless and until

Congress confers power upon it ....").

Prior to 1976, there was no single act defining the extent of Executive power

over the public lands. With respect to the power to withdraw federal lands,

Congress occasionally passed legislation that delegated such power to the

Executive. *See generally*, C. Wheatley, Jr., *Study of Withdrawals and Reservations*

*of Public Domain Lands* Volume I (1969) ("*Wheatley Study*"). In the absence of

statutory authority, the President would sometimes make temporary withdrawals in

aid of future legislation withdrawing specific public lands. *See United States v.*

*Midwest Oil Co.*, 236 U.S. 459, 479–81 (1915). In *Midwest Oil*, the Supreme

Court ruled that congressional acquiescence to this type of Executive action

provided the President with implied authority to make withdrawals. *Id.* at 479–81.

Importantly, however, the Court acknowledged that Congress could revoke that

implied authority through subsequent legislation. *Id*. at 481.

In 1910, Congress passed the Pickett Act, which delegated to the Executive

Branch limited authority to make temporary withdrawals "for waterpower sites,

irrigation, classification of lands, or other public purposes ...." Ch. 421, 36 Stat.

847 § 1 (1910) (Sections 1 and 3 repealed by FLPMA, Section 2, as amended, is

4

codified at 43 U.S.C. § 142). Because the Pickett Act post-dated the controversy in *Midwest Oil,* however, and because there was no evidence that Congress intended for it to have retroactive effect, the Court in *Midwest Oil* refused to consider whether that Act repealed the Executive's implied authority. 236 U.S. 481–83. Thus, following *Midwest Oil* there remained uncertainty about whether the Pickett Act revoked the implied authority of the Executive to make withdrawals.

In 1941, the Attorney General wrote an opinion stating that the Executive had implied authority to make withdrawals, even beyond what was authorized by the Pickett Act. U.S. Attorney General, *Withdrawal of Public Lands*, 40 U.S. Op. Atty. Gen. 73, 81–84 (1941). As a result, the Executive continued to make withdrawals not authorized by any specific statute. *See, e.g.,* Executive Order No. 8911 (Sept. 27, 1941). In 1958, Congress further limited the President's withdrawal authority by passing the Defense Withdrawal Act, which prohibited the Executive from making defense withdrawals in excess of 5,000 acres. 43 U.S.C. §§ 155–158; *see Wheatley Study* at 310

The uncertainty over the Executive's withdrawal authority, among other land management issues, led to the creation of the Public Land Law Review Commission ("PLLRC") in 1964. Pub. L. 88-606 (Sep. 19, 1964). The PLLRC noted that there was "concern about problems associated with the 'withdrawal' and

'reservation' of public domain lands," which were voiced during the deliberations that eventually led to the Commission's creation. PLLRC, *One Third of the Nation's Land* 43 (1970) ("PLLRC Report"). Specifically, the PLLRC Report provided that withdrawals "have been used by the Executive in an uncontrolled and haphazard manner." *Id.* As a result of these unchecked withdrawals, by 1970 "virtually all" of the public domain had been withdrawn from entry under one or more of the public land laws. *Id.* at 52. Accordingly, the PLLRC recommended that "Congress assert its constitutional authority by enacting legislation reserving unto itself exclusive authority to withdraw or otherwise set aside public land for specified limited-purpose uses." *Id.* at 2.

Following the recommendations of the PLLRC, Congress passed FLPMA in 1976. *See* S. Rep. No. 94-583, at 35 (1975), *reprinted in* Senate Comm. on Energy and Natural Resources, 95th Cong., *Legislative History of the Federal Land Policy and Management Act of 1976* 100 (1978) (stating that the Senate version of FLPMA, "is in accordance with over one hundred recommendations of the [PLLRC Report]."); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 876–77 (1990) ("*NWF*") (recognizing the important role the PLLRC Report played in the subsequent enactment of FLPMA). FLPMA "addressed [the] lack of a comprehensive statutory mandate" on the extent of the Executive's power to

manage public lands. *See State of Cal. ex rel. State Water Res. Control Bd. v. F.E.R.C.*, 966 F.2d 1541, 1555 (9th Cir. 1992).

FLPMA requires that the Secretary "manage the public lands under principles of multiple use and sustained yield, in accordance with land use plans developed by him ...." 43 U.S.C. § 1732(a). "Multiple use" is defined as, *inter alia*, "[t]he management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people ...." 43 U.S.C. § 1702(c). In passing FLPMA, Congress also continued the policy of the MMPA by requiring public lands to be managed "in a manner which recognizes the Nation's need for domestic sources of minerals .... including implementation of the [MMPA] as it pertains to the public lands ...." 43 U.S.C. § 1701(a)(12).

Regarding withdrawals, FLPMA declares a policy that "the Congress exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes and that Congress delineate the extent to which the Executive may withdraw lands without legislative action." 43 U.S.C. 1701(a)(4); *see also* 43 U.S.C. § 1702(j) (defining "withdrawal"). Accordingly, in Section 704(a) of FLPMA, Congress expressly repealed 29 withdrawal statutes, overruled *Midwest Oil*, and revoked any and all implied power that the Executive may have had to withdrawal public lands. Pub. L. 94–579, § 704 (Oct. 21, 1976),

7

90 Stat 2743, 2792.  Although Congress delegated to the Secretary of the Interior the authority to make withdrawals, that authority may be exercised "*only* in accordance with the provisions and limitations of [Section 204 of FLPMA]."  43 U.S.C. § 1714(a) (emphasis added); *Mountain States Legal Foundation v. Andrus*, 499 F. Supp. 383, 395 (D. Wyo. 1980).  ("[I]t was the intent of Congress with the passage of FLPMA to limit the ability of the Secretary of the Interior to remove large tracts of public land from the operation of the public land laws ...."); *see Casey E. Folks*, *Jr.*, 183 IBLA 24, 48 n.32 (2012) ("[w]hatever authority may exist in the President, Congress has limited the Secretary's authority to that provided in section 204 of FLPMA").

Under Section 204(d), the Secretary may withdraw "less than five thousand acres" ("small-tract withdrawals") "on his own motion or upon request by a department or an agency head ...."  43 U.S.C. § 1714(d).  In contrast, withdrawals of 5,000 acres or more ("large-tract withdrawals") may only be made for 20 years and upon making such a withdrawal, the "Secretary shall notify both Houses of Congress of such a withdrawal."  43 U.S.C. § 1714(c)(1).  Concurrently, the Secretary must provide Congress twelve categories of information which explains, *inter alia*, why the withdrawal is necessary, the mineral potential of the area, and the economic impact of the withdrawal.  43 U.S.C. § 1714(c)(2).  A large-tract withdrawal will also terminate and become ineffective at the end of ninety days,

"beginning on the day notice of such withdrawal has been submitted to the Senate and the House of Representatives, if the Congress has adopted a concurrent resolution stating that such House does not approve the withdrawal." *Id.*

Finally, except for emergency withdrawals, the Secretary can only withdrawal lands under the administration of another agency with the consent of that agency:

> In the case of lands under the administration of any department or agency other than the Department of the Interior, the Secretary shall make, modify, and revoke withdrawals *only with the consent of the head of the department or agency concerned* ….

43 U.S.C. § 1714(i) (emphasis added).

### C.    The National Forest Management Act.

Like FLPMA, the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*, sets forth "multiple use" and "sustained yield" as the guiding principles for the Forest Service's National Forest management.  16 U.S.C. § 1601(d) ("It is the policy of the Congress that all forested lands in the National Forest System shall be maintained ... to secure the maximum benefits of multiple use sustained yield management ...."); 16 U.S.C. § 1604(e).

To fulfill its multiple-use mandate, the Forest Service uses a multi-step planning and decisionmaking process.  First, the Forest Service must develop a forest plan for each individual National Forest.  16 U.S.C. § 1604(a).  Each forest plan must "provide for multiple use and sustained yield."  16 U.S.C. § 1604(e).

Second, "the Forest Service implements each forest plan by approving or disapproving site-specific actions." *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 957 n.1 (9th Cir. 2005). NFMA requires that "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i). Therefore, "all subsequent agency action ... must comply with NFMA and the governing forest plan." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009); *Idaho Sporting Cong., Inc. v. Rittenhouse,* 305 F.3d 957, 962 (9th Cir. 2002).

## II. FACTUAL BACKGROUND.

Northern Arizona contains some of the highest grade uranium deposits in the United States. *See*, *e.g.*, ER375 (grade of withdrawn deposits "is significantly higher than almost all of the other uranium reserves in the United States ...."); ER221 ("all of the lands involved in the proposed withdrawal are considered to be lands with some of the highest uranium potential in the country."); ER443. These deposits are concentrated in breccia pipes, which allow operators to "produce more uranium with less environmental footprint." ER438. The area also contains other locatable minerals, including deposits of uncommon varieties of building stone. ER213.

These valuable mineral deposits are located in northern Arizona outside the 1.2 million acre Grand Canyon National Park.[1]  In 1984, Congress passed legislation establishing 250,000 acres of federal land in the area as wilderness while opening up 600,000 acres of land for multiple use, including mining. Arizona Wilderness Act, Pub. L. 98–406, Title III, 98 Stat 1485 (Aug. 28, 1984). The 1984 Arizona Wilderness Act was the result of historic compromise between environmental groups, uranium mining interests, the livestock industry, and others that established what areas in northern Arizona should be preserved, and which areas should be open for multiple use.  *See, e.g.*, *The Northern Arizona Mining Continuity Act of 2011: Hearing on H.R. 3155 Before the H. Subcomm. on National Parks, Forests and Public Lands* (Nov. 3, 2011) (Statement of Sen. John McCain), *available at* http://naturalresources.house.gov/UploadedFiles/McCainOpening11.03.11.pdf; ER359 (statement of Arizona Utah Local Economic Coalition in support of Northern Arizona Mining Continuity Act of 2011); ER493 (Comments of AEMA's Executive Director on proposed withdrawal).

