# 14-17350

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

<u>Gregory Yount</u>
Appellant,

9th Cir. Case No. <u>14-17374</u>

Originating Court Case No. <u>3:11-cv-08171_DGC</u>

vs.

S.M.R. Jewell, et al
Appellee(s).

**R E C E I V E D**
MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

APR 1 6 2015

FILED_____ _____
DOCKETED_____
                      DATE         INITIAL

## APPELLANT'S INFORMAL BRIEF

(attach additional sheets as necessary)

1. Jurisdiction
  a. Timeliness of Appeal:

   (i) Date of entry of judgment or order
   of originating court: <u>September 30, 2014</u>

   (ii) Date of service of any motion made after judgment (other than
   for fees and costs): N/A

   (iii) Date of entry of order deciding motion: N/A

   (iv) Date notice of appeal filed: <u>December 1, 2014</u>

9th Cir. Case No. <u>14-17374</u>                                    Page 2

2. What are the facts of your case?

*NORTHERN ARIZONA WITHDRAWAL DECISION*

In 2009, the DOI published its notice of intent to withdraw 633,547 acres of public lands and 360,002 acres of National Forest System land in Northern Arizona. 74 Fed. Reg. 35,887-88 (July 21, 2009). The withdrawal's purpose was "to protect the Grand Canyon watershed from adverse effects of locatable hardrock mineral exploration and mining." The notice segregated the lands from location and entry for two years to allow time for NEPA analysis and other studies.

Public comment on the Draft Environmental Impact Statement (DEIS) opened on February 18, 2011. 76 Fed. Reg. 9,594 (Feb. 18, 2011). The DEIS stated that the purpose of the NAW was "to protect the natural, cultural, and social resources in the Grand Canyon watershed from the possible adverse effects of the reasonably foreseeable locatable mineral exploration and development that could occur in the segregated area." DEIS AR000545. The resources in the Grand Canyon watershed to be protected were "[s]urface water and groundwater, including seeps, springs, wells, and runoff, that may ultimately flow into the Colorado River;" "[c]ultural resources, including prehistoric and historic sites, places of traditional religious and cultural importance (including Traditional Cultural Properties [TCPs]) and other places of significance to American Indians;"

"[v]egetation, wildlife, and aquatic species and their habitat that are unique to the Grand Canyon watershed;" and "[v]isual resources, including night skies, scenic overlooks, and other designated scenic areas." AR000545-46.

The DEIS considered four alternatives, including the no action alternative, the proposed action to withdraw over one million acres of land for 20 years, and two smaller withdrawals of 652,986 acres and 300,681 acres of land for 20 years, respectively. AR000575-93. The NAW consists of three parcels, the North, East, and South Parcels located around the Grand Canyon National Park. The DEIS did not identify a preferred alternative. AR000490, AR000594.

Because the NEPA process would not be completed within the two-year segregation window, the Secretary issued a 6-month emergency withdrawal. 76 Fed. Reg. 37,826 (June 28, 2011); Public Land Order No. 7773. Contemporaneously, the Secretary announced his decision to withdraw the full one million acres for 20 years. AR003651. The FEIS published in October of 2011, 76 Fed. Reg. 66,925 (Oct. 28, 2011), did not change the original purpose to protect the Grand Canyon watershed. FEIS AR001625. The FEIS identified the preferred alternative as withdrawing about one million acres of land for 20 years. AR001569.

The Secretary signed the Record of Decision (ROD) on January 9, 2012, and the public land order withdrawing 1,006,545 acres from mining. ROD AR000002; 77 Fed. Reg. 2563 (Jan. 18, 2012), Public Land Order No. 7787. This included 549,995 acres in the North Parcel, 322,096 acres in the South Parcel, and 134,454 acres in the East Parcel. ROD at AR000004, 000008. The ROD stated that the NAW was "to protect the Grand Canyon Watershed from adverse effects of locatable mineral exploration and development." AR000002. The ROD also listed four reasons for the withdrawal: (1) uncertain effects to surface and groundwaters, and risk of significant harm; (2) potential impacts to tribal resources which could not be entirely mitigated; (3) mining would continue to benefit the communities due to potentially 11 mines proceeding under the withdrawal; and (4) the circumstances and unique resources in the area support a cautious and careful approach. AR000009.

The ROD stated that the "likelihood of a serious impact [to water resources] may be low, but should such an event occur, significant." *Id.* The 20-year withdrawal would allow for the gathering of additional data and investigation of groundwater flow paths, travel times, and radionuclide contributions from uranium mining. Notwithstanding the lack of data showing a risk to surface or groundwater

or a significant harm, the ROD concluded that the unavailable information regarding the impacts of uranium mining was not essential to the decision because data from six former mine sites and the conservative assumptions as to the estimated impacts were sufficient. AR000010.