---

[1] Congress has expressly defined which lands should be protected as a part of the Grand Canyon National Park.  *See* Act of February 26, 1919, 40 Stat. 1175 (1919) (designating Grand Canyon National Park); Grand Canyon National Park Enlargement Act, Pub. L. No. 93-620, 88 Stat. 2089 (1975) (expanding boundaries of the Grand Canyon National Park, not including the lands withdrawn in this case).

Since 1984, it was the continuing policy of the various Presidential administrations to follow congressional intent and manage the designated lands in northern Arizona for multiple use. For example, in June 2008, in response to a proposal to withdrawal land in northern Arizona, Mark Rey, then-Undersecretary for Natural Resources and Environment, Department of Agriculture, testified that a withdrawal would be unnecessary because "[e]xisting law, including the Clean Air Act, the Clean Water Act, the Federal Land Policy and Management Act, the National Environmental Policy Act, Forest Service and Bureau of Land Management policy, and the Kaibab National Forest Land Management Plan, as well as applicable state and local permitting requirements, provide sufficient direction for the protection of resources while providing for multiple use of the area." ER347.

The longstanding policy of leaving designated federal lands in northern Arizona open for mineral exploration suddenly changed in 2009. On July 15, 2009, the Acting Director of the Bureau of Land Management ("BLM") sent the Secretary a request to file an application to withdraw 633,547 acres of public lands and 360,002 acres of National Forest System Lands for up to 20 years from location and entry under the Mining Law. ER208. The purported purpose of the withdrawal, "*if determined to be appropriate*, would be to protect the *Grand*

12

*Canyon Watershed* from adverse effects of locatable hardrock mineral exploration and mining." *Id.* (all emphasis added).

On July 21, 2009, in response to the BLM's request, the Secretary published notice in the Federal Register proposing to withdraw the requested lands. The only stated purpose for the proposed withdrawal in the notice, "if determined to be appropriate, would be to protect the Grand Canyon watershed from adverse effects of locatable hardrock mineral exploration and mining." ER216.

Upon publication of the notice of proposed withdrawal, the area was segregated for two years, ER217, purportedly "to allow time for various studies and analyses...." ER216. Pursuant to the National Environmental Policy Act, ("NEPA"), 42 U.S.C. § 4321 *et seq*., the BLM began drafting an Environmental Impact Statement ("EIS") to study the effects of various alternatives for withdrawing land in northern Arizona, including an alternative to not withdraw any land. *See* ER181.

On June 28, 2011, before the federal agencies completed their investigation, the Secretary ordered a sixth month "emergency withdrawal" because he concluded, without the benefit of a Final Environmental Impact Statement ("FEIS"), that it was necessary to protect the resources in the area. ER353. In October 2011, the BLM issued the FEIS for the proposed withdrawal. ER218.

On January 9, 2012, the Secretary signed the Record of Decision ("ROD") for the Northern Arizona Withdrawal, ER165, and Public Land Order ("PLO") 7787, which implemented the ROD by withdrawing 1,006,545 acres from location and entry under the Mining Law for twenty years. ER189. The withdrawal consists of three parcels: the North Parcel (~549,995 acres); the East parcel (~134,454 acres); and the South Parcel (~322,096 acres). ER168; *see also* ER225 (Map of the withdrawal area). The entire South Parcel, and portions of the East Parcel, are comprised of the Kaibab National Forest. ER188; ER225. Prior to the signing of the ROD, on January 5, 2012, Thomas Tidwell, Chief of the Forest Service, sent a one-page letter to the Director of the BLM, which purportedly consented to the withdrawal of the Forest Service lands. ER340.

The ROD relied on new justifications not listed in BLM's application. ER174–76. The Secretary believed that leaving the area open under the Mining Law would be "unacceptable" because, purportedly, the effect of mining on water resources was uncertain and more time was needed to study the issue. ER174. The Secretary also believed that the withdrawal would protect other resources in the area, including cultural, visual, and wildlife resources. ER174–76. Finally, the Secretary concluded that the withdrawal would not reduce the economic benefits of mining, even though it would prevent new mining claims in the area. ER175–76.

14

Furthermore, as a result of the withdrawal, "neither the BLM nor the Forest Service will process a new notice or plan of operations until the surface managing agency conducts a mineral examination and determines that the mining claims on which the surface disturbance would occur were valid as of the date the lands were segregated or withdrawn." ER170. As described by the Secretary, "[d]etermining the validity of a mining claim is a complex and time-consuming legal, geological, and economic evaluation that is done on a claim-by-claim basis." ER170.

As a result, many operators with claims in the withdrawn area, including AEMA members, have suffered economic injury including: loss of market value and lease income on existing claims, inability to engage in more than casual use absent a lengthy mineral examination, inability to explore for and locate additional claims. ER97–100. Those operators that have chosen to keep claims, including other AEMA members, are unable to timely develop those claims as a result of the complex and time-consuming mineral examinations required.[2] *Id.*

## III.   HISTORY OF THE CASE.

On March 6, 2012, AEMA filed this action seeking judicial review, under the APA of the actions by the Secretary and others that led up to and culminated in

---

[2] Based on these injuries, the district court properly determined that AEMA has standing to bring this suit. *Id.*

the massive withdrawal.[3]  AEMA alleged that Appellees violated FLPMA, NFMA, and NEPA.  *See* ER149–63.  AEMA also alleged that Defendant Salazar exceeded his authority in withdrawing over 5,000 acres because Section 204(c)(1) of FLPMA contains an unconstitutional and non-severable legislative veto, which renders Section 204(c)(1) null and void.  *Id.*  On August 20, 2013, the district court consolidated AEMA's case with three other cases.[4]  Dist. Ct. Dkt. 56.[5]

On January 18, 2013, AEMA filed a motion for partial summary judgment, alleging that the legislative veto in Section 204(c)(1) of FLPMA was unconstitutional and could not be severed from the delegation of authority to make withdrawals over 5,000 acres.[6]  Dist. Ct. Dkt. 90.  On March 20, 2013, the district court held that the legislative veto was unconstitutional but still denied AEMA's motion, and granted federal defendant's cross-motion on the same issue.  ER87.  The district court only severed a portion of the subsection and left intact the congressional delegation of authority to make large-tract withdrawals.  ER86–87.

---

[3] The others are the BLM; Thomas J. Vilsack, Secretary, Department of Agriculture; and the United States Forest Service ("Forest Service").

[4] In the same order, the district court granted intervention to Grand Canyon Trust, Center for Biological Diversity, Havasupai Tribe, and National Parks Conservation Association's (collectively "Trust").  Dist. Ct. Dkt. 56.

[5] An asterisk before a document number indicates that the cited document was filed in *AEMA v. Jewell*, 12-cv- 8042-DGC.  A document number without an asterisk refers to the docket in the lead case below, *Yount v. Jewell*, 11-cv-8171-DGC.

[6] On January 8, 2013, the district court had dismissed AEMA's NEPA claims, ruling that AEMA was not within the zone of interests protected or regulated by NEPA.  ER128.

On September 30, 2014, the district court denied AEMA's motion for summary judgment on its remaining claims, and granted federal defendant's cross-motion, on AEMA's remaining claims. ER45. The same day, the district court entered final judgment on all of AEMA's claims. ER1. On November 25, 2014, AEMA filed a notice of appeal. ER135.

## SUMMARY OF ARGUMENT

The over one million acre withdrawal at issue in this case is the type of uncontrolled and haphazard withdrawal Congress sought to eliminate with the passage of FLPMA. With FLMPA, Congress reasserted its control over large-tract withdrawal decisions and granted the executive only limited authority to make large-tract withdrawal decisions in accordance with strict limitations. The most important of the limitations Congress placed on the executive's large-tract withdrawal decisions was a legislative veto that allowed Congress to terminate a withdrawal with a joint resolution of both houses.

Because the legislative veto in Section 204(c)(1) is unconstitutional, this Court must sever the entirety of Section 204(c)(1) from the rest of FLPMA. The text, structure, and legislative history of FLPMA demonstrate that Congress would not have granted the executive the authority to make withdrawals over 5,000 acres without the legislative veto. Severing only the legislative veto, as the district court did, leaves Section 204(c)(1) functioning in a manner inconsistent with

17

congressional intent. Therefore, this Court should reverse the judgment of the district court and sever the Secretary's authority to make large-tract withdrawals from FLPMA.

Assuming, *arguendo*, that Congress would have granted the Secretary the authority to make an over one million acre withdrawal without the ability to legislatively veto the decision, this Court should still vacate and set aside the withdrawal. Neither the original stated purpose of the withdrawal nor the justifications stated in the ROD are supported by the record. The record demonstrates that area resources will be adequately protected without a withdrawal. On the other hand, the withdrawal will have an immense adverse effect on mineral development in the area. Therefore, the Secretary failed to manage the public lands for multiple use by eliminating a principal use of the public lands with little to no benefit to any other resource.