As an additional reason for the withdrawal, the ROD noted that the entire area is the traditional homeland and use area for seven tribes, who believe that uranium mining will result in the loss of their functional use of the land's natural resources and degrade the value of the land. AR000009, AR000011.

Contradicting the finding that potentially 11 mines would proceed under the withdrawal, the ROD states that "neither the BLM nor the USFS will process a new notice or plan of operations until the surface managing agency conducts a mineral examination and determines that the mining claims on which the surface disturbance would occur were valid as of the date the lands were segregated or withdrawn." AR000006. A valid mining claim is limited to those claims where there is a physical exposure of the mineral deposit, which demonstrates a discovery of valuable minerals of sufficient quality and quantity that a reasonable man would invest his own funds to develop the property. AR000007.

9th Cir. Case No. <u>14-17374</u>                                       Page 6

1.     *Impacts to Cultural and American Indian Resources*

The American Indian Tribes found within the Grand Canyon and NAW areas include the Southern Paiute, Havasupai, Hualapai, Navajo, Hopi, and the Zuni. The FEIS identifies cultural resources as archaeological sites, historic buildings and structures, and places of traditional religious and cultural importance. The FEIS concluded that the potential impacts of mining on cultural, historical, and archaeological resources were negligible due to existing laws and regulations that require avoidance or mitigation of any impacts. AR002215-16, AR002218.

The FEIS discusses American Indian resources separately as places that are important to Indian cultures and traditions.

The FEIS and ROD conclude that impacts to self-described beliefs that mining wounds the earth and degrades the value of tribal lands cannot be fully mitigated. The FEIS explains "any drilling or excavation into the earth is considered wounding the earth." AR002222-23.

The ROD states that "any mining within the sacred and traditional places of tribal peoples may degrade the values of those lands to the tribes that use them."

ROD at AR000009.   FEIS also found that sacred and traditional use places are protected from mining under federal law.   AR001912, 002221.   Although recognizing that there is only one traditional cultural property in the withdrawal area, the ROD states that seven tribes "uniformly believe that continued uranium mining will result in the loss of their functional use of the area's natural resources." *Id.* at AR000011.

## Summary of Legal Argument

Plantiff Yount claims that the secular purposes for the Defendant's withdrawal decision are a sham and that the decision violates the Establishment Clause of the U.S. Constitution. Area Native Americans, through the EIS process (Government to Government consultation), essentially petitioned the Secretary of the Interior for relief; to determine that their free exercise of religion was being violated by uranium mining in the Northern Arizona Withdrawal (NAW) area. That exploration drilling and mining wounded the earth, that the earth is sacred and should not be dug up for commercial reasons and that repeated wounding of the earth can kill their deities and by extension a sacred site.

9th Cir. Case No. <u>14-17374</u>                                                    Page 8

The Secretary provided that relief for the area's Native Tribes, indicating that the impacts to American Indian resource could not be mitigated due to their belief that mining "may degrade the values of those lands to the tribes that use them. (ROD at 9,11).

If the tribes had sued in Federal Court to obtain this result, it would have been denied based on Supreme Court precedent of Lyng *v.* Northwest Indian Cemetery Protective Association 485 U.S. 439 (1988) and Ninth Circuit Court's Navajo Nation *v.* USFS 535 F.3d 1058 (2008). There is literally nothing to distinguish the rational of the Secretary's decision on behalf of the area's Native Americans and the pleadings of the Plaintiffs in Lyng. The Supreme Court decided in *Lyng,* that there was no undue or substantial burden on Native American rights to exercise their religion and that Plaintiffs were neither coerced nor penalized for their religious practices.

The Court noted that: "no disrespect for these practices is implied when one notes that such beliefs could easily require de facto beneficial ownership of some rather spacious tracts of public property. Even without anticipating future cases, the diminution of the Government's property rights, and the concomitant subsidy of Indian religion, would in this case be far from trivial….." (Lyng v. NWICPA., 485 U.S. at 453 (1988)). The Court also recognized that to find for the Plaintiffs

would create "a religious preserve for a single group in violation of the **establishment clause**." (Lyng v. NWICPA., 485 U.S. at 445 (1988)). However, the Court also stated that "The Constitution does not permit government to discriminate against religions that treat particular physical sites as sacred,....."Lyng, 485 U.S. at 453.

The more than one million acre Northern Arizona Withdrawal does not qualify as a particular physical site. No other religious group has been given a Free Exercise beneficial use of such a large tract of land. That the Secretary provided such relief to Native Americans in the withdrawal decision was anticipated by the decision in *Lyng* where it was stated that doing so would diminish                the Governments property rights and provide a subsidy for Indian religion, i.e., the very definition of an Establishment Clause violation.