Finally, this Court should, at a minimum, set aside the withdrawal with respect to the 355,874 acres of Forest Service land withdrawn. FLPMA provides that land under control of other federal agencies can only be withdrawn with the consent of the agency. The Forest Service's purported consent to the withdrawal, however, was unlawful. First, the decision to consent violated the governing Forest Plan. Second, the Forest Service only provided a two-sentence letter

consenting to the withdrawal that did not provide adequate justification for the decision. Accordingly, this Court should reverse the judgment of the district court.

## ARGUMENT

## I.  STANDARD OF REVIEW

This Court reviews the grant of summary judgment de novo. *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1065, *amended*, 387 F.3d 968 (9th Cir. 2004). Accordingly, this Court "will look at the case anew … giving no deference to the district judge's determinations." *McComish v. Bennett*, 611 F.3d 510, 519 (9th Cir. 2010) (internal quotations and citations omitted).

Under the APA, a court will hold unlawful and set aside a decision if, after reviewing the administrative record, it determines that the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Natural Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, 877 (9th Cir. 2005) (quoting 5 U.S.C. § 706(2)(A)). Under this standard of review, this Court must "engage in a substantial inquiry," which entails "a thorough, probing, in-depth review." *Native Ecosys. Council*, 418 F.3d at 960 (internal quotations omitted). This Court need only defer to an agency's decision if it is "fully informed and well-considered" and must reject an agency decision that amounts to "a clear error of judgment." *Sierra Club v. Bosworth*, 510 F.3d 1016,

1023 (9th Cir. 2007) (citations and internal quotations omitted).  Specifically, a

decision is arbitrary or capricious if:

> the agency has relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter to
> the evidence before the agency, or is so implausible that it could not
> be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1983).

## II. THE UNCONSTITUTIONAL LEGISLATIVE VETO IN SECTION 204(c)(1) OF FLPMA WAS ESSENTIAL TO, AND CANNOT BE SEVERED FROM, THE DELEGATION OF AUTHORITY TO MAKE LARGE-TRACT WITHDRWALS.[7]

This Court should reverse the judgment of the district court because, while

the district court correctly ruled that the legislative veto in Section 204(c)(1) of

FLPMA is unconstitutional, it erred in its decision to only invalidate some of

Section 204(c)(1).  *See* ER86–87.  The legislative veto in Section 204(c)(1) is

indispensable from the delegation of authority to make large-tract withdrawals.

Therefore, this Court must sever the entirety of Subsection 204(c)(1) from the rest

of FLPMA.

The Supreme Court applies a "'well established'" two-pronged test in

conducting a severability analysis.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S.

---

[7] Pursuant to Federal Rule of Appellate Procedure 28(i), AEMA adopts by reference Appellant National Mining Association's arguments also demonstrating that this Court should sever the entirety of Section 204(c)(1).

Ct. 2566, 2668 (2012) (Joint Opinion of Scalia, Kennedy, Thomas, and Alito, JJ., dissenting) (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987)). First, this Court must determine whether Section 204 "will function in a *manner* consistent with the intent of Congress[,]" without the veto. *Alaska Airlines,* 480 U.S. at 685 (emphasis in original). If, after weighing these concerns, this Court determines that Section 204 will not function in a manner consistent with the intent of Congress without the veto, it must invalidate Section 204(c)(1). *Id*. at 685; *Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 194 (1999) (Because the President intended the Executive Order to embody "one coherent policy," the offending language was not severable.).

Second, even if Section 204(c)(1) can function in a manner consistent with the intent of Congress without the veto, this Court must determine if Congress would have delegated large-tract withdrawal authority to the Secretary without the veto. If not, the entirety of Section 204(c)(1) must be severed. *See Alaska Airlines*, 480 U.S. at 685 ("[T]he unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted."). As demonstrated below, the language, structure, and legislative history of FLPMA demonstrate that the entirety of Section 204(c)(1) must be severed.

**A.      The Delegation Of Authority To Make Large-Tract Withdrawals Without A Legislative Veto Is Inconsistent With The Intent Of Congress When It Passed FLPMA.**

The main purpose of the FLPMA's withdrawal section was to reassert meaningful congressional control over large-tract withdrawals.  43 U.S.C. § 1701(a)(4); *see also* Robert L. Glicksman*, Severability and the Realignment of the Balance of Power over the Public Lands: The Federal Land Policy and Management Act of 1976 After the Legislative Veto Decisions,* 36 HASTINGS L.J. 1, 72 (1984) ("Throughout the legislative process leading to the enactment of FLPMA, Congress repeatedly stressed the need to restrain the executive's authority to make withdrawals.").  By simply severing the legislative veto from the rest of Section 204(c)(1), the district court returned large-tract Executive withdrawals to its pre-FLPMA state, thwarting Congress's intent when it passed the law.

The text, structure, and legislative history of FLPMA demonstrate that the legislative veto was an essential part of delegating large-tract withdrawal authority. *See Alaska Airlines, Inc*, 480 U.S. at 687 (examining "the language and structure of the Act and [] its legislative history" in order to determine severability of a legislative veto).  FLPMA provides that it is the policy of the United States that "the Congress exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes and that Congress delineate the extent to which the Executive may withdraw lands without legislative

22

action." 43 U.S.C. § 1701(a)(4); *see Mountain States Legal Foundation,* 499 F. Supp. at 395 ("it is clear that Congress intended with the passage of FLPMA to reassert control over the use of federal lands.").

In furtherance of this policy, Congress delegated to the Executive the authority to make withdrawals "only in accordance with the provisions and limitations of [Section 204]." 43 U.S.C. § 1714(a); *see Casey E. Folks*, *Jr.*, 183 IBLA 24, 48 n.32 (2012) ("[w]hatever authority may exist in the President, Congress has limited the Secretary's authority to that provided in section 204 of FLPMA"). This specific language demonstrates that Congress intended to only delegate large-tract withdrawal authority under specific conditions which included a legislative veto. *See Tuan Anh Nguyen v. INS*, 533 U.S. 53, 72 (2001) ("[I]t must be remembered that severance is based on the assumption that Congress would have intended the result. In this regard, it is significant that," Congress provided that a person may only be naturalized "'in the manner and under the conditions prescribed in this subchapter and not otherwise.'"); *Miller v. Albright*, 523 U.S. 420, 457–58 (1998) (Scalia, J., concurring in judgment) (same).

The structure of Section 204(c)(1) also demonstrates that the legislative veto was the indispensable limit on the delegation of authority to make large-tract withdrawals. Specifically, Congress embedded the legislative veto in the same subsection as the delegation. 43 U.S.C. § 1714(c)(1). This indicates that the

23

delegation of authority to make large-tract withdrawal and the legislative veto are "interwoven" and cannot be separated. *See Hill v. Wallace,* 259 U.S. 44, 70 (1922); *Thomas v. Union Carbide Agric. Products Co.*, 473 U.S. 568, 582 (1985) (where scheme for pesticide use, registration, and compensation "is integrated in a single subsection that explicitly ties the follow-on registration to the arbitration," a finding that the arbitration requirement was unconstitutional would support the remedy of enjoining registration entirely). Therefore, by including the legislative veto with the delegation of authority, Congress indicated that the two policies are interwoven and should be analyzed together. *Regan v. Time, Inc.*, 468 U.S. 641, 677 (1984) (Brennan, J., concurring in part and dissenting in part) ("[T]he two requirements are so completely intertwined as to be plainly inseverable; they constitute *a single statutory provision* which operates as an integrated whole. They therefore 'must stand or fall as a unit.'" (quoting *Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 83 (1976) (emphasis added)).

This conclusion is supported by the text of FLPMA's severability clause, which provides that "[i]f any provision of this Act or the application thereof is held invalid, the remainder of the Act and the application thereof shall not be affected thereby." Pub. L. 94–579, Section 707, 90 Stat at 2794; 43 U.S.C. § 1701 note. The word "provision" indicates that Congress intended entire sections or subsections to be severed, rather than several words within a section or subsection.

*See Black's Law Dictionary* 1240 (7th ed. 1999) (Defining "provision" as "[a] clause in a statute, contract, or other legal instrument."); *id.* at 243 (Defining "clause" as "[a] distinct section or provision of a legal document or instrument.").[8] If Congress intended for the legislative veto to be severable from the delegation of authority to make withdrawals, it would have placed the veto and the delegation in different subsections.

In fact, this is what Congress did in the statute at issue in *I.N.S. v. Chadha*. 462 U.S. 919, 923–25 (1983). In *Chadha*, the unconstitutional legislative veto was in a separate subsection than the delegation of authority to the Executive. *Id.* at 922–25. The severability clause in the act at issue in *Chada* provided for severability "[i]f *any* particular provision of this Act, or the application thereof to *any* person or circumstance, is held invalid ...." *Id.* at 932 (emphasis in original). Based on where the legislative veto was located, the Court stated that "[t]he one-House veto provision in § 244(c)(2) is clearly a 'particular provision' of the Act as that language is used in the severability clause." *Id.* This is not true of Section 204(c) of FLPMA, where the legislative veto is not in a separate

---

[8] Even if this Court interprets the word "provision" narrowly, the inclusion of a severability clause does not automatically require that the offending language simply be severed from the rest of the statute. *See Hill,* 259 U.S. at 70 (refusing to sever an unconstitutional section from a federal statute despite the presence of a severability clause.); *Carter v. Carter Coal Co.*, 298 U.S. 238, 313 (1936) ("The presumption in favor of separability does not authorize the court to give the statute an effect altogether different from that sought by the measure viewed as a whole." (internal quotation omitted)).

"provision" from the authority to make large-tract withdrawals. Therefore, the text of the severability clause further demonstrates that Congress intended to make the legislative veto inseparable from the delegation of authority to make large-tract withdrawals.