A federal action may protect American Indian religious beliefs and traditions, but only when these religious beliefs are tied to a specific site that also has historical and cultural significance making it eligible for listing under the NHPA. *See e.g. Access Fund*, 499 F.3d at 1043-45; *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 975-76 (9th Cir. 2004).

The Defendant argues in their Cross-motion for Summary Judgment (Document 205-1) that Plaintiff Yount relies on – *Access Fund* and *Cholla Ready Mix, Inc* – involving NHPA-eligible sites and claims that neither case supports Yount's stated legal proposition and, in each case the court rejected claims of an establishment clause violation. While the court rejected claims of an establishment clause violation, it did so because the particular areas involved *were* a particular discrete religious site (Cave Rock and Woodruff Butte).

The over one million acre withdrawal cannot be understood or recognized as a particular discrete religious site or traditional cultural property. Size matters! Recognizing one religious group, American Indians, as beneficiaries of a one million acre traditional cultural property or defining it as a discrete religious site cannot be understood as anything but an endorsement of Native American religion. No other religion has a one million acre traditional cultural property on the public lands.

The fact that these two cases found against an establishment clause claim is not in any way supportive of the Defendant's position since these two cases are not analogous to the case at hand as demonstrated above and simply do not apply. The controlling precedents are Lyng *v.* Northwest Indian Cemetery Protective

9th Cir. Case No. 14-17374                                        Page 11

Association 485 U.S. 439(1988)    and Navajo Nation *v.* USFS. 535F.3d 1058(2008).

Even if the court were to consider that the *Access Fund* and *Cholla Ready Mix, Inc* cases might be applicable or instructive, Yount's establishment clause claim is valid because the Defendant's decision does not pass the *"Lemon test"*.

SECULAR PURPOSE

The first prong of the *Lemon* test asks whether the challenged action has a secular

purpose or whether it was taken for "the ostensible and predominant purpose of advancing religion." *Access Fund*, 499 F.3d at 1043 (*quoting McCreary County v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 860 (2005)). Under the FEIS, the purpose of the proposed action was to protect the natural, cultural, and social resources in the Grand Canyon watershed from possible adverse effects of uranium mining. AR001625 (FEIS 1-5).

The DOI Secretary's rationale for the withdrawal was based on the limited data regarding effects of mining on water quality and quantity in the Grand Canyon watershed and the potential risk of great harm, on the need to protect American Indian sacred and traditional resources, and on the broad purpose of protecting

other resources such as plants and wildlife. AR000009-000012 (ROD). In *Mount Royal Joint Venture*, 477 F.3d at 757-58, the court held that the withdrawal of lands from mining to protect American Indian areas of traditional spiritual importance did not violate the Establishment Clause because there were several secular purposes for the withdrawal.

Unlike the case of *Mount Royal Joint Venture*, the secular purposes identified in the FEIS are inadequate because the studies cited are contradicted by other findings in the FEIS and cannot be said to support the determination that uranium mining will adversely affect the Grand Canyon watershed or adversely impact plants and wildlife. *See McCreary County*, 545 U.S. at 864-65 (When there is a sham or the secular purpose is secondary, it is not adequate basis.); *Stone v. Graham*, 449 U.S. 39, 41 (1980).

Additionally, the *Access* decision contemplates that the Forest Service acted pursuant to a secular purpose – the preservation of a historic cultural area. The decision noted that " At every opportunity, the Forest Service reaffirmed its desire to protect Cave Rock as a cultural, historical, and archaeological monument." Also noting that a traditional cultural property is a discretely defined property. The Defendant did not take every opportunity during the EIS process to inform the

public that the whole of the withdrawal area was to be considered a traditional cultural property and afforded the protection available to such properties. The defendant did not do so because the NAW area does not qualify as a traditional cultural property. The Defendant admitted such in the ROD: "there is only one eligible traditional cultural property (Red Butte on the South Parcel)..." (ROD at 6.2). Red Butte is a very small percentage of the withdrawal area.

The Defendant did not articulate or advance any significant cultural or historic arguments that would allow the entire NAW area to be included in the NRHP, but instead describe its significance based on Native American religious doctrine: "Many of these tribes include the Grand Canyon in their creation stories, and all continue to use all or portions of the withdrawal area for traditional tribal purposes. All seven tribes, the Havasupai Tribe, Hualapai Tribe, Hopi Tribe, Navajo Nation, Kaibab Band of Paiutes, the Paiute Indian Tribe of Utah, and the Zuni Tribe, uniformly believe that continued uranium mining will result in the loss of their functional use of the area's natural resources." (ROD at 6.2).

In contrast, the Forest Service in *Access Fund* stated, the significance of Cave rock was " not based on 'Washone religious doctrine' but rather on the secularly-derived historic ethnographic record." (*Access* Fund at 1044). The Forest

Service chose a historic period from 1885 to 1965 as the time period management of activities at Cave Rock. Thus, current and historic activities were considered in the secularly-derived historic and ethnographic record.