Moreover, Section 204 differentiates the executive's authority to make large-tract withdrawals with the authority to make small-tract withdrawals. *Compare* 43 U.S.C. § 1714(c) *with* 43 U.S.C. § 1714(d). Specifically, Congress delegated almost unrestrained authority to the Executive to make small-tract withdrawals. 43 U.S.C. § 1714(d); *see* David Getches, *Managing The Public Lands: The Authority of the Executive to Withdraw Lands*, 22 Nat. Resources J. 280, 318–19 (1982). On the other hand, Congress subjected large-tract withdrawals to a notice requirement, the legislative veto, and mandated that the Secretary submit information to Congress that contains information on 12 specific elements, including a mineral report. 43 U.S.C. § 1714(c). Clearly, Congress intended large-tract withdrawals to have much more congressional oversight than small-tract withdrawals. *See* PLLRC Report at 54 (recommending that "[l]arge scale limited or single use withdrawals of a permanent or indefinite term should be accomplished only by act of Congress."). Severing only the legislative veto is inconsistent with that intention, because it leaves no meaningful difference between large-tract withdrawals and small-tract withdrawals.

The non-legislative veto requirements in Section 204(c) of FLPMA are not meaningful restraints on withdrawal authority. Below, the district court held that the requirements to notify and send information to Congress are sufficient to uphold congressional intent to assert its authority over large-tract withdrawals of public lands. ER72. The purpose of these requirements, however, was to give Congress the chance to assess the withdrawal and, if necessary, veto the decision. See, Glicksman, 36 Hastings L.J. at 80–81 (concluding that these requirements are both part of the legislative veto); *see also* 43 U.S.C. § 1714(c)(1) (providing that the notice triggers the 90 days in which Congress must exercise its veto power). Importantly, a legislative veto is not the same as passing a bill that overturns a withdrawal. Under FLPMA, "Congress' disapproval can be manifested in a concurrent resolution which may avoid some of the procedures encumbering ordinary legislation." Getches, 22 Nat. Resources J. at 325. Furthermore, this congressional oversight produces a "sobering effect" which "may assure greater responsibility in using the authority." *Id.* at 329. Therefore, invalidating only the legislative veto, as the district court did, would be inconsistent with congressional intent.

**B.    The Evidence Demonstrates That Congress Would Not Have Delegated The Authority To Make Large-Tract Withdrawals Without The Control Provided By The Veto**.

In addition to the text and structure of Section 204, the legislative history of FLPMA demonstrates that Congress would not have granted the Secretary large-tract withdrawal authority without the ability to veto the decision.  *See* H. Rep. No. 94-1163, at 9 (1976), *reprinted in Legislative History of the Federal Land Policy and Management Act* at 439 ("Public concern over the possibility of excessive disposals of public lands on the one hand and excessive restrictions on the other is reflected in the inclusion of requirements for referral of certain types of actions to the Congress for review.").  Congress expressly included the legislative veto to "insure that the integrity of the great national resource management systems will remain under the control of Congress."  *Id.*; *see also* PLLRC Report at 44 (noting the "increasing controversy" of excessive use of statutory withdrawals").

In addition to the evidence supplied by the Committee Reports, statements by individual members of Congress reaffirm this conclusion.[9]  *See* 122 Cong. Rec. 23,434–57 (July 22, 1976); 122 Cong Rec. 23,436–37 (Rep. Skubitz) ("One of the most important reasons for adopting this bill is that it provides for congressional oversight and control over an executive agency which, at present, is free to act

---

[9] Although AEMA relies on individual statements, it recognizes that the Committee Reports are more indicative of Congress' intent, *Garcia v. United States*, 469 U.S. 70, 76 (1984), and that the text of FLPMA is most authoritative. *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 568 (2005).

mostly of its own accord."); *see also* 122 Cong. Rec. 23,454 (Rep. Johnson) ("I think it has been proven time after time that granting authority to the executive branch .... tends to result inevitably in the abuse of the authority.").

Therefore, this Court should not simply sever the unconstitutional legislative veto from Section 204(c)(1). Instead, this Court should invalidate all of Section 204(c)(1), which would be consistent with both FLPMA's severability clause and Congress' intent in passing Section 204. Glicksman, 36 HASTINGS L.J. at 82 (Removing all of section 204(c) from FLPMA "seems closest to the scheme Congress itself would have chosen had it known that the legislative veto was invalid."); *id* at 92 ("Narrowly construing the authority retained by the agency seems appropriate in a statute enacted in large part to impose restraints on an executive branch which, in the legislature's view, had improperly taken control of public lands policy-making.").

Severing all of Section 204(c)(1) would preserve FLPMA, and most of Section 204, while still respecting Congress' intent to limit the Executive Branch's authority to make withdrawals. *See* Glicksman, 36 HASTINGS L.J. at 81. As demonstrated above, the language, structure, and legislative history of Section 204 demonstrate that Congress wanted to strike a balance which would allow the Secretary to make relatively small withdrawals while maintaining congressional

control over large-tract withdrawals.  Severing Section 204(c)(1) in its entirety best accomplishes Congress's intent.

Furthermore, severing Section 204(c)(1) would still allow the Secretary to make three year emergency withdrawals to "preserve values that would otherwise be lost."  43 U.S.C. § 1714(e).  During the three year period, Congress would have time to pass legislation withdrawing the lands for a longer time, if necessary. Therefore, severing Section 204(c)(1) respects Congress's intent to oversee large-tract withdrawal decisions, while respecting its intent for the Executive to conduct day-to-day administration of the public lands.[10]  *See* Glicksman, 36 HASTINGS L.J. at 89 ("Section 204(e) of FLPMA seems to reflect Congress' recognition that it would have to sacrifice some control over the public lands in order to permit immediate withdrawal action in emergency situations.").  Accordingly, this Court should reverse the judgment of the district court, and hold unlawful and set aside the ROD and PLO 7787.

---

[10] It is also important to note that the same principles of separation of powers and checks and balances that prevent legislative vetoes caution against this Court severing only the legislative veto from Section 204(c)(1).  The Constitution guards against "the accumulation of excessive authority in a single Branch."  *Mistretta v. United States*, 488 U.S. 361, 381 (1989).  With the passage of Section 204 of FLPMA, Congress intended to restore the balance of authority between the Legislative and Executive Branches over withdrawals.  Simply severing the legislative veto from Section 204(c)(1) would again upset that balance in favor of the Executive Branch, contrary to the expressed intent of Congress.

### III. THE PURPORTED JUSTIFICATIONS FOR THE WITHDRAWAL ARE NOT SUPPORTED BY THE EVIDENCE.

Assuming, *arguendo*, that Congress would have granted the Secretary the authority to make a one million acre withdrawal without meaningful congressional oversight, this Court should still reverse the decision of the district court. By signing the ROD and issuing PLO 7787, the Secretary acted arbitrarily, capriciously, and failed to manage the public lands in accordance with FLPMA's multiple-use mandate. Although "multiple use" is not a precise concept, one thing is sure: Congress did not authorize the Secretary to make a land management decision without factual support. *See* 43 U.S.C. § 1702(c) (defining "multiple use"); PLLRC Report at 43 (PLLRC expressing concern that withdrawals "have been used by the Executive in an uncontrolled and haphazard manner."). As demonstrated below, neither the original stated purpose for the withdrawal nor the Secretary's purported rationales are supported by the evidence in the record. Accordingly, this Court should reverse the decision of the district court. *State Farm*, 463 U.S. 29, 43 (1983) (decision is arbitrary and capricious if the agency "offered an explanation for its decision that runs counter to the evidence before the agency ....")

**A.     The Rationales For The Withdrawal Stated In The Record of Decision Are Inconsistent With The Applicant's Stated Purpose For The Withdrawal.**

BLM's application for the withdrawal provides that the purported purpose, "*if determined to be appropriate*, would be to protect the *Grand Canyon Watershed* from adverse effects of locatable hardrock mineral exploration and mining." ER208 (emphasis added). BLM stated this purpose pursuant to the Department of Interior regulations, which provide that the application must state "[t]he public purpose or statutory program for which the lands would be withdrawn." 43 C.F.R. § 2310.1-2(c)(7). It was the Secretary's responsibility to analyze the application to determine if the withdrawal was appropriate based upon the stated purpose of the applicant. 43 C.F.R. § 2310.3–3; 43 U.S.C. § 1714(b)(1). According to the Department of the Interior Land Withdrawal Manual, "withdrawals shall be kept to a minimum consistent with the *demonstrated needs of the applicants*." Department of the Interior Departmental Manual 603 DM 1.1(A), *available at* http://elips.doi.gov/ELIPS/0/doc/1806/Page1.aspx (emphasis added); ER479 (Any withdrawal must be "justified in accordance with the Department of the Interior Land Withdrawal Manual 603 DM 1 and the BLM regulations at 43 CFR 2310."). The withdrawal decision, however, was not consistent with the demonstrated need of the BLM.