No such consideration was given in the NAW decision. Instead, the Secretary only considered that Native American creation stories include the Grand Canyon and that they uniformly believe that continued uranium mining will result in the loss of their functional use of the area's natural resources.

The Secretary, by only considering archaic American Indian cultural and religious beliefs and ignoring the last 150 years or more of historical ethnographic use (cattle grazing, mining, timber harvest, tourism, etc.) of the withdrawal area when making his decision, has endorsed American Indian religious doctrine and thus has advanced American Indian religion.

9th Cir. Case No. 14-17374                                    Page 15

## EFFECT OF ADVANCING OR ENDORSING RELIGION

*Access Fund* : "The effect prong of *Lemon* "asks whether, irrespective of the government's actual purpose[1], the practice under review in fact conveys a message of endorsement or disapproval." *Lynch,* 465 U.S. at 690, 104 S.Ct. 1355 (O'Connor, J., concurring); *see also Vernon,* 27 **F.3d** at 1398. The test also considers whether non-adherents might view the challenged action as disapproval of their religious choices. *Cammack v. Waihee,* 932 F.2d 765, 777-78 (9th Cir.1991). In addressing these issues, we often look to "the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between government and religious authority." *Agostini,* 521 U.S. at 232, 117 S.Ct. 1997 (quoting *Lemon,* 403 U.S. at 615, 91 S.Ct. 2105) (discussing effect and entanglement together) (internal quotations omitted)."

As a practical matter, the NAW decision can and is perceived as an endorsement of area Native American Indian religious beliefs and practices because area Native American specifically sought and lobbied for ban on uranium mining due to their religious beliefs and received one.

---

[1] In other words, disregard the supposed secular purposes put forth by the government and determine whether the practice conveys a message of endorsement or disapproval.

9th Cir. Case No. <u>14-17374</u>                                      Page 16

The Defendant's ROD states; "it is likely that the potential impacts to tribal resources could not be mitigated. Any mining within the sacred and traditional places of tribal peoples may degrade the values of those lands to the tribes that use them." (ROD at VI)

In other words, how area Native Americans feel about how mining affects their cultural and religious use of the withdrawal area could not be mitigated. The Defendant's withdrawal decision endorses Native American religious practices because it creates a religious preserve on over one million acres of public land where a formerly encourage activity, mining, can no longer be pursued based solely on the religious objections of area Native Americans. No other religion in the United States has such a preserve. To the extent that some mining will still go forward, this is due only to the fact that prior existing rights give property rights against the US Government and not the goal of eliminating mining the NAW area.

Additionally, the Defendants actions excessively entangles government in area Native American religious practices. From page 4-221 of the FEIS:

*"It is important to note that many American Indians view exploratory drilling and mining as wounding the earth. Past mining activities that are visible on the surface*

9th Cir. Case No. <u>14-17374</u>                                    Page 17

*are seen as wounds that cannot scab over or heal (Nuvamsa 2008). Any drilling into the earth, regardless of size, is considered a wound to the earth. In commenting on other projects in the withdrawal area, the Hopi have repeatedly stated that the earth is sacred and should not be dug up for commercial reasons (Forest Service 1986a). Other tribes believe that repeated wounding of the earth can kill their deities and by extension a sacred site. In their lawsuit against the U.S. government over the Canyon Uranium Mine, the Havasupai stated that "the Canyon Mine site is sacred and any mining will interfere with their religious practices at and near the mine, and will kill their deities, and destroy their religion" (Havasupai Tribe v. United States 1992)."*

This view point as described in the FEIS[2] and promoted in the ROD as the reason that Native American religious objections to mining in the NAW area cannot be mitigated stand in sharp contrast to the actual practices of area Native Americans with regard to mining. Specifically, the Navajo and Hopi both mine

---

[2] The NPS repeatedly commented that the EIS had to pay special attention to American Indian feelings of place and values relating to the entire landscape. AR003546 (Briefing Statement from Steven Martin, NPS);

004343 (NPS DEIS Ch.4 Comments, Mar. 15, 2010). NPS commented repeatedly that American Indians believe that any disturbance or hole drilled in the earth is a "wound to the earth," and that the feeling and association to the land must be analyzed in the EIS. AR004344-004345, 004350 (DEIS Ch.4 NPS Comments, Mar. 15, 2010); 050773 (DEIS Ch.4 Comments, Aug. 3, 2010); 076337-076338 (Preliminary DEIS Comments, June 15, 2010). NPS also concluded that it was impossible to mitigate impacts of mining because it is an irreversible desecration and drilling into the earth is a "cultural taboo." AR076343, 076336, 076342 (Preliminary DEIS Comments, June 15, 2010); 074165, 074175 (DEIS Comments, Mar. 15, 2010); 079916 (Preliminary FEIS Comments, Aug.18, 2011).

coal or benefit from commercial mining on their lands. They routinely drill and rip the land to mine coal for commercial gain. In fact, mining is a primary source of income for both tribes. This contrary practice was identified to the Defendant by Plaintiff Yount in submitted Public comments (FEIS at page 5-64) and AR052123.