32

Communications among Department of Interior officials demonstrate that the record does not support the purported purpose of the withdrawal stated in the application. ER481–82 (BLM's Arizona Strip District Manager stating that he was "bother[ed by] ... the justification for the whole withdrawal[,]"; ER486 (Arizona BLM Planning and Environmental Coordinator stating that "based on the EIS, [I] cannot see a way to strengthen the rationale for withdrawal and still make these factual points in the ROD.") As a National Park Service hydrogeologist stated, the analysis failed to "establish impacts to water resources from uranium mining" and "instead creates enough confusion and obfuscation of hydrogeologic principles to create the illusion that there could be adverse impacts if uranium mining occurred." ER355. Summarizing the issue, Bill Jackson, the NPS Chief of Water Resources explained, "[t]he USGS report and the DEIS both support the premise of impermeable geology between breccia pipes and regional aquifers .... There exists no information we could find that would contradict [that conclusion], nor any hypotheses suggested as to how contamination of park waters might physically occur ...." ER354. Mr. Jackson confessed that "[t]his is obviously a touchy case where the hard science doesn't strongly support a policy position." *Id*. As a result, Mr. Jackson suggested that "the best way to 'finesse'" the problem would be to "fall back on the 'precautionary principle,'" a principle not mentioned

33

in the BLM's application. *Id.*; ER208. In an attempt to justify the withdrawal, the Secretary added this new "precautionary" justification to the ROD. ER174.

The evidence could not justify withdrawal based on the demonstrated need of the BLM that a withdrawal would protect the "Grand Canyon Watershed from adverse effects of locatable hardrock mineral exploration and mining." ER208. As a result, the Secretary had to change the justification in an attempt to justify the withdrawal. The Department of Interior's regulations and the Land Withdrawal Manual, however, require the Secretary to make a determination based on the application for the withdrawal.[11] 43 C.F.R. § 2310.3–3; 43 U.S.C. § 1714(b)(1); 603 DM 1.1(A). Therefore, the Secretary's decision was unlawful because the record failed to demonstrate that a withdrawal was necessary to protect the Grand Canyon Watershed. *See Native Ecosystems Council*, 418 F.3d at 960; *State Farm*, 463 U.S. at 50 ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself"). Accordingly, this Court should reverse the decision of the district court.

---

[11] As demonstrated by Appellant Quaterra, *et al.*, even if the stated purpose of the withdrawal in the application encompasses all resources, it still cannot justify a withdrawal to protect resources outside of the Grand Canyon Watershed. *See* ER447 (BLM official stating that 120,000 acres of the proposed withdrawal area is outside the Grand Canyon Watershed). Pursuant to Federal Rule of Appellate Procedure 28(i), AEMA adopts by reference Quaterra's argument on this issue.

**B.    The Secretary's Rationales Are Not Supported By The Evidence.**

Despite his own officials acknowledging that the record did not support the stated purpose of the withdrawal in the application, the Secretary chose to move forward with a full withdrawal.  In order to accomplish this, the Secretary added new rationalizations in an attempt to justify the decision.  ER174–76 (providing purported reasons for the withdrawal, including that impacts to area resources are uncertain).  Assuming, *arguendo*, that the Secretary's decision did not need to be "consistent with the demonstrated needs of the applicants," 603 DM 1.1(A), and could be justified on the grounds stated in the ROD, this Court should still reverse the judgment of the district court.  The record does not support the justifications stated in the ROD and, thus, the Secretary acted arbitrarily, capriciously, and failed to manage the public lands in accordance with FLPMA's multiple-use mandate.

**1.    A One Million Acre Withdrawal is Not Necessary to Protect Water Resources in Northern Arizona.**

The first stated reason for the withdrawal in the ROD is that the effects of mining on water resources are uncertain but, because the potential impacts might be severe, the withdrawal is necessary in order to prevent unacceptable impacts to water resources.  ER173–74.  Yet, as demonstrated above, Department of Interior officials acknowledged that the record demonstrates that water resources are not at risk as a result of mining.

35

Furthermore, the record demonstrates that the effects of mining are only uncertain, and potentially significant, when one makes spurious presumptions that the BLM itself rejected as unlikely. For example, the FEIS provides that, if the area is left open to location and entry, the potential risk to quality of the R-aquifer wells in the South Parcel ranges from "None to Major." ER303. The major end of the spectrum, however, is only possible if "mine drainage were to reach the R-aquifer and not be mitigated." ER297. Even the BLM admits that "although possible, these impacts are not considered likely because of the removal of contaminated sump water during mining, reclamation of the mines, monitoring, and the low permeability conditions that typically occur in the breccia pipe and in the hundreds of feet of intervening rock formation between the aquifer and the mining openings." *Id.*

In the North Parcel, the FEIS also characterizes the potential impact to perched aquifer wells from the no-action alternative as "None to Major." ER303. The FEIS, however, gets to "Major" only through two layers of speculation: "if an impact were to occur, it *could be* major." ER291. Yet, the preceding page of the FEIS indicates that impacts are not likely to occur. ER290 ("Water quality impacts to perched springs or wells would not be expected to occur during mining or if the perching layer is not re-established because the mine openings would be expected

to drain the perched aquifer, and movement of mine contaminants to the spring or well would not be possible.").

The record demonstrates that the Secretary did not adequately consider the effect of the current statutory and regulatory scheme on mitigating potential impacts to water resources. BLM regulations require that all mining activities comply with both federal and state water quality standards. 43 C.F.R. § 3809.420(b)(5); 36 C.F.R. § 228.8 (Forest Service regulations providing the same). Although the FEIS provides that "it must be assumed that state and federal regulations have been and are being met," the BLM and the Secretary failed to consider the existing regulatory regime in any meaningful way. ER302.

For example, when analyzing potential impacts to perched aquifer springs and wells under the no-action alternative, the BLM determined that "drilling operations that occurred after the regulations were adopted on March 5, 1984 (ADWR 2008), are considered to represent no impact or a negligible impact to the quantity and quality of perched groundwater available to perched aquifer springs or wells." ER302. Despite acknowledging that drilling operations under current regulations would represent "no impact or a negligible impact," the BLM still concluded that, under the no-action alternative, potential impact to the quantity and quality of discharge from perched aquifer wells was assumed to be no impact to *major impact* for the North Parcel. ER305. This conclusion was purportedly

based on the number of anticipated mines, the assumption that "zero to half" of the anticipated number of mines "might be located within the perched groundwater zone that supports a well," and the "salient conclusion[]" that "[i]f no such reclamation or preventive measures are taken, then depletion of the perched aquifer would be expected to continue." ER304–05. Yet that "none to major" conclusion is inconsistent with the assumption that operators will comply with applicable laws and regulations.

Therefore, the Secretary vastly overstated the potential risk of impacts from mining on water resources in the area to justify the ROD's conclusion that mining development should be slowed to allow further study of the impacts of mining.[12] As demonstrated above, if the Secretary and the BLM had correctly assumed that mining operations will comply with current laws and regulations, then the FEIS demonstrates that mining will have little to no impact on water resources in the area. *See* ER490–92 (Comments of AEMA's Executive Director demonstrating

---

[12] In the East Parcel, the BLM was unable to conclude that mining could have a major impact on water resources, even with their "conservative assumptions." ER293. Under the no-action alternative, the FEIS characterizes the potential impact to water resources in the East Parcel as "Negligible" for perched aquifer springs, "None to Negligible" for perched aquifer wells, "Negligible" for water quantity of R-aquifer Springs, "None to Moderate" for water quality of R-aquifer springs, "none" for R-aquifer wells, and "Negligible to Moderate" for surface waters. ER303. As a result, there is no support for the Secretary's assumption that the potential effects of mining on water resources would be "unacceptable" in the East Parcel. ER174. Thus, at a minimum, the withdrawal of the East Parcel should be held unlawful.

adequacy of current laws and regulations to protect resources).  As a result, the

Secretary's assumption that the withdrawal was necessary to protect water

resources was arbitrary and capricious.  *Greenpeace Action v. Franklin*, 14 F.3d

1324, 1337 (9th Cir.1992) (Agency action is arbitrary and capricious if it fails to

ground "its decision in a consideration of the relevant factors.").

### 2.     A One Million Acre Withdrawal is Not Necessary to Protect Cultural Resources in Northern Arizona.

The second purported reason for the withdrawal stated in the ROD is to

protect cultural and tribal resources in the area.[13]  ER175.  Once again, the record

demonstrates that a withdrawal is not needed in order to protect these resources.

The FEIS provides that, under the no action alternative, continued mining and

exploration "could" have a direct and/or indirect impact on cultural resources in

the area, but no cumulative impact.  ER333.  Importantly, however, "[d]irect

impacts would be mitigated through established regulations and procedures of

avoidance and mitigation."  ER255.

As with water quality standards, mining operations are required to comply

with all applicable statutes and regulations and take certain steps to prevent

---

[13] The purported impacts to cultural and other resources were justifications added at the last minute.  The final memo from the BLM to the Secretary recommending the withdrawal only focuses on the uncertain impacts to water resources.  ER344. The only mention of tribal resources is a sentence that provides that "the neighboring Grand Canyon National Park is a unique world icon, and it is a sacred place for numerous tribes."  ER344.

impacts to cultural resources.  43 C.F.R. § 3809.420(b)(8).  Mining operations must comply with the National Historic Preservation Act, 16 U.S.C. § 470 *et seq*. *See, e.g.,* ER427 (Decision Memo for Vane Minerals Uranium Exploration Drilling Project noting compliance with National Historic Preservation Act ).  In the ROD, however, the Secretary failed to acknowledge the mitigating effects of the current statutory and regulatory scheme and instead based his decision on the conclusory statement that the tribes "believe that continued uranium mining will result in the loss of their functional use of the area's natural resources." [14]  ER175.  The Secretary failed to discuss what, if any, evidence supports the tribe's beliefs or the BLM's purported analysis of impacts from mining on cultural resources.[15]  As a result, the Secretary's assumption that the withdrawal was necessary to protect cultural resources was arbitrary and capricious.