The Defendant, by ignoring that mining is an everyday activity for many of the areas Native Americans and is indeed a major source of their income, is promoting a Native Amercan religious belief (mining will kill their religion) that area Native Americans do not practice on their own lands. By promoting such a religious belief in the decision for the NAW, the Secretary has impermissibly embroiled the Government in the religious affairs of area Native Americans by promoting a belief that few currently follow, i.e., the Secretary is reinforcing a seemingly archaic religious dogma that present day Native Americans don't uniformly or economically follow or practice.

The Defendant's withdrawal decision fails the "secular purpose" and the "effect of advancing or endorsing religion" prongs of *Lemon*.

9th Cir. Case No. <u>14-17374</u>                                Page 19

The Defendant's withdrawal decision as articulated in the ROD violates the Establishment Clause of the US Constitution.

The Defendant claims that there are no limits on the acreage that can be withdrawn in support of Native American sacred landscapes and in fact they are claiming that they have unlimited discretion to do so under Section 204 of the FLPMA as long as the Government action complies with the Lemon test.

The Defendant cites Mount Royal to support this theory.
Taking the Defendants theory to its logical extreme, all federal lands could be piece meal withdrawn until all of the public lands are closed to some multiple use that Native Americans determine are incompatible with their religious feelings. I think most American would feel this result would be an endorsement of Native American Religion.

The size of this one million acre withdrawal matters, it is greater than the size of the State of Rhode Island.

That the Defendant endorsed the concept of sacred landscapes in the EIS over protecting specific discrete sites matters as discrete sites are protected under current law.

That the Defendant endorsed the religious belief that drilling and mining wounds the earth and that this impact to the religious feelings of area Native Americans cannot be mitigated......matters, especially when the Hopi and Navajo rip the earth up digging for coal on their lands.

The Defendant became entangled in Native American religious doctrine and had to essentially decide doctrine when deciding that wounding the earth for profit was indeed Taboo even though the practitioners routinely violate this taboo.

The Defendant endorsed a religious belief that the practitioners do not follow to justify a one million acre withdrawal.

In Lynch v. Donnelly 465 US 688 (1984) Justice O'Conner put forth a clarification of Establishment Clause Doctrine.

Paraphrasing:

The purpose prong of the Lemon test asks whether government's actual purpose is to endorse or disapprove of religion. The effect prong asks whether, **irrespective** of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval. An affirmative answer to either question should render the challenged practice invalid.

The proper inquiry under the purpose prong of Lemon, is whether the government **intends** to convey a message of endorsement or disapproval of religion.

The Defendant **intended** that the Religious Feelings of Area Native Americans be weighed in the EIS to determine if these feeling were impacted, or in other words "SUBSTANTIALLY BURDENED."

The Defendant did this even though under Supreme Court precedence, government action that diminishes subjective spiritual fulfillment does not "substantially burden" religion.

Justice O'Conner writes for the effect prong of Lemon:

"What is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion. It is only practices having that effect, whether intentionally or unintentionally, that make religion relevant, in reality or public perception, to status in the political community."

It is clear from the Defendant's withdrawal rationale, that Native Americans now enjoy an endorsement of their religious beliefs that government actions on the public land can substantially burden their subjective spiritual fulfillment.

No other religion enjoys this status.

Native Americans now enjoy a virtual religious veto on multiple use questions on the public lands. All that is required is to claim that the practice involved : Mining, Timber Harvest, Hunting, Road Building, etc., upsets their religious sensibilities and cannot be possibly mitigated; Couple that with some amorphous or sham secular purpose(s) and a cooperative governmental agency and another 1 million acre sacred landscape has been withdrawn.

No other religion has this status.

Native Americans now have access to government or governmental powers not fully shared by non-adherents to their religion. The government must now determine if any of the public lands are sacred to Native Americans and whether any proposed action is taboo and diminishes Native American religious feelings for the land.

The defendant has fostered the creation of a political constituency defined along religious lines.

9th Cir. Case No. <u>14-17374</u>                                        Page 23

Irrespective of the governments secular purpose; the size of this withdrawal coupled with the elevated status of Native American religious considerations appears to and does send a message of endorsement.

Regardless of the government's secular purpose in this withdrawal, the effect prong of Lemon demands that the withdrawal be remanded.