### 3. A One Million Acre Withdrawal is Not Necessary to Protect Other Resources in Northern Arizona.

The third purported reason for the withdrawal stated in the ROD is that it will protect "other resources[,]" specifically visual resources and fish and wildlife. ER175.  For example, the Secretary concluded that the withdrawal would reduce truck traffic, which "could create a major cumulative effect to visual resources."

[14] Even the Secretary recognized that "there is only one eligible traditional cultural property" in the area.  ER175.

[15] Furthermore, as demonstrated by Appellants Quaterra, *et al.*, this justification is not sufficient to justify the withdrawal.  Pursuant to Federal Rule of Appellate Procedure 28(i), AEMA adopts by reference Quaterra's argument on this issue.

*Id.* This conclusion is contradicted by the FEIS, which characterizes the expected effect to visual resources under the no-action alternative as "moderate."[16] ER331. The FEIS defines moderate impact to visual resources as "[v]isual impacts that would partially retain the existing character of the landscape, and while attracting the attention of the casual viewer, would not dominate the view." ER329. For all Parcels, the anticipated visual impacts absent a withdrawal are "moderate" and "would not dominate the view." *Id.*, ER331.

Once again, even these moderate impacts are overstated as the BLM failed to analyze how the current regulatory scheme would mitigate any purported impacts to visual resources. *See* 36 C.F.R. § 228.8 (Forest Service regulations providing that an operator "shall, to the extent practicable, harmonize operations with scenic values …."); 43 C.F.R. § 3809.420(a)(4) (BLM regulations requiring operators to comply with mitigation measures). As a result, it is unlikely that visual resources would be significantly impacted in the absence of the withdrawal.

The other resource cited by the Secretary is fish and wildlife: "[a]s a result of projected surface and groundwater effects, wildlife may be impacted." ER175. As demonstrated above, any potential impact to water resources, however, are unlikely and insignificant. For surface effects, the Secretary seemingly based his

---

[16] The FEIS does provide that some locations "may" have a major impact to visual resources, but the BLM still concluded that "the expected changes in visual quality … could lead to moderate impact to visual resources in the proposed withdrawal area." ER331.

decision on the purported potential exposure of wildlife to uranium and other radionuclides. *Id.* The record demonstrates that the Secretary's so-called "concerns" are unfounded.

For example, anticipated soil disturbance in each Parcel under the no-action alternative is less than 1% of the Parcel area. ER251. For the full withdrawal alternative, impacts of soil contamination *could* range from below to above applicable remediation standards. ER252. This is the same potential impact under all of the alternatives. *Id.* For impacts to vegetation, about 1.4% of the area is potentially disturbed, and the worst case scenario is disturbances would be "measurable but not apparent." *Id.*

Potential direct impacts to fish and wildlife are also completely speculative. The FEIS provides that "very little research has actually been performed to develop taxa specific plant and wildlife threshold levels for uranium or other metals ...." ER323. The BLM determined, however, that future site-specific analysis would provide (a more detailed, quantitative analysis of the possible effects of chemical and radiation hazards to general wildlife species …." ER324. A site-specific analysis would also provide "more precise information on the locations of exploration sites, mine sites, and roads" which "would be useful to better understand the magnitude, extent, and duration of impacts to wildlife and fish species." *Id.*

As with other resources, there are already laws and regulations in place that help determine and minimize impacts to wildlife on a site-by-site basis. 43 C.F.R. § 3809.420(b)(7) (BLM regulations); 36 C.F.R. § 228.8(e) (Forest Service regulations); ER323 ("impacts associated with new access points ... would need to be studied as part of the plan of operations as well as for the ADOT right-of-way application …"). Any potential impacts to fish and wildlife would be studied, and mitigated, when an operator submits a proposed plan of operations. Despite the BLM's recognition that a site-specific approach would provide better information about potential impacts to wildlife, and despite the fact that current regulations protect wildlife from negative impacts from mining, the Secretary determined that a withdrawal would best protect wildlife because wildlife *might* be impacted by mining.

But even the worst case scenario in the FEIS, which was based on speculative presumptions, demonstrates that mineral exploration and development would have no apparent impact on wildlife. The FEIS provides that, under the no-action alternative, "[i]mpact to overall quality and quantity of unfragmented habitat would be measurable but not apparent. Individuals may experience reduced viability or mortality; however, these impacts would not alter wildlife distribution in the study area or result in changes to overall wildlife population viability." ER326. Impacts for both the full withdrawal and no-action alternative are

43

anticipated to be long-term, but the impacts from the no-action alternative are considered "moderate" because the amount of acres potentially impacted is only 1.1% more area than the area potentially impacted under the full withdrawal alternative. *Id*.

Therefore, the record demonstrates that impacts to wildlife from mining will not be widespread, and instead depend on where surface-disturbing activities may occur. Furthermore, impacts are not likely to be significant and can be mitigated through the current statutory and regulatory scheme under which mining operations are regulated. Accordingly, the Secretary's assumption that the withdrawal was necessary to protect wildlife was arbitrary and capricious.

### 4. A One Million Acre Withdrawal Has a Major Effect on the Economic Benefits of Mining.

Finally, the Secretary tried to justify the withdrawal because it would not result in the complete cessation of mining. The Secretary stated that "even with a full withdrawal, the economic benefits of continued uranium mining could still be realized ...." *Id*. Although some mining might continue within the withdrawn area, the Secretary severely underestimated the impact of the withdrawal on the development of mineral resources in the area. *See* ER101 ("Yount has effectively lost his opportunity to validate the claims in which he has made substantial personal investments."). In fact, the record demonstrates that the BLM underestimated the amount of uranium in the withdrawn area. *See, e.g.,* ER448

44

(providing that the uranium endowment will be estimated based on a two decade old study); ER444 (providing that the estimate does not accommodate the "hidden breccia pipe" effect).[17]

Furthermore, it is irrelevant whether some mining will continue if the withdrawal arbitrarily and unnecessarily limits mining exploration and development. With the Mining Law, Congress set out an objective of increasing the Nation's wealth by facilitating development of the Nation's minerals. *Deffeback v. Hawke*, 115 U.S. 392, 402 (1885). Congress reaffirmed this policy when it passed both the MMPA, 30 U.S.C. § 21a, and FLPMA, 43 U.S.C. § 1701(a)(12). Under FLPMA, exploration and development under the Mining Law is a "principal or major use." 43 U.S.C. § 1702(l). The Secretary's decision also thwarts Congress's purposes in passing the 1984 Arizona Wilderness Act, which designated over 250,000 for wilderness and about 600,000 acres for multiple use. Pub. L. 98–406, Title III, 98 Stat 1485 (August 28, 1984). The withdrawal thwarts Congress's purposes in passing these statutes because it prevents further exploration for enormous mineral wealth in the area.

The withdrawal also stymies further development on existing claims by substantially increasing the time and cost involved in getting a plan of operations

---

[17] The underestimate of the endowment is further demonstrated by Appellant Gregory Yount. Pursuant to Federal Rule of Appellate Procedure 28(i), AEMA adopts by reference his argument.

approved. AEMA members can no longer engage in notice- or plan-level operations without first submitting to a validity examination. ER170. As the Secretary admitted, "[d]etermining the validity of a mining claim is a complex and time-consuming legal, geological, and economic evaluation that is done on a claim-by-claim basis." *Id.*; ER95 (District court stating that claim holders "must continue to pay annual maintenance fees while the now-mandatory and time consuming examination process proceeds."). As a result, some mining claimants will choose to not pursue development of their mining claims because of this costly and time-consuming process.[18]

As demonstrated above, the withdrawal does not significantly increase the protection of other resources in the area. Therefore, the Secretary's decision unnecessarily prevents multiple use of the area and unnecessarily impedes development of the Nation's minerals. Accordingly, this Court should reverse the decision of the district court and hold unlawful and set aside the ROD and PLO 7787.

---

[18] Also of note is that the BLM recognized that there are "known deposits" of "uncommon varieties" in the withdrawn area. ER213; *see* 30 U.S.C. § 611. Despite this, the BLM failed to analyze the impact of preventing exploration and development of these other locatable minerals.

46

## IV. THE FOREST SERVICE'S PURPORTED CONSENT TO THE WITHDRAWAL WAS UNLAWFUL.

This Court should also reverse the decision of the district court because the district court failed to set aside the ROD and PLO 7787 with respect to the 355,874 acres of Forest Service land withdrawn. The Forest Service acted arbitrarily, capriciously, and/or not in accordance with law when it purportedly consented to the withdrawing of Forest Service lands on January 5, 2012.[19]

In accordance with NFMA, the Kaibab National Forest adopted a Forest Plan in 1988, which has been subsequently amended several times. ER389. At the time of the Forest Service's purported consent to the withdrawal, the Kaibab Forest Plan had most recently been amended in 2004 and corrected in 2008 ("2008 Forest Plan"). *Id.* The 2008 Forest Plan contemplated withdrawals in only a small portion of the Forest. Despite expressly stating in the Forest Plan which areas of the Forest warranted a withdrawal, the Forest Service consented to the withdrawal of 355,874 acres of National Forest lands.

Furthermore, the Forest Service ignored NFMA's multiple-use mandate and the Kaibab National Forest Plan when it purportedly consented to the withdrawal. The Forest Service provided only a two sentence explanation for its decision to consent to the withdrawal. Accordingly, this Court should reverse the decision of

---

[19] The Forest Service's arbitrary and unlawful actions provide an additional and independent basis for holding unlawful and setting aside the ROD and PLO 7787 with respect to the 355,874 acres of Forest Service land withdrawn.

the district court, and hold unlawful and set aside the ROD and PLO 7787 with respect to the 355,874 acres of Forest Service land withdrawn.