## 2. Administrative Procedures Act

Section 706(2)(A) of the Administrative Procedure Act (APA) instructs courts reviewing regulation to invalidate any agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The arbitrary-or-capricious test is used by judges when reviewing the factual basis for agency rulemaking. Courts can overturn agency rules if they find the underlying rationale or factual assertions to be unreasonable.

## Uranium Endowment

The amount of uranium Foreclosed by the Withdrawal is the First Direct Impact contemplated by the Defendant in the ROD.

The Secretary's reliance in the ROD on the hugely incorrect amount of uranium foreclosed in the Northern Arizona Withdrawal taints the rational for the withdrawal. The Defendant failed to consider an important aspect of the problem; they offered an explanation that runs counter to the evidence before them that cannot be ascribed to a difference in view or their suppose agency expertise.

In AR 6 the Defendant's ROD, the endowments cited for both the undiscovered uranium and the economically mined uranium are wrong and under reported. The undiscovered uranium endowment is wrong because it does not include hidden pipes.

The economic endowment is wrong because the BLM reduced the undiscovered endowment by 85% based on a single literature citation that the BLM admits has no data to back it up, ***nor*** is there any Scientific Study, Geologic Report, Grade-Tonnage Graph cited in the AR to support the conclusion that: *just*

because the USGS estimate included concentrations as low as .01% uranium that 85% of the endowment was of such low concentrations.

In fact, only a small portion of the undiscovered uranium endowment is low grade. There **are** Scientific Studies, Geologic Reports, and Grade- Tonnage Graphs cited in the AR that prove this.

Paraphrasing <u>AR 42327</u>

*The uranium ore within the breccia pipes is high grade and has sharp cut-off.....*
*There is almost no low-grade uranium ore in the ore bodies and no low-grade halo.......*

From USGS Circular 1051, the 1990 uranium endowment assessment,
*"Low Grade rock is generally a small part of the entire deposit."*

*"Study of considerable data from Energy Fuels Nuclear's exploration drilling indicates that there PROBABLY ARE no large bodies of mineralized rock having average grades in the 0.01 to 0.09 percent range....... "*

*"The amount of low-grade material in ore-grade deposits is small, as is shown by the unpublished 1979 DOE graph of the distribution of uranium inventory, **by grade**, for the Hack No. 2 deposit."*

The BLM's conclusion that 85% of the endowment or 252 million pounds is low grade is proven false by USGS Circular 1051.

In contrast, the BLM's conclusion that 252 million pounds of uranium is low grade ore, leads to:  **All** breccia pipes in the withdrawal area have large low grade ore bodies, this has never been observed!!

The economic endowment was reduced 500% because the lead agency, the BLM, has NO expertise in determining the economic endowment for a mineral province. It is not the agency's mission to do this.

The BLM was unaware that they could just rerun the Circular 1051 analysis at a higher cutoff grade to find the economic uranium endowment. Both Circular 1051 and the 2010 Scientific Investigation Report reference USGS Circular 994 which explicitly states how to find the *economic portion or potential uranium resource*.

The amount of uranium Foreclosed by the Withdrawal is the First Direct Impact contemplated by the Defendant in the ROD. That the Defendant got this wrong by more than 500% is far from trivial.

The Defendant failed to consider an important aspect of the problem; they offered an explanation that runs counter to the evidence before them that cannot be ascribed to a difference in view or their suppose agency expertise. The decision is therefore arbitrary, capricious, an abuse of discretion and the withdrawal should be remanded.


## **WATER RESOURCES**

For Water Resources, the Defendant's ROD stated that the withdrawal was based on the low probability of risk, but major impacts should they occur.

For Perched Aquifer Springs, the Defendant's analysis is purely theoretical. It is based on random distribution probability analysis for pipe location.

It has no basis in reality. The breccia pipes are where there are.

A breccia pipe has to be **on** the very small drainage area that supplies a perched Aquifer spring for an impact to occur.

Otherwise the impact to the spring is zero. I will reference AR 46145 where the Draft EIS states that to mitigate impacts to Perched

Aquifer Springs, don't approve a mine permit for a mine that could impact a spring.

There are no risks to Perched Aquifer Springs as described in the ROD. The supposed risks are all hypothetical because **avoidance** reduces the risk to ZERO.

Rationalizing a one million acre withdrawal on a hypothetical analysis that has no basis in reality and is so easily avoided is the definition of arbitrary and capricious.

The Defendant's ROD also establishes an arbitrary impact level of ZERO increases in radionuclides to the environment. This impact level is not based on any law, rule, or regulation expressed by the Defendant in the AR.

The defendant suggests, that although no EPA limit was exceeded, that ANY increase radionuclides in the environment is unacceptable. This zero radionuclide impact limit is arbitrary and capricious, and not in accordance with established law.

3. NEPA

Appellant's NEPA Claims were dismissed for lack of Standing.