### A. The Forest Service's Decision To Consent To The Withdrawal Violated The Governing Forest Plan.

#### 1. Mining is a Necessary Component of the Forest Planning Process.

The Forest Service violated NFMA and the governing Forest Plan when it consented to the withdrawal because the governing Forest Plan does not contemplate a withdrawal of 355,874 acres of land. In an attempt to get around the requirements of NFMA, the ROD provides that "[w]ithdrawal decisions are outside the authority of National Forest Planning, so no plan amendment is required."[20] ER176. The district court simply accepted this argument and ruled that the Forest Service's consent did not need to be consistent with the Kaibab Forest Plan. ER41.

The district court's decision is incorrect, however, because FLPMA gives the Forest Service the express authority to refuse to allow the Secretary to withdraw Forest Service Lands. 43 U.S.C. § 1714(i). As a result, withdrawal decisions are not outside the authority of Forest Service planning because the Forest Service can refuse to consent to a withdrawal when the proposed withdrawal would violate NFMA and the applicable Forest Plan.

---

[20] This statement is belied by the *Federal Register* notice of the ROD, which provided that "Forest plans for the Kaibab National Forest would be amended to reflect the intent of the withdrawal." ER346.

Furthermore, the Forest Service's own regulations, and the actions of the Forest Service in developing the Kaibab Forest Plan, demonstrate that mining is an essential part of the forest planning process. In accordance with NFMA, the Forest Service has promulgated regulations providing for what a forest plan must cover. Specifically, the regulations provide that "[t]he plan must include plan components, including standards or guidelines, for integrated resource management to provide for ecosystem services and multiple uses in the plan area." 36 C.F.R. § 219.10(a) (2012). The regulations further require that "the responsible official shall consider .... Renewable and nonrenewable energy and mineral resources." *Id.* § 219.10(a)(2) (2012). Therefore, in the eyes of the Forest Service, minerals management is an essential part of the Forest Service planning process.

This is reflected in the Kaibab Forest Plan. When the Forest Service adopts a forest plan, it lets a potential operator know how the Forest Service will manage the forest and what uses of land are acceptable. *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 587 (1987) (Forest Service "[l]and use planning in essence chooses particular uses for the land ...."). If the Forest Service truly believed that minerals management was outside the scope of the forest planning process, as it argued below, the Kaibab Forest Plan would have reflected that belief.

49

Instead, the Purpose and Need section of the Final EIS that accompanied the 2008 Forest Plan provides that "[t]he implementing regulations require that a number of analyses be done during the planning process" including "estimating probable occurrence of minerals and [the] potential for future mineral development ...." ER463. Furthermore, issue 13 in the Purpose and Need section is entitled "Minerals Management" and one of the criteria for evaluating the resolution of that issue is "Acres of proposed mineral withdrawals." ER469; ER471.

Accordingly, the 2008 Forest Plan proposes withdrawals from mineral entry and location in certain areas of the forest. For example, in the Tusayan Ranger District, the Forest Plan contemplates future withdrawals in: Special Area 6, ER410–11; Special Area 7, ER413–14; Land Use Zone 21, ER415–17; and Land Use Zone 22, ER419–20. Therefore, the Forest Service reviewed its multiple-use objectives and concluded that only certain areas of the forest should be closed to mineral exploration. The Final EIS for the Forest Plan further provides that "[t]he only new withdrawals contemplated are those needed to protect areas with high resource values such as existing and proposed developed recreation sites involving large capital investments, research natural areas and threatened and endangered plant habitat." ER473. Despite the Forest Service's contention that it did not need

50

to consider mineral resources or mining, the planning process for the Forest Plan, and the Forest Plan itself, indicate the opposite.[21]

The Forest service's regulations governing specific operations also indicate an intent to govern mineral development on its lands. The Forest Service has adopted regulations to ensure that mining operations on national forests are "conducted so as to minimize adverse environmental impacts on National Forest System surface resources." 36 C.F.R. § 228.1 (2013); *see, generally*, 36 C.F.R. § 228 (2013). Forest Service regulations require anyone intending to engage in mining operations to notify the Forest Service when such operations "might cause disturbance of surface resources." 36 C.F.R. § 228.4(a) (1994). In reviewing previous versions of these regulations, the Ninth Circuit held that "[t]he initiation or continuation of such an operation is subject to the approval of the Forest Service." *United States v. Weiss*, 642 F.2d 296, 297 (9th Cir.1981).

---

[21] In 2014, the Forest Service adopted a new Forest Plan to conform with the withdrawal decision. United States Department of Agriculture, *Land and Resource Management Plan for the Kaibab National Forest* 82 (February 2014), *available at* http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprd3791580.pdf. As demonstrated below, however, the Forest Service cannot retroactively amend a forest plan. Furthermore, for the 2014 Forest Plan, the Forest Service did not analyze whether a withdrawal would be appropriate, as it did with the previous Forest Plan and amendments. Instead, the Forest Service conveniently adopted a new position that withdrawal decisions were outside the scope of the planning process. United States Department of Agriculture, *Final Environmental Impact Statement for the Kaibab National Forest Land and Resource Management Plan* 9, 256 (February 2014), *available at* http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprd3791591.pdf.

Therefore, mineral development is an essential aspect of the forest planning process. *See Pac. Rivers Council v. Thomas*, 873 F. Supp. 365, 372–73 (D. Idaho 1995). In *Pac. Rivers Council*, the issue was whether mining operations should be enjoined until the Forest Service completed the required consultation with other agencies about the effects of several forest plans. *Id.* at 372. A mining group argued, as the Forest Service argued below, that forest plans do not govern mining and, thus, mining operations could not be enjoined pending completion of the consultation on the forest plan. *Id*. Although NFMA did not expressly require forest plans to plan for minerals management, the court in *Pac. Rivers Council* took into account the actions of the Forest Service to determine whether mining was outside the scope of the forest planning process.

Despite 16 U.S.C. § 1604(e)(1) only directing "planning for effective management of recreation, range, timber, watershed, wildlife and fish, and wilderness resources" the court ruled that mining activities were covered by the forest plans at issue because "mining activities are discussed in the plans, and terms and conditions on such activities, including mitigation measures, are provided for in the plans." *Id.* at 372–73. Like the Kaibab Forest Plan at issue here, the forest plans in *Pac. Rivers Council* expressly planned for minerals management. *Id.* at 273.

52

Furthermore, the court noted that the Forest Service regulations "require anyone intending to engage in mining operations to notify the Forest Service when such operations 'might cause disturbance of surface resources.'" *Id.* at 374 (quoting 36 C.F.R. § 228.4(a) (1994)); *see also* 16 U.S.C. § 478 (mining operations must comply with rules and regulations covering national forests); 36 C.F.R. § 228.8 (2013) (Mining operations "shall be conducted so as, where feasible, to minimize adverse environmental impacts ...."). Thus, the court concluded "that mining activities should be included in consultation on the [forest plans] to ensure that the USFS and NMFS have a comprehensive view of all activities on the national forests ...." *Pac. Rivers Council*, 873 F. Supp. at 374.

Therefore, the Forest Service must plan for operations involving non-renewable mineral resources on National Forest lands. *Cf. Mountain States Legal Foundation v. Hodel*, 668 F. Supp. 1466, 1476 (D. Wyo. 1987) (ruling that the Department of Agriculture is required by law "to promulgate rules and regulations regarding its policies and procedures pertaining to recommendations on" oil and gas leasing). Accordingly, Forest Service decisions must be consistent with all parts of the governing forest plan, not just those sections that govern renewable resources.

###        2.        The Governing Forest Plan Did Not Contemplate a
              Withdrawal of over 355,000 Acres of Land.

Because the Forest Service was required to and did plan for mineral

management in the 2008 Forest Plan, NFMA requires that any subsequent

decision, including the decision to consent to the withdraw, to be consistent with

the governing Forest Plan.  16 U.S.C. § 1604(i); *Ecology Ctr.*, 574 F.3d at 656;

*Idaho Sporting Cong.,* 305 F.3d at 962.  At the time the Forest Service purportedly

consented to the withdrawal, the 2008 Forest Plan contemplated that only certain,

discrete areas might be withdrawn from entry and location under the Mining Law.

The Forest Plan did not contemplate a withdrawal of over 355,000 acres of land.

Under the 2008 Forest Plan, the Forest Service lands withdrawn by PLO

7787 were open for entry and location under the Mining Law.  ER404,  ER406,

ER401, ER225; ER390–91; *see also* 16 U.S.C. § 478.  Most of the Forest Service

land withdrawn by PLO 7787 is in the Tusayan Ranger District of the Kaibab

National Forest.  ER260; ER390;  ER392.  Specifically, the geographic areas

withdrawn are geographic areas 08, 09, and 10.  ER392.  The 2008 Forest Plan

expressly contemplates the future development of locatable minerals in Geographic

Areas 08 and 09.  ER404, ER406.  The only contemplated restriction on locatable

mineral exploration and development within Geographic Area 10 is within discrete

heritage sites.  ER401.