3. What did you ask the originating court to do (for example, award damages,give injunctive relief, etc.)?

**RELIEF REQUESTED**

     A.     Immediately and permanently set aside and void the Secretary of the Interior's Record of Decision for the NAPW signed January 9, 2012, because it is substantively based on an unconstitutional preference for Native American religious beliefs.  Defendant's rationale for the ROD substantially relies on deferring to and accommodation for  Native American religious and cultural beliefs and has the appearance of conveying a message of endorsement of their religious beliefs contrary to established law.

     B.     Immediately and permanently set aside and void the Secretary of the Interior's Record of Decision for the NAPW signed January 9, 2012, because it is an abuse of discretion, and was  done without observance of procedure required by law, and are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. §706(2) and that even if the FEIS was supplemented to correct all deficiencies under NEPA claimed by the Plaintiff , there would still be no justification or

rationale for a withdrawal decision as the decision is contrary to and unsupported by evidence in the FEIS.

C.      Declare that Defendants are in Violation of NEPA-implementing regulations for the cited laws, and the APA.

D.      Declare that Defendants have abused the customary civil, legislative, and judicial deference accorded to Government Agency expertise as illustrated by manipulating scientific and technical knowledge, assumptions, findings, analyses, and by excluding new significant information in the NAPW EIS process in order to support a policy decision already made by Defendant Secretary of Interior Ken Salazar.

E.      Immediately enjoin Defendant Secretary of the Interior, Ken Salazar, from withdrawing any lands cited in the Northern Arizona Proposed Withdrawal until Defendant BLM and Defendant Ken Salazar have answered this complaint and until this complaint has been adjudicated by the Court.

F.      Enjoin Defendant Secretary of the Interior, Ken Salazar, from withdrawing any lands cited in the Northern Arizona Proposed Withdrawal until the BLM has published, for public comment, a complete Supplemental DEIS and

until a subsequently re-issued Final NAPW EIS has been published and recorded in The Federal Register.

G.     Order the BLM to withdraw the Final NAPW EIS published October 27, 2011, and publish for public comment a complete Supplemental DEIS for all sections of the DEIS, that fully conforms with the requirements of NEPA, prior to republishing the Final EIS for the Northern Arizona Proposed Withdrawal.

H.     Grant Plaintiff such further relief as may be just, proper, and equitable.

**4**. State the claim or claims you raised at the originating court.

1. Defendants Must Revise the FEIS or Prepare a Supplement to Address Significant New Circumstances and Information Identified in the Comments on The Northern Arizona Proposed Withdrawal.

2. Scientific Studies and Analyses Were Not Performed To Provide Information Essential To A Reasoned Choice Between Alternatives.

3. The FEIS Failed to Adequately Respond to the Numerous Substantive Comments Received that Directly Challenge the Accuracy, Validity, Adequacy,

and Scientific Rigor to the Point that the FEIS Precludes Meaningful Analysis in Direct Violation of NEPA.

4. The DEIS and FEIS Merely Justify A Policy Decision Already Made by Secretary Salazar, by Purposely Shaping, Mis-interpreting, and Disregarding Scientific and Technical Findings to Support the Secretary's Prior Decision To Withdraw over One Million Acres of Land as Proposed in the NAPW Action in Direct Violation of NEPA.

5. The NAPW FEIS Fails to Adequately Analyze the Merits of the No Action Alternative.

6. The Secretary of the Interior's ROD Is Not Substantiated By the FEIS, Is Not In Accordance With Established Law, And Is An Abuse Of Discretion And Authority.

5. What issues are you raising on appeal? What do you think the originating court did wrong?

1. The District Court erred in its analysis of my Establishment Clause Claim. Specifically, the second prong of the "Lemon Test.

9th Cir. Case No. <u>14-17374</u>                                    Page 33

The purpose prong of the Lemon test asks whether government's actual purpose is to endorse or disapprove of religion. The effect prong asks whether, **irrespective** of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval. An affirmative answer to either question should render the challenged practice invalid.

The District Court did not fully analyze the effect prong of "Lemon". The District Court erred in stating that:

"But even if the protection of tribal and cultural resources was the only purpose asserted by the government, the protection of cultural and traditional values has been held to be a proper secular purpose.....Yount argues that a federal action may only protect American Indian religious beliefs and traditions if they "are tied to a specific site" eligible for listing under the National Historic Preservation Act ("NHPA"). Doc. 167 at 37. In support, he cites *Access Fund* and *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969 (9th Cir. 2004), but neither case holds that this is a requirement."

The District Court erred when making this determination. Supreme Court precedent does not support this conclusion.

*Access Fund* was decided by being a specific site. From *Access Fund:* "A traditional cultural property is "a discretely defined property that [has an] association with cultural practices or beliefs of a living community…"

2. The District Court erred in finding that I lack standing under NEPA. The EIS for the NAW for with the Defendant's ROD and subsequent withdrawal is the only EIS that I will have for my mining claims under this withdrawal action. The NAW EIS is only about how exploration for and hard rock mining of Uranium affects the Grand Canyon Watershed by current and future mining claims. As such, my mining claims and all other mining claims at that time were the subject matter of the EIS. I should be able to challenge the EIS that supported the Defendants ROD and withdrawal. The District Court took a too narrow approach to determining my NEPA standing.

3. The District Court erred when determining that the Defendant's decision regarding the Uranium Endowment was fully informed and well considered. The facts in the AR do not support this. The BLM's estimate of the uranium endowment constituted a clear error of judgment and was arbitrary and capricious.

4. The District Court erred in fact regarding the disagreement with the water resource analysis in the FEIS by National Park Service Hydrologists. The District Court wrote in their September 30, 2015 order:

"The record does reflect some disagreement among experts within the relevant agencies. One hydrologist decided not to comment on the draft FEIS because he believed it went "to great lengths in an attempt to establish impacts to water resources from uranium mining" and "create[d] enough confusion and obfuscation of hydrogeologic principles to create the illusion that there could be adverse impacts if uranium mining occurred." AR 6820. While the Court does not wish to discount the views of this hydrologist, surely one internal expert's disagreement with a conclusion reached by other internal experts does not make a final agency decision arbitrary or capricious. If it did, agency actions would survive APA review only when there was complete unanimity among internal experts, an unlikely outcome on difficult questions."

There were **three** National Park Service Hydrologists that held these views. The District Court discounted or neglected to realize the depth of the internal disagreements within the agency and so erred in determining whether the agencies final decision was arbitrary or capricious.

9th Cir. Case No. 14-17374                                    Page 36

The whole of the Water Resource analysis that the Defendant relied on was based primarily upon assumptions and on very little hard science and should receive any agency deference.

6. Did you present all issues listed in #5 to the originating court?
_____ If not, why not?
Yes

7. What law supports these issues on appeal?
(You may, but need not, refer to cases and statutes.)

The APA Section 706.

The US Constitution

Navajo Nation et al  *v.* United States Forest Service 535 F.3d 1058(2008)

Lyng, Secretary of Agriculture, et al  v.  Northwest Indian Cemetery Protective Association et al  485 US 439 (1988)

Access Fund  *v.* US Department of Agriculture 499 F.3d 1036 (2007)

Cholla Ready Mix, Inc. *v.* Civish, 382 F.3d 969 (9th Cir. 2004)

9th Cir. Case No. <u>14-17374</u>                                        Page 37

8. Do you have any other cases pending in this court?
If so, give the name and docket number of each case.

No.


9. Have you filed any previous cases which have been decided by this court?
If so, give the name and docket number of each case.

None

<u>Gregory Yount</u>
Name

807 W. Butterfield Rd.
Chino Valley, Az 86323
_____
Address


<u>April 10, 2015</u>
Date

# CERTIFICATE OF SERVICE

Case Name: Gregory Yount v. S.M.R. Jewell, et al

9th Cir. Case No.: <u>14-17374</u>

IMPORTANT: You must send a copy of ALL documents filed with the Court and any attachments to counsel for ALL parties in this case. You must attach a copy of the certificate of service to each of the copies and the original you file with the Court. Please fill in the title of the document you are filing. Please list the names and addresses of the parties who were sent a copy of your document and the dates on which they were served. Be sure to sign the statement below.

I certify that a copy of the **APPELLANT'S INFORMAL BRIEF**
(title of document you are filing)

and any attachments was served, either in person or by mail, on the persons listed below.

Signature
Notary NOT required

Date : April 10, 2015

John S. Most, VA Bar No. 27176

Natural Resources Section

P.O. Box 7611

Washington, D.C. 20044-7611

Council for Defendants


Edward B. Zukoski

Earth Justice

1400 Glenarm Place, Suite 300

Denver, Co. 80202

Attorney for Defendant-Intervenors

Grand Canyon Trust, et al.


Matthew L. Campbell

Native American Rights Fund

1506 Broadway

Boulder, Co 80302

Amicus Indian Band of Paiute Indians

Contance E. Brooks, Colo. Bar. No. 18258

C.E. Brooks & Associates, P.C.

303 East 17th Avenue, Suite 650

Denver, Colorado 80203

Attorneys for Plaintiffs Quaterra Alaska, Inc

and Arizona Utah Local Economic Coalition


Steven James Lechner

Mountain States Legal Foundation

2596 S. Lewis Way

Lakewood, Co 80227

Attorney for Plaintiff American Exploration & Mining Association


R. Timothy McCrum

Crowell & Moring LLP

1001 Pennsylvania Ave. NW, Ste 1100

Washington, DC. 20004-2595

Attorney for Plaintiff National Mining Association