Additionally, the withdrawal removes portions of geographic area 16 in the North Kaibab Ranger District from entry and location under the Mining Law. ER260; ER390–91. The Forest Plan provides that those portions of Geographic Area 16 which are not in the Grand Canyon National Game Preserve, including the portions affected by the withdrawal, are open for location and entry under the Mining Law. ER390. The areas withdrawn by PLO 7787 were not identified in the Forest Plan as potential withdrawal areas and, as a result, the Forest Service violated both NFMA and the 2008 Forest Plan when it consented to the withdrawal.[22]

> **3.  The Forest Service Cannot Retroactively Amend the Forest Plan to Justify a Previous Decision.**

Pursuant to NFMA, all decisions of the Forest Service must comply with the Forest Plan in effect at the time of the decision, and NFMA does not allow the Forest Service to retroactively amend a forest plan to be consistent with an earlier decision. 16 U.S.C. § 1604(i). The Forest Service's purported consent to the withdrawal changed the legal consequences of exploring for and developing

---

[22] The EIS for the 2008 Forest Plan demonstrates why those areas withdrawn by PLO 7787 were not considered for a withdrawal in the 2008 Forest Plan. For example, the EIS provides that "[p]otential cumulative effects of both leasable and locatable developments primarily involve social and economic impacts. Cumulative impacts to wildlife and visual resources from mineral developments are considered insignificant when viewed in light of *the small area likely to be directly impacted through mining* … and mitigation measures available to offset impacts on wildlife habitats." ER474–75 (emphasis added).

55

mineral resources in the Kaibab National Forest.  Not only is the location of new mining claims prohibited, owners of existing mining claims can no longer engage in notice-level operations without enduring a lengthy and time-consuming validity examination.  ER170; ER95.  The Forest Service, however, only has the authority to "change the legal consequences of completed acts," including the legal consequences of a governing forest plan, "if Congress conveys such authority in an express statutory grant." *Friends of Southeast's Future v. Morrison,* 153 F.3d 1059, 1070 (9th Cir. 1998) (citing *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988)).

In *Friends of Southeast's Future*, this Court held that the Forest Service violated NFMA by proposing a timber sale without first conducting an area analysis, as required by the forest plan.  *Id.* at 1070.  The Forest Service argued that it complied with NFMA's consistency requirement in 16 U.S.C. § 1604(i) because, after issuing the decision for the proposed timber sale, it amended the forest plan to conform to its earlier decision.  *Id.*  The court rejected the Forest Service's argument because § 1604(i) "requires timber sales to be consistent with a single Forest Plan, not selected elements of two Plans."  *Id.* (internal citation omitted).  This Court made clear that Congress, through § 1604(i), did not convey to the Forest Service the authority to retroactively amend a forest plan to be consistent with previous decisions.  *See id.*

56

In *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161 (9th Cir. 2011), this Court reexamined whether the Forest Service has the authority to retroactively amend forest plans. In that case, the plaintiffs challenged a timber harvesting project, approved in 2004, and argued that the decision violated NFMA because it failed to comply with species monitoring requirements in the governing forest plan. *Id.* at 1168–69. The Forest Service argued that the project did not need to comply with the monitoring requirements because the requirement was removed in 2007, and a different section of NFMA, 16 U.S.C. § 1604(f)(4), purportedly provides the authority to retroactively amend forest plans. *Id.* at 1188. That section simply provides that a forest plan can "be amended in any manner whatsoever after final adoption after public notice ...." 16 U.S.C. § 1604(f)(4). Based on the language "in any manner whatsoever," the Forest Service argued that it had the authority to retroactively amend a forest plan to make a previous decision lawful. 646 F.3d at 1188.

Judge Reinhardt, whose opinion controlled the disposition of this issue, ruled that the Forest Service does not have the authority to retroactively amend a forest plan.[23] *Id.* at 1169–70. In so doing, he noted that *Friends of Southeast's*

---

[23] Judge Noonan concurred in the result on the issue. *Sierra Forest Legacy*, 646 F.3d at 1170. Judge Fisher wrote a dissenting opinion on the issue, and argued that § 1604(f)(4) gives the Forest Service the authority to retroactively amend a forest plan. *Id.* Judge Reinhardt's opinion controlled the disposition of the issue because it was the narrowest opinion, and is cited for its persuasive authority. *Id.* at 1169.

*Future* was controlling, and that § 1604(f)(4) does not "provide the 'necessary express statutory grant' to enable the Forest Service to promulgate a retroactive amendment." *Id.* at 1188. Judge Reinhardt further opined that no plausible interpretation of § 1604(f)(4) grants the Forest Service the authority to retroactively amend a forest plan. *Id.* at 1190. Based on the plain language and context of the statute, he stated that the words "[p]lans developed in accordance with this section shall be amended in any manner whatsoever" only refer to the procedures of amending a forest plan, not the ability to retroactively amend a forest plan to conform with a previous decision. *Id.* at 1190–91 (citing 16 U.S.C. § 1604(f)(4)).

Judge Reinhardt's analysis is supported by the second half of § 1604(f)(4), which demonstrates that the subsection only applies to the procedures for amending a forest plan. Section 1604(f)(4) provides that a forest plan can:

> be amended in any manner whatsoever after final adoption after public notice, and, if such amendment would result in a significant change in such plan, in accordance with the provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section ....

16 U.S.C. § 1604(f)(4). The second half of the sentence provides for the specific procedures the Forest Service must use to amend a forest plan when an amendment would result in a significant change. Therefore, the words "in any manner whatsoever" earlier in the sentence must also be about procedures the Forest

58

Service can use, and not whether the Forest Service can retroactively amend a forest plan. *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) ("[W]e rely on the principle of *noscitur a sociis—*a word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.'" (quoting *Gustafson v. Alloyd Co.,* 513 U.S. 561, 575 (1995))); *see also United States v. Williams,* 553 U.S. 285, 294 (2008) ("a word is given more precise content by the neighboring words with which it is associated").

Friends of Southeast's Future* and *Sierra Forest Legacy*, as well as the plain language of NFMA, demonstrate that the Forest Service must comply with the forest plan in effect at the time it makes a decision. The Forest Service does not have the power to retroactively amend a forest plan to validate a previous decision that violates the forest plan. C*f. Mount Royal Joint Venture v. Kempthorne,* 477 F.3d 745, 750 (D.C. Cir. 2007) (BLM amending resource management plan in advance to allow for contemplated withdrawal)*.* Accordingly, because the 2008 Kaibab Forest Plan did not authorize a decision to withdrawal over 355,000 acres of land, this Court should hold unlawful and set aside the ROD and PLO 7787 with respect to the 355,874 acres of Forest Service land withdrawn.

**B.    The Forest Service Failed To Adequately Justify Its Decision To Consent To The Withdrawal.**

In addition to failing to comply with the Forest Plan, the Forest Service failed to articulate sufficient reasons for consenting to the withdrawal.  In the letter consenting to the withdrawal, the Chief of the Forest Service provided two sentences of justification, stating that "[t]he [Withdrawal] EIS acknowledges that impacts are possible from uranium mining in the area, including impacts to water resources.  Important cultural and other resource values would also be protected by the withdrawal."  ER340.

Although the Forest Service purportedly adopted the BLM's EIS, it was still required to perform its own independent review of the impacts of the withdrawal. independent review.  *See* 40 C.F.R. § 1506.3(c).  The conclusory statements in the Forest Service's letter are not an independent analysis and are not supported by the record.  The consent letter fails to consider the Forest Service's multiple use mandate, the governing Forest Plan, the likelihood that "potential" effects will occur, the severity of the "potential" effects, or the effectiveness of the current regulatory scheme in mitigating impacts from mining.  Accordingly, the Forest Service's decision to consent to the withdrawal was arbitrary and capricious.  *State Farm*, 463 U.S. at 43; *Native Ecosystems Council*, 418 F.3d at 960.

## **CONCLUSION**

For the foregoing reasons, this Court should reverse the judgment of the

district court, and hold unlawful and set aside the ROD and PLO 7787.

DATED this 10th day of April 2015.

Respectfully submitted,

s/ Jeffrey W. McCoy
Jeffrey W. McCoy, Esq.
Steven J. Lechner, Esq.
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227
(303) 292-2021
(303) 292-1980 (facsimile)
jmccoy@mountainstateslegal.com
lechner@mountainstateslegal.com

Attorneys for Appellants AEMA

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Ninth Circuit Rule 28-2.6, AEMA identifies each of the following cases consolidated with this case as related cases. Both this case and the other cases challenge the Secretary of the Interior's actions in withdrawing over 1,000,000 acres in Northern Arizona:

- *National Mining Association v. Jewell* (No. 14-17350)

- *Quaterra Alaska, Inc. v. Jewell* (No. 14-17351)

- *Yount v. Jewell* (No. 14-17374)

The undersigned is unaware of any other related case pending before this Court.

/s/ Jeffrey W. McCoy
Jeffrey W. McCoy, Esq.

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that, pursuant to Fed. R. App. P 32(a)(7)(C) and Ninth Circuit Rule

32-1, the attached Opening Brief is proportionately spaced, has a typeface of 14

points or more, and contains 13,989 words.

/s/ Jeffrey W. McCoy
Jeffrey W. McCoy, Esq.

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on this 10th day of April 2015.

I certify that all counsel of record in this case are registered CM/ECF users and that service to the counsel of record will be accomplished by the appellate CM/ECF system. I further certify that I served Appellant Gregory Yount via first class mail at the following address: 807 West Butterfield Road, Chino Valley Arizona 86323.

DATED this 10th day of April 2015.

<u>s/ Jeffrey W. McCoy</u>
Jeffrey W. McCoy, Esq.
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227
(303) 292-2021
(303) 292-1980 (facsimile)
jmccoy@mountainstateslegal.